1          IN THE UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF TEXAS

3                 EL PASO DIVISION

4

5  UNITED STATES OF AMERICA              No. EP:10-CR-2213-KC

6  v.                                    El Paso, Texas

7  RAMON RENTERIA                        May 25, 2012

8

9                     JURY TRIAL

10            TESTIMONY BY THOMAS ROBERTS

11        BEFORE THE HONORABLE KATHLEEN CARDONE

12             UNITED STATES DISTRICT JUDGE

13

14  <u>APPEARANCES</u>:

15  For the Government:  Brian Skaret
                        United States Department of Justice
16                      Criminal Division, Human Rights and
                        Special Prosecutions Section
17                      1301 New York Avenue, NW, Suite 200
                        Washington, D.C. 20530
18
                        Joseph Cooley
19                      United States Department of Justice
                        Criminal Division, Gang Unit
20                      10th and Constitution Avenue, NW
                        Washington, D.C. 20530
21
                        George Leal
22                      Assistant United States Attorney
                        700 East San Antonio, Suite 200
23                      El Paso, Texas 79901

24

25

1    For the Defendant:    Scott P. Foster
                           718 Myrtle Avenue
2                          El Paso, Texas 79901

3

4        Proceedings recorded by stenotype.   Transcript produced by

5    computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            THE COURT:  Government may call their next witness.
 2            MR. COOLEY:  Thomas Roberts.
 3            THE COURT:  We are going to bring in this witness.
 4   It's going to take a couple of minutes.  Take a short break in
 5   case you need to use the restroom.  Remember, you remain under
 6   the instructions the Court has previously given you and see you
 7   in five minutes.
 8            (Jury leaves courtroom.)
 9            (Recess.)
10            THE COURT:  You may be seated.  You can go get the
11   jury.
12            (Jury enters courtroom.)
13            THE COURT:  You may be seated.  Government may call
14   their next witness.  This witness needs to be sworn in.
15            MR. COOLEY:  I don't believe -- he needs to be sworn
16   in.
17                     THOMAS ROBERTS, SWORN
18                      DIRECT EXAMINATION
19   BY MR. COOLEY:
20   Q.  Sir, please state your name.
21   A.  Thomas Martin Roberts.
22   Q.  Mr. Roberts, you've pled guilty in this case.  Have you
23   not?
24   A.  Yes, I have.
25   Q.  And you pled guilty to three counts, four counts?
```

1   A.   It was actually four counts.

2   Q.   What were those counts?

3   A.   Racketeering, money laundering, um, drug sales.  And I

4   don't remember the fourth one, sir.

5   Q.   Importation --

6   A.   Yes, sir.

7   Q.   -- of drugs?

8   A.   Yes, sir.

9   Q.   Now, in your plea agreement it had that 20-year cap.  Is

10  that right?

11  A.   Yes, sir.

12  Q.   Meaning if the Court, um, accepts your plea agreement, the

13  most that you can be sentenced off of that plea agreement is 20

14  careers.  Is that right?

15  A.   Yes, sir.

16  Q.   And your guideline's actually had 30 years to life.

17  A.   Yes, sir.

18  Q.   As part of your plea agreement you agreed to cooperate with

19  the Government.  Is that right?

20  A.   Yes, I did.

21  Q.   In exchange for that the Government has agreed to recommend

22  you as a candidate for the witness SEC program.  Is that right?

23  A.   Yes, sir.

24  Q.   In addition, the Government agreed that if you continued to

25  cooperate, that we would file a departure of the 20-year

1    sentence with the Court.  Is that right?

2    A.  Yes, sir.

3    Q.  And what judge would make a determination of your sentence

4    ultimately?

5    A.  Your Honor, sir.

6    Q.  Judge Cardone?

7    A.  Yes, sir.

8    Q.  Now in the past you've been addicted to drugs.  Is that

9    right?

10   A.  Yes, sir.

11   Q.  What type of drugs?

12   A.  Cocaine, mainly.

13   Q.  I'm sorry?

14   A.  Cocaine.

15   Q.  How long have you been addicted to the cocaine?

16   A.  Many, many years.

17   Q.  Did you ever become clean?

18   A.  In 2002 when I was incarcerated.

19   Q.  2002?

20   A.  Yes, sir.

21   Q.  You became incarcerated in 2002.  Um, did you get clean

22   right away or did it take a period of time from that point?

23   A.  In 2002 is when I was incarcerated.  I was not let out.  So

24   from that point on.

25   Q.  So when were you released from that incarceration?

