1                  IN THE UNITED STATES DISTRICT COURT

2                     WESTERN DISTRICT OF TEXAS

3                          EL PASO DIVISION

4

5    UNITED STATES OF AMERICA              No. EP:10-CR-2213-KC

6    v.                                    El Paso, Texas

7    RAMON RENTERIA                        May 25, 2012

8

9                             JURY TRIAL

10           TESTIMONY BY FERNANDO CARRILLO CANDIA

11           BEFORE THE HONORABLE KATHLEEN CARDONE

12                  UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   For the Government:  Brian Skaret
                          United States Department of Justice
16                        Criminal Division, Human Rights and
                          Special Prosecutions Section
17                        1301 New York Avenue, NW, Suite 200
                          Washington, D.C. 20530
18
                          Joseph Cooley
19                        United States Department of Justice
                          Criminal Division, Gang Unit
20                        10th and Constitution Avenue, NW
                          Washington, D.C. 20530
21
                          George Leal
22                        Assistant United States Attorney
                          700 East San Antonio, Suite 200
23                        El Paso, Texas 79901

24

25

1   For the Defendant:   Scott P. Foster
                         718 Myrtle Avenue
2                        El Paso, Texas 79901

3

4        Proceedings recorded by stenotype.   Transcript produced by

5   computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  Government may call their next witness.
 2              MR. SKARET:  Fernando Carrillo Candia.
 3              THE COURT:  Is now a good time for a short break?
 4    Let's take a short break.
 5              You remain under all the instructions the Court has
 6    previously given you.  See you at 230.
 7              (Jury leaves courtroom.)
 8              (Recess.)
 9              COURTROOM DEPUTY:  Court is back in session.
10              THE COURT:  Ready to bring in the jury?
11              MR. SKARET:  Yes, Your Honor.
12              THE COURT:  Okay.
13              (Jury enters courtroom.)
14              THE COURT:  You may be seated, Ladies and Gentlemen.
15              Mr. Skaret, whenever you're ready.  Government has
16    called your next witness.  He has not been sworn in yet.
17    Whenever you are ready.
18                   FERNANDO CARRILLO CANDIA, SWORN
19                          DIRECT EXAMINATION
20              MR. SKARET:  Mr. Martinez, if we could have the Elmo
21    turned on, before I forget.
22    BY MR. SKARET:
23    Q.  Good morning, sir -- pardon me.  Good afternoon.  Would you
24    please introduce yourself to the jury and spell your last name
25    more the court reporter?
```

```
1    A.  My name is Fernando Carrillo Candia.  My last name is
2    C-A-R-R-I-L-L-O.
3    Q.  And what is your country of citizenship?
4    A.  I was born in Juarez, Mexico.
5    Q.  And have you ever been a member of the Barrio Azteca?
6    A.  Yes, I do.
7    Q.  When did you join?
8    A.  2000.
9    Q.  Are you still a member?
10   A.  Yes, I do.
11   Q.  As of -- when you get off the witness stand, will you be a
12   member of the Barrio Azteca?
13   A.  Not anymore.
14   Q.  Are you currently serving a federal prison sentence here in
15   the United States?
16   A.  Yes, I do.
17   Q.  What is that sentence for?
18   A.  It's for illegal re-entry, 60 months.
19   Q.  What does is illegal re-entry mean?
20   A.  I don't got no papers to be in the United States.
21   Q.  How long is -- how much longer do you have on that 60-month
22   sentence?
23   A.  Two years and a half.
24   Q.  Do you have any history of drug use?
25   A.  Yes.
```

David A. Perez, RMR, RPR

1   Q.   What is that history?

2   A.   Marijuana, cocaine, alcohol.

3   Q.   When did you start using those drugs?

4   A.   When I was around 15 years old.

5   Q.   Have you been using them consistently since them?

6   A.   Yes, I do.

7   Q.   When was the last time you used illegal drugs?

8   A.   Back in 2010 before I got arrested.

9   Q.   Now, you said you've been a BA since about the year 2000.

10  Is it against BA rules to cooperate with the United States

11  government?

12  A.   Yes.

13  Q.   Why are you doing it?

14  A.   Because I want to get out from this gang.  I'm tired to be

15  following something it's not worth it.  And, um, the only --

16  they only going to take me to end up life in prison or even

17  death.  And I'm done with that.

18  Q.   You made a lot of bad choices in your life?

19  A.   Yes, I do.

20  Q.   What are you hoping to get from cooperating, aside from

21  doing the right thing?

22  A.   They going to look for my safety and my family's safety.

23  Q.   Has anyone promised you that you would get a reduction in

24  your current sentence?

25  A.   No.

David A. Perez, RMR, RPR

1    Q.  Are you hoping to get out early?

2    A.  Yes, I do.

3    Q.  Who is ultimately in charge of whether you do get a

4    reduction?

5    A.  The judge.

6    Q.  Have prosecutors made promises to you regarding the witness

7    security program?

8    A.  No.

9    Q.  Are you sure?

10   A.  Yes.

11   Q.  Have prosecutors applied for the prisoner witness security

12   program on your behalf?

13   A.  Yes.

14   Q.  What do you know about that program?

15   A.  It's about my safety.

16   Q.  All right.  And how is it that that program helps provide

17   for your safety?

18   A.  They're going to put me apart of all the BA members --

19   apart.

20   Q.  Is there any guarantee you will be admitted into that

21   program?

22   A.  No.

23   Q.  Has the prosecution made any promises to you about sending

24   you back to Mexico after your sentence?

25   A.  No.

David A. Perez, RMR, RPR

```
 1    Q.  Has the United States made any promises to you about
 2    ensuring the safety of your immediate family?
 3    A.  Yes.
 4    Q.  What are those promises?
 5    A.  Just look about the safety, see if there's any problem with
 6    the BAs or. . .
 7    Q.  So that is -- that's the United States' part of the deal.
 8    What's your part of the deal?
 9    A.  Just be cooperating and give my statement.  The better I
10    can do and help them out the best way I can do it.
11    Q.  Is your deal to help out the United States or to testify
12    truthfully?
13    A.  Yes, I do.
14    Q.  To what?  Pardon me?
15    A.  Yes.
16    Q.  Which is it?  Is it to do your best for the United States
17    or to testify truthfully?
18    A.  Both.
19    Q.  Has any agent in the case ever asked you for anything more
20    than the truth?
21    A.  No.
22    Q.  Has any prosecutor ever asked anything more than the truth?
23    A.  No.
24    Q.  I would like to talk about your personal history.  You said
25    you were from Juarez, Mexico.  When did you first come to the
```

```
 1   United States?
 2   A.  Just to help my visa.  And I was coming back and forth
 3   before I get arrested.
 4   Q.  And, approximately, when was it that you first came to the
 5   United States?  How old were you?
 6   A.  Around five, six years old with my parents.
 7   Q.  Did you live here in El Paso?
 8   A.  No.
 9   Q.  When did you first have problems with the law?
10   A.  When I got arrested back in January 2000.
11   Q.  What did you get arrested for?
12   A.  Possession, intent more than 1,000 pounds of marijuana.
13   Q.  Was that here in El Paso or in Mexico?
14   A.  No, it was in here in New Mexico.
15   Q.  And just tell us briefly about that charge.
16   A.  They just got me with possession, intent, try to smuggling
17   drugs from Juarez to the United States.  And I got arrested
18   from the Border Patrol.
19   Q.  And who's drugs did that belong to?
20   A.  To one of my uncles.
21   Q.  And was your uncle related in any way to the people in the
22   Juarez drug cartel?
23   A.  Yes.
24   Q.  Now what is the Juarez drug cartel?
25   A.  It's the main guys who run all the drugs in Ciudad Juarez.
```

```
1    Q.  And by doing that job that got you in trouble.  Were you
2    trying to join up with the Juarez cartel?
3    A.  Yes.
4    Q.  Why were you wanting to join?
5    A.  Because I got a hard life.  And I tried to get the easy
6    life.
7    Q.  Were you convicted of bringing over all that marijuana?
8    A.  Yes.
9    Q.  And what was your sentence?
10   A.  37 months.
11   Q.  What prisons did you serve the majority of your time on
12   that 37 months sentence?
13   A.  It was in Pecos, Texas and Big Spring.
14   Q.  When you finished up your sentence there, where were you
15   sent?
16   A.  They deport me back to Mexico.
17   Q.  All right.  You mentioned you became a Barrio Azteca member
18   in 2000.  Where were you when you joined?
19   A.  I was in Pecos, Texas.
20   Q.  That's when you were serving that drug sentence?
21   A.  Yes.
22   Q.  Why did you want to join at that time?
23   A.  It was just two options, be a Barrio Azteca or be "Paisa".
24   Q.  Why were those the only two options?
25   A.  They're the only guys who they walk on the population, on
```

1    the yard.

2    Q.  And what did you have to do to join?

3    A.  I got -- put myself in -- prove the gang members I got love

4    on them.

5    Q.  And what did you do to prove yourself?

6    A.  I beat up five guys during four or five months period.

7    Q.  Who are those five guys?

8    A.  It was rival gang members.

9    Q.  Who was their gang?

10   A.  Border Brothers.

11   Q.  And when you say they were rivals, were the BA at war with

12   that gang?

13   A.  Yes.

14   Q.  So how did you beat these guys up?

15   A.  Um, I used to work on R and D.  And --

16   Q.  Is that receiving and discharge?

17   A.  Yes.

18   Q.  Go ahead.

19   A.  And I look at the files.  Every time these people came into

20   the prison before they got them -- and I was the -- my job --

21   it was part -- as soon as they got cleared from arriving, I was

22   the guy who take these people to the -- to their units.

23   Q.  Once you took them to their units -- let me go back a step.

24   You would receive, basically, their application as they're

25   coming into the prison?

```
 1   A.   Yes.

 2   Q.   Was their gang affiliation listed on those applications?

 3   A.   Yes.

 4   Q.   So you knew who was who before they even got there?

 5   A.   Yes.

 6   Q.   And you mentioned you'd take them to the cell.  What would

 7   you do when you got them to the cell?

 8   A.   It was like some people -- some guys, they go to -- depends

 9   on the unit they went.  And, um, as soon as I put these people

10   in their unit, I hold the rival gang member to stay some space

11   where they can get -- can't get us on camera or security

12   guards.  And after I put the people on their units, I beat them

13   up.

14   Q.   And what kind of beatings are we talking about?  How

15   serious?

16   A.   Punching, kicking till they bleed.  Broken teeth, broken

17   jaws, ribs.

18   Q.   Were those particular victims able to walk away from the

19   beatings?

20   A.   No.

21   Q.   How were they taken out?

22   A.   With a stretcher bed.

23   Q.   With what?

24   A.   Stretch bed.

25   Q.   A stretcher?
```

1    A.   Yeah.

2    Q.   At that point had you proved yourself?

3    A.   Actually, I did it three times by myself.  And that's not

4    supposed to be like that.  And they told me to quit doing that.

5    The last two they send me with another two guys.  And after

6    that, I beat up those five guys.  And I get some disciplinary

7    action.  And I don't tell nobody I got out from the special

8    housing unit.  And they offered me to became a member from the

9    Barrio Azteca.

10   Q.   You mentioned "they" a couple of times.  Who's -- you said

11   beat up three guys and they told me to stop doing it by myself.

12   Who's they?

13   A.   The Barrio Azteca members.

14   Q.   So then the last two beatings of these five that you

15   mentioned, is that with the Barrio Azteca?

16   A.   Yes.

17   Q.   And who ordered you to do those particular beatings?

18   A.   It was the name in charge.  It was Fresa.  His name is

19   Alberto Nunez.

20   Q.   All right.  So Fresa told you to beat up these -- these two

21   Border Brothers, I presume?

22   A.   Yes?

23   Q.   And were those beatings the same that you had handed out

24   before?

25   A.   Yes.

1    Q.  Just with three people against one?

2    A.  Yes.

3    Q.  After the last two beatings, what happened to you?  Were

4    you -- did you still have your job in R and D?

5    A.  No, they fired me.

6    Q.  Where did they put you?

7    A.  They put -- gave me a disciplinary action.  I spent 30 days

8    in solitary.  And I got out.  And I was just in the unit

9    working in the unit.

10   Q.  Did you still have to prove yourself coming out of

11   solitary?

12   A.  Actually, it's when they came to me and offered me if I

13   want to became a member.

14   Q.  So who, specifically, asked you to become a member?

15   A.  Alberto Nunez, Fresa.  And at that time it was like around

16   eight to ten members.  And most of them they asked me if I want

17   to join them.

18   Q.  So this particular individual, Fresa, did he do anything to

19   move the ball on your membership?

20   A.  Yes.

21   Q.  What did he do?

22   A.  He put word for me and sent my name to one of the capos

23   from the gang.

24   Q.  Which capo?

25   A.  Manuel Cardoza.

```
1    Q.   And what was his nickname?
2    A.   Tolon.
3    Q.   And did you ever hear back from Tolon?
4    A.   No.
5    Q.   Did you get a letter back from Tolon?
6    A.   Yes.
7    Q.   Did you become a Barrio Azteca member?
8    A.   Yes.
9    Q.   And did Tolon become your padrino?
10   A.   Yes.
11   Q.   Was that a good thing for you?
12   A.   At the time it was good because I didn't know what was I
13   was getting into it.  They never told me what was the risk or
14   the danger.  Actually, they didn't do -- allow to tell you
15   nothing till you became a member.
16   Q.   Is it good to have a BA captain actually be your padrino as
17   opposed some other guy on the street?
18   A.   Yes.
19   Q.   Why is that good?
20   A.   Because it's one of the highest rank in -- in the gang.
21   Q.   Do you have any special privileges in regards to access to
22   that captain if he is your padrino?
23   A.   Sometimes.
24   Q.   Can you write to that captain?
25   A.   Yes.  Um, depends on the actions you're doing or the
```

1    trouble you're into.  You can write the captain or your padrino

2    and let them know what's going on in the deal.  And sometimes

3    going to put word for you to calm down everybody or the people

4    who's trying to -- to put something on you or whatever.

5    Q.  All right.  Let's move ahead a little bit.  You're a

6    full-fledged BA member.  Was there ever a large prison fight at

7    the Pecos prison after you became a member?

8    A.  Yes, it was a riot.

9    Q.  What happened at that riot?

10   A.  It was -- one of the Border Brothers came into the

11   population.  He don't supposed to be there.  And the Paisas

12   tried to back him up, tried to keep him on the yard because

13   they let us be on population.  And the BAs -- it's -- they

14   can't stay over there with us because we got war.  And the

15   Paisas they say like they're not going to stay here.  You're

16   not going to be either.

17   Q.  So was the Barrio Azteca controlling who could and who

18   could not walk outside in the yard?

19   A.  Actually, it was against rival gang members.

20   Q.  All right.  And with respect to those rivals was the Barrio

21   Azteca trying to keep them out of the yard?

22   A.  Yes.

23   Q.  And, basically, this Border Brother was coming into your

24   yard?

25   A.  Yes.

1    Q.  So what happened?  How did the riot start?

2    A.  They just told me I have to check in to the special

3    housing, he can't be on the population.  And, actually, the

4    Paisas back him up saying, like, he's going to be -- he's going

5    to stay here.  He's not going to stay here.  You have to go

6    with him.  And that's when they started punching and kicking

7    and --

8    Q.  Okay.  Let me ask you.  So the Border Brother that was not

9    supposed to be in your yard went to the Paisas?

10   A.  Yes.

11   Q.  Who are the Paisas?

12   A.  There's a union.  Most of these guys are from Mexico.

13   Q.  It's a gang?

14   A.  It looks like.

15   Q.  Okay.  Were you at war?  Or were you sort of neutral with

16   the Paisas?

17   A.  At this time it was neutral.  We wasn't at war.  But it

18   became a war because the Border Brothers.

19   Q.  So did the Paisas basically backup this Border Brother who

20   wanted to walk in the yard?

21   A.  Yes.

22   Q.  So what happens between the Paisas and Barrio Azteca?

23   A.  We went to a big riot.  It was like 15 of us against like

24   200, 300 of them.

25   Q.  Who won that fight?

```
 1   A.  Actually, we -- it was like four or five of us they -- we
 2   got beat up real bad.  And I was one of them.
 3   Q.  What happened to you?
 4   A.  They stabbed me.  They hit me with free weights, dumbbells.
 5   And punched me, kick me all the way.
 6   Q.  Did you get sent to the hospital?
 7   A.  Yes.
 8   Q.  After the riot, did you stay at Pecos?
 9   A.  Yes.
10   Q.  How long did you stay there?
11   A.  Around seven to ten months.
12   Q.  All right.  Now, in serving out the rest of your sentence
13   there, um, where did you finally end your prison sentence?
14   Which -- which prison facility?
15   A.  They send me to outside of Dallas, a private facility.
16   Q.  And in between Pecos and Dallas, did you serve at a number
17   of facilities as well?
18   A.  Yeah.
19   Q.  Did you engage in same type of Barrio Azteca business at
20   those facilities?
21   A.  Yes.
22   Q.  At the end of your prison sentence when you're at Dallas, I
23   assume you're ultimately released, where do you go?
24   A.  They deport me back to Mexico through Laredo, Texas to
25   Laredo, Texas to Laredo, Tamaulipas.  And then I went back to
```

```
 1   Ciudad Juarez, Mexico.
 2   Q.  Okay.  And about this time that you're deported, what year
 3   is that?
 4   A.  It was in back in 2002.
 5   Q.  When you went back and reported in Juarez, Mexico -- first
 6   of all, why did you report?
 7   A.  Because it's one of the rules.
 8   Q.  All right.  Who did you report to?
 9   A.  I went to see Cosas.
10   Q.  Was Cosas a Barrio Azteca member?
11   A.  Yes.
12   Q.  How do you know who to go talk to?
13   A.  Um, they let us know as soon as -- before we got out, we
14   got a place to go or information to a phone number.
15   Q.  Pardon me.  Who's they?  Who lets you know?
16   A.  The Barrio Azteca.  The gang.
17   Q.  Would this be the leader of the last prison facility you
18   are at?
19   A.  Yes.
20   Q.  So who was the BA -- or what was the BA like in Juarez when
21   you checked in in 2002?
22   A.  It was like prison gang.  It wasn't like it is right now.
23   Actually, it wasn't that kind of organized.  Everybody was
24   splitting.  At this time is when everybody -- Cosas start to
25   get the people straight up and start to get meetings and put
```

1    everybody together to work.

2    Q.  So when you went and checked in with Cosas, did you start

3    working with the BA or did you find other work?

4    A.  I found another work.

5    Q.  With what?

6    A.  I was working with the Juarez cartel.

7    Q.  Let me ask you, you mentioned the Juarez cartel.  Is La

8    Linea another name for the Juarez cartel?

9    A.  Yes.

10   Q.  How did you get involved in working with Juarez cartel?

11   A.  Because one of my uncles -- two of my uncles, they're

12   relatives through the main guys from the Juarez cartel.

13   Q.  The same uncle who you got locked up for transporting the

14   marijuana across the border?

15   A.  Yes.

16   Q.  Did you have credibility with those guys?

17   A.  Yes.  Yes.

18   Q.  What kind of work were you doing for the Juarez cartel at

19   the time?

20   A.  I start to transport drugs from Mexico, even in Ciudad

21   Juarez.

22   Q.  All right.  How much drugs were you transporting?

23   A.  Around 50 keys of cocaine each week.

24   Q.  How much were you paid for that?

25   A.  3- to $4,500.

1    Q.  Were you making -- can you tell us, were you also working

2    on the side, a side drug business?

3    A.  Yeah.  After I was -- I work for La Linea around ten months

4    a year.  And then I got split.  And I start to do my own thing.

5    Q.  All right.  Now, you mentioned that Tolon was your padrino.

6    Did you ever send him any money down in Juarez at this time?

7    A.  Yes.  It was back in 2003.

8    Q.  And how much money did you send him?

9    A.  Around 2- $300.

10   Q.  How did you get that money to him?

11   A.  I give it to her daughter.

12   Q.  To his daughter?

13   A.  Yes.

14   Q.  And what was the name of his daughter?

15   A.  April.

16   Q.  I would like to show you what's been marked as Government's

17   Exhibit 26.

18          MR. SKARET:  This is not evidence, Your Honor.

19          THE COURT:  All right.  Just the witness.

20   Q.  (By Mr. Skaret)  This particular individual, Government's

21   Exhibit 26, do you recognize her?

22   A.  Yes.

23   Q.  What is her name?

24   A.  April Cardoza.

25   Q.  Is that the individual that you gave the money to send to

1    your padrino, Tolon?

2    A.   Yes.

3    Q.   Are you aware he she's been indicted in this case?

4    A.   Yes.

5    Q.   Now it's, approximately, 2003.  Did you ever come back to

6    the United States?

7    A.   Yes.

8    Q.   And why?

9    A.   I got married with my wife.

10   Q.   Did you get married here in El Paso?

11   A.   Yes, on the courthouse.

12   Q.   When was the next time you got in trouble with the law?

13   A.   2006.

14   Q.   What happened there?

15   A.   They arrested me transporting around 200 pounds of

16   marijuana in Oklahoma -- in the State of Oklahoma.

17   Q.   And what were you doing with this 200 pounds of marijuana?

18   A.   I was on my way to Memphis, Tennessee.

19   Q.   Memphis, Tennessee?

20   A.   Yes.

21   Q.   Were you convicted for that?

22   A.   Yes.

23   Q.   Did you plead guilty?

24   A.   Yes.

25   Q.   What was your sentence?

1    A.   36 months.

2    Q.   Was that in federal court?

3    A.   Yes.

4    Q.   So now you're in federal system.  What prisons did you

5    serve your time at for the drug charge?

6    A.   I went to Fort Worth, Texas.

7    Q.   Where else?

8    A.   And Bastrop.

9    Q.   Anywhere else?

10   A.   Back to Pecos.  And back deported back to Mexico.

11   Q.   Did the BAs have a presence in the federal prisons that you

12   were transported to?

13   A.   Yes.

14   Q.   All right.  Did you check in to the prisons like you were

15   supposed to?

16   A.   Yes.

17   Q.   Tell me, when you checked in, did the Barrio Azteca

18   leadership investigate you when you checked in?

19   A.   Yes.

20   Q.   Tell us about that investigation process.

21   A.   They take your information, name.  And if there's not a

22   rank over there in that prison, they send it to a rank to check

23   your background.

24   Q.   And what part of rank -- or who with rank would they send

25   that to?

```
1    A.  Depends on who you got communication with.
2    Q.  Ultimately, did you pass your investigation?
3    A.  Yes.
4    Q.  Did you join up with the Barrio Azteca in those prisons?
5    A.  Yes.
6    Q.  Did you engage in BA assaults during your prison terms?
7    A.  Yes.
8    Q.  When you finished up your 36-month sentence on the drug
9    charge, what happened?
10   A.  I get deported back to Mexico in 2008.
11   Q.  Was Juarez a different place?
12   A.  Yes.
13   Q.  How was it different?
14   A.  The gang -- it was real, real organized.  And they joined
15   Juarez drug cartel, like they're enforcers.
16   Q.  And why did the Barrio Azteca and Juarez drug cartel join
17   forces at that time?
18   A.  At the beginning they started just with drugs.  After that,
19   they -- they became like more connected to the cartel.  And the
20   cartel start using the gang to do their dirty work.
21   Q.  Who was the gang doing their dirty work against?
22   A.  Against another rival gangs and the rival Sinaloa cartel.
23   Q.  So the Juarez cartel was basically at war?
24   A.  Yes.
25   Q.  With whom or against whom?
```

1   A.   Against the Sinaloa cartel.

2   Q.   Now, you mentioned it was a Barrio Azteca rule to check in.

3   Did you check in in Juarez, Mexico?

4   A.   Yes.

5   Q.   Who did you check in with?

6   A.   Fresa.

7   Q.   The same Fresa that sponsored you in back in Pecos?

8   A.   Yes.

9   Q.   Tell us about how you checked in.

10   A.   I looked for him because I'm -- one of the sisters used to

11   have a business where we used to hang up before I come to live

12   in El Paso and went to prison.  And I meet him.  And he take me

13   to my rehab to check my background again.

14   Q.   Who was at rehab to check your background?

15   A.   It was Freddie and Cuate.

16   Q.   Cuate.  Did you ever meet an individual named Chino Valles?

17   A.   I spoke on the phone with him.

18   Q.   All right.  And that was at that time at the rehab?

19   A.   Yes.

20   Q.   Why did you speak on the phone with Chino Valles?

21   A.   At that time it was a real, real heat on Juarez because the

22   war.  And because the Government, they're looking for members

23   of the gang.  And there was like more hiding.

24   Q.   And Chino Valles, was he a Barrio Azteca member?

25   A.   Yes.

David A. Perez, RMR, RPR

```
1    Q.  Was he a leader?

2    A.  He used to be.

3    Q.  Um, what did you talk about with him on the telephone?

4    A.  He asked me my name and where I coming from and -- how if I

5    was good and clear.  And I told him yes.

6    Q.  As part of your cooperation in the United States, have you

7    previously identified Fresa and Chino Valles?

8    A.  Yes.

9    Q.  I would like to show you what's been marked as Government's

10   Exhibit 26.

11           MR. SKARET:  This is not in evidence, Your Honor.

12           THE COURT:  All right.

13   Q.  (By Mr. Skaret)  Do you recognize at that individual there?

14   A.  Yes.

15   Q.  Who is that?

16   A.  Fresa.

17   Q.  Do you recognize -- he's not on here.  So, basically, Chino

18   Valles conducted your investigation?

19   A.  Yes.

20   Q.  Did he get back to you on the results of the investigation?

21   A.  It was quick on the same phone call I got with him.

22   Q.  Okay.  How was he able to basically complete your

23   background investigation so quickly?

24   A.  Because Fresa, he know me back in the day.  He was the one

25   who sponsored me to become a member.
```

1    Q.  And Fresa vouched for you?

2    A.  Yes.

3    Q.  All right.  Did Fresa give you an update of what was going

4    on in Juarez?

5    A.  Yes.

6    Q.  What did he say?

7    A.  He say we was in a war and we had to take care about what

8    we do, where we go.  If you got any tattoos, you have to cover

9    up because the federal government -- it was behind us and the

10   rival gangs.

11   Q.  And what did he say about the murders that were occurring

12   in Juarez?

13   A.  Um, he told me like right now there were working for La

14   Linea direct -- work for La Linea.  And they told me, like the

15   enforcers.  And at this time it was JL in charge from La Linea.

16   He was the main guy who orders the hits and tell the Barrio

17   Azteca to do it.

18   Q.  And why is Juarez so important to these cartels that are

19   fighting?

20   A.  Because it's one of the biggest places to transport drugs

21   into the United States.

22   Q.  Now, you just mentioned an individual named JL?

23   A.  Yes.

24   Q.  And you mentioned he was involved with the Juarez drug

25   cartel?

```
 1   A.  Yes.
 2   Q.  What was his position?
 3   A.  He was the leader.
 4   Q.  Did there ever come a time when you went and talked to JL?
 5   A.  Yes.
 6   Q.  Tell us about that.
 7   A.  I meet him before I went to prison the last -- second time.
 8   And I was doing some work for him, moving around keys of
 9   cocaine.  And when I got out the second time, um, one of my
10   have cousins used to have a bar over there.  It was a place
11   where they used to hang up.  My cousin told me, like, JL came
12   by before I got out and asked for me.  My cousin -- at the time
13   I went with my cousins to get a couple of drinks.  He told me
14   if I can go and see JL.
15   Q.  Did you ultimately meet up with him?
16   A.  Yes.
17   Q.  And why did you go see him?
18   A.  Just to give my respects.  And just to find out what he
19   want from me.
20   Q.  Were you looking for a job?
21   A.  Not really.
22   Q.  Why not?
23   A.  Because I'm done.  And I was doing too many time in prison.
24   And, actually, I was married.  My wife wait for me.  And she
25   told me if I came back again to the same thing, she's going to
```

1  left me.

2  Q.  Where was your wife at this time?

3  A.  In El Paso.

4  Q.  Did you ultimately go see JL?

5  A.  Yes.

6  Q.  Where was he?

7  A.  It was kind of outside Juarez city limits.

8  Q.  All right.  Um, what happened when you -- did you go to the

9  place?

10  A.  Yes.

11  Q.  What happened when you got there?

12  A.  I got there.  And as soon as I came in, I see three of the

13  gang members from the Barrio Azteca.  One of them, it was in

14  the car.  And two of them was inside of the house talking with

15  JL.

16  Q.  Who was in the car?

17  A.  Camello.

18  Q.  Camello.  Do you know his full name?

19  A.  Jesus Chavez.

20  Q.  And with respect to this individual, Jesus Chavez, he's

21  also known as Camello, you say?

22  A.  Yes.

23  Q.  All right.  Do you know what his position was at that time?

24  A.  Fresa told me he became leader.  He was in charge of one of

25  the hit squads.

```
 1   Q.  Now Camello is in the car.  Who's outside of the car?
 2   A.  Nobody was outside the car.  The other two members -- it
 3   was inside of the house.
 4   Q.  Inside the house?
 5   A.  Yes.
 6   Q.  Did you go inside his house?
 7   A.  Yes.
 8   Q.  And did you see who were those two other guys?
 9   A.  Yes.
10   Q.  Who were they?
11   A.  One of them was Tablas.  And the other one was Rafa Duarte.
12   Q.  Who's Tablas?
13   A.  Eduardo Ravelo.
14   Q.  What's his position in Juarez?
15   A.  It's one of the captains for the gang.
16   Q.  For them who?  The Barrio Azteca?
17   A.  Yes.
18   Q.  All right.  I'm showing what's been marked as Government's
19   Exhibit 26.  Do you recognize that individual?
20   A.  Yes.
21   Q.  Who is it?
22   A.  Tablas.
23   Q.  You mentioned the second individual that was inside was
24   Rafa?
25   A.  Rafa Duarte.  Rafael Duarte.
```

```
1   Q.  And what was his role in the Barrio Azteca organization?
2   A.  He is a lieutenant from the gang.
3   Q.  Why was Tablas and Rafa Duarte at the home of JL that day?
4   A.  He was talking about some business.
5   Q.  All right.  What kind business?
6   A.  Actually, when I get in, Rafa -- I saw JL.  And he told me,
7   like, he want to introduce me to these guys.  And he didn't
8   know I was a Barrio Azteca member.  So he told me, like, I want
9   you to meet these guys.  And they're working with me.  And it
10  was a laugh over there, because the two gang members, they
11  already know me because I was a member.  And JL became like
12  strange because he didn't know about me.  So --
13  Q.  He's trying to introduce you to people that already know
14  you?
15  A.  Yes.
16  Q.  All right.  What, if anything, did JL tell Tablas about
17  you?
18  A.  Um, actually, they start to talk about business.  And JL
19  told me to get to another room.  As soon as they finish, I came
20  back.  And JL told to Tablas, like, I want you to take care
21  about this guy, about me.  And I don't want you to put him on a
22  hit -- he just barely got out.  I don't want you to put him on
23  the hit squads and all that.
24  Q.  All right.  Now, you mentioned the hit squads.  What is a
25  hit squad?
```

1    A.  Hit squad, it's about -- it's about six -- six, seven

2    members.  It's these people, they're always in quarantine.

3    These people -- it's people who got deported or they're from

4    Juarez.  They are Barrio Azteca members.  And they put them to

5    work.

6    Q.  Okay.  So what kind of work does a hit squad do?

7    A.  Killing.

8    Q.  And is this -- is that the sole goal in life, basically?

9    A.  Yes.

10   Q.  All right.  So JL tells Tablas don't put you on a hit team.

11   A.  Yes.

12   Q.  All right.  Does Tablas end up putting you on a hit team?

13   A.  No.

14   Q.  All right.  What does he do?

15   A.  He talked to me.  And he was worried.  He asked me where I

16   know JL.  I told him it was back in the day and I was working

17   with him.  And he was kind of worried, kind of jealous

18   because -- I don't know.

19   Q.  Because you were friends with JL?

20   A.  Yes.

21   Q.  Okay.  Now, if JL hadn't put in that word for you, do you

22   know what Tablas had in mind for you?

23   A.  Yes.

24   Q.  And what had he had in mind?

25   A.  Put me on a hit squad right away.

1   Q.  In Juarez did you ever come across another individual by
2   the name of Arturo Castrellon Gallegos, otherwise known as
3   Benny or Farmero?
4   A.  Yes.
5   Q.  As part of your cooperation in this case you've identified
6   that individual, correct?
7   A.  Yes.
8   Q.  I would like to show you what's been marked as Government's
9   Exhibit 26.  Do you recognize that individual?
10  A.  Yes.
11  Q.  Who is it?
12  A.  Farmero.
13  Q.  Is he also known as Benny, real name Arturo Castrellon
14  Gallegos?
15  A.  Yes.
16  Q.  What are some of the other leaders of the Barrio Azteca
17  that you met down there after meeting with JL at his house?
18  A.  Actually, I got out.  And two days later Fresa called me
19  and they want -- they want to talk to me.  And they take me to
20  another house.  And I meet Tablas over there and Rafa.  And he
21  want to talk to me.  And he pulled me to the side and asked me
22  about JL and all that.  And, actually, he tried to get JL out
23  of the game and tried to get his spot.
24  Q.  Tried to get his spot?
25  A.  Yes.

1    Q.  So, basically, Tablas is trying to take over?

2    A.  Yes.

3    Q.  Did he want your help?

4    A.  Yes.

5    Q.  Did you give it to him?

6    A.  No.

7    Q.  Why not?

8    A.  I told him, like, he has to be real connected with the main

9    leader from the Juarez drug cartel.  Because if he don't, the

10   leader is going to come and get him.

11   Q.  Um, now when you were down there, meeting up with some of

12   these Barrio Azteca leaders in Juarez, in addition to nicknames

13   did they go by numbers?

14   A.  Yes.

15   Q.  Why do they have numbers assigned to them?

16   A.  Because all the communication they have on the frequency

17   radios, they don't want to pick up names or nicknames.

18   Q.  So they use numbers on the radios?

19   A.  Yes, sir.

20   Q.  Did you listen to the radios when you were down there?

21   A.  Yes.

22   Q.  What kind of business are they conducting on the radio?

23   A.  All kind of business.  Killings, extorsion, drug business,

24   money laundering.

25   Q.  Let me go back for a second.  When you met with Tablas and

David A. Perez, RMR, RPR

```
 1   he wanted to use you with respect to JL, what did Tablas want
 2   your help in doing to JL?
 3   A.   Kill him.
 4   Q.   Okay.  All right.  That's when you say no you're not going
 5   to do that?
 6   A.   Yes.
 7   Q.   Now with respect to these -- the Barrio Aztecas' use of
 8   radios down there, they use the number on the radio.  Why is
 9   that?
10   A.   Because they don't wanna get the federal police, get a
11   track or for names or nicknames.
12   Q.   When you were with Fresa, did he have a radio?
13   A.   Yes.
14   Q.   Was he a leader in the Barrio Azteca then?
15   A.   He got -- he was on the -- the leader of one of the hit
16   squads.
17   Q.   All right.  And he had a radio?
18   A.   Yes.
19   Q.   And did you hear hits going down on the radio?
20   A.   Yes.
21   Q.   Did the Barrio Azteca leaders in Juarez all have radios?
22   A.   Yes.
23   Q.   What is Chino Valles a leader?
24   A.   Yes.
25   Q.   Did you ever make it back to your wife in El Paso?
```

1    A.  Yes.

2    Q.  When was that?

3    A.  Just spent like 20 days, 25 days in Juarez.  And I came

4    back to El Paso.

5    Q.  All right.  Did the police ever come to you because you

6    were here illegally at that point?

7    A.  Yes.

8    Q.  When was that?

9    A.  Back in May 26, 2010.

10   Q.  Before you got picked up, did you report to the Barrio

11   Azteca here in El Paso?

12   A.  Yes.

13   Q.  And who did you report to?

14   A.  It was Flaco.

15   Q.  All right.  Was he a leader in the organization?

16   A.  Yes.  He was in charge of one of the areas from El Paso.

17   Q.  All right.  Now, with respect to the police catching you

18   because you were here illegally, were you charged and convicted

19   on a charge relating to that?

20   A.  Yes.

21   Q.  Is that the illegal re-entry charge we talked about

22   earlier?

23   A.  Yes.

24   Q.  Where have you spent your prison time up to date on that

25   charge?

David A. Perez, RMR, RPR

```
 1    A.  I went to Coleman, Florida.  And then they transferred me
 2    to Oakdale, Louisiana.
 3    Q.  Before you came out here for trial, where were you?
 4    A.  Oakdale, Louisiana.
 5    Q.  And when you left Oakdale, who was in charge for the BAs
 6    there?
 7    A.  I was.
 8    Q.  Mr. Carrillo, I would like to ask you, have you ever heard
 9    of a BA member by the name of Spooky?
10    A.  Yes.
11    Q.  How have you heard of this individual?
12    A.  We got some communication with another lieutenant.  And he
13    let us know about -- he's the new captain on the Barrio Azteca
14    gang.
15    Q.  Did you know anything about his background?
16    A.  Over there in Oakdale, there was a member who used to --
17    did some time with Spooky.
18    Q.  All right.  What did that particular member tell you about
19    Spooky?
20    A.  He said he was in charge in some prison.  I don't know the
21    name of the prison.  And, um, he got shipped out to Otisville,
22    New York.
23    Q.  Otisville, New York?
24    A.  Yes.
25    Q.  All right.  Go ahead.
```

```
 1   A.  And he did some kind of mess.  And he got to clean it up.

 2   And another capo from the gang, Shotgun, Carlos Pereya, send

 3   him a order to clean up his mess.

 4            MR. FOSTER:  Judge, I'm going to object and ask for a

 5   hearing on this matter.

 6            THE COURT:  Would the attorneys approach?

 7            (Bench conference.  Out of hearing of Jury.)

 8            THE COURT:  What's your objection?

 9            MR. FOSTER:  They're about to introduce prior

10   adjudicated conduct for which there has been a trial, pled

11   guilty.  And he's been -- and my client -- has been sentenced

12   on that case.  This conduct falls within the -- just about a

13   month within the indictment.  If they're going to use

14   adjudicated conduct within the indictment to prove up his

15   involvement in the BA, then that could constitute a lesser

16   included offense or might be a prior jeopardy claim.

17            THE COURT:  Is it a pending case?

18            MR. FOSTER:  It's already been adjudicated.  He's pled

19   guilty on it and been sentenced and did his time.  They're

20   about to introduce things from which there's already a judgment

21   pending.  My client has not testified.  And so, um, using a

22   prior adjudicated conduct against him at this point actually

23   constitutes a portion of the offense that -- that's charged.

24   And it could be a former jeopardy.

25            THE COURT:  All right.  What's the Government's
```

1    response?

2           MR. SKARET:  First of all, Your Honor, the defense has

3    had notice of this.  It's been in this 302 of this particular

4    individual, first.  Second, under RICO, this is typical and

5    customary RICO type of evidence.  What did the guy do in jail?

6    How did he participate in BA activities?  I believe the

7    witness's testimony up to the point of the objection was that

8    this particular person that he knew as Spooky, he heard from

9    his BA -- BA buddies at Oakdale was -- this particular man

10   named Spooky was locked up in Otisville.  And that I believe

11   the testimony is going to be that as part of that -- well, I

12   should back up.  The testimony was that while in Otisville, he

13   got himself in a mess, which I'm going to have him explain what

14   a mess is.

15          In order to clean up that mess an individual named

16   Shotgun told him he had to do a job.  This individual, in

17   talking with others in the conspiracy, all believed that what

18   he did to clean up that job was stabbed a rival inmate.  We're

19   not getting into anything about whether he was charged and

20   convicted of that offense.  Um, only that that was the word.

21   And the reason why that's important, that particular event gave

22   the defendant instant credibility in the organization.  And he

23   was subsequently shipped off to be housed with Shotgun.  And,

24   you know, of course, the Court knows the evidence after that.

25          So with respect to our RICO conspiracy, it's within

```
 1   the timing of the RICO, but it's a co-conspirator statement

 2   certainly within the time of the conspiracy.

 3            MR. FOSTER:  What's a co-conspirator statement -- I

 4   know what a co-conspirator statement is.  What I'm saying is

 5   this man is not a co-conspirator.

 6            MR. SKARET:  Yes.  He is unnamed.

 7            MR. FOSTER:  He's not in the indictment or the other

 8   indictment.

 9            MR. SKARET:  The indictment alleges the RICO

10   conspiracy was with these individuals and others named and

11   unnamed.  This individual testified he's a member of the Barrio

12   Azteca, has been a member.  He was a member of the Barrio

13   Azteca before the charged conspiracy, all during, and, in fact,

14   all the way up until today.  So he's certainly a

15   co-conspirator.  And the statement that he's referencing, um,

16   is from a Barrio Azteca member, who's at Oakdale and speaking

17   about this charged conspiracy and talking about Spooky and why

18   he's got credibility.

19            THE COURT:  Okay.  What are we trying to prove with

20   all of this?  I'm at a loss to understand what the Government

21   is attempting to prove that this incident happened at Oakdale.

22            MR. SKARET:  Well, the incident didn't happen at

23   Oakdale.  It was at Otisville.

24            THE COURT:  Sorry.

25            MR. SKARET:  We are attempting to prove that members
```

1    who were in jail, not even at Otisville, members all over the

2    country knew about Spooky.  The reason they knew was that he

3    proved himself just like every other witness that has taken the

4    stand.  They've proven themselves.  And the way he did is he

5    stabbed an individual at Otisville, New York while

6    incarcerated.  It was a member of a rival gang.  And the reason

7    he did it was because he was in bad standing with Shotgun.

8             THE COURT:  This is at Shotgun's direction?

9             MR. SKARET:  Yes.

10            THE COURT:  What year is it?

11            MR. SKARET:  2003, I believe.

12            MR. FOSTER:  February 21, 2003 is the allegation --

13   that's the --

14            MR. SKARET:  Of course, he gets charged for that in

15   the Southern District of New York.  That's why, ultimately, he

16   gets, basically, another sentence stacked onto his sentence

17   that he was serving time for.  We're not getting into the fact

18   he was charged or convicted.  And, basically, it's just the

19   beginning of that part of the story.

20            MR. COOLEY:  May I address this?

21            THE COURT:  Sure.

22            MR. COOLEY:  RICO would permit to us get into that

23   conviction if we decided to do that.  RICO encompasses other

24   offenses of conviction.  We're not even going that far.

25   Simply, the information is provided by other co-conspirators.

 1    Again, that raised his status to one of the top five people in

 2    the whole BA gang.  I mean, that explains why.  That's why it's

 3    pertinent.

 4          MR. FOSTER:  I can see their point, Judge.  I'm

 5    looking at this saying this is an event which is a part of this

 6    case, the fact that he has been convicted on it brings up a

 7    former jeopardy claim.

 8          THE COURT:  I don't know how it's part of this case.

 9    The conspiracy that we're talking about here has to do -- I

10    mean, everything the Barrio Azteca does is in furtherance of

11    the BA.  The RICO conspiracy has been about the movement and

12    the collection of quotas here in El Paso area and not anything

13    to do with, you know, some stabbing in Otisville.  I mean,

14    everything that Barrio Azteca do since they formed is in

15    furtherance of the BA.  Doesn't make it part of this case.

16          MR. SKARET:  Your Honor, I believe the witness already

17    is -- for the most part in his life when he joined, he was in

18    jail.  And, you know, I think we've heard a lot of evidence in

19    this case that the enterprise conducts its affairs in jail.

20          He's saying that, you know, while he was in jail, he's

21    ordered to beat up members of the rival gangs.  It's no

22    different than what Spooky did back in 2003.  I believe it was

23    two weeks or so where I had a conversation with Mr. Foster

24    about our ability to introduce the certified conviction on this

25    case.  At that point he raised the same concern and said, Well,

 1    I don't want the jury thinking they need to punish my guy for a
 2    stabbing that he's already been convicted for.  He mentioned he
 3    might put this in his side of the case.
 4         MR. FOSTER:  That's true, Judge.
 5         MR. SKARET:  That might very well be in.  But as far
 6    as we're concerned, we don't need to introduce the evidence.
 7    This is the evidence that we need to get in.  We don't need a
 8    certified conviction, again, what we're trying to get to the
 9    jury.  But if he's concerned about the jury wanting to punish
10    his guy a second time for something that he's already done, he
11    believes is part of the conspiracy, we would have no objection
12    to him introducing this in his part of the case.
13         THE COURT:  Again, I don't want to confuse the jury.
14    There's been plenty of testimony of illegal activities.  The
15    Court's going to overrule the objection.  I do think it's
16    admissible.  But if someone -- whether the government or you
17    attempt to introduce his prior conviction, then I'm going to
18    need some good reason to introduce it.  Because it's not being
19    introduced for any other purpose than to show standing in the
20    BA, so -- not because he's trying to be punished for it.  So
21    all right.  I'll -- I'll overrule.
22         (End of bench conference.  Back in open court.)
23         THE COURT:  The Court will overrule the objection.
24    You may proceed.
25    Q.  (By Mr. Skaret)  So you had just told the Members of the

 1    Jury that you heard from a BA member in Oakdale, Louisiana that
 2    the defendant was in Otisville, New York, got himself into a
 3    mess.  In order to get himself out of the mess, he obeyed an
 4    order from Shotgun and stabbed an inmate.  Is that correct?
 5    A.  Yes.
 6    Q.  What does it mean to get yourself into a mess?
 7    A.  It's different.  Kind of a screwed up.  Probably, he didn't
 8    follow an order or didn't do something he supposed to do.
 9    Q.  As, um, usual practice in the Barrio Azteca if you get
10    yourself into a mess, are you given a job?
11    A.  Yes.
12    Q.  Is it usually -- um, what types of jobs are you given?
13    A.  It's depending of the rank what he want to give you.  He
14    can give you probation, put to you work or put to you workout.
15    Or even they could give you a job where you need to stab
16    somebody.
17    Q.  Is it safe to say this is how the defendant proved himself
18    with Shotgun?
19    A.  Yes.
20    Q.  Is this the last you heard of an individual in the Barrio
21    Azteca named Spooky?
22    A.  After he did his job, he got some time, federal time, for
23    doing that.  He got transported to Pollock, Pollock USP where
24    he meet with Shotgun.
25    Q.  How do you know that?  How do you know he was transferred

```
1    to Pollock?
2    A.  Because the same member he was with me, he told me about
3    his -- his story.
4    Q.  And did you ever see a picture of this individual named
5    Spooky?
6    A.  Yes.
7    Q.  And what kind of a picture was it?
8    A.  It was a prison group picture.
9    Q.  Group prison picture?
10   A.  Yes.
11   Q.  In that particular picture what was this individual named
12   Spooky wearing?
13   A.  Muscle shirt.
14   Q.  Muscle shirt?
15   A.  Yes.
16   Q.  Can you describe from the picture what Spooky looked like?
17   A.  Short guy, white, with long sleeved tattoos.
18   Q.  And is it common to see pictures of other Barrio Azteca
19   members while you were in prison?
20   A.  Yes.
21   Q.  And is it common to send out pictures of Barrio Azteca
22   members in your facility?
23   A.  Yes.
24   Q.  All right.  Have you ever seen this individual named Spooky
25   in person?
```

```
 1    A.  No.
 2    Q.  If you saw him again, would you recognize him?
 3    A.  Yes.
 4    Q.  Do you recognize him today in court?
 5    A.  Yes.
 6    Q.  If you would, please point to the individual that you
 7    recognize from that photo and identify him by what he's wearing
 8    and sitting.
 9    A.  It's right there, that table.  Wearing a black suit with a
10    blue shirt.
11          MR. SKARET:  May the record reflect a positive
12    identification of the defendant?
13          THE COURT:  It will so reflect.
14    Q.  (By Mr. Skaret)  Did you receive any letters regarding this
15    particular individual named Spooky while you were at Oakdale?
16    A.  Not for him.
17    Q.  Not from him?
18    A.  No.
19    Q.  Did you receive letters about him?
20    A.  Yes.
21    Q.  What were those about?
22    A.  They just let us know who he was, the new captain on the
23    gang.
24    Q.  Was it your job to receive these types of letters?
25    A.  I wasn't in charge.  It was another gang member.
```

1   Q.   So when was this, approximately?

2   A.   Approximately, in January this year.

3   Q.   And, um, that he's when you received it at Oakdale?

4   A.   Yes.

5   Q.   What did the letter say?

6   A.   Um, it says about Spooky.  And say about Shotgun, he was

7   underground on the supermax.  And it said another gang member

8   Lugas was in charge of the federal system.  And, um, he said

9   also, like, as soon as Shotgun get out from the shoe on -- on

10  Florence, he's going to do a clean-up on the gang.

11  Q.   Does it say thinking about the guys who are on the muleta

12  list?

13  A.   Excuse me?

14  Q.   Does it say anything about the guys who are on the muleta

15  list?

16  A.   Not really.

17          MR. SKARET:  Your Honor, at this time the Government

18  would offer Government's Exhibit 26 into evidence.  This is the

19  organizational chart.  I believe everyone has been identified

20  by name and by picture, by rank.  And the government would like

21  to produce this for demonstrative purposes.

22          THE COURT:  Any objections?

23          MR. FOSTER:  No, Judge.  I've been counting.  They've

24  got them all identified.

25          THE COURT:  So Government's Exhibit 26 will be

1    admitted.

2              MR. SKARET:  May I publish, Your Honor?

3              THE COURT:  You may.

4              MR. SKARET:  Pass the witness.

5              THE COURT:  Mr. Foster?

6                        CROSS-EXAMINATION

7    BY MR. FOSTER:

8    Q.  Mr. Carrillo, you were charged and sentenced to 37 months

9    back in 2000.  Is that correct?

10   A.  Yes.

11   Q.  In federal court.  Possession of marijuana with intent to

12   distribute?

13   A.  Yes.

14   Q.  That was out of New Mexico?

15   A.  Yes.

16   Q.  Um, and shortly thereafter you were also -- or probably

17   wrapped into the same case, you had an importation of marijuana

18   of 100 kilos where you got 36 months?

19   A.  Yes.

20   Q.  That was the case out of El Paso, correct?

21   A.  No, in Oklahoma.

22   Q.  No.  Let's see.  Oklahoma.  That was in 2006?

23   A.  Yes.

24   Q.  I'm talking 2001.  Did you not have a case in El Paso and a

25   case in New Mexico for drug smuggling?

David A. Perez, RMR, RPR

1   A.   Yes.

2   Q.   Okay.  In 2006 you had a possession with intent to

3   distribute marijuana out of Oklahoma, correct?

4   A.   Yes.

5   Q.   And you did a cooperative agreement in that case as well,

6   didn't you?

7   A.   Yes.

8   Q.   Then here in 2010, it looks like May 25th, you were in the

9   county jail for possession of marijuana less than two ounces?

10  A.   Yes.

11  Q.   And that's where you were picked up by immigration

12  officials and consequently prosecuted for illegal re-entry.  Is

13  that correct?

14  A.   Yes.

15  Q.   You received a 66-month sentence or 60?

16  A.   60.

17  Q.   In this case you're looking for a reduction in sentence.

18  Is that correct?

19  A.   Yes.

20  Q.   When did you first start talking to the Government about

21  this case?

22  A.   It was August of 2010.

23  Q.   August 2010.  Even though you had been talking to the

24  government you went back to a prison where you were put in

25  charge by the Barrio Azteca?

1    A.    Yes.

2    Q.    They didn't know you had talked to the government?

3    A.    Yes.

4    Q.    They did or did not?

5    A.    Did not.

6    Q.    Okay.  In fact, when you were first started talking to the

7    government, you denied any gang affiliation, didn't you?

8    A.    No.

9    Q.    Were you arrested on this?

10    A.    They already know it's on my record.

11    Q.    You've also been a user of drugs, as well, cocaine,

12    marijuana?

13    A.    Yes.

14    Q.    You used right up until the time you were arrested.  Is

15    that correct?

16    A.    Yes.

17    Q.    In fact, that's why you were over there in jail was because

18    of the marijuana.

19    A.    Yes.

20    Q.    And earlier in your life you also used mushrooms and LSD?

21    A.    Yes.

22    Q.    What are mushrooms?

23    A.    It's a -- it's -- grows underwater.  But it's some kind of

24    a synthetic drug.

25    Q.    Okay.  Are you looking for something like an S visa or

```
1    asylum this your case?
2    A.  Yes.
3    Q.  What happens if the government and immigration officials do
4    deport you or restate your deportation order and you go back to
5    Juarez?
6    A.  I'm going to get killed.
7    Q.  You worked for La Linea at one time.
8    A.  Yes.
9    Q.  What did you do for La Linea?
10   A.  Transported drugs.
11   Q.  It's my understanding La Linea is the enforcement side of
12   the Juarez cartel?
13   A.  It's a name for the Juarez cartel.
14   Q.  So it's used interchangeably?
15   A.  Yes, it's the same thing.
16   Q.  To prove yourself you beat up how many people?
17   A.  Five.
18   Q.  Broken ribs?
19   A.  Yes.
20   Q.  Knocked out their teeth?
21   A.  Yes.
22   Q.  Serious injuries.
23   A.  Yes.
24   Q.  You said after you got out, you went back to Juarez and
25   reported to Cosas?
```

David A. Perez, RMR, RPR

1    A.   Yes.

2    Q.   And you were -- I'm sorry.  How much cocaine you said you

3    transported each week?

4    A.   Around 50 kilograms.

5    Q.   About 50 kilos?  How much were you being paid?

6    A.   3,000 to $4500 a week.

7    Q.   Did you suspect that you were being severely underpaid for

8    that?

9    A.   Yes.

10   Q.   Why did you do it?

11   A.   Because I don't got no job and no money at the time.

12   Q.   Now, let's see.  When you were in Oakdale, Louisiana, you

13   said you were in charge.  Were you in regular population or

14   lock-down?

15   A.   Regular population.

16   Q.   Now, you said Tablas came to you and asked you for help in

17   taking over in Juarez?

18   A.   For the leader.

19   Q.   What did you tell him?

20   A.   I told him, like, he's not being really connected to the

21   main guy through the leader from the cartel, he's going to send

22   people to kill him.

23   Q.   No.  I said what did you tell him?  Did you tell him -- you

24   told him no?

25   A.   Yes.

David A. Perez, RMR, RPR

1    Q.   Is that correct?

2    A.   Yes.

3    Q.   And is no a word you use to the leadership?

4    A.   No, not really.  I just -- I just explained to him what was

5    going to be the risk if he do that.

6    Q.   You claimed to recognize Mr. Renteria from a photograph.

7    When was the first time you saw a photograph of Mr. Renteria?

8    A.   At the beginning of this year.

9    Q.   Who showed you that photograph?

10   A.   Another member.

11   Q.   I'm sorry?

12   A.   Another member.

13   Q.   Another member?

14   A.   Yes, sir.

15   Q.   So it was done in prison?

16   A.   Yes.

17   Q.   Was it done by the FBI?

18   A.   It was a prison photograph.

19   Q.   You have no problem with your recollection at this point of

20   this one person?

21   A.   Yes.

22   Q.   Was that a group photograph you looked at?

23   A.   Yes.

24   Q.   Do you remember everybody on that photograph?

25   A.   Most of them.

1    Q.  How many were on that photograph?

2    A.  Around eight, ten people.

3    Q.  Do you know when the photograph was taken?

4    A.  Probably Otisville, New York.

5    Q.  No.  When?

6    A.  I don't know.

7    Q.  You don't know when it is?

8    A.  No.

9    Q.  You weren't there for the photograph to be taken, right?

10   A.  Yes.

11   Q.  Have you seen that photograph again?

12   A.  I just saw him, like, a couple times.  That's it.

13   Q.  Have you seen it a couple of times since you first saw it?

14   A.  Yes.

15   Q.  From the same people, same location?

16   A.  Yes.

17   Q.  Not since you've been talking with the FBI or the

18   government?

19   A.  No.

20   Q.  But you've never before met Mr. Renteria?

21   A.  No.

22   Q.  When you testified about things that you heard about what

23   happened in Otisville -- I'm sorry, yeah, Otisville, those were

24   things you heard from somebody?

25   A.  Yes.

1    Q.  You have no person knowledge of that?

2    A.  Not really.  But we not allowed say --

3    Q.  Sir -- I'm sorry.  Do you have any personal knowledge of

4    that?  Yes or no, please.

5    A.  They just told me about it.

6    Q.  How many people did it go through before it got to you?  Do

7    you have any clue?

8    A.  No.

9    Q.  How far are you on the BA gossip vine?

10   A.  I don't understand the question.

11   Q.  Are you one of the top people who gets information right

12   away about stuff like that -- well, back in 2003, were you one

13   of the top people who gets information about that right away or

14   kind of on the tail end of that line?

15   A.  Can you say that again?

16   Q.  Back when this was supposed to have happened in 2003, were

17   you one of the first people to receive this type of

18   information?  Or were you at the end of the line of receiving

19   information?

20   A.  What information you talking about?

21   Q.  The information you're testified to, sir.

22   A.  I don't understand 2003 and this information.

23        MR. SKARET:  I believe the question misstates the

24   evidence.  The information came in around the beginning of this

25   year was the testimony on direct.

```
 1              THE COURT:  All right.
 2              MR. SKARET:  Not 2003.
 3              THE COURT:  The jury will recall the testimony.
 4              MR. FOSTER:  I will go ahead and pass the witness.
 5              THE COURT:  All right.  Mr. Skaret?
 6                       REDIRECT EXAMINATION
 7  BY MR. SKARET:
 8  Q.  Mr. Carrillo, how important is effective communication
 9  within the Barrio Azteca?
10  A.  It's -- when you're in prison, it's the only way to get
11  communication between the other prisoners.
12  Q.  What happens if you receive unreliable information?
13  A.  You're up to get disciplinary action.
14  Q.  And the people who provide unreliable information, what
15  happens to them?
16  A.  Depends.  They got beat up.  They can be stabbed or they
17  can become ex-members.
18  Q.  And if you spread unreliable information, what happens to
19  you?
20  A.  Reliable.  It's always we talk.
21  Q.  And if you spread unreliable information, what happens to
22  you?
23  A.  They run a card on you.  And they put you up to
24  disciplinary action.
25              MR. SKARET:  That's all, Your Honor.
```

David A. Perez, RMR, RPR

1          THE COURT:  All right.  Mr. Foster, anything further?

2          MR. FOSTER:  Give me just a second, Judge.

3          THE COURT:  All right.

4          MR. FOSTER:  We're not going to have any further

5     questions of this witness.

6          THE COURT:  Is this witness excused?

7          MR. SKARET:  Yes, Your Honor.

8          MR. FOSTER:  We have no objection, Judge.

9          THE COURT:  You may step down.  You're excused as a

10    witness.

11          (End of requested testimony.)

12

13

14

15                              **INDEX**

16

17                    <u>Direct</u>    <u>Cross</u>    <u>Redirect</u>    <u>Recross</u>

18    WITNESSES FOR THE
      GOVERNMENT:

19

20    FERNANDO CARRILLO      3       47        55
      CANDIA

21

22    <u>EXHIBITS</u>:                                    <u>Admitted</u>

23    Government

24    26    Chart                                            47

25

David A. Perez, RMR, RPR

* * * * * *

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.  I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Signature:/s/_____Date:  June 14, 2013
            David A. Perez, RMR, RPR


David A. Perez, RMR, RPR