```
1                IN THE UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF TEXAS

3                        EL PASO DIVISION

4

5   UNITED STATES OF AMERICA            No. EP:10-CR-2213-KC

6   v.                                  El Paso, Texas

7   RAMON RENTERIA                      May 21, 2012

8

9                          JURY TRIAL

10                          VOLUME II

11             BEFORE THE HONORABLE KATHLEEN CARDONE

12                 UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15  For the Government:   Brian Skaret
                          United States Department of Justice
16                        Criminal Division, Human Rights and
                          Special Prosecutions Section
17                        1301 New York Avenue, NW, Suite 200
                          Washington, D.C. 20530
18
                          Joseph Cooley
19                        United States Department of Justice
                          Criminal Division, Gang Unit
20                        10th and Constitution Avenue, NW
                          Washington, D.C. 20530
21
                          George Leal
22                        Assistant United States Attorney
                          700 East San Antonio, Suite 200
23                        El Paso, Texas 79901

24

25
```

1    For the Defendant:    Scott P. Foster
                           718 Myrtle Avenue
2                          El Paso, Texas 79901

3

4        Proceedings recorded by stenotype.   Transcript produced by

5    computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1          COURTROOM DEPUTY:  EP:10-CR-2213, USA versus Ramon
2    Renteria.
3          MR. SKARET:  Good morning.  Brian Skaret, Joseph
4    Cooley and George Leal for the United States.
5          THE COURT:  Announcements?
6          MR. FOSTER:  Scott Foster for the defendant.  We're
7    ready to proceed.
8          THE COURT:  We're about to bring in the jury so I can
9    finish instructions, then opening statements.  As we talked
10   about, each side has indicated to me 20 minutes.  Um, do you
11   want notice when you're getting close?  If so, how much time?
12         MR. SKARET:  Yes, Your Honor.  If at all possible,
13   before I address this, I wanted to let the Court know that over
14   the weekend we have trimmed down our witness list a little bit.
15   Um, we do not anticipate calling Rigoberto Fragoso.  We do not
16   anticipate calling Gustavo Gallardo.
17         Rigoberto Fragoso is here.  He's in the area.  So, I
18   mean, he could be put in reserve.  We don't anticipate calling
19   him.
20         THE COURT:  Okay.
21         MR. SKARET:  With respect to Gustavo Gallardo, he's
22   come from a long way.  The Marshals would like to remove him
23   from the area.  We want to ask for permission to proceed with
24   that.
25         THE COURT:  If you're sure you're not going to use
```

1    him, that's fine.  Okay.

2            MR. SKARET:  With respect to what you're getting at

3    with time limits, you know that throughout the course of my

4    time here I have consistently under-promised on the timing.

5    And I think in going through my opening this weekend I might

6    need a few more minutes.  If I could ask for 30 minutes, I

7    would appreciate that.

8            THE COURT:  Each side will have 30 minutes.  At what

9    point do you want notice that you're getting close?

10           MR. SKARET:  Maybe 25 minutes.

11           THE COURT:  Okay.  All right.  On behalf of defense,

12   when did you want to know that you're getting close?

13           MR. FOSTER:  Judge, I don't anticipate needing that.

14   I would ask if I could reserve my opening statement until the

15   defense case.

16           THE COURT:  You certainly can.  All right.  Then if --

17   since I'm giving him five-minute notice, if you get close, I

18   will let you know.  All right.

19           The next question is, my understanding is there are a

20   number of witnesses that are going to be brought in to testify

21   that are prisoners.  The Marshals would like to keep them in

22   their prison garb in shackles.  Does anybody have any problems

23   with that?  There's no question they're in prison.

24           MR. SKARET:  We would object to the hands just because

25   it may be necessary to handle exhibits.

```
 1              THE COURT:  Okay.  Other than that, no problems with
 2    shackles on the feet?
 3              MR. FOSTER:  I'm in agreement.
 4              THE COURT:  That's fine.  And then any other matters
 5    before we go into final instructions?
 6              MR. SKARET:  Just to ensure that we have the Court's
 7    permission to have seated in the courtroom Special Agent
 8    Samantha Mikeska and two other agents, Gregory Waterson and Jim
 9    Krieger.  We also would like permission to designate Andy
10    Sanchez to sit in the courtroom.  He's our expert witness.  And
11    we would like him to listen to the evidence.
12              THE COURT:  Any objections?
13              MR. FOSTER:  I don't have any objections, Judge.
14              THE COURT:  Then -- is someone going to invoke the
15    Rule?
16              MR. FOSTER:  Judge, we would ask the Rule be invoked
17    except for the witnesses named.
18              THE COURT:  Are there witnesses available to be sworn
19    in today that are here?  I mean, I see a lot of people in the
20    courtroom.  But I don't know if they're witnesses or just
21    observers.  But if there are witnesses, then I need to swear
22    them in.  Yes?
23              MR. SKARET:  Yes.  The people that are here in the
24    courtroom are in the courtroom.  Andy Sanchez and Mr. Jim
25    Krieger.
```

1          THE COURT:  But there's no witnesses that are gonna be

2    excluded that are in the courtroom?

3          MR. SKARET:  No, Your Honor.

4          THE COURT:  Okay.  Then don't worry about it.  We'll

5    swear you in.  But if witnesses do start showing up, I wanna

6    make sure that they understand the Rule.  They don't, like, sit

7    out in the hall and talk.  So, please, let me know if either

8    side has witnesses here, we'll swear them in.  Okay?  All

9    right?

10         Is there anything else, then, we need to address

11   before we get started?

12         MR. SKARET:  Nothing from the United States.

13         MR. FOSTER:  Were you going to do the stipulations?

14         MR. LEAL:  Prior -- prior to the first witness being

15   called we do have stipulations.  So after opening statement,

16   we've got stipulation facts one through four that we're going

17   to offer prior to the first witness.

18         THE COURT:  Okay.  And that's fine.  All right.  Then

19   we'll do that.  We'll do opening statements first -- I guess

20   opening statement first and then the stipulation.  Okay.  Then

21   we're ready to bring in the jury.

22         (Jury enters courtroom.)

23         THE COURT:  You may be seated, Ladies and Gentlemen.

24   Ladies and Gentlemen of the Jury, by the oath that you took

25   last Friday as jurors you have become officials of this Court

1    and active participants in the administration of justice.  If,

2    at any time, you cannot clearly hear the proceedings, please do

3    not hesitate to let me know.  Just raise your hand.  Let one of

4    the CSOs or Mr. Martinez know.  But it's important that you be

5    able to hear everything.  So if you can't hear, let us know.

6    Please do not discuss this case with anyone during your service

7    as jurors.

8            To maintain the integrity of the jury system, you're

9    not to discuss the case with anyone, even amongst yourselves

10   until you are told to be to begin your deliberations.  Please

11   listen carefully to the testimony.

12           The lawyers may choose to make opening statements in

13   this case.  These statements are not evidence, but are made to

14   help you understand the nature of the case and of the evidence.

15           The evidence that you may consider will consist of

16   testimony of the witnesses.  Evidence will also be presented in

17   the form of physical objects or documents called exhibits.

18   Each of you must determine the facts as you see them.

19           To do so, you must evaluate the credibility of each

20   witness and decide the weight and value to be given their

21   testimony.  In considering the weight and value of the

22   testimony of a witness, you may consider the person's

23   appearance, their attitude and behavior, the person's interest

24   in the outcome of the case, his or her relationship to the

25   defendant or with the United States, the inclination of that

1    witness to tell the truth, the probability or improbability of

2    that witness's statements, the reasonable inference from those

3    statements, and any and all other factors that you feel will

4    help you in giving the testimony of that witness the degree of

5    credibility that you feel that it deserves.

6           You will be allowed to take notes throughout the

7    trial.  And I notice a number of you have tablets.  I will be

8    supplying paper and pencils throughout the trial in the jury

9    room.  Any notes that you take throughout the trial are only

10   aids to your memory.  If your memory differs from those notes,

11   you should rely on your memory and not on the notes.  Your

12   notes are not evidence.  If you do not take notes, you should

13   rely on your independent recollection of the evidence.  And you

14   shouldn't be unduly influenced by the notes of any other juror.

15   Notes are not entitled to any greater weight than the

16   recollection or impression of each juror about the testimony

17   you hear.

18          Remember, you, as the jurors, must decide this case

19   solely on the evidence that is presented here within the four

20   walls of this courtroom.  This means that during the trial of

21   this matter, you must not conduct any independent research

22   about the case, the matters in the case, and the individuals or

23   entities involved in this case.  You cannot read or listen to

24   any press coverage.  You must immediately turn off any

25   broadcast you might hear regarding this matter.  And you must

```
1     not read any article that covers this matter.  You should not
2     consult dictionaries or other reference materials, search the
3     Internet, websites or blogs or use any tools, electronic or
4     otherwise, to obtain information about this case to help you
5     decide the case.
6            Please do not try to find information from any source
7     outside the confines of my courtroom until you retire to
8     deliberate.  As I've previously stated, you may not discuss
9     this case with even own your fellow jurors.  And when this
10    Court instructs you to begin your deliberations, you will
11    retire to the jury room and then you may begin discussing this
12    case with your fellow jurors.  But not before you are
13    instructed.
14           At that time you cannot discuss this case with anyone
15    else until you've returned a verdict and the case is at an end.
16    I know that many of you use cell phones, iPhones, Blackberries,
17    the Internet and other tools of technology.  You also must not
18    talk to anyone about this case or use those tools to
19    communicate electronically with anyone about the case.  This
20    includes your family and your friends.  You cannot communicate
21    using the cell phone through the e-mail, Blackberry, iPhone
22    text messaging, Twitter or through any blogging or website,
23    through any Internet chatroom or any other social networking
24    site including, but not limited to, Facebook, MySpace, Linkedin
25    and Youtube.  If you are selected -- I'm sorry.
```

1          It's important that now that you've been selected as

2    jurors, that if you don't do all of this, it can result in a

3    mistrial.  Which means I have to start all over again.  So it's

4    important that each of you follow and obey all of those

5    instructions.

6          You -- as we begin the trial, um, I want you to listen

7    carefully to all of the testimony.  If you -- once you go back

8    to begin your deliberations, oftentimes I will get a request

9    for a read -- for something from the transcript.  Understand,

10   that the law is clear.  The law provides that if the jury

11   disagrees as to the statement of any witness, then they may,

12   upon applying to the Court in writing, have read back to them

13   from the court reporter's notes only that portion of the

14   witness's testimony on the particular point that is in dispute

15   and no other.

16         That means that after I receive a request about the

17   transcript, I have to instruct my court reporter, Mr. Perez, to

18   go through all of the testimony of the entire trial and find

19   the testimony on that particular point that's in dispute.  It

20   takes a lot of time.  It's very time consuming.

21         So it's important that throughout the trial you listen

22   to the testimony and the evidence carefully.  Requesting a feed

23   back can take a long time -- a read back, I'm sorry.

24         The trial will proceed as follows:  One, the

25   government's attorney may make their open statements.  Then the

1    defendant's attorney may make an opening statement or reserve

2    the right to do so at a later time.  Then, the government will

3    offer any evidence through witnesses.  And the defendant's

4    attorney may cross-examine each witness.  When the attorney for

5    the government has finished presenting all of their case, then

6    the defendant's attorney may present evidence.  But, remember,

7    the defendant is never required to prove his innocence.

8            The government's attorney may then cross examine each

9    defense witness, if any.  When the defense is finished

10   presenting its witnesses, then the government may put on

11   rebuttal witnesses.  At the conclusion of all of the

12   presentation of the evidence, I will give you the Court's

13   charge.  And then each side will have the opportunity to make

14   their closing argument.  And then you will begin your

15   deliberations.

16           At this time we're gonna begin with opening

17   statements.  And, again, remember all the instructions the

18   Court has given you.

19           Whenever you're ready.

20           (Government opening statement.)

21           MR. SKARET:  Thank you, Your Honor.  Good morning,

22   Ladies and Gentlemen.  Prison riots, walking the yard,

23   controlling the yard, gang treaties, and gang wars.  Gang

24   symbols, tattoos, the number 21, Aztec culture and hand signs.

25   Drugs, dealing drugs, doing drugs, smuggling drugs into

1    prisoners, smuggling them across the border into the United

2    States, into El Paso and beyond.  Heroin, cocaine, and

3    marijuana.  Kilograms, ounces and dime bags.  Extorsion,

4    quotas, street tax and cash money.  Gang members, ex-members,

5    soldiers, esquina, prospectos, sergeants, lieutenants and

6    captains; five captains.  Violence in the street.  Violence

7    behind bars.  Beatings, broken arms, broken legs, guns, rifles

8    pistolas, knives and shanks and murder.

9            This is the Barrio Azteca.  And we expect the evidence

10   in this trial to show that the Barrio Azteca, or simply the BA,

11   is a ruthless, violent and organized gang with largely one

12   goal, power.  Power in prison and power on the street.

13   Hundreds, if not thousands, of hardened men, young and old,

14   serving time in the United States and in Mexican jails and on

15   the streets of these two countries have joined the Barrio

16   Azteca.  They follow Barrio Azteca rules.  They rise through

17   the ranks.  They do the business of the Barrio Azteca.  And

18   they have sworn ultimate allegiance to the BA family which

19   takes priority over all other things, including God, country,

20   parents, wife and children.

21           So what gives the Barrio Azteca this power?  Well,

22   you'll here that this is a gang that relies on strict rules to

23   enforce its structure.  And those rules are brutally enforced.

24   You will hear when those rules are broken, the Barrio Azteca

25   does not hesitate to handout what they call a calentada.

1   Serious beatings.  Or with gravy, a really serious beating.
2   And when the BA determines someone is an enemy, they put that
3   person on their hit list.  They issue the green light.  Their
4   orders of violence are sometimes general.  Give him a
5   calentada.  Sometimes more specific.  Break his ribs.  And
6   sometimes deadly.  Kill him.
7        The BA maintains its power through drug trafficking.
8   You will hear that through treaties with the Juarez drug cartel
9   they buy heroin, cocaine and marijuana at the source in Mexico.
10  The BA sells in Mexico.  They smuggle drugs into the United
11  States.  They sell to dealers and users on our streets.  They
12  also smuggle the drugs into U.S. and Mexican prisons.  And you
13  will hear that having drugs in prison is power.  Having money
14  in prison is power.  And the BA has a lot of power.
15       They maintain some of this power through extorsion.
16  These are the guys that charge drug dealers money in order to
17  sell drugs on the Barrio Azteca turf.  That money is put into
18  what they call a BA bank.  And the money is used to pay for BA
19  expenses and sent to the BA in prison.  Perhaps, most
20  importantly, the Barrio Azteca thrives on a complicated web of
21  communication.  Because the gang operates on the street and in
22  prison, the gang must rely on communication to enforce its
23  dictates and to communicate on the street.
24       The BA in prison smuggles cell phones into prisons to
25  direct everything that's going on in the free world.  And when

1   they're not on the phone, they're writing letters, coded

2   letters.  You will see in this case how a BA letter that

3   doesn't make sense to you and me amounts to a death sentence to

4   a man who lived right here in El Paso.

5        To maintain power the BA needs strong leaders.  And

6   you will hear that this organized -- organization is led by

7   five men, five captains.  Or, as they're called, five capos,

8   who rule the U.S. prison system and the streets of El Paso from

9   the confines of their cell or from their secrecy and anonymity

10  of the street.  These are the five men that have the final say

11  about who's in and out, who's getting promoted, who gets

12  demoted.  And in some cases who lives and who dies.

13       Captain number one, Benjamin Alvarez.  Convicted in

14  2008 right here in El Paso of racketeering.  Sentenced to life.

15  Currently behind bars at the ADX super maximum in Florence,

16  Colorado.  Captain number two, Manuel Cardoza, also known as

17  Tolon.  Convicted right here in El Paso in 2008 on racketeering

18  charges.  Currently behind bars at Texas Department of

19  Corrections where he's serving a fifty-year sentence for

20  murder.  When he's done with that sentence, he will serve his

21  federal sentence on the racketeering charge.  Tolon is in

22  charge of the BA's operations in Texas state prisons.

23       Captain number three, Carlos Pereyra.  An individual

24  who goes by the name Shotgun.  Also convicted here in El Paso

25  in 2008 of racketeering and sentenced to life.  He served the

1    last couple years of his sentence at a prison in Pollock,

2    Louisiana.  It's called U.S. Penitentiary Pollock.  Recently,

3    he was transferred to the U.S. penitentiary in Florence,

4    Colorado.

5            Captain number four, Eduardo Ravelo, who also goes by

6    Tablas.  Ravelo is an FBI top ten most wanted fugitive.  You

7    will hear he runs all operations for the BA in Mexico.  So

8    that's three BA captains serving life here in the United

9    States.  And there's one capo who's on the run in Mexico and

10   taking charge of the Mexican operations.  But there's one more

11   captain.  There's one more leader.  And that is exactly why

12   we're here today.

13           The judge introduced you to the defendant as a man

14   named Ramon Renteria.  And you will learn the name that he goes

15   by in the Barrio Azteca.  You will learn the name that he is

16   known by in prison and on the streets.  And that name is Spook

17   or Spooky.

18           Ladies and Gentlemen, this is the fifth captain of the

19   Barrio Azteca.  The evidence will show that the defendant

20   joined the Barrio Azteca, that he ruthlessly proved himself in

21   jail, that he coordinated BA business while he was behind bars,

22   that he directed drug trafficking on the streets while he was

23   confined in his prison cell.  And when he got out of the jail,

24   he became a captain.  He ordered beatings on the street.  He

25   took charge of the BA's bank and started funneling money to the

1    BA's leaders in prison.  He ordered a drive-by shooting in El

2    Paso.  He participated in serious violence, including a

3    stabbing right here in El Paso.  And he coordinated drug

4    trafficking with the BA brotherhood in Juarez.  And speaking of

5    Juarez, as soon as he got out of prison, he got real tight with

6    the BA leaders down there.  And he got a walkie-talkie to

7    communicate down south.

8         So this is Spooky.  If there's any doubt about his BA

9    nickname, you will see it tattooed right here on the back of

10   his arm.  Spook.  And if there's any doubt about the

11   organization that he leads, you will see it in bold ink across

12   his stomach.  Azteca.

13        So you may be thinking, how does someone like Spooky

14   rise to the top?  How do you become a captain of the BA?  Well,

15   it's not unlike other things in life, I suppose.  You've got to

16   know people and prove yourself.  Well, proving yourself and

17   knowing the right people have gone hand in hand for Spooky for

18   many years.  He proved in 2003 when he was incarcerated in New

19   York obeying a BA order and brutally stabbing and enemy of the

20   BA.  That stabbing gave Spooky the instant credibility in

21   prison and on the streets and gave him the opportunity to rise

22   up in the ranks.

23        You will also hear that he knew the right people.

24   Because after that stabbing, he got sent to the U.S.

25   penitentiary in Pollock, Louisiana.  And there he was cellmates

1    with Captain Shotgun.  For years he served as his right-hand

2    man.  You will hear that Shotgun gave the orders.  And Spooky

3    made them happen.  In fact, the two were so tight, and you will

4    see this in this case, that Spooky tattooed a portrait of

5    Shotgun's face on his own arm.  You see, Shotgun was in for

6    life.  And he was grooming Spooky for a life of leadership on

7    the streets.  Shotgun blessed Spooky.  First, giving him rank

8    of sergeant and then lieutenant and ultimately crowning him

9    captain.

10           You will hear the captain is the ultimate rank of the

11   BA.  That's as high as you get.  No colonels, generals, just

12   five ruling captains.  And you will hear what it means to be

13   captain.  It means power.  When he hit the streets in September

14   of 2010, he took control of the gang's operations in El Paso.

15   You are going to hear that the gang was structured.  But the

16   gang separated El Paso into five sections, Central, Northeast,

17   Eastside, Lower Valley and the Westside.  And each of those

18   sections had their own leader.  And each leader reported to a

19   sergeant who was in charge of El Paso at that time.

20           And when Spooky took charge, who did the El Paso

21   leader report to?  The captain, of course.  Spooky.  Who began

22   to coordinate with Juarez?  Spooky.  Who gave all the orders to

23   the El Paso leaders?  Spooky.  Who was in charge?  Spooky.  And

24   Spooky's why we're here today.

25           My name is Brian Skaret.  And with me on the case are

1    prosecutors Joseph Cooley and George Leal.  Also, at the

2    prosecution table is FBI Special Agent Samantha Mikeska and

3    paralegal Jeffrey Keogh.  Two additional case agents that are

4    on this case are sitting in the front row, Jim Krieger on the

5    right and Gregory Waterson on the left.

6            It's our responsibility to present this case to you on

7    behalf of the United States of America.  And when we're done,

8    you are going to have all the evidence you need to convict this

9    man of his crimes beyond a reasonable doubt.

10            The United States is prosecuting Ramon Renteria for

11   four criminal charges.  And I would like to talk to you briefly

12   about those charges.  Before I go any further though, I have to

13   make abundantly clear that the judge is totally in charge of

14   instructing you on the law.  After you've heard all the

15   evidence in this case, she will instruct you on the law and go

16   through the crimes element by element.  But I'd like to just

17   discuss a few of the things that the United States has to prove

18   in this case so you will be able to keep in mind some of those

19   things as you listen to the evidence.

20            The first crime that the defendant was charged with is

21   that he conspired with others to commit racketeering.  One of

22   the things with respect to racketeering that the United States

23   must prove in this case is the existence of an enterprise.

24   That's the legal term.  Enterprise.

25            An enterprise is basically an association or group of

individuals who work together to achieve a common goal or purpose.  And here we're going to prove that that enterprise was actually a gang.  That it was actually the Barrio Azteca gang.  And you're going to learn over the course of this trial that the BA had structure.  A structure that lasted over time.  And a structure that provided for individuals to step into the shoes of other individuals that fall out of favor with the BA.  And in this way the enterprise continues year after year after year.

You're going hear about the purpose of this enterprise, that the BA's purpose was to make money by selling drugs to control their territory and to dominate in prison and on the street.  You're also going to hear about the crimes committed in the name of the Barrio Azteca.  Things like drug importation, drug distribution, extorsion, violence, witness intimidation and murder.  So we have to show you that the BA is an enterprise.  Of course, we also have to show you how the defendant is linked to that enterprise.  Well, you're going to hear in this case that the defendant has been a member of the Barrio Azteca for many, many years.  You are going to hear that he wasn't afraid to engage in enterprise and business, that he rose through the ranks and ultimately led the organization.

The second crime that the defendant is charged with, is conspiracy to commit -- conspiracy to distribute heroin, cocaine and marijuana in the United States.  You are going to

```
 1   hear that Barrio Azteca members and as a whole possess and sell
 2   drugs, a lot of drugs.  And everybody in the organization knows
 3   what everybody else is doing because they're all doing the same
 4   thing.
 5        All over El Paso and West Texas the Barrio Azteca is
 6   possessing drugs and selling drugs.  And you will hear in this
 7   case how the defendant knew about that, participated in it, and
 8   benefited from it.  That leads us to the third crime.
 9   Conspiracy to import heroin into the United States.
10        You're going the hear all about how the Barrio Azteca
11   imports heroin to the United States and Mexico.  You will hear
12   about the alliances that they have formed with the Juarez drug
13   cartel.  You will hear how they bring the heroin into the
14   United States, how much and how they smuggle it.  And you will
15   hear how this defendant knew about it, how he participated in
16   it and benefited from it.
17        Finally, the defendant is charged with conspiring with
18   others to commit money laundering.  You're going to hear that
19   the Barrio Azteca makes a lot of money selling drugs.  They
20   also make money through their extorsion program.  That is
21   charging drug dealers a certain amount of money which they call
22   a quota in order to sell on their turf.  But you're also going
23   to hear what the BA does with that.  They don't declare it.
24   They don't pay taxes on it.  They send it to BA leaders who are
25   locked up in jail.  And you're going to hear that's money
```

1    laundering.  They're disguising the source of the money and

2    sending it on to further the criminal enterprise.  And you will

3    hear how the defendant personally benefited from this program,

4    how he participated in it by taking up the BA bank when he got

5    out of jail and sent off the money to BA leaders in jail.

6         So how are we going to tell you the story about the

7    defendant and his organization?  What's the evidence that we're

8    going to provide you so you can put the story together for

9    yourselves?  Well, you're going to have the opportunity to see

10   many different types of evidence and hear from a wide ranging

11   group of witnesses.

12        First, the physical evidence.  This is the stuff that

13   you can hold, feel.  Over the years the FBI has accumulated

14   physical evidence to prove that the Barrio Azteca actually

15   exists.  You're gonna see lists of rosters, detailed listings

16   of BAs in prison.  Sectional rosters, like one from the west

17   side, which show who's -- who's doing their job, who's not

18   doing their job, who's in good standing and who isn't.

19   Pictures of gangsters in prison flashing their signs, on the

20   streets posing.

21        You will see things like gang treaties the gang

22   entered into with others.  And you will see the copy of the

23   sacred rules that all Barrio Azteca must abide by.  You will

24   see things that the BA needs in order to engage in its drug

25   trafficking.  Things like phones, lots and lots of phones.

1   Scales to weigh their drugs.  Drug ledgers which record their

2   drug sales, drug wrappings.  You will see all of these things.

3   And you will see the drugs themselves.

4          You will also see how the Barrio Azteca hides its

5   drugs.  Car tires that have been slit so drugs can be placed

6   into the tires and smuggled across the border.  You'll see

7   bottles of lotion that hide heroin.  Books that have heroin

8   stuffed in the backs of their bindings.  You're gonna to see

9   evidence of the BA's extorsion and their money laundering

10  program.  Lists of who has paid the street tax.  Lists of who

11  hadn't.  Thousands of dollars seized.  Receipts of money orders

12  sent to BA leaders in prison.  And records of that extorsion

13  money going straight into the commissary accounts of leaders in

14  prison, including the defendant.

15         And you will see evidence of the BA's ruthless

16  enforcement of their rules, pages and pages of hit lists.

17  These are people that have disobeyed Barrio Azteca rules and

18  are now on a list to get killed.  You will be shocked at how

19  long that list is.  And you will see that this just -- isn't

20  just some game.  We're going to show you some of the BA's guns

21  and ammunition that were found on the street right here in El

22  Paso and on the west side in New Mexico.

23         In addition to the things that you can touch and hold,

24  we're gonna present recordings of BA leaders who are conducting

25  their business on the phone.  You see the FBI got authorization

from the Court to listen to and to record the calls of a few

cell phones of BA members and leaders.  Two of those phones

belonged to leaders in jail.  One, Shotgun's phone in Pollock,

Louisiana.  The second belonged to Hector Galindo, who is a BA

lieutenant in Texas.

You're gonna hear some of those calls from those

recordings.  Calls relating to drug trafficking, money

laundering, the chain of command and punishments for

disobedience.  Calls relating to Spooky and his role in taking

over all of El Paso.  And you will here Spooky's voice as well.

You will hear him answering Shotgun's phone.  You will hear him

order a leader in El Paso to redirect a shipment of drugs they

were trying to smuggle into Pollock's prison.  You will here

Spooky make a call from prison to coordinate with the BA in

Juarez, Mexico.

So you will see the physical evidence.  You will hear

some recordings.  You are also going to hear from some law

enforcement agents regarding the case, including FBI Special

Agent Samantha Mikeska.  She's going to summarize the

investigation of the Barrio Azteca and tell you how she and the

rest of the FBI obtained cell phone recordings and where the

physical evidence came from.  You will also hear from El Paso

County Police Detective Andy Sanchez.

Detective Sanchez is a gang expert.  He's been living

and breathing the Barrio Azteca for years.  And he's going to

1    help you understand the evidence as it relates to the

2    enterprise and as it relates to the defendant.  Finally, and

3    most importantly, you are going to hear all about the Barrio

4    Azteca and Spooky's leadership of the Barrio Azteca from people

5    on the inside of the organization.  Because police detectives

6    and FBI special agents can only shed so much light on an

7    organization that so highly values secrecy and loyalty.

8           You're going to hear about the Barrio Azteca from

9    members and former leaders of the gang.  These are the

10   insiders.  They are in the best position to provide evidence of

11   exactly what's going on in a world that is so foreign to so

12   many.  These are the cooperators.  Men who are in prison and

13   have now decided to turn their back on the Barrio Azteca and

14   all that it stands for in order to cooperate with the United

15   States.

16          These cooperators are going to tell you the inside

17   story of the Barrio Azteca.  You will hear from a former leader

18   of El Paso.  Mid-level leaders.  You will hear from low-level

19   BA soldiers.  One of Spooky's cellmates that spent long time in

20   Pollock, Louisiana with him and with Shotgun.  You will learn

21   from these men that the Barrio Azteca is an enterprise.  And

22   you will learn from them that Spooky was their leader.  But you

23   must remember, these particular cooperating witnesses are not

24   exactly model citizens; far from it.  These are criminals.

25          They're the exact same men who entered into the same

1    conspiracies and worked in the same enterprise as the

2    defendant, Ramon Renteria.  But, they're going to come into

3    this courtroom.  They're going to take an oath and tell you

4    what happened.  They're going to cooperate.  So why would they

5    do that?  Why would these men cooperate?  Well, they all have

6    their individual reasons.  And you will hear some of those.

7    But if we get right down to it, the majority of them want a

8    break in the sentence.  For the men locked up they're hoping

9    that this is a way to get out early.  They're hoping that by

10   testifying truthfully that some day a prosecutor like myself or

11   Mr. Cooley or Mr. Leal, will go before a judge and request a

12   decrease in their sentence.  Some are serving just a few years.

13   Others, 20, 25 years and even life imprisonment.

14          But as you will hear, they have agreements with the

15   United States.  And they understand that their only hope of

16   ever getting a reduction in sentence is by testifying

17   truthfully before you over the next couple days.  Even then, a

18   reduction in their sentence is completely in the hands of a

19   federal judge.

20          Now, the judge is going to tell you that you need to

21   evaluate their testimony very carefully.  They're testifying.

22   Testifying in order to benefit themselves.  You will not be

23   asked to blindly accept their word for everything that

24   happened.  What they say will be backed up through other pieces

25   of evidence through the testimony of other cooperators, through

testimony of other agents by the physical evidence and the wire
recordings that you are going to hear.

So if you wait until the end of the case, and you
compare their testimony to all of the other pieces of evidence
that come in, you will find that that they will be checked out.
They will be supported.  They will be confirmed.

At the end of this trial after hearing all of the
witnesses and seeing all of the evidence, it will be clear to
you that the Barrio Azteca is a violent enterprise that uses
criminals act to achieve power on the streets and in prison.
It will be clear to you that Spooky is one of their leaders, a
captain, no less.  And his grip on BA power is strong indeed.

Not afraid to prove himself, he brutally stabbed a BA
enemy.  He stood at Shotgun's right-hand side in prison for
years.  He received sergeant stripes, lieutenant bars and
ultimately crowned captain.  When he hit the streets, he seized
the opportunity and ran with his newly granted power, which was
his right.  And, the defendant, this man sitting right here
with his attorney, told the BA leadership in Juarez that he
approved of BA teams from Juarez coming here coming to this
town to commit murder in the name of the Barrio Azteca.

At the end of this trial, Mr. Leal and Mr. Cooley are
going to stand up and ask you to find that the defendant Ramon
Renteria is guilty.  And, at that time, you will know that the
charges are valid.  And that there's a really good reason why

1    he's here today.  And that he is guilty.  Thank you very much,

2    Your Honor.

3           THE COURT:  All right.  Government may begin with

4    their testimony.

5           MR. LEAL:  The Government at this time would offer

6    into evidence Stipulation of Facts Number One, Stipulation of

7    Facts Number Two, along with the attached exhibits to those

8    stipulations.  Stipulation of Facts Number Three, along with

9    the attached exhibits.  Government's Exhibit Number 3D, as in

10   Dog.  Government's Exhibit Number 3 as in Edward -- 3E as in

11   Edward.  Stipulation of Facts Number Four, along with the

12   exhibits attached to it, as well as Government's Exhibit 4E, as

13   in Edward, 4F, 4G.  Government's Exhibit 17A, 17A-1, 17A-2,

14   17A-3, Government's Exhibit 27, Government's Exhibit 28.  And I

15   tender those exhibits, along with all the attachments, to

16   defense counsel, Your Honor.  He's previously had a chance to

17   look at them.

18          THE COURT:  All right.

19          MR. FOSTER:  Your Honor, I've looked at all of these

20   previously and have copies.  And there is no objection.  They

21   are stipulations.

22          THE COURT:  All right.  So stipulated evidence,

23   Government's Exhibits Number 1, Number 2, with attached

24   exhibits, Number 3, Number 3D, 3E, Number 4, Number 4E, 4F, 4G,

25   17A, 17A-1, 17A-2, 17A-3, Exhibit 27 and 28 will all be

1    admitted with attachments.

2            MR. LEAL:  Your Honor, I ask to publish Stipulation of

3    Facts Number One to the jury, Your Honor, orally.

4            THE COURT:  All right.

5            MR. LEAL:  So the record is clear, the Court did admit

6    the attachments for the Stipulation of Facts Number One.  Is

7    that correct?

8            THE COURT:  For all exhibits.

9            MR. LEAL:  Okay.

10           (Stipulation read.)

11           MR. LEAL:  And for record purposes, the attached

12   exhibits are Government's Exhibit A, Government's Exhibit A1,

13   Government's Exhibit A2, Government's Exhibit A-2-a,

14   Government's Exhibit A-3, Government's Exhibit Stipulation of

15   Facts Number 2.  Ask to publish that orally to the jury.

16           THE COURT:  All right.  And as far as the attachments

17   to 1, did you wish those to be shown to the jury?

18           MR. LEAL:  Not at this time.

19           THE COURT:  Then stipulation Number 2.

20           (Stipulation read.)

21           MR. LEAL:  B1-G, B1-H, B1-I, B1-J, B1-K, and B1-L.

22   Again, Your Honor, I don't need those photographs published at

23   the time.

24           THE COURT:  All right.

25           MR. LEAL:  In reference to Stipulation of facts Number

David A. Perez, RMR, RPR

1    3.  Ask to publish that to the jury, Your Honor.

2              THE COURT:  All right.

3              (Stipulation read.)

4              MR. LEAL:  Your Honor, for the purposes of

5    clarification, the active ingredient in the lab report is

6    actually cocaine.  And that's been stipulated to.

7              Is that right, Scott?

8              MR. FOSTER:  That's correct.

9              MR. LEAL:  There's a typographical error in that

10   stipulation.

11             THE COURT:  So noted.

12             MR. LEAL:  Attached to those exhibits are Government's

13   Exhibit C, C-1, 3C-2, 3C-3, 3C-4, 3C-5.  And the Government

14   would also ask to publish Stipulation of Facts Number Four and

15   publish that to the jury orally, Your Honor.

16             THE COURT:  All right.

17             (Stipulation read.)

18             MR. LEAL:  And attached to the Stipulation of Facts is

19   Exhibit D-1, D-2.

20             May I have just a moment, Your Honor?

21             THE COURT:  Sure.

22             MR. LEAL:  Thank you, Your Honor.

23             THE COURT:  Government may call their first witness.

24             MR. SKARET:  The United States would call FBI Special

25   Agent Samantha Mikeska.  Ms. Mikeska.  Special Agent Mikeska.

DIRECT - SAMANTHA MIKESKA

                    SAMANTHA MIKESKA, SWORN

                     DIRECT EXAMINATION

BY MR. SKARET:

Q.  Good morning, please introduce yourself and spell your last

name.

A.  Special Agent Samantha A. Mikeska.  Last name

M-I-K-E-S-K-A.

Q.  Where do you currently work?

A.  I'm sorry?

Q.  Where do you currently work?

A.  At the FBI El Paso in El Paso, Texas.

Q.  And how long have you been there?

A.  For approximately 16 years.

Q.  What do you do as a special agent?

A.  I work gang investigations on the Safe Streets Gang Task

Force.

Q.  How long have you been working gang investigations there?

A.  11 or 12 years.

Q.  How long have you been in El Paso as an FBI agent?

A.  16 years.

Q.  Are you familiar with an investigation leading to the

indictment against the defendant, Ramon Renteria, in this case?

A.  Yes, sir, I am.

Q.  How do you know about that indictment and the

investigation?

1    A.  I was the case agent on the investigation.

2    Q.  Were there any other case agents on that investigation?

3    A.  Yes, there was.

4    Q.  Who were they?

5    A.  Special Agent James Krieger.  And also Special Agent Greg

6    Waterson in the courtroom today.

7    Q.  Why the need for three case agents?

8    A.  It was a diversified case.  They had different districts.

9    So we all had separate roles in the investigation.

10   Q.  What were the different areas involved in the case?

11   A.  El Paso, Texas was one.  Juarez, Mexico was the other.  And

12   Las Cruces, New Mexico was the other area.

13   Q.  Agent Mikeska, is this your first BA case you've done?

14   A.  No, sir, it's not.

15   Q.  Have you ever been involved in prior investigations?

16   A.  Yes, sir, I have.

17   Q.  All right.  Would you describe some of those investigations

18   for us?

19   A.  Back in 2001 we had a RICO investigation.  I was not the

20   case agent but I assisted in the investigation and basically

21   focused on the leadership in the BAs.  There was -- at the time

22   there was a problem with BA and Texas Syndicate and Mexican

23   Mafia in the prison systems.  So we started a RICO

24   investigation to go after the leaders involved in that.

25            In April 2003, I was a case agent on another RICO

1    investigation.  The first RICO concentrated on the BA members

2    who were already in the Bureau of Prisons and also the Texas

3    Department of Corrections.  So what I wanted to do was focus on

4    the leadership here in El Paso and make a impact on the

5    community.

6    Q.  Any other RICO cases?

7    A.  This investigation that we have now, I'm the case agent on

8    that -- or co-case agent.  We have three.

9    Q.  Okay.  In the 2008 RICO case that you mentioned, who was

10   convicted in that case?

11   A.  It was three captains.  We have a 27-defendant indictment.

12   But three of the captains were sentenced to life.  Life

13   sentences.

14   Q.  About that same time period, was there another captain on

15   the street named David Meraz?

16   A.  Yes, there was.

17              MR. SKARET:  Your Honor, I would like to show

18   Government's Exhibit 19-E.

19              THE COURT:  All right.

20   Q.  (By Mr. Skaret)  Do you have that up?

21   A.  Yes, sir, I do.

22   Q.  Do you recognize 19E?

23   A.  Yes, sir, I do.

24   Q.  And, um, before I keep going.

25              THE COURT:  Touch the screen.

```
 1              MR. SKARET:  Okay.  Thanks.
 2   Q.  (By Mr. Skaret)  So -- pardon me.  Tell me, do you
 3   recognize Government's Exhibit E?
 4   A.  Yes, I do.
 5   Q.  Do you recognize who that's a photo of?
 6   A.  Yes, I do.
 7   Q.  And who is it?
 8   A.  It's David Meraz, also known as Chicho.
 9   Q.  What was Chicho's rank back at the time of the 2008 case?
10   A.  His rank was captain.
11   Q.  Is that a fair and accurate depiction of Chicho?
12   A.  Yes, sir, in his younger years.
13              MR. SKARET:  Your Honor, at this time, I offer
14   Government's Exhibit 19E.
15              THE COURT:  Any objections?
16              MR. FOSTER:  No objections.
17              THE COURT:  It will be admitted.
18              THE COURT:  Would you like it shown?
19              MR. SKARET:  Not at this time.
20              THE COURT:  All right.
21   Q.  (By Mr. Skaret)  Was David Meraz a captain in the BA?
22   A.  Yes.
23   Q.  Was he indicted in the 2008 RICO case?
24   A.  No, sir, he was not.
25   Q.  Why not?
```

```
 1    A.  He was a pretty smart individual.  We could not obtain
 2    enough evidence on him, um, and he was not included in the
 3    indictment.
 4    Q.  What was the result, um, in terms of convictions of the
 5    2008 RICO case?  Who was convicted in that case?
 6    A.  Six individuals took us to trial.  And they were convicted.
 7    The first one is going to be Benjamin Alvarez, also known as
 8    T-top.  The second one was Carlos Pereyra, also known as
 9    Shotgun.  A third one's gonna be Manuel Cardoza, also known as
10    Tolon.  The fourth one's gonna be Said Herrera, also known as
11    Shorty.  The fifth one's gonna be Eugene Mona, Gino.  And the
12    sixth one was Arturo Enriquez.
13    Q.  With respect to Benjamin Alvarez, what sentence did he
14    receive?
15    A.  He -- a life sentence.
16    Q.  And where is he currently serving his sentence?
17    A.  Florence, Supermax.
18    Q.  With respect to Carlos Pereya, Shotgun, what was his
19    sentence in the case?
20    A.  Life.
21    Q.  And where is he currently located?
22    A.  He's currently located in USP Florence.
23    Q.  Has he always been at the U.S. penitentiary in Florence?
24    A.  No, sir.  He was originally shipped to USP Pollock.
25    Q.  Where is Pollock located?
```

1    A.  Pollock, Louisiana.

2    Q.  What about Manuel Cardoza?  What was his sentence in this

3    case?

4    A.  Life.

5    Q.  And where is he currently serving his sentence?

6    A.  In the Texas Department of Corrections.  At the Smith Unit

7    in La Mesa, Texas.

8    Q.  And how long of a sentence is he serving under Texas law?

9    A.  Fifty years for murder.  And after he gets finished with

10   his state sentence, he will be sent to federal to serve his

11   federal time.

12   Q.  So at the time, in the 2008 case, Captain Benjamin Alvarez,

13   Carlos Pereya and Captain Manuel Cardoza were convicted?

14   A.  That is correct.

15   Q.  All right.

16            MR. SKARET:  If I may publish Government's Exhibit

17   19E?

18            THE COURT:  You may.

19   Q.  (By Mr. Skaret)  This is the individual you referred to as

20   Chicho?

21   A.  Yes, sir, it is.

22   Q.  And he was another captain at that time, correct?

23   A.  Yes, sir, he was.

24   Q.  Were there any other high-ranking leaders that were

25   indicted in your 2008 RICO case, but were not convicted?

1   A.   No, sir.

2   Q.   Any lieutenants of the Barrio Azteca?

3   A.   Yes, sir.

4   Q.   Okay.  Who would be?

5   A.   Gustavo Gallardo, Tavo.  He was a lieutenant and Gino Mona.

6   Gino, um, Miguel Angel Escajeda, Angelillo, and I believe

7   that's the lieutenants.  And then the sergeant would be Said

8   Herrera, also known as Shorty.

9   Q.   Was Eduardo Ravelo indicted in your 2008 RICO indictment?

10  A.   Yes, sir, he was.  I'm sorry he's also known as Tablas.

11  Q.   And was Tablas convicted in that case?

12  A.   No, he was not.  He's currently an outstanding fugitive, we

13  believe, in Mexico.

14  Q.   Is he a top ten most wanted?

15  A.   Yes, sir.

16       MR. SKARET:  Your Honor, I would like to show the

17  witness what's been marked as Government's Exhibit 15H.

18       THE COURT:  You may.

19  Q.   (By Mr. Skaret)  All right.  Do you recognize what's been

20  marked as Government's Exhibit 15H?

21  A.   Yes, sir, I do.

22  Q.   And what is Government's Exhibit 15H?

23  A.   It's a photograph of Benjamin Alvarez, also known as T-top.

24  Q.   How do you know that's him?

25  A.   Through investigation and through the trial in 2008.

1   Q.  Is that a good picture of how he looked back then?

2   A.  Yes, sir, it is.

3   Q.  Agent Mikeska, I would like to show you what's been marked

4   as Government's Exhibit 15I.  Do you recognize Government's

5   Exhibit 15I?

6   A.  Yes, sir, I do.

7   Q.  And how do you recognize it?

8   A.  It's a photograph of Manuel Cardoza, also known as Tolon.

9   And I recognize him.  He was one of the defendants in the 2008

10  RICO.

11  Q.  And is that a fair and accurate depiction of how he looked

12  back in 2008?

13  A.  It was a younger -- this is a younger picture of him.  He

14  was a little bit older back in 2008.

15  Q.  Are you certain that's a picture of Manuel Cardoza?

16  A.  I'm positive it's a picture of him.

17  Q.  I would like to show you what's been marked as Government's

18  Exhibit 15B.  Do you recognize Government's Exhibit 15B?

19  A.  Yes, sir, I do.

20  Q.  How do you recognize it?

21  A.  It's a photograph of Carlos Pereya, also known as Shotgun.

22  He was also a defendant in the 2008 RICO.

23  Q.  And is that a fair and accurate depiction of how he looked

24  back then?

25  A.  Yes, sir, it is.

1   Q.  With respect to this particular individual, Shotgun, did

2   you recover any letters related to his involvement in the BA

3   criminal enterprise back in the 2008 case?

4   A.  Yes, I did.

5   Q.  I would like to show you what's been marked as Government's

6   Exhibit 19A.  Do you recognize Government's Exhibit 19A?

7   A.  Yes, sir, I do.

8   Q.  And is this one of the letters that you're talking about?

9   A.  Yes, sir, it is.

10  Q.  And where did this particular letter come from?

11  A.  I had a source that was in the Otero County prison facility

12  in Chaparral, New Mexico.  And the letter was given to him.

13  And it was forwarded to me.

14  Q.  In what language is Government's Exhibit 19 -- 19A -- what

15  language is that letter in?

16  A.  It is in Spanish.

17  Q.  Did you have it transcribed?

18  A.  I had it transcribed, yes, sir.

19  Q.  Did you have it translated into English?

20  A.  Yes, I did.

21  Q.  I would like to show you Government's Exhibit 19B.  Do you

22  recognize Government's Exhibit 19B?

23  A.  Yes, I do.  It's a transcription.

24  Q.  Is that the transcription you just mentioned?

25  A.  Yes, sir.

1  Q.  All right.  I would like to show you Government's Exhibit

2  19C.  Do you recognize Government's Exhibit 19C.

3  A.  Yes, I do.

4  Q.  What is it?

5  A.  It is the translation of the letter from Spanish to

6  English.

7  Q.  Did anyone help you in decoding the letter?

8  A.  Yes, they did.

9  Q.  I would like to show you Government's Exhibit D, as in dog.

10 What is Government's Exhibit 19D?

11 A.  It's basically the letter in Spanish.  But there are words

12 that are blocked off within the letter.

13 Q.  And is that a blown-up picture of the actual letter in 19A?

14 A.  Yes, an excerpt.

15 Q.  Why was this particular excerpt blown up?

16 A.  In order to show the jury in the 2008 RICO just the code

17 words.  And, basically, what the letter meant.

18 Q.  I would also like to present to you Government's Exhibit

19 15A.  Do you recognize Government's Exhibit A?

20 A.  Yes, sir, I do.

21 Q.  What is Government's Exhibit 15A?

22 A.  They are the original sacred rules in Spanish and English.

23 Q.  What are sacred rules?

24 A.  Sacred rules are the rules that the Barrio Aztecas follow

25 once they become a member.

```
 1   Q.  How did the FBI or other law enforcement agency come in to
 2   get what's been marked as 15A?
 3   A.  When we have cooperating witnesses or sources, um, we ask
 4   them for the sacred rules and all treaties they have.  And they
 5   provide us with these copies of the documents.
 6   Q.  Okay.
 7           MR. SKARET:  Your Honor, at this point I offer
 8   Government's Exhibit 15H, Government's Exhibit 15I, 15B, 19A,
 9   19B, 19C, 19D, and 15A.
10           THE COURT:  Any objections?
11           MR. FOSTER:  As to 15H, I, B, no objections.
12           As to 19A, B, C and D, I believe that the defendant --
13   sorry, the witness has failed to authenticate this letter and
14   to show that it was actually from Carlos Pereya in other than
15   through a hearsay.  And so it's not properly authenticated.  As
16   to 15A, I have no objection.
17           THE COURT:  All right.  15H, I, and 15A and 15B will
18   be admitted.
19           THE COURT:  19A, B, C and D, any response?
20           MR. SKARET:  With the Court's indulgence, please?  If
21   I may ask the witness a few more questions.
22           THE COURT:  Sure.
23   Q.  (By Mr. Skaret)  With respect to the letter, Government's
24   Exhibit 19A, can you tell us again about how you acquired the
25   letter?
```

1    A.  I acquired a letter through a source of mine at Otero

2    County prison facility.

3    Q.  And did the source indicate where he received the letter

4    from?

5    A.  Shotgun.

6    Q.  And --

7              MR. FOSTER:  I would object as to hearsay, Judge.

8              THE COURT:  I'll sustain.

9    Q.  (By Mr. Skaret)  Um, when -- you mentioned that the source

10   decoded the letter.  Um, what did he tell you about the letter?

11   A.  That there was just code words in it.

12             MR. FOSTER:  Object as to hearsay, Judge.

13             THE COURT:  I'll sustain.

14             MR. SKARET:  I will move on.

15             THE COURT:  All right.  So 15H, I, A and B have been

16   admitted.

17             MR. SKARET:  If I may publish 15H, Your Honor.

18             THE COURT:  You may.

19   Q.  (By Mr. Skaret)  Is this Benjamin Alvarez that you

20   mentioned?

21   A.  Yes, sir, it is.

22   Q.  All right.

23             MR. SKARET:  May I publish 15I?

24             THE COURT:  You may.

25   Q.  (By Mr. Skaret)  This is Manuel Cardoza?

1    A.  Yes, sir, it is.

2            MR. SKARET:  If I may publish 15B?

3            THE COURT:  You may.

4    Q.  (By Mr. Skaret)  Is this Carlos Shotgun Pereya?

5    A.  Yes, sir, it is.

6    Q.  At the time of the 2008 case, were these three captains on

7    the street free or in jail when they were indicted?

8    A.  They were incarcerated and indicted.

9    Q.  Now, you've told us a little bit about the result of the

10   2008 RICO case against some of these BA leaders.  When did this

11   case finish up?

12   A.  In 2008, January.

13   Q.  January of 2008.  When did you start reinvestigating the

14   BA?

15   A.  In January of 2010.

16   Q.  So you took a year off?

17   A.  Yes, sir, you could call it that.

18   Q.  All right.  Um, tell us, as part of your reinvestigation,

19   did you seek to initiate wiretaps?

20   A.  Yes, sir, we did.

21   Q.  Explain to the jury, please, what is a wiretap or wire

22   intercept?

23   A.  It's where we, um, have enough probable cause to know that

24   these individuals are using cellular telephones or telephones

25   for criminal activities.  We draft an affidavit.  We submit it

1    to the United States Attorney's Office.  And it was forwarded

2    to the Court for authorization.

3    Q.  What was the first wire intercept that you sought to

4    achieve in your new investigation?

5    A.  A cell phone being utilized by Carlos Pereya, Shotgun.  He

6    was incarcerated at USP Pollock.

7    Q.  Have you investigated the location of the phone?

8    A.  Yes, sir.

9    Q.  At the time of your application, where did you believe the

10   phone was located?

11   A.  With him in his cell at USP Pollock.

12   Q.  Now, as a federal prisoner at the USP in Pollock,

13   Louisiana, was he allowed to have a cell phone?

14   A.  No, sir.

15   Q.  Just so we're clear.  This is the same Shotgun, Carlos

16   Pereyra, that you had indicted -- or sought the indictment of

17   in the 2008 RICO case?

18   A.  Yes, sir, it is.

19   Q.  So once you determined that the phone was located in the

20   prison, what did you do to advance your wire intercept that you

21   wanted?

22   A.  Like I said, we drafted, we submitted it to the AUSA.  They

23   submitted to the Court.  We are granted to go up on this phone.

24   So steps were made to secure a wiretap on his phone.  Um, we

25   had minimizations for language specialists.  In this particular

1  wire, all the conversations were in Spanish.  So we thought it

2  best to use language specialists to interpret and document the

3  calls.

4  Q.  You mentioned you said that you requested authorization to

5  go up on the calls.  What does going up on the call mean?

6  A.  Basically, to initiate the Title III to start listening to

7  his conversations on his cellular telephone.

8  Q.  You said you received an order granting that -- that

9  application.  How long did the order give you to go up on the

10  call?

11  A.  Just for 30 days.

12  Q.  Once that 30-day period is over, what do you have to do?

13  A.  Either we do not listen to the phone, shut it down, or

14  apply for a renewal.

15  Q.  All right.  Now, you mentioned that after you had the order

16  in hand, you mentioned the word minimization.  Can you explain

17  what that means?

18  A.  Yes, sir.  When the language specialists or anyone who's

19  listening to the calls -- if the conversations do not include

20  criminal activities, or an element of criminal activities, we

21  do not listen to the calls.  We, basically, stop listening.

22  And then, we monitor it in what we call spot-checking.

23  Periodically, we will go back into the conversations, listen to

24  it to see if they're engaging in criminal activities on the

25  phone.

1    Q.  So in other words, if the language specialists hear the

2    targets on the cell phone talking about the Dallas Cowboys,

3    what do they have to do?

4    A.  We stop listening.  We minimize it.

5    Q.  And with respect to this particular wire intercept, did the

6    language specialist apply minimization techniques that you know

7    of?

8    A.  Yes, sir, they did.

9    Q.  How do you know?

10   A.  In the line sheets -- basically, a summary of the evidence,

11   they will document when they minimize the call and stop

12   listening.

13   Q.  Is minimization difficult when you're listening to gang

14   calls?

15   A.  Yes, is it.

16   Q.  Why?

17   A.  Because the gangs use a lot of code.  So we don't know,

18   specifically, what they're talking about.  So we will push the

19   envelope a little and listen.  But when we find out for sure

20   they're not engaging in criminal activities on the calls, we

21   will stop listening.

22   Q.  Now, in this particular case, you had authorization to

23   listen to a phone that was inside a Bureau of Prisons facility.

24   Did you notify the Bureau of Prisons that you were going up on

25   this phone?

1    A.   Yes, sir, we did.

2    Q.   Did you coordinate with them?

3    A.   Yes, sir, we did.

4    Q.   Tell us, what is a pertinent call?

5    A.   Pertinent call is a call or conversation that the

6    individuals are engaging in criminal activities.

7    Q.   Are the pertinent calls in a wiretap summarized?

8    A.   Yes, they are.

9    Q.   And how are they summarized?

10   A.   They will just go through and instead of documenting every

11   word that is stated in the conversation, they will go and just

12   make a synopsis or summary of the call.

13   Q.   Are those summaries in documents called line sheets?

14   A.   Yes, sir, they are.

15   Q.   And did you read these line sheets?

16   A.   Yes, sir, I have.

17   Q.   How long did you stay up on Shotgun's prison cell phone?

18   A.   Till August 19, 2010.

19   Q.   And do you know, approximately, how many pertinent calls

20   were made in that time period?

21   A.   152 calls.

22   Q.   And after reading through the line sheets, can you give us

23   a general summary of what he was using his phone to talk about

24   during all those calls?

25   A.   Yes, sir.  Basically, he was using a cellular telephone to

DIRECT - SAMANTHA MIKESKA

```
 1    issue orders and directives to another BA member who was
 2    running the streets of El Paso.
 3    Q.  And just so we're clear, while you were up on that phone,
 4    he was incarcerated in maximum or in a federal prison?
 5    A.  Yes, sir, he was.
 6    Q.  Ultimately, did you ever see the phone?
 7    A.  Yes, sir, I have.
 8    Q.  And how did you see it?
 9    A.  Notification was made to the Bureau of Prisons to pick up
10    the phone.  So the Bureau of Prisons used their SRT team to go
11    into his cell, seize his phone, pass it on to the SIS.  And
12    notification was made to the FBI in New Orleans to go down and
13    pick up the phone and FedEx it back to us.
14    Q.  You mentioned SIS.  What is that?
15    A.  It's a, basically, a gang intelligence officer in the
16    Bureau of Prisons.
17    Q.  So tell me if I get this right.  You finish the wiretap on
18    the phone.  You alert BOP that you're done with the wiretap.
19    They give it to their SIS.  The SIS gives it to your FBI
20    contact in New Orleans.  Is that correct?
21    A.  That's correct.
22    Q.  Did you request that your contact in New Orleans send it to
23    the FBI?
24    A.  Yes, we did.
25    Q.  You as the FBI?
```

1    A.  As the FBI, yes, sir.

2    Q.  Did you ever receive that phone from your contact in New

3    Orleans?

4    A.  Yes, sir, we did.  And booked it into our evidence.

5    Q.  If I may ask you, did you -- you ultimately received the

6    phone from your contact in Louisiana, correct?

7    A.  Yes, sir, our evidence technician -- it went directly to

8    them.

9    Q.  How was the phone packaged at the time?

10   A.  It was packaged in a Irish Spring soap box in a FedEx

11   package.

12   Q.  Was the phone on the inside of the soap box?

13   A.  Yes.

14          MR. SKARET:  Your Honor, if I may approach the

15   witness?

16          THE COURT:  You may.

17   Q.  (By Mr. Skaret)  Agent Mikeska, do you recognize what's

18   been marked as Government's Exhibit 9?

19   A.  Yes, sir, I do.

20   Q.  Is this what you received from your contact in Louisiana?

21   A.  Yes, sir, it was.

22   Q.  And when you received it, what did you do with it?

23   A.  We booked it into evidence.

24   Q.  And how do we know that the exhibit you're holding today is

25   the same exhibit that you received from your contact in

1    Louisiana?

2    A.  Well, once we make contact with BOP to go get his phone,

3    they got his phone.  And then the chain of custody started with

4    the individual who seized it.  Passed it on to the gang

5    intelligence officer to the agent in New Orleans and forwarded

6    it on to us.

7              MR. SKARET:  If I may retrieve the exhibit, Your

8    Honor?

9              THE COURT:  You may.

10             MR. SKARET:  Your Honor, at this time I offer

11   Government's Exhibit 9.

12             THE COURT:  Any objections?

13             MR. FOSTER:  May I take the witness on voir dire for

14   authentication?

15             THE COURT:  Could the attorneys approach?

16             (Bench conference.  Out of hearing of jury.)

17             THE COURT:  Why?

18             MR. FOSTER:  Because Carlos Pereya and Ramon Renteria

19   were removed from that cell the 18th.  There were new people in

20   that cell on August the 19th.  And that's when the search took

21   place.  She hasn't testified that, specifically.  I think that

22   needs to be brought up.

23             THE COURT:  Well, you can do that on cross.  What's

24   that got to do with authentication?

25             MR. FOSTER:  If there were other people in that cell,

 1   that particular cell phone may belong to those other people in

 2   that cell.  She hasn't authenticated this particular phone

 3   through serial numbers or electronic serial numbers or anything

 4   of that nature.

 5        THE COURT:  My understanding is that it was -- you're

 6   trying to offer it for proving that's the one seized from that

 7   cell.  Is that correct?

 8        MR. SKARET:  Yes, Your Honor.

 9        THE COURT:  Then I will certainly allow cross on the

10   issue.  But I don't see how it's not authenticated as a phone

11   seized from that cell.

12        MR. FOSTER:  Very well.

13        (End of bench conference.  Back in open court.)

14        THE COURT:  I will deny that request.  Any objection

15   then other than the request for authentication?

16        MR. FOSTER:  We will withdraw our objection as to

17   authentication.  There is no objection.

18        THE COURT:  All right.  Then Government's Exhibit 9

19   will be admitted.

20        MR. SKARET:  Thank you, Your Honor.

21        THE COURT:  Could the attorneys approach again for a

22   second?  This doesn't have to be on the record.

23        (Attorneys approach bench.  Off record discussion.)

24        THE COURT:  Ladies and Gentlemen of the Jury, the

25   Court wants to take a break.  It's 10:35.  We're going to take

1    a break.  You remain under all the instructions the Court has

2    given you.  It will be ten minutes.  Be available at 10:46.

3    See you then.

4              (Jury leaves courtroom.)

5              (Recess.)

6              COURTROOM DEPUTY:  Court is back in session.

7              THE COURT:  Ready for the jury?

8              MR. SKARET:  Yes, Your Honor.

9              (Jury enters courtroom.)

10             THE COURT:  You may be seated, Ladies and Gentlemen.

11   You may proceed.

12             MR. SKARET:  Thank you, Your Honor.

13   Q.  (By Mr. Skaret)  I believe we were just talking about the

14   end of the wire intercept on Shotgun's phone in Pollock,

15   Louisiana.  Is that correct?

16   A.  Yes, sir.

17   Q.  Did any information from that particular wire intercept

18   lead to drug seizures or assist in drug seizures by law

19   enforcement?

20   A.  Yes, it did.

21   Q.  And can you explain those seizures for me?

22   A.  The first seizure is we intercepted a call where they had

23   lost a drug shipment.  And they were talking about trying to

24   redirect or reroute that drug shipment so it would go to its

25   destination.

1   Q.  Who is they?  They lost it.

2   A.  I'm sorry.  It was Carlos Pereya and BA member Manuel

3   Lopez.

4   Q.  And they mentioned on the wire they had lost a shipment?

5   A.  Yes, sir.

6   Q.  Okay.  Please continue.

7   A.  And then -- that was June 26, 2010.  And then on June 28th,

8   2010, there was a call with Ramon Renteria and Manuel Lopez.

9   And, basically, Ramon Renteria was telling Manuel Lopez that it

10  wouldn't be a good idea to go and pick up the package.  And,

11  basically, ordered him to redirect the package.

12  Q.  Where had the package been sent to?

13  A.  To Washington DC.  The address was 1162 Neil Street,

14  Northeast Washington, D.C. 20002.

15  Q.  And was that package ever found in Washington, D.C.?

16  A.  Yes, it was.

17  Q.  Tell us about how it was found.

18  A.  Okay.  Um, we received another call on July 21, 2010.  And,

19  basically, it was between Carlos Pereya and Manuel Lopez.  And

20  the call was that Pereya, Carlos, was telling Manny Lopez that

21  they had put the wrong address on the package.  That they had

22  put 1662 instead of 1162.  And that was on July 21.

23       We also received a call that we received the tracking

24  number on that package.  And the case agent supervising that

25  wire contacted FedEx since we had the tracking number.  And

1    FedEx notified us that we needed to contact law enforcement so
2    there was an Officer Martin Moncado with the Alpha Unit here in
3    El Paso, Texas.  We advised him about the package.  And he
4    advised us that it had already been seized in Washington, D.C.
5    Q.  And who had seized the package in Washington D.C.?
6    A.  Washington, D.C. Metropolitan Police.  An individual named
7    Officer James Surega.  And what had happened is June 22, 2010,
8    he was notified the package was on its way to Washington, D.C.
9    And Washington Police Department went and picked up the package
10   on June 23, 2010.  They ran a dog on the package.  He
11   positively alerted to the presence of narcotics in the package.
12   Mr.-- Officer Surega obtained a search warrant and found drugs
13   inside the package.
14   Q.  You said they ran a dog on the package.  What's that about?
15   A.  They basically used a narcotic K-9 to sniff the package to
16   see if there was an odor of narcotics in the package.  That,
17   basically, gives you probable cause to obtain the search
18   warrant.
19   Q.  And when you said that the dog alerted to the package, what
20   does that mean?
21   A.  Sniffed the package.  It sniffed a presence of narcotics.
22   And began scratching on the package.  And that is the sign for
23   that dog to alert to a package containing narcotics.
24   Q.  Did the FBI in El Paso ever obtain the FedEx package sent
25   to Washington?

1    A.  Yes, we did.

2    Q.  How did you get the package?

3    A.  Basically, I notified James Surega and advised him we had

4    an ongoing RICO investigation.  And we would be interested in

5    prosecuting the individuals responsible for sending this

6    package.  And when he opened the package after the dog had

7    alerted to it, he found two jars of Ponds Cold Cream.  And

8    within those jars, secreted, was balloons of heroin.  I believe

9    14 of them.

10              MR. SKARET:  Your Honor, I would like to approach the

11   witness.

12              THE COURT:  You may.

13              (Attorney approaches witness.)

14              MR. SKARET:  May I give the witness a pair of

15   scissors?

16              THE COURT:  Yes, you may.

17   Q.  (By Mr. Skaret)  Agent Mikeska, I'm handing you what's been

18   marked as Exhibit 2C.  What is exhibit 2C?

19   A.  Currently from the outside it's just a box.  But inside the

20   box it contains two jars of Ponds Cold Cream.

21   Q.  How do you know what's inside the box?

22   A.  Because when we received it, I booked it into evidence.

23   Q.  Would you please open Exhibit 2C?

24   A.  Yes, sir.  I wrapped it well.  Stand by.

25              MR. SKARET:  May I approach?

```
 1              THE COURT:  You may.
 2   Q.  (By Mr. Skaret)  Okay.  It looks like a tough box to open.
 3   A.  Yes, sir.
 4   Q.  All right.  And what kind of a box is that that you have?
 5   A.  It is a FedEx box.
 6   Q.  What's inside of the FedEx box?
 7   A.  Two jars of Ponds Cold Cream.
 8   Q.  Okay.  Have you ever looked inside of the Ponds Cold Cream?
 9   A.  Sir?
10   Q.  Have you ever looked inside?
11   A.  Yes, sir.
12   Q.  What's inside?
13   A.  Cold cream.
14   Q.  Now, with respect to the heroin that was discovered inside
15   the Ponds Cream, was that sent off to the DEA for examination?
16   A.  Yes, sir, it was.
17   Q.  Were the results of that examination by Darren Gain of the
18   DEA lab?
19   A.  Yes, sir.
20              MR. SKARET:  Your Honor, if I may publish Government's
21   Exhibit 2B-1, which has been admitted by stipulation?
22              THE COURT:  Any objection?
23              MR. FOSTER:  No objection.
24              THE COURT:  It may be published.
25   Q.  (By Mr. Skaret)  Do you recognize this?
```

1    A.  Yes, sir, I do.

2    Q.  Does this drug lab -- does this drug lab relate to the

3    heroin that was inside of the Ponds Cold Cream?

4    A.  Yes, it does.

5    Q.  How do you know?

6    A.  By the 1B number.  And the amount of the heroin that's

7    marked.

8    Q.  Okay.  I'd like to direct your attention to what's been

9    marked as Exhibit 2B1J1.  It should be up to your left off of

10   the screen.

11   A.  Sorry.

12   Q.  Sorry.  What does that appear to be?

13   A.  Did you say 1B161?

14   Q.  1B1J1.

15   A.  Okay.  Exhibit.

16   Q.  Yes?

17   A.  Okay.

18   Q.  What does that exhibit appear to be?

19   A.  It is the balloons of heroin that were found inside of the

20   Ponds Cold Cream jars.

21        MR. SKARET:  Your Honor, at this point I would offer

22   the package with respect to the cream bottles 2C and also the

23   heroin recovered from the Ponds Cold Cream, which is 2B1J1.

24        THE COURT:  Any objections to 2C?

25        MR. FOSTER:  No objections, Judge.

```
 1              THE COURT:  Any objections to 2B1J1, Mr. Foster?

 2              MR. FOSTER:  I'm sorry.  Either one, Judge.

 3              THE COURT:  So 2C and 2B1J1 will be admitted.

 4              MR. SKARET:  It's my understanding all exhibits under

 5     Exhibit 2 have been admitted into evidence.  If I may, may we

 6     publish 2B1A?

 7              THE COURT:  All right.  Yes.  All of them and 2B1A.

 8     Q.  (By Mr. Skaret)  Is this the outside label of the FedEx box

 9     you're holding?

10     A.  Yes, sir, it is.

11     Q.  Next one.  What does 2B1B appear to be?

12     A.  A box containing bubble wrap.

13     Q.  All right.  Can we go to 2B1C?  Can you see it on your

14     screen?

15     A.  Yes, sir.

16     Q.  What does that appear to be?

17     A.  It looks like two jars of Ponds Cold Cream stacked on top

18     of each other.

19     Q.  All right.  Exhibit 2B1F, please?  Can you identify 2B1F?

20     A.  Yes, sir.  It looks like the same jars of Ponds Cold Cream

21     that he just pulled out of the box.

22     Q.  And the red items on that picture, what are those?

23     A.  They are orange balloons.  And they were filled with

24     heroin.

25     Q.  What kind of balloons were they?
```

1    A.   Just small packaging balloons, just rubber balloons.

2    Q.   Like party balloons?

3    A.   Party balloons, yes, sir.

4    Q.   And the drugs were secreted in the party balloons?

5    A.   Inside the balloons, yes, sir.

6    Q.   All right.  You mentioned there were more than one drug

7    seizure that came off of the Carlos Pereya wire you mentioned

8    in one package going to Washington, D.C.  Was there a second

9    package that you found because of or at least with respect to

10   the Carlos Pereya wire?

11   A.   Yes, sir, there was.

12   Q.   Tell us about that package.

13   A.   Okay.  In the end of July of 2010, Carlos Pereya and Manuel

14   Lopez were discussing sending drugs through the mail system.

15   And Carlos Pereya in the call was basically telling Manuel

16   Lopez exactly how to wrap the packages so it wouldn't be

17   detected by law enforcement or dogs.  And, basically, telling

18   him to take the drugs and wrap it with carbon paper.  Put

19   carbon paper one side and turn it inside out and wrap it again

20   and place the carbon paper with drugs in it inside a Ziploc

21   bag.  And then put tape on the outside of the bag so the air

22   couldn't be -- outside the plastic bag couldn't be detected by

23   law enforcement.  And he told Pereya -- Pereya told Manny Lopez

24   to then put the drugs in a priority mail package or envelope

25   and put it in another envelope and send it through the mail.

1    And he gave the address of the recipient should be Michelle

2    Smith, 3306 Buchanan, Number 102, Mt. Rainier, Maryland.  I

3    believe the zip code was 20217.

4    Q.  Did law enforcement ever get their hands on that package?

5    A.  Yes, they did.  We immediately notified the postal

6    inspector on August 2nd.  It took us a while to track down the

7    package.  It was August 19th before the package was found.

8    August 20th, I believe, a drug dog was run again on the

9    package, basically, checking it for the odor of narcotics.  The

10   dog positively alerted on the package.  And on August 24, 2010,

11   a search warrant was obtained.  And inside the package were ten

12   small blue balloons packaged inside.  And inside the package

13   also were newspapers from El Paso, Texas.

14   Q.  So the wrapping on the inside of the package was newspaper

15   from this area?

16   A.  Yes, sir.

17   Q.  Okay.  Did you ever physically obtain the package?

18   A.  Yes, sir, we did.

19   Q.  And what did you do with the drugs that you found inside

20   the package?

21   A.  Once we obtained it from the police department, we booked

22   it into our evidence.  And then sent it off for testing

23   purposes.

24   Q.  Okay.  I'd like to direct your attention to Government's

25   Exhibit 1A1 on your left -- on the screen, pardon me.  Sorry.

```
 1    A.  It's up on the screen, sir.
 2             THE COURT:  That has been -- 2A?
 3             MR. SKARET:  Yes.  I'm actually looking for it, Your
 4    Honor.
 5             THE COURT:  Those have been admitted as part of the
 6    exhibits?
 7             MR. SKARET:  Exactly.  Those have been admitted
 8    pursuant to the stipulation in Exhibit 1.
 9             THE COURT:  Did you want it displayed?
10             MR. SKARET:  Yes, please.
11             THE COURT:  Okay.
12    Q.  (By Mr. Skaret)  I believe Exhibit 1A1 is in front of you.
13    Do you recognize it?  I'm sorry.  On the screen, Agent Mikeska.
14    A.  That's 1-B.  That's not the correct exhibit.
15             MR. SKARET:  My apologies.  With the Court's
16    indulgence.
17             THE COURT:  That's okay.
18    Q.  (By Mr. Skaret)  1A2A.  Is that what you have in your
19    hands?
20    A.  Yes, sir, it is.
21    Q.  Can you explain 1A2A?
22    A.  Basically, it's a package containing the ten balloons --
23    blue balloons, of heroin seized out of the package sent to
24    Mount Rainier, Maryland.
25    Q.  Okay.  And did you have the contents of -- of that exhibit
```

1  tested?

2  A.  Yes, I did.

3  Q.  What was the result of that test?

4  A.  It was positive for heroin.

5  Q.  All right.  Based on the information that you obtained

6  during Shotgun's wire recordings, did you spin off into any

7  other wire intercepts?

8  A.  Yes, we did.  We received the call regarding the drugs.

9  And that gave us enough probable cause to go up on Manny

10  Lopez's phone.

11        MR. SKARET:  You know, before I go on, Your Honor, I

12  need to offer 1A2A1.

13  Q.  Is that what you were just looking at, Agent Mikeska?

14  A.  1A2A1.

15  Q.  1A2A1, the drugs seized in that package.

16        THE COURT:  Any objections?

17        MR. FOSTER:  No objection.

18        THE COURT:  1A2A1 will be admitted.

19  Q.  (By Mr. Skaret)  Okay.  Agent Mikeska, you mentioned that

20  you may have spun off from Shotgun's wire into other intercepts

21  in this investigation?

22  A.  Yes, sir.

23  Q.  All right.  Explain what a spin-off is.

24  A.  A spin-off is when we're up on a wire or capturing

25  conversations on somebody's phone.  If there's another

1   individual conducting criminal activities on their cellular

2   telephone or telephone then we will have enough probable cause

3   to go up on another wire intercept and capture conversations on

4   that individual's phone.

5   Q.  Did you attempt to do that after the Shotgun Pereya wire?

6   A.  Yes, we did.

7   Q.  Whose phone did you go up on?

8   A.  Manuel Lopez.

9   Q.  Did you follow all the same procedures as with respect to

10  the Shotgun wire?

11  A.  Yes, sir.

12  Q.  Did the Court authorize that -- your application to go up

13  on that wire?

14  A.  Yes, sir, they did.

15  Q.  Did the FBI apply the same minimization techniques?

16  A.  Yes, sir, they did.

17  Q.  How long was the FBI up on Manny Lopez's phone?

18  A.  Just for 30 days on that particular cell phone.

19  Q.  Was he in jail at time?

20  A.  No, sir, he was on the streets.

21  Q.  And how many pertinent calls did he make during that 30-day

22  period?

23  A.  230.

24  Q.  Can you summarize for us, basically, what kind of business

25  Manny Lopez was conducting on that phone?

1  A.  He was taking orders and directives from Carlos Pereya.

2  And, basically, implementing these orders and directives on the

3  streets of El Paso.

4  Q.  And can you summarize, um, did you -- pardon me.  Did you

5  spin-off from Manny Lopez's wire to any other intercepts?

6  A.  Yes, we did.

7  Q.  All right.  And who did you spin-off onto this time?

8  A.  Hector Galindo, also known as Silent.  He is a lieutenant

9  for the BA criminal enterprise.  He was currently incarcerated

10 in the Texas Department of Corrections, Coffield Unit.

11 Q.  And did you have evidence to believe he was using a cell

12 phone?

13 A.  Yes, sir, we did.

14 Q.  How did you get that evidence?

15 A.  Through source information and also through, um, captured

16 conversations on Manny Lopez's phone.

17 Q.  What is special with respect to the BA when talking about

18 the prison in Texas at Coffield?

19 A.  Coffield is, basically, the mesa for the Barrio Aztecas.

20 You have leaders of Texas Syndicate, leaders of the Texas

21 Mexican Mafia, all housed in Coffield.  Mesa, the table.  All

22 decisions are made out of Coffield.  Blessed by the capos and

23 then handed down to the streets.

24 Q.  And did you file an application to go up on Hector

25 Galindo's phone at the Coffield Unit?

1    A.   Yes, sir, we did.

2    Q.   Did you receive authorization to do so?

3    A.   Yes, sir, we did.

4    Q.   Did you use all the required minimization techniques?

5    A.   Yes, sir.

6    Q.   All right.  And what date did the FBI team start recording

7    Hector Galindo's calls?

8    A.   It was August 13, 2010 through November 24, 2010.

9    Q.   As I understand, that's -- if my math is correct, that's

10   more than a 30-day period.  Is that right?

11   A.   Yes, sir.  There were two renewals on that phone.  So we

12   were up about 90 days.

13   Q.   What is a renewal again?

14   A.   A renewal is there is probable cause for us to continue to

15   stay up on that phone in order to capture additional criminal

16   activities for investigation.

17   Q.   And during that total time that you were up on Hector

18   Galindo's phone, approximately how many pertinent calls were

19   made?

20   A.   526.

21   Q.   Do you know about how much time it took Hector Galindo to

22   make those calls?

23   A.   It was about four days worth of calls.  So if you look at

24   it, 96 hours.

25   Q.   Can you give us just a general summary of what Hector

1    Galindo was talking about during all that time?

2    A.  Yes, sir, I can.  Um, he was issuing orders and directives

3    to Manny Lopez since Lopez was running the streets of El Paso.

4    He was issuing orders and directives through Manny Lopez.  He

5    was also asking for drugs to be sent to him in the prison

6    system.  Since he was at the Coffield Unit, the mesa, it's very

7    imperative for him to know what's going on in the streets of El

8    Paso so he can keep peace also in the Coffield Unit.  And if

9    there's any problems, he has the leaders of Texas Syndicate and

10   the Mexican Mafia and other gang leaders there to -- if there's

11   a problem on the streets, he can notify those leaders and try

12   to squash it at the Coffield level.

13   Q.  You mentioned that that particular wire intercept on Hector

14   Galindo's phone ended November 12, 2010.

15   A.  Yes, sir.

16   Q.  Now, while your office was listening to Hector's phone at

17   Coffield, were there FBI agents in Las Cruces on another Title

18   III wire intercept?

19   A.  Yes, sir, there was.

20   Q.  All right.  And, um, at about that same time from October

21   to November, had they received Court authorization to conduct a

22   wire intercept?

23   A.  Yes, they did.

24   Q.  And who were they up on?

25   A.  Up on Jesus Espino, also known as -- just Espino.  And he

1   was the leader, the Barrio Aztecas on the west side of El Paso.

2   Q.  So that's wire intercepts done by your office on Shotgun

3   Pereya, Manny Lopez, Hector Galindo.  And then Jesus Espino by

4   the Las Cruces office, correct?

5   A.  Yes, sir, we had one more on Manuel Lopez also.

6   Q.  Tell us about that wire intercept.

7   A.  Okay.  Also, on the second wire that we had on -- actually,

8   Galindo's wire -- I think I misspoke.  We were up on Galindo's

9   wire from August 13, 2010 to November 12, 2010.  I think I said

10  the 24th.  But there was a fourth wire that the El Paso office

11  went up on.  And it was a second phone, of Manny Lopez.  And we

12  went up on that phone from November 10, 2010 through

13  November 19, 2010.

14  Q.  And applying to go up on that phone did you apply for Court

15  authorization?

16  A.  Yes, sir, the same procedures as before.

17  Q.  Were you granted authorization to go up on that phone?

18  A.  Yes, sir, we were.

19  Q.  You mentioned you were on that phone only a short time.

20  A.  Yes, sir.

21  Q.  Why just a short time?

22  A.  He dropped the phone.  We executed two federal search

23  warrants.  And they got wind of the federal search warrants

24  that we had executed.  They thought we had telephone numbers.

25  So they dropped their phones and changed their numbers.

David A. Perez, RMR, RPR

1   Q.  Agent Mikeska, I would like to approach and hand you three

2   DVDs that are labeled as containing Government's Exhibits 20A,

3   20A-1, 20A-2, 20A-3, 20A-4, 20A-5, 20B, 20B-1, 20B-2, 20C,

4   20C-1, 20C-2, 20C-3, 20D, 20D-1, 20D-2, 20E, 20E-1, 20E-2,

5   20E-3, 20F, 20F-1, 20F-2, 20G, 20G-1, 20G-2, 20H, 20H-1 and

6   20H-2.  It's on the first DVD.

7           A second DVD containing Government's Exhibits 21A,

8   21A-1, 21A-2.

9           And the third DVD containing Government's Exhibits

10  21-B, 21-B1, 21-B2, 22-A, 22-A1, and 22-A2.

11          May I approach, Your Honor?

12          THE COURT:  You may.

13  Q.  (By Mr. Skaret)  Do you recognize those exhibits?

14  A.  Yes, sir, I do.

15  Q.  How do you recognize them?

16  A.  By the CD.  We've been through these.  And just by the

17  exhibits.

18  Q.  All right.  And what's on those particular three CDs?

19  A.  Excerpts of calls between BA members and Carlos Pereya.

20  Excerpts of calls between BA members and Manuel Lopez.  And

21  excerpts of calls between Hector Galindo and other BA members.

22  Q.  If you could, please be specific.  And, um, please tell us

23  where are all of the Exhibit 20s from?  You will see 20A.

24  Everything that starts with 20 on exhibit, which wire did those

25  come from?

DIRECT - MANUEL MIRANDA

1    A.  It's gonna be coming off of Hector Galindo's calls.

2    Q.  All right.  What about 21A-1 and A2, which wire?

3    A.  Carlos Pereya's wire.

4    Q.  And Exhibit 21-B, B1, B2, and 22-A, 22-A1 and 21-A2, where

5    did those come from?

6    A.  They came from the Manuel Lopez wire.

7    Q.  Now, are these calls an exact digital copy of the calls

8    recorded by the FBI during the actual intercepts?

9    A.  Yes, sir.

10   Q.  All right.  How can you be certain of that?

11   A.  I was with Manuel Lopez when we went over each of these

12   calls.

13   Q.  And when was the last time that you listened to the calls

14   that are actually on those disks?

15   A.  Last night.

16   Q.  In these recordings, what language is being spoken for the

17   most part?

18   A.  For the most part Spanish.  That's why we had the language

19   specialist.

20   Q.  You mentioned earlier that a BA speaks in a lot of code.

21   A.  Yes, sir.

22   Q.  Did the language translators at the FBI understand all the

23   codes in these wire intercepts?

24   A.  No, sir, they did not.  That's why we had Manuel Lopez go

25   over the calls so he could document code words that were

1    utilized during the conversations.

2    Q.  Explain that to us.  Who is Manny Lopez?

3    A.  Manny Lopez is a BA member.  He was running the streets of

4    El Paso prior to the point where he opted to cooperate with the

5    Government.

6    Q.  All right.  Is he currently a cooperator in this case?

7    A.  Yes, sir, he is.

8    Q.  In fact, Manny Lopez is one of the individuals whose phone

9    you were up on.  Is that right?

10   A.  Yes, sir.

11   Q.  How much time would you say you went through these calls

12   with Manny Lopez?

13   A.  It was over -- as far as hours, I do not know.  But it was

14   over a three-week period, I believe.

15   Q.  And did Mr. Lopez make any corrections to the transcripts?

16   A.  Yes, he did.

17   Q.  Did he make corrections to the translations of those

18   transcripts?

19   A.  Yes, he did.

20   Q.  What did you do with those corrections that you made?

21   A.  We took them back to the language specialist.  And the

22   language specialist made corrections to the documents.  And we

23   made finalized copies.

24   Q.  The transcripts on those disks that refer to each call, are

25   those the final transcripts?

David A. Perez, RMR, RPR

1   A.  Yes, sir.

2   Q.  Now, you mentioned that you were with Manny Lopez when he

3   was going through and checking these transcripts.  Were you

4   listening to the calls with him as well?

5   A.  I was listening.  But I do not speak Spanish.  So I would

6   try to follow through the transcriptions.  And then he would

7   look at the transcriptions and then translate it into English.

8   And I would read the English portion.

9   Q.  And did he identify the speakers on the calls?

10  A.  Yes, he did.

11  Q.  And did he identify his own voice on some of those calls?

12  A.  Yes, he did.

13  Q.  And after spending all that time with him, can you also

14  identify his voice on the calls?

15  A.  Yes, I can.

16  Q.  Are you confident where the transcripts indicate that Manny

17  Lopez is speaking it really is Manny Lopez?

18  A.  Yes, I am.

19          MR. SKARET:  Your Honor, may I retrieve the exhibits?

20          THE COURT:  You may.

21          MR. SKARET:  I offer 21A, 21A-1, 21A-2, 20A, 20A-1,

22  20A-2, 20A-3, 20A-4, 20A-5, 20B, 20B-1, 20B-2, 20C, 20C-1,

23  20C-2, 20C-3, 20D, 20D-1, 20D-2, 20E, 20E-1, 20E-2, 20E-3, 20F,

24  20F-1, 20F-2, 20G, 20G-1, 20G-2, 20H, 20H-1, 20H-2, almost

25  there.  And 21-B, 21B-1, 21B-2, 22A, 22A-1 and 22A-2.

```
 1              THE COURT:  Any objections?

 2              MR. FOSTER:  No objections, Judge.

 3              THE COURT:  All right.  Then 20A, 20A-1, -2, -3,

 4   20A-4, 20A-5, 20B, 20B-1, 20B-2, 20C, 20C-1, 20C-2, 20C-3, 20D,

 5   20D-1, 20D-2, 20E, 20E-1, 20E-2, 20F, 20F-1, 20F-2, 20G, 20G-1,

 6   20G-2, 20H, 20H-1, 20H-2, 21A, 21A-1, 21A-2, 21-B, 21B-1,

 7   21B-2, 22A, 22A-1, and 22A-2 will be admitted.

 8              MR. SKARET:  Thank you, Your Honor.

 9              THE COURT:  You're welcome.

10   Q.  (By Mr. Skaret)  Agent Mikeska, I've handed you had 23A,

11   -A1, and 23A-2.  Are you familiar with these particular

12   exhibits?

13   A.  Yes, sir, I am.

14   Q.  What are they?

15   A.  They're a telephone call with Ramon Renteria and an unknown

16   or unidentified male that he made from the prison system to a

17   number outside the prison.

18   Q.  Which prison system?

19   A.  Pollock, Louisiana.

20   Q.  And what kind of a call is this?

21   A.  It's --

22   Q.  Let me rephrase.  Is this part of your wire intercepts that

23   you did in this particular case?

24   A.  No, sir, it's not.

25   Q.  How did you get this call?
```

1    A.   We requested it from the Bureau of Prisons.

2    Q.   How did the Bureau of Prisons get it?

3    A.   They capture all calls made from their prison systems

4    outside.

5    Q.   Do they have a practice of recording all the calls that go

6    out from their prison?

7    A.   Yes, sir, they do.

8    Q.   Have you listened to Government's Exhibit 23A?

9    A.   Yes, sir, I have listened to it.  But it is in Spanish.

10   And I had the cooperator sit down with me.

11   Q.   All right.  And 23A-1.  Is that the transcript and

12   translation of 23A?

13   A.   Yes, sir.

14   Q.   And is 23A-2, a synchronized copy of the translation with

15   the recording?

16   A.   Yes, sir.

17   Q.   When you listened to it, did there appear to be any

18   evidence the call was tampered with?

19   A.   No, sir.

20   Q.   Did you have it transcribed and translated?

21   A.   Yes, sir.

22   Q.   Because you went through this with Manny Lopez, are you

23   confident that the translation and transcription are correct?

24   A.   Yes, sir, I am.

25             MR. SKARET:  Your Honor, I offer the recorded call,

David A. Perez, RMR, RPR

1    the transcript of the call synchronized version being Exhibits

2    23A, 23A-1, and 23A-2.

3                 THE COURT:  Any objections?

4                 MR. FOSTER:  No objections, judge.

5                 THE COURT:  23A, 23A-1, 23A-2 will be admitted.  Can I

6    ask a point of clarification.  I show there's 22A-1 and 22A-2.

7    Have you requested they be admitted?  The transcript of a

8    recording and fully synchronized.

9                 MR. SKARET:  What was it again?

10               THE COURT:  22A-1 and 22A-2.  I just want to make

11   sure.

12               MR. SKARET:  Yes, Your Honor.

13               THE COURT:  For the record, to make sure, any

14   objections to those, Mr. Foster?

15               MR. FOSTER:  No objections, Judge.

16               THE COURT:  So 22A-1 and 22A-2 will be admitted.  You

17   may proceed.

18   Q.  (By Mr. Skaret)  You mentioned in Las Cruces an individual

19   went up on wire named Jesus Espino?

20   A.  Yes, sir.

21   Q.  Based on that wire, were agents in Las Cruces able to, um,

22   make any drug trafficking seizures?

23   A.  Yes, they were.

24   Q.  And can you tell us about those events?

25   A.  Okay.  I believe it was on November 9th they received a

1    call off the wire from Jesus Espino, telling another BA member

2    by the name of Juan Amaro, also known as Porky, to go down and

3    pick up something from Peewee.  And then the agents in Las

4    Cruces sent their surveillance team down to set up at Peewee's

5    house.  Peewee is another Barrio Azteca in El Paso, Texas named

6    Omar Lopez.  They set up on his house.  And a short time later

7    Juan Amaro and another BA member identified as Lucero showed up

8    at the house.  They greet Omar Lopez, Peewee, outside.  Um,

9    they believed the exchange is made.  Porky, Amaro, and Sonny

10   Lucero get back in the truck.  A traffic stop is conducted on

11   the vehicle by El Paso Police Department.  Juan Amaro is

12   subsequently detained and taken into the police department.

13   Um, and at the police department, they found approximately 1

14   ounce 26.5 grams of heroin on his person.

15   Q.  Could you sort through those exhibits, Agent Mikeska, and

16   find 1A-3A, Government's Exhibit?

17   A.  The drugs related to the seizure is 1A-3B.

18   Q.  1A-3B.  I'm all mixed up.  All right.  Do you recognize

19   what's been marked as Government's Exhibit 1A-3B?

20   A.  Yes, sir, I do.

21   Q.  What are those?

22   A.  It's a packet containing heroin.  It was the drugs that

23   were seized by the El Paso Police Department from Juan Amaro

24   also known as Porky.

25   Q.  And did you send those drugs off for testing?

 1   A.  I believe Albuquerque sent the drugs off for testing.

 2   Q.  And did the DEA come back with any findings to what those

 3   drugs were?

 4   A.  I believe it was positive for heroin.

 5          MR. SKARET:  Your Honor, at this point I offer the

 6   drugs identified as 1AB -- 1A-3B.

 7          THE COURT:  Any objections?

 8          MR. FOSTER:  No objections, Judge.

 9          THE COURT:  1A-3B will be admitted.

10   Q.  (By Mr. Skaret)  Now, in addition to the wire recordings

11   that were done by the FBI, um, did the FBI do any search

12   warrants in the case?

13   A.  Yes, sir, we did.

14   Q.  All right.  Can you tell us about the search warrants that

15   took place on November 1, 2010?

16   A.  Yes, sir, I can.  The first search warrant was on Jose

17   Sanchez or Jorge Sanchez, Jorge Diaz also known as Payaso.  He

18   is a BA member.  And he was what they call the bank for BAs.

19   So, basically, all monies collected from quota were turned in

20   to him and he maintained the funds.  Then the second wire was

21   on a female named Yolanda Barba.

22   Q.  The second search warrant?

23   A.  I'm sorry.  Search warrant.  My apologies.  The second

24   search warrant was on Yolanda Barba Chavira.  And she was in

25   direct contact with Hector Galindo on the wiretap.

 1          MR. SKARET:  Your Honor, may I approach?

 2          THE COURT:  You may.

 3  Q.  (By Mr. Skaret)  I'm showing you what's been marked as

 4  Government's Exhibits 8A through 8Q.  Do you recognize these

 5  exhibits?

 6  A.  Yes, sir, I do.

 7  Q.  How do you recognize them?

 8  A.  I pulled them out of the evidence bags and placed them in

 9  the exhibits.  And then marked the exhibits with Yolanda

10  Chavira's search.

11  Q.  And were these exhibits among the items that were seized at

12  Yolanda Barba Chavira's house November 12?

13  A.  Yes, sir.

14          MR. SKARET:  I Offer 8A through Q.

15          THE COURT:  Any objections?

16          MR. FOSTER:  No objections.

17          THE COURT:  8A through 8Q will be admitted.

18  Q.  (By Mr. Skaret)  Now, with respect to what was recovered

19  from Yolanda Barba Chavira's house, were any money orders

20  recovered?

21  A.  Yes, there were.

22  Q.  I would like to ask you, what is a money order?

23  A.  A money order is what we see when the money is funneled to

24  the Texas Department of Corrections.  They will go out and get

25  a money order and maintain the receipt for reconciliation

1    purposes, I guess.  But they use these money orders to take

2    monies collected from quota --

3              MR. FOSTER:  Judge, I'm sorry.  I'm going to have to

4    object.  This is nonresponsive.  She was asked what a money

5    order was.  She's going on describing procedures and processes

6    for using a money order.

7              THE COURT:  I'll sustain.  Listen to the question and

8    answer the question specifically.

9    A.  They are subsequent documents to send monies through the

10   mail system.

11   Q.  (By Mr. Skaret)  I would like to direct your attention,

12   please, to Government's Exhibit 8F.  This should pop up on your

13   screen, Agent Mikeska.

14   A.  Okay.

15             MR. SKARET:  May we publish to the jury?

16             THE COURT:  You may.

17   Q.  (By Mr. Skaret)  Do you recognize 8F?

18   A.  Yes, I do.

19   Q.  And is this a money order that you were just talking about?

20   A.  It is a wire transfer.

21   Q.  A wire transfer?

22   A.  Yes, sir.

23   Q.  What's the difference between a money order and wire

24   transfer?

25   A.  A money order comes in a document.  And a wire transfer is

 1    a document where monies are wired through wire services.

 2    Q.  So Government's Exhibit 8F is a Western Union wire

 3    transfer?

 4    A.  That is correct.

 5    Q.  Can you take us through this document?  Do you recognize

 6    names?  Can you explain where the document's going and for how

 7    much the wire order is for?

 8    A.  Yes, sir.  Um, the money is going to Miguel Angel Escajeda.

 9    You have the register number or inmate number off to the side

10    of the name.  And Miguel Angel Escajeda is a lieutenant within

11    the BA criminal enterprise.  He was one of the defendants in

12    the 2008 RICO case.  It is for $150.  Lieutenants in the Barrio

13    Aztecas per month typically receive $150.

14    Q.  I would like to show you what's been marked as Government's

15    Exhibit 8K.  I may publish that.  This appears to be a similar

16    document from Western Union.  Does it not?

17    A.  Yes, sir, it is.

18    Q.  And who is this wire transfer made out to?

19    A.  It's Said Francisco Herrera.  And you have the register

20    number, inmate number off to the right side of the name.  The

21    amount is for $100.  He is a sergeant within the BA criminal

22    enterprise.  And he was one of the defendants in the 2008 RICO

23    investigation.

24    Q.  I would like to show you what's been marked as Government's

25    Exhibit 8M.  Was this another item seized from Yolanda Barba

1  Chavira's residence?

2  A.  Yes, sir, it was.

3  Q.  And can you tell us who the -- who the letter appears to be

4  made out to and whose the return address?

5  A.  The letter is made out to Yolanda Chavira, 7702 Parral, El

6  Paso, Texas.  That is the female that we conducted the search

7  warrant on November 12, 2010.  And the letter is from Hector

8  Galindo.  If you look in the upper right-hand corner for office

9  name he has his inmate number.  He is located in Coffield Unit,

10  which is in the Texas Department of Corrections.  And the

11  address for Coffield Unit is 2661 FM, Farm Market Road, 2054

12  Tennessee Colony, Texas 75884.

13  Q.  Is this the same Hector Galindo that had the phone that the

14  FBI was up on for a while?

15  A.  Yes, sir, I believe it is.

16  Q.  And was Hector Galindo charged in this particular case?

17  A.  Yes, he was.

18  Q.  And what was Yolanda Chavira charged in this particular

19  case?

20  A.  Yes, she was.

21  Q.  All right.  You also mentioned that on November 12th there

22  was another search.  You mentioned a guy's name, Payaso, or

23  Jorge Diaz.  Correct?

24  A.  Jorge Diaz, yes, sir.

25         MR. SKARET:  Your Honor, I did not request to approach

David A. Perez, RMR, RPR

1    the witness.  May I for the next 30 minutes do so?  All right.

2    Q.  (By Mr. Skaret)  I'm showing you what's been marked as

3    Government's Exhibit 13A through 13W.  Do you recognize those

4    exhibits?

5    A.  Yes, sir, I do.

6    Q.  All right.  And what are those exhibits?

7    A.  They're items that were seized out of Jorge Diaz's

8    residence.

9    Q.  And this was at the search on November 12, 2010?

10   A.  Yes, sir.

11   Q.  How do you know those are the same exhibits?

12   A.  I pulled them out of the evidence bags and placed them in

13   this exhibit bag and labeled it Exhibit 13 and marked it as

14   Jorge Diaz's search.

15          MR. SKARET:  Your Honor, at this time I offer

16   Government's Exhibit 13A through W.

17          THE COURT:  Any objections?

18          MR. FOSTER:  No objections.

19          THE COURT:  13A through W will be admitted.

20   Q.  (By Mr. Skaret)  Now, you mentioned that the seizure took

21   place on November 12, 2010.  Can you tell us about some more of

22   the details about what happened on the day of the seizure?

23   A.  Yes, sir.  We -- we went to the house approximately 0600

24   hours.

25   Q.  6:00 in the morning?

1    A.   6:00 in the morning.

2    Q.   Okay.

3    A.   We made contact with Jorge Diaz.  He had an outstanding

4    immigration warrant.  So he was placed in custody.  His wife

5    Monica Diaz, came to the door.  We explained to her that we had

6    a search warrant.  She let us in the house.  We searched the

7    house, um.  Since he was a bank, we were looking for documents

8    pertaining to him keeping a tally on a quota being collected in

9    El Paso, Texas.  But we did not find these documents or a large

10   sum of money at his house at the time.

11   Q.   And did the FBI leave the house?

12   A.   Yes, we did.

13   Q.   Did the FBI ever go back to the house?

14   A.   Yes, we did.  Um, like I mentioned previously, we were up

15   on another wire on Manny Lopez's phone.  Monica Diaz,

16   subsequently, after we left, called Manny Lopez and advised

17   that the FBI had just been at the house and they had arrested

18   Jorge Diaz and they didn't find what they were looking for and

19   that she also advised Manny that -- not to come back to the

20   house and told her -- she told him that she didn't want any BA

21   members coming over to her house anymore.

22   Q.   What did the FBI do when they heard that call on Manny's

23   wire?

24   A.   The individuals sitting on the wire notified us.  So we

25   went back to the house since we had already executed the search

 1   warrant.  We asked for consent to search the house and the
 2   vehicle.  She gave us consent.  And we found a bag of money
 3   with the quota sheets and the quota envelopes.
 4   Q.  How much money was found at the residence?
 5   A.  Approximately $20,000.
 6           MR. SKARET:  Your Honor, um, I would ask that we
 7   publish Government's Exhibit 13B.
 8           THE COURT:  It may be.
 9   Q.  (By Mr. Skaret)  Do you recognize 13B?
10   A.  Yes, I do.
11   Q.  Do you recognize any -- tell us, first of all, what is it?
12   A.  It is a photograph of individuals.
13   Q.  Do you recognize any of those individuals?
14   A.  Yes, I do.
15   Q.  Who do you recognize?
16   A.  Jorge Diaz, Payaso, and another BA member, who at one time
17   was running the streets of El Paso, Ramon Cano.
18   Q.  Can you point out which of these men was or is Jorge Diaz?
19   A.  Yes.  The individual in the, um -- I put a mark on it.  The
20   individual in the Washington Redskins jersey in the middle is
21   going to be Jorge Diaz.  And the individual off to his -- to
22   his left this individual here is going to be Ramon Cano.
23   Q.  Was Jorge Diaz charged in the case?
24   A.  Yes, he was.
25   Q.  I would like to publish, Your Honor, Government's Exhibit

1    13V.

2              THE COURT:  V as in.

3              MR. SKARET:  Victor.

4              THE COURT:  You may.  This is.

5              MR. SKARET:  This is a multipage document.

6    Q.  (By Mr. Skaret)  Let's see, this may better if we have you

7    look at the actual exhibit and do some explaining, agent.

8              Can you pull us what's been marked as 13V?

9    A.  V as in Victor, correct?

10   Q.  As in Victor.  What is Government's Exhibit 13V?

11   A.  They are wire transfer documentation, wire grams,

12   basically.

13   Q.  Now, how many are there in all of 13V.  Could you say there

14   are numerous wire transfers?

15   A.  I would say there's eight to ten.

16   Q.  Let's take a look at the first four that you've looked at.

17   Can you take us through a few of those and explain what they

18   are and how they relate to the case?

19   A.  Yes.  It's a money wire transfer, Western Union money gram.

20   The money is to Carlos Delgado Pereya, again his inmate number

21   is off to the right-hand side of the names for $100.  It is

22   9-8-2010.  And I traced this amount of money to the documents

23   for Carlos Pereya that he received these -- this -- these

24   monies.

25   Q.  Um, can you take a look at the second one, please?  Please

1   explain it for us.

2   A.  It is another Western Union money gram.  It is to Benjamin

3   Alvarez, inmate number stated off to the right-hand side of the

4   name is for $100.  It's dated 9-29-2010.

5   Q.  If you would please take a look at the exhibit that we

6   published on the screen.  Can you explain what that tells us.

7   Again, this is part of 13V, correct?

8   A.  Yes.  It is a Western Union money gram to -- to -- it looks

9   like Manuel Cardoza.

10  Q.  And you mentioned Manuel Cardoza was one of the defendants

11  in the 2008 RICO case?

12  A.  Yes, sir.

13  Q.  All right.  And in what amount is that particular wire

14  receipt for?

15  A.  It is for $200.

16  Q.  I'd like to show you what's been marked as Government's

17  Exhibit 27.  What is Government's Exhibit 27?

18  A.  It is source documents of the commissary monies going into

19  Ramon Renteria's account while he was incarcerated.  And source

20  documents of monies going into Carlos Pereya's commissary

21  account when he was incarcerated.

22  Q.  And is there an affidavit attached to Government's Exhibit

23  27?

24  A.  Yes, sir, self-proving affidavit.

25  Q.  Does it state that that is an affidavit that these records

```
 1   were kept in the ordinary course of business?
 2   A.  Yes, sir.
 3           MR. SKARET:  Your Honor, we would offer Government's
 4   Exhibit 27.
 5           THE COURT:  Any objections?
 6           MR. FOSTER:  No objections, Judge.
 7           THE COURT:  I show 27 and 28.
 8           MR. SKARET:  It's already in.
 9           THE COURT:  But 27 will be admitted.
10           THE COURT:  That's fine.
11   Q.  (By Mr. Skaret)  Now, with respect to Government's Exhibit
12   27, you mentioned there are records of monies going into the
13   commissary accounts of Ramon Renteria and Shotgun Pereya?
14   A.  Yes, sir.
15   Q.  Have you reviewed those?
16   A.  Yes, sir, I have.
17   Q.  And what can you tell us about the monies going into
18   Shotgun Pereya's account based on your review of Government's
19   Exhibit 27?
20           MR. FOSTER:  Carlos Pereya?
21           MR. SKARET:  Carlos Pereya.
22   A.  They're in the denominations of $100, $200, um, some in
23   $300.
24   Q.  Does it say where those denominations are going?
25   A.  They're going to Carlos Pereya's account.
```

1    Q.  And do they show where the monies come from?

2    A.  Yes, they do.  They give a name and address, city and zip

3    code and phone number.

4    Q.  Does it also show the frequency with which those -- those

5    entries into the commissary accounts are made?

6    A.  Yes, they do.

7    Q.  All right.  And with respect to Government's Exhibit 27,

8    that refers to Ramon Renteria.  Are there similar records?

9    A.  Yes, sir, there are.

10   Q.  And are there amounts that are going -- that show are going

11   into his commissary account?

12   A.  Yes, sir, there are.

13   Q.  And were you able to make any connection to the amounts

14   going into Ramon Renteria's accounts and the amounts going into

15   Carlos Pereya's accounts?

16   A.  Yes, sir.

17   Q.  Can you explain those?

18   A.  Yes, sir.  One of the money orders that we seized from

19   Jorge Diaz's house was traced back to Carlos Pereya's account.

20   And that was on 9-8-2010 in the amount of $100.  And the

21   individual that sent that money in was Jose Perez.  He's used

22   the address of 3518 Idalia, El Paso, Texas.  Telephone number

23   915-562-2891.  It appears 7-28-2010 Jose Perez also sent $200

24   to Ramon Renteria.  But this time Jose Perez used the address

25   of 3814 Mobile, El Paso, Texas.

1  Q.  So, basically, we have the same individual with different

2  addresses sending money to Ramon Renteria and Carlos Pereya.

3  A.  That is correct.

4  Q.  Moving on.  I wanted to talk to you about Jesus Espino.

5  You testified that Jesus Espino was a leader on the west side.

6  Um, after the FBI had completed its search warrants at Payaso's

7  house, Jorge Diaz and Yolanda Barba Chavira's house, did the

8  Las Cruces division execute a search warrant at Jesus Espino's

9  house?

10  A.  Yes, sir, they did.

11  Q.  All right.  Was that pursuant to a search warrant?

12  A.  Yes, sir.

13  Q.  I'd like to hand you what's been marked, um -- there's a

14  number of exhibits 10A through 10K.  Do you recognize these

15  exhibits, Agent Mikeska?

16  A.  Yes, sir, I do.

17  Q.  And are these exhibits among the items that the FBI seized

18  on November 23, 2010, at Jesus Espino's house?

19  A.  Yes, they are.

20  Q.  And how do you know that?

21  A.  I pulled them from the evidence bags and placed them into

22  this Exhibit 10 bag.

23  Q.  Okay.  Can you briefly describe Government's Exhibits 10A

24  through 10K?

25  A.  There is a document, a photograph of Barrio Azteca members.

```
 1   It looks like it's been taken in the prison.  There's a
 2   newspaper regarding Barrio Azteca.
 3   Q.  Just the headline, please, if you would?
 4   A.  It's in Spanish.  I will do the best I can.  Azteca Ante El
 5   Juez.  It's El Diario.
 6   Q.  Are there a number of newspaper articles?
 7   A.  Yes, sir, there's one, two, three, four articles that are
 8   all related to Barrio Azteca.
 9   Q.  All right.  What else do you find?
10   A.  There are two magazines for the weapon we found in his
11   house.
12   Q.  There's some letters addressed to Jesus Espino.  Some
13   documents with telephone numbers of Espino and Peewee.  There's
14   a bible.  It's got inside the bible, it's got telephone numbers
15   of individuals, Manny Cardoza, capo of Barrio Azteca criminal
16   enterprise is on the back page TDC number.  There's ammo
17   located in the magazines.  And an ID card of Jesus Espino
18   and --
19          MR. SKARET:  Your Honor, before she goes into this any
20   further, if I may offer Government's Exhibit 10A through 10M
21   and also 10O.
22          THE COURT:  All right.  So not N.
23          MR. SKARET:  Everything except for N.
24          THE COURT:  Any objections to 10A through M and 10O?
25          MR. FOSTER:  No objections, Your Honor.  We have
```

```
 1    previously seen these exhibits.

 2              THE COURT:  All right.  So 10A through 10M and 10O

 3    will be admitted.

 4    Q.  (By Mr. Skaret)  I would like to show you 10N.  And I note

 5    that the marshals have reviewed the contents of 10N and it is

 6    safe.

 7              THE COURT:  All right.

 8    A.  Also, that was in Jesus Espino's house, is a document.

 9    It's a 302; it's our testimonial document that the FBI uses.

10    And it's a --

11              MR. FOSTER:  Judge, I'm going to object.  This is

12    totally nonresponsive.

13              THE COURT:  All right.  I'll sustain.

14    Q.  (By Mr. Skaret)  If you would please, take a look at 10N.

15    A.  Okay.

16    Q.  And what is Government's Exhibit 10N?

17    A.  10N is a Ruger pistol, it appears.

18    Q.  Where was this particular exhibit recovered from?

19    A.  Espino's residence.

20    Q.  All right.  And, um, how do you know it's the same pistol

21    that was recovered from that particular residence?

22    A.  I was at the residence when it was seized.

23              MR. SKARET:  We would offer 10N and request to

24    publish.

25              THE COURT:  Any objections?
```

David A. Perez, RMR, RPR

```
 1              MR. FOSTER:  No objections, judge.
 2              THE COURT:  10N will be admitted and you may publish.
 3    Q.  (By Mr. Skaret)  Agent Mikeska, would you show the jury the
 4    contents of 10N?
 5    A.  Hold it up?
 6    Q.  Yes, please.  You mentioned also that with respect to what
 7    was found at Jesus Espino's search that there were some
 8    magazines found.  Would you please take a look at 10L.
 9    A.  Okay.
10    Q.  Do those appear to be magazines for a pistol?
11    A.  Yes, sir.
12    Q.  How many of them?
13    A.  Two.
14    Q.  All right.  If you would, please, look at 10M like Mary.
15    A.  Okay.
16    Q.  What do those appear to be?
17    A.  Ammunition.
18    Q.  I would also direct your attention to exhibit 10A.
19              MR. SKARET:  May we publish?
20              THE COURT:  Yes, you may.
21    Q.  (By Mr. Skaret)  All right.  Taking a look at 10A, can you
22    describe for us what is 10A?
23    A.  10A looks like the second page of an FBI document.
24    Q.  All right.  And what kind of an FBI document is this?
25    A.  FD302.
```

```
 1   Q.  All right.  And what is an FD302 used for in your agency?
 2   A.  It's our testimonial documentation.
 3   Q.  Okay.  And is it a report of an interview?
 4   A.  Yes, it is.
 5   Q.  And is that what 302s always are?
 6   A.  Yes, sir.
 7   Q.  And, this was recovered at Jesus Espino's residence as
 8   well.
 9   A.  Yes, sir.
10   Q.  All right.  Do you know, did anyone in your organization
11   give Jesus Espino permission to have this document?
12   A.  No, sir.
13   Q.  Do you hand these out on a regular basis?
14   A.  No, sir.
15   Q.  Do you ever hand them out to non-law enforcement officials?
16   A.  No, sir.
17   Q.  Moving on.  I would like to show you what's been marked --
18            THE COURT:  Could the attorneys approach?
19            MR. SKARET:  Yes.
20            (Attorneys approach bench.  Off record discussion.)
21            THE COURT:  Back on the record.  We're going to take a
22   break for lunch.  Remember, you remain under the instructions
23   the Court has given you.  See you back at 1:05.
24            (Jury leaves courtroom.)
25            THE COURT:  You may be seated.  Anything we need to
```

```
 1    take up?
 2              MR. SKARET:  I don't believe so, Your Honor.
 3              THE COURT:  Stand in recess.
 4              (Recess for lunch.)
 5              (Back on the record.)
 6              COURTROOM DEPUTY:  Court is back in session.
 7              THE COURT:  You may be seated.  Anything we need to
 8    take up?
 9              MR. FOSTER:  We're ready to go, Judge.
10              MR. SKARET:  We're ready.
11              (Jury enters courtroom.)
12              THE COURT:  You may be seated, Ladies and Gentlemen.
13    Whenever you're ready.
14              MR. SKARET:  Thank you, Your Honor.
15    Q.  (By Mr. Skaret)  Agent Mikeska, during your 2008 RICO
16    investigation of the Barrio Azteca, were you involved in a
17    seizure of, approximately, a hundred kilograms of cocaine?
18    A.  Yes, sir.
19    Q.  Can you please tell us about that seizure?
20    A.  It was about a Barrio Azteca member that set up the drug
21    deal with some individuals out of Detroit.  The BA member got
22    the drugs from Eduardo Ravelo, also known as Tablas, and Luz
23    Mendez.  And the Barrio Azteca member had the drugs concealed
24    in a duffle bag and some tires.  The drugs were subsequently
25    taken to a Whataburger in El Paso, Texas.  They were picked up
```

David A. Perez, RMR, RPR

1    and transported to Detroit, Michigan.  It was a controlled

2    delivery.  And the drugs were taken down in Detroit.

3         MR. SKARET:  Your Honor, I would like to reference

4    Government's Exhibit 3, the stipulation of facts.  If I may

5    publish 3C-1.

6         THE COURT:  You may.

7    Q.  (By Mr. Skaret)  Agent Mikeska, do you recognize 3C-1?

8    A.  Yes, sir.

9    Q.  Does this appear to be the DEA drug lab on that approximate

10   hundred kilograms of drugs that was seized?

11   A.  Yes, sir.

12   Q.  All right.  And does this lab indicate that the hundred

13   kilograms was indeed cocaine?

14   A.  Yes, sir.

15   Q.  I'd like to show you what's been marked as 3C-2.  Do you

16   recognize 3C-2?

17   A.  Yes, sir.

18   Q.  What is 3C-2?

19   A.  A number of boxes.

20   Q.  Are you familiar with what's inside of those boxes?

21   A.  The cocaine.

22   Q.  I would like to direct your attention to 3C-3.  Does that

23   look like one of those boxes as well just a close-up view?

24   A.  Yes, sir.

25   Q.  And does the lab number on that box match the lab number on

1    the DEA lab?

2    A.  Yes, sir.

3    Q.  I would like to direct your attention to Government's

4    Exhibit 3C-4.  Tell us what we're looking at, 3C-4?

5    A.  It's a pallet of bundles containing cocaine.

6    Q.  And the bundles are all the black packages?

7    A.  That is correct.

8    Q.  Can you zoom in on that just a little more?  In those black

9    bundles, is that the original packaging?

10   A.  Yes, sir.

11   Q.  As they were seized?

12   A.  As they were seized, yes, sir.

13   Q.  I would like to show you what's been marked as Government's

14   Exhibit 3C-5.  Can you tell us what 3C-5 is?

15   A.  It's a photograph of, looks like a horse or lion, stamped

16   on, like a kilogram of cocaine.

17            MR. SKARET:  Your Honor, may we publish 3C-5?

18            MR. FOSTER:  No objections.

19            THE COURT:  All right.  It may be published.

20   Q.  (By Mr. Skaret)  Again, what is it we're looking at here?

21   A.  It looks like either a horse or lion, an animal, stamped on

22   the cocaine.

23   Q.  Was that horse or that animal stamped on all the different

24   packages of cocaine?

25   A.  To my understanding what was open, yes.  I did not

 1   personally see the cocaine unwrapped.

 2   Q.  As I understand, it all the exhibits under three are

 3   admitted into evidence.  I would like to publish 3D.

 4           THE COURT:  All right.

 5   Q.  I would like to show you what's been marked as Government's

 6   Exhibit 3D.

 7           THE COURT:  You want that shown to the jury, correct?

 8           MR. SKARET:  Yes, please, Your Honor.

 9           THE COURT:  All right.

10   Q.  (By Mr. Skaret)  Do you recognize what's been marked as

11   Government's Exhibit 3D?

12   A.  Yes, sir.

13   Q.  What is Government's Exhibit 3D?

14   A.  It is two, looks like, spare tires and a duffle bag.  Looks

15   like bundles of an item inside the duffle bag.

16   Q.  All right.  And how was this -- how was the drugs -- how

17   were the drugs packaged in those tires?

18   A.  The drugs were packaged inside of the tires.  And the tires

19   were cut open to get the drugs out and the drugs were inside

20   the duffle bag.

21   Q.  So, in addition to the tires, they were in the duffle bag?

22   A.  Yes, sir.

23   Q.  I would like to show you what's been marked as 3E and

24   published to the jury.

25           THE COURT:  You may.

David A. Perez, RMR, RPR

```
 1   Q.  (By Mr. Skaret)  Government's Exhibit 3E here.  What are we
 2   looking at here if you can see that?
 3   A.  It is a package being removed from one of the spare tires.
 4   Q.  And is this area of the tire that I am pointing at here,
 5   the top portion of the photo, is that a tear in the tire?
 6   A.  That's where they cut it open to get the drugs out.
 7   Q.  Who cut that tire open?
 8   A.  To my understanding DEA and the strike force comprised of
 9   FBI agents.
10   Q.  Agent Mikeska, I'd like to talk to you about the
11   stipulation of facts number four.  This is stipulation in
12   evidence now, um, and this refers to a seizure of drugs that
13   was found in the binding of a book.  Are you familiar with this
14   exhibit?
15   A.  Yes, sir, I am.
16   Q.  All right.  Can you tell us about what happened during that
17   seizure?
18   A.  We received a telephone call off the wire.  And they
19   were -- it was between Hector Galindo and Manny Lopez.  And
20   Hector Galindo asked Manny Lopez if the grams in the books had
21   been sent yet and Manny advised him it had not, he was working
22   with a BA member to get them sent.  At this point, I contacted
23   the Texas Department of Corrections Office of Inspector
24   General, Jim Cleeland, and advised him there may a drug
25   shipment coming to the TDC Coffield Unit.  And for him to be on
```

1    the lookout.

2         The package did arrive.  They ran it through an x-ray;

3    it did not pick up anything on the x-ray.  OIG inspector

4    Cleeland took the book back to his office and started looking

5    at the book more closely.  The binding of the book looked

6    suspicious.  They took a rod and put it the back of the

7    binding.  When the rod came back out, it had a black -- brown

8    substance on it.  They tested the brown substance.  It tested

9    positive for cocaine.  And they inspected, tested further and

10   removed, approximately, 4 grams of heroin out of the binding of

11   the book.

12   Q.  Forgive me.  Did you say the book was headed into the

13   Coffield prison?

14   A.  Yes, sir, it was.

15        MR. SKARET:  As I understand, all of Government's

16   Exhibit 4, the stipulation, has been admitted into evidence.  I

17   would like to publish what's been marked as 4E.

18        THE COURT:  All right.  4E may be published.

19   Q.  (By Mr. Skaret)  4E, Agent Mikeska.  This is hard to see.

20   But can you make out what it is that we're looking at?

21   A.  It looks like they're looking down the spine of the book

22   where the -- the drugs were secreted.

23   Q.  And the blue around here?

24   A.  That's going to be one of the inspector's gloves, hands

25   pinching the book to keep it open.

1    Q.  I would like to show you what's been admitted as

2    Government's Exhibit 4F.  May I publish?

3              THE COURT:  You may.

4    Q.  (By Mr. Skaret)  You see the same blue fingers.  What else

5    can we see in here?

6    A.  The substance, approximately, four grams of heroin in the

7    binding of the spine of the book.

8              MR. SKARET:  4G.  If I may publish?

9              THE COURT:  You may.

10   Q.  (By Mr. Skaret)  What do we see there, Agent Mikeska?

11   A.  It appears that they have removed the drugs from the spine

12   of the book and they are laying next to the book.

13   Q.  Did the FBI request that these drugs be sent to the DEA for

14   testing?

15   A.  Yes, sir, they did.

16   Q.  What was the result of the testing?

17   A.  Tested positive for heroin.

18   Q.  This is Government's Exhibit 4D-1, the drug lab.

19             MR. SKARET:  May I publish this, Your Honor?

20             THE COURT:  4D-1?  Okay.  I'm just not clear -- any

21   objection to 4D-1?

22             MR. FOSTER:  No objections.

23             THE COURT:  It may be shown.

24             MR. FOSTER:  That's under our stipulation, Judge.

25             THE COURT:  Okay.

```
 1            MR. SKARET:  Thank you.
 2   Q.  (By Mr. Skaret)  Can you tell us what you're looking at
 3   here?
 4   A.  Yes, sir.  You're looking at a drug lab report on the
 5   heroin.
 6   Q.  And, um, can you show us on your screen where the research
 7   weight of the heroin is located?
 8   A.  Right here.  Actually, over to the right a little bit more.
 9            THE COURT:  Do you want to redo it?  You can circle it
10   or an arrow.
11            THE WITNESS:  When I tapped it, Your Honor, it jumped
12   over to the left.
13   Q.  (By Mr. Skaret)  In the left corner you can push clear.
14   And when you circle, give it a nice firm circle.
15   A.  I will move it.
16   Q.  And the reserve weight is?
17   A.  1.9 grams.
18   Q.  This tested positive for heroin?
19   A.  Yes, sir.
20            MR. SKARET:  May I approach the witness, Your Honor?
21            THE COURT:  You may.
22   Q.  (By Mr. Skaret)  I'm showing you what's been marked as
23   Government's Exhibit 4H.  Do you recognize that exhibit?
24   A.  Yes, sir, I do.
25   Q.  What is that?
```

DIRECT - SAMANTHA MIKESKA

```
 1    A.  This is the book that contained the heroin that was shipped
 2    to Texas Department of Corrections, Coffield Unit.
 3    Q.  Did the FBI receive possession of that book?
 4    A.  Yes, it did.
 5    Q.  How did you get the book?
 6    A.  Through the mail.
 7    Q.  Okay.  And who did you request it from?
 8    A.  OIG Inspector Jim Cleeland.
 9    Q.  Where is he out of?
10    A.  Out of TDC, Tennessee Colony, Coffield Unit.  He's an
11    inspector for the Coffield Unit.
12    Q.  So he sent you this book upon your request?
13    A.  Yes, sir.
14    Q.  Okay.  And what's the name of the book?
15    A.  The Whole Truth.
16    Q.  Would you please open the bag on the exhibit, please?
17              MR. SKARET:  Your Honor, before I have her show this,
18    I'd like to offer this.
19              THE COURT:  Any objections?
20              MR. FOSTER:  No objections, Judge.
21              THE COURT:  4H will be admitted.  And it may be shown.
22    Q.  (By Mr. Skaret)  Can you show us sort of where the heroin
23    was secreted in the book?
24    A.  In the spine of the book, the heroin was secreted back on
25    this back side.
```

1    Q.  Thank you, Agent Mikeska.

2            Agent Mikeska, are you familiar with a individual

3    named Ramon Cano?

4    A.  Yes, sir.

5    Q.  Who is Ramon Cano?

6    A.  He is a Barrio Azteca member.  Back in 2009, 2010, he was

7    in charge of running the streets of El Paso.

8    Q.  All right.  And, pardon me, did you say he was a

9    lieutenant?

10   A.  No.  He did not have any rank.  But he was running the

11   streets of El Paso.

12   Q.  And at some point did the FBI conduct a search of his

13   residence?

14   A.  Yes, sir, they did.

15   Q.  When was that?

16   A.  It was March 19, 2010.

17   Q.  Okay.  Do you recognize what I handed you in Government's

18   Exhibits 5A, 5B, and 5D?

19   A.  Yes, sir.

20   Q.  What are those exhibits?

21   A.  5A.  It looks like wrappings, little plastic bags.  5B is

22   going to be a black scale.  And 5D is wrappings.

23   Q.  And were these part of what was found at the search of

24   Ramon Cano's house?

25   A.  Yes, sir, they were.

1          MR. SKARET:  I offer 5A, 5B and 5D.

2          THE COURT:  Any objections?

3          MR. FOSTER:  No objection.

4          THE COURT:  5A, 5B, D will be admitted.

5   Q.  (By Mr. Skaret)  Agent Mikeska, if I can show you what's

6   been marked as 5C.  Do you recognize the photograph, 5C?

7   A.  Yes, I do.

8   Q.  What is 5C?

9   A.  A spare tire that has been cut open.

10  Q.  And where was 5C located?

11  A.  In Ramon Cano's house.

12  Q.  This was part of the search?

13  A.  Yes, sir.

14  Q.  That was part of the evidence that was recovered?

15  A.  Yes, sir.

16  Q.  Is there anything special about that tire?

17  A.  Yes, sir.  Um, they -- at -- there are slits all around the

18  side walls of the tire.

19          MR. SKARET:  Your Honor, I offer Government's Exhibit

20  5C.

21          THE COURT:  Any objections?

22          MR. FOSTER:  No objections, Judge.

23          THE COURT:  It will be admitted.  Would you like it

24  shown?

25          MR. SKARET:  Yes, please.

```
 1    Q.  (By Mr. Skaret)  Can you please show us with your finger
 2    where the slits in the tire are in this picture and highlight
 3    them for us?
 4    A.  All around the outside wall.
 5    Q.  Is this consistent with the tire that was seized or with
 6    the two tires seized with respect to Exhibit 4 that we just
 7    looked at?
 8    A.  Yes, sir.
 9              MR. SKARET:  May I approach, Your Honor?
10              THE COURT:  Yes, you may.
11    Q.  (By Mr. Skaret)  Agent Mikeska, forgive me, I neglected to
12    show you 4G-1 when we were talking about the book.  Do you
13    recognize what's been marked as 4G-1?
14    A.  Yes, I do.
15    Q.  What is 4G-1?
16    A.  It's a package containing the heroin that was removed from
17    the book that was sent to TDC Coffield Unit.
18    Q.  And is this the substance that tested positive for heroin?
19    A.  Yes, it is.
20    Q.  Out of that book?
21    A.  Yes, sir.
22              MR. SKARET:  Your Honor, I offer 4G-1.
23              THE COURT:  Any objections?
24              MR. FOSTER:  No objections, Judge.
25              THE COURT:  It will be admitted.
```

```
 1              MR. SKARET:  Okay.
 2   Q.  (By Mr. Skaret)  As part of the case, there were searches
 3   done at the residence of the co-defendants in the case.  Is
 4   that correct?
 5   A.  Yes, sir.
 6   Q.  All right.  Do you know of an individual named Omar Lopez?
 7   A.  Yes, I do.
 8   Q.  And who is Omar Lopez?
 9   A.  Omar Lopez is a Barrio Azteca member and right-hand man of
10   Manny Lopez.
11   Q.  What does it mean to be someone's right-hand man?
12   A.  An individual that the leader can count on.  If there's a
13   job that needs to be done, they can count on that individual to
14   take care of it.
15   Q.  And you said he was Manny Lopez's right-hand man.  What was
16   Manny Lopez's role at the time of the arrest in the case?
17   A.  He was running the streets of El Paso for the BAs.
18   Q.  What was his rank?
19   A.  He was sergeant.
20   Q.  I'm showing you what's been marked as Government's Exhibits
21   6A through 6SS.
22              If you would, take a look at 6A through 6SS.  If you
23   would tell us if you recognize these items?
24   A.  Yes, I do recognize them.
25   Q.  Where are these items from?
```

1   A.  From Omar Lopez's search.

2   Q.  Were these taken by the FBI?

3   A.  Yes, sir, they were.

4   Q.  And how can we be certain those are the same objects that

5   were taken from the home and are the same objects we're looking

6   at here in court?

7   A.  Well, after the search they were booked into evidence.  I

8   removed the bags from evidence and pulled the items out of the

9   evidence bags and placed them in Exhibit 6 bags.

10          MR. SKARET:  Your Honor, I offer Government's Exhibits

11  6A through 6S.

12          THE COURT:  Any objections?

13          MR. FOSTER:  No objections.

14          THE COURT:  6A through 6S will be admitted.

15  Q.  (By Mr. Skaret)  Agent Mikeska, if you would count how many

16  cell phones you have in one of those bags.  If we may publish

17  the phones, Your Honor?

18          THE COURT:  You may.  I want to clarify you initially

19  said 6SS.  Is that what you asked to admit through.

20          MR. SKARET:  Yes.  6SS.

21          THE COURT:  All right.  Any objections.  I think I

22  misspoke.  Through 6SS will be admitted.

23          MR. SKARET:  Thank you.

24  A.  I've counted 18 cell phones.

25  Q.  Those were all recovered from Mr. Omar Lopez's house?

```
 1    A.  Yes, sir.
 2    Q.  Now, in Government's Exhibit -- if you could please give us
 3    a general idea of what Government's Exhibits 6W through 6DD
 4    are.  6W to 6DD.
 5    A.  Can you repeat those again, sir?
 6    Q.  Yes.  6W.
 7    A.  W?
 8    Q.  Uh-huh.  And 6X, Y, Z and AA, BB, CC, DD.
 9    A.  Explain what it is?  Or what --
10    Q.  What are they, generally speaking?
11    A.  We've got drug ledgers sheets.  We've got some money order
12    receipts.  We've got some -- or I should issued say wire
13    transfer receipts.  We've got a list of BA members on the west
14    side, photo, a ledger with more drug ledgers on there.
15    Q.  You mentioned the drug ledgers.  Let me take you to 6BB.
16            MR. SKARET:  Your Honor, if I may publish this on the
17    screen and have Agent Mikeska look at it.
18            THE COURT:  You want it shown to the jury?
19            MR. SKARET:  Yes, please.
20    Q.  (By Mr. Skaret)  Agent Mikeska, is this a drug ledger that
21    you mentioned?
22    A.  Yes, sir, it is.
23    Q.  And how can you tell?
24    A.  The BAs sell an ounce of heroin for $800 and a half ounce
25    for $400.  So it appears he makes $6,400.
```

David A. Perez, RMR, RPR

1    Q.  All right.  Now, in the middle just to the left of the

2    bottom of the Government's Exhibit sticker there, it says

3    dimes.  What -- do you know what that means?

4    A.  I believe it means how much he can make off dime bags.

5    Q.  What is a dime bag?

6    A.  About a gram or little bit less.

7    Q.  All right.

8         MR. SKARET:  Your Honor, I would like to show the

9    agent what's been marked as 6MM.

10        THE COURT:  Do you want the jury to see it?

11        MR. SKARET:  Yes, please.

12        THE COURT:  All right.

13   Q.  (By Mr. Skaret)  What is 6MM?

14   A.  It is the search and seizure warrant that was left at 6385

15   Domingo Street.

16   Q.  Do you see the address, that's what you're referring to?

17   A.  Yes.  Thank you.  6385 Domingo Street.

18   Q.  And the address of the search that you're serving is what?

19   A.  2900 Harrison Street.

20   Q.  All right.  So this is a record of the search and seizure

21   that occurred at another residence?

22   A.  That is correct.

23   Q.  Now, with respect to the search, did you find any drugs at

24   the home of Omar Lopez?

25   A.  Yes, sir, we did.

```
 1   Q.  And did you field test the drugs?

 2   A.  Yes, sir, we did.

 3   Q.  And what did the drugs test as?

 4   A.  They tested positive for heroin.

 5   Q.  How much was found?

 6   A.  97.5 grams.

 7   Q.  Agent Mikeska, would you look up there.  Do you have

 8   Government's Exhibit 1A-1A?

 9   A.  Yes, sir, I do.

10   Q.  Are those the drugs that were seized?

11   A.  Yes, sir, they are.

12   Q.  Those were the drugs that were tested?

13   A.  Yes, sir.

14           MR. SKARET:  Your Honor, I offer Government's Exhibit

15   1A-1A.

16           THE COURT:  Any objections?

17           MR. FOSTER:  No objections, Judge.

18           THE COURT:  It will be admitted.

19   Q.  (By Mr. Skaret)  We were just looking at that search and

20   seizure warrant.  Are the -- or the search and seizure returned

21   that was found at Omar Lopez's house?

22   A.  Yes, sir.

23   Q.  That was an address on Dominguez Street?

24   A.  Domingo Street.

25   Q.  Are you familiar with any individuals that live on Domingo
```

DIRECT - SAMANTHA VIGIL-KA

1  Street?

2  A.  Yes, sir, I am.

3  Q.  That particular address?

4  A.  Jesus Espino was residing at that residence.

5  Q.  Was that the search and seizure receipt from the search

6  conducted at Jesus Espino's house?

7  A.  Could you pull up the receipt for me, please?

8  Q.  Yes.  That is Government's Exhibit 6MM.

9         MR. SKARET:  If we may publish that to the jury, Your

10  Honor?

11  A.  That is the search and seizure warrant.  But not the

12  receipt.  The receipt of property?  Or the receipt?

13  Q.  Can we pull up what's listed as --

14         THE COURT:  Might be the last page.

15         MR. SKARET:  Perhaps the last page.  Here we go.

16  Q.  (By Mr. Skaret)  Do you recognize that?

17  A.  Yes, sir I do.

18  Q.  What is that?

19  A.  That is items of property seized from Jesus Espino's

20  residence on November 23rd.

21  Q.  This was found at Omar Lopez's house?

22  A.  Yes, it was.

23  Q.  Okay.  I'd like to show you what's been marked as 6NN as in

24  Nancy Nancy.  If we may publish?

25         THE COURT:  You may.

1    Q.  (By Mr. Skaret)  What is 6NN?

2    A.  It is the search warrant that was left at Jorge Diaz's

3    residence.  Payaso, his residence was located at 5649 Beacon in

4    El Paso, Texas.

5    Q.  And scroll down a little bit on this one.  What is that

6    page?  Tell us about the address on Beacon.

7    A.  This was the property item seized from the Beacon residence

8    during the search warrant and consent to search.

9    Q.  Go to the next page.  How about the second page of receipt

10   of property?

11   A.  That is the also property that was seized from Payaso's

12   house.

13   Q.  Again, so this is a receipt of property seized at Payaso's

14   house found at Omar Lopez's house?

15   A.  That is correct, sir.

16   Q.  Okay.  Let's move on.  Are you familiar with an individual

17   named Rigoberto Fragoso?

18   A.  Yes, sir, I am.

19   Q.  And who is Rigoberto Fragoso?

20   A.  Rigoberto Fragoso is a BA gang member.  And he was in

21   charge of the Northeast side of El Paso, Texas for BAs.

22   Q.  And was there a search performed at his house?

23   A.  Yes, there was.

24   Q.  I'm handing you what's been marked as Government's Exhibits

25   12A through 12D and E, F and G together.  I'd like to just have

DIRECT - SAMANTHA MIGYES-KA

```
 1    you focus your attention on Exhibits 12A through 12D.
 2    A.  Okay.
 3    Q.  When did you perform the search at Rigoberto Fragoso's
 4    house?
 5    A.  March 9, 2011.
 6    Q.  All right.  And what is Government's Exhibit 12A through
 7    12D?
 8    A.  They're cellular telephones.
 9    Q.  Were they found at that search?
10    A.  Yes, sir.
11              MR. SKARET:  And, Your Honor, I would move to
12    introduce 12A through 12D.
13              THE COURT:  Any objections?
14              MR. FOSTER:  No objections.
15              THE COURT:  12A through D will be admitted.
16              MR. SKARET:  May we publish those?
17              THE COURT:  Yes.
18    Q.  (By Mr. Skaret)  This is 12A.  Can you explain what we're
19    looking at here?
20    A.  Yes, sir, it appears to be a cellular telephone.
21    Q.  Antiquated?
22    A.  Antiquated.
23    Q.  12B?
24    A.  Antiquated cellular telephone.
25    Q.  Same thing there, right?
```

1   A.   Yes, sir.

2   Q.   And 12C?

3   A.   A little more updated cellular telephone.

4   Q.   D?

5   A.   Same thing.  A little bit updated cellular telephone.

6   Q.   Okay.  Let's move on.  Are you familiar with an individual

7   named Carlos Perez?

8   A.   Yes, sir.

9   Q.   And does he have a nickname?

10   A.   Bandit.

11   Q.   Is he a Barrio Azteca?

12   A.   Yes, sir.

13   Q.   Was he charged in this indictment?

14   A.   Yes, sir, he was.

15   Q.   All right.  And was there a search performed at his

16   residence?

17   A.   Yes, there was.

18   Q.   When was that search done?

19   A.   March 9, 2011.

20   Q.   All right.  I've handed you what's been marked as

21   Government's Exhibits 11A through 11G.  Do you recognize

22   Government's Exhibits 11A through 11G?

23   A.   Yes, sir.

24   Q.   All right.  And what are those?

25   A.   They're items seized from Carlos Perez's residence during

```
1    the search warrant.

2    Q.  How do we know it's the same items that were seized there

3    that we're seeing in court today?

4    A.  Because items were booked into evidence after the search.

5    And I removed them from the evidence bag and placed them into

6    the Exhibit 11 bag and labeled it Carlos Perez's search.

7    Q.  All right.  And tell us, what is Government's Exhibit 11A?

8    A.  Cellular telephone.

9           MR. SKARET:  At this point, I should offer

10   Government's Exhibits 11A through 11G.

11          THE COURT:  Any objections?

12          MR. FOSTER:  No objections, Judge.

13          THE COURT:  11A through 11G will be admitted.

14   Q.  (By Mr. Skaret)  Would you explain to us what we're looking

15   at with Government's Exhibits 11A through G?

16   A.  It's, again, documents that were seized from Carlos Perez's

17   residence.

18   Q.  Which exhibit is that?

19   A.  This is 11G.

20   Q.  Um.

21          MR. SKARET:  Can we publish that to the jury?

22          THE COURT:  You may.

23   Q.  11G.  Could you zoom in on that, Jeff?  Can you see 11G up

24   there?

25   A.  Yes, sir.
```

David A. Perez, RMR, RPR

1    Q.  And what does this appear to be?

2    A.  It appears to be a muleta list which is bad standing list

3    of Barrio Azteca members.

4    Q.  Can you tell us what we're looking at on Government's

5    Exhibit 11C?

6    A.  It is a small pendulum scale.

7    Q.  What kind?

8    A.  Pendulum.  Scale.

9    Q.  All right.  And, finally, um, with respect to what you have

10   up there, 11D.  Can you explain what is 11D?

11   A.  11D is ammo.

12   Q.  What kind of ammunition?

13   A.  It appears to be 7.62 caliber round.

14   Q.  And can you approximate for us how many rounds were

15   recovered just by looking?

16   A.  Just in this bag?

17   Q.  Uh-huh.

18   A.  Thirty rounds.

19   Q.  Is there a magazine with respect to Government Exhibit 11D?

20   Can you show the magazine to the members of the jury?  Explain

21   to us what is a magazine?

22   A.  A magazine is a item that is input into a rifle.  And it is

23   loaded with ammo.  And basically feeds ammo into the chamber

24   after the round is fired.

25   Q.  I'm showing what's been marked as 11H.  Was this something

1    recovered at the search of Carlos Perez's house?

2    A.  Yes, sir, it is.

3    Q.  And what is it?

4    A.  It is an SKS rifle.

5         MR. SKARET:  Your Honor, I would move to admit the SKS

6    rifle Government's Exhibit 11H.

7         THE COURT:  Any objections?

8         MR. FOSTER:  No objections, Judge.

9         THE COURT:  Admitted.

10        MR. SKARET:  May we publish?

11        THE COURT:  You may.

12   Q.  (By Mr. Skaret)  Please show the jury what's been marked as

13   11H.  What kind of a weapon is this?

14   A.  It is an SKS assault rifle.

15   Q.  And the magazine also found, does that fit into that

16   particular weapon?

17   A.  Yes, sir.

18   Q.  And the bullets that you were referencing, are those

19   bullets for that weapon?

20   A.  Yes, sir.

21   Q.  I'd like to show you what's been marked as Government's

22   Exhibit 11I.  I will take that from you.  What is Government's

23   Exhibit 11I?

24   A.  It is a Highpoint rifle.

25   Q.  Was this recovered at the search of Carlos Perez's house?

```
 1   A.  Yes, it was.
 2   Q.  How do we know this is the same rifle that was recovered
 3   that we're looking at in court today?
 4   A.  It was seized and placed into evidence and then brought to
 5   me for trial purposes.
 6            MR. SKARET:  I offer 11I, Your Honor.
 7            THE COURT:  Any objections?
 8            MR. FOSTER:  No objections, Judge.
 9            THE COURT:  11I will be admitted.
10            MR. SKARET:  May we publish?
11            THE COURT:  You may.
12   Q.  (By Mr. Skaret)  Agent Mikeska, please show the members of
13   the jury 11I.
14            Could you please take a look at Government's 11E,
15   Agent Mikeska?
16   A.  B?
17   Q.  E.
18   A.  E.  Okay.
19   Q.  What is Government's 11E?
20   A.  It appears to be additional rounds of 7.62 caliber.
21   Q.  Which is the same ammunition that we were looking at --
22   same ammunition that fit into Government's Exhibit 11H, the
23   SKS?
24   A.  Yes, sir.
25   Q.  All right.  Would you please take a look at 11F?
```

 1   A.  Yes, sir.

 2   Q.  What is Government's Exhibit 11F?

 3   A.  Additional rounds.  You've got nine millimeter.  It looks

 4   like 40 caliber ammo.

 5        MR. SKARET:  Your Honor, may we publish this to the

 6   jury as well?

 7        THE COURT:  You may.

 8   Q.  (By Mr. Skaret)  Would you show the jury some of what

 9   you're looking at in that bag?

10   A.  Yes, sir.

11   Q.  Again this is 11F?

12   A.  These are nine millimeter rounds.  And there's

13   approximately fifty rounds at the bottom of the bag.  And this

14   is going to be a 40 caliber round.  There is a fifty rounds in

15   the sleeve ammo.

16        MR. SKARET:  I believe we have a photo of all this

17   ammunition all laid out together.  May we publish that?

18        THE COURT:  It is being published.

19   Q.  (By Mr. Skaret)  The date of this search was what day?

20   A.  March 9, 2011.

21   Q.  There were also some photos taken on the day of the search.

22   Is that correct?

23   A.  Yes, sir.

24   Q.  Are you familiar with the photos?

25   A.  Yes, sir, I am.

1  Q.  Are those true and accurate representations of the search

2  as they were being conducted that day?

3  A.  Yes, sir.

4  Q.  All right.

5        MR. SKARET:  Um, I would -- I offer to admit 11J, Your

6  Honor.

7        THE COURT:  Any objections?

8        MR. FOSTER:  No objection, Judge.

9        THE COURT:  11J will be admitted.

10  Q.  (By Mr. Skaret)  With respect to Government's Exhibit 11J,

11  are there any typographical errors on this particular photo?

12  A.  Yes, sir, the date.

13  Q.  The date?

14  A.  Yes, sir.

15  Q.  Okay.  And which error is that?  Can you show us where that

16  is?

17  A.  Yes, sir.  It should be March 9, 2011.

18  Q.  2011 as opposed to 2010?

19  A.  Yes, sir.  Yes, sir.

20  Q.  And is it listed incorrectly like that throughout?

21  A.  Yes, sir.

22        MR. SKARET:  Javier, can we capture that for the

23  record?

24        THE COURT:  This was 11J.  How about 11J-1?  Does that

25  work?

```
 1              MR. SKARET:  Thank you, Your Honor.
 2    Q.  (By Mr. Skaret)  Were there any drugs seized from Carlos
 3    Perez's house on the day of the search?
 4    A.  Yes, sir.
 5    Q.  What was seized?
 6    A.  Amount of cocaine and a small amount of heroin.
 7              MR. SKARET:  May I approach?
 8              THE COURT:  You may.  And that has been captured.
 9              MR. SKARET:  Thank you.
10    Q.  (By Mr. Skaret)  I've handed you what is marked as 1A-3A.
11    A.  Yes, sir.
12    Q.  Do you recognize 1A-3A?
13    A.  Yes, I do.
14    Q.  What is it?
15    A.  It is the heroin that was seized out of Carlos Perez's
16    residence.
17    Q.  And was this heroin sent to the DEA for analysis?
18    A.  I believe so.
19    Q.  What was the -- what was the result of the DEA's analysis?
20    A.  It tested positive for heroin.
21              MR. SKARET:  Your Honor, I offer 1A-3A.
22              THE COURT:  Any objections?
23              MR. FOSTER:  No objections, Judge.
24              THE COURT:  1A-3A will be admitted.
25    Q.  (By Mr. Skaret)  You mentioned an individual by the name
```

```
1    Manny Lopez?
2    A.  Yes, sir.
3    Q.  You said he was a Barrio Azteca member.  Is that right?
4    A.  He was a Barrio Azteca in charge of the streets of El Paso,
5    yes, sir.
6    Q.  And did the FBI do a search warrant at his house?
7    A.  Yes, sir, they did.
8    Q.  What day was that?
9    A.  March 9, 2011.
10   Q.  If you would please take a look at Government's Exhibit 7A.
11   Do you recognize Government's Exhibit 7A?
12   A.  Yes, sir.
13   Q.  And what is 7A?
14   A.  It's a cellular telephone.
15   Q.  Was this cellular telephone taken on the day of the search
16   warrant at Manny Lopez's house?
17   A.  Yes, sir, it was.
18   Q.  And what was the date of that search?
19   A.  March 9, 2011.
20            MR. SKARET:  Your Honor, I offer 6A.
21            MR. FOSTER:  No objections --
22            MR. SKARET:  I'm sorry, 7.  7.
23            THE COURT:  7A will be admitted.
24   Q.  (By Mr. Skaret)  Were you involved with the defendant's
25   arrest in the case?
```

```
 1   A.  Yes, sir, I was.

 2   Q.  And what date did that take place?

 3   A.  March 9, 2011.

 4   Q.  And where was the defendant living at that time?

 5   A.  4116 Durazno.

 6   Q.  All right.  Did you execute a search warrant at his

 7   residence?

 8   A.  Yes, I did.

 9   Q.  Was it that day?

10   A.  No, it was two days later.  March 11, 2011.

11   Q.  Did you have court authorization to search his home?

12   A.  Yes, I did.

13   Q.  Were you personally involved in the search?

14   A.  Yes, I was.

15   Q.  Did you have permission from the Court to search his entire

16   home?

17   A.  No, sir, just his bedroom.

18   Q.  Can you describe what his bedroom looked like?

19   A.  Yes, sir.  Um, going down the hallway you come into his

20   bedroom.  The bed is right in front.  Next to the bed there's a

21   nightstand.  And then off to the right-hand side there's a

22   desk.  And there was a chair.  And then in the corner there is

23   like a little mini-closet where you can hang clothes.  And then

24   when you turned and went more into his bedroom, he had a chest.

25   And then an ironing board, television set.  And -- and a sink
```

1    back in the right-hand corner.

2    Q.  I'm handing you what's been marked as 14B through 14J.  Do

3    you recognize 14A through 14J?

4    A.  Yes, sir.

5    Q.  How do you recognize it?

6    A.  These were items that were seized out of Ramon Renteria's

7    bedroom.

8    Q.  I may have misspoke.  I'm not sure you have 14A.  You may

9    just have B through J.  Can you check for these exhibits?

10   A.  I have 14A.

11   Q.  Okay.  You do.

12   A.  Yes, sir.

13          THE COURT:  But you only spoke to 14B.  Is she

14   identifying A through J?

15          MR. SKARET:  14J that's right, Your Honor.  14A

16   through 14J.

17   Q.  (By Mr. Skaret)  Were those items recovered at the home,

18   Ramon Renteria?

19   A.  They were recovered in his bedroom.

20   Q.  In his bedroom?

21   A.  Yes, sir.

22   Q.  And you had Court authorization to do so?

23   A.  Yes, sir.

24          MR. SKARET:  I offer 14A through 14J.

25          THE COURT:  Any objections?

```
 1              MR. FOSTER:  Just a minute, Judge.  I have no
 2   objection.
 3              THE COURT:  No objection?
 4              MR. FOSTER:  No objections, Judge.
 5              THE COURT:  All right.  14A through 14J will be
 6   admitted.
 7   Q.  (By Mr. Skaret)  All right.  There were also some
 8   photographs taken on the date of that search.  Is that correct?
 9   A.  Yes, sir.
10   Q.  I'd like to show you what's been marked -- Court's
11   indulgence.  All right you mentioned there were some photos
12   taken.  Are you familiar with photos 14K through 14T?
13   A.  Yes, sir.  But I could please see them?
14   Q.  Yes, you may.  Do you recognize 14K?
15   A.  Yes, sir, I do.
16   Q.  What is that a picture of?
17   A.  It's the birth certificate of Ramon Renteria.
18              MR. SKARET:  Your Honor, I offer 14K.
19              THE COURT:  Any objections?
20              MR. FOSTER:  Only that it will be kept sealed or
21   private after --
22              THE COURT:  Yes.  There's no problems with making
23   sure.
24              MR. FOSTER:  Then no objections, Judge.
25              THE COURT:  14K will be admitted.
```

1    Q.  (By Mr. Skaret)  This shows -- this birth certificate that
2    you mentioned, 14K, was found where in his room?
3    A.  In the bedroom.  I believe it was on the nightstand.
4    Q.  I'd like to show you what's been marked as 14M.  What is
5    14M?
6    A.  It's a bank statement.
7    Q.  Was this found at -- is this a true and accurate
8    representation that was found at the defendant's house?
9    A.  Yes, sir.
10              MR. SKARET:  All right.  Your Honor, I'd offer 14M.
11              THE COURT:  Any objections?
12              MR. FOSTER:  No objections.
13              THE COURT:  Admitted.  Shown to the jury?
14              MR. SKARET:  Yes, please.
15   Q.  (By Mr. Skaret)  I would like to show you a photograph of
16   14K, Government's Exhibit -- 14Q.  Do you recognize 14Q?
17   A.  Yes, I do.
18   Q.  What is Government's Exhibit 14Q?
19   A.  It is a pancho of a Aztec calendar hanging up in his
20   bedroom.
21   Q.  Was it hanging up just like that when the picture was
22   taken?
23   A.  Yes, sir.
24   Q.  Is that a true and accurate representation of how it was
25   that day?

```
 1   A.  Yes, sir.
 2            MR. SKARET:  I offer 14Q.
 3            MR. FOSTER:  No objections.
 4            THE COURT:  14Q will be admitted.
 5   Q.  (By Mr. Skaret)  14R.  What part of this picture do you see
 6   the Aztec calendar that you mentioned?
 7   A.  Just the whole dial is what I would refer to as an Aztec
 8   calendar.
 9   Q.  I would like to show you 14R.  Government's Exhibit 14R.
10   A.  It's like a plate hanging up on the wall, Aztec calendar,
11   Aztec culture.
12   Q.  And this was in his room?
13   A.  Yes, sir.
14   Q.  Was this a true and accurate representation of how it
15   looked on that day?
16   A.  Yes, sir.
17            MR. SKARET:  I offer 14R.
18            THE COURT:  Objections?
19            MR. FOSTER:  No objections, Judge.
20            THE COURT:  It will be admitted.  Would you like the
21   jury to see it?
22            MR. SKARET:  Yes, please.
23   Q.  (By Mr. Skaret)  As far as the Aztec calendar goes, is the
24   entire plate part of the calendar?
25   A.  It's just -- I wouldn't call this the calendar.  It's just
```

1   an Aztec culture representation, kind of a plate that was on

2   his wall.

3   Q.  And did the FBI seize that plate or take a picture?

4   A.  No, sir, we just took photographs.

5   Q.  I would like to show you what's been marked as Government's

6   Exhibit 14S.  Do you recognize 14S?

7   A.  Yes, sir, I do.

8   Q.  What is it?

9   A.  It is a blanket of an Aztec Indian holding his slain

10  maiden.

11  Q.  Where was that the day of the search?

12  A.  Immediately to your left-hand side on the wall when you

13  walked in the door.

14  Q.  Is that a true and accurate representation of how that

15  looked on the day of the search?

16  A.  Yes, sir.

17          MR. SKARET:  I offer Government's Exhibit 14S.

18          THE COURT:  Any objections?

19          MR. FOSTER:  No objections.

20          THE COURT:  It will be admitted.

21  Q.  (By Mr. Skaret)  Can you explain to the jury, Agent

22  Mikeska, what we're looking at again?

23  A.  It is a blanket of an Indian warrior holding his slain

24  maiden.

25  Q.  And what's coming out of the top of the warrior's

1    headdress?

2    A.  Feathers.

3    Q.  All right.  I would like to show you what's been marked as

4    14T.

5            MR. SKARET:  Just for the agent.

6    Q.  Do you recognize 14T?

7    A.  Yes, sir.

8    Q.  What is it, 14T?

9    A.  It is two receipts.  It appears he had purchased a 2005

10   Elantra.

11   Q.  2005 what?

12   A.  Elantra.

13   Q.  Is this a -- where was this photo taken?

14   A.  The receipts were on top of the chest in his bedroom and

15   laying up on top of the chest.

16   Q.  Is this a true and accurate photo of the receipts on that

17   chest?

18   A.  Yes, sir.

19   Q.  On that day?

20   A.  Yes, sir.

21           MR. SKARET:  I offer 14T, Your Honor.

22           THE COURT:  Any objections?

23           MR. FOSTER:  No objections.

24           THE COURT:  It will be admitted.  Would you like it

25   shown to the jury?

1          MR. SKARET:  Yes, please.

2    Q.  (By Mr. Skaret)  Can you see that okay on your screen,

3    Agent Mikeska?

4    A.  Yes, sir.

5    Q.  I would like to show you what's been marked as Exhibit 14P.

6    Do you recognize 14P?

7    A.  Yes, I do.

8    Q.  And what is that exhibit?

9    A.  They were letters that were pulled out of his drawer right

10   by his bed.

11   Q.  Is that a photograph of those letters?

12   A.  Yes, sir.

13   Q.  Is that how it looked on the day of the search?

14   A.  Once we pulled them out -- they were placed in the drawer,

15   we pulled them out and laid them out and took photos of them.

16          MR. SKARET:  I offer 14P, Your Honor.

17          THE COURT:  Any objections?

18          MR. FOSTER:  No objections.

19          THE COURT:  14P will be admitted.

20   Q.  (By Mr. Skaret)  Now, these particular letters that we're

21   taking a look at, did you seize the letters themselves?

22   A.  Yes, we did.

23   Q.  All right.  Can you please show me Exhibit 14E.  I believe

24   it's up with you.

25   A.  B?

```
 1   Q.  E.  It would be a letter?
 2              THE COURT:  And that has been admitted.  Do you want
 3   it shown to the jury?
 4              MR. SKARET:  Yes, please, Your Honor.
 5   Q.  (By Mr. Skaret)  What's on the outside of the letter?
 6   A.  It is to Mr. Renteria, Ramon.  His register number at
 7   Bureau of Prisons United States Penitentiary, P.O. Box, 2099,
 8   Pollock, Louisiana 71467.  And is from a Mrs. C Sandy; 7558 --
 9   it looks like Adobe Drive, El Paso, Texas 79915.
10   Q.  What's the date of that postmark?
11   A.  August 17, 2010.
12   Q.  I would like to show you what's been marked as Exhibit 14G
13   and admitted into evidence.
14              THE COURT:  You want it shown?
15              MR. SKARET:  Yes, please.
16   Q.  (By Mr. Skaret)  What is this we're looking at?
17   A.  It's a letter to Mr. Ramon Renteria.  Again, register
18   number United States penitentiary, P.O. Box 2630 Beaumont,
19   Texas.  And it's from a Mrs. C. Sandy Delgado, 7558 Adobe Drive
20   El Paso, Texas 79915.
21   Q.  What's the date?
22   A.  September 8, 2010.
23   Q.  Is this the letter that was inside of the papers that were
24   inside that letter?
25   A.  Yes, sir.  Let me confirm.  Yes, it is.
```

1    Q.  Okay.  I'd like to show you, um, on the screen if you

2    could, Government's Exhibit 14C.  Do you recognize 14C?

3    A.  Yes, sir, I do.

4    Q.  What is that?

5    A.  Newspaper from El Diario regarding the Barrio Aztecas.

6    Q.  Was this found in the room of the defendant?

7    A.  Yes, sir, on his chest in his bedroom.

8    Q.  Government's Exhibit 14A.

9           MR. SKARET:  I don't believe we published that, Your

10   Honor.

11          THE COURT:  Did -- yes.

12   Q.  (By Mr. Skaret)  I would like to show you Government's

13   Exhibit 14A.  If we may publish this?

14          THE COURT:  Yes.

15          MR. SKARET:  May I approach?

16   Q.  (By Mr. Skaret)  14A.  Tell us what we're looking at.  14A.

17   A.  It is a receipt from Ramon Renteria for rent '05 Elantra,

18   Palm, for $500.

19   Q.  I'd like to show you what's been marked as Government's

20   Exhibit 14D.  If we may publish this to the jury as well?

21          THE COURT:  You may.

22   Q.  (By Mr. Skaret)  Agent Mikeska, what are we looking at here

23   in 14D?

24   A.  It's a receipt for the purchase of a Cricket cell phone, it

25   appears.

1   Q.  And this was found in the defendant's room?

2   A.  Yes, sir, it was.  I believe this was found in his

3   nightstand by his bed.

4   Q.  I would like to show you Government's Exhibit 14H.  Do you

5   recognize 14H?

6           MR. SKARET:  May I publish this?

7           THE COURT:  You may.

8   Q.  (By Mr. Skaret)  What is it?

9   A.  It is a stickie note with his e-mail account or address on

10  there.

11  Q.  And the email appears to be what?

12  A.  Ramon, R-A-M-O-N.Renteria, R-E-N-T-E R-I-A, 75@yahoo.com.

13  Q.  Across the right side of this exhibit with the numbers

14  going from bottom to top, do you see -- can you read us what

15  those numbers are or what it says?

16  A.  Yes, sir.  It looks like a password, 21oldschool21.

17  Q.  So 21oldschool21?

18  A.  Yes, sir.

19  Q.  Here is a different address at the bottom of Government's

20  Exhibit 14H?

21  A.  Yes, sir.

22  Q.  Is that RENRamon73@yahoo.com?

23  A.  Yes, sir.

24  Q.  14I.

25          MR. SKARET:  If we may publish this, Your Honor?

```
 1              THE COURT:  You may.
 2   Q.  (By Mr. Skaret)  What are we looking at here, Agent
 3   Mikeska?
 4   A.  It looks like a financial statement from a Navy Federal
 5   Credit Union.
 6   Q.  Who is it addressed to?
 7   A.  It is addressed to Ramon Renteria.
 8   Q.  Can you pull up 14F?
 9              MR. SKARET:  May we publish this to the jury, Your
10   Honor?
11              THE COURT:  Yes.
12   Q.  (By Mr. Skaret)  What are we looking at here, Agent
13   Mikeska?
14   A.  It is an envelope from Federal Bureau of Prisons.  It
15   appears it may have been going to him.  But he wasn't, maybe,
16   at Pollock anymore.  So they forwarded it to the place where he
17   was at, Beaumont, Texas.
18   Q.  So the return address is in Pollock, Louisiana.  And it
19   appears to be -- the forwarding address is Beaumont, Texas?
20   A.  Yes, sir.
21   Q.  I'd like to show you what's been marked as 14J.  Do you
22   recognize --
23              MR. SKARET:  May we publish this to the jury, as well?
24              THE COURT:  You may.
25   Q.  (By Mr. Skaret)  Do you recognize 14J?
```

1    A.  Yes, sir, I do.

2    Q.  What is it?

3    A.  It's a sheet of paper with an e-mail address on it.  The

4    same as on the stickie note.  And the 21oldschool21 right

5    underneath it.

6    Q.  All right.  Um, are you familiar with a production done by

7    the History Channel entitled Gangland?

8    A.  Yes, sir.

9    Q.  How are you familiar with that?

10   A.  It was based on the 2008 RICO after the trial had ended.

11   Q.  Okay.  And what is it?  What is Gangland?

12   A.  It's, basically, describing the Barrio Aztecas and how they

13   connected with the Juarez drug cartel.  They are based in El

14   Paso, Texas.  And connected with the Juarez drug cartel.  The

15   drug shipments, the violence that all occur in this area.

16   Q.  And is that a television show?

17   A.  Yes, sir, it's on the History Channel.  But it has been on

18   Spike TV.

19   Q.  And when did that come out, more or less?

20   A.  Maybe the end of 2009.

21   Q.  And the episode that you're describing, is that an episode

22   that's specific to the Barrio Azteca?

23   A.  Yes, it is.  It's called Blood River.

24   Q.  I'd like to draw your attention to Government's Exhibit

25   14B.  Do you recognize Government's Exhibit 14B?

1   A.  Yes, sir, I do.

2   Q.  And what is Government's Exhibit 14B?

3   A.  It's a CD of the Gangland episode, El Paso and Juarez

4   titled Blood River.

5          MR. SKARET:  May we publish 14B?

6          THE COURT:  You may.

7   Q.  (By Mr. Skaret)  You found this in the defendant's room?

8   A.  Yes, sir.  It was on the chest in his bedroom.

9   Q.  Now, 14L.  Can you describe what we're looking at in 14L?

10  A.  14L is a photograph of his chest in his bedroom, which had

11  the newspaper, the receipts are not shown but the receipts were

12  there, and then the Gangland Blood River episode CD.

13  Q.  Is that a fair and accurate representation of how that

14  looked on the day of the search?

15  A.  Yes, sir.

16         MR. SKARET:  Your Honor, I offer Government's Exhibit

17  14L.

18         THE COURT:  Any objections?

19         MR. FOSTER:  No objections, Judge.

20         THE COURT:  14L will be admitted.

21         MR. SKARET:  May we publish Government's Exhibit 14L?

22         THE COURT:  You may.

23  Q.  (By Mr. Skaret)  I'd like to show you what has been marked

24  as Government's Exhibit 28.  Are you familiar with Government's

25  Exhibit 28?

```
 1   A.  Yes, sir, I am.
 2   Q.  And what is Government's Exhibit 28?
 3   A.  Photographs of Ramon Renteria and his tattoos.
 4   Q.  And the pictures that are associated with Government's
 5   Exhibit 28, came from where?
 6   A.  As far as being photographed, they came from Ramon
 7   Renteria.
 8   Q.  Okay.
 9        THE COURT:  I show it's been admitted.  Do you want it
10   shown to the jury.
11        MR. SKARET:  Yes, if we could, please.
12   Q.  (By Mr. Skaret)  Is this part of Government's Exhibit 28?
13   A.  Yes, sir.
14   Q.  What are we looking at here?
15   A.  Photographs of Ramon Renteria's tattoos.
16   Q.  Okay.  What are we looking at there?
17   A.  Pictures of EPT on his neck, tattoo.
18   Q.  All right.  Moving on.  I'd like to show you what's been
19   marked as Government's Exhibit 26.  Do you recognize
20   Government's Exhibit 26?
21   A.  Yes, sir, I do.
22   Q.  What is Government's Exhibit 26?
23   A.  It is an organizational chart of the Barrio Azteca criminal
24   enterprise for this RICO 2011 case.
25   Q.  Does the chart list everyone indicted in the current case?
```

```
 1    A.  Yes, sir.
 2    Q.  Is there anyone on the chart that has not been indicted in
 3    the case?
 4    A.  Yes, sir, there are.
 5    Q.  Would that be Benjamin Alvarez?
 6    A.  Yes, sir.
 7    Q.  And Carlos Pereya?
 8    A.  Yes, sir.
 9    Q.  And Manuel Cardoza?
10    A.  Yes, sir.
11    Q.  Did you supply the names and the pictures for this
12    particular organizational chart?
13    A.  Yes, sir, I did.
14    Q.  How do you know that the names that are on this chart go
15    with the pictures?
16    A.  Because I listed them underneath the photographs.
17    Q.  With respect to the captains in the 2008 case, Benjamin
18    Alvarez, Carlos Pereya and Manuel Cardoza, are those true and
19    accurate representations of those individuals?
20    A.  Yes, sir.
21    Q.  On this organizational chart?
22    A.  Yes, sir.
23    Q.  All right.  It is a true and accurate representation of the
24    defendant, Ramon Renteria?
25    A.  Yes, sir.
```

DIRECT - SAMANTHA MIGYESKA

```
1    Q.  Is it a true and accurate representation of Roberto
2    Cardona?
3    A.  Yes, sir.
4    Q.  Is this a true and accurate representation of Hector
5    Galindo?
6    A.  Yes, sir.
7    Q.  And Manny Lopez?  True and accurate on Jesus Espino?
8    A.  Yes, sir.
9    Q.  And Thomas Roberts?
10   A.  Yes, sir.
11   Q.  David Conde?
12   A.  Yes, sir.
13   Q.  Is it a true and accurate representation of Omar Lopez?
14   A.  Yes, sir.
15   Q.  Rigoberto Fragoso?
16   A.  Yes, sir.
17   Q.  Albert Mendoza?
18   A.  Yes, sir.
19   Q.  Ricardo Gonzalez?
20   A.  Yes, sir.
21   Q.  Juan Manuel Vizcaino?
22   A.  Yes, sir.
23   Q.  Adam Garcia?
24   A.  Yes, sir.
25   Q.  Angel Renteria?
```

1    A.   Yes, sir.

2    Q.   Santiago Lucero?

3    A.   Yes, sir.

4    Q.   Carlos Perez?

5    A.   Yes, sir.

6    Q.   April Cardoza?

7    A.   Yes, sir.

8    Q.   Yolanda Chavarria Barba?

9    A.   Yes, sir.

10   Q.   Desiree Cardona?

11   A.   Yes, sir.

12   Q.   Fabian Rodriguez?

13   A.   Yes, sir.

14   Q.   Lorenzo Espino?

15   A.   Yes, sir.

16   Q.   Hilda Cervantes.

17   A.   Yes, sir.

18   Q.   And Jorge Diaz?

19   A.   Yes, sir.

20   Q.   And how do you know, um, that all of those are fair and

21   accurate of all of those individuals?

22   A.   I spoke with the case agent for the Albuquerque case.  And

23   I had them send me all the individuals -- their booking photos

24   or their DL photos.  They sent them.  And the guys that we had

25   in El Paso, we already had those photographs.  And we put it

1  together in a chart.

2  Q.  You talked to us earlier about an individual named David

3  Meraz, AKA Chicho.

4  A.  Yes, sir.

5  Q.  I would like to show you what's been marked as Government's

6  Exhibit 19E.

7         MR. SKARET:  I believe this has been admitted into

8  evidence.  I would like to publish it.

9         THE COURT:  Yes.

10  Q.  (By Mr. Skaret)  Government's Exhibit 19E is a picture of

11  David Meraz.  Is that correct?

12  A.  Correct, sir.

13  Q.  All right.  And what was his role in the criminal

14  organization?

15  A.  From 2008 RICO, he was operating as a captain.

16  Q.  All right.  You mentioned earlier you got a letter in

17  regards to Chicho.  Without telling me what the letter said,

18  what did you do after you got that letter?

19  A.  After I got the letter we tried to verify the contents of

20  the letter.  And we did verify it.  It took us about a week,

21  week and a half.  And we went out to search for David Meraz.

22  Q.  Were you concerned about David Meraz's safety?

23  A.  Yes, sir, we were.

24  Q.  Did you corroborate the threat?

25  A.  Yes, sir, we did.

     1    Q.  And did you find David Meraz?

     2    A.  No, we did not.

     3    Q.  Did you -- what did you do to try to find him?

     4    A.  I went out with a task force officer on our squad.  We

     5    questioned a lot of sources.  We went to his mother's house.  I

     6    left my business card there.  And I never heard back from his

     7    mother.

     8            MR. SKARET:  We pass the witness.

     9            THE COURT:  It's 2:44.  Let's take a break.  Remember,

    10    you remain under all the instructions the Court has given you.

    11    And see you back before 3:00.  2:55.

    12            (Jury leaves courtroom.)

    13            THE COURT:  You may be seated.  I would ask that when

    14    Mr. Martinez comes back in, that you go over the list of

    15    exhibits that have been admitted with him.  Just to make sure

    16    he's got them all.  And then, Mr. Foster, are you going to

    17    reference those exhibits at all while you're crossing?

    18            MR. FOSTER:  I'm sorry?

    19            THE COURT:  Are you going to reference any of the

    20    exhibits the Government issued while they've been crossing --

    21    when you cross?

    22            MR. FOSTER:  I probably will only use about five of

    23    them.  Some of them are physical, which will make it easier.

    24    But I will give them a list of what I want --

    25            THE COURT:  So they know which ones.  All right.  Then

David A. Perez, RMR, RPR

1    we stand in recess.

2           (Recess.)

3           COURTROOM DEPUTY:  Court is back in session.

4           THE COURT:  You may be seated.  Ready?

5           MR. FOSTER:  Yes, Judge.

6           (Jury enters courtroom.)

7           THE COURT:  You may be seated, Ladies and Gentlemen.

8    Whenever you're ready.

9                        CROSS-EXAMINATION

10   BY MR. FOSTER:

11   Q.  Good afternoon, Ms. Mikeska.

12   A.  Good afternoon, sir.

13   Q.  For the jury, my name is Scott Foster.  I know you know me

14   because we've met a couple of times.

15   A.  Yes, sir.

16   Q.  I'm going to go over some questions with you.  I must say I

17   don't think you're as mean as the other defense attorneys make

18   you out to be.

19   A.  I appreciate that.

20   Q.  But I do need to ask you a few things.  So you were heavily

21   involved in the 2008 trial that people -- that we've been

22   talking about here today.  Correct?

23   A.  Yes, sir.

24   Q.  Um, you said that, let's see, there were a number of people

25   that were prosecuted by the name of Benjamin Alvarez?

```
1   A.  Yes, sir.

2   Q.  Juan Carlos Pereya and Manuel Cardoza?

3   A.  Yes, sir.

4   Q.  Is that correct?  And then there was a name mentioned,

5   Gustavo Gallardo.  You said he was not convicted in that case.

6   Was that because he was not prosecuted in that case?

7   A.  He was prosecuted in that case.  I misunderstood the

8   question, or I misspoke.  But he was prosecuted in the case.

9   Q.  Actually, he was prosecuted in that case and also another

10  case.  Is that correct?

11  A.  Which case was that, sir?

12  Q.  That would have been a case where the drugs that went up to

13  Detroit that you testified about, about the controlled

14  delivery?

15  A.  That case was rolled into the RICO case.

16  Q.  Wasn't he prosecuted separately before this judge?

17  A.  No, I don't believe so, sir.

18  Q.  Okay.  Mr. Gallardo, like some other people, testified in

19  that trial?

20  A.  Yes, sir, he did.

21  Q.  And he received favorable benefit.  Is that correct?

22  A.  He received a benefit.

23  Q.  Okay.  And Eduardo Ravelo -- how do you pronounce?

24  A.  Eduardo Ravelo.

25  Q.  Uh-huh.  He's prosecuted in this particular case?
```

 1    A.  Yes, sir.  He has a outstanding warrant in 2008.  And he's
 2    also prosecuted in this case.
 3    Q.  And he's a named defendant in this particular case?
 4    A.  Yes, sir.
 5    Q.  And he is actually the only person outstanding in this case
 6    who has not been arrested.  Is that correct?
 7    A.  There are two.  April Cardoza has also not been arrested.
 8    Q.  Okay.  Is there any reason why April Cardoza has not been
 9    arrested?
10    A.  She has fled to Mexico.
11    Q.  A lot of the same evidence that you used in the 2008 case
12    is being used in this case.  Is that correct?
13    A.  I wouldn't say a lot, sir.  But the case does encompass
14    back to 2003.
15    Q.  And the 2008 case went back to 2003 as well, did it not?
16    A.  Yes, sir.
17    Q.  Same dates.  It's just that this is a -- kind of an
18    elongation?
19    A.  It's an elongation.  It's incorporated due to the fact it's
20    the criminal enterprise.
21    Q.  A lot of the same evidence is coming in.
22    A.  There is some evidence, but not a lot.
23    Q.  You talked about doing a wire intercept on the phone by
24    Carlos Pereya, a cell phone that was in his possession.
25    A.  Yes, sir.

1    Q.  And I don't think I got the time frame on that.  Exactly

2    when was that started?

3    A.  6-24, which is June 24, 2010.  And we had a renewal on

4    that.  And we took it down on August 19, 2010.

5    Q.  Why did you take it down August 19, 2010?

6    A.  The conversations in the wire, there was a lot of -- Carlos

7    Pereya was asking for a lot of assaults.  So we didn't want to

8    take the chance of somebody getting killed.  So we decided to

9    take it down at that time.

10   Q.  You meant you decided take the phone down at that time, not

11   just the wire intercept.  You're talking about you decided to

12   take -- go in to find the phone to stop the communication?

13   A.  Correct.

14   Q.  Is that what you mean?

15   A.  And that would take down the wire --

16   Q.  Okay.

17   A.  -- once we took the phone away.

18   Q.  Now, isn't it standard operating procedure when you have a

19   wire or running an intercept on a phone that's being operated

20   inside the Bureau of Prisons that you have Bureau of Prisons

21   personnel who are actually part of your operation who listen in

22   on the phone conversations?

23   A.  Yes, sir.

24   Q.  And who was that that was assigned on that particular case?

25   A.  We had George Maldonado, BOP.  And also Fabian Galindo.

1   Q.  And what is their positions with BOP?

2   A.  I'm not for certain, sir.

3   Q.  Do they have like Texas does, an Office of Inspector

4   General or something like that, kind of a -- more of a

5   investigative law enforcement end on the BOP?  Or is it just

6   like regular BOP personnel that may be assigned?

7   A.  I can't speak on that, sir.

8   Q.  So it's safe to assume that the Bureau of Prisons knew

9   about the conversations that were coming through this telephone

10  that you-all were -- that was in Mr. Carlos Pereya's

11  possession?

12  A.  Yes, sir, they did.

13  Q.  How did you establish, prior to listening and prior to

14  getting your warrant, that it was Mr. Carlos Pereya's

15  telephone?

16  A.  We did research and analysis that tied it to a cell phone

17  that was being used by Chino Valles over in Mexico.  And we had

18  probable cause to go up on his phone.

19  Q.  I'm taking your word you had probable cause because the

20  Judge wouldn't have issued a warrant otherwise.  But what I'm

21  trying to get to is I'm trying to find out, is it like top

22  secret information that you can't share?  Or is it -- that's

23  what I'm trying to find out.  Particular details of how you got

24  to this phone goes to Carlos Pereya.  Is there something like

25  --

David A. Perez, RMR, RPR

1   A.  There's information I just cannot divulge at this time,

2   sir.  I apologize.

3   Q.  That's okay.  It's fair enough.  I understand those

4   situations and not wanting to talk about that in a public

5   courtroom.

6   A.  I appreciate that.

7   Q.  But what I want to get to is, you-all -- when I say

8   you-all, FBI, the Bureau of Prisons personnel, decided to take

9   the phone down on August 19th.  Is that correct?

10  A.  Yes, sir.

11  Q.  And did you realize or did you know that on August 18

12  Carlos Pereyra and Ramon Renteria had been removed from that

13  cell and moved to other locations?

14  A.  No, sir, we did not.

15  Q.  The Bureau of Prisons personnel, would they have not been

16  privy to that information?

17  A.  I was not aware of that information, sir.

18  Q.  Were you aware that on August 19 there were other people

19  that populated that particular cell where the cell phone was

20  found?

21  A.  No, sir, I was not.

22  Q.  Never heard of the name of Michael Smith?

23  A.  No, sir, I have not.

24  Q.  Do you know where in the cell that the particular telephone

25  was found?

1    A.  To my understanding it was a locker.

2    Q.  Okay.  There are usually two lockers in a cell where

3    there's two bunks.

4    A.  I do not know exactly which locker that is.

5    Q.  Okay.  And so far you have testified that there is only one

6    telephone conversation on that cell phone that is recorded with

7    my client, Mr. Renteria.  Is that correct?

8    A.  On that phone, yes, sir.

9    Q.  And the other recordings you-all have are on the public

10   telephone or the prison's phone that's used by prisoners.

11   A.  There is one phone call that captured Mr. Renteria.  And

12   then on another wire that we were up on, he answered the phone.

13   Q.  Okay.  I don't think I've seen that one.  I'm talking about

14   the prison phone, the inmate phones that are used.

15   A.  Yes, sir, that is outside the wires.

16   Q.  Right.  Because that's commonly -- that is commonly known

17   that particular phone that the prisoners use is recorded,

18   correct?

19   A.  Correct.

20   Q.  And that's why they don't do legal phone calls on those

21   particular phones, right?

22   A.  Yes, sir, that's correct.

23   Q.  And the prisoners know it's recorded.

24   A.  They should know it's recorded, yes, sir.

25   Q.  Because it has to tell them before they use it?

1   A.  Yes, sir.

2   Q.  And there are three quick -- three fairly fast recordings

3   on that.  Do you know who he was talking to when he was talking

4   on those lines?

5   A.  No, sir.  It's an unidentified male.

6   Q.  Back to the cell phone.  What date did the recording take

7   place where you recorded Mr. Renteria?

8   A.  On which call?

9   Q.  The cell phone that you-all were doing the -- the intercept

10  on that was in Carlos Pereya's possession?

11  A.  I believe June 28, 2010, call number 16 on Carlos Pereya's

12  wire.

13  Q.  Okay.  Are you positive on the date?

14  A.  Not positive.

15  Q.  Well, I'm asking are you sure.  I'm not looking for -- I'm

16  not trying to split hairs.  Was it the 28th and 29th, over

17  midnight like that?  I'm trying to get down, are you sure it

18  was June, maybe not in August?

19  A.  No, sir.  It was in June.  Call number 16.

20  Q.  Okay.  Then you say you had spinoffs from that particular

21  cell phone usage?

22  A.  Yes, sir.

23  Q.  And on those spinoffs you're talking about they belonged

24  to, I believe you said, Manny Lopez?

25  A.  Manny Lopez, yes, sir.

```
 1   Q.  And we're expecting to hear from Manny Lopez later, right?
 2   He's one of the cooperators?
 3   A.  He will be a witness.
 4   Q.  Yes.  And a Hector Galindo?
 5   A.  Yes, sir.
 6   Q.  Who I understand, as you said, is off in Coffield?
 7   A.  He was in Coffield.
 8   Q.  At that time?
 9   A.  Until -- yeah.  At the time until his arrest.
10   Q.  Until all that stuff came out?
11   A.  Correct.
12   Q.  And Jesus Espino?
13   A.  Yes, sir.
14   Q.  And did any of those phones -- did you ever hear Ramon
15   Renteria's voice on any of those phones?
16   A.  On Galindo's phone.
17   Q.  On Galindo's phone?
18   A.  Yes.  He answered the phone for Shotgun one day.  And his
19   voice is on that call.
20   Q.  So when Galindo calls Carlos Pereya?
21   A.  Yes, sir.
22   Q.  And the phone is in the cell?
23   A.  Yes, sir.
24   Q.  And Ramon Renteria answers it for him?
25   A.  Yes, sir.
```

```
 1   Q.  Okay.  Any orders given to Mr. Renteria or any orders given
 2   by Mr. Renteria on that call?
 3   A.  Not at that time, no, sir.
 4   Q.  Any business other than "is Shotgun there" conducted on
 5   that phone call with Mr. Renteria?
 6   A.  Galindo was looking for Carlos Pereya at that time.
 7   Q.  Okay.  Now, let's see, I'm sorry.  I was just trying to
 8   pick this up. . .
 9         Now, you did a search warrant on Jorge Diaz's house?
10   A.  Yes, sir.
11   Q.  What date was that search warrant done?
12   A.  November 12, 2010.
13   Q.  And Jorge Diaz was, I believe your testimony was -- what --
14   I'm sorry, what section was --
15   A.  He lived in Central.  But he was the bank for the Barrio
16   Azteca criminal enterprise.  In other words, he kept all the
17   money that was collected.
18   Q.  Yes.  There was -- there was some money that was taken,
19   seized in that.  You testified that it was about $20,000.
20   A.  About 20,000.  Yes, sir.
21   Q.  You were there actually on that seizure, were you not?
22   A.  Yes, sir.
23   Q.  Or were you there when it was counted out.
24   A.  I had two other agents counting that out.
25   Q.  How much exactly was it counted out to be?
```

1    A.  It counted out to be -- out of the car was $20,812.  There

2    was some extra money inside the house.  So I think total that

3    they gave me at the house was $21,279.

4    Q.  Okay.  Where did that money go?

5    A.  The money was counted twice.  And it was taken to the

6    office and booked in evidence.

7    Q.  Who booked it into evidence?

8    A.  The on-scene ERT personnel, which is Evidence Recovery

9    Personnel.  And it was Michael Cordero.

10   Q.  Okay.  I understand there's been a problem with -- with

11   locating a portion of that money?

12   A.  Yes, sir, there has been.

13   Q.  Explain to me what Michael Cordero did with the money.

14   A.  He booked it into evidence, sir.

15   Q.  When you into it into evidence, it's like you're giving it

16   to a teller or locker?

17   A.  We have an evidence control room.  And I was there when he

18   had the money.  And we were booking it in evidence.  It was

19   already in a bag.  And we booked it into evidence.  And there

20   was $3,475 short when it was pulled out to take it to the bank

21   and cashed it to the Marshals.

22   Q.  Do other people besides Michael Cordero have access to the

23   evidence control room?

24   A.  He does not have access.  It's only the evidence control

25   technicians.

CROSS - SAMANTHA MIKESKA

1  Q.  And how many of those?

2  A.  There's two of them in the evidence room.  And in order to

3  get into the drugs or valuables vault, there has to be two

4  individuals.  Evidence control technician and then a witness.

5  Q.  I understand that that missing money is now under

6  investigation.

7  A.  Yes, sir, it is.

8  Q.  Now, my client has been charged with money laundering.

9  It's my understanding money laundering is taking money that has

10 been gained from some kind of illegal enterprise and trying to

11 use it in some other way so it doesn't appear to be money

12 gained from an illegal enterprise.  Is that correct?

13 A.  Yes, sir.

14 Q.  So, whenever -- if and when someone's finally figured out

15 on this $3,400 that came out of the stash house, are they going

16 to be joined in on this particular case or --

17 A.  It's not my investigation, sir.  It's under OIG.  It's up

18 to them how they're going to prosecute it and move forward with

19 it.

20 Q.  I'm being a little smart.  I apologize.

21 A.  That's fine, sir.

22 Q.  Let's see.  I believe you found some wire transfers.  It

23 was 13V.  And that were going to Pollock.  Is that correct?

24 A.  Can I get the -- the exhibit, please?

25 Q.  Certainly.  I didn't tell them about that.  So I apologize.

```
1    It might take them a few minutes.  I just was --
2    A.  Just so I know exactly what you're talking about, sir.
3    Q.  Yes, sir -- yes, ma'am.  And I agree.  I apologize.  Do you
4    see it on your screen?
5    A.  Yes, sir.
6    Q.  Those are Western Union transfers?
7    A.  Western Union wire transfer to -- it just changed.
8    Cardoza.
9    Q.  I'm not in control of it.
10   A.  Okay.
11   Q.  So these were going to whom?
12   A.  That this one in particular that I'm looking at now it's
13   got the inmate number 0540289.
14   Q.  And do you know who that is?
15   A.  I believe that's Manuel Cardoza's inmate number.
16   Q.  Okay.  Now, let's see, and Manuel Cardoza was -- Manuel
17   Cardoza was in the Coffield Unit.  Is that correct?
18   A.  He was -- he is in the Texas Department of Corrections,
19   Smith Unit.
20   Q.  Okay.  That's right -- well, let's see.  All right.  So
21   he's the TDCJ guy.  He's not the Fed prison.  There's one
22   that's TDCJ and the others are Fed, right?
23   A.  That's correct as far as captains go, sir.
24   Q.  Okay.  Let's see.  And I believe there was one made out to
25   Carlos Pereya for $50.
```

1    A.  I don't believe it's $50.

2    Q.  Well, let me help out.  I believe the date was September 8,

3    2010.

4    A.  September 8th.  Jeff, can you keep going?  That's 922.

5    Keep going, please.  That's it right there.  It's for $100,

6    sir.

7    Q.  For a hundred.  Okay.

8    A.  Yes, sir.

9    Q.  I misread that.  I thought captains were only paid 200.

10   A.  If there's money short, they may pay them $100.  Then the

11   next week or next following week they will pay them $100.  So

12   they will have $200 a month.

13   Q.  So they don't always get an exact amount, specific, like

14   for sure 200 now.  It might be broken up?

15   A.  In order to avoid law enforcement detection, yes, sir.  It

16   may be broken up.

17   Q.  Okay.  Are you aware that Carlos Pereya was not in Pollock

18   during that time, September 8, 2000 -- 2010?

19   A.  I was not aware that he was not in Pollock.  But to my

20   understanding when they took the phone, he immediately was

21   moved.  But I did not know where he got moved to.

22   Q.  Now, you said something about they were disguising where it

23   was coming from by giving different names or different

24   addresses?

25   A.  It is my understanding and through investigations that they

David A. Perez, RMR, RPR

```
 1   will use bogus names and bogus addresses in order to avoid law
 2   enforcement detection in order to send funds to commissary
 3   accounts.
 4   Q.  So when you testified about a particular money order coming
 5   from Jose Perez at 3518 Idalia here in El Paso, that would
 6   probably have been a bogus name and address.
 7   A.  I have not checked that out.  But there is potential that
 8   it is a bogus name and address.
 9   Q.  And, actually, I believe that information came out in the
10   2008 case with -- with a gentleman that we talked about,
11   Mr. Gallardo.
12   A.  Yes, sir.
13   Q.  He kind of talked about that, didn't he, and about how they
14   would use different names and he would pick them out of the
15   phone book.
16   A.  Yes, sir.
17   Q.  Now Jesus Espino.  Jesus Espino was what section of town?
18   A.  He was west side.
19   Q.  Okay.  You did a search warrant in his case?
20   A.  Yes, sir.
21   Q.  When did you-all execute that search warrant?
22   A.  November 23, 2010.
23   Q.  So 11 days after Jorge Diaz.
24   A.  Yes, sir.
25   Q.  Of particular interest you said that you found a -- an
```

1    FD302 form.

2    A.  Yes, sir.

3    Q.  And who was the interview with on that FD302?

4    A.  Baltazar Gallegos.

5    Q.  And was that -- was that something that had -- was a past

6    investigation or present investigation?

7    A.  I believe it was a past investigation, sir.

8    Q.  You testified that you don't normally hand those out to

9    non-law enforcement officers.

10   A.  No, sir.

11   Q.  U.S. attorneys get them, right?

12   A.  Yes, sir.

13   Q.  And defense attorneys like me, we get them, right?

14   A.  Sometimes.

15   Q.  Okay.  Yeah, that would be a true statement.  Who else

16   besides -- outside the FBI might get those?

17   A.  There shouldn't be in -- you know, maybe a law enforcement

18   agency if they need a 302 to work their investigation.  But

19   other than that, the 302s are basically our document that we

20   use for testimonial nature, interviews.  Anything that's going

21   to be used in court.

22   Q.  Suspecting that you might have somebody in your office that

23   might be giving information?

24   A.  There is potential.

25   Q.  Right after that you testified about a seizure of

1    100 kilograms of cocaine that was in two tires and a duffle

2    bag.

3    A.  Yes, sir.

4    Q.  Where did you say that came from?

5    A.  The drugs were supplied by Eduardo Ravelo, Tablas, and also

6    Luis Mendez.  The middleman was going to be Gustavo Gallardo.

7    Q.  That's the one you're saying that was rolled into the

8    2008 -- case?

9    A.  Yes, sir.  We took those drugs and rolled them into the

10   2008 because it was part of the enterprise.

11   Q.  So that's kind of part of the old evidence that you're

12   using here to kind of jump into this trial?

13   A.  Yes, sir, that is correct.

14   Q.  So the 2008 seizure -- actually, that was a 2006 seizure,

15   was it not?

16   A.  2006.

17   Q.  December 12, 2006, right at the end of 2006?

18   A.  Yes, sir.

19   Q.  So that doesn't have Ramon Renteria's name or stamp or

20   anything on that, does it?

21   A.  No, sir.

22   Q.  Now, the -- you talked about the books -- the book that had

23   the cocaine in the binder.

24   A.  It was heroin, sir.

25   Q.  Heroin.  I'm sorry.  You are correct.  Okay.  But didn't

```
 1   you say it tested positive for cocaine on a field test?
 2   A.  It tested positive for heroin.  If I said cocaine, I
 3   misspoke.
 4   Q.  Okay.  Well, I had heard that and written it down and
 5   that's kind of funny.  Okay.  I will give you that.  Can you
 6   tell me what date that was that seizure was made on?
 7   A.  I believe it was September 14, 2010.
 8   Q.  And that one didn't have Ramon Renteria's name or stamp or
 9   anything on it either, did it?
10   A.  No, sir, it did not.
11   Q.  In fact, it actually -- the lab reports came out and tested
12   3.3 grams, right?
13   A.  Correct.
14   Q.  Now, you talked about Ramon Cano.  You said he was in
15   charge of central El Paso in 2009 and 2010.  Can you give me
16   more specific dates?  That covers a 24-month period.
17   A.  It was at the end of 2009 and then beginning of 2010.  It
18   kind of went back and forth for a while.  So we were unsure who
19   was the one running the streets of El Paso ourselves,
20   initially.  And then it was determined that Ramon Cano was
21   running the streets.
22   Q.  Did you say he didn't have rank?
23   A.  He did not have rank, no, sir.
24   Q.  But Manny Lopez had rank during that time, did he not?
25   A.  I do not believe he had his sergeant stripes, no, sir.
```

1   Q.   When did Manny Lopez get rank?

2   A.   It was on a wire that he was given rank.  You know, I

3   cannot give you -- I can give you an approximate date.

4   Q.   Okay.

5   A.   Maybe July or August.

6   Q.   2010?

7   A.   Yes, sir.  For a short time.  Maybe it was a little

8   earlier.  Maybe it was May.  But he just had control of the

9   streets for a short period of time.

10   Q.   So would that have corresponded with Ramon Cano's losing or

11   no longer having control?

12   A.   Ramon Cano was subsequently arrested.  So when Cano was

13   arrested, then Manny stepped up and took over.  Actually, let

14   me kind of back up.  It was Ramon Cano.  And then Roberto Angel

15   Cardona got it.  And then Roberto Angel Cardona was arrested

16   and Manny Lopez got the streets.

17   Q.   And where was Ramon Renteria during this time?

18   A.   To my understanding incarcerated.

19   Q.   Pollock and Beaumont?

20   A.   Yes, sir.

21   Q.   So those things that -- where there was a search done and a

22   tire was cut open, it had to do with Ramon Cano.  That didn't

23   have Ramon Renteria's name or -- or connection with that

24   either, did it?

25   A.   No, sir.

CROSS - SAMANTHA MIKESKA

160

```
 1    Q.  You-all did a search warrant on Omar Lopez's house?
 2    A.  Yes, sir.
 3    Q.  And what day did you do that search on?
 4    A.  March 9, 2011.
 5    Q.  So we're skipping ahead a year from Cano to when you-all
 6    did all these search warrants on March 9th?
 7    A.  We did two search warrants November 12, 2010.  And then the
 8    indictment came.  And we did the take-down in which we did Omar
 9    Lopez's search on his house.
10    Q.  You did the search on Omar Lopez, Jesus Espino, Rigoberto
11    Fragoso, Carlos Perez, Manny Lopez, and the arrest of Ramon
12    Renteria all in the same day, March 9, 2011.  Is that correct?
13    A.  Yes, sir.
14    Q.  Were you at each and every one of these searches that were
15    done?
16    A.  No, sir, I was not.
17    Q.  Which search were you present at?
18    A.  I was present -- I don't believe I was present at any of
19    the searches.  I had the, you know -- case agent was taking
20    care of individuals coming to be spoken to and interviewed.
21    Q.  Were you present at the search that was done on March 11,
22    2011 at the house or the bedroom of Ramon Renteria?
23    A.  Yes, I was.
24    Q.  Why were you only allowed to search the bedroom?
25    A.  When they -- the arrest for Ramon Renteria went to his
```

David A. Perez, RMR, RPR

 1  house to arrest him on the 9th.  Officers were advised that

 2  there was a notebook in his room.  And we --

 3  Q.  No.  No.  I'm sorry.  Why was it that you were only allowed

 4  by the Judge -- in the search warrant you were only allowed to

 5  search the bedroom and not the entire household.

 6  A.  Because we only had probable cause for the bedroom.

 7  Q.  Usually when you get in the door, you get the whole house,

 8  don't you?

 9  A.  On this search we only had probable cause for the bedroom,

10  sir.

11  Q.  Okay.  Okay.  Let me go back up the list then.  Let's start

12  with the Omar Lopez search there.  And that's the brother of

13  Manny Lopez?

14  A.  Yes, sir.

15  Q.  And Omar Lopez -- I believe, he's going to be one of the

16  cooperating witnesses as well is what's kind of planned.

17  A.  He's a witness.

18  Q.  You found a drug ledger, you call it, in his house.  I

19  believe it's 6BB?

20  A.  Yes, sir.

21  Q.  I'm going to show you that now.  Now, you were talking

22  about how this was broken down.

23          THE COURT:  You want the Jury to see this?

24          MR. FOSTER:  I'm sorry.

25          THE COURT:  The Jury?

```
 1              MR. FOSTER:  Yes, please.  I'm sorry.  I'm not as
 2     techno as what people think I am.
 3     Q.  (By Mr. Foster)  Okay.  You had this broken down.  You said
 4     there 800s and 400s.  Would you explain that?
 5     A.  Yes, sir.  As an investigator, we know that the ounce of
 6     heroin is sold for $800 an ounce.  That's like the going rate.
 7     Q.  And how do you know that?  Through snitches or through
 8     undercover buys?
 9     A.  Through sources.
10     Q.  Sources.  Those confidential informants.
11     A.  That is correct.
12     Q.  Okay.  And the 400 would be half an ounce?
13     A.  Yes, sir.
14     Q.  What's a dime?
15     A.  A dime I would say is a gram or little less.  You pay ten
16     dollars for just a hit.  So that is an assumption.  And it's
17     just an amount of money he believes he can make on selling
18     dimes.
19     Q.  Well, my confidential sources say you can get eight dimes
20     out of a gram.  Would that make sense to you?
21     A.  I don't think you can get eight.
22     Q.  I'm sorry.  Eight dimes out of an ounce?
23     A.  Eight dimes out of an ounce.  I'm not sure on that one.
24     Q.  So is this going to be -- this ledger -- is this what was
25     sold or is this what's in stock?
```

1   A.  I'm not for sure if it's what is sold or what's in stock.

2   It may be what he believes he could make on the streets.  If he

3   sold one, two, three, four ounces and one, two, three, four,

4   five half ounces, he would make $6,400.

5   Q.  Okay.  Thank you.  You also found 18 telephones at his

6   house.

7   A.  Yes, sir.

8   Q.  You didn't talk about the things you found at Jesus

9   Espino's house on search warrant, I don't think.  I don't seem

10  to have that anywhere.  What kind of things did you find at

11  Mr. Espino's house?

12  A.  There was newspapers.  Um, there was a weapon, the Ruger

13  pistol that we found, two magazines.

14  Q.  That's correct.  I think I wrote that in another section.

15  Okay.

16  A.  Then we also found the 302 on Gallegos.

17  Q.  Right.  I apologize.  You've got that right.  Let's see,

18  you went to -- you said the 6385 Domingo, Number B or Apartment

19  B.  That was Jesus Espino's residence?

20  A.  Yes, sir.

21  Q.  Okay.  Now, you found some drugs, what you believe to be

22  drugs, at Omar Lopez's house.  Is that correct?

23  A.  That's correct.

24  Q.  And it came out to how much?

25  A.  About 97.5 grams.

David A. Perez, RMR, RPR

```
 1   Q.  Not enough to equal all of the money on this ledger?

 2   A.  No, sir.

 3   Q.  And did you have a lab test done on that?

 4   A.  Yes, sir.

 5   Q.  Is that included in some of the testing that was stipulated

 6   to earlier?

 7   A.  Yes, sir.

 8   Q.  Now, Mr. Fragoso's house, you found some cell phones.

 9   A.  Yes, sir.

10   Q.  How many cell phones?

11   A.  I believe there was two cell phones.  Actually, it was, it

12   two.  If I could see the exhibit again.

13   Q.  That's -- I'm sorry.

14   A.  And thumb drives.  We had thumb drives.

15   Q.  I don't remember if it was one or two or if it was a big

16   bag.

17   A.  No, it was either two or four.  There's so many cell phones

18   that came into this investigation.  So I can't keep them

19   straight.

20   Q.  Quite a few.

21   A.  Yes, sir.

22   Q.  Then you-all hit Carlos Perez and his house, right?

23   A.  Yes, sir.

24   Q.  AKA Bandit?

25   A.  Yes, sir.
```

1   Q.  All right.  You found, um, some cell phones there or at

2   least a cell phone.

3   A.  A cell phone, I believe, yeah.  Yes, sir.

4   Q.  You found a bunch of ammo and some guns, right, two rifles?

5   A.  Two rifles.

6   Q.  And they're on your far left?

7   A.  Yes, sir.  Yes, sir.

8   Q.  We will have to get that -- when I was little my dad made

9   me wear -- put a leaf in this pocket and rock in this pocket,

10  you know, to try and remember where right and left are.  And I

11  don't think it stuck.

12  A.  I will try that one day.

13  Q.  Let me ask you about the SKS rifle.

14  A.  Yes, sir.

15  Q.  You want to take a look at it?  You can open up the box.

16  You don't have to pull it out.  I don't want you have to point

17  it towards anybody or all that kind of stuff.  But be real

18  careful with it.

19  A.  Yes, sir.

20  Q.  Okay.  Now, which -- I looked at that.  It looked to me

21  like it had a painted stock and barrel, things like that.  It

22  looks like it's kind of spray painted or something.  Is that

23  what you're getting by looking at that?

24  A.  It looks like the top part is painted.  Maybe it was

25  rusted.  I'm not for sure on that.

CROSS - SAMANTHA O'BRIEN

```
 1    Q.  You know much about rifles and assault rifles?
 2    A.  I know that they fire a 7.62 round out of SKS.
 3    Q.  You know where SKS comes from?
 4    A.  No, sir.
 5    Q.  It doesn't come from the United States, does it?
 6    A.  No, sir, I do know that.
 7    Q.  My sources tell me it's made in China.
 8    A.  It could.  Could be.
 9    Q.  Um, less expensive than an AK47?
10    A.  Yes, sir.
11    Q.  Older in design.  I know it's got a plastic stock.  But you
12    can buy those for just about anything nowadays, right?  I mean,
13    I can buy a plastic BB gun if I needed it, right?
14    A.  That's correct.  That is correct.
15    Q.  Not quite the same design as an AK47.  Not designed to go
16    full auto.  Is that correct?
17    A.  I don't believe this is full auto.  It's semi-auto.
18    Q.  Okay.  The ammunition that you found goes into that gun,
19    that's 7.62 by 39?
20    A.  I know it's -- I don't know exactly what the extension is.
21    Q.  Same type of ammunition that you would find for an AK47.
22    Is that correct?
23    A.  I'm not for sure on that, sir.
24    Q.  All right.  Do you know the difference between burn end
25    primers and box end primers?
```

1   A.  No, sir.

2   Q.  Can you tell or do you know where the origin of that

3   ammunition is?

4   A.  No, sir.

5   Q.  I'm going to ask you to take a look.  If you want to put

6   that up or on the floor or whatever.  And take a look at that

7   Highpoint rifle.  I know it's been plastic banded into that

8   box.  So at least you don't have to worry about that one

9   falling out.  Tell me about that.  What kind of condition is

10  that rifle in?

11  A.  I have not fired it.  I believe it probably can be fired.

12  It's got a broken front sight on it.  It doesn't look like it's

13  been updated as far as collapsable stocks.  It's a fixed stock.

14  Q.  The finish on it.  What kind of finish does it have?

15  A.  Like a polymer, plastic finish.

16  Q.  Black also?

17  A.  Black, also.  Yes, sir.

18  Q.  Got a front -- broken front sight?

19  A.  Yes.

20  Q.  Known to be notoriously bad shots?

21  A.  Pray and pray.

22  Q.  Now, that's nine millimeter, is it not?

23  A.  I believe so, yes, sir.

24  Q.  And, basically, shoots the same round as a 9mm handgun.

25  A.  That's correct.

1   Q.  A lot easier to get ahold of than a 9mm handgun, right?

2   A.  This gun is easier to get ahold of.

3   Q.  Easier to find and buy something like that.  It's easier to

4   buy a rifle than it is a handgun?

5   A.  I do not know.  I've never bought one of these weapons,

6   sir.

7   Q.  What's the purpose of having a rifle that shoots a pistol

8   round?

9   A.  I do not know.  I wouldn't know.

10  Q.  Well, let me ask you something --

11  A.  Cheaper rounds, maybe.  Cost less.

12  Q.  You've been in law enforcement for a good while now, right?

13  A.  Yes, sir.

14  Q.  You were in law enforcement before you started with the

15  FBI.

16  A.  Yes, I was.

17  Q.  Want to take either of these two weapons with you when you

18  go into a house-clearing operation?

19  A.  No, sir.

20  Q.  Not what I call high quality weapons.  What would you

21  think?

22  A.  Not high quality, no.

23  Q.  You can put those down and away.  I'm sorry.

24          Let me go to -- now move to the search you-all did on

25  Mr. Ramon Renteria's house.  Did you find any cell phones?

David A. Perez, RMR, RPR

1   A.  No, sir.

2   Q.  You found a cell phone bill.  But did you ever find a cell

3   phone for that bill?

4   A.  No, sir.

5   Q.  Did you find any guns or ammunition?

6   A.  No, sir, we did not.

7   Q.  Did you find any heroin or cocaine, marijuana or any kind

8   of illegal narcotics?

9   A.  No, sir, not in his bedroom.

10  Q.  Did you find any kind of, um, court or FBI documents about

11  any co-defendants or anything of that nature?

12  A.  No, sir, we did not.

13  Q.  Didn't find any kind of search warrant papers like you

14  found in some of the other houses.  No 302s.

15  A.  No, sir.

16  Q.  What you did find was a throw or blanket with an American

17  or native aboriginal motif?

18  A.  Aztec motif.

19  Q.  How do you know it's Aztec?

20  A.  I've been working the Barrio Aztecas for 11 to 12 years.

21  And a lot of the Aztecas have the calendar, the culture.

22  Q.  You sure it's not Toltec?  I mean, because there's a number

23  of native Americans who have inhabited these regions.

24  A.  I agree with you on that.

25  Q.  And I mean, as far as the calendar, can you tell the

```
 1    difference between a Mayan calendar and Aztec calendar?
 2    A.  No, sir, I cannot.
 3    Q.  So when it comes down to it, you're assuming it's Aztec
 4    because you're dealing with Aztecas and that must be what it
 5    is.
 6    A.  I wouldn't say because I'm dealing with Aztecas.  It's just
 7    that the Aztec culture is what typically the Aztecas have
 8    hanging on the wall.  So I kind of roll it all in together and
 9    just -- Aztec culture.
10    Q.  Now, I collect a lot of World War II memorabilia myself.
11    And I've got some Nazi memorabilia.  Is that going to -- are
12    you going to draw conclusions about my political leanings
13    regarding that?
14    A.  I'm not, but others may.
15    Q.  Darn.  I'm not even a Republican.  Okay.  Let me ask you
16    about what was marked -- I believe it's 14I.  This was the bank
17    statement.
18    A.  I wouldn't say bank statement.  I call it financial
19    statement.
20    Q.  Okay.  Up in the corner, where does that come from?
21    A.  Navy Federal Credit Union.
22    Q.  So it's some type of account with Navy Federal Credit
23    Union?
24    A.  Correct.
25    Q.  Who has -- who can become members of the Navy Federal
```

```
 1   Credit Union.  Do you know?
 2   A.  I don't know what their policy -- a lot of credit unions
 3   have changed in order to get more membership.
 4   Q.  Okay.  I will grant you that.  Who do you typically see
 5   with Navy Federal Credit Union?
 6   A.  Military.
 7   Q.  And down here at the bottom right-hand, that would be the
 8   balance in that account.
 9   A.  Yes, sir.
10   Q.  Looks like it was opened with about $200?
11   A.  Yes, sir.
12   Q.  Made two percent interest, what they call dividends.  Have
13   to report that on the income tax statements.  1099 DIP, right?
14   They took away $5.00 for service fee and what the big print
15   giveth the little print taketh away.
16   A.  That is correct.
17   Q.  All right.  This -- and this was found in March.  How long
18   had Mr. Renteria been out of prison?
19   A.  He was released in September, I believe, 2010.  So
20   September. . . six months, seven months.
21   Q.  Okay.  Six or seven months accumulated $200 in a bank
22   account.
23   A.  In that bank account.
24   Q.  Have any other bank accounts that you were able to --
25   A.  Not that I'm aware of.
```

1   Q.  Living at his mother's house, correct?

2   A.  Yes, sir.

3   Q.  That's why the bedroom because the rest of the house

4   belonged to mom?

5   A.  Mom.

6   Q.  Okay.  Are you aware of anybody or know anybody that is

7   military that's close to Mr. Renteria that might get him an

8   account with the Navy Federal Credit Union?

9   A.  Yes.  I believe his brother is in the military.

10  Q.  Now, let's see, we were talking about Carlos Perez a little

11  earlier.  That's where the junky looking rifles came from.

12  A.  Yes, sir, that's where the rifles came from.

13  Q.  Okay.  What do you know about Carlos Perez and any drug

14  addiction or habits he might have?

15  A.  I'm not for sure on his drug addictions, sir.

16  Q.  Were you aware that he had a drug addiction or not?

17  A.  I am not aware that he had a drug addiction, no.

18  Q.  Okay.  You did get to debrief Mr. Manny Lopez, didn't you?

19  A.  Yes, sir, I did.

20  Q.  And what did Mr. Lopez tell you about his drug addictions

21  or drug use?

22  A.  That he was addicted to heroin.

23  Q.  Did the FBI or another government agency under your-all's

24  direction or acceptance treat Mr. Lopez for drug addiction?

25  A.  The day that we arrested him, we called a ambulance due to

1    the fact that he was going through DT withdrawals.  So they had

2    to tend to him, yes, sir.

3    Q.  He was going through DTs?

4    A.  Yes, sir.

5    Q.  He's not the one who had the dope.  That was another one --

6    okay.

7            The -- skipping back to the search at Mr. Renteria's

8    house, the letters that you found.

9    A.  Yes, sir.

10   Q.  That were addressed to him in prison.

11   A.  Correct.

12   Q.  They were from a female.

13   A.  Yes, sir.

14   Q.  Did it look like a female's handwriting to you?

15   A.  Yes, sir, it did.

16   Q.  Sometimes it can be hard to distinguish.  If you look at

17   mine, it's definitely scratch.  My wife's is nice and pretty

18   and bold, you know.  Did -- have anything in there about doing

19   jobs, dope running, anything like that?

20   A.  No, sir, I do not recall.

21   Q.  Basically, it's a pen-pal looking for somebody to hook up

22   with, isn't it?

23   A.  It's a letter from a female.

24   Q.  Yeah.  Did you notice in 14L, the photo of the newspaper,

25   that there was a bottle of Oakland Raiders -- Oakland Raiders

1    bottle behind that?

2    A.  I saw that in the background, yes, sir.

3    Q.  Full of quarters.  Does that speak anything towards gang

4    involvement?  Do they have favorite teams or anything?

5    A.  Dallas Cowboys is their favorite football team.  They are

6    seen with jerseys sometimes with 21 on it.

7    Q.  The 21.  Go ahead and explain that.  What's the 21 about?

8    A.  21 is -- the two is the second letter in the alphabet,

9    which is B.  And one is the first letter in the alphabet,

10   Barrio Azteca, BA.

11   Q.  So 21 is a significant thing?

12   A.  Very significant for Aztecas.

13   Q.  Did you find any 21 jerseys or anything like that, any kind

14   of stuff with 21 in Ramon Renteria's bedroom?

15   A.  No, sir.

16   Q.  I'm sorry.  Just -- give me just a minute, please.  Now,

17   it's been alleged that Mr. Ramon Renteria had the rank of

18   captain.

19   A.  Yes, sir.

20   Q.  Were you made aware of this prior to his leaving prison?

21   A.  I was made aware that he was going to be taking over the

22   streets once he got out of prison.

23   Q.  That was the talk?

24   A.  That was the talk.

25   Q.  You don't have anything from Ramon Renteria, writing,

```
 1    telephone call, or otherwise, saying he was taking over the
 2    streets, do you?
 3    A.  No, sir, not from Ramon Renteria.
 4    Q.  It's other people saying that's going to happen.  Is that
 5    correct?
 6    A.  Several other people.
 7    Q.  And those other people -- when other people say stuff about
 8    someone, that's called what?  I don't know.  I used to
 9    prosecute out in Van Horn, Texas.  It's a little town.  I'm
10    supposed to have dated at least 25 women in that town.  And I
11    don't think there's 25 single women there.  I'm supposed to --
12    we call that what?
13    A.  You tell me.
14    Q.  Gossip?
15    A.  That's not gossip, sir.
16    Q.  You're talking about the thing about Ramon, right?
17    A.  Him taking over the streets was not gossip, no, sir.
18    Q.  And the -- because your confidential sources -- or as a
19    matter of fact, they wouldn't lie to you?
20    A.  Confidential sources and information we received off the
21    wire intercepts, yes, sir.
22    Q.  And you ever run any -- handle any sources?
23    A.  Yes, sir.
24    Q.  About how many have you handled?
25    A.  Since I've been in the bureau?
```

```
1    Q.  Yes, ma'am.
2    A.  20 to 30.
3    Q.  You ever been privy through wire or any other type of
4    recording device to a Barrio Azteca monthly meeting?
5    A.  Yes, sir.
6    Q.  How many you think?
7    A.  Three.
8    Q.  You're known as quite an expert around the nation in this
9    particular field.  Where do you get your expertise from?  Where
10   do you get your information from?
11   A.  My expertise in my job or the information that I received
12   for --
13   Q.  The other -- I'm sorry.  I didn't mean to talk.  I got a
14   quick lightning look there.  Your expertise in this area of
15   this particular gang involvement, Barrio Azteca.  Okay?  Where
16   do you acquire your information?
17   A.  From wire intercepts, from sources, from BOP, Bureau of
18   Prisons, from Texas Department of Corrections, from fellow
19   agents, from task force officers, from gang experts.  I gather
20   information from all over.
21   Q.  Gang experts are other people like yourself.  And you-all
22   get together and compare notes?
23   A.  I'm not an expert.  I rely on the experts.
24   Q.  Okay.  Now, what about -- you say you get it from sources.
25   People you talk to are not necessarily under arrest.
```

```
 1    A.   Yes, sir.

 2    Q.   But they could be.

 3    A.   We try to keep it where they wouldn't be under arrest.

 4    Q.   They're allowed to continue with their criminal activity

 5    while they give information to you?

 6    A.   No, sir, not unless it's authorized by us.

 7    Q.   How often does that happen?

 8    A.   If it does happen, they're terminated as far as being a

 9    source.  And we look at it as unauthorized criminal activity

10    and we shut them down and prosecution would be imminent.

11    Q.   Is there authorized criminal activity?

12    A.   There is, yes.

13    Q.   Have you ever authorized criminal activity?

14    A.   Yes, sir.

15    Q.   Ma'am, you took an oath to uphold and defend the

16    Constitution of the United States, did you not?

17    A.   Yes, sir, I did.

18    Q.   And in that Constitution it talks about the protection of

19    the general welfare.

20    A.   Yes, it does.

21    Q.   When you authorize criminal activity of your sources, are

22    you protecting the general welfare?

23    A.   I am.  They are watched 24/7.  If it is a drug buy, we

24    follow sources to and from.  Everything is recorded.  And

25    everything is documented and submitted to the FBI.
```

```
1    Q.  So it's well-surveyed?

2    A.  Yes, sir.

3    Q.  Did you have surveillance on Ramon Renteria after he left

4    the penitentiary from Beaumont?

5    A.  Yes, sir.

6    Q.  And how much did you survey him?  Was it 24/7 surveillance?

7    A.  No, sir.

8    Q.  What kind of surveillance was it, ma'am?

9    A.  I generated a document that surveillance would be conducted

10   by our SOG, which is our surveillance team.  But I don't know

11   how long it lasted.  Um, they would pick him up and they would

12   lose him.

13   Q.  Did they watch his house?

14   A.  I do not believe so.  Because we did not know exactly where

15   he was residing when he was released from the prison system.

16   Q.  It's because he didn't go to a halfway house.  Is that

17   correct?

18   A.  It's not that it's correct.  We just didn't know where he

19   was living when he got released.

20   Q.  But he didn't go to a halfway house?

21   A.  I'm not aware if he did or did not, sir.

22          MR. FOSTER:  I will pass the witness.

23          THE COURT:  All right.  Anything further?

24          MR. SKARET:  Yes, Your Honor.  Just briefly.

25
```

```
1                        REDIRECT EXAMINATION
2    BY MR. SKARET:
3    Q.  Agent Mikeska, you authorize criminal activity as an agent
4    with the FBI?
5    A.  Yes, sir.
6    Q.  Is there another name for this?  Something like undercover
7    operations?
8    A.  Undercover operations.  Undercover buy walks.
9    Q.  Is this a common law enforcement technique?
10   A.  Absolutely.
11   Q.  How many FBI committees and approvals did you have to go
12   through before you do a group one undercover operation?
13   A.  Numerous.
14   Q.  Why wouldn't Carlos Perez tell the world, including maybe
15   some of your sources on the street, that he was a drug addict?
16   A.  Because being a drug addict within the Barrio Azteca
17   criminal enterprise is frowned upon.
18   Q.  What did the Barrio Aztecas do if they find out that you
19   are a drug addict?
20   A.  They'll park you.  Tell you you need to dry out.  And if
21   you continue to be a junky, what they say, they will issue a
22   calentada.
23   Q.  A calentada?
24   A.  Yes, sir.
25   Q.  What's that?
```

1   A.  A beating.

2   Q.  Mr. Foster mentioned that you did not find a gun or any FBI

3   documents or drugs at Ramon Renteria's house.  That's true,

4   right?

5   A.  Yes, sir.

6   Q.  You didn't find any Western Union receipts?

7   A.  No, sir.

8   Q.  You did find a copy of the Gangland DVD though, right?

9   A.  Yes, sir.

10  Q.  You also testified that you found Exhibit 14C from El

11  Diario.  Is that correct?

12  A.  Yes, sir.

13  Q.  What's the date?  Here's 14C.  What's the date on that

14  newspaper.  Can you read that Spanish?

15  A.  I believe it's January 28th.

16  Q.  What year?

17  A.  2011.

18  Q.  What day was the search performed?

19  A.  March 11, 2011.

20  Q.  So the defendant had kept this El Diario around for about a

21  month and a half?

22  A.  That's correct.

23  Q.  Now, you mentioned that Manny Lopez was the El Paso leader

24  when Spooky got out of jail.  Is that right?

25  A.  Yes, sir.

1   Q.  And on March 9th, you also searched Manny Lopez's house.

2   Is that correct?

3   A.  2011, yes.

4   Q.  And as a result of that search, what did you find?

5   A.  We saw -- found a cell phone and there was several money

6   orders that we found.  And we found some money, like $1200

7   worth of cash.

8   Q.  And?

9   A.  From the drugs.

10  Q.  And the Western Union receipts that you mentioned, who were

11  those made out to?

12  A.  They were not made out to anybody.

13  Q.  Any idea who they were going to?

14  A.  To my understanding his ex-wife.

15  Q.  Is she a Barrio Azteca member?

16  A.  No, sir.

17  Q.  Are there any women in the Barrio Azteca?

18  A.  There's associates.  There's -- and they help them out with

19  communications.  But there's no, like, made members, no.

20  Q.  So you only found a cell phone and a couple of money orders

21  to an ex-wife at Manny Lopez's house?

22  A.  That's correct.

23  Q.  Who does Manny Lopez's dirty work for him?

24  A.  Omar Lopez.

25  Q.  Is that his brother?

1    A.  Yes, sir.

2    Q.  That's the search where we found 17 cell phones, heroin?

3    A.  Correct.

4    Q.  All the Western Union receipts?

5    A.  Correct.

6    Q.  Is there any evidence that Ramon Renteria served his

7    country as a member of the U.S. military?

8    A.  I'm sorry?

9    Q.  Is there any evidence that Ramon Renteria served his

10   country as a member of the U.S. military?

11   A.  No, sir.

12   Q.  With respect to the FBI 302, that was found at Jesus

13   Espino's house.  Direct your attention to Exhibit 10A.  As I

14   look at Exhibit 10A, it would appear that this is an interview

15   with an individual named Gallegos.  Does that appear to be

16   true?

17   A.  Yes, sir.

18   Q.  And this was actually a 302 out of a Barrio Azteca case.

19   Is that correct?

20   A.  Yes, sir.

21   Q.  Was this a 302 that came from the Bobby Mesa case?

22   A.  Yes, sir, out of Albuquerque.

23   Q.  Who was the case agent on the Bobby Mesa case?

24   A.  Yes, sir, Greg Waterson.

25   Q.  Is that the same Greg Waterson that's sitting in here with

```
 1    us today?
 2    A.  Yes, it is.
 3    Q.  You mentioned you do not hand out these 302s willy-nilly to
 4    defense lawyers.  Why is that?
 5    A.  Due to the fact in 2008 one of our defendants had a full
 6    stack of discovery in his jail cell.  And when you hand these
 7    over, they will know who's cooperating.  And there will be
 8    ramifications to the individual who's cooperating.
 9    Q.  And by finding a 302 of this individual who's on the 302,
10    is that proof that he's cooperating with the FBI?
11    A.  Yes, sir.  There's a statement on here that says Gallegos
12    agreed to a follow-up interview with the interviewing agents at
13    a later date.
14    Q.  Is it safe to say his cooperation with the FBI is written
15    in blood on this particular 302?
16    A.  Absolutely.
17    Q.  Are you familiar with rules about cooperating with law
18    enforcement?
19    A.  Yes, sir.
20    Q.  What is the rule?
21    A.  Very much frowned upon.  In fact, you will get put on the
22    muleta list if you cooperate.  Black list.
23              MR. SKARET:  That's all.  Thank you, Your Honor.
24              THE COURT:  Anything further?
25              MR. FOSTER:  No further questions.
```

1        THE COURT:  You may step down.  It's 4:30.  We're

2   going to recess for the evening.  Remember, you remain under

3   all the instructions the Court has previously given you.  See

4   you tomorrow morning at 8:30.

5           (Recess for evening.)

6           THE COURT:  Anybody need anything?

7           MR. SKARET:  Not from the Government.

8           MR. FOSTER:  We're good, Judge.

9           THE COURT:  All right.  We'll see you tomorrow morning

10  at 8:30.  Thank you.

11          (Recess for evening.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

David A. Perez, RMR, RPR

**INDEX**

GOVERNMENT OPENING STATEMENT   11

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES FOR THE GOVERNMENT: | | | | |
| SAMANTHA MIKESKA | 30 | 141 | 179 | |

| EXHIBITS: | | Admitted |
|---|---|---|
| Government | | |
| 1 | Stipulation | 28 |
| 1A2A1 | Drugs | 61 |
| 1A-3B | Drugs | 75 |
| 1A-1A | Heroin | 108 |
| 1A-3A | Heroin | 119 |
| 2 | Stipulation | 28 |
| 2C | Box | 57 |
| 2B1J1 | Heroin | 57 |
| 3 | Stipulation | 28 |
| 3D | Stipulation | 28 |
| 3E | Stipulation | 28 |
| 4 | Stipulation | 28 |
| 4E | Stipulation | 28 |
| 4F | Stipulation | 28 |
| 4G | Stipulation | 28 |
| 4H | Book | 100 |
| 4G-1 | Package | 104 |
| 5A | Wrappings | 102 |
| 5B | Scale | 102 |
| 5D | Plastic bags | 102 |
| 5C | Photograph | 102 |
| 6A | Cell phone | 105 |
| 6B | Cell phone | 105 |
| 6C | Cell phone | 105 |
| 6D | Cell phone | 105 |
| 6E | Cell phone | 105 |
| 6F | Cell phone | 105 |

| 1 | EXHIBITS: | | Admitted |
|---|---|---|---|
| 2 | 6G | Cell phone | 105 |
|   | 6H | Cell phone | 105 |
| 3 | 6I | Cell phone | 105 |
|   | 6J | Cell phone | 105 |
| 4 | 6K | Cell phone | 105 |
|   | 6L | Cell phone | 105 |
| 5 | 6M | Cell phone | 105 |
|   | 6N | Cell phone | 105 |
| 6 | 6O | Cell phone | 105 |
|   | 6P | Cell phone | 105 |
| 7 | 6Q | Cell phone | 105 |
|   | 6R | Cell phone | 105 |
| 8 | 6S | Cell phone | 105 |
|   | 6SS | Photograph | 105 |
| 9 | 7A | Cell phone | 120 |
|   | 8A | Money order | 76 |
| 10 | 8B | Money order | 76 |
|   | 8C | Money order | 76 |
| 11 | 8D | Money order | 76 |
|   | 8E | Money order | 76 |
| 12 | 8F | Money order | 76 |
|   | 8G | Money order | 76 |
| 13 | 8H | Money order | 76 |
|   | 8I | Money order | 76 |
| 14 | 8J | Money order | 76 |
|   | 8K | Money order | 76 |
| 15 | 8L | Money order | 76 |
|   | 8M | Money order | 76 |
| 16 | 8N | Money order | 76 |
|   | 8O | Money order | 76 |
| 17 | 8P | Money order | 76 |
|   | 8Q | Money order | 76 |
| 18 | 9 | Cell phone | 50 |
|   | 10A | FBI 302 | 89 |
| 19 | 10B | Photograph | 89 |
|   | 10C | Photograph | 89 |
| 20 | 10D | Jesus Espino Identification | 89 |
|   | 10E | Newspaper | 89 |
| 21 | 10F | Newspaper | 89 |
|   | 10G | Newspaper | 89 |
| 22 | 10H | Newspaper | 89 |
|   | 10I | Newspaper | 89 |
| 23 | 10J | Bible | 89 |
|   | 10K | Names and phone numbers | 89 |
| 24 | 10L | Magazines | 89 |
|   | 10M | Ammunition | 89 |
| 25 | 10O | Photographs | 89 |

```
  1    EXHIBITS:                                     Admitted

  2    10N    Pistol                                      90
       11A    Cell phone                                 113
  3    11B    Cell phone                                 113
       11C    Scale                                      113
  4    11D    Ammo                                       113
       11E    Ammo                                       113
  5    11F    Ammo                                       113
       11G    List                                       113
  6    11H    Rifle                                      115
       11I    Rifle                                      116
  7    11J    Photograph                                 118
       12A    Cell phone                                 111
  8    12B    Cell phone                                 111
       12C    Cell phone                                 111
  9    12D    Cell phone                                 111
       13A    Tally                                       80
 10    13B    Photograph                                  80
       13C    Tally                                       80
 11    13D    Tally                                       80
       13E    Tally                                       80
 12    13F    Tally                                       80
       13G    Tally                                       80
 13    13H    Tally                                       80
       13I    Tally                                       80
 14    13J    Tally                                       80
       13K    Tally                                       80
 15    13L    Tally                                       80
       13M    Tally                                       80
 16    13N    Tally                                       80
       13O    Tally                                       80
 17    13P    Tally                                       80
       13Q    Tally                                       80
 18    13R    Tally                                       80
       13S    Tally                                       80
 19    13T    Tally                                       80
       13U    Tally                                       80
 20    13V    Wire transfer                               80
       13W    Tally                                       80
 21    14A    Receipt                                    123
       14B    DVD                                        123
 22    14C    Newspaper                                  123
       14D    Receipt                                    123
 23    14E    Letter                                     123
       14F    Envelope                                   123
 24    14G    Letter                                     123
       14H    Stickie note                               123
 25    14I    Financial statement                        123
```

| 1 | EXHIBITS: | | Admitted |
|---|---|---|---|
| 2 | 14J | Email address | 123 |
|  | 14K | Birth certificate | 124 |
| 3 | 14M | Bank statement | 124 |
|  | 14Q | Photograph | 125 |
| 4 | 14R | Photograph | 125 |
|  | 14S | Photograph | 126 |
| 5 | 14T | Receipts | 128 |
|  | 14P | Letters | 128 |
| 6 | 14L | Photograph | 134 |
|  | 15A | Sacred rules | 40 |
| 7 | 15B | Photograph | 40 |
|  | 15H | Photograph | 40 |
| 8 | 15I | Photograph | 40 |
|  | 17A | Stipulation | 28 |
| 9 | 17A-1 | Stipulation | 28 |
|  | 17A-2 | Stipulation | 28 |
| 10 | 17A-3 | Stipulation | 28 |
|  | 19E | Photograph | 33 |
| 11 | 20A | Transcript | 71 |
|  | 20A-1 | Transcript | 71 |
| 12 | 20A-2 | Transcript | 71 |
|  | 20A-3 | Transcript | 71 |
| 13 | 20A-4 | Transcript | 71 |
|  | 20A-5 | Transcript | 71 |
| 14 | 20B | Transcript | 71 |
|  | 20B-1 | Transcript | 71 |
| 15 | 20B-2 | Transcript | 71 |
|  | 20C | Transcript | 71 |
| 16 | 20C-1 | Transcript | 71 |
|  | 20C-2 | Transcript | 71 |
| 17 | 20C-3 | Transcript | 71 |
|  | 20D | Transcript | 71 |
| 18 | 20D-1 | Transcript | 71 |
|  | 20D-2 | Transcript | 71 |
| 19 | 20E | Transcript | 71 |
|  | 20E-1 | Transcript | 71 |
| 20 | 20E-2 | Transcript | 71 |
|  | 20F | Transcript | 71 |
| 21 | 20F-1 | Transcript | 71 |
|  | 20F-2 | Transcript | 71 |
| 22 | 20G | Transcript | 71 |
|  | 20G-1 | Transcript | 71 |
| 23 | 20G-2 | Transcript | 71 |
|  | 20H | Transcript | 71 |
| 24 | 20H-1 | Transcript | 71 |
|  | 20H-2 | Transcript | 71 |
| 25 | 21A | Transcript | 71 |

```
 1   EXHIBITS:                                          Admitted

 2   21A-1 Transcript                                        71
     21A-2 Transcript                                        71
 3   22A   Transcript                                        71
     22A-1 Transcript                                        71
 4   22A-2 Transcript                                        71
     23A   Transcript                                        73
 5   23A-1 Transcript                                        73
     23A-2 Transcript                                        73
 6   27    Stipulation                                       28
     27    Commissary document                               85
 7   28    Stipulation                                       28

 8

 9

10

11

12

13

14

15

16

17

18                     * * * * * *

19        I certify that the foregoing is a correct transcript

20   from the record of proceedings in the above-entitled matter.  I

21   further certify that the transcript fees and format comply with

22   those prescribed by the Court and the Judicial Conference of

23   the United States.

24

25   Signature:/s/_____Date:  July 16, 2013
                  David A. Perez, RMR, RPR
```

David A. Perez, RMR, RPR