```
 1   A.  2007.
 2   Q.  So when you came out, you basically stopped using cocaine?
 3   A.  Yes, sir.
 4   Q.  Now, your criminal history includes theft.
 5   A.  Yes, sir.
 6   Q.  Drugs.
 7   A.  Yes, sir.
 8   Q.  Multiple burglaries.
 9   A.  Yes, sir.
10   Q.  During the course of your incarceration you've been
11   disciplined.  Is that right?
12   A.  Yes, sir.
13   Q.  For what type of violations?
14   A.  Um, when I was in a prerelease unit, I had for what they
15   call the meal ticket.  I also had one fight.  And also for
16   paraphernalia of -- they were little stickers from a Cracker
17   Jack package that I brought from visitation.
18   Q.  What about holding on to prescription drugs?
19   A.  Yes, sir, also.
20   Q.  Can you explain what happened on that?
21   A.  On that incident, um, they were giving me medication for
22   pain.  And that medication was also used for psych medication.
23   And the medication was -- I was having a bad reaction to that
24   medication.  And I kept the medication inside of a bowl.  And
25   when they did a search and seizure on my home, they found the
```

David A. Perez, RMR, RPR

DIRECT — TOMAC — 03/05/13

1    medication.  And I had a disciplinary for that.

2    Q.  You said search and seizure of your home.  Actually, your

3    cell?

4    A.  Well, yes, sir.  Yes, sir.

5    Q.  Let's talk about the day you were arrested in this case.

6    Can you explain the day you were arrested in this case?

7    A.  Yes, sir.  It was 3-9 of '11, which was actually my

8    birthday.  And what happened in this case I was getting ready

9    to go to work that morning.  And, um, where my house is located

10   there's a quite a few bars on the other side of the house.  And

11   I have a habit of going over there when I see cars parked there

12   because there's times when the people have been drunk or stuff

13   like waken them up and got them up.  And I went over there.

14   And that's when Samantha was in the car when I approached her.

15   Q.  Who's Samantha?

16   A.  The FBI agent.  Because I thought she needed help.  I was

17   going to see if she was okay.

18   Q.  What happened?

19   A.  Samantha came out the vehicle.  And when I seen it was her,

20   I just said whatever you need I'm here.

21   Q.  Did you see her before that day?

22   A.  Never.

23   Q.  So what happened?

24   A.  She just arrested me.  And we -- I agreed to help her with

25   whatever she needed to be done at that time.

1   Q.   Now, did you give a statement that day?

2   A.   Yes, I did.

3   Q.   And you give a statement regarding what?

4   A.   Regarding my activities in Chaparral and northeast.  And

5   regarding other activities that were present at that time.

6   Q.   When did you become a BA member?

7   A.   1999 in the Sanchez Unit.

8   Q.   How did it happen?

9   A.   In 1999 in the Sanchez Unit, I was a prospecto.  And there

10  was Lugas -- Anque was there.  And at that time my paperwork

11  was getting ready to go in.  And he's the one who passed me

12  through and got my -- what they call your huaraches.  He is the

13  one who became my padrino.

14  Q.   Who was?

15  A.   Lugas Anque.

16  Q.   Did he maintain -- or was he your padrino throughout the

17  course of your career with the BA?

18  A.   Yes, he was.

19  Q.   Who witnessed it?

20  A.   That was Mota.  And he was also from Odessa.  And Danny

21  Boy.  He was also from Odessa.

22  Q.   And where were they from?

23  A.   Odessa.  Midland.

24  Q.   That's part of Texas?

25  A.   Yes, in the west part.

1   Q.  You're familiar -- once you became a BA member you became

2   familiar with sacred rules.

3   A.  Yes, sir.

4   Q.  What are some of the more important sacred rules that come

5   to mind?

6   A.  One that mostly comes to mind is exactly what we're doing

7   is participating with law enforcement.  If you participated

8   with any type of law enforcement, automatically you became an

9   ex.  And a green light would be put on you.

10  Q.  After you became BA member you were released approximately

11  18 months and sometime in December of 2001.  Is that correct?

12  A.  Yes, sir.

13  Q.  Then you were arrested again in February of 2002?

14  A.  Yes, sir.

15  Q.  And you met other BA members during that period of

16  incarceration?

17  A.  Yes, I did.

18  Q.  Where were you incarcerated during that period of time?

19  A.  Um, first I was incarcerated at the Sanchez Unit.  From the

20  Sanchez, I was incarcerated at a prerelease unit.  And then

21  that's when I was sent to Telford.

22  Q.  I'm going to show what I believe is in evidence.  But if it

23  isn't, I will show it to the witness that the point, 16D-1.

24          THE COURT:  D or B?

25          MR. COOLEY:  D as in David.

David A. Perez, RMR, RPR

1          THE COURT:  I show it's in.

2          MR. COOLEY:  Can we show it just to the witness at

3     this point?

4          THE COURT:  Sure.

5     Q.  (By Mr. Cooley)  Do you recognize the individual in this

6     photo?

7     A.  That is me.

8     Q.  Who's that?

9     A.  It is me.

10         MR. COOLEY:  Again, Your Honor, for the record we

11     offer if it hasn't been 16D-1.

12         THE COURT:  It was admitted when Marquez was on the

13     witness stand.

14         MR. COOLEY:  I would ask that it be published, Your

15     Honor.

16         THE COURT:  It may be published.

17     Q.  (By Mr. Cooley)  You have a series of tattoos on your body.

18     Is that right?

19     A.  Yes, I do.

20         MR. COOLEY:  At this time I would ask to show the

21     witness 16D-3.  It's not evidence at this point.

22         THE COURT:  All right.

23     Q.  (By Mr. Cooley)  Do you recognize 16D-3?

24     A.  Yes, sir, that is my back.

25     Q.  And it has a series of tattoos.  Is that correct?

```
 1    A.  Yes, sir.

 2              MR. COOLEY:  We offer evidence 16D-3.

 3              THE COURT:  Any objections?

 4              MR. FOSTER:  No objections.

 5    Q.  (By Mr. Cooley)  We're not going to go through all these

 6    tattoos.  But if you can describe as far as the BA's concerned,

 7    Barrio Azteca.  Which of those tattoos closely represents your

 8    participation and membership of the BAs?

 9    A.  It would have to the calendario and also -- plus, the

10    feather serpent, sir.  Feathers.  Exactly.

11    Q.  Basically that area?

12    A.  Yes, sir.

13              MR. COOLEY:  We didn't publish that.

14              THE COURT:  Oh, I thought --

15              MR. COOLEY:  My apologies.

16    Q.  (By Mr. Cooley)  There's a circle right now.  That's the

17    area you're talking about?

18    A.  Yes, sir.

19    Q.  Would you please focus in on that circled area.  So you're

20    talking about the calendar and the serpent?

21    A.  Yes, sir.

22    Q.  Feather serpent?

23    A.  Yes, sir.

24    Q.  Now, you were -- when you -- towards the end of your time

25    before your arrested, you were holding a position of authority
```

1    within the BA.  Is that correct?

2    A.  Yes, sir.

3    Q.  What area?

4    A.  I had Northeast and Chaparral.

5    Q.  And at some point do they distinguish between one or the

6    other -- in other words, sometimes it's just Northeast and

7    encompasses Chaparral, other times, um, it's split up.  Is that

8    correct?

9    A.  Yes, sir.

10   Q.  When did you -- you've had that position on two separate

11   occasions.  Is that correct?

12   A.  Yes, I had.

13   Q.  The first time you had it for how long?

14   A.  Oh, approximately, five to six months.

15   Q.  And who appointed that position to you?

16   A.  It was Nano.

17   Q.  Did he take it away?

18   A.  Yes, he did.

19   Q.  Why?

20   A.  I wasn't doing -- I wasn't bringing no quotas in.  I wasn't

21   doing the job that was supposed to be done.

22   Q.  Who replaced you?

23   A.  Bird.

24   Q.  How long did Bird have that position?

25   A.  I really do not know.  I know he did it until he got

```
 1   arrested.
 2   Q.  After he got arrested, who took over?
 3   A.  I took it back.
 4   Q.  And you kept that position for how long?
 5   A.  Until I was arrested.
 6   Q.  Before you were arrested.  To the day you were arrested or
 7   shortly before?
 8   A.  Shortly before I was arrested.
 9   Q.  Now you mentioned quota.  When you were collecting quota,
10   um, you weren't collecting quota during your first period of --
11   A.  No, sir.
12   Q.  When you had the leadership in northeast?
13   A.  No, sir.  That was one of the problems.
14   Q.  What about the second time?
15   A.  Yes, I was.
16   Q.  Do you know, um, a person by the name of Spook?
17   A.  Yes, I do.
18   Q.  How do you know a person by the name of Spook?
19   A.  I met him when we had a junta.  That was the first time I
20   met him.  That's when we were called to a gathering together to
21   meet Spooky.
22   Q.  You mentioned a word.  What word did you mention?
23   A.  Junta.
24   Q.  What is that?
25   A.  It's like a gathering where we -- the ones who are in
```

```
 1    charge of the areas are the ones that are called in who have

 2    some type of say so in an area.  We get together and we have a

 3    meeting.

 4    Q.  Where did that take place?

 5    A.  In some hotel.  I wasn't sure right there.  I'm pretty sure

 6    about Yarbrough.  In that area.

 7    Q.  When did this take place, approximately?

 8    A.  Whoa.  Golly.  The exact date, I'm not sure of when it was.

 9    Q.  Do you know an individual by the name of Payaso?

10    A.  Yes, I do.

11    Q.  How do you know?

12    A.  I met Payaso when I was in the Telford Unit.  And, um, he

13    was released before I was released.  And that's where me and

14    him became friends.

15    Q.  During the period of time when you were collecting quota

16    during your last period of leadership in the northeast?

17    A.  Yes, sir.

18    Q.  What were you doing with the quota once you collected it?

19    A.  First of all, when I was receiving quota from the two

20    different areas, I would take the quota to -- that's when

21    Payaso had the bank.  So I was taking it to him first.

22    Q.  13B is up.  Published.

23         Do you see a group of individuals that are depicted in

24    Government's Exhibit 13B?

25    A.  Yes, I do.
```

```
 1   Q.  Do you recognize any of the individuals in that photo?
 2   A.  Paya and Cano.
 3   Q.  If you can, which one is Cano?
 4   A.  Cano is the heavyset one over here to your -- my right.
 5   Q.  The second one to the right?
 6   A.  Yes, sir.  Yes, sir.
 7   Q.  Payaso.  Which -- describe what he's wearing.
 8   A.  He's wearing the Redskins jersey with the 21.  Right
 9   next -- that's him.  Yes, sir.
10   Q.  That individual?
11   A.  Yes, sir.
12   Q.  That's the individual that you would dropoff quota?
13   A.  Yes, sir.
14   Q.  At some point did you stop?
15   A.  Yes, I did when he was arrested.
16   Q.  After he was arrested, who was collecting quota?
17   A.  After he was arrested, it went to the Lopez brothers, to
18   Omar.
19   Q.  And does he go by a nickname?
20   A.  Yes, he does.
21   Q.  What is it?
22   A.  Peewee.
23   Q.  How long was he collecting quota?
24   A.  Oh, I would say, probably -- I'm not really sure.  But I
25   would have to give it like for four or five months.
```

1    Q.  Months?

2    A.  Yes, sir.

3    Q.  Now -- during the period of time with, um, you mentioned

4    this meeting -- did this meeting occur before or after Payaso

5    was arrested?

6    A.  It was after.

7    Q.  How long after that?

8    A.  Boy, I'm not really sure on that time.  I'm not really

9    sure.

10   Q.  Are we talking a month, two months?

11   A.  No.  We're talking a lot longer than that.  Maybe three or

12   four months.

13   Q.  You said you were arrested when?

14   A.  3-9-11.

15   Q.  Okay.  And if Payaso was arrested in November, are you

16   still certain it was three or four months after that?

17   A.  In November?

18   Q.  November 2010.

19   A.  Yes, sir.

20   Q.  Now, you said that Peewee --

21          MR. COOLEY:  One moment, Your Honor.

22   Q.  Now in terms of, um -- let's talk about this meeting.  Um,

23   how many people were at this meeting when you first met Spook?

24   A.  I'd say probably around 11 or 12 people.

25   Q.  And you said occurred in a hotel you believe on the east

1  side of El Paso?

2  A.  Yes, it was the east side.

3  Q.  What was the purpose of this meeting?

4  A.  Basically to let us know we had Spook here and that we had

5  a capo and he was taking care of everything in the calles.  And

6  everything was his.

7  Q.  Who called the meeting?

8  A.  I was told to come to the meeting by Manny.

9  Q.  Who is Manny?

10  A.  Lopez.  He was a sergeant.

11  Q.  Up until then you understand that Manny was running El

12  Paso?

13  A.  Yes, sir.  Yes, sir.

14  Q.  So he calls this meeting.  You said there was ten or more

15  people there.  Is that right?

16  A.  Yes, sir.

17  Q.  What takes place during that meeting?

18  A.  It was just discussing the things.  And how things were

19  ran.  And what things were going on.  And how things were going

20  to change.  And, um, then also introducing us to Spooky.

21  Q.  Who was doing most of the talking?

22  A.  Spooky was.

23  Q.  You keep referring to Spooky.  Do you see him in the

24  courtroom today?

25  A.  Yes, I do.

1   Q.   Describe what he's wearing.  Where he is sitting?

2   A.   Wearing a blue suit with a blue shirt.  And he's sitting

3   over there on that able.

4           MR. COOLEY:  May the record reflect the identification

5   of the defendant, Your Honor.

6           THE COURT:  It will so reflect.

7   Q.   (By Mr. Cooley)  Um, that's the first time you met him?

8   A.   Yes, sir.

9   Q.   Um, so, in general, you talked about what was being

10  discussed.  Was there any particular focus on you during that

11  meeting?

12  A.   Really, the only thing I was focused on me was

13  straightening up my area also.  And being able to, um, meet the

14  quota needs and the things that needed to be done.  The

15  meetings were held in Spanish.  And I don't speak Spanish.  So

16  a lot of times, um, the guys would have to dictate to me what

17  was being said.

18  Q.   Now, in comparison to the other sections of El Paso, you

19  had northeast.  Is that right?

20  A.   Yes, I did.

21  Q.   How would you compare what you were collecting on a weekly

22  basis to others?

23  A.   Not too good.

24  Q.   That was some of the things that Spook was talking to you

25  about?

1    A.  Those are some of the things, yes, sir, that were brought
2    up.
3    Q.  Now, again, you mentioned that Payaso was -- when Payaso
4    was arrested, Peewee took over.  Does somebody replace Peewee?
5    A.  After -- no, not that I know of.  When I was dropping off
6    to Peewee, the next one I started dropping off to was Spook.
7    Q.  So somebody did take over?
8    A.  It would be Spooky, yes, sir.
9    Q.  You dropoff quota to him personally?
10   A.  Yes, I did.
11   Q.  Approximately, how many times?
12   A.  A good four or five times.
13   Q.  Do you recall some of the locations in which you would drop
14   money off?
15   A.  Yes, Gateway East.  There at the Kentucky Fried Chicken.
16   Also, right there across from the University Medical.  Then we
17   also did a drop right there on -- right there by Cielo Vista
18   Mall at the Valero.
19   Q.  When you're dropping off, are you dropping off personally,
20   alone or with somebody?
21   A.  No, I would be by myself.
22   Q.  What was the approximate amounts of money that you're
23   dropping off on those occasions?
24   A.  Basically, I would be dropping 450.  Because I was getting
25   approximately 250 from Chaparral and 200 from the norte.

1    Q.  Now, towards the end, um, we don't need to get into quota.

2    A.  Okay.

3    Q.  But prior to you being introduced to Spook, were the

4    brothers, the BA members, did they have to pay quota on drugs

5    they sold?

6    A.  No.  There was a rule that was brought in that I know that

7    I've heard about it before.  But it was ten percent of whatever

8    the brothers had on their sales that they put in what was

9    supposed to be used as a bank to be used for family.

10   Q.  When was the last time that occurred before that you first

11   met Spook?

12   A.  It wasn't never occurred.  When we had -- Spooky took over,

13   he set that up also from my understanding.  And that was to set

14   up a bank for -- specifically for the carnales out there who

15   needed money for bills or whatever might need have been done.

16   Q.  So your understanding he was going to charge BA members ten

17   percent for ten percent of their drug sales?

18   A.  Yes.  Yes, sir.  Their personal.

19        MR. COOLEY:  Now, can you bring up Exhibit 14B?  I'd

20   ask this published.

21        THE COURT:  You may.

22   Q.  (By Mr. Cooley)  Do you recognize what's on the screen?

23   A.  Yes, sir.

24   Q.  What is that?

25   A.  This was that Blood River.  That was that sort of like that

1    CD made about the Barrio Aztecas.  I think I seen this on You

2    Tube.

3    Q.  Do you know whether or not other brothers have seen it as

4    well?

5    A.  I'm pretty sure they have.

6    Q.  Okay.  Was this something discussed when you first saw it?

7    A.  Yes, I think so.  I know that we had talked about this.

8    Q.  Let's talk about a few days before you were arrested.  Did

9    you meet the defendant a couple days before you were arrested?

10   A.  Yes, sir, I did.

11   Q.  Who were you with?

12   A.  I was with Fragoso.

13            MR. COOLEY:  Can you bring up 16E-1, please?  I would

14   ask that this be published.

15            THE COURT:  You may.

16   Q.  (By Mr. Cooley)  Do you recognize this individual depicted

17   in 16E-1?

18   A.  Yes, sir.

19   Q.  Who is that?

20   A.  Fragoso.

21   Q.  So a couple days before you were arrested you and Fragoso,

22   meet the defendant.  Is that correct?

23   A.  Yes, we do.

24   Q.  Where did that meeting take place?

25   A.  It took place at Memorial Park.

```
 1    Q.  What was the point of that meeting?
 2    A.  It was -- I was going to give everything to Fragoso.  I
 3    wanted out.
 4    Q.  What do you mean give everything to him?
 5    A.  Fragoso -- he had the norte with me.  But at this time I
 6    was turning everything over to Fragoso.
 7    Q.  When you say he had the northeast with you, what does that
 8    mean?
 9    A.  We were working northeast jointly.
10    Q.  So the northeast encompassed Chaparral as well?
11    A.  Exactly.
12    Q.  So you're working it together and you wanted to walk away?
13    A.  Yes, I did.
14    Q.  Why did you want to walk away?
15    A.  I was done.
16    Q.  Now, being a BA member, you know you just can't walk away.
17    A.  That's right.
18    Q.  What story did you give them to help you walk away?
19    A.  I told them that my cancer had reoccurred.
20    Q.  Did you have cancer?
21    A.  I had it before.  But I don't have it.  It was a lie.
22    Q.  Now before you did that, um, did you talk to Rigo about
23    this?
24    A.  Yes, I did.
25    Q.  What did he agree to do?
```

1    A.  He agreed to take the norte.

2    Q.  As a result of that, um, you approached the defendant.  Is

3    that right?

4    A.  Yes, we did.

5    Q.  And you told him you had cancer.

6    A.  Yes, I did.

7    Q.  And you wanted out.

8    A.  Yes, sir.

9    Q.  What decision did he make?

10   A.  He said it was fine.

11   Q.  Now, during that conversation was there a name brought up,

12   the name of Sinner?

13   A.  Excuse me?

14   Q.  Was the name Sinner brought up during that meeting?

15   A.  Yes, it was.  Yes, it was.

16   Q.  In what context did he bring up the name Sinner?

17   A.  Through the conversation that we were having Sinner's name

18   came up and another ex-member came up.  I don't know who this

19   ex-member is.  But, um, the deal is that, um, Spook -- he

20   wanted Sinner out of the way, basically.

21   Q.  What does that mean?

22   A.  That means you take him out of the way.  Get him out of

23   there.

24   Q.  What does that mean?

25   A.  Put him to sleep.

1  Q.  Put him to sleep.  Can you be more specific?

2  A.  Oh, kill him.

3  Q.  Now, as a result of that, um, was somebody contacted to do

4  that?

5  A.  Yes, sir.  When we left -- when we left Spooky from

6  Memorial, um, me and Fragoso -- Fragoso dropped me off.  And I

7  picked up my vehicle.  And we met Whispers over there on -- by

8  54 -- by 54 and Howdy's.  And at this time, Fragoso, since he

9  had -- he had the area, talked to Whispers about the hit that

10  needed to be done.

11  Q.  Who's Whispers?

12  A.  Was another carnal from -- he was from northeast and also

13  from Chaparral.

14  Q.  Another BA member?

15  A.  Yes, he was.

16  Q.  Did he agree to take on that assignment?

17  A.  He's been waiting to take that.  Oh, yes.  Most definitely.

18  Q.  He agreed to take on the mission of killing Sinner?

19  A.  Yes, sir.

20  Q.  Why was Sinner so important as a target for the BA?

21  A.  Um, from my understanding, this is all I really know about

22  this issue, is I know he was moving a lot of drugs also.  And,

23  um, that he was, you know, that he was in areas and he wasn't

24  supposed to be moving.  And there's other things that I

25  probably don't know that was going on also.

David A. Perez, RMR, RPR

```
 1              MR. COOLEY:  One moment, Your Honor.
 2   Q.  Mr. Roberts, let's go back a little bit about the
 3   collection of the quota and you who dropping it off to.
 4   A.  Okay.
 5   Q.  You indicated that, um, Payaso -- up until Payaso was
 6   arrested for an extended period of time you were dropping off
 7   to him.
 8   A.  Yes, sir.
 9   Q.  After him, you were dropping off to Peewee.
10   A.  Yes, sir.
11   Q.  And after Peewee you dropped off to the defendant.
12   A.  Yes, sir.
13   Q.  Is that right?
14   A.  Yes, sir.
15   Q.  And you estimated if Payaso was arrested in mid-November of
16   2010, you were arrested in March of 2011, you still believe
17   that you were dropping off to Peewee for four months.  Or would
18   it much less time?
19   A.  It had to have been more time.
20   Q.  More time or less?
21   A.  More time.  It's because I'm not really sure on the dates
22   on the time.
23   Q.  From the time of November, mid-November to March of 2011,
24   is basically four months, maybe five.
25   A.  Right.
```

1    Q.  Is that correct?

2    A.  Right.  Right.

3    Q.  Tops.  How long of a period of time were you dropping off

4    quota to the defendant?  You say you dropped off five times.

5    Over what period?

6    A.  Like, about five times.  But after that, Whispers was going

7    to drop it off to the defendant.

8    Q.  Five times.  And when you're typically dropping off, you're

9    dropping off on a weekly basis?

10   A.  Yes, sir.  Yes, sir.

11   Q.  So five times.  That's a five-week period.  Is that right?

12   A.  Yes, sir.  Yes, sir.

13   Q.  And the last time you dropped off to the defendant before

14   you were arrested was how long?

15   A.  I would have to say probably in February.

16   Q.  So approximately a month prior to that?

17   A.  Yes, sir.

18          MR. COOLEY:  No further questions, Your Honor.

19          THE COURT:  All right.  Mr. Foster.

20                    CROSS-EXAMINATION

21          MR. FOSTER:  Just a couple questions, Judge.

22   BY MR. FOSTER:

23   Q.  This meeting you went to on this hotel where 11 or 12

24   people were there, was Fernando Carrillo Candia at that

25   meeting?

1   A.   Who is this?

2   Q.   Fernando Carrillo.  Do you remember a Fernando Carrillo?

3   A.   No, sir.

4   Q.   The people that were at that meeting that were like

5   leadership people, were they not?

6   A.   Yes, they were.  I know that the ones that I knew.  You

7   know, I don't know all of them.  Like I knew Espino and Manny.

8   Q.   It wasn't for someone who'd just been initiated into the

9   BA, right?

10  A.   No, not that I think of.

11  Q.   Now, you said you met Mr. Renteria at a KFC on Gateway

12  East.

13  A.   Yes, sir.

14  Q.   Whereabouts on Gateway East?

15  A.   You know, I really don't know the street.  I know when you

16  come off -- when you come off the interstate, there's a

17  Kentucky Fried Chicken if you're going west.  There's a

18  Kentucky Fried Chicken.  There's a 7-Eleven right there across

19  the street, too.

20  Q.   So that would be on Gateway West?

21  A.   Right.

22  Q.   Not Gateway East.

23  A.   That's what I thought I said was west.

24  Q.   At Cielo Vista Mall?

25  A.   Yes, sir.

1   Q.  Where is Cielo Vista Mall?

2   A.  It's right there by Hawkins, Viscount off I-10.

3   Q.  East side.

4   A.  Yes, sir.

5           MR. FOSTER:  I will pass the witness, Judge.

6           THE COURT:  Anything further?

7           MR. COOLEY:  Nothing further, Your Honor.  Thank you.

8           THE COURT:  May he step down?  And is he released as a

9   witness?

10          MR. COOLEY:  Yes, from the Government, Your Honor.

11          THE COURT:  Mr. Foster?

12          MR. FOSTER:  Yes, Judge.

13          THE COURT:  Thank you.  You may step down.

14          THE WITNESS:  Thank you.

15          (End of requested witness testimony.)

16                              **INDEX**

17

18              <u>Direct</u>   <u>Cross</u>   <u>Redirect</u>   <u>Recross</u>

19   WITNESSES FOR THE
     GOVERNMENT:

20

21   THOMAS ROBERTS          3          26

22   <u>EXHIBITS:</u>                                  <u>Admitted</u>

23   Government

24   16D-3 Photograph                               11

25

David A. Perez, RMR, RPR

* * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Signature:/s/_____Date:  June 5, 2013
                David A. Perez, RMR, RPR

David A. Perez, RMR, RPR