1                IN THE UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF TEXAS

3                        EL PASO DIVISION

4

5   UNITED STATES OF AMERICA              No. EP:10-CR-2213-KC

6   v.                                    El Paso, Texas

7   RAMON RENTERIA                        May 22, 2012

8

9                          VOLUME III

10                         JURY TRIAL

11           BEFORE THE HONORABLE KATHLEEN CARDONE

12                UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15  For the Government:   Brian Skaret
                          United States Department of Justice
16                        Criminal Division, Human Rights and
                          Special Prosecutions Section
17                        1301 New York Avenue, NW, Suite 200
                          Washington, D.C. 20530
18
                          Joseph Cooley
19                        United States Department of Justice
                          Criminal Division, Gang Unit
20                        10th and Constitution Avenue, NW
                          Washington, D.C. 20530
21
                          George Leal
22                        Assistant United States Attorney
                          700 East San Antonio, Suite 200
23                        El Paso, Texas 79901

24

25

David A. Perez, RMR, RPR

1   For the Defendant:   Scott P. Foster
                         718 Myrtle Avenue
2                        El Paso, Texas 79901

3

4        Proceedings recorded by stenotype.   Transcript produced by

5   computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURTROOM DEPUTY:  EP:10-CR-2213, USA versus Ramon
 2    Renteria.
 3              MR. SKARET:  Good morning, Your Honor.  Brian Skaret,
 4    Joseph Cooley and George Leal for the United States.
 5              MR. FOSTER:  Scott Foster for the defendant.  We're
 6    ready to proceed.
 7              THE COURT:  Let's bring in the jury.  Government have
 8    their next witness ready?
 9              MR. COOLEY:  You want the witness now?
10              (Jury enters courtroom.)
11              THE COURT:  You may be seated, Ladies and Gentlemen.
12    Call your next witness.
13              MR. COOLEY:  Your Honor, the government's calling
14    Daniel Reyes.
15              THE COURT:  All right.  And he has not been sworn in.
16              MR. COOLEY:  No, he has not.
17                         DANIEL REYES, SWORN
18                         DIRECT EXAMINATION
19    BY MR. COOLEY:
20    Q.  Sir, please state your name.
21    A.  Daniel Reyes.
22    Q.  Mr. Reyes, did you go by a nickname while you were -- in
23    the past?
24    A.  Yes, sir.
25    Q.  What was that nickname?
```

```
 1    A.   Duke.
 2    Q.   They also call you El Duque?
 3    A.   Yes, sir.
 4    Q.   Approximately, February of -- February 24th of this year,
 5    you came in to the FBI.  Is that correct?
 6    A.   Yes, sir.
 7    Q.   What was the reason for you coming to the FBI?  What did
 8    you want to do?
 9    A.   I wanted to put an end to all this and come and talk to
10    somebody.
11    Q.   And did you talk to an FBI agent?
12    A.   Yes, sir.
13    Q.   I want to direct your attention to a couple weeks prior to
14    that.  What happened a couple weeks prior to you coming into
15    the FBI to talk to them?
16    A.   Um, I really don't know what happened right now.  My
17    brother just went and took some shots at my house.  And he
18    almost hit my pregnant wife and some of my kids.
19    Q.   Okay.  Now, you were a BA at the time, were you not?
20    A.   Yes, sir.
21    Q.   Was your brother a BA at the time he shot at your house?
22    A.   No, ex-member.
23    Q.   He was an ex-member?
24    A.   Yes, sir.
25    Q.   For him shooting at the house, what impression did that
```

```
 1    leave you in terms of his motive for shooting -- shooting at
 2    the house at that time?
 3              MR. FOSTER:  Objection, calls for speculation.
 4              MR. COOLEY:  His impression which would led him to
 5    talk to the FBI.
 6              THE COURT:  All right.  So his state of mind?
 7              MR. COOLEY:  Yes, Your Honor.
 8              THE COURT:  I will overrule the objection.
 9    A.  Repeat the question.
10    Q.  Yes.  What was the impression you had after your brother
11    shot up your house?  What did you think his motive was?
12    A.  My first impression was he was probably trying to get back
13    into the -- to the gang and -- and do something, a hit on me.
14    Or, um, he was so out of his mind that -- that I thought he was
15    trying to kill me to fix his thing and get back into the Barrio
16    Azteca.
17    Q.  Was that one of the reasons why you came in to talk to the
18    FBI?
19    A.  Yes, sir.
20    Q.  Now, your understanding -- you were a BA member as you
21    said, right?
22    A.  Yes, sir.
23    Q.  And you understand the sacred rules?
24    A.  Yes, sir.
25    Q.  What's the sacred rules about -- saying about the BA over
```

```
 1    family?
 2    A.  You got to do what you got to do.
 3    Q.  What comes first?
 4    A.  The BA.
 5    Q.  BA over family?
 6    A.  Yes, sir.
 7    Q.  Now, you're currently not charged.  Is that right?
 8    A.  I'm not charged, sir.
 9    Q.  Over the last 18 years --
10    A.  Yes, sir.
11    Q.  -- prior to you coming to the FBI --
12    A.  Yes, sir.
13    Q.  -- um, prior to you coming to the FBI, how long were you on
14    the street?  You came to the FBI February of this year.  Is
15    that correct?
16    A.  Yes, sir.
17    Q.  The last time you were released from jail was when?
18    A.  About three months prior to that.  About three months prior
19    to that.
20    Q.  Okay.  Prior to that, over the last 18 years, how much time
21    did you spend on the street, approximately?
22    A.  A rough estimate, I'd say about -- anywhere from 20 to 24
23    months within a 20-year period.
24    Q.  So the majority of your adult life you've been serving
25    prison time.  Is that correct?
```

```
1    A.   Yes, sir.
2    Q.   You're currently not being charged.  Is that right?
3    A.   Yes, sir.
4    Q.   You're currently not under indictment?
5    A.   I'm not under indictment, sir.
6    Q.   Now, the FBI agreed to relocate you and your family.  Is
7    that correct?
8    A.   Yes, sir.
9    Q.   Um, and you've been relocated?
10   A.   Yes, sir.
11   Q.   Approximately, how long ago was it that you were relocated?
12   A.   About a month ago, sir.
13   Q.   Okay.  And you're in a position where you're trying to
14   start your life over.  Is that correct?
15   A.   That's what I'm going to do, sir.
16   Q.   When did you become a BA member?
17   A.   Approximately, 1994, sir.
18   Q.   How old are you?
19   A.   21.
20   Q.   And where did that occur?
21   A.   County jail.
22   Q.   Who was your padrino?
23   A.   My first padrino was Grande Fernandez, Manuel Fernandez.
24   Q.   Who sponsored you?
25   A.   Chicho, David Meraz.  Y2K, George Torres.  Um, and a Nabor.
```

1    Q.  You mentioned Chicho?

2    A.  Yes, sir.

3         MR. COOLEY:  Can you bring up what's been admitted as

4    Government's Exhibit 19E?

5         THE COURT:  It's been admitted already.

6         MR. COOLEY:  Yes, Your Honor.

7    Q.  (By Mr. Cooley)  You have a picture for you marked as 19E.

8    A.  Yes, sir.

9    Q.  Do you recognize that individual?

10   A.  Yes, sir.

11   Q.  Who is that?

12   A.  That's my padrino, David Meraz.

13   Q.  Okay.  He was your padrino?

14   A.  Yes.

15   Q.  We actually haven't gotten that far.

16   A.  Yes, sir.

17   Q.  Your first padrino was who?

18   A.  Fernandez.

19   Q.  And Chicho was one of your sponsors?

20   A.  Yes, sir.

21   Q.  What does that mean?

22   A.  Um, he was another high rank at the moment that was present

23   and present in my inauguration into Barrio Azteca.

24   Q.  Now, you mentioned that, um, one brother that shot up your

25   house was a BA member -- or ex-member at the time, right?

David A. Perez, RMR, RPR

1    A.  Yes, sir.

2    Q.  What was his name?

3    A.  Jesus Reyes.

4    Q.  You have another brother that was a BA member, as well.  Is

5    that right?

6    A.  Yes, sir.

7    Q.  What's his name?

8    A.  Pedro Reyes, Jr.

9    Q.  Does he also go by Pedro Jesus or Jesus Pedro?

10   A.  Jesus Pedro, sir.

11   Q.  And that's a younger brother or older?

12   A.  Older brother.

13   Q.  Was he a BA member before you were?

14   A.  Yes, sir.

15   Q.  All right.  You mentioned that you became a BA member in

16   '94.  Prior to that, in 1994, were you an associate of the BAs?

17   A.  Yes, sir.

18   Q.  Your brother was BA?

19   A.  Yes, sir.

20   Q.  Where are you from?

21   A.  Downtown El Paso here.  El Paso, Texas.

22   Q.  And when you were an associate of the BAs, what did that

23   mean?

24   A.  Um, I did all kinds of jobs for the gang, you know, without

25   actually being a member, just a associate.  But -- beatings,

1    drug collections, you know, whatever.  Whatever I was asked.

2    Q.  Um, okay, so what -- give me another example of what --

3    A.  Extortion.  Going out after the prostitutes, collecting

4    money, shaking down people, intimidating.  Whatever it had to

5    be.  Taking drugs to the jail.

6    Q.  All right.  I want you to explain the process of how you

7    become a BA member.

8    A.  Well, first of all you have to do like -- as I said, when I

9    was an associate, you go through the processes.  And when they

10   think you're ready to -- to accept the higher charge in the --

11   in the real gang, then you have to draw some blood, put a hit

12   on another gang member, you know, participate in a full-fledged

13   manner.

14   Q.  What's the origin of the BAs?  How did they start?

15   A.  Well, it started off as a brotherhood to protect your

16   brothers and to -- in a prison gang.  Um --

17   Q.  When was that?

18   A.  1986, sir.

19   Q.  Continue, please.

20   A.  In 1986, the -- the older people from El Paso, like Meraz

21   and Grande and all them, they started talking about El Paso

22   needed a gang to protect itself in prisons.

23   Q.  Why was that?  Why'd they need protection?

24   A.  Well, back then in those days, the system was kind of

25   aggressive as far as one certain gang had a lot of pull with

DIRECT — DANIEL MUNIZ

```
 1   administration in the prisons.  And they would abuse inmates a
 2   lot.  And El Paso -- El Paso people started sticking together.
 3   And they just tried to get away from all that and form their
 4   own gang to -- to stand out on their own.
 5   Q.  So what was the -- what other gangs were a threat to the
 6   people in El Paso?
 7   A.  Excuse me, sir?
 8   Q.  What -- what other gang was a threat -- the most
 9   threatening towards the El Paso inmates?
10   A.  Um, Texas Syndicate.  Basically, the Texas Syndicate.
11   Mexican Mafia.  Against -- Pistoleros, Raza Unida.  But,
12   basically, it was Texas Syndicate.
13   Q.  Now, as a result of that decision, what happened next?
14   A.  Well, there was a word put out and sent early on.  Like I
15   said, my brother was a member already.  So that's how I heard
16   about it.  And nobody joined any other gang.  El Paso's gonna
17   have it's own gang pretty soon.  And, sure enough, 1987,
18   January, started picking up people.
19   Q.  All right.  Getting back to how they formed.  They made a
20   decision to form a gang --
21   A.  Yes.  The capos, the first captains got together, made
22   their decision to -- to form the gang on a certain date.  At
23   first it took, like, a year to spread the word around.  And
24   everybody just was waiting for that day.
25   Q.  Okay.  So as far as capos are concerned, that's the highest
```

1  rank?

2  A.  Yes, sir, the highest rank.

3  Q.  When it started -- when the BA started, how many capos were

4  there?

5  A.  To my -- to my knowledge, five.

6  Q.  Okay.  Do you know any of them by name?

7  A.  Oh, yes, sir.

8  Q.  Or nickname?  What are these names?

9  A.  Raul Fierro, um, Gypsy, Joe Chavez, one of the first

10  captains.  T-top, Ben Alvarez.

11  Q.  Who's T-top?

12  A.  Ben Alvarez, the highest -- the -- well, that's what we all

13  respected as the real creator of this Barrio Azteca.

14  Q.  T-top?

15  A.  T-top.

16  Q.  And he's a capo today?

17  A.  Yes.  To my knowledge, he is.

18  Q.  And he was one of the first -- was the first?

19  A.  Yes, sir.

20  Q.  Okay.  Now, you had the capos.  Um, how is it organized

21  from there?  Who's under the capos?

22  A.  Lieutenants and sergeants.

23  Q.  And soldiers?

24  A.  And soldiers.

25  Q.  Approximately, how many members do you think there are?

1   How many BA members are there?

2   A.  Nowadays, there's really no telling.  Over thousands.  Over

3   the thousand period.

4   Q.  Um, at this point, I would ask you to --

5           MR. COOLEY:  I believe it's in evidence, Your Honor,

6   Exhibit 6SS.

7           THE COURT:  Let me check.  But I think it is also.

8   Q.  (By Mr. Cooley)  Take a look at this -- you see this photo

9   in front of you?

10  A.  Yes, sir.

11  Q.  Take a moment to look at those.  There's -- on this photo

12  there's names.  And underneath the names there's locations.  Is

13  that right?

14  A.  Yes, sir.

15  Q.  Do you recognize any of these individuals?

16  A.  Yes, sir.

17  Q.  Use your finger, if you can.  Touch the screen.  Point out

18  which individual you recognize -- or start -- start with the

19  first one you recognize.

20          THE COURT:  And let me explain.  If you just tap the

21  screen, it will put a little arrow on it.

22          THE WITNESS:  Okay.  Thank you.

23          THE COURT:  You're welcome.

24  A.  I'm gonna go first with --

25  Q.  Speak into the microphone, please.

DIRECT - DANIEL REYES

```
1    A.  Okay.  The first one is Freddie from Juarez.

2    Q.  Okay.  How do you know him?

3    A.  I knew him as -- he was only an associate.  But he was

4    always participating in the river crossings, drugs.  He was a

5    friend of mine on the streets.

6    Q.  Did he later become a BA member?

7    A.  Yes, sir.

8    Q.  When was the first time you met him?

9    A.  The '80s.

10   Q.  '90s --

11   A.  No, no.  '90s.  Yes, sir.

12   Q.  Anyone else you recognize?

13   A.  Um, Rafa from Juarez.

14   Q.  He's standing up.  Is that right?

15   A.  Yes.

16   Q.  With the glasses?

17   A.  The second one with the glasses.  Because both --

18   Q.  Okay.  And how do you know him?

19   A.  Well, I knew him -- he was nobody.  But after the -- he

20   went to the Cereso.  And there was a big conflict with Chuy

21   Diablo.  And he became a brother and started running all

22   Juarez.

23   Q.  He starting doing what in Juarez?

24   A.  Running all Juarez.  Giving the orders.  And he became a

25   rank.  And he started taking control of Juarez streets.
```

David A. Perez, RMR, RPR

DIRECT - DANIEL REYES

1    Q.   Okay.   What was his rank.   Do you remember?

2    A.   A sergeant.

3    Q.   Anyone else you recognize?

4    A.   Aldia from Segundo Barrio.

5    Q.   Can you point to him?

6    A.   Yeah.   Sorry.

7    Q.   All right.   So he's next to Rafa?

8    A.   Yes, sir.

9    Q.   You didn't do a very good job, the arrow --

10   A.   The arrow doesn't want to pop up.

11   Q.   How do you know him?

12   A.   Well, we grew up together, since kids.   He's from Fifth

13   Street here in the downtown, Segundo.

14   Q.   Who became a BA member first, you or him?

15   A.   Him.   He was actually in the '94 Christening of me too.

16   Q.   He was what?

17   A.   He was there in the 1994 at the same tank where I joined.

18   He was already a member.

19   Q.   Okay.   Anyone else?

20   A.   Vela.   I know, but not -- I didn't associate with him.   But

21   I know him.

22   Q.   Which one is this?   The one next?

23   A.   Yes.

24   Q.   So the three top guys starting with Rafa, Aldia.   And --

25   how did you pronounce that other name?

DIRECT - DANIEL PEREZ

1    A.  Vela.

2    Q.  Vela.  Okay.  So you know those three?

3    A.  Yes, sir.

4    Q.  Anyone else?

5    A.  Triste here on the bottom.  He's from Juarez.

6    Q.  How do you know him?

7    A.  Um, I knew him in passings.  And then I saw him the last

8    time I went to prison in the federal system.

9    Q.  Where?

10   A.  Beaumont.  He was going to Reno, Oklahoma.

11   Q.  Okay.

12   A.  But from the streets, the same as with Freddie, we would

13   see each other.  I live right next to the border.  And we would

14   pass the drugs there, smuggle the illegal aliens.  So we knew

15   each other in that life.

16            MR. COOLEY:  Your Honor, at this time --

17   Q.  Anyone else that's -- that really sticks out in your mind?

18   A.  I know Harley from Socorro.  But I really didn't associate

19   with him as well.  This one on the bottom right-hand.  I'm

20   touching it.

21   Q.  Yeah, I see it.  When did you first meet him?

22   A.  Just in passings through jail.  Hey, what's up bro?  But,

23   you know, they introduce him as a brother.

24   Q.  Okay.

25            MR. COOLEY:  One second, Your Honor.  At this time,

1    we're done with this.  But we can make a record of this.

2            THE COURT:  You want to capture it?

3            MR. COOLEY:  Yes, Your Honor.

4            THE COURT:  Give us just a second then.

5            MR. COOLEY:  I guess 6SS-1.  At this time I would like

6    to publish 15A -- is 15A --

7            THE COURT:  Okay.  Hold on.  He's not -- until he

8    tells you.  If you move it, we lose it.

9            MR. COOLEY:  Okay.

10           THE COURT:  All right.  Whenever you're ready.

11           MR. COOLEY:  We would like to publish 15A.  I believe

12   that's in evidence.

13           THE COURT:  All right.  Let me check.  I do not show

14   15A.  That's the sacred rules.  We might have it somewhere

15   else.  But it is the rules.  We will go ahead and publish it.

16   Q.  (By Mr. Cooley)  Do you see the screen?

17   A.  Yes, sir.

18   Q.  It's Government's Exhibit 15A.  Do you recognize that?

19   A.  Yes, sir.

20   Q.  What is that?

21   A.  It's part of our first rules that we get read when we get

22   inducted, introduced into Barrio Azteca.  But you can only see

23   them once you're an actual member, after the Christening,

24   they'll give you the rules.

25   Q.  Um --

David A. Perez, RMR, RPR

1    A.  Well, right through the Christening, that's what they're

2    reading to you.  But later on, they'll hand them to you so you

3    can read them for a little while and memorize them.  You'll

4    never get the paper again.

5    Q.  Now, there's been a couple versions.  Is that right?

6    A.  Yes, sir.

7    Q.  Can you go to the last page, the very end?  There're 29

8    rules there.  Is that right?

9    A.  Yes, sir.

10   Q.  The first one you saw, how many rules did it have?

11   A.  It was about 37 -- 36, 37 rules.  That they actually

12   explained to me right there.

13   Q.  And then you're supposed to memorize them and not keep a

14   copy.  Is that right?

15   A.  Exactly.

16   Q.  What are some of the rules?  We talked about one of the

17   rules, right, about BA over family?

18   A.  Yes, sir.

19   Q.  What other sacred rules, whether it's on here or what you

20   remember from the first one you saw --

21          THE COURT REPORTER:  I'm sorry.  Can you repeat the

22   question?

23          MR. COOLEY:  I'm sorry.

24   Q.  (By Mr. Cooley)  Whether it's on this list or what you saw

25   when you first memorized the rules, what are some of the rules

```
 1    that stick out in your mind?
 2    A.  Well, one of the basic most important ones that I remember
 3    was one of the ones that I remember was you were not to ever
 4    speak to the media, give testimony against another brother, you
 5    know, respect to the end Barrio Azteca.  You could not put
 6    yourself on a gang member's wife.  I'm talking in regards if he
 7    goes to jail, you can't go over there and try to be with her
 8    or -- violate your brother's respect.
 9            Um, you die for your brothers.  You live for your
10    brothers.  You carry out any mission that is put before you, no
11    questions asked.
12    Q.  Chain of command?
13    A.  Chain of command.  Excuse me, could you -- what do you mean
14    by that?
15    Q.  Chain of command.
16    A.  Yes, chain of command.
17    Q.  Now, you mentioned if you talked to the Man or testify
18    against a brother, what happens as a result of that?
19    A.  Some rules are labeled major rules.  And some rules, if you
20    break them, you get a chance to probably getting a stabbing, a
21    beating or a job to do.  But where it says major, you're
22    automatically exed out and executed as soon as possible.
23    Q.  What does that mean, executed?
24    A.  They kill you.
25    Q.  So if you're testifying against another BA, what do you
```

1    expect would happen to that BA member if they have a chance?

2    A.  He's going to die.

3            MR. COOLEY:  Bring up 13E.  I believe that's in

4    evidence, Your Honor.

5            THE COURT:  That's correct.

6            MR. COOLEY:  Can we publish 13E?

7            THE COURT:  You may.

8            MR. COOLEY:  Starting with the top, if you could

9    scroll down, Jeff, a little bit.

10   Q.  (By Mr. Cooley)  You've seen this before.  Is that right?

11   A.  Yes, sir.

12   Q.  In preparation of your testimony you were shown this?

13   A.  Yes, sir.

14   Q.  Now, you mentioned, um, one of your brothers was an

15   ex-member.  Is that correct?

16   A.  Yes, sir.

17   Q.  Which one was that?

18   A.  Um, Jesus Reyes, the younger one.  He became an ex -- Jesus

19   Pedro Reyes and Jesus Reyes were both ex members.  But Jesus

20   Pedro Reyes was made an ex-member first.

21   Q.  Do you see your brother on that list?

22   A.  Yes, sir.  Do I touch the screen?

23   Q.  Yes.  Let's do this.  Do a circle so you don't strike it

24   out.

25           MR. COOLEY:  I would like to capture that if we can.

David A. Perez, RMR, RPR

DIRECT - DANIEL MENDEZ

1    That's Government's Exhibit 13E-1.

2    Q.  That's your brother?

3    A.  Yes, sir.

4    Q.  And on this list, what's the information that has -- that's

5    on that list?  It has his name.  What else does it have?

6    A.  It has his nickname, it has the city he's from.  Um, where

7    the decision came from to give him -- to make him an ex-member,

8    and the reason.

9    Q.  Okay.  So when -- how do you know when the decision was

10   made?

11   A.  Because it says Boot '08.  They made him an ex-member in

12   Juarez, um, 2008 for treason.

13   Q.  For treason?

14   A.  Yes.

15   Q.  What does that mean?  For treason.

16   A.  Means that you betrayed the Barrio Azteca.

17   Q.  How do you betray them?

18   A.  You don't do a job asked of you.  Or you go to the law, go

19   to -- to -- to -- if you're in an institution, don't carry out

20   a job.  But it has to do with betraying the rules and then your

21   brothers.

22   Q.  Let's bring up --

23            THE COURT:  Not yet.

24            MR. COOLEY:  I'm sorry.

25            THE COURT:  Now.

David A. Perez, RMR, RPR

```
 1              MR. COOLEY:  15B.  I believe that's in evidence, Your
 2    Honor.
 3    Q.  (By Mr. Cooley)  Do you see that picture in front of you?
 4    A.  Yes, sir.
 5    Q.  Who is that individual?
 6    A.  Carlos Pereya, Shotgun.
 7    Q.  Shotgun?
 8    A.  Yes, sir.
 9    Q.  Now he's what?
10    A.  Captain.  Capo.
11    Q.  Is he currently a capo?
12    A.  From my knowledge, yes, sir.
13    Q.  Up to the day you came in to talk to the FBI --
14    A.  Yes.
15    Q.  -- in February of this year, as far as you know from
16    talking to the BA members, was he a capo?
17    A.  Yes, sir.
18    Q.  Did you have a conversation with him and anyone else about
19    your suspicions that your brother was on the ex list?
20    A.  Yes, sir.
21    Q.  When did that take place and where?
22    A.  In -- I was doing time in Pollock, Louisiana.
23    Q.  Who were you with?
24    A.  With -- with Shotgun and with Renteria.
25    Q.  And what did you bring up?
```

1   A.  Well, I called home and they told me that my brother had

2   been beaten severely at the Annex.  My first action was to ask

3   them what had happened.  I asked Shotgun and I asked my -- I

4   asked Renteria.  They gave me no answers.

5   Q.  Um, did you believe what they were telling you?

6   A.  No, sir.

7   Q.  You believe that they actually had him on the ex list?

8   A.  A captain's --

9              MR. FOSTER:  Objection, calling for speculation.

10             MR. COOLEY:  It comes to his state of mind.

11             MR. FOSTER:  It's not state of mind.  He's asking what

12  he believes.

13             MR. COOLEY:  What he believes.  His state of mind.

14             THE COURT:  Could the attorneys approach a second?

15             (Bench conference.  Out of hearing of jury.)

16             THE COURT:  I don't have problems with what he

17  believes.  My question is what relevance does it matter?

18             MR. COOLEY:  Because if he believes his brother was on

19  the ex list, he believed that he was a marked man, too.  As a

20  result, he was taking certain precautions through the prison

21  system.

22             THE COURT:  How is that not admissible, state of mind?

23             MR. FOSTER:  What he's trying to get to is he believes

24  my client put the man on the ex list.  That's the impression

25  he's leaving with the jury.  That's a problem when he has no

 1   knowledge of how his brother got on the list.
 2         THE COURT:  I think you can cross-examine him.  But I
 3   don't think that challenges the fact it's admissible.  I'll
 4   overrule the objection.
 5         (Back in open court.)
 6         THE COURT:  I'll overrule the objection.
 7   Q.  (By Mr. Cooley)  So you didn't believe them when they said
 8   he's not on the ex list?
 9   A.  I didn't, sir.
10   Q.  You didn't what?
11   A.  I didn't believe what they were answering me.  That's a
12   captain and that's a right-hand man.  How are you not going to
13   know what's happening in your --
14   Q.  So as a result of that, um -- well, number one, if -- if
15   your brother was put on the list to be killed, who would have
16   the authority to do that?
17   A.  A capo.
18   Q.  Shotgun?
19   A.  Shotgun.
20   Q.  In your mind it was Shotgun that would have put that order
21   out?
22   A.  Yes.  Only two people.  Shotgun and Tablas in Juarez.
23   Q.  Okay.  You brought up Tablas.
24         MR. COOLEY:  Um, I don't believe that has been
25   admitted yet, Your Honor.  It's Government's Exhibit 15J.

David A. Perez, RMR, RPR

```
 1              THE COURT:  If we can bring it up for the witness only
 2   so he can see it.  All right.
 3   Q.  (By Mr. Cooley)  Do you recognize that individual?
 4   A.  Yes, sir.
 5   Q.  Who is that?
 6   A.  That's Eddie Ravelo.  Tablas.
 7   Q.  When's the first time you met Tablas?
 8   A.  In passings back in the '80s.
 9   Q.  Where?
10   A.  In my neighborhood.
11   Q.  In El Paso?
12   A.  In El Paso, Texas.
13   Q.  And what was his -- was he a BA at that time?
14   A.  Back then he just moved a lot of drugs.
15   Q.  Okay.  And how many times do you think you've seen him --
16              MR. COOLEY:  At this point, Your Honor, we offer into
17   evidence Government's Exhibit 15J.
18              THE COURT:  Any objection?
19              MR. FOSTER:  No objection.
20              MR. COOLEY:  We ask that it be published.
21              THE COURT:  It may be published.
22   Q.  (By Mr. Cooley)  So you mentioned, um, that the two people
23   that came to mind would have been Tablas and Shotgun --
24   A.  Yes, sir.
25   Q.  -- who would have put a hit on your brother?
```

```
1    A.  Yes, sir.
2    Q.  And you said a capo could only do that.
3    A.  The word would have come from Shotgun to Tablas.
4    Q.  So at that time Tablas wasn't a capo?
5    A.  No, sir.
6    Q.  Who was a Capo?
7    A.  Shotgun.
8    Q.  Who was the other capo in Juarez?
9    A.  The only other capo -- there wasn't a capo in Juarez.  It
10   was Chicho in El Paso.
11   Q.  He was in El Paso?
12   A.  Yes, sir.
13   Q.  And we already -- we've already seen Chicho's photo.
14   A.  Yes, sir.
15   Q.  So at this point Tablas was not a capo?
16   A.  No, he was a lieutenant.
17   Q.  He would have put a word out about your brother to Shotgun?
18   A.  And then gotten approved and --
19   Q.  All right.  How does that happen?  He's in Juarez, Shotgun
20   is in Pollock.  How does he communicate?
21   A.  Letters, um, through family members and any -- any -- by
22   any means.  Like I say, a visit, a message, like a letter.
23   Q.  Then how does Shotgun communicate with --
24   A.  Messages through the phones system.  A message dropped off
25   for the family member, another associate.  Sometimes even an
```

1    attorney.

2    Q.  One thing we didn't touch on, we talked about your

3    relocation and your concern about your safety and your family's

4    safety.  Is that right?

5    A.  Yes, sir.

6    Q.  Up to now, the FBI has provided you some funds to relocate.

7    Is that right?

8    A.  Yes, sir.

9    Q.  Approximately, how much?

10   A.  7- to $8,000, sir.

11   Q.  You're hopeful that they may provide some additional

12   funding for you to get yourself started.  Is that right?

13   A.  Yes, sir.

14   Q.  Up until you came in to cooperate with the FBI, how were

15   you making money?  How were you living?  How were you supplying

16   or -- supporting your family?

17   A.  I was just depending on my tattooing -- on my tattooing and

18   friends and family that I have that would help me out.  But,

19   basically, my tattooing.

20   Q.  Okay.  And you also were involved in drug trafficking in

21   the past, were you not?

22   A.  Yes, sir.

23   Q.  In fact, one other thing we also need to talk about is that

24   you, um, were heavily addicted to --

25   A.  Heroin, sir.

```
 1   Q.  -- heroin.  For how long?
 2   A.  Practically, most of my life.  Ever since 11, 12 years old
 3   up to about a year and a half ago -- year ago.
 4   Q.  Since you're 11 years old?
 5   A.  Yes, sir.
 6   Q.  In addition to heroin -- you stopped using heroin.  Is that
 7   right?
 8   A.  Yes, sir.
 9   Q.  What other drugs have you used?
10   A.  Oh, back in the '80s when I was growing up, acid,
11   marijuana, you know, all kind of pills, Rohypnols, some -- once
12   or twice a little bit of Angel Dust.
13   Q.  Okay.  What about marijuana?
14   A.  Yes, marijuana.
15   Q.  Let's talk a little bit about your criminal history.  When
16   we started, we said that you -- basically, up until your last
17   incarceration when you were released, um -- basically in
18   November of 2011.
19   A.  Yes, sir.
20   Q.  You were in jail for, approximately, 18 years with the
21   exception of 24 months?
22   A.  Yes, sir.
23   Q.  So this would start as a juvenile.  Is that right?
24   A.  Yes, sir.
25   Q.  Um, and then in, um, 1990 you were arrested for controlled
```

1    substance, heroin and cocaine.  Is that right?

2    A.  Yes, sir.

3    Q.  And you were released, um -- then you were arrested for

4    burglary in '91.  Is that right?

5    A.  Yes, sir.

6    Q.  So you were on the street for about three years?

7    A.  Yes, sir.

8    Q.  And that's '94 you had probation revoked.  Is that right?

9    A.  Yes, sir.

10   Q.  Didn't get out of jail until, basically, March of 2000?

11   A.  Yes, sir.

12   Q.  Then you were on the street for a grand total of five

13   months?

14   A.  Yes, sir.

15   Q.  Where you were revoked on parole again, then released in

16   October of 2002.

17   A.  Yes, sir.

18   Q.  Then you were on the street for total about another five

19   months.  And, um, you were arrested for drugs and assault.  And

20   you were released in, um, March of 2006.  So another,

21   basically, three-year stint.

22   A.  Yes, sir.

23   Q.  That was in the state?

24   A.  State of Texas.

25   Q.  Okay.  Now, when you -- during your prison terms, you said

1    you became a BA member in '94?

2    A.  Yes, sir.

3    Q.  That's when you were serving time in Middleton, Robinson

4    and Wynne.

5    A.  Yes, sir.

6    Q.  What facility were you when you were made a BA member?

7    A.  Right here in the downtown County Jail in El Paso, Texas

8    before going to prison, before we caught the chain to prison.

9    Q.  Was there a ceremony?

10   A.  Yes, sir.

11   Q.  Explain that.

12   A.  Well, like I say, there was a captain and about two

13   lieutenants and some sergeants in that same tank and about 30

14   more members.  We were about 32 members at that time in that

15   part of the jail they had us housed in.  And, um, they read me

16   my rules.  And I had already -- those three years that you

17   mentioned that I was outside, I was doing work since '86.  So

18   it wasn't hard.  The doors were already open.  And, well, yeah,

19   we had drugs in there and everything.  We had a party.  And

20   everybody got ready to go to prison and pick up somemore time

21   because we were at war at that time over there with Syndicate.

22   So everybody knew what they were going to.

23   Q.  So that's when you became a full-fledged BA member as

24   opposed to an associate?

25   A.  Yes, sir.

```
1    Q.  All right.  So let's talk about this five months when you
2    were on the street from, basically, March of 2006 to August of
3    2006.  About five months you get out of jail, get out of the
4    state system, right?
5    A.  Yes, sir.
6    Q.  You hit the streets and you're a full-fledged BA member?
7    A.  Yes, sir.
8    Q.  You had a rank.  Is that right?
9    A.  Yes, sir.
10   Q.  What was your rank?
11   A.  I was a sergeant.
12   Q.  Now, when did you first make sergeant?
13   A.  Back in '95.
14   Q.  Okay.
15   A.  '94, '95 when I went to Middleton, I got demoted because of
16   politics with the captains.  Then I got upgraded again,
17   demoted.  It's been part of the 18-year process.
18   Q.  All right.  So you first were promoted to sergeant.  Did
19   you reach a higher rank?
20   A.  I got to be a lieutenant.
21   Q.  For how long were you a lieutenant?
22   A.  That was a short period of time because I wouldn't -- about
23   a year.
24   Q.  When you hit the streets, you were demoted to sergeant?
25   A.  Yes.
```

```
1    Q.  Why did they demote you from lieutenant to sergeant?
2    A.  Because I'm really not -- I don't go with the flow.  I
3    object and speak my mind if I don't think something doesn't
4    make sense to me.  And sometimes the capos, the rules say one
5    thing, but you're going to do what they say or -- you're gonna
6    shine their shoes or you're not gonna do nothing.  So --
7    Q.  So the rules say something but sometimes the rules don't
8    apply to the capos.  Is that what you're saying?
9    A.  Yes, sir.
10   Q.  And you would question that.  And for that reason they
11   demoted you from lieutenant to sergeant?
12   A.  To sergeant.
13   Q.  So you hit the streets in El Paso for this five months.
14   And this is in March of 2006, you're a sergeant.  Where do you
15   go?
16   A.  I went straight to Chicho.
17   Q.  David Meraz?
18   A.  Yes, sir.
19   Q.  You go to Chicho.  And what's his rank at the time?
20   A.  He's a captain.
21   Q.  What happens when you go to Chicho?
22   A.  He demotes me again.
23   Q.  To what?
24   A.  To a soldier.
25   Q.  He demotes you?
```

DIRECT - DANIEL MENDEZ

1    A.  Yes, sir.

2    Q.  Okay.  Um, that's -- this was your padrino?

3    A.  Yes, I wouldn't shine his shoes.

4    Q.  We didn't get to that, though, because your first padrino

5    was Grande, right?

6    A.  Yes, sir.

7    Q.  And what happened to Grande?

8    A.  He became an ex-member, I believe, in the first RICO.  He

9    became an ex-member.  And that's when Chicho offered to be my

10   new padrino since he was a captain and a sponsor when I got my

11   rules.

12   Q.  The first RICO.  You're saying the first BA RICO

13   prosecution?

14   A.  Yes, sir.

15   Q.  Approximately, 2001?

16   A.  About.  Yes.

17   Q.  So why did they demote Grande because of the RICO

18   prosecution?

19   A.  Um, a little bit before that him and Chicho were having the

20   politics.  And Chicho ended up taking his captains -- Grande's

21   captains away and left him a lieutenant.  Then, when the RICO

22   came around, he just threw in the towel and stepped back.  He

23   didn't want to participate anymore or nothing.

24   Q.  Okay.  So you hit the streets, you report to Chicho, you

25   wouldn't shine his shoes.  And, as a result, he demotes you

```
1   from sergeant to soldier?
2   A.  That's why my lieutenant's bars got taken away because of
3   Grande and the politics.  And since he became an ex-member,
4   they were no good no more.  So I stayed a sergeant.  I come
5   home.  But Chicho wants me to do what he wants.  And he's doing
6   bad in the streets.  And he's on drugs.  And I, actually, was
7   trying to straighten myself.  My mother had just passed away
8   two months before I got released.  And he started giving me all
9   his ideas and his rules and this and that.  And I just put up a
10  fight.  And he took off my sergeant's stripes.
11  Q.  What was -- um, when you say shine shoes, what are you
12  talking about?  You're not talking about physically shining
13  shoes, are you?
14  A.  Well, no, no, no.  Just that you do their little favors and
15  whatever they say without asking a question.  I mean, I'm a
16  rank.  I got to ask questions.  Other than that, you know,
17  common sense, you know.  But some people do just what they say.
18  And that's the way they get the ranks.
19  Q.  And you mentioned you reported to Chicho.  Why do you have
20  to report to somebody when you get out of jail?
21  A.  First of all, I'm a rank.  So I got to come and report my
22  status so they can approve it before they give me any part of
23  El Paso, any collection or anything that's supposed to be my
24  job.  So, basically, the first months, you're gonna be on --
25  enjoying time with your family.  That's all you get.  But once
```

DIRECT - DANIEL MEEKS

1  the word comes back that your rank is good or he took your rank
2  or whatever, then you get your station and attend the meetings.
3  Q.  How did the word come back?
4  A.  Through mail.
5  Q.  Where?
6  A.  From the prison, from Texas.
7  Q.  Which prison?
8  A.  Basically, Coffield.
9  Q.  Why basically Coffield?
10 A.  We have another captain there that's in charge of the
11 decisions for the prison system.
12 Q.  Who was that?
13 A.  At that time it was Cardoza.  Tolon.  50.
14 Q.  So, basically, that's where records are kept for people for
15 their status.  Is that right?
16 A.  Yes, sir.  Just to verify how they left the state.  If they
17 left in good standing, or an ex-member or his rank is what it
18 is that he's claiming.  Your standing -- if you owed money or
19 whatever before you left, any promises or jobs that were
20 ordered that you got to do outside.  But, basically, all that
21 has to be questioned.  Because the leader in the streets might
22 question orders that are sent from prison because those are his
23 streets and the orders are going to be done through his will.
24 Q.  25B in evidence, Your Honor?  I believe it is.
25         MR. COOLEY:  I do not show it as admitted.  Can I

```
 1    publish it to this witness only?
 2              THE COURT:  You may.
 3    Q.  (By Mr. Cooley)  Do you see 25B in front of you?
 4    A.  Yes, sir.
 5    Q.  Um, can you scroll down?  You were shown this the other day
 6    in preparation for your testimony.  Is that correct?
 7    A.  Yes, sir.
 8    Q.  Do you recognize what this is?
 9    A.  Yes.  It's, basically, a list.  And a list with the units
10    that, basically, a rank or captain is there and money will be
11    sent there.
12    Q.  Okay.  There's numbers next -- each one of those lines
13    contain a location.  Is that right?
14    A.  Yes, a unit, a specific penitentiary and the number of
15    Aztecas that are in that particular penitentiary.
16    Q.  And these penitentiaries are located, generally, where?
17    A.  All over Texas.  That's a list of all the prisons in Texas
18    that we have.  But the ones that have a line by it or a number
19    by it means the number of the facility where there's Aztecas
20    and needs to be paid attention to.
21    Q.  Okay.  And with these facilities -- you've been to many of
22    those, haven't you?
23    A.  Yes, sir.
24    Q.  Give us a few examples.  Which ones?
25    A.  I've been to Middleton, Robertson, um, Connolly, Eastham.
```

1    Darrington.  And passed through McConnell and Telford.

2    Q.  This is, basically, a BA document.  Is that right?

3    A.  Yes, sir.

4    Q.  No doubt in your mind?

5    A.  No doubt.

6            MR. COOLEY:  At this time we offer into evidence

7    Government's Exhibit 25B, Your Honor.

8            THE COURT:  Any objection?

9            MR. FOSTER:  It has not offered the predicate under a

10   business records affidavit or any type of business records.  We

11   don't know whether it's kept for truth of the matter asserted.

12           Secondly, it has to do with the state prison system.

13   My client was incarcerated in a federal prison system.  And I

14   would question relevance and materiality.

15           MR. COOLEY:  I would be happy to respond, Your Honor,

16   if you want me to.

17           THE COURT:  Yes, please.

18           MR. COOLEY:  Number one, this is a co-conspirator

19   statement.  This is contained by the BAs for the purposes of

20   furthering their conspiracy.  There's been testimony already

21   that the BAs exist in the federal and the state system.

22   Whether or not this defendant was in the state system is of no

23   bearing.  The evidence has been that he's a capo in charge of

24   whether -- in charge of BA.  And so for that reason it is

25   relevant.

```
 1              THE COURT:  All right.  I'll overrule the objection.
 2    It will be admitted.
 3              MR. COOLEY:  Can we publish it, Your Honor?
 4              THE COURT:  You may.
 5    Q.  (By Mr. Cooley)  So there's a number that represents how
 6    many brothers, BA members, are in a particular facility when
 7    this document was created?
 8    A.  Yes, sir.
 9              MR. COOLEY:  At this time I would like to bring up
10    Government's Exhibit 13G, which I believe has been admitted
11    into evidence.
12              THE COURT:  It has.
13              MR. COOLEY:  I would ask that be published, Your
14    Honor.
15              THE COURT:  It may.
16    Q.  (By Mr. Cooley)  13G, you see that?
17    A.  Yes, sir.
18    Q.  Now, this is a document you've seen in preparation of your
19    testimony.  Is that right?
20    A.  Yes, sir.
21    Q.  Um, what does this document -- what is this document?
22    A.  It's a list pertaining to the -- to the westside of El
23    Paso, Texas.
24    Q.  How do you know it's westside of El Paso, Texas?
25    A.  The code.  The codes we use and the way it's spelled in the
```

```
 1   bottom.  And, plus, the people I know.  And, basically, people
 2   that were out and they're from the westside.
 3   Q.  So this is the westside region of El Paso.  Is that right?
 4   A.  Basically -- not necessarily, but most of them is the
 5   westside.
 6   Q.  These are BA members.  Is that right?
 7   A.  Yes, sir.
 8   Q.  Okay.  What's the code you're talking about?  Could you use
 9   the arrow and point on the screen?  Okay.  Now -- so look at
10   Jose, the very first name.  Jesus Espino.
11   A.  Yes, sir.
12   Q.  That's a BA member.  You know of him?
13   A.  Yes, sir.
14   Q.  What's the next line?  Right below that.
15   A.  Aldo Lopez.
16   Q.  Not the -- the next -- right below Espino.
17   A.  That's just the name of a unit.
18   Q.  And the year?
19   A.  Yes.  1990.
20   Q.  So that would represent what?
21   A.  Basically, probably, where he got picked up or made him a
22   brother.
23   Q.  So when he first becomes a BA, that's --
24   A.  Or -- either that.  Or the unit that he was and got
25   released from there.  But it's a 1990 date.  So it's probably
```

David A. Perez, RMR, RPR

```
 1    when he barely joined.
 2    Q.  So he actually is a BA member before you?
 3    A.  Yes.  This is a little bit older than me.
 4    Q.  What's the next line?
 5    A.  Aldo Lopez.  Carlos Pereya.  Shotgun.  Basically, that's
 6    his padrino.  But the captain was Carlos Pereya.  So the
 7    captain gave Aldo Lopez, which was another rank, from that
 8    captain permission to pick up Jesus Espino at that unit at that
 9    particular time.
10    Q.  Okay.  Then there's the next line?
11    A.  Canuto.  That's where the person being sponsored is from.
12    And that's some kind of numbering or a phone number or some --
13    some of our codes.  TDC number.  But it looks like a phone to
14    the free world where you can reach them.
15    Q.  So it's a contact number?
16    A.  Yes, sir.
17    Q.  Can you see, um, underneath the word Carlos Perez and in
18    parenthesis Bandit?  You see that?
19    A.  Oh, yes, sir.
20    Q.  It's over the next -- on the side, next column, um --
21    A.  Yes, on the side.
22    Q.  What's right below that?
23    A.  My name, sir.
24    Q.  Duke Reyes?
25    A.  My name and my captain's name.
```

1  Q.  Okay.  And what does it say below that?

2  A.  Grande.

3  Q.  What's that?

4  A.  Grande.

5  Q.  Who's Grande?

6  A.  Manuel Fernandez, my captain at the time when I -- well,

7  okay.

8  Q.  What's right below that?

9  A.  Um, Middleton Unit.

10  Q.  What year?

11  A.  1995.

12  Q.  Then right below that there's a location.  And it says no

13  phone.

14  A.  Sunland, New Mexico.  No phone.

15  Q.  Okay.  So this indicates what as it relates to Bandit and

16  you?

17  A.  This indicates that Grande, since I was a sergeant, I

18  couldn't pick him up just like that.  So I had to get the

19  blessing from my captain.  And I picked up this person at that

20  unit.  I made him a Barrio Azteca gang member when we were at

21  war with the other gangs.  But that's the -- an example of how

22  I explain his -- his introduction into Barrio Azteca.  And

23  every time he goes to a prison or unit, he has to give that

24  information so they check it in Coffield and know he's a member

25  and who he was approved by and what ranks and what

1    authorization and the year.

2    Q.  Okay.  Um -- um, look at Arturo Lorenzo, Drowsy.

3    A.  Yes, sir.

4    Q.  Do you see that?

5    A.  Yes, sir.

6    Q.  All right.  There's an Annex 2000.

7    A.  Yes, sir.

8    Q.  And then right below that, whose name is that?

9    A.  My name again, sir.  And Sleepy Armendariz.

10   Q.  Who's Sleepy?

11   A.  He was a known lieutenant.

12   Q.  So, according to this, Sleepy gave authority for Drowsy?

13   A.  Uh-huh.

14   Q.  Is that right?

15   A.  Supposedly him and me.  But, basically, the name that's

16   here -- my name means that I asked Sleepy for sponsorship to

17   help me bring this person in.  Because at the time this person

18   believed my sergeant's rank was still active.  But this was a

19   bogus -- bogus claim.  The kid thought he was Aztec and he

20   claimed I sponsored him and Sleepy.  But the process there, it

21   doesn't even make sense if you're a gang member and you know

22   how it's supposed to be done.

23   Q.  So there was a bogus claim?

24   A.  Yes, sir.

25   Q.  As a result -- you remember this in your mind?

David A. Perez, RMR, RPR

1   A.  Yes, sir.

2   Q.  What happened after this bogus claim?

3   A.  I got asked by Mr. Renteria if I had sponsored this person.

4   Like I said, everything goes to Coffield and to the prisons to

5   verify.  That's the whole reason of these lists and documents.

6   And the word got to me that why was I picking up people without

7   notifying.  Because I pick up somebody, my job is write it

8   down, send a message to Coffield and it gets on the list.  And

9   it would have been perfect.

10          But I never gave the go-ahead on him until I received

11  this.  And for him doing that, I was asked by Mr. Renteria if I

12  had sponsored him.  I told him he's a good kid, but I ain't

13  sponsored him.  So he got a beating and then made an Aztec and

14  given a job to do.

15  Q.  He got a beating?

16  A.  Yes.

17  Q.  He was given a job.  What kind of job?

18  A.  Um, he had to go stab somebody or pull some kind of job for

19  Barrio Azteca.  Since he's claiming it, he's supposed to show

20  it then.

21  Q.  So after he did the job he was brought in as a BA member.

22  A.  And then they actually put me down as his padrino.

23          MR. COOLEY:  Your Honor, at this time we bring up

24  Government's Exhibit 6GG.  I believe that's in evidence, Your

25  Honor.

DIRECT - DANIEL TIKPA

```
 1              THE COURT:  It is.
 2              MR. COOLEY:  Request that be published, Your Honor.
 3              THE COURT:  Yes.
 4    Q.  (By Mr. Cooley)  You were shown this document in
 5    preparation of your testimony.  Is that right?
 6    A.  Yes, sir.
 7    Q.  Government's Exhibit 3GG.  What is this document?
 8    A.  This is, basically, a list for the westside here in El
 9    Paso, Texas of all the active members or ^^participators which
10    would be like prospects participating in the -- in the Barrio
11    Azteca activities on the westside.
12    Q.  There's a date on this.  Is that right?
13    A.  Yes, sir.
14    Q.  What's that date?
15    A.  9-6-10.
16    Q.  And you're still a member at that time.  Is that right?
17    A.  Yes, sir.
18    Q.  You're in a jail at that time.  Is that right?
19    A.  Yes, sir.
20    Q.  So you're not reporting during this period of time.
21    A.  No, sir.
22    Q.  So it says Jose Espino, Espino, 121 percent?
23    A.  Yes, sir.
24    Q.  What does 121 percent mean?
25    A.  That means that he's all clear.  He's good.  He's
```

1    121 percent active in the BA.

2    Q.   Why not a hundred percent?

3    A.   No.  Because it's hundred percent BA.

4    Q.   Hundred percent BA.  What does 21 mean?

5    A.   BA.

6    Q.   Why does it -- why does that represent BA?

7    A.   When you go by the alphabet, it's just the codes that we

8    make up.  The second letter of the alphabet is B.  The first is

9    A.   So that's your 21 right there.

10   Q.   Now, there's the first three guys on here are 121 percent.

11   A.   Yes, sir.

12   Q.   What's the -- Victor.  What's his status?

13   A.   Victor, Cachitas, is -- he just punched in.  There is no

14   verification on him yet.  So he's, basically, on ice while the

15   Coffield says if he's a brother, if he's claiming to be a

16   brother.  But if he's on the list, it means that he reported.

17   Q.   So --

18   A.   That's what "ponchar tarjeta" means.

19   Q.   So he's on ice to check with Coffield and find out his

20   status?

21   A.   Yes, sir.

22   Q.   Meaning whether he is a BA member, not a BA member or an ex

23   member?

24   A.   Exactly.

25   Q.   That's important as well?

1    A.  Verification.

2    Q.  So, what you are talking about when you got out -- in

3    jail -- for that five-month period, you had to report, there

4    would have been a list, something like this, generated.  Is

5    that right?

6    A.  Yes, sir.  Unless I come from the state or feds with a

7    letter of my own from a captain saying that everything's clear.

8    Q.  A letter of recommendation?

9    A.  Yes.  Then paperwork is avoided by that.

10   Q.  So you're not put on ice.  You're, like, automatic?

11   A.  Straight in.

12   Q.  Now, when you're talking about one of these letters, does

13   it say, To whom it may concern, Daniel Reyes is a upstanding BA

14   member.  Is that how it reads?

15   A.  Basically.  But in our codes, you know.  That he's good.

16   Or, if you don't even know what you're taking, it might say

17   he's bad and take care of him.  And you don't know what you're

18   turning in.  But, basically, that's what it is.

19   Q.  So what you're saying is you could bring that letter.  And

20   if there's a certain code you're not familiar with, you're

21   handing over your death warrant?

22   A.  Yes, if you're not a member who's been doing homework and

23   knows codes, you might be giving them your own execution.

24   Q.  We'll just touch on one more.  Ricky M.  You see that?

25   A.  Yes, sir.

1    Q.  At the end, what does it say about his status?

2    A.  Um, Ricky Gonzalez?

3    Q.  It just says Ricky M.

4    A.  Oh, okay.  Ricky M.  He ain't reported.  They're bringing

5    a -- they probably heard that he's around.  But -- and then

6    they know he's a brother.  But he ain't reporting.  So that's

7    the first warning.

8    Q.  Okay.

9    A.  It's -- okay.

10   Q.  You said non-reporting is a first warning?

11   A.  Yes, sir.  But like I said, it's a westside list, so he's

12   been seen around the westside, probably, partying, doing drugs,

13   but not participating in the BA activities how he's supposed

14   to.  So it's -- for everybody who's at that meeting seeing that

15   list, whenever you see Ricky, tell him to report.  He don't

16   report by the next time, I will be sending somebody to go bring

17   you.  And, basically, get a beating the first time.

18   Q.  At some point, um, he may be put on that ex list that your

19   brother was on?

20   A.  Yes.

21   Q.  What is Angel Renteria, Primo.  What is that?

22   A.  Angel Renteria, Primo.  That's his name.  That's his

23   nickname.  And that's his status as a prospect.  Right here

24   where it's underlined, that's where you see he is a prospect.

25   It's a code word for -- it's half a word for prospect.  And

David A. Perez, RMR, RPR

 1   then 121 percent, he's doing real good.  So if he's a prospect

 2   and got that 121 percent, it means they're putting a stamp on

 3   him.  So he might get inducted pretty soon.

 4   Q.  So he's not a full-fledged member.  He's an associate?

 5   A.  Yes.

 6   Q.  Similar to the way you were when you were on the streets in

 7   El Paso in the late '80s and early '90s?

 8   A.  Yes, sir.

 9   Q.  A prospect.

10   A.  Yes, sir.

11   Q.  Now, there's a couple of other references here.  Um,

12   Morales, Gonzo, I believe it is.  You see that?  Two lines

13   down.  Bandit, which was somebody that you sponsored, right?

14   A.  Uh-huh.

15   Q.  And right below Bandit.

16   A.  Oh, Guillermo Morales, Gonzo.

17   Q.  Yeah, what's that reference?

18   A.  Just his name, nickname.  And that he's just reported.

19   Q.  He has reported?

20   A.  Yes.  Just punched in.  Ponchar tarjeta means that you just

21   go -- you know how when you go to work in the old school jobs

22   and punch in your card.  What ponchar tarjeta means he already

23   came and punched in his name, his information, so he can get

24   verified.

25   Q.  Why would he be 121 percent?

David A. Perez, RMR, RPR

A.  Because he's got good word probably from somebody.  But on
him it doesn't say 121 percent --
Q.  No, it doesn't.
A.  No.
Q.  So why wouldn't it say 121 percent --
A.  Because he's still --
          THE COURT REPORTER:  It wouldn't or would?
Q.  It doesn't say 121 percent.
A.  It doesn't.
Q.  It says something else.
A.  It just says that he punched in his card.  But, probably,
at that group that he went and approached on the westside,
nobody knows him there.  So they're not going to put --
nobody's going to put word -- when you put 121 it's because you
got people behind you saying, yeah, he's a good guy, he does
work, he's participating.

          This person probably got there and didn't know too
many people.  But he's putting in his part and coming forward
and offering himself to do jobs or whatever.  So they just put
him on the list that he's punched in.  They'll probably send
his information.  And the -- they will probably get word back
to put him as a prospect so at least he has a title.
Q.  Okay.  Um, let's get back to that five-month period again
where you are on the streets of El Paso.  Um, you were only on
the street in El Paso for five months because you caught

```
1    another case.
2    A.  Yes, sir.
3    Q.  And the other case had to do with the distribution of
4    marijuana.
5    A.  Yes, sir.
6    Q.  Approximately, how much marijuana were you caught with?
7    A.  I can't be exact.  Somewhere around 46 or 48 kilos.
8    Q.  Okay.  Was this a state case or federal?
9    A.  Federal case, sir.
10   Q.  Now -- so you're on the street in El Paso for five months.
11   And the first time you make -- move dope, that is marijuana,
12   you get caught, right?
13   A.  Yes, sir -- no, it's about the second -- second time.  I
14   worked for that people like two times.  The third time I got
15   caught.
16   Q.  Third time?
17   A.  Yes, sir.
18   Q.  So you got away with it two times and third time you got
19   caught?
20   A.  I got caught.
21   Q.  All right.  So who were you -- let's get back to before we
22   get into the drug trafficking.  You report to Chicho.  He takes
23   away your status.  Um, you're on ice for a while until they
24   confirm who you are, right?
25   A.  Uh-huh.  Yes.
```

1   Q.  What are you doing for money?  And what work are you doing
2   for BA during that five-month period?
3   A.  You know, not too many people agreed with Chicho.  So I
4   still got brothers that got drugs, that got to offer.  But I
5   wasn't really trying to, like I say.  So I went to the Linea
6   and started getting drugs from them.
7   Q.  Where were you in -- where did you report to?  What part of
8   El Paso?
9   A.  Me, um, to the south side, Segundo Barrio.  And, initially,
10  one of those times they sent me to the westside.  I was in
11  charge of the westside.
12  Q.  So they gave you -- in charge for a little while?
13  A.  Yes.  But at that time he took away my rank but tried to
14  play with my head that I was in charge of the Segundo Barrio.
15  And he put somebody else with me.  But, like I say, I just
16  threw my rank at him, kept my soldier.  And I just did what I
17  wanted to do.
18  Q.  So you went across to El Paso -- into Juarez.  Is that
19  right?
20  A.  Yes, sir.
21  Q.  And you worked out a deal with La Linea?
22  A.  Yes, sir.
23  Q.  Who is that?
24  A.  Another part of the Juarez cartel.  Like the soldiers for
25  them.

DIRECT - DANIEL REYES

```
 1   Q.  And what kind of deal did you work out with them?
 2   A.  Well, basically, they approached me, um -- and we had a
 3   talk.  And they offered me that any drugs, whether it's
 4   cocaine, heroin or marijuana that I was able to cross to this
 5   side, half automatically was mine and half for them.  I had to
 6   pay no money.
 7   Q.  So you smuggle -- when you got caught with this 47 kilos or
 8   so --
 9   A.  Yes, sir.
10   Q.  -- half of that was for --
11   A.  For me and half for them.
12   Q.  Basically, 25 or 20 so kilos would have been for you?
13   A.  Yes, sir.
14   Q.  And you could make money on it?
15   A.  Yes, sir.
16   Q.  And who were you distributing that marijuana to?
17   A.  To all the peddlers and people in the downtown area.
18   Anybody who smokes weed.
19   Q.  Including brothers?
20   A.  Yes.  Brothers, everybody.  To them, basically, I would
21   give it to them, you know, make their money.
22   Q.  Now, in addition to doing some drugs, were you, um,
23   collecting quota?
24   A.  In 2006, right at that time, no.  They tried to send me a
25   few times in 2006 whenever -- remember I told you I did three
```

David A. Perez, RMR, RPR

1    trips, on the third one I got caught, but in between times when

2    I would come from out of town or whatever, I would -- they

3    would send me to little bars on Alameda Street with somebody to

4    collect a quota.  But prior to that, I learned an experience

5    that the capos that steal all the money might put something on

6    you that that money gets lost.  So I wouldn't pick it up.  I

7    had somebody else pick it up.  But I would supervise.  I would

8    see it.

9    Q.  So you, personally, have gone into a store to collect

10   money?

11   A.  Yes, sir.

12   Q.  What are you talking about, a store, 7-Eleven?

13   A.  No.  Sometimes.  But stores, bars, drug houses.  Drug

14   houses, bars.  Any business where they're selling drugs and it

15   automatically falls into our little circle.

16   Q.  Okay.  So if you're going to a drug dealer, you ask them

17   for what?

18   A.  For, um -- well, you go to a drug dealer, you know, and --

19   well, everybody has their own different style.  Somebody will

20   just go straight up and beat them up and take their money.  And

21   give them a warning and next time you report.  And give us the

22   ten percent or whatever the cut is at that time.  Because, like

23   I say, it changes.  They change all the time.  But me,

24   personally, I would go and ask them, how much they're making a

25   week.  I mean, basically, the thing is to -- for them to work

1    with you, you know.  But I would ask them how much they're

2    making a week, how much I think is good for them to turn in

3    that week.

4              And that's what I go report to my rank.  He's not

5    going to ask me questions.  Or if I'm the rank, I'm just gonna

6    tell him, you know what, he's going to be giving you $30 a

7    week.  He's only selling $100 a week.  That other one is

8    selling $500 a week.  I want $250 out of that.

9    Q.  And if they refuse to pay, what happens?

10   A.  Well, I think --

11   Q.  Not what you think.

12   A.  People that don't know, you might get killed.  But it

13   starts with a beating, a warning, a beating.  And, ultimately,

14   death if you don't stop selling or you stop selling or pay your

15   cut.

16   Q.  Do you recall an incident where somebody was not paying and

17   they were killed as a result of it?

18   A.  Yes, sir.

19   Q.  Explain what happened on that occasion.

20   A.  Well, we had one of these capos that's doing too much drugs

21   and everybody's picking up the quotas from different drug

22   dealers and everything.  This particular kid put up a fight and

23   he didn't want to pay.  And the decision out of that capo

24   finally came out to go.

25   Q.  Which capo?

1   A.   Chicho Meraz.

2   Q.   So what happened?

3   A.   They ended up going down there to give him a little scare.

4   But, the orders were, that if he puts up a fight, you're not

5   going to take a gun to a place if you're not gonna use it.   So

6   he put up a fight and ended up getting killed.

7   Q.   Where did this happen?

8   A.   Over here on the Alameda side of town, by Alameda Street,

9   Frutas.   Central.   Segundo, Central.   It's --

10   Q.   This was, um, ordered by Chicho?

11   A.   Yes, sir.

12   Q.   So this is while Chicho was still a capo?

13   A.   Yes, he's a captain on the streets.   So it comes from him.

14           THE COURT:   Could the attorneys approach?

15           (Attorneys approach bench.   Off record discussion.)

16           THE COURT:   We are going to take a break.   Make sure

17   you are available at 10:45.   So it will be about 20, 25

18   minutes.   Remember, you remain under all the instructions the

19   Court has given you.   And see you in 25 minutes.

20           (Recess.)

21           (Jury leaves courtroom.)

22           THE COURT:   You may be seated.   Are we ready for the

23   jury?

24           MR. LEAL:   Mr. Cooley had to go to the restroom real

25   quick.

1          THE COURT:  As soon as he comes back we will start.

2          (Jury enters courtroom.)

3          THE COURT:  Be seated.  Whenever you're ready.

4   Q.  (By Mr. Cooley)  Mr. Reyes, when we broke, you were talking

5   about the, um, collection of a quota and that there was an

6   incident where a person they were collecting from was

7   ultimately killed.  Is that right?

8   A.  Yes, sir.

9   Q.  And you talked about the location where it occurred.  What

10  location was that?

11  A.  By Alameda Street, somewhere between Frutas Street, I

12  think.  Not the completely central.  Between Segundo Barrio,

13  it's still considered central area.

14  Q.  And you indicated you gave the impression that you knew the

15  victim.  Is that right?  The person that was killed.

16  A.  Well, um, he was a known kid from the streets that was

17  selling.

18  Q.  Did you actually know him?

19  A.  Not personally, no.

20  Q.  Okay.  Um, now during this period of time -- again, we're

21  talking about this five-month period or so when you're -- in

22  '06 when you were on the street, um, right before you got

23  locked up for the -- the marijuana shipment, you mentioned

24  about Chicho was in charge.  Who -- was there a lieutenant on

25  the street at that time?

DIRECT - DANIEL RIVAS

1    A.   To my recollection it was Tavo.

2    Q.   And what was Tavo's relationship with Chicho?

3    A.   Well, basically, um, that statement I used about -- he used

4    to shine his shoes.  For some reason it looked like he had him

5    under some kind of protection.  He would take care of him a

6    lot.  Gave him his rank.  He gave him his rank back.  And --

7    without consulting anybody else or nothing he just --

8    Q.   Now, was there some concern about Tavo and whether he was

9    cooperating with law enforcement?

10   A.   Yes, sir.  That was, basically, the main reason I

11   stopped -- I didn't put up a fight for my -- for my sergeant's

12   rank or nothing because he was participating in the meetings

13   and we all thought that he was an informant back then when he

14   got out of the feds.

15   Q.   Um, what led them to believe that in terms of his sentence?

16   A.   Actually, papers and word from other members in the federal

17   system.  But they weren't going to do nothing to him in the

18   federal system until he got out.  But Chicho started protecting

19   him.

20   Q.   And what was the word that came from the federal system?

21   A.   That he was -- he was informant.

22   Q.   How would they know that?

23   A.   On the paperwork.  Basically, the PSI, they don't let us

24   take them to the federal system with us.  But inside the

25   federal system, there's ways that we can get the files.

1    Q.  How?

2    A.  We pay the trustees, the SSIs that are allowed to -- they

3    have a minimum record.  And they are allowed to work in the

4    back offices.  We will pay them money and they will bring us

5    the information.

6    Q.  What's a PSI?

7    A.  Your -- basically, your whole rap sheet under that case

8    that you've been indicted on or doing time for.  And it will

9    state everything that you said against any person or what was

10   said against you.  And it's all evidence from a trial.

11   Q.  So it's important to know who's cooperating with law

12   enforcement, correct?

13   A.  That's basically why we try to get into those desks to find

14   out -- that's the only way you're going to get the PSI report.

15   Q.  But despite that fact, Chicho promoted him and was

16   protecting him?

17   A.  Yes, sir.  He was demoted all the way down.  And he was

18   made a lieutenant as soon as he came back out.

19   Q.  And that's one of the problems you had with Chicho?

20   A.  Yes, sir.

21   Q.  Now, you mentioned that you were -- um, we were talking

22   about collecting quota when we got into that murder.  Um, but

23   there was times when -- during this period of time, the five

24   months that you were collecting quota or having somebody

25   collect it, you'd gather it and then give it to Chicho.  Is

1   that who you give it to?

2   A.  Basically.

3           MR. COOLEY:  13J, please.  I believe this is in

4   evidence.  13J.  I would like to publish that.

5           THE COURT:  All right.

6   Q.  (By Mr. Cooley)  Now, 13J appears to be an envelope.  Is

7   that correct?

8   A.  Yes, sir.

9   Q.  And there's some, um, inscriptions on that envelope.  You

10  see that?

11  A.  Yes, sir.

12  Q.  From -- what's the dates that -- that appear to be on that?

13  A.  October 18, 24.

14  Q.  What are the notations that are right below that?  Do you

15  recognize those?

16  A.  Yes.  They're parts of El Paso or neighboring --

17  Q.  What's the first part?

18  A.  The Valley.

19  Q.  What's the one below that?

20  A.  Fabens.

21  Q.  What is it?

22  A.  Fabens.

23  Q.  What's the one below that?

24  A.  Socorro.

25  Q.  The one below that?

```
1    A.   Central.

2    Q.   And below that?

3    A.   West.

4    Q.   And below that?

5    A.   Eastside.

6    Q.   And there's figures next to that.  Is that right?

7    A.   Yes.

8    Q.   What do those figures represent?

9    A.   That's, basically, what that particular part of town is

10   turning in as far as quota collection depending on -- it's not

11   too specific whether it's on a weekly basis, bi-weekly.  But

12   that's what they're turning in to the bank to the capo.

13   Q.   To the bank.

14   A.   Yeah.

15   Q.   Depending on which time we're talking about, there were

16   different people that took charge of the bank.  Is that right?

17   A.   Yes.

18   Q.   And when people are taking charge of the bank, are they

19   supposed to keep records well -- as well?

20   A.   They're supposed to.

21   Q.   Why is that?

22   A.   Well, um, too many times the money gets lost or doesn't

23   reach the prisons that it's supposed to be reaching, whatever

24   that money's being collected for.  And to verify the ranks so

25   they won't lose their rank or get caught up in the middle for
```

1    other people stealing and they get the pain for it.  You get
2    your receipts and you make your notes -- these notations that
3    proves that I turned so much in -- and what happens after that,
4    that's you.
5    Q.  So you're covering yourself with that notation?
6    A.  Yes, sir.
7    Q.  Now, you mentioned the bank.  Are you talking about a
8    regular bank?  What are we talking about?
9    A.  No.  Whoever they got in charge of it.  Basically, back
10   then it was -- it was all going to Chicho.  But he would use
11   Tavo or somebody else to hold onto the money.
12   Q.  And that money is supposed to go where?
13   A.  To all the capos and the soldiers in prison and out here in
14   the streets.  But there's supposed to be notations.  But it's
15   mandatory to the prison system.
16   Q.  How does it get into the system?
17   A.  Money orders.  Basically, money orders.
18   Q.  Now, the state system has a different system as far as
19   money is concerned.  Do you know?  You've both -- you've both
20   been in the state and federal system, right?
21   A.  Yes.  Yes.
22   Q.  How does money get into the state system?
23   A.  Basically, um, you send a little ticket home.  You fill it
24   out.  Your family fills out the rest of it, puts the money
25   order with it, they send it to a separate P.O. box, not to

```
 1    where you're housed.  But the State of Texas has a separate
 2    place where you send the money orders.  And then you -- it
 3    automatically appears on your account.  But, it will usually go
 4    through a family member or a gang member, you know.  If I don't
 5    want to go put it directly under my name to you, you know, pass
 6    it on to somebody else or whoever, one of these prospects that
 7    has the little 121 percent, he's a prospect, use him go put the
 8    money.
 9    Q.  Let me ask you, in terms of, um -- was there a set amount
10    for a capo?  A capo would get a certain amount of money on a
11    weekly basis.  Do you know?
12    A.  Yeah, um, not specific, because depending on who's running
13    the streets and how much you're stealing from the banks and
14    whatever, they get sent so much.  But when it's in order and
15    everybody's doing what they're supposed to, basically 500, 600.
16    Q.  It all depends?
17    A.  Depends.
18    Q.  So let's say, use a term -- an amount like 200 going into a
19    commissary account.
20    A.  Yeah, basically, be like --
21    Q.  Now, inmates who's in -- in jail during a period of time,
22    um, how do they earn money legitimately?
23    A.  Well, if you're in the State of Texas, you are not going to
24    get nothing because all they give you is good time.  They don't
25    pay you.  The State of Texas doesn't pay you money for your
```

David A. Perez, RMR, RPR

1   work.  But in the federal system, they will start you off like

2   $30 every month for minor jobs, the yard, cleaning the -- the

3   day rooms or whatever.

4           As soon as you get your level and get a higher job or

5   better standing, a Grade 2, Grade 1, 3, 4 -- it's a system --

6   the money goes a little bit higher.  But it will never pass the

7   $100 mark.

8   Q.  So in the state system you can't earn money?

9   A.  No, sir.

10  Q.  You rely on people to put money in your commissary?

11  A.  Yes, sir.

12  Q.  So if you're getting $200 in your commissary in a month, is

13  that a lot of money?

14  A.  Yes, sir, for an inmate, yeah.

15  Q.  In the federal system you get $200.  That's still a lot of

16  money even though you're making money.  Is that correct?

17  A.  Well, yes.  It's still -- still a big amount because you're

18  not -- we're not making much money in the federal system

19  either.

20  Q.  Okay.  Um, now, you indicated you made three trips and a

21  third trip of smuggling marijuana from, um -- how -- how did

22  you bring the marijuana in, by the way?

23  A.  I would -- I live right on the border close to Mexico here

24  in the downtown area.  So I would pack it in bags.  And just

25  shoot it -- take it all the way to the river where it's already

1    the United States and throw it to this side and some of my

2    friends would pick it up.  Or I just throw it in the bushes and

3    then come around and pick it up.

4    Q.  Okay.  And who were you working with on those -- those

5    three times?

6    A.  The Linea members in Juarez.  And on this side I just had

7    one person that I asked -- that I asked to help me.

8    Q.  And who was that?

9    A.  Martin Silva.

10   Q.  Was he a BA member?

11   A.  Yes, sir.

12   Q.  Then you got caught and you were sent to Pollock?

13   A.  Yes, sir.

14   Q.  Ultimately, right?

15   A.  Me and him, we were both caught and we were both sent.  I

16   was sent to Pollock and he was sent to Reno.

17   Q.  And this was federal system, now, we're talking?

18   A.  Yes, sir.

19   Q.  Um, did you go right to Pollock or did you go into one

20   system first and then --

21   A.  Well, the process, I had to go to Otero, then Sierra

22   Blanca, then to Oklahoma.  And then from there straight to the

23   maximum when I got classified.

24   Q.  Okay.  Um, we will get back to the time when you were in

25   Pollock.

```
 1              But when you hit the streets again -- um, this would
 2      have been 6-09, that is June of '09, you were on the streets
 3      for, approximately, eight months.  Is that right?
 4      A.  Yes, sir.
 5      Q.  Who was in charge at that time?
 6      A.  At that time I think Chicho was already on a violation or
 7      something like that.  And it was Cano.  Cano was in charge of
 8      the streets.
 9      Q.  Okay.  How many times did you meet Cano?
10      A.  I met him, like, twice outside in the streets.  And then
11      when the -- we met up in the county jail when I got arrested
12      for the violation.
13      Q.  You met him twice on the street?  Or on the streets you
14      would see him.
15      A.  Yes, on the streets I would see him because I would report
16      to him.  He was the one in charge.
17              MR. COOLEY:  At this time we would like to bring up --
18      if you could please bring up 13B.  Your Honor, I believe this
19      is already admitted in evidence -- I'm sorry?
20              THE COURT:  Yes, it is.
21              MR. COOLEY:  I would like to publish that.
22              THE COURT:  It may.
23      Q.  (By Mr. Cooley)  Now, do you see -- do you recognize
24      anybody in this -- this is a photo before you.  Is that
25      correct?
```

DIRECT - DANIEL MEJIA

1    A.  Yes, sir.

2    Q.  13B?

3    A.  Yes, sir.

4    Q.  Do you recognize anybody in that photo?

5    A.  Cano's right there on -- the white stripes.

6    Q.  Okay.  You have an arrow pointing at him.  Is that correct?

7    A.  Yes, right there.

8         MR. COOLEY:  I would like to capture that, I guess, if

9    I could, Your Honor.  Make it, I guess, 13B-1.

10        THE COURT:  All right.

11   Q.  (By Mr. Cooley)  While we're doing that, Cano was in charge

12   of El Paso at that point.  Is that right?

13   A.  Yes, sir.

14   Q.  And what was -- where were you assigned to at that point?

15   A.  They sent me to the westside.

16   Q.  And you're doing, basically, the same thing the last time

17   you were out for five, six months.  Is that right?

18   A.  Yes, sir.

19   Q.  Now, who was, basically, if anybody -- BA members in El

20   Paso, taking in -- bringing in most of the drugs?

21   A.  From Mexico to El Paso?

22   Q.  Yes.

23   A.  Okay.  That would be Enano sending it to Cano, Tweety.

24   Q.  Where's Enano or Nano?  Where were they?

25   A.  Mexico.

DIRECT - DANIEL RIKKERS

```
 1    Q.  Okay.  And who's receiving it?
 2    A.  Cano.
 3    Q.  How was he transporting it into -- into the United States?
 4    Do you know some of the methods he would use?
 5    A.  Yes, basically, women.
 6    Q.  I'm sorry?
 7    A.  Basically, girls or kids going up and down, crossing the
 8    bridge.
 9    Q.  Okay.  And we're talking what kind of drugs now?
10    A.  Heroin, cocaine, marijuana.
11    Q.  How would he bring in marijuana?
12    A.  Um, they're still -- they still do it the same way, putting
13    it in tires, cutting them up.  Some cars, you know, get
14    stopped, some make it.
15            MR. COOLEY:  Did we capture that?  Thank you.  15C,
16    please.  I believe that's in evidence already, Your Honor.  And
17    if we can, publish it, please.
18            THE COURT:  I do not show 15C.
19            MR. COOLEY:  The Court's indulgence, Your Honor?
20            THE COURT:  Sure.
21            MR. COOLEY:  I apologize.  5C not 15.  I believe that
22    is -- that is in evidence.
23            THE COURT:  It is in evidence.  It may be shown.
24    Q.  (By Mr. Cooley)  Can you see what that photo is in front of
25    you, 5C?
```

1    A.   Yes, sir.

2    Q.   Okay.  What is that?

3    A.   Basically, a utensil for sending the drugs over here.

4    Q.   So if you could describe what it is, for the record.

5    A.   It's a tire, a cut open tire.

6    Q.   And that was a common method which Cano would use and

7    others would use.  Is that right?

8    A.   Yes, sir.

9    Q.   Now, during this period of time, um, when you were on the

10   streets, you're selling drugs.  Is that right?

11   A.   Yes, sir.

12   Q.   What type of drugs were you selling during this period of

13   time?

14   A.   Basically, heroin.

15   Q.   And who were you getting the heroin from?

16   A.   Well, it's the same heroin that was being distributed by

17   the -- our gang, by our -- Barrio Azteca.  But I would be

18   getting it from -- from Manny.

19   Q.   This is when Cano was in charge.  Is that right?

20   A.   Yes.

21   Q.   So Cano was bringing it in?

22   A.   Yes.

23   Q.   But you're not going to Cano?

24   A.   No.  He had his little brother, Peewee, in charge of the

25   drugs.  And he would give it to the leaders of each side of

 1   town.  And they would distribute it to whoever is on that side
 2   of town.
 3           MR. COOLEY:  Your Honor, at this time I would like to
 4   show the witness, which I believe is already in evidence, but
 5   not to publish it, Exhibit 6QQ.
 6   Q.  Just so we're clear, um, what we're talking is about when
 7   you got released from Pollock.  Is that right?
 8   A.  Yes, sir.
 9           THE COURT:  6QQ is in evidence.  Do you wish it shown
10   to the jury?
11           MR. COOLEY:  Not to the jury at this point, Your
12   Honor.  Just so the witness can see it.
13           THE COURT:  Okay.
14   Q.  (By Mr. Cooley)  Now, um, before we get into this, let's
15   just get a little better sense of -- when you went to Pollock
16   and you got released on supervised release, you got violated.
17   Is that right?
18   A.  Yes, sir.
19   Q.  For what?
20   A.  For coming back into the halfway house drinking.  I was
21   drinking.
22   Q.  So they violated you.
23   A.  For that and for -- for a UA.
24   Q.  A what?
25   A.  UA.  I refused to give them a UA.

```
 1    Q.   Refused to give a urine?
 2    A.   Yeah.
 3    Q.   Okay.  Um, so you got sent back to where?
 4    A.   To Otero.
 5    Q.   Who was your judge?
 6    A.   Mr. Briones.
 7    Q.   And what did you tell him in terms of your supervision?
 8    A.   Oh, that I couldn't -- I couldn't handle probationary
 9    status.  And if I could return to three years -- if he could
10    find a way that I could just do time for it.
11    Q.   And you did do time for it?
12    A.   Yes, sir.
13    Q.   So then you get out.  And that's in June of 2009?
14    A.   Yes, sir.
15    Q.   Okay.  So what we're talking about is this eight-month
16    period in June '09, um -- okay.  So during this eight-month
17    period, June '09, Cano had the -- controlled the streets.  Is
18    that right?
19    A.   Yes, sir.
20    Q.   All right.  Now, you see a photo here, which is 6QQ?
21    A.   Yes, sir.
22    Q.   Um, this was shown to you in preparation for trial just
23    recently.  Is that correct?
24    A.   Yes, sir.
25    Q.   This photo?
```

1    A.  Yes, sir.

2    Q.  You were able to identify two people in there?

3    A.  Yes, sir.

4    Q.  Which two people did you identify in that photo?

5    A.  Um, Manny -- Manny Lopez right here in the middle.  Not

6    that one.  This -- this one.

7    Q.  And who else?

8    A.  His little brother, Peewee.

9            MR. COOLEY:  At this time I would like to publish,

10   Your Honor, the photo to the jury.

11           THE COURT:  All right.  And I -- I think he clarified

12   that he recognized three people.  Is that correct?

13           THE WITNESS:  Yes, ma'am.

14           MR. COOLEY:  Two people.

15           THE COURT:  Three.

16   Q.  (By Mr. Cooley)  Oh, three people?

17   A.  Yes.

18   Q.  Who's the other person you recognize?

19   A.  Old School, Mr. Mena, right here.

20   Q.  Um, just so the jury understands, which one is Manny?

21   A.  Manny is this one.

22   Q.  The one the in the center?

23   A.  Yes.

24   Q.  And there's arrows, the person right below him and one to

25   his -- to his left.  Who was the person to his left?

David A. Perez, RMR, RPR

DIRECT - DANIEL MENDEZ

```
1    A.  Peewee, his little brother.
2    Q.  And the person below is the individual you described as Old
3    School?
4    A.  Yes.
5    Q.  Is he BA as well?
6    A.  Yes, sir.
7    Q.  What's Manny holding?  Can you see that?  I'm sorry.  Not
8    Manny, but Peewee.
9    A.  Oh, a Barrio Azteca -- well, it's not a Barrio Azteca.
10   It's a traditional shirt with our logo.  Basically, that's what
11   we use out in the streets.
12   Q.  You got that copyrighted?
13   A.  Looks like it.
14          MR. COOLEY:  Capture this, Your Honor, if we can.  I
15   guess it'd be CQQ-1(sic).
16          THE COURT:  6QQ-1.
17   Q.  (By Mr. Cooley)  Is it correct that this --
18          THE COURT:  Oh, if you want it captured --
19          MR. COOLEY:  Oh, I apologize.
20          THE COURT:  All right.  Just let him finish.
21          MR. COOLEY:  I'm sorry.
22   Q.  (By Mr. Cooley)  There's some symbolism on that shirt.  Is
23   there not?
24   A.  Yes, sir.
25   Q.  Um, below is -- is that Azteca Pride?
```

DIRECT - DANIEL MENDEZ

1    A.  Yes, sir.

2    Q.  What's right below that?

3    A.  Aztlan and part of the calendar.  The Aztec calendar.

4    Q.  And what's right below that?

5    A.  Two hands joining in unity representing the Azteca pride.

6    Q.  What's significant about that, holding hands?

7    A.  Well, it means brothership, you know.  That's what you do

8    when you shake your hands with your brothers, it's representing

9    Azteca pride, you know.

10   Q.  Did you have -- did the BAs have a certain handshake?  When

11   you greet a brother did you have a certain handshake?  Or was

12   it just kind of a standard handshake?

13   A.  The regular standard.  But for some of us that we go way

14   back, it would be the whole arm.  When you shake your hand, you

15   grab the whole arm.

16   Q.  All right.  Just to describe for the record, you're

17   basically griping the forearm when you're --

18   A.  Like how they are there.  But you've gotta grab the whole

19   arm -- the whole forearm.

20   Q.  Okay.  So, you get violated for supervised release and you

21   go where in, um, February 2010?  Do you remember?

22   A.  Yes.  They sent me back to -- to Beaumont.

23   Q.  Texas?

24   A.  Yes, Beaumont, Texas.

25   Q.  Now, while you're in Beaumont, Texas, did word come down

 1    that Shotgun had something in his possession?

 2    A.   Yes, sir.

 3    Q.   What did they -- what did word come down that he had in his

 4    possession?

 5    A.   That he had a telephone.

 6    Q.   When he was in -- when you were in Pollock with him, did he

 7    have a telephone at that point?

 8    A.   No, not at that time.

 9    Q.   And, again, with the communication within the BA system,

10    where was Shotgun being housed during that period of time when

11    you heard he had a phone?

12    A.   Back in Pollock.  He had barely come back from the -- from

13    the RICO -- that they came down and they sent him back to

14    Pollock and back to his unit.

15    Q.   Okay.  Pollock.

16         Okay.  You mentioned, um -- let's focus on the day you

17    walked in to talk to the FBI, for a minute.

18    A.   Uh-huh.

19    Q.   How many capos were there in the BA the day you walked in

20    to cooperate with the FBI?  Talking February this year.

21    A.   I think they were probably back down to four.

22    Q.   What's that?

23    A.   They were down to four.  And then Renteria had just gotten

24    his, um -- oh, yeah, five.

25    Q.   Five capos?

David A. Perez, RMR, RPR

1   A.   Yes.

2   Q.   Now, you mentioned T-top already.  Is that right?

3   A.   Yes, sir.

4   Q.   He's the very first capo?

5   A.   Yes, sir.

6   Q.   When you turn yourself in -- when you cooperated with the

7   FBI, walked into the FBI, agreed -- did you agree to denounce

8   the BA at that point?

9   A.   Um, they told me I wasn't -- I was just going to -- I

10   needed to talk -- because, like I said, I was already messed up

11   from what my brother had done and --

12   Q.   You weren't sure you wanted to follow through with it?

13   A.   I was debating to just go out and hurt some people or do

14   the right thing and go and try to explain some of this stuff,

15   what's going on.

16   Q.   And you wanted to hurt some people because they shot up

17   your house?

18   A.   Yes, sir.

19   Q.   And you decided to go in another direction?

20   A.   Yes, sir.

21   Q.   And during that time when you walked in, um, you said there

22   were five capos.  Is that right?

23   A.   Yes, sir.

24   Q.   And at that time, um, T-top -- where was T-top being

25   housed?

1    A.   Back in ADX in Colorado.

2    Q.   The supermax?

3    A.   Yes, sir.

4    Q.   Where was Shotgun being housed?

5    A.   By this time he was already in ADX, too, in supermax.

6    Q.   Now, we're talking about February of this year.  Is that

7    right?

8    A.   Yes.

9    Q.   Now, we didn't get into this, but, um, you saw a picture --

10   who was another capo?  Let's talk about that first.  Who was

11   another capo?  So we're -- you're talking about T-top, Shotgun.

12   A.   Cardoza.

13   Q.   Cardoza.  What's his nickname?

14   A.   Big 50.

15   Q.   What else does he go by?

16   A.   Big 50, Tolon.

17   Q.   So where was he being housed at that time?

18   A.   I believe in the Smith Unit.

19   Q.   In the state system.

20   A.   Texas.

21   Q.   Who's -- who was the fourth capo?

22   A.   Um, Tablas.

23   Q.   Now, you mentioned Tablas.  And --

24            MR. COOLEY:  Can we bring up Government's Exhibit 15J,

25   please?  Your Honor, I believe we've discussed this a couple of

DIRECT DANIEL REYES

```
 1   times.
 2   Q.  You've already talked about Tablas earlier in your
 3   testimony.  Is that right?
 4   A.  Yes, sir.
 5   Q.  And Tablas was one of the two people you felt were
 6   responsible for your brother being put on the ex list.  Is that
 7   right?
 8   A.  Yes, sir.
 9   Q.  Which brother?
10   A.  Jesus Pedro.
11   Q.  And Tablas was located where?
12   A.  Mexico.
13   Q.  And Tablas became a capo.  Is that right?
14   A.  Yes, sir.
15   Q.  Who did he replace?
16   A.  Chicho.
17   Q.  The same Chicho you talked about controlling the streets.
18   Is that right?
19   A.  Yes, sir.
20   Q.  And, again, from what you heard from talking to the
21   brothers before you came in to talk to the FBI, you understand
22   that Tablas is in Mexico.
23   A.  Yes, sir.
24   Q.  What else do you know about Tablas?
25   A.  Oh, he used to work for the cartel before he became Aztec.
```

1  And, basically, that was his job, to get that capo's rank.

2  Q.  Do you know whether or not Tablas is wanted by the -- by

3  law enforcement?

4  A.  Yes, sir.

5  Q.  And you know that how?

6  A.  Um, because of the Top Ten Most Wanted.

7  Q.  Whose most wanted?

8  A.  Tablas.

9  Q.  Whose Top Ten Most Wanted?

10  A.  The America's Most Wanted.  The top ten list for the FBI.

11  Q.  And you know this from talking with the brothers?

12  A.  Yes.

13  Q.  Who's the fifth capo?

14  A.  Mr. Renteria.

15  Q.  Do you know his full name?

16  A.  Yes.  Raymundo or Ramon.

17  Q.  What's his nickname?

18  A.  Spooky.

19  Q.  Where is he?

20  A.  Right here in front of me.

21  Q.  Can you describe what he's wearing?

22  A.  Gray.  Gray and black.

23  Q.  Where is he sitting?

24  A.  Right next to the man with the darker suit right there in

25  front of me.

1          MR. COOLEY:  May the record reflect the identification

2    of Ramon Renteria, also known as Spook or Spooky.

3          THE COURT:  It will so reflect.

4    Q.  (By Mr. Cooley)  How long have you known him?

5    A.  For a long time.

6    Q.  How long?

7    A.  Since we were kids.  Probably, like -- I was like 16, 17 --

8    16.

9    Q.  And you were living where?

10   A.  In the downtown area.

11   Q.  What area?

12   A.  Here in the Segundo Barrio in the downtown area.

13   Q.  In El Paso?

14   A.  Yes, sir.

15   Q.  Let's get back to this period of time, um -- actually, when

16   was the last time you saw Ramon Renteria before today?

17   A.  Before today, when I got arrested on that charge for the

18   four months that I went to the Annex when I went up to the

19   floor.  Before they sent me to the Annex, I ran into him.

20   Q.  Prior to that.  Before that.

21   A.  Pollock, Louisiana.

22   Q.  Okay.  And this is during -- how long were you serving time

23   in Pollock, Indiana -- Pollock, Louisiana?

24   A.  I had a 36-month sentence.  But I served there about two

25   years and some months.

1   Q.  Okay.  And this was the marijuana arrest you were serving

2   out.  Is that right?

3   A.  Yes, sir.

4   Q.  And how many brothers -- how many BA brothers were in

5   Pollock during that time in which you were serving that

6   eight-month -- two year period or so?

7   A.  The number changed a few.  But it never went more than 25.

8   It was either 20, 21, our number, 23, 24.  People would leave

9   and come.  But, basically, from 19 to 25 members.

10          MR. COOLEY:  Your Honor, I believe this is already in

11  evidence 17A-2 and -3.

12          THE COURT:  They are.

13          MR. COOLEY:  I would like to use the -- the Elmo.

14  Q.  (By Mr. Cooley)  In preparation for your testimony, you

15  were shown this photo.  Is that right?

16  A.  Yes, sir.

17  Q.  The first time you were shown this photo, did it have names

18  or not names?  Did you see the names or not?

19  A.  No, sir.

20  Q.  Let's go through this.  Um, the individual -- you recognize

21  this photo?

22  A.  Yes, sir.

23  Q.  How do you recognize this photo?

24  A.  I was there.  That's when I was in Pollock.

25  Q.  Starting with number one, who's number one?

DIRECT - DANIEL HERPS

```
 1    A.   That's Wizard.

 2    Q.   Can you make out the people even though it's not blown up?

 3    A.   Yes, sir.

 4    Q.   Number two?

 5    A.   That's Jesus Lopez.  We called him Gomez.

 6    Q.   Number three?

 7    A.   Carzoli.

 8    Q.   Number four?

 9    A.   Some kid who they called Grandpa.

10    Q.   Number five?

11    A.   Shotgun.

12    Q.   Who's number six?

13    A.   Boogie.

14    Q.   Who's number seven?

15    A.   Pacheco.

16    Q.   Who's number eight?

17    A.   Spider.

18    Q.   Who's number nine?

19    A.   Some kid they called Charlie, Carlos.

20    Q.   Who's number ten?

21    A.   That's Cuate.

22    Q.   Who's number 11?

23    A.   That's Moreno.

24    Q.   Who's number 12?

25    A.   That's the other Moreno, Omar.
```

DIRECT - DANIEL PEREZ

1    Q.   Who's number 13?

2    A.   Spooky.

3    Q.   Which Spooky?

4    A.   This one right here, Mr. Renteria.

5    Q.   Who's number 14?

6    A.   That's me.

7    Q.   You see the nickname that's indicated on this?

8    A.   Yes.

9    Q.   What's that nickname?

10   A.   That's El Duque.

11   Q.   Number 15?

12   A.   That's Fry.

13   Q.   16?

14   A.   Gato.

15   Q.   17?

16   A.   Oso.

17   Q.   18?

18   A.   Another homeboy.  He's just a homeboy, Rocky.

19   Q.   19?

20   A.   Pork chop.

21   Q.   What is it?

22   A.   Pork chop.

23   Q.   Now, in terms of these individuals here, um, how many of

24   them are brothers, BA members, at that time that photo was

25   taken?

David A. Perez, RMR, RPR

DIRECT - DANIEL REYES

1   A.  At that time all of them except three.

2   Q.  Okay.  Let's start with the first one that was not a BA

3   member.  Who was that?

4   A.  Number four.

5   Q.  So these are associates, clearly.  Is that right?

6   A.  Yes, sir.

7   Q.  Okay.  There's, um -- there's certainly rules we talked

8   about.  Is that correct?

9   A.  Yes, sir.

10  Q.  And we also talked about how capos are -- at times hold

11  themselves above the law.  Is that right?

12  A.  Yes, sir.

13  Q.  What is one of the, um, laws regarding relation with

14  another man?

15  A.  You can't do that.

16  Q.  What was the relationship between Spook -- oh, I'm sorry,

17  between Shotgun who's number five, and number four?

18  A.  Well, I don't know what kind of relationship.  But that

19  kids not even supposed to be in that picture like that hugging

20  him.

21  Q.  They're holding each other are they not?

22  A.  Yes.

23  Q.  Now, you mentioned there was two other people who are not

24  BA brothers but still in that picture?

25  A.  Yes.

```
 1    Q.   Who was that?
 2    A.   Number nine.  And number 18.
 3    Q.   But would they ride with BA?
 4    A.   Yes.
 5    Q.   What does that mean, ride with BA?
 6    A.   As long as they're there, um, they're expected to
 7    participate in any major riot or, like, if it's Barrio Azteca
 8    business, we're not going to send them to do it.  Because
 9    they're not -- they're not looking to be full-fledged members.
10    But if it's a riot and we all have to get involved, they're --
11    they're agreeing to participate.
12    Q.   And what are they supposed to carry?
13    A.   Well, their -- their weapon.  Their -- their knife.
14    Q.   What's that called?
15    A.   A shank, you know.
16    Q.   Now, you've been disciplined while you've been in the
17    prison systems.  Is that correct?
18    A.   Yes, sir.
19    Q.   For various violations?
20    A.   Yes, sir.
21    Q.   Did one of them involve possession of a shank?
22    A.   Yes, sir.
23    Q.   So all the individuals here would carry a shank?
24    A.   Yes, sir.
25    Q.   Is that correct?
```

David A. Perez, RMR, RPR

1    A.   Except Grandpa.

2    Q.   What about Grandpa?

3    A.   He always lost it or he wouldn't carry it.

4    Q.   And who was protecting him?

5    A.   I guess all of us.  But only because of the word of the one

6    who's hugging him.

7    Q.   The word of who?

8    A.   Shotgun.

9    Q.   Now, you had, um -- did you have responsibilities when you

10   were in Pollock?

11   A.   Yes, sir.

12   Q.   What was your responsibility?

13   A.   I was in charge of the yard.

14   Q.   What does that mean, being in charge of the yard?

15   A.   Um, well, no violence or any actions pertaining to Barrio

16   Azteca and another -- peoples in the facility will go without

17   me first reviewing what's going on.  And if it's something

18   major, I take it to them.  I take it to Shotgun -- to Spooky.

19   Q.   You take it to Spooky?

20   A.   Yeah, then he talks to Shotgun.

21   Q.   Why would you take to it Spooky?

22   A.   That's the right-hand man.

23   Q.   Of who?

24   A.   Shotgun.

25   Q.   What was, um -- where were you housed?  When you're

```
 1    sleeping at night, where would you be housed?
 2    A.  C Unit.
 3    Q.  And did you have a set assignment cell where you were at?
 4    A.  Yes, sir.
 5    Q.  Did you have a bunk mate?
 6    A.  Yes, sir.
 7    Q.  Did you have the same bunk mate during that time?
 8    A.  Um, almost through all of it.  Almost through all of my
 9    time there.
10    Q.  How do you get a bunk mate assigned?
11    A.  Well, um, in the federal system, it works like this.  You
12    go there, your gang members, your brothers are there.  You
13    won't live with any other gang member.  You either buy a cell
14    or get a cell.  And you live with another one of your brothers.
15    Q.  Can you make a request?
16    A.  Yes, sir.
17    Q.  Will they honor that request?
18    A.  Yes.  Yeah.  That's what they want.  They want it to be
19    peaceful.  So you just go and talk to them, ask for them.  And
20    they'll switch you around.
21    Q.  Who was Shotgun's cell mate?
22    A.  When I got there, Mr. Renteria.
23    Q.  When you -- when you got there, who, Spook?
24    A.  Yes, Spooky.
25              MR. FOSTER:  Judge, I'm going to object to continuing
```

1    to using monikers.  We know who Mr. Renteria is.  It's a formal

2    setting.  We should be using his name.

3               THE COURT:  All right.  Well, the Court will overrule

4    the objection.  But I would prefer using Mr. Renteria.

5               MR. COOLEY:  Certainly, Your Honor.

6    Q.  (By Mr. Cooley)  Um, so, when you first got there, Renteria

7    and Shotgun --

8               MR. COOLEY:  Is there any objection using Shotgun,

9    Your Honor?

10              THE COURT:  No.  As long as -- again, that's fine.

11   Q.  (By Mr. Cooley)  Um, Mr. Renteria and Shotgun were bunk

12   mates.  Is that correct?

13   A.  Yes, sir.

14   Q.  Who left first, you, Renteria, or Shotgun?

15   A.  Shotgun.

16   Q.  From the whole time you were there, who was Shotgun's bunk

17   mate?

18   A.  Mr. Renteria.

19   Q.  Then Shotgun left?

20   A.  Yes, sir.

21   Q.  All right.  We will get back to that.  Um, so you mentioned

22   your responsibilities were -- your responsibilities were taking

23   care of the yard.  Is that correct?

24   A.  Yes, sir.

25              MR. COOLEY:  The Court's indulgence, Your Honor?

```
 1              THE COURT:  Certainly.
 2              MR. COOLEY:  Your Honor, I would like to show him a
 3    photo without publishing it at this point.
 4              THE COURT:  All right.  That's fine.
 5    Q.  (By Mr. Cooley)  I'm showing you what's been marked as
 6    Government's Exhibit 16.  Can you see that photograph?
 7    A.  Yes, sir.
 8    Q.  Do you recognize who that individual is?
 9    A.  Yes, sir, that's --
10    Q.  Who is that?
11    A.  Me.  El Duque.
12    Q.  What is that?
13    A.  El Duque.  Me.
14    Q.  When was that taken, approximately?
15    A.  When I got released.  A little after I got released from
16    Beaumont.
17    Q.  16J-1.  Do you recognize that?
18    A.  Yes, sir.
19    Q.  What is that -- whose tattoo is that?
20    A.  That's a tattoo I have on my right side, on my chest.  Top
21    of my chest.
22    Q.  16J-2.  Do you recognize that tattoo?
23    A.  Yes, sir.
24    Q.  Whose is that?
25    A.  That's mine.
```

```
1    Q.  16J-3?

2    A.  Yes, sir.

3    Q.  Whose tattoo is that?

4    A.  Mine also.

5    Q.  16J-4.  Whose tattoo is that?

6    A.  That's mine also.

7    Q.  16J-5.  Whose tattoo is that?

8    A.  That's mine also.

9    Q.  16J-6.  Whose tattoo is that?

10   A.  Mine.

11   Q.  16J-7.  Whose tattoo is that?

12   A.  Mine.

13   Q.  And 16J-8.  Whose tattoo is that?

14   A.  That's mine.

15        MR. COOLEY:  Your Honor, at this time I offer into

16   evidence Government's Exhibits 16J and 16J-1 through 16J-8.

17        THE COURT:  Any objections?

18        MR. FOSTER:  No objections, Judge.

19        THE COURT:  16J, 16J-1 through -8 will be admitted.

20        MR. COOLEY:  Thank you, Your Honor.

21   Q.  (By Mr. Cooley)  This is 16J-5.  Is that correct?  I'm

22   sorry, 16J.  Can you see that photo?

23   A.  Yes, sir.

24   Q.  And that is you.  Is that right?

25   A.  Yes, sir.
```

1    Q.  Do you know, approximately, when this was taken?

2    A.  It was about -- let's see.  I got out of Beaumont.  I was

3    only out for about -- I think, about three, four months.  So

4    that's when I got arrested and was sent to the Annex after I

5    got out of Beaumont.

6    Q.  16J-1.  Can you see that?

7    A.  Yes, sir.

8    Q.  Can you describe for the record what this is?

9    A.  That's a tattoo of my -- two skulls representing the number

10   2.  And, also, my two feathers when I was a lieutenant.

11   Q.  So there are two skulls that are depicted on there.  Is

12   that correct?

13   A.  Yes.

14   Q.  That's one skull?

15   A.  Yes, sir.

16   Q.  That's another skull?

17   A.  Yes, sir.

18   Q.  We will see the next photo.  But there's another skull on

19   the other side.

20   A.  Yes, sir.

21   Q.  So what's the significance of the two skulls on one side

22   and one on the other?

23   A.  It represents 21.  2 and 1.  And until the death, you know.

24   Q.  There are two feathers that are coming down.  What do they

25   represent?

1    A.   To me, the reason I put them, that was for my -- my bars.

2    Q.   What bars?

3    A.   When I was a lieutenant.

4    Q.   16J-2.  Where is that tattoo located on your body?

5    A.   The center part of my chest.

6    Q.   And you could see the actual two skulls here, again, on the

7    left side?

8    A.   Yes, sir.

9    Q.   16J-3.  That's the other skull you're talking about?

10   A.   That's my other skull, yes, sir.

11   Q.   There's one feather that comes down from that?

12   A.   Yes, sir.

13   Q.   What does that represent?

14   A.   That represents only one feather, you're a sergeant.  It

15   also represents the number 1.

16   Q.   16J-4.  There's a name that is tattooed on there.

17   A.   Yes, sir.

18   Q.   What's that name?

19   A.   It's my nickname, Duke.

20   Q.   16J-5.  What is this tattoo?

21   A.   That's Shotgun.

22   Q.   What's Shotgun?

23   A.   Carlos Pereya.

24   Q.   The person you're serving time with in Pollock?

25   A.   Yes, sir.

1    Q.   The capo?

2    A.   Yes, sir.

3    Q.   What does the number 12 represent?

4    A.   That's his nickname.  It's short for Shotgun.  The one and

5    two for 12 gauge.

6    Q.   And this tattoo is located where?

7    A.   On my right hand.

8    Q.   You mean your arm?

9    A.   Arm -- side of my arm.

10   Q.   16J-7.  What is this tattoo?

11   A.   That's Mr. T-top.

12   Q.   Which T-top?

13   A.   Ben Alvarez.

14   Q.   This is the number one capo.  Is that right?

15   A.   Yes, sir.

16   Q.   Who started it all?

17   A.   Yes, sir.

18   Q.   Now, you've seen a lot of BA tattoos on a lot of brothers.

19   Is that right?

20   A.   Yes, sir.

21   Q.   How often have you seen T-top and Shotgun tattooed on

22   somebody?

23   A.   I had never seen it before.

24   Q.   Before you had it.  You know there's other brothers that

25   have it as well.  Is that correct?

DIRECT - DANIEL MERKS

```
 1    A.  Very few.

 2    Q.  How many?

 3    A.  Only that I can say of that I know, just me, Mr. Renteria,

 4    Shotgun, Carzoli.  Just us.

 5    Q.  Finally 16J-8.  That's another tattoo?

 6    A.  Yes, sir.

 7    Q.  And that's on you.  Is that right?

 8    A.  Yes, sir.

 9    Q.  And there's a number there?

10    A.  Yes, sir.

11    Q.  What's that number?

12    A.  21.

13            MR. COOLEY:  Your Honor, I believe Government's

14    Exhibit 28 has already been --

15            THE COURT:  Admitted.  Let me check.  Yes, it has.

16            MR. COOLEY:  Before we get into that --

17    Q.  (By Mr. Cooley)  16J-6.  Do you recognize that?

18    A.  Yes, sir.

19    Q.  That's a tattoo on your body?

20    A.  Yes, sir.

21    Q.  Where?

22    A.  My hands.

23    Q.  And what does that represent?

24    A.  21.

25    Q.  It keeps repeating, 21?
```

1    A.  Yes, sir.

2    Q.  Showing you what's been admitted as Government's Exhibit

3    28.  Do you recognize who this individual is?

4    A.  Yes, sir.

5    Q.  Who is that?

6    A.  It's Mr. Renteria.

7    Q.  And the next photo on the first page that I'm showing you,

8    there's a word underneath there.

9    A.  Yes, sir.

10   Q.  What is that word?

11   A.  Azteca.

12   Q.  Going to the next page, do you recognize a number indicated

13   there?  Can you see that number?

14   A.  It looks like a 21.

15   Q.  We will move on.  There's a tattoo that's on the right arm.

16   Do you recognize that tattoo?

17   A.  Yes, sir.

18   Q.  What is that tattoo?

19   A.  It's Shotgun.

20   Q.  Is that similar to the tattoo you have on your arm?

21   A.  Yes, sir.

22   Q.  There's another tattoo on this other arm or on the other

23   side of this arm.  Do you recognize that?

24   A.  Yes, sir.

25   Q.  Whose tattoo is that?

1    A.   It's Mr. Alvarez.

2    Q.   Also known as what?

3    A.   T-top.

4    Q.   Moving on to the next page, page four, of this document,

5    there's another tattoo.  Can you make out what that says?

6    A.   It's Nagual.  The Nagual numbers for 21.  It says "o me

7    se."

8    Q.   From your understanding, um, in order to have Shotgun's

9    tattoo put on your arm, do you have to have permission?

10   A.   Oh, yes, sir.

11   Q.   What about T-top?

12   A.   Yes, sir.

13   Q.   And from what -- all the brothers you've seen you've only

14   seen three people with those tattoos.  Is that right?

15   A.   Four.

16   Q.   Name the four.

17   A.   Just me, Shotgun, Mr. Renteria, and, I believe, Carzoli.

18   Q.   Which number is he?

19   A.   Number three.

20   Q.   This individual here?

21   A.   Yes, sir.

22        THE COURT:  For the record, you showed him a picture.

23   That picture has got a number on it.

24        MR. COOLEY:  I apologize, Your Honor, there's, um --

25   this is a photo.  It's in evidence.  It's Government's Exhibit

1   17A-3.  It's actually not a photo that we showed him.  It's a

2   similar photo.  I will go through that with him.

3           THE COURT:  I just want the record to show when you

4   said number three where that came from.  That's fine.  Thank

5   you.

6   Q.  (By Mr. Cooley)  17A-3 is a similar photo to what you've

7   seen?

8   A.  Yes, sir.

9   Q.  Are you included in this one?

10  A.  No, sir.  That was little bit before I got there.

11  Q.  Do you see Shotgun in that?

12  A.  Yes, sir.

13  Q.  What number is he?

14  A.  He's number 5.

15  Q.  Do you see, um, Mr. Renteria?

16  A.  Yes, sir.

17  Q.  What number is he?

18  A.  Number 15.

19  Q.  And we talked about Carzoli.

20  A.  Yes, sir.

21  Q.  And he's what number?

22  A.  Number 3.

23  Q.  And he's the only other person that you've seen that you've

24  already talked about who had those tattoos on him -- Shotgun's

25  tattoo in particular.

1   A.  Yes, sir.

2   Q.  Now, there was a time when Shotgun -- before we get into

3   that.  If somebody is caught with that tattoo or, for that

4   matter, a BA tattoo and are not a member, what's going to

5   happen?

6   A.  No.  He's is -- he's gonna get hurt.

7   Q.  Now, there was a time when Shotgun called a meeting in

8   which -- in Pollock where he indicated he was leaving.  Is that

9   correct?

10  A.  Yes, sir.

11  Q.  Tell us about that.

12  A.  Um, he heard that indictment was on the way and he was --

13  he was asked to pack out, pack his stuff.  And he would be

14  called.  So he called a meeting for us to let us know who's

15  going to stay in charge of the unit.  And the correspondence to

16  the other units.  And, basically, the ground rules until he

17  gets back.

18  Q.  If he gets back.

19  A.  If he gets back.

20  Q.  Now, who was at that meeting?

21  A.  That time it was me, Mr. Renteria, Carzoli and, I believe,

22  Kike Cardona.

23  Q.  And who did Shotgun say he was going to put in charge?

24  A.  Mr. Renteria.

25  Q.  The defendant here?

1   A.  Yes, sir.

2   Q.  Was that rank -- during this meeting, was a rank given out?

3   A.  Yes, sir.

4   Q.  What rank was given out and to whom?

5   A.  Sergeant to Mr. Renteria.

6   Q.  Was there another meeting called?

7   A.  Yes, sir.

8   Q.  Approximately, how long after that first meeting was the

9   second meeting called?

10  A.  About two weeks, three weeks.

11  Q.  What happened during that second meeting?

12  A.  Um, he was already getting closer to taking off, so

13  Mr. Renteria was upgraded to lieutenant.  And I stayed the

14  same, in charge of the yard.  Orders was not to -- you know, to

15  take care of him and help him out in anything I could.  And as

16  soon as Shotgun came back, another higher rank was going to be

17  distributed for him.

18  Q.  Now, were you aware of when Renteria's going to be released

19  from jail?

20  A.  He was supposed to be released -- when I went to the

21  halfway house, around that date, a few months later, he was

22  supposed to have left too.

23  Q.  To where?

24  A.  To the halfway house.

25  Q.  Did he go with you?

```
 1    A.   No.

 2             MR. FOSTER:  Objection as to time frame, please.

 3             THE COURT:  All right.

 4    Q.  (By Mr. Cooley)  When were you released to the halfway

 5    house?

 6    A.   I believe it was in January or February 2009.

 7    Q.   Okay.  And you both were scheduled to be released around

 8    the same time?

 9    A.   Spooky was supposed to meet me up over there around June.

10    Q.   But he didn't go.

11    A.   Never got there.

12    Q.   Why not?

13    A.   Um, I believe he was going to wait for Shotgun.

14    Q.   So what happened as a result of his desire to wait for

15    Shotgun?  What did he -- what, if anything, did he do?

16    A.   Um, he -- I believe he's -- he picked up a some kind of a

17    case and got some of his good time tooken away or his halfway

18    house.  Or, he could have just refused it.  But he never showed

19    up at the halfway house.  I was waiting for him.

20    Q.   Now -- so Shotgun was going to trial in this '08 RICO case.

21    Is that right?

22    A.   Yes, sir.

23    Q.   Who else was going to trial?

24    A.   Ben Alvarez, Tolon, Gino.

25    Q.   As far as the capos are concerned, there were three capos
```

1   going.

2   A.  Yes, sir.

3   Q.  There was a fourth capo on the street.

4   A.  Yes, sir.

5   Q.  Who was that fourth capo?

6   A.  Chicho still.

7         MR. COOLEY:  Jeff, can you bring up, um, 19E?

8         THE COURT:  While he's doing that, can the attorneys

9   approach?

10         MR. COOLEY:  I'm sorry?

11         THE COURT:  Come on up.

12         (Attorneys approach bench.  Off record discussion.)

13         THE COURT:  All right.  Whenever you're ready.

14         MR. COOLEY:  I would ask this to be published, Your

15   Honor.  I think it's --

16         THE COURT:  Yes, you may -- it may be published.

17   Q.  (By Mr. Cooley)  This is Chicho.  Is that correct?

18   A.  Yes, sir.

19   Q.  He was the fourth captain or capo who was on the street.

20   Is that correct?

21   A.  Yes, sir.

22   Q.  And he, um -- as far as you know, he wasn't included in

23   that indictment with the other three capos.

24   A.  No, sir, he wasn't.

25   Q.  During -- before Shotgun left, did he have any conversation

David A. Perez, RMR, RPR

1    with you about his concerns about Chicho?

2    A.   Prior to that, I believe -- well, he -- he interviewed me

3    because I was coming off from the streets.  And he asked me

4    questions about what I thought about what he was doing.  Since

5    he was my padrino still, he basically wanted to know, I guess,

6    if I was skimming off the money, if I was, you know,

7    participating with what he was doing.  Because everybody was in

8    disagreement with Chicho, with what he was doing.

9            So he talked to me about what I thought about what he

10   was doing.  And the ten years that he's been in charge out

11   there, the money keeps disappearing.  He's hooked on drugs.

12   He's not trying to participate with the proceedings with --

13   with the procedures that are being done in Juarez and over

14   here.

15           MR. COOLEY:  Your Honor, may we approach?

16           (Bench conference.  Off the record.)

17           THE COURT:  Ladies and Gentlemen of the Jury, it is

18   about 1:00.  We're gonna go ahead and break.  Remember, you

19   remain under all the instructions the Court has previously

20   given you.  And we'll see you at 2:05.

21           (Jury leaves courtroom.)

22           (Recess for lunch.)

23           COURTROOM DEPUTY:  Court is back in session.

24           THE COURT:  You may be seated.  Ready for the jury?

25           MR. COOLEY:  Yes.

David A. Perez, RMR, RPR

```
1              (Jury enters courtroom.)
2              THE COURT:  You may be seated.  You may proceed.
3              MR. COOLEY:  Thank you, Your Honor.
4   Q.  (By Mr. Cooley)  Mr. Reyes, um, let's talk a little bit
5   more about your experience in Pollock.  Now, you mentioned, in
6   passing, that if you were reporting while you're in Pollock,
7   you weren't reporting directly to Shotgun, but you were going
8   through his right-hand man.  Is that correct?
9   A.  Yes, sir.
10  Q.  What type of things would you report to his right-hand man
11  while in Pollock?
12  A.  Um, the procedures, if there was any problems with the --
13  with our -- with our brothers, or about dirty UAs, how they're
14  doing in work, the work field.  Basically, just -- I really
15  wouldn't bother them unless it was something major.  But the
16  rest, it was up to me, you know, taking care of the yard,
17  making sure I had weapons in the yard in case of a riot or
18  whatever, you know, everybody -- make sure everybody gots their
19  own weapon and stuff like that.
20  Q.  While you were in Pollock, you mentioned you were a heroin
21  addict.  Is that correct?
22  A.  Yes, sir.
23  Q.  Did you have access to heroin while in Pollock?
24  A.  Yes, sir.
25  Q.  How often were you getting heroin while you were in
```

```
 1    Pollock?
 2    A.  Well, um, like I say, they had this imaginary rule that we
 3    couldn't use it.  So I was getting it from the other -- from
 4    the other gangs.  Um, even when we had our own heroin, I wasn't
 5    getting it from our people.
 6    Q.  So you were getting it from somebody outside of BA?
 7    A.  Yes.
 8    Q.  You said this "imaginary rule".  What do you mean, this
 9    imaginary rule?
10    A.  Yeah, supposedly, we're not supposed to be using and
11    nothing.  But, if it's a higher rank or somebody that can't
12    get -- be told nothing, nothing happens and it just goes along.
13    Q.  Do you know whether Shotgun had access to heroin while you
14    were in Pollock?
15    A.  Yeah.
16    Q.  How do you know?
17    A.  He was always messed up.  You could always tell his face.
18    You know, I'm a heroin addict.  I've been a heroin addict all
19    my life.  And that's, basically, one of those things where I
20    started to realize some things, you know.  Because he'd be
21    willing to discipline us and -- and put us on -- on the spot.
22    But, he was always messed up himself.
23    Q.  Now, was there a rule in terms of, like, kind of looking
24    the other way with heroin use versus getting caught with heroin
25    use?
```

David A. Perez, RMR, RPR

1    A.  Yes.  Yes, sir.  Like I say, on the record, basically,

2    everyone of us when we're in charge, if we were really trying

3    to help, that's your brother, you know, you really don't want

4    to go mess him up.  Because we all grew up in this as criminals

5    doing drugs and everything.  So all of a sudden you want us to

6    change, but you're not changing.  And the rule is on the

7    record, I tell you don't do it.  Off the record, you can do it,

8    but don't let me catch you.

9    Q.  Don't get caught?

10   A.  Yes.

11   Q.  What about getting caught by BOP?

12   A.  Now, that one, you can't beat it.  Because if you get a

13   case for that, you're going to get your ass chewed out or a

14   little discipline.

15   Q.  Now, part of your discipline while you were in the prison

16   system, you actually got caught trying to circumvent a urine

17   test.  Is that right?

18   A.  Yes.

19   Q.  Where was that and what was the reason for you trying to

20   circumvent the urine test?

21   A.  Because I was dirty and I got called for a random --

22   because I was on the hot list because of my past.  So, as soon

23   as you get to a prison system, they put you on probationary

24   status.  And they will be checking whenever they want to.

25   Q.  Now, as far as in Pollock, with the heroin use that was

1    being performed by the brothers, um, it was -- it was what

2    you're saying, is it's one thing that they kind of look the

3    other way, but if you get caught by BOP, then it's a problem?

4    A.  Yes.

5    Q.  And Shotgun would come down hard on that.  Is that correct?

6    A.  He would come down on Renteria and Renteria would come down

7    on me.

8    Q.  Okay.  Um, why was that?  Why did Shotgun really care about

9    whether he got caught up by BOP?

10   A.  Because if -- if -- if you're, um, soldiers are all messed

11   up on drugs and you're supposed to be a leader, and you can't

12   keep them under control, that means there's gonna be problems.

13   So the less problems for him, the less they look his way.

14   Q.  Less problems for who?

15   A.  For -- the less problems for him.  If his soldiers are

16   getting caught with heroin, the BOP is going to be on him.

17   They know he's the leader.  They know he's letting them or --

18   or giving it to them.  So his -- his way of disguising that is

19   there's a rule.  Nobody does it.  And nobody, actually --

20   you're always on -- on the lookout.  So there's very few BA

21   members that will get caught dirty.

22   Q.  Well, in BOP itself, that is, particularly to the Pollock

23   um -- was -- did you go through urine tests while you were in

24   Pollock?

25   A.  Yes.

1   Q.   Did you ever get caught?

2   A.   No.

3   Q.   Why not?

4   A.   I always beat it.

5   Q.   How did you beat it?

6   A.   The guard turns -- when he sits you in there, he's supposed

7   to be looking at you.  Sometimes he just turns the other way

8   and you throw some -- some hot urine that you have in a cup or

9   tied to your boxers.  And you're gone.

10  Q.   So the guard would look the other way?

11  A.   Yes.  And if he does catch you, and you have a little

12  money, you can just pay the trustee to go rip the case out of

13  the locker before it hits the -- the system where you get

14  notified that you got a case.  Usually, you lose your job.  So

15  they'll know something happened.

16  Q.   So as far as you know, Shotgun was never caught using

17  heroin?

18  A.   No.

19  Q.   Now, you talked about, um, providing shanks.  Who did you

20  provide shanks to when you were in Pollock?

21  A.   Every single one of my soldiers.

22  Q.   Just your soldiers?

23  A.   Yes.

24  Q.   Anyone above you?

25  A.   Well, my ranks too.

DIRECT - DANIEL 07/16/13

```
 1   Q.  Who?
 2   A.  Um, Shotgun, Mr. Renteria.
 3   Q.  What type of shanks did you supply them?
 4   A.  In the beginning when I didn't have access to the good
 5   metals, just regular.  Or they would provide me, so I could cut
 6   them.  But once I figured out a way to get some metals that
 7   don't -- the -- when you pass through the metal detectors, you
 8   wouldn't be able to detect those.  So that special metal I had
 9   for my ranks and for me.  So I could be everywhere, in the
10   kitchen, school, everywhere with my -- my piece on me.
11   Q.  And you gave that to you and to your ranks?
12   A.  Yes.
13   Q.  And when you say your ranks, who are you talking about?
14   A.  Um, Shotgun.  Shotgun at that time.  And Spooky because
15   Spooky had to take care of Shotgun.
16   Q.  Mr. Renteria?
17   A.  Mr. Renteria.
18        MR. COOLEY:  Now, can you please bring up 13E?  I
19   believe this is in evidence, Your Honor.  If we can publish it?
20        THE COURT:  13E?
21        MR. COOLEY:  As in Edward.
22        THE COURT:  I believe so, too.  But let me check.
23   Yes, sir.
24   Q.  (By Mr. Cooley)  Okay.  We've been through this already
25   with your testimony.  Is that correct?
```

1    A.  Yes, sir.

2    Q.  Actually, this is actually a different one.  Is it not --

3         MR. COOLEY:  Jeff, please bring up 13F.  Which, Your

4    Honor, I believe is in evidence.

5         THE COURT:  Yes.

6    Q.  (By Mr. Cooley)  Now, these are the ex lists.  Is that

7    correct?

8    A.  Um, yes, sir.

9    Q.  And they were revised from time to time?

10   A.  Excuse me?

11   Q.  They're revised from time to time?

12   A.  Oh, yes.  Yes.

13   Q.  And who maintains that list?

14   A.  Basically, every -- every leader in every unit.  But

15   Coffield has -- the Coffield Unit in Texas has the main list.

16   Every name you collect around the system, you send it to

17   Coffield so they can put it on the big list.  That way that

18   list doesn't get lost.  And whenever you get to another prison,

19   you just ask them to start sending it to you all over again.

20   Q.  Again, your brother is listed on this list.  We've been

21   through that.  Is that correct?

22   A.  Yes, sir.

23        MR. COOLEY:  Your Honor, at this time I'm going to

24   show him something that hasn't been in evidence yet.

25        THE COURT:  All right.

```
 1              MR. COOLEY:  This is not published.  Is that correct?
 2              THE COURT:  Which -- yeah, it's not published.
 3              MR. COOLEY:  As long as he can see it off the Elmo.
 4              THE COURT:  Yes, he can.
 5    Q.  (By Mr. Cooley)  Do you recognize what kind of document
 6    this is?
 7    A.  It's another list containing ex members.
 8    Q.  Any doubt this is a BA list?
 9    A.  Oh, it's a BA list.
10              MR. COOLEY:  This time, Your Honor, we offer into
11    evidence Government's Exhibit 25A.
12              THE COURT:  Any objections?
13              MR. FOSTER:  No objection.
14              THE COURT:  It will be admitted.
15              MR. COOLEY:  I ask it be published.
16              THE COURT:  All right.
17    Q.  (By Mr. Cooley)  Do you see it on the screen?
18    A.  It's kind of small but. . .
19    Q.  You can see it?
20    A.  Yes, sir.
21    Q.  See the pages being turned?
22    A.  Yes, sir.
23    Q.  These lists are generally alphabetical.  Is that right?
24    A.  Yes, sir.
25    Q.  You mentioned an individual by the name of Tavo.
```

DIRECT - DANIEL ORTEGA

| | |
|---|---|
| 1 | A.  Yes, sir. |
| 2 | Q.  Do you see him on this list?  Direct your attention to |
| 3 | right here. |
| 4 | A.  Yeah.  Right there. |
| 5 | Q.  Do you see what -- |
| 6 | A.  Oh, yeah.  I see it.  That means he's a snitch to the feds. |
| 7 | Q.  That's the Tavo you're talking about before? |
| 8 | A.  Yep.  Yes, sir. |
| 9 | Q.  You were mentioning a Sleepy before.  Is that correct? |
| 10 | A.  Yes, sir. |
| 11 | Q.  Do you know what his real name is? |
| 12 | A.  Sleepy.  His last name is Armendariz, one of them. |
| 13 | Q.  His last name is what? |
| 14 | A.  One of them is Sleepy Armendariz.  I don't know his first |
| 15 | name.  His last name is Armendariz.  He should be in the A's. |
| 16 | THE COURT:  Should be A-R. |
| 17 | MR. COOLEY:  Yeah, I understand, Your Honor. |
| 18 | THE COURT:  Oh, okay.  You were at R so I wanted to |
| 19 | make sure. |
| 20 | MR. COOLEY:  Apparently, there's another Sleepy. |
| 21 | Q.  (By Mr. Cooley)  Um, you see the bottom of this list? |
| 22 | A.  Yes, sir. |
| 23 | Q.  Who's that? |
| 24 | A.  My brother. |
| 25 | Q.  Who's right below that? |

1    A.   Rios.   Sleepy.

2    Q.   That's a different Sleepy?

3    A.   Yes, sir.  It's another Sleepy.

4    Q.   What does this say in terms of your brother, the last

5    column?

6    A.   That he was made an ex member in 2008 for treason and the

7    streets in Juarez -- no, in J town in the Cereso, the prison in

8    Mexico.

9    Q.   Does that sound about right?

10   A.   Yes, sir.

11   Q.   Now, you testified earlier, almost at the beginning of your

12   testimony, the reason why, um, the BAs were formed, that is in

13   the prisons, particularly, initially, to protect them from

14   other gangs.  Is that right?

15   A.   Yes, sir.

16   Q.   And at some point, um, you developed, that is the BAs

17   developed, enough strength that they can stand up to these

18   other gangs?

19   A.   Yes, sir.

20   Q.   And do you ever recall hearing anything about, um, like

21   peace treaties?

22   A.   Yes, sir.

23   Q.   Do you know if they were committed to writing?

24   A.   Yes, sir.

25           MR. COOLEY:  I don't want it published at this point.

```
1              THE COURT:  All right.
2    Q.  (By Mr. Cooley)  Can you see the top of that first page?
3    A.  No, sir.  Okay, now I see it.
4    Q.  Take a moment to look through that a little bit.  Then I
5    want to go to the end of the document.
6    A.  I recognize it.
7    Q.  You recognize it?
8    A.  Yes, sir.
9    Q.  Let's go to the end of the document.  Do you see a date on
10   there?
11   A.  Yes, sir.
12   Q.  What do you recognize this document to be?
13   A.  It's the last document after several reviews to see if they
14   honored the first peace that we gave them in regards to the war
15   when we were at war with each other.  It was a process.  And
16   this is the final -- the final document where there won't be no
17   more revisions.  It just states no more war, respect for
18   respect.  If we go back to war, it's not going to end.
19   Q.  And this is between BA and who?
20   A.  Mexican Mafia.
21              MR. COOLEY:  At this time, Your Honor, I offer into
22   evidence Government's Exhibit 25C.
23              THE COURT:  Any objections?
24              MR. FOSTER:  No objections.
25              THE COURT:  25C will be admitted.
```

David A. Perez, RMR, RPR

```
1              MR. COOLEY:  May it be published?
2              THE COURT:  It may be published.
3    Q.  (By Mr. Cooley)  So you recognize this document?
4    A.  Yes, sir.
5    Q.  Have you seen a copy of this or something similar to this
6    before?
7    A.  Basically, at the time -- if you were a rank or even a
8    soldier, you had to have an opinion.  And -- and after we read
9    all this and revised it ourselves, we had to have -- turn in
10   our opinions before we approved it to make changes on it or
11   upgrade or dismiss the peace and go back to war.  But there was
12   always a vote.
13             The captains were the ones that signed it.  But they
14   would ask the soldiers and the -- the regions in the different
15   prisons to see if we felt it was -- it pertains to all of us.
16   So -- so we had to see if it was in the best interest of
17   everybody.
18   Q.  So there's drafts that would be circulating?
19   A.  Yes.
20   Q.  And revisions?
21   A.  Yes.
22   Q.  And this appears to be the final resolution?
23   A.  Yes.
24   Q.  Now, a couple more questions regarding this trying to avoid
25   getting caught with, um -- testing positive for the use of
```

1    heroin or other drugs.  Do you recall an instance -- incident

2    in Pollock where one of the brothers got caught and you were

3    given orders to do something about it?

4    A.  I had to discipline him.

5    Q.  What's that?

6    A.  I had to discipline him.

7    Q.  Tell us about that, what happened and when it happened.

8    A.  It was -- well, it happened in Pollock, Louisiana, I guess,

9    a little bit before I left, about six months.  I'm not too

10   accurate on the time.  It was during that time I was in

11   Louisiana.  This kid already had several warnings.  And then I

12   had barely put in a word with him so that he could be made an

13   Aztec member.  So he was a fully-fledged Aztec member on

14   probation.  And he was messing around with heroin and had

15   several warnings.

16   Q.  By who?

17   A.  By all of us.  You know, we would talk to him, chill, slow

18   your roll and everything.  But when he got tested positive by

19   the BOP, we couldn't protect him no more.  So it hurt.  But I

20   had to go and take another soldier with me and discipline him.

21   Q.  What happened?  What did you do?

22   A.  About three minutes assault on his body.

23   Q.  Who gave that you order?

24   A.  That -- that one came from Mr. Renteria.

25   Q.  The defendant here?

1    A.  Yes, sir.

2              MR. COOLEY:  One moment, Your Honor.

3              THE COURT:  Sure.

4    Q.  (By Mr. Cooley)  Um, you talked about your sacred rules and

5    there's a chain of command.  Is that correct?

6    A.  Yes, sir.

7    Q.  So the defendant, Renteria, is giving you an order?

8    A.  Yes, sir.

9    Q.  Shotgun put him in charge.  And you have to comply with

10   that order?

11   A.  Yes, sir.

12   Q.  What happens if you don't?

13   A.  Well, besides the point that I will lose my -- my job as

14   the -- as the protector of the yard, I'll probably get

15   disciplined myself.

16   Q.  Same type that you handed out to this other brother?

17   A.  Probably worse because I'm supposed to be setting the

18   example.

19   Q.  All right.  So you said that, um, you would have been

20   disciplined even longer?

21   A.  Yes, sir.

22   Q.  Meaning a longer duration of getting beat?

23   A.  Probably more severe.  Probably not just a beating.

24   Probably stabbed.

25   Q.  Now, in terms of the beating that you administered on this

1  guy as a result of Defendant Renteria's orders, what did you do

2  to this guy?

3  A.  I put another soldier for three minutes on him, just body

4  blows.

5  Q.  Body blows?

6  A.  Until he collapsed.  And he had to get up and collapsed

7  like three times.  Got up again.

8  Q.  So it was between what part of the body?

9  A.  From your stomach to your chest nothing on the face.

10 Q.  And if you violated a rule being rank, or being a

11 supervisor, it would have probably been more harsh for you.  Is

12 that what you're saying?

13 A.  Yes, sir.

14 Q.  Now, while you were in Pollock, money was coming in from

15 the quotas?

16 A.  Yes, sir.

17 Q.  Who was getting the money?

18 A.  Basically, Mr. -- Shotgun.

19 Q.  And when Shotgun left, who was getting the money?

20 A.  Um, Mr. Renteria.

21 Q.  And when Shotgun or Renteria gets the money, do they dish

22 any of that out?

23 A.  Well, basically, it stays in that unit.  But if you need

24 something, they won't tell you no.  But, basically, it stays in

25 that -- in that pod right there.

DIRECT - DANIEL 07/16/13

```
 1   Q.  What do you mean that pod, that unit?
 2   A.  Wherever the -- the captain lives.  That's supposed to be
 3   meant for everybody.  But, no, that doesn't happen like that.
 4   Q.  So what's done with the money?  You get the physical money.
 5   What's done with it?
 6   A.  Well, either buy more drugs, supplies, tennis shoes,
 7   warmups, whatever, food.
 8   Q.  Now, aside from the quota money coming in from the
 9   brothers, is there occasionally family members that would
10   contribute to commissaries?
11   A.  Well, it depends.  But everybody's having a hard time out
12   here.  So it's rare that the inmates get money.  So, basically,
13   the money that's coming in is from the gang and your little
14   check that they pay there.
15   Q.  But if there is money coming in from family, is there a way
16   they separate that out from money that's coming in from the
17   brothers?
18   A.  Um, could you re-explain it better?
19   Q.  Say, for example, Shotgun's got some long loving cousin and
20   he wants to send him some money, how do they distinguish that
21   from the money that the brothers are sending in to his
22   commissary account?
23   A.  From his commissary account, you're really never gonna
24   know.  Because you can't stick your nose into that kind of
25   business.  But I mean, there's -- it's too much money, you
```

1   know.  And, um, in regards to -- in regards to us, if I get

2   sent money from that, I know it's BA money that was sent

3   through a family member of mine.  Yeah, I got to buy whatever

4   list they give me and turn that in the BA bank or give them

5   whatever I traded for, you know.  Or, if it's for drugs or

6   whatever.

7   Q.  But if it didn't come from -- like, if you had a family

8   member that was sending you something, you'd keep it in your

9   own commissary account.

10  A.  Oh, yeah.  It's all the same commissary account.  But, um,

11  um, if it's your money, I mean, you're not gonna get jacked for

12  it.  But if it's money that was sent for a certain purpose,

13  you're going to have to report it and buy whatever it is for

14  that.  And you can't touch that money.  If you say, Oh, I

15  accidentally spent $15, you're probably going to get your ass

16  chewed out -- oh, sorry.  You're gonna get chewed out or

17  disciplined or something.

18  Q.  Do you know a person that went by the nickname of Sinner?

19  A.  Yes, sir.

20  Q.  Who's Sinner?

21  A.  He's another ex gang member that -- well, he went -- he got

22  exed out.  He's an ex gang member.  He was a brother of mine.

23  Q.  At one time he was a brother?

24  A.  Yes, sir.

25  Q.  Then he was exed out.  Do you know his real name?

```
 1   A.  No, I don't remember it.  I've seen it on the list.
 2   There's too many names.  And I don't remember his exact name.
 3   Q.  Now, in terms of this particular individual, Sinner, um,
 4   just prior to coming in to the FBI, um, right -- prior to you
 5   spending your last jail time, did his name come up at all in
 6   discussions with the brothers?  I mean, there's a lot nicknames
 7   on this list.  But him in particular.
 8   A.  Yes, sir.  But it was -- right now, it came to -- there's
 9   two Sinners.  And both of them got exed out.  One was a Manny,
10   I believe.  Manny -- he was a sergeant.  He got exed out.  And
11   then the other Sinner.  But, yeah, there was conversations on
12   both of them, you know, take care of them on sight.
13   Q.  Did either one of those Sinners pose a bigger threat to the
14   BA than the other?
15   A.  Yes.
16   Q.  Which one?
17   A.  Not Manny, the other one that was out here -- to my
18   furthest knowledge he's still out here.  He used to have his
19   own little group and go out and look for -- for Aztecs that
20   were still active.  And, you know, him and a little group of ex
21   Aztecs would beat up on Aztecs coming out of clubs and shooting
22   them.  He was a bigger threat.  He was actually going after --
23   after bros.
24   Q.  So he started forming his own gang?
25   A.  Yeah.
```

1    Q.  And posed a threat on the -- on the BAs on the street?

2    A.  Yes, sir.  So he was a high priority.  We had to take care

3    of him as soon as we saw him.  He got shot a few times.  And

4    they went and burned down his shop.  He had a shop.

5    Q.  Where was the shop?

6             MR. FOSTER:  Judge, I'm sorry.  I'm gonna object to

7    constantly saying "they".  And he's not really identifying

8    specific persons or situations.

9             THE COURT:  I don't need a speaking objection.  What's

10   your objection?

11            MR. FOSTER:  Well, Judge, it all sounds like hearsay,

12   beyond hearsay.

13            THE COURT:  I'll sustain.

14   Q.  (By Mr. Cooley)  Who are you talking about when you say

15   they?

16   A.  Actual Aztec members that were out in the streets.

17   Q.  Okay.  And how do you know this?

18   A.  Um, because it would come out in the newspaper.

19   Q.  Forget the newspaper.  Other than the newspaper, how else

20   would you know what was going on with Sinner?

21   A.  Because of the brothers, the conversations that we would

22   have.  It was a high priority.  Get him on sight.  Kill him.

23   Shoot him.  Stab him.  Whatever.  Get him.

24   Q.  Okay.  Now, before Shotgun left Pollock while you were

25   there, um, you said there were two meetings -- there was

1    meetings regarding him leaving.  Is that right?

2    A.  Yes, sir.

3    Q.  But you also talked a little bit about, um, discussions

4    regarding Chicho.  Is that right?

5    A.  Chicho.

6    Q.  Chicho?

7    A.  Yes, sir.

8    Q.  I'm sorry.

9    A.  Yes, sir.

10   Q.  What was the concern that he raised with you regarding

11   Chicho?

12   A.  Well, in a way he was trying me out how I felt about, um,

13   his actions and his behavior -- Chicho's behavior towards us,

14   the money that was missing.  In other words, prepping us for

15   something was going to happen to Chicho.

16   Q.  At some point, while you were in either Beaumont or in, um,

17   Pollock, did you see any communication about what was going to

18   happen to Chicho?

19   A.  Yes.

20   Q.  What did you see?

21   A.  I saw a letter in regards to him where word was going to

22   get sent out to just park him, make him keep believing he's

23   still a captain, but he had no decisions in the -- in the

24   dealings -- wheelings and dealings of BA.  But he was supposed

25   to be led to think that he was still going to be able to fix

David A. Perez, RMR, RPR

```
 1    his -- his rank.
 2             In other words, he was just put like on ice.  He still
 3    had rank, but he couldn't use it.
 4    Q.  And if he didn't have rank or couldn't -- or if he had the
 5    rank and couldn't use it, meaning that he didn't have brothers
 6    listening to him, following his orders.  Is that correct?
 7    A.  Exactly.
 8    Q.  And wouldn't have protection of the brothers?
 9    A.  Exactly.
10    Q.  Now, we talked before, um, that when the RICO indictment
11    came down in '08, that Chicho was the only one that was not put
12    in that case, the only capo not put in that case.  Is that
13    correct?
14    A.  Yes, sir.
15    Q.  Once Shotgun was sent to El Paso to stand trial on that
16    RICO case, what happened to Chicho?
17    A.  Died.
18    Q.  How do you know that?
19    A.  He died.  He got murdered in Juarez.
20    Q.  What brother first told you about that, if you recall?
21    Where were you when he --
22             THE COURT:  One question at a time.
23             MR. COOLEY:  I'm sorry, Your Honor.  I withdraw that
24    question.
25    Q.  (By Mr. Cooley)  Where were you when you first heard?
```

1    A.   In Pollock.

2    Q.   You were in Pollock?

3    A.   Yeah, I was still there when Shotgun came to El Paso.   We

4    still -- I still stayed there for about another seven months

5    before I went to the halfway house.   And within that time

6    period is when we got the letters and phone calls, you know,

7    little codes that he was gone.

8    Q.   Now, before Shotgun left, um -- and he was your padrino.

9    Is that right?

10   A.   Well, when he left -- actually, when we had that little

11   talk and he told me that my padrino wasn't no good, that if I

12   felt -- if I believed in his beliefs.   And I told him -- that's

13   when I told him the truth.   That -- that when I got out, I told

14   Chicho.   I go -- that if he was my padrino or not I wasn't

15   gonna participate -- I guess, that's the only reason why I

16   didn't get killed in Pollock.   He was trying to see if I was

17   doing the same things that Chicho was doing.   But, in a way, he

18   let me make it.   But he told me that he was my new padrino.

19   Q.   So what impression were you left with in terms of what was

20   going to happen to Chicho?

21   A.   Well, the only way that I got Chicho as a padrino is

22   because my other padrino got exed out.   That's the only reason

23   you get a new padrino.   If they ex him out, or he's dead or

24   he's going to get hurt.

25   Q.   And so Shotgun said who was going to be your new padrino?

```
 1   A.   Him.
 2            MR. COOLEY:  19F.  Your Honor, I don't believe this is
 3   in evidence.  I will show it to the witness.
 4            THE COURT:  All right.  You're correct.  It's not.
 5   Q.  (By Mr. Cooley)  Do you recognize that photo?
 6   A.   Yes, sir.
 7   Q.   What is that photo?
 8   A.   That's Chicho.
 9   Q.   Is that before or after he was killed?
10   A.   He looks pretty dead right there.
11   Q.   This was after he was killed?
12   A.   Excuse me?
13   Q.   This is after he was killed?
14   A.   Yes, sir.
15            MR. COOLEY:  Your Honor, at this time I offer into --
16   Government's Evidence(sic) 19F.
17            MR. FOSTER:  I would object to the offer of evidence
18   in this case.  It is a particularly gruesome photograph, one.
19   Two, it -- this is -- this witness has not testified to the
20   proper predicate for the admission of the photograph.  He may
21   recognize the person in the paragraph.  But without personal
22   knowledge, having been there or seen this, there's no way he
23   can testify to that it's an accurate representation.
24            THE COURT:  I'll sustain the objection.
25            MR. COOLEY:  That's fine, Your Honor.  Thank you.
```

```
 1              14B.  I believe this is in evidence.
 2              THE COURT:  It is.
 3              MR. COOLEY:  I would like to publish this, please.
 4              THE COURT:  All right.
 5    Q.  (By Mr. Cooley)  Do you recognize what this is?
 6    A.  Yes, sir.
 7    Q.  What is that?
 8    A.  It's a CD containing the -- the doings and the happenings
 9    on Barrio Azteca.
10    Q.  And this was a program, a national program?
11    A.  Yes, sir.  It was a program on a show called Gangland.  It
12    talks about how we began, the things we do to get there, the
13    wars we had with other gangs, the violence in Juarez, our
14    connections to the cartel and everything.
15    Q.  After this came out, how did the brothers feel about being
16    exposed on national TV?
17    A.  Well, most of them were thinking that it was cool, that we
18    had finally made it to -- but in reality, no, that's -- that's
19    when everything started to fall.
20    Q.  So they were kind of proud of it?
21    A.  Yeah.
22    Q.  Was there other rival gangs that were upset about that?
23    A.  Yes, sir.
24    Q.  Which gangs?
25    A.  The ones we embarrassed.  Texas Syndicate and Mexican
```

1    Mafia.

2    Q.  Did they get over it?

3    A.  Yeah, they had to.

4    Q.  How did they get over it?

5    A.  They had to swallow their pride or go back to war.

6              MR. COOLEY:  Your Honor, pass the witness.

7              THE COURT:  Before you do, I have a question about the

8    captures, 6SS-1, 11J-1, 13B-1, 13E-1, and 6QQ-1.  Are you

9    asking they be admitted into evidence?

10             MR. COOLEY:  Yes.

11             MR. FOSTER:  I'm sorry.  What are we going through?

12             THE COURT:  These are exhibits when he marked the

13   pictures, we captured them.

14             MR. FOSTER:  The captured images.  I have no

15   objection.

16             THE COURT:  6SS-1, 11J-1, 13B1, 13E-1 and 6QQ-1 will

17   be admitted into evidence.

18             And, um, let's go ahead and take a real short break.

19   It's almost 3:00.  So we will take a short break and proceed

20   with cross.  All right.  Ten minutes, Ladies and Gentlemen of

21   the Jury.

22             (Jury leaves courtroom.)

23             (Recess.)

24             COURTROOM DEPUTY:  Court is back in session.

25             THE COURT:  Be seated.  Ready for the jury?

```
 1              (Jury enters courtroom.)

 2              THE COURT:  Be seated.  You may proceed.

 3                        CROSS-EXAMINATION

 4   BY MR. FOSTER:

 5   Q.  Mr. Reyes, my name is Scott Foster.

 6   A.  Yes, sir.

 7   Q.  I want to go over some things with you today.  And let's

 8   start -- let's go over a little bit of your history.

 9   A.  Yes, sir.

10   Q.  I noticed that yours goes back a pretty good ways.

11   A.  Yes, sir.

12   Q.  You even mentioned even as a juvenile you had some

13   problems.  Um, I have done -- it looks like there's a 1999

14   possession of controlled substance.

15   A.  Yes, sir.

16   Q.  What kind of controlled substance was that?

17   A.  Heroin and cocaine.

18   Q.  1991, criminal solicitation, burglary, burglary of vehicle.

19   A.  Yes, sir.

20   Q.  What happened with those cases?

21   A.  Exactly what it says there.

22   Q.  And which is?

23   A.  I went to jail or got on probation or something.

24   Q.  Okay.  And later on in December of '91, I have criminal

25   mischief.  And did that affect your probation from your
```

David A. Perez, RMR, RPR

```
 1   burglary and criminal solicitation cases?
 2   A.  I'm sure it did.
 3   Q.  In '94 and also in '93, it looks like there were two
 4   burglary of vehicle cases wrapped together.  And you got -- got
 5   sentenced to the penitentiary.  Is that correct?
 6   A.  Yes, sir.
 7   Q.  That was eight years and ten years respectively?
 8   A.  Yes, sir.
 9   Q.  Those cases ran concurrent, didn't they?
10   A.  Yes, sir.
11   Q.  Let's see it also looks like in 1994, in October, that
12   would have been after the change of law where you got burglary
13   of vehicle, but that time it was a misdemeanor.
14   A.  Yes, sir.
15   Q.  Pled for time served on that one.
16   A.  Yes, sir.
17   Q.  In 1995, a credit card abuse here in El Paso.
18   A.  Yes, sir.
19   Q.  Got two years on that.
20   A.  Yes, sir.
21   Q.  Another burglary of vehicle in 1995.
22   A.  Um, yes, sir.
23   Q.  Pled for time served on that one.
24   A.  Yes, sir.  I think it was old cases.  And before I went to
25   prison, they put everything was running concurrent.
```

1   Q.  So all those things we're talking about, like '93, '94,

2   '95, came up all at one time and you bundled them together?

3   A.  Yes, sir.

4   Q.  That's not uncommon.  Okay.  So what about the December

5   '95 prohibited substance in a correctional facility.

6   A.  Yes, sir.

7   Q.  Got eight years on that one, sir?

8   A.  Yes, sir.

9   Q.  And that was also bundled with these others.

10  A.  Yes, sir.

11  Q.  So then you're back out in the year 2000, right?

12  A.  Yes, sir.

13  Q.  I see a couple of things, but it looks like failure to

14  identify as a fugitive.

15  A.  Yes, sir.

16  Q.  Which is a misdemeanor offense.  But it means lying about

17  your identity.

18  A.  Yes, sir.

19  Q.  To a police officer.

20  A.  Yes, sir.

21  Q.  Because you've got some kind of warrant out there, whether

22  it be a traffic warrant or whatever.

23  A.  Yes, sir.

24  Q.  Okay.  And you had another one of those in 2002.  Is that

25  correct?

```
1    A.  Yes, sir.
2    Q.  Um, I see both of those got three day sentences.  Is that
3    pled in the Jail Magistrate Court?
4    A.  Yes, sir.
5    Q.  In front of Judge Carter?
6    A.  Yes, sir.
7    Q.  In 2004, there's a curious entry, violation of a --
8    violation of a court order on gang activity?
9    A.  Yes, sir.  If you remember the injunction --
10   Q.  There were injunctions that were going on that the DA's
11   office got together a list of, I believe, it was current BA
12   members, wasn't it?
13   A.  Uh-huh, yes, sir.
14   Q.  And went to civil court, got an injunction.
15   A.  Yes, sir.
16   Q.  And the legislature passed a new law about -- about
17   violation of one of those orders, right?
18   A.  Yes, sir.
19   Q.  And you got 60 days in jail as a result.
20   A.  Yes, sir.
21   Q.  Another plea in front of Judge Carter?
22   A.  I'm not too sure if it was Mr. Carter.  But it was done
23   like that, 60 days or something like that.
24   Q.  Well, I'm just curious because those look like Jail Mag
25   recommendations to me.  And I would have been the prosecutor
```

1   back then.  Do you recall seeing me?

2   A.  Yeah, I do remember you from -- I remember a lot of you

3   guys.

4   Q.  I'm not trying to pull a family reunion here, just -- okay,

5   just a little activity going on.  Okay.  It looks like also

6   in -- about two months after that you picked up a possession of

7   controlled substance, penalty group one.

8   A.  Yes, sir.

9   Q.  Over 4, under 200 grams.

10  A.  Yes, sir.

11  Q.  What kind of controlled substance was that?

12  A.  It was probably heroin.  I was a heroin addict.

13  Q.  You got two years in the state penitentiary on that one.

14  A.  Um, I never made a state -- to the -- oh, yeah.  Yes, sir.

15  Yes, sir.  I thought it was talking about Sanchez Unit.

16  Q.  Okay.  Okay.  The short timers out there.

17  A.  I never made it to none of those.  That's why I'm saying it

18  had to be TDC.  Because they wouldn't send me to those places.

19  Q.  Okay.  Then it looks like two years later in August of

20  2006, you picked up a federal charge, conspiracy to possess a

21  controlled substance with intent to deliver?

22  A.  Yes, sir.

23  Q.  And that's this one you got 36 months in the federal

24  penitentiary on?

25  A.  Correct.

David A. Perez, RMR, RPR

1    Q.   And, then, when you came back out, of course, the federal
2    system gives you probation after you get off of --
3    A.   Correct.
4    Q.   -- it's called supervised release?
5    A.   Yes.
6    Q.   And you got a revocation of supervised release on that one
7    later?
8    A.   Yes, sir.
9    Q.   Right?  Okay.  And that's when you talk about having come
10   in to the county jail Annex for a while?
11   A.   Um, no, sir --
12   Q.   Just the downtown?
13   A.   Yeah.
14   Q.   Got it.  Um.  You had another one of those little false
15   identification to peace officer cases in March 2011.
16   A.   Um --
17   Q.   Is that right?
18   A.   Probably is, sir.
19   Q.   Then in January of 2012 you walked into the FBI building?
20   A.   Yes, sir.
21   Q.   Exactly --
22              MR. COOLEY:  Objection.  Objection.  He's misstating
23   the testimony.  It was February.
24              MR. FOSTER:  He's right, Judge.
25              THE COURT:  Restate the question.

1    Q.  (By Mr. Foster)  So in February of 2012, you went in to see

2    the FBI?

3    A.  Yes, sir.

4    Q.  How did you get in to see the FBI?

5    A.  Um, the night my brother shot me -- shot at my house and

6    family, I was -- I had to go down to the police station with my

7    family and everybody to -- to give a statement.  And at that

8    point you got to realize, that, hey, you've been faithful to

9    something for 20 years, and now your own brother's trying to

10   kill you, you know.  So I spoke a little bit to a detective.

11   And he just -- he didn't pressure me or nothing.  He just

12   offered me a number if I was willing to really open my eyes

13   now.  And I spoke to Ms.- -- to Samantha.

14   Q.  Now, did your brother decide to go shoot at you in your

15   house just out of the clear blue or was there a particular

16   reason?

17   A.  I don't think any brother of anybody just out of the clear

18   blue decides to go shoot you and your family, you know.

19   Q.  Do you know why he tried to do that?

20   A.  To tell you the truth, no.  But the pressure of, I guess,

21   being an Aztec, ex-gang member and having a brother that's

22   still active, and all the stuff they put in your head, he might

23   have been paranoid or something and just took a shot at me.

24   Q.  So you don't think he did that because you were on some

25   sort of list?

1   A.  Well, I really can't tell you.  I haven't seen a list.

2   Or -- I don't know why he did it.  But in this life it kind of

3   seems normal.

4   Q.  Have you talked to him since then?

5   A.  No, sir.

6   Q.  Let's talk about the units that you spent some time in.

7   I'm talking -- when I'm talking here, I'm talking about federal

8   units.  Give me a rundown because -- let's see, your federal --

9   your federal cases start actually in 2004.  Is that correct?

10  A.  No, sir, it starts in 2006.

11  Q.  2006.  Yes.  I'm sorry.  You are right.  What unit did you

12  go to first?

13  A.  Um, a real unit was in Oklahoma.  It's a transfer -- it's a

14  transfer facility.  And the smaller facilities here in Otero

15  and Sierra Blanca, before I got to my real unit, the

16  penitentiary.

17  Q.  What time did you get to -- what date did you get to El

18  Reno?

19  A.  I didn't get to El Reno.  It's the other transfer -- it's

20  still -- it's the same in Oklahoma.  But it's just a transfer.

21  It's just Oklahoma City.  The transfer facility, I believe, I

22  got there somewhere around 2006, late 2006, 2007.  I believe I

23  arrived in Pollock -- I was only there for like two weeks and

24  then sent there to Pollock.

25  Q.  Okay.  So when did you arrive in Pollock?

1   A.  I believe it was sometime in early -- early or mid-2007.

2   Q.  Okay.  I'm sorry.  Did you say early --

3   A.  No.  Early or mid-2007.  I don't really remember the exact

4   dates, sir.

5   Q.  When did you leave Pollock?

6   A.  Um, 2009.

7   Q.  Do you know about when in 2009?

8   A.  I think it was somewhere late 2009.  I'm not sure.

9   Q.  Okay.  Where did you go from Pollock?

10  A.  To a halfway house here on Alameda Street in El Paso,

11  Dismas.

12  Q.  Went straight from Pollock to Dismas Charities?

13  A.  Yes, sir.

14  Q.  And when was the next time that you saw the inside of a

15  jail?

16  A.  Um, about three days later because. . . I got there for,

17  like, two days.  And my first time they let me out I drank beer

18  and tested positive for an alcohol test.  So I ended up back in

19  Otero.

20  Q.  How long did you stay there?

21  A.  About four months.  Anywhere from three to four months just

22  for disciplinary.

23  Q.  So you had like a very quick revocation of supervised

24  release?

25  A.  Yes, exactly.  As soon as I finished the time that I was

1   supposed to do in the halfway house since I couldn't be in a

2   halfway outside, they sent me to Otero.  I did there the

3   remainder of the time of the halfway house, then was released

4   to the streets.

5   Q.  So you didn't go back to Dismas Charities?

6   A.  Yes.  You know what, yes.  I was sent -- I was sent --

7   disciplined.  And then, yeah, I went back to Dismas Charities.

8   Then I failed a UA.

9   Q.  How long did you stay at Dismas Charities?

10  A.  About two weeks.

11  Q.  Okay.  So about when is this that you're getting released

12  from Dismas Charities?

13  A.  I believe about June.  Somewhere around June, I think.

14  Q.  We're talking about June 2009?

15  A.  Yeah.

16  Q.  June 2010?

17  A.  Yes.

18  Q.  Then the next time you were arrested was when?

19  A.  About eight months later.

20  Q.  So about February 2011?

21  A.  About.  Yeah, you know what, you're right.  February.

22  Q.  Would that correspond, maybe, with that March 2011 fail to

23  identify?

24  A.  No, March -- yeah, you know what, yes.  That's the one

25  because I gave the Marshal a wrong name.  I gave the officer a

1   wrong name.  That's why they had to take me to the INS.  The

2   fingerprint turned out I was wanted by the Marshals.

3   Q.  And what was that -- basically, the arrest wasn't for

4   failure to identify.  That was a subsequent charge.  The arrest

5   was for what?

6   A.  For shooting up -- for heroin.  Well, that's what they

7   said.  There was a suspicion that somebody was using dope at

8   that place.  And they came to investigate.

9   Q.  A revocation of supervised release situation?

10  A.  Yes.

11  Q.  For using heroin?

12  A.  Yes.

13  Q.  Is that where you -- did they take a UA from you?

14  A.  No.  I refused to give it to them.

15  Q.  Okay.  That was my next question.  I noticed looking

16  through one of the reports it says that you were an enforcer

17  for the Barrio Azteca.

18  A.  Basically.

19  Q.  What did you do as an enforcer?

20  A.  Collect money, go intimidate people.  Whatever I had to do.

21  Q.  Well, when you say whatever you had to do, that's what I'm

22  trying to find out, is what it was you had to do.

23  A.  Hurt people.  Not just regular people.  People that were

24  selling drugs.

25  Q.  If I ask a question, then respond, okay.  But don't respond

```
 1    if I don't ask.
 2    A.  Got you.
 3    Q.  That's -- that's -- that's against the rules.  All right.
 4          Okay.  When you were in Pollock, what unit were you
 5    in?
 6    A.  In Pollock -- oh, C.
 7    Q.  C.  Describe C to me.
 8    A.  It's, basically, three -- three -- three blocks of cells in
 9    one compound, A, B and C.  I lived in C.
10    Q.  Describe for the jury the layout of -- this would be the
11    federal penitentiary in Pollock?
12    A.  Yes, sir.
13    Q.  We're not talking about the FCI?
14    A.  No.  No, the maximum.  The --
15    Q.  Where they hold the higher level offenders?
16    A.  Yes, sir.
17    Q.  Okay.  Now, describe what the layout is of those three
18    different blocks.
19    A.  They're exactly the same.  It's A building, which is A1,
20    A2, A3 and A4.  It's four living blocks in one.  So it's A, but
21    it's got four units in it.  Then it's B.  And it's got four
22    units in it.  And it's C.  And it's got four units in it.  I
23    lived in C2.
24    Q.  Okay.  In the box, they got these four blocks.  Are they --
25    they've got a center hub to them?
```

1    A.  Could you explain that better?

2    Q.  Well, do they join, like -- say, like, flower petals?  Or

3    what I'm trying to say is it -- is it designed like an X or is

4    it all just right there together?

5    A.  Yeah, they're like this.  One, two, three.  You got a field

6    on this side for soccer, a field in the middle for handball.

7    And then -- and C, where I belong, because there's gates to

8    cross to A to B and to C.  And those are, basically, open all

9    day or when they -- when they open them for the changes.

10   But -- and then there's the baseball field on my side.

11   Q.  Are there officers at these gates?

12   A.  There's a tower in the middle.  Basically, they just

13   control the gates.  But, sometimes if there's violence or

14   whatever, there will be officers in the gates to check with the

15   metal detectors to see if we've got. . .

16   Q.  What about inside the blocks inside your units?

17   A.  Well, before I lived -- what do you mean inside them?

18   Q.  Well, inside your C unit, where you were at, did you have

19   officers in there?

20   A.  Yes, there was always one.

21   Q.  Always one for four different blocks?

22   A.  One to each.  And then there's a separate door to each one

23   of them.  Each block has one officer.  And block C1 has one

24   officer.  You go in.  He does his count.  The doors are closed.

25   They only open the doors every hour.

1    Q.  You're told when to get up and go to breakfast?

2    A.  Yeah, the doors open at a certain time.  And you're called

3    to go to breakfast.  If you want to go, you go.  If you don't,

4    you stay in the block.

5    Q.  You're told when lunch is served?

6    A.  Yes.

7    Q.  You're told when to go to bed, lights out at a certain

8    time?

9    A.  Yes.

10   Q.  What cell block was Carlos Pereya in?

11   A.  B2.

12   Q.  Spend a lot of time over in B2, did you?

13   A.  Not really.  Only when I was called or when I had to go

14   talk to Mr. Renteria or Shotgun.

15   Q.  You're free to just walk into someone else's cell?

16   A.  Well, no, you've got to knock.

17   Q.  The guards don't keep you from going to other people's

18   cells?

19   A.  Not really.  He's in his office playing with his computer.

20   Q.  So it sounds like it is a pretty open society there?

21   A.  Yes, it is.

22   Q.  You're telling this court and this judge that she's -- when

23   she sends people to the federal penitentiary, she's sending

24   them to a place where they can freely communicate, walk around,

25   talk to whomever they want to, and, basically, do what they

```
 1   want to because there's only one little guard tower looking
 2   around at all these people?
 3   A.   Exactly.
 4   Q.   Mr. Reyes, you wouldn't exaggerate anything, would you?
 5   A.   Look at the records.
 6   Q.   Okay.  Well, that's what I'm going to do here.  You said
 7   that the FBI has paid you and your family somewhere between
 8   $7,500 and $8,000 so far?
 9   A.   Yes, sir.
10   Q.   And you're looking for more?
11   A.   I'm not looking for nothing.  I'm here by myself.
12   Q.   You testified that you were anticipating more money?
13   A.   It was something that was suggested.  Because, you know,
14   everywhere I go out here, somebody's going to try and kill me.
15   So. . .
16   Q.   Suggested by whom?
17   A.   Excuse me?
18   Q.   Suggested by whom?
19   A.   Um, when I agreed to testify, it's something that came up.
20   Because, of course, I asked.  You know, I'm not just going to
21   testify and walk out there like that, you know.
22   Q.   But I understand your family's already relocated.
23   A.   Yes, sir.
24   Q.   And you're with your family?
25   A.   Yes, sir.
```

CROSS - DANIEL - 7/16/13

```
 1   Q.  Now, did I hear you say you were doing work for the BA as
 2   an associate back in 1986?
 3   A.  Yes, sir.
 4   Q.  Because, as I remember your history lesson, the BA didn't
 5   actually hit this town and no advertisement went out until '87?
 6   A.  That's what you guys heard.  But everybody that was active
 7   and doing something, we knew since '86.
 8   Q.  So you just didn't know who you were associating for?
 9   A.  No, I had a brother that was a active gang member from the
10   beginning.  So I new pretty much what I was doing.
11   Q.  But you waited until 1994 before you were brought in?
12   A.  When I was 21.
13   Q.  And did I understand correctly, David Meraz was your
14   padrino?
15   A.  My second padrino.
16   Q.  Who was your first padrino?
17   A.  Grande, Manny Fernandez.
18   Q.  Where's Manny Fernandez?
19   A.  I can't tell -- I don't know.
20   Q.  What happened that Manny Fernandez is no longer your
21   padrino?
22   A.  Um, he decided to walk away from all of this when the RICO
23   started popping up.
24   Q.  No penalties?
25   A.  Oh, yeah, he's doing time somewhere.
```

1    Q.   I'm talking about for walking away.

2    A.   Oh, yeah, he's going to get killed some day, too.

3    Q.   On the infamous muleta list, right?

4    A.   Yes, sir.

5    Q.   Looks like there's more people on that list than there are

6    Aztecas.

7    A.   Oh, you wouldn't imagine how many there are now.

8    Q.   All right.  Prior to 1994, when you were an associate, you

9    testified that you did some things as an associate.  Tell the

10   jury what sort of things that you did.

11   A.   I would collect money.  I would bring drugs to the county

12   jail.  I would go check on homies' families.  I would help them

13   get their drugs, distribute, go collect quotas.

14   Q.   When you say homies, are you talking about associates, BA

15   members, what?

16   A.   Everything in general.

17   Q.   Just so anybody that's connected in some way is a homie?

18   A.   Yes.

19   Q.   All right.  Because I'm not familiar with that

20   nomenclature.

21   A.   I'm sorry about that.

22   Q.   That's all right.  So, did you administer beatings?

23   A.   Oh, yes, sir.

24   Q.   How did you get drugs into the county jail?

25   A.   Digging holes in the walls, getting brothers to come in

```
 1   with the drugs up their butt, visit, making holes through the
 2   windows, guards, paying them to bring it in.  Whatever.
 3   Q.  When you would administer beatings, did you ever break
 4   bones?
 5   A.  I imagine sometimes.  I don't remember.  But there were
 6   some pretty bad beatings.
 7   Q.  Did you ever kill anyone?
 8   A.  No.
 9   Q.  You sure about that?
10   A.  Unless he died after I left.
11   Q.  What full activity did you participate in to become a BA
12   member?
13   A.  Like I said, since '86, everything that was asked of me.  I
14   was my own gang member leader.  But everything that was asked
15   from me, it was done.
16   Q.  So up to '94, who would be asking you?
17   A.  Ranks.  I never took quotas from nobody except ranks.
18        MR. FOSTER:  Give me just a minute, Judge.  I seem to
19   have lost my train of thought here.
20   Q.  You said you had met Tablas in passing.  Exactly how did
21   you meet Tablas?
22   A.  Back then I was real young.  So, like I say, when I would
23   receive drugs or something, he would sometimes come down to the
24   barrio and -- over in Sandoval and the Westside too.  Like I
25   said, I was a kid.  I wasn't really shaking his hand and
```

1  everything.  But I knew who he was.

2  Q.  You said you had a conversation with Carlos Pereya about

3  your brother.

4  A.  Yes, sir.

5  Q.  Being beaten up.  Would that be in his cell or in yours?

6  A.  No, it was outside on the compound.

7  Q.  In the compound?

8  A.  Yes, sir.

9  Q.  Again, you freely moved from the C compound to the B

10  compound.

11  A.  Yes, unless there was a murder that had happened, the gates

12  would be locked.  But other than, when everybody was behaving,

13  the compound -- the three gates that let you go into the

14  different yards, are always open.  Only the main units, they

15  open every hour, and everybody shoots out like ants and goes

16  wherever they want.

17  Q.  And Shotgun didn't have any information for you?

18  A.  That's what he said.

19  Q.  You don't believe that?

20  A.  Of course not.

21  Q.  You blame Shotgun for that?

22  A.  Yes.

23  Q.  But isn't it true there are other capos who could have

24  ordered that?

25  A.  Not at the time.

```
1    Q.  Chicho was in El Paso?

2    A.  Chicho's stoned on drugs.  He was already on park.  Nobody

3    was listening to him in that regard.

4    Q.  Who was in charge of El Paso at the time then?

5    A.  Basically, Shotgun.

6    Q.  Shotgun was in Pollock.

7    A.  He had Tablas --

8    Q.  Who was on the ground in El Paso?

9    A.  He had Tablas in Juarez.  And Tablas made sure that what he

10   wanted was going to get done.

11   Q.  Who was in charge of El Paso?

12   A.  Cano.

13          MR. COOLEY:  It's been asked and answered, Your Honor

14   --

15          MR. FOSTER:  It's not been answered, Judge.

16   A.  Cano.

17   Q.  (By Mr. Foster)  Thank you.

18          THE COURT:  All right.

19   Q.  So Cano could have ordered that as well.

20   A.  No.

21   Q.  No?  Cano couldn't have ordered that?

22   A.  He was just in charge of El Paso.  He didn't have rank.  A

23   murder cannot be ordered except by a high rank.

24   Q.  Your brother was murdered?

25   A.  No.  But when you get an X on your name, that's what
```

David A. Perez, RMR, RPR

```
1    they're trying to do.  They just -- they didn't do the job
2    right.
3    Q.  Well, now, I've met a lot of exes.  And you're an ex, too,
4    right?
5    A.  Right now I am.
6    Q.  What's that supposed to mean?
7    A.  This day, today.
8    Q.  Day-to-day.  So tomorrow you might not --
9    A.  No.  I said this day, today, you can consider me an ex.  I
10   will never be an Aztec again.
11   Q.  You said that capos communicate through letters, family
12   members, phone calls.  Tell me exactly how many letters to the
13   capos you've actually seen.
14   A.  Lots.
15   Q.  How many?
16   A.  Over a hundred.
17   Q.  How many did you see in Pollock?
18   A.  In Pollock --
19   Q.  How many were you privy to in Pollock?
20   A.  None -- a few.  Like, two or three.
21   Q.  A few?
22   A.  That's how I know.
23   Q.  No.  You're kind of giving me a wishy-washy answer.
24   A.  Ask me again.  And I'll get you right.
25   Q.  How many letters were you privy to when you were in
```

CROSS - DANIEL - 07/16/13

```
1   Pollock?
2   A.  I saw about three or four.
3   Q.  How did you see them?
4   A.  I was asked to go over there and read them.
5   Q.  To?  Read them to whom?
6   A.  To myself so I could see what's happening.  He's not gonna
7   sit there and tell you what's going on.  He makes you read
8   them.  That way you learn how to write --
9   Q.  When you say he --
10  A.  -- and understand codes.
11  Q.  When you say "he" --
12  A.  Shotgun.
13  Q.  So you're saying Shotgun gave you letters to read.
14  A.  Yes, sir.
15  Q.  That were sent to him.
16  A.  Yes, sir.
17  Q.  Regarding what?
18  A.  Decisions, Chicho, who's -- who's coming up in rank, who's
19  being demoted, who's an ex, the happenings.
20  Q.  And you say that Shotgun gave you rank.
21  A.  No.
22  Q.  You were put in charge of the yard.
23  A.  Exactly.  Like what we talked about Cano, I can be in
24  charge, but I don't necessarily have to be a rank.  When a
25  captain says something, that's what it is.
```

David A. Perez, RMR, RPR

```
 1   Q.  Which yard were you in charge of?

 2   A.  The whole compound.

 3   Q.  When you say in charge --

 4   A.  There's three yards, A, B, C --

 5   Q.  I understand.  When you say in charge, what do you -- what

 6   does that entail?

 7   A.  I'm gonna go see that my soldiers have weapons.  I'm gonna

 8   go see that whatever's happening in the yard is on line.  I'm

 9   gonna talk to other gang members when there's a problem.  And

10   if can't avoid a problem, I'm going to be the first one to go

11   out there and do something.

12   Q.  You talked about that you bought heroin from other gang

13   members.  What other gang members would you buy heroin from?

14   A.  Basically the blacks, DCs, Louisiana people.

15   Q.  How much heroin did you buy?

16   A.  I was shooting up more in there than out here in the free

17   world.

18   Q.  How much did you consume in a week?

19   A.  I'd say about $100 worth.  That would be four papers of $25

20   on a bad day.  On a good day, when I would sell drawings, or do

21   my extra little details -- I was in charge of the kitchen for a

22   while.  So I had access to get the -- the potatoes and

23   everything to sell for the wine and -- I had -- I had my ways.

24   Q.  Pretty regular?

25   A.  Yes, sir.
```

David A. Perez, RMR, RPR

```
1    Q.  Why did Shotgun put you in charge of the yard?
2    A.  Probably, you know, to keep an eye on me.  Like I tell you,
3    I started feeling like he wasn't trusting me too much or. . .
4    Q.  So he put you in charge so he could watch you?
5    A.  Watch me do my job.
6    Q.  Not that so you could watch the yard.
7    A.  No, watch me watch the yard.  And when I mess up on the
8    yard, guess what happens to me?
9    Q.  So did ever -- guess what happens to you ever happen to
10   you?
11   A.  No, sir.
12   Q.  So just why would -- well, the use of the heroin was
13   against the rules.
14   A.  Yes, sir.
15   Q.  So just why would Shotgun take somebody who's constantly
16   using and high on heroin to do an important job like that?
17   A.  Because like him, he believes he functions better on drugs.
18   And he would see that I would function better on drugs, too.
19   You see?
20   Q.  Did you ever see -- did you ever see Carlos Pereya actually
21   use heroin, inject, however you take it?
22   A.  I walked into the unit a few times.
23   Q.  Walked in without knocking?  Please verbalize.
24   A.  You walk into the unit.  You can't go see him for a little
25   bit, you know, until he finishes.  You'd see the little blood
```

```
 1  mark, his pale face, scratching, you know.
 2  Q.  But you never actually saw him shooting up?
 3  A.  No, not actually.
 4  Q.  So what you're talking about is you're assuming from what
 5  you saw that that's what happened?
 6  A.  No, I'm not assuming.  Ask me why I know.  I'm --
 7  Q.  No.  I'll ask the questions that I need to ask, sir,
 8  please.
 9  A.  Okay.
10  Q.  Who was it that gave you rank?
11  A.  First, it was Manuel Fernandez, Grande.
12  Q.  When was that rank withdrawn?
13  A.  Um '97, '98.
14  Q.  '97 or '98?
15  A.  Yes.
16  Q.  Where were you when it was withdrawn?
17  A.  I was already at the Wynne Farm.
18  Q.  At the what?
19  A.  At the Wynne Farm in Huntsville, Texas.
20  Q.  That's a prison unit?
21  A.  That's a prison unit.
22  Q.  Is that what it's called?  Or is that what inmates call it?
23  A.  No, that's the real name of it.  Wynne, W-Y-N-N(sic).
24  Q.  Okay.  Who was it that took your rank?
25  A.  Um, I was told by a lieutenant and sergeant that I had to
```

```
 1    return it.  I couldn't claim it because there was some politics
 2    going on with Fernandez.
 3    Q.   Okay.  Who was it that took your --
 4    A.   Peppy Steel and Gato Camacho.
 5    Q.   Was it Chicho?
 6    A.   No.  That was the second time --
 7    Q.   Earlier you testified Chicho demoted you to soldier --
 8    A.   Yeah.  I was a lieutenant.  But I got demoted to sergeant.
 9    So I stayed in charge at Wynne farm while I was there for the
10    duration, along with Lieutenant Peppillo Steel and Sergeant
11    Gato Camacho.  When I left to the free world, um, Chicho took
12    my sergeant's rank away too.
13    Q.   So you went all the way back down to --
14    A.   To soldier.
15    Q.   -- the bottom.  That was in 2001?
16    A.   2000.
17    Q.   Actually, wasn't it Tolon from Coffield that ordered your
18    rank reduced?
19    A.   No.  He asked me if I was willing to fight for it or did I
20    want it back or wanted to present my case.  And I said, no.
21    Q.   I would like to draw your attention to -- let's see.
22    Well --
23            MR. FOSTER:  Can we have --
24    Q.   When was it --
25            MR. FOSTER:  Pardon me, Judge.  I'm sorry.
```

```
1    Q.   When was it that you first met Ramon Renteria?

2    A.   When we were kids, about 16, 17 years old.

3    Q.   You said he got his nickname how?

4    A.   Who, Mr. Renteria?

5    Q.   Yes.

6    A.   Spooky.  From the spray can.

7    Q.   He use to huff paint or something, sniff?

8    A.   I guess.  Or he probably tagged on walls.  But he got that

9    name --

10   Q.   We can't guess.  We can't guess.  I asked if you knew how

11   he got his --

12   A.   Yeah, he used to huff paint.

13   Q.   Do you know where he lived?

14   A.   Yes.

15   Q.   Can you describe it to me?

16   A.   Over here by Lincoln and Lincoln Park.

17   Q.   How close to the freeway?

18   A.   Real close.

19   Q.   You say real close.

20   A.   By where the handballs are and the houses there.  I don't

21   know his exact house.  But that was his neighborhood.

22   Q.   Did he have any other nicknames later on?

23   A.   Not that I know of.

24   Q.   Not that you're --

25   A.   The same one, spray can, crystal clear, whatever pertains
```

David A. Perez, RMR, RPR

1    to a spray can, you can use it for his name.

2    Q.  Well, that's the first one -- I've heard of that one.  Did

3    you know any other Spookys?

4    A.  I've heard.  I don't know them, personally.  But I've heard

5    of a few other Spookys.

6    Q.  How many others?

7    A.  That are Aztec members or regular?

8    Q.  Let's start with Aztec members.

9    A.  About two.

10   Q.  Non-Aztec members.

11   A.  About three -- three, four.

12   Q.  Do you know Salvador Delgadillo?

13   A.  No.

14   Q.  How about Angel Esceda -- Escajeda -- or Esceda?

15   A.  No.

16   Q.  Jaime Rodriguez?

17   A.  No.

18          MR. FOSTER:  Could we have 13G, please?

19   Q.  Can you see it on your monitor there?

20   A.  Yes, sir.

21   Q.  Now, what did you say this was a list of Westside BA list?

22   A.  Yes, sir.

23   Q.  Any particular time frame on this list, sir, that you know?

24   A.  No, sir.

25   Q.  You didn't make this list?

David A. Perez, RMR, RPR

```
1    A.  I didn't make it.
2    Q.  You recognize it because you recognize the names on there.
3    Is that correct?
4    A.  Exactly.
5    Q.  And you don't know whose handwriting this is?
6    A.  No, sir.
7    Q.  You don't know how authentic it may or may not be?
8    A.  For somebody to duplicate something like that, it would be
9    hard to know these codes.
10   Q.  What I'm asking you, is you don't know if all the codes are
11   true and correct.
12   A.  I do.  Those are the codes we use.
13   Q.  So you know all these people on this list and you know what
14   that means?
15   A.  Basically.
16   Q.  And you know that there -- that if someone is, say -- what
17   I'm trying to get to, you didn't make this list.  And so you
18   you don't know about the truth of this list.  Is that correct?
19   You don't know -- let me put it this way, you don't know if
20   whoever made this list, made this list for somebody else's eyes
21   to mess somebody over or not.
22   A.  Um, I'm pretty positive that wasn't done with this list.
23   Q.  How can you be pretty positive?
24   A.  Because I'm going to tell you if you do a list like that to
25   play with somebody's mind, especially in this business, you're
```

David A. Perez, RMR, RPR

1    going to get killed.  You're not going to be writing letters

2    like this with captains or lieutenants or sergeants.  This is a

3    list of people and their padrinos.  They're reporting to

4    whoever that this person just got to this unit.  He's claiming

5    this person is his padrino.  That's what this is.

6    Q.  Tell me about Arturo Lozano, Drowsy.

7    A.  Yeah.

8    Q.  Tell me about that, their names --

9    A.  That's a perfect example.  That's how we found out that was

10   a mistake.  You see the person who was claiming, not the one

11   who wrote it, the person who was claiming that I was his

12   padrino, lied about it.

13   Q.  So on this document there's false information?

14   A.  Yes.

15   Q.  That's what I'm getting to.  And because --

16          THE COURT:  You need to speak into the microphone.

17   Q.  -- your name is not on other persons' details.  You might

18   not know the specific aspects of that, whether it's true or

19   not.  Is that correct?

20   A.  I guess you could say that.

21   Q.  Well, I am saying that.  I'm asking you if that would be

22   true.

23   A.  It's not true.

24   Q.  No.  You believe it's going to be correct.  But you don't

25   know that it's gonna be correct, do you?

1   A.  Oh, no, I do.

2   Q.  You do?  How do you know?

3   A.  Because the rank, whoever sent this to us or to the unit to

4   investigate it, he was doing his job.  He did correct what that

5   person was telling him.  The other person was not an Aztec.  He

6   came and presented himself as an Aztec.  He was lying.

7   Q.  How does this piece of paper show that?

8   A.  Exactly.  That's how.  Because Arturo Lozano came up to --

9   to the leader of that unit and told him, Duke and Sleepy are my

10  godfathers.  So this person takes that information and sends it

11  to us.  Then I get asked.

12  Q.  Do you know who that person is?

13  A.  Yeah, it was --

14          THE COURT:  Hold on.  Hold on.  This is not a

15  conversation.  I have three people talking.  What's your

16  objection?

17          MR. COOLEY:  Objection.  He was interrupting the

18  witness as he was trying to speak.

19          THE COURT:  All right.  Now -- and I'm gonna ask you

20  to -- also, Mr. Reyes, to listen to the question and then

21  answer.  And let him finish his question before you answer.

22  And the same for you, please wait until your witness has

23  answered.

24          MR. FOSTER:  Yes, ma'am.

25          THE WITNESS:  Yes, ma'am.

1          MR. FOSTER:  I'm gonna move on.  I think I've beat

2    that one to death.

3    Q.  (By Mr. Foster)  When did you first meet Mr. Renteria, in

4    prison or jail?

5    A.  In jail in the '90s when we were doing time in the

6    county -- here in the county jail.

7    Q.  When did you meet him for the first time in prison?

8    A.  In prison?  No, he went to the feds.  I went to state.  So

9    the first time would be in Pollock, Louisiana.

10   Q.  And when was that that you first met up with him?

11   A.  That I first met up with him where?

12   Q.  In Pollock.

13   A.  The day I got there --

14   Q.  Give me a month and a year, please.

15   A.  That would be 19 -- I mean, 2007.  Like I told you, early

16   2007, as soon as I got there.

17   Q.  Where was Ramon Renteria staying?  What was he assigned to?

18   A.  He was in B2 block.  He was Shotgun's cellee.

19   Q.  You were out and back to work on the streets in 2006,

20   correct?

21   A.  Yes.  I was released from Texas prison in 2006.

22   Q.  You said you went back to work selling drugs.

23   A.  Yes, sir.

24   Q.  You made a deal with La Linea?

25   A.  It wasn't no kind of deal.  It was just a little agreement

David A. Perez, RMR, RPR

CROSS - DANIEL MEZA

1    for the time being.

2    Q.  Did you have permission from the rank to do that?

3    A.  I didn't need it.

4    Q.  You could deal with them directly, regardless?

5    A.  At that time we were treating them like flunkies.

6    Q.  And you tell me -- you tell this Court and the jury that

7    they would give you half of the drugs they crossed?

8    A.  Yes, sir.

9    Q.  Why on Earth would they give you half of the drugs they

10   crossed?

11   A.  Because if they weren't dealing through us, we just take

12   everything.  So they would prefer to at least stay with

13   something.

14   Q.  So you're saying that you were getting a quota from them in

15   kind for 50 percent?

16   A.  Yes, sir.

17   Q.  Isn't your standard quota ten percent?

18   A.  For a normal person that you're doing business with.  I'm

19   not doing business with them.  I'm going to take their stuff or

20   they're gonna meet my --

21   Q.  And La Linea had no problem with you taking 50 percent of

22   their drugs?

23   A.  Like I tell you, they were dying in Juarez.  They didn't

24   want no problems with us.

25   Q.  In 2006?

1    A.   In 2006.

2    Q.   You mentioned that the money that went to -- we were

3    talking about quotas.  And you gave a figure of -- if someone

4    was making $500 a week off dealing drugs, you would take 250.

5    Is that right?

6    A.   Depending.

7    Q.   Isn't the quota, again, ten percent?

8    A.   Like I say, it's just like the rules.  They're just there

9    for show.

10   Q.   So, basically, what you're saying is even though you had

11   rules that say ten percent, you were extorting people for more

12   money and more profit and more gain than what even the rules of

13   the BA allowed.  Is that right?

14   A.   Exactly.

15   Q.   So you had no problem making your quota?

16   A.   No.

17   Q.   You mentioned that there was a person that didn't pay their

18   quota that lived on Frutas in Central.  You remember that?

19   A.   Yes, sir.

20   Q.   Wasn't that information that was used in the last RICO

21   trial in 2008?

22   A.   You know what, I think it was, sir.

23   Q.   So we're looking at a rehash here.  You brought this --

24   this is old information you brought that's been used more than

25   once.  Is that correct?

```
 1   A.  I guess.
 2   Q.  And did you have personal knowledge, which means, did you
 3   see it for yourself?
 4   A.  Oh, yes.  It was brought to my attention that this --
 5   Q.  No, no.  I didn't ask you brought to your attention, sir.
 6   Please.
 7   A.  Rephrase that, please.
 8   Q.  Did you see it for yourself?
 9   A.  Oh, no.  I wasn't there.  I would have been on that
10   indictment, too.
11   Q.  So your information comes from what other people tell you.
12   A.  Particularly, the captain.
13   Q.  Other people.
14   A.  No, not people.  Barrio Azteca gang member.
15   Q.  Comes from what other -- Barrio Azteca gang members are
16   people, correct?
17   A.  Yes, sir.
18   Q.  Okay.
19            MR. FOSTER:  Could we have 13J, please?  I can't see
20   it on the monitor.  That's okay.
21   Q.  Can you see it on your monitor?
22   A.  Yes, sir.
23   Q.  13J, that has to do with figures on a quota?
24   A.  Yes, sir.
25   Q.  Can you give me a time frame from this document?
```

1    A.  October 18 through 24th.

2    Q.  Of what year?

3    A.  It doesn't say the year.

4    Q.  You don't know the year.  So when you recognize this

5    document, basically, you recognize figures on this document and

6    you believe them to be quotas.

7    A.  I used to do the same thing.

8    Q.  You believe it to be quotas because it looks similar to

9    something you've seen before?

10   A.  Exact same thing.

11   Q.  The exact same thing?

12   A.  Exact.

13   Q.  Are we talking like exact numbers?

14   A.  Basically.

15   Q.  So -- all right.  You used to write it on an envelope?

16   A.  Excuse me?

17   Q.  You used to write it on the envelope?

18   A.  That's where we would put all the money that was turned in.

19   Q.  Okay.  So that's what I'm asking.  You believe it to be

20   figures for a quota based on other documents you've seen

21   before.  You haven't seen this document, personally.

22   A.  No, I couldn't identify who wrote it or who it was.  But it

23   was. . .

24   Q.  And you can't vouch for the accuracy of that, either, can

25   you?

1    A.  It always changes.

2    Q.  And you don't know whether someone's skimming off of that

3    or not.

4    A.  Oh, they're always skimming.

5    Q.  You don't know whose it is.  You don't --

6    A.  It tells you whose it is.

7    Q.  Whose is it?

8    A.  Every person that's in charge of each of those sides of the

9    town.

10   Q.  So it doesn't give you a name that -- who's turned that in?

11   A.  Only the people who are in charge at that time know.

12   Q.  And you don't even know what time that is.

13   A.  It's the October 18th through the 24.

14   Q.  2008, 2006, 2010?

15   A.  I don't know.  Doesn't say specific on that.

16   Q.  That's what I'm asking.  You don't know when that is.

17   A.  No.

18   Q.  So you can't vouch for whose figures these are.

19   A.  Oh, no, I can't say they're Cano's or they're yours or

20   mine.

21   Q.  You don't know who the leaders of these particular areas

22   are because you don't know when this is, right?

23   A.  Yeah, I guess you could say that.

24   Q.  This document could even be outside the range of the

25   indictment, could it not?

1   A.  No.

2   Q.  Could it be prior to 2003?  Isn't that possible that it's

3   prior to 2003?

4   A.  It could be possible.

5   Q.  You mentioned about sending money to the capos.  And I

6   noticed that you said that officers, capos, received 5- to $600

7   a month.  Is that your figures?

8   A.  Depending.  That's what I used to send.

9   Q.  Now, the jury's already heard testimony from others and

10  seen documentation that capos get $200 a month.  Any particular

11  reason why you would send two and a half to three times as much

12  money?

13  A.  Yes, sir.

14  Q.  Why is that?

15  A.  More activity on the streets.  More sales of drugs.  More

16  people selling for me.  More quotas being picked up.

17  Q.  It also makes it a lot more conspicuous when they receive

18  it in jail, doesn't it?

19  A.  It doesn't go all at one time.  A hundred here, a hundred

20  there, 200 here.  But it's never going to be over 200.  That's

21  probably what they meant.

22  Q.  No, I don't think that's what they meant.

23          THE COURT:  You need to put it in the form of a

24  question.

25          MR. FOSTER:  Okay.  I will withdraw that, Judge.

1    Q.   (By Mr. Foster)  So if somebody said they were sending $200
2    a month, you're telling me that would be incorrect?
3    A.   No, it's probably correct.
4    Q.   So when you generalized and said that they get 5- to $600 a
5    month, what you really meant was sometimes you would send 5- or
6    $600 a month?
7    A.   Yes.
8    Q.   You also said that in the fed system people can get work
9    starting at $30 a month?
10   A.   Yes, somewhere around there.
11   Q.   They never make more than $100 a month?
12   A.   Not on a regular job until you get to Unicor.  You can make
13   up to 500 there.
14   Q.   Tell me about Unicor.  What's that?
15   A.   That's a very high-class job within the compound.  But us
16   that are aggravated gang members or that you've been caught
17   with a dirty UA or a knife or something, you can't hold those
18   jobs.  Or, you hold them for a very short -- be able to hold
19   them for a short period of time.
20   Q.   BA members ever get jobs in Unicor?
21   A.   You know what, I was surprised when we got there, yeah, a
22   few did.
23   Q.   So it's possible for people who are in BA to make $500 --
24   up to $500 a month, legitimately, while in prison?
25   A.   Probably, the most, like, 200, 300.  But not the $500 job.

1   Certain machines -- depending on what machine you're working,

2   that machine makes the most money.

3   Q.  So are you saying, like, Texas Syndicate or Mexican Mafia

4   people are favored over BA members for those jobs?

5   A.  Sometimes.  Depends.

6   Q.  You say you met Cano twice on the streets?

7   A.  Yes, sir.

8   Q.  Did he have rank?

9   A.  No, sir.

10  Q.  But he was in charge?

11  A.  Yes, sir.

12  Q.  When was it exactly that you were assigned to the Westside

13  to get the BA drugs from Mexico?

14  A.  When I was?

15  Q.  Yes, sir.

16  A.  I was never assigned to get the drugs from Mexico myself.

17  Q.  When?

18  A.  No, I was never assigned myself --

19  Q.  Okay.  I'm sorry.  Were you ever involved in smuggling the

20  drugs from Mexico?

21  A.  Not the BA drugs.

22  Q.  When was it -- you were talking about going to Mexico and

23  throwing the drugs across the river or into the bushes.  When

24  was that?

25  A.  For the -- the drugs that I would get from La Linea or the

```
 1   drugs I would buy with my own money.
 2   Q.  And that was not BA drugs?
 3   A.  Those were my drugs.
 4   Q.  Did you pay quota on it?
 5   A.  No, sir.
 6   Q.  Later on, you said you would sell heroin here in El Paso.
 7   A.  Yes, sir.
 8   Q.  And you said you got it from Manny Lopez or Peewee?
 9   A.  Yes, sir.
10   Q.  Peewee is Omar Lopez, right, his brother?
11   A.  I don't remember his first name.  But Peewee is his
12   brother.
13   Q.  Okay.  How much drugs would you sell?
14   A.  Depending.  Like I said, it was -- I would buy, like, an
15   ounce, half an ounce, pay it in cash.  That way, if I did it
16   myself or lost it, it's mine.
17   Q.  Well, my next question is going to be how much did you take
18   for yourself?
19   A.  What do you mean?
20   Q.  How much of the heroin that you bought to sell did you use
21   for yourself?
22   A.  Most of the times most of all of it.
23   Q.  You know, I was curious, on Exhibit 6QQ you mentioned that
24   there was a shirt with a logo being held up.
25        MR. FOSTER:  You know, I don't know what's happening.
```

1   But it's not showing anything.  I'm having a problem --

2   Q.  Who is it that's holding up that T-shirt?

3   A.  That would be Peewee.

4   Q.  Now, you said something about that's the Azteca logo.

5   A.  No, I was commenting if -- if -- since we always wear Aztec

6   pride shirts and anything having to do with the Aztec culture,

7   you know.  Is it a logo of us?  Did we copyright the logo?

8   Q.  So that's not actually made for the Barrio Azteca.

9   A.  Um, no.  They sell them on the streets.

10  Q.  It's not like you got your own print shop and stuff.

11  A.  No, unless you get it and then you put it on the back.

12  Q.  So when you say that's our logo, you just -- what you're

13  saying is that's something that's Aztec and you identify with

14  that.

15  A.  Yes, sir.

16  Q.  Okay.  Well, it sounds a little different, don't you agree?

17  A.  Well -- do you want me to explain a little bit on that?

18  Q.  I just wanted a yes or no.

19  A.  No.

20  Q.  Is there any particular symbolism to the Aztec calendar?

21  A.  Yes.  That's the Fifth Sun.  It represents the Quinto Sol,

22  our Empire.

23  Q.  I'm sorry?  What?

24  A.  The Fifth Sun, which is part of our -- the last sun, our

25  Empire.

1   Q.  You say sun.  You mean like -- "sol"?

2   A.  Yes, the "sol".

3   Q.  Okay.  You talked about a handshake where the older guys

4   would grip each others' arms.

5   A.  Yes, sir.

6   Q.  Isn't that a Native American concept?

7   A.  Depends.  We made it our own, sir.

8   Q.  So it's not necessarily like a secret handshake, like --

9   you know like an Obama fist bump, more like.

10  A.  You can tell right away.  If -- if I shake somebody's hand

11  like that, it's just a normal person.  When I walk to

12  Mr. Renteria or somebody that I believed was my brother for

13  reals, I will die for you.

14  Q.  That brings up another thing that I want to look at.

15          MR. FOSTER:  Can we look at 17A-2 or 17A-3?

16          THE COURT:  Do you not have a hard copy of it so he

17  can look at it?

18          MR. FOSTER:  You know, he was getting that out.  My

19  fault.  He was getting that out.  And I said I will be okay.  I

20  think it's A2 that I want to look at.

21          THE COURT:  That's up on the screen also.

22  Q.  (By Mr. Foster)

23          MR. FOSTER:  Okay.

24  Q.  (By Mr. Foster)  Now, is that the one where Mr. Carzoli is

25  number three?

1    A.  It's too dark on this one.  But, yes.  I can't really see

2    it.

3              THE COURT:  Can you make it larger so he can see?

4              THE WITNESS:  Thank you, ma'am.

5              THE COURT:  You're welcome.

6    A.  Yes, sir.  Number three.

7    Q.  (By Mr. Foster)  I realize it's just the lower portions of

8    his arms that are showing.  But I don't see that tattoo that

9    you were talking about he had of Shotgun.

10   A.  Who are you referring to?

11   Q.  Mr. Carzoli.  Number three.

12   A.  Right there it -- I don't think -- none of us had it right

13   there.

14   Q.  Now, this particular picture, was this like, Hey, guys,

15   let's get our group picture taken?

16   A.  Um, yes.

17   Q.  It was you-all -- you-all wanted this picture taken?

18   A.  No.  Um, Shotgun would tell us a certain date everybody get

19   your tickets, we're gonna go take pictures.

20   Q.  And that's because you-all wanted a group picture?  Or is

21   that because maybe the penitentiary was wanting a picture of

22   everyone?

23   A.  He was -- that's the way he sends the pictures to identify

24   who's in the unit, who's there.

25   Q.  So Shotgun's in charge of picture taking at the

```
1    penitentiary?
2    A.  Yeah.  We can go on our own if we want to.  But a group
3    with everybody in it, basically, it's him who's going to order
4    it.
5    Q.  Okay.  Well, let's look at -- first on that one, on that A2
6    picture, who's number 18?
7    A.  Number 18?
8    Q.  Yes.
9    A.  That's Rocky.
10   Q.  Rocky Anchondo, right?
11   A.  Excuse me?
12   Q.  Rocky Anchondo.
13   A.  I believe so.
14   Q.  Okay.  I believe your testimony was he was an associate at
15   the time?
16   A.  Yes, just an associate.
17   Q.  So wouldn't he get in trouble for flashing 21?
18   A.  I don't know.  I wasn't there when that happened.  I would
19   have talked to him about it.
20   Q.  I'm asking.  You know the rules.  Would he get in trouble
21   for flashing 21?
22   A.  Yes.
23   Q.  Being just an associate?
24   A.  Yep.
25   Q.  Would you look at his right hand in that picture and tell
```

```
 1    me what that's doing?
 2    A.  Yeah.  There's a lot of things in that picture that
 3    shouldn't be done like that.  Number 4 shouldn't be standing
 4    there in the middle like that, either, with our captain.
 5    Q.  So I can -- if I'm a BA member, I could shake someone's arm
 6    like this.  Welcome, brother.  But I can't be nice to them or
 7    say, you're my dude, right?  Because if you do that, then, it's
 8    showing that you're homosexual.  Is that what that's saying?
 9    A.  I don't know, man.  But it looks funny.
10    Q.  That's what you intimated earlier.  And I'm just asking you
11    if that's the deal.  If one man puts his arm on another one,
12    that's the only thing it can be for you?
13    A.  We're in a prison.
14    Q.  Please answer me yes or no --
15    A.  Yes.
16    Q.  Again, Mr. Carzoli, you said, was Number 3?
17    A.  Yes.
18    Q.  You see his right arm?
19    A.  As you can see there, he doesn't even have tattoos.  He
20    didn't start getting tattooed yet.
21    Q.  How long had he been a BA member?
22    A.  He was one of the new ones.  When I got there, it wasn't
23    too long ago I think that they had just barely brought him up.
24    That's when he started getting tattooed.
25    Q.  Let's go to your tattoos.  I believe that's going to be
```

David A. Perez, RMR, RPR

1    16J-1, 16J-3.  The headdress that's there, got lots of feathers

2    on the top of the headdress, right?

3    A.  Yes, sir.

4    Q.  Two on the side?

5    A.  Yes, sir.

6    Q.  And you're saying that's for being a lieutenant?

7    A.  Yes, sir.  The two on the side, yes.

8    Q.  And then on the other side of your arm, on the other side

9    of your body, in 16J-3, that one has one side feather?

10   A.  Yes, sir.

11   Q.  And you're saying that's for being a sergeant?

12   A.  Yes, sir.

13   Q.  When did you get these tattoos?

14   A.  That one, I got it fixed there at Pollock.  The other one I

15   had it since as far as I can remember.

16   Q.  As far as you can remember?

17   A.  Yes, way back.

18   Q.  Back before '86?

19   A.  About 2000.

20   Q.  See --

21   A.  You see, I don't --

22   Q.  Really, because what I'm asking -- what I'm going to get to

23   is this, you got two skulls on one side, and one skull on the

24   other side, right?

25   A.  Yes, sir.

```
 1   Q.  And that means -- got two over here, one over here.  What
 2   does that mean?
 3   A.  21.  BA.  Barrio Azteca.
 4   Q.  You got two feathers over here and one feather over here.
 5   A.  That means your rank.  When it's -- I know you don't know
 6   about our culture --
 7   Q.  Are you sure that just doesn't mean 21.  Barrio Azteca?
 8   A.  I'm sure.
 9   Q.  Because I've been told the feathers that -- they don't
10   really mean that.
11   A.  Depends on who you talk to.
12   Q.  Well, associates weren't allowed to carry shanks.  Is that
13   correct?
14   A.  Depends.
15   Q.  I believe you made a statement of only the BA carry shanks.
16   A.  Yes.  Well, they carry their shanks.  But only the BA are
17   sent to handle BA hard jobs.
18   Q.  Hard drops?
19   A.  Hard jobs.  About he's always supposed to carry his
20   shank --
21   Q.  Please, only ask answer the questions that are asked.
22   A.  Sorry about that, sir.
23   Q.  Just kind of a curiosity.  Your nickname is El Duque?
24   A.  Yes, sir.
25   Q.  That wouldn't be like a takeoff on the Mussolini thing,
```

CROSS - DANIEL - 7/16/13

```
 1    would it?
 2    A.  No.
 3    Q.  Now, on the -- on the tattoo that you have of Carlos
 4    Pereya, it has a number 12 --
 5    A.  Yes, sir.
 6    Q.  -- on top of that?
 7    A.  Yes, sir.
 8    Q.  Isn't his nickname really Doce?
 9    A.  It's the same thing.  Doce is 12 in Spanish.
10    Q.  Not Shotgun?
11    A.  Shotgun --
12    Q.  It's true that people have kind of taken that.  And it's
13    gone from 12 to 12 gauge and then to Shotgun and it's kind of
14    evolved?
15    A.  No, sir.  12 represents 12 gauge shotgun.
16    Q.  What did 12 come from?
17    A.  From the 12 gauge.
18    Q.  Sure it wasn't because he's like the twelfth man?
19    A.  No, sir.
20    Q.  So people that have BA tattoos who aren't BA are subject to
21    being hurt.
22    A.  Yes, sir.
23    Q.  What if you're wearing a jersey with number 21 on it?
24    A.  Yes, sir.  You're gonna be asked about it if you're nobody.
25    The regular shirts like how -- the one you saw right now, if
```

1    it's just a normal person that's not in and you're wearing it,

2    you're probably going to get hit up, Why you wearing that

3    shirt?

4    Q.  A lot of football players on the list, right?

5    A.  Yeah.  But we're not going to be murdering NFL players.

6    Q.  You talked about having a meeting with Shotgun leaving

7    Pollock or before Shotgun left Pollock.  How did you get into

8    that meeting?

9    A.  I was called.

10   Q.  By whom?

11   A.  By Shotgun.

12   Q.  Did you have rank at that time?

13   A.  No, sir.

14   Q.  And there were some -- how many BAs there at Pollock at

15   that time?

16   A.  About 19.  Anywhere -- through the time I was there,

17   anywhere from 19 to 25, 26.

18   Q.  How many of them had rank?

19   A.  Nobody.

20   Q.  Shotgun had rank.

21   A.  He was the only one.

22   Q.  So exactly why did he call you into the meeting?

23   A.  Because I was one of his enforcers.

24   Q.  The heroin addict?

25   A.  He was a heroin addict, too.

1    Q.  But he's on top and you're not.

2    A.  I was, too.

3    Q.  You were, too?

4    A.  Yes, sir.

5    Q.  You were in charge?

6    A.  See, he had a little sit-down with me.  And he told about

7    the drugs and about the heroin.  We could use it under his --

8    under his guidance.  But only certain -- certain of us.

9    Q.  So he made special rules for you?

10   A.  Yes, sir.

11   Q.  So if Shotgun, as you claim, was going to put Ramon

12   Renteria in charge and not you, that's a little thorn in your

13   side, wasn't it?

14   A.  Hell, no.  I was never power hungry.  That's why I gave

15   back my rank.

16   Q.  You weren't jealous?

17   A.  No, sir.  I loved that dude right there --

18   Q.  But you were in charge --

19   A.  -- he was my brother.

20   Q.  You said it was fairly easy to circumvent the UA in prison.

21   A.  Yes.

22   Q.  So why did you get caught?

23   A.  I didn't get caught with a dirty UA.  I refused it.

24   Q.  Why did you refuse it if you could pay off the -- the

25   trustee to pull the report?

```
 1   A.  Not all the guards and not all the -- the trustees do it.
 2   Plus, Shotgun wasn't dumb.  That's why he told me that -- he
 3   knew I was using and I wasn't going to stop using just like he
 4   wasn't.  So he says don't get caught.  And don't lose your job.
 5   Q.  So you refused the UA.  Did you lose your job?
 6   A.  No.
 7   Q.  What happened to you?
 8   A.  I guess you could say as long as you're keeping things in
 9   order, the officers are willing to look the other way.
10   Q.  Uh-huh.  I was looking at that muleta list that was put up.
11   A.  Yes, sir.
12   Q.  I noticed there was a man on there by the name of Cesar
13   Reyes.  That was right below -- right there where your
14   brother's name was.
15   A.  Yes, sir.
16   Q.  Did you happen to notice his moniker, his nickname?
17   A.  No, sir.
18   Q.  I believe that's 13F.
19           THE COURT:  It's been admitted.  Do you want the jury
20   to see it?
21           MR. FOSTER:  Yes, Judge, if we can.  That's not the
22   right one.  I'm sorry.
23           THE COURT:  It has Cesar Reyes.
24           MR. FOSTER:  It's the last one that has the
25   handwriting there.
```

```
1    Q.  (By Mr. Foster)  Fourth from the bottom.
2    A.  I see it.
3    Q.  What's the moniker, the nickname?
4    A.  King with a question mark.
5    Q.  It says what beyond that?
6    A.  Reyes is King with a question mark.  And Spooky is
7    Northeast.
8    Q.  Thank you.
9            THE COURT:  Could the attorneys approach just a sec?
10           (Attorneys approach bench.  Off record discussion.)
11           THE COURT:  Whenever you're ready.
12   Q.  (By Mr. Foster)  You testified that it's about the quotas
13   and receiving that money while in prison from the BA, the
14   quotas -- receiving that money and being distributed.
15   A.  Yes, sir.
16   Q.  Did you ever receive money from quotas?
17   A.  Yes, sir.
18   Q.  Did you ever send any of your money to Ramon Renteria?
19   A.  No, sir.
20   Q.  You testified that it's rare that inmates get money from
21   family.
22   A.  Most of the time.
23   Q.  Most of the time.  Well, let me ask you.  You also said
24   that no one would really know how that would be separated out,
25   didn't you?
```

David A. Perez, RMR, RPR

1   A.  By the receipts, that's the only way.

2   Q.  Well, who would have the receipts?

3   A.  The money order.  Whoever did the money order.

4   Q.  Don't these money orders get sent to a post office box and

5   gets deposited from there into these accounts?

6   A.  It goes through the -- if you're in the federal system, it

7   goes through the moneygram, that blue form, and goes straight

8   into your account.

9   Q.  So the prisoners wouldn't have receipts of who they

10  received money from, would they?

11  A.  No, not to my knowledge.

12  Q.  And there wouldn't be any real way of the inmates knowing

13  for sure where that money had come from unless someone

14  communicated to them.  Is that correct?

15  A.  Oh, yes.

16  Q.  In other words, I wouldn't know if that money came from my

17  Aunt Jane or a local BA member, unless I was told from someone

18  else that it came from my Aunt Jane or a local BA member?

19  A.  Oh, no, you'd know.

20  Q.  You have intuition?

21  A.  No, well, you can ask.  You see there's a little machine

22  that you go to right there when we go to work.  You put in your

23  badge number and it says who sent the money.

24  Q.  And, of course, the BA are sending it under their own name,

25  right?

1    A.  Depends, sometimes, yeah.  Sometimes they're dumb enough to
2    send it under their own name.
3    Q.  So sometimes somebody might know.
4    A.  Might know?
5    Q.  Might know who sent the money.
6    A.  Oh, like I told you, you know.  As soon as you get money
7    and if you don't know in your phone account, you go to the
8    office and you put your number.  They have a machine there for
9    you.  You only know that code.  And you punch in that code.
10   And it would tell you who every person that sent you money for
11   the whole month.
12   Q.  You talked about one spot that there was a member that
13   tested positive for drugs.  And you were told to do the
14   discipline.
15   A.  Yes, sir.
16   Q.  Do you remember what kind of drugs they tested positive
17   for?
18   A.  I think it was heroin and marijuana.
19   Q.  Who was it?
20   A.  Bones.
21   Q.  I'm sorry?
22   A.  Bones.
23   Q.  Do you know Bones' legal name?
24   A.  No, sir, I don't remember it.  Joe-something.  I'm not
25   really sure.  But I know it's Bones.

David A. Perez, RMR, RPR

CROSS - DANIEL PEREZ

1    Q.  So you're telling this Court that you, as a heroin addict,

2    was sent by the leadership to discipline somebody for heroin

3    use?

4    A.  Yes, sir.

5              MR. FOSTER:  Pass the witness for now, Judge.

6              THE COURT:  All right.

7                          REDIRECT EXAMINATION

8    BY MR. COOLEY:

9    Q.  Who's 15 again?

10   A.  Mr. Renteria.

11   Q.  You remember this photo?

12   A.  I wasn't there.

13   Q.  You indicated earlier in your testimony that that was taken

14   before you got to Pollock?

15   A.  Yes, sir.

16   Q.  Is that right?

17   A.  Yes, sir.

18   Q.  Do you see any tattoos on 15?

19   A.  No, sir.

20   Q.  You indicated -- when did you get your Shotgun tattoo and

21   your T-top tattoo?

22   A.  At the same time.  Basically, all of us got it at the same

23   time.  Around -- as soon as they were going to pick up Shotgun,

24   it was a tribute to him.  And at the same time he was my new

25   godfather.  So it was a tribute to him and T-top.

David A. Perez, RMR, RPR

```
 1            MR. COOLEY:  One moment, Your Honor.  The Court's

 2    indulgence.

 3    Q.  You testified about this earlier.

 4    A.  Yes, sir.

 5    Q.  This is a tattoo on Renteria's arm?

 6    A.  Yes, sir.

 7    Q.  This tattoo right now you're seeing, which is Government's

 8    Exhibit 28, this, apparently, was put on his arm after that

 9    picture was taken that we just talked about.

10    A.  Oh, yes, sir.  This is while I was there.

11            MR. COOLEY:  No further questions.

12            THE COURT:  Anything further of this witness.

13            MR. FOSTER:  Yes, judge.

14                         RECROSS EXAMINATION

15    BY MR. FOSTER:

16    Q.  When did you say Carzoli got there?

17    A.  I don't know.  When I got there, he was already there.

18    Q.  He was new to the membership?

19    A.  Yes, sir.

20    Q.  Isn't it true he had been in that unit since 2003?

21    A.  Yes, but he wasn't an Aztec member until -- it was a while.

22    Q.  Where was he stationed?  What cell block?

23    A.  B2.

24    Q.  You aware they only put Aztec members in B?

25    A.  No, sir.
```

David A. Perez, RMR, RPR

```
 1   Q.  They wouldn't put members of another gang in there, would
 2   they?
 3   A.  Yes, sir.  Texas Syndicate, Mexican Mafia.
 4   Q.  You testified earlier, as I recall, that they put like gang
 5   members together in the cell blocks and not different --
 6   A.  In their own cell.  But you got to realize, there's about
 7   seventy cells in each unit.  And that's four units in every
 8   unit.
 9   Q.  Again, I'm going to ask you.  So you were not aware that
10   they only put Barrio Aztecas in B?
11   A.  I don't believe that to be true.
12   Q.  Now, in that photograph -- what was it?
13              THE COURT:  28.
14              MR. FOSTER:  I'm sorry.  17A-3.  No, not that one.
15   The other one.  It's like it.
16              THE COURT:  It's on the screen.
17   Q.  (By Mr. Foster)  This is the one where the infamous arm on
18   the back there, from Carlos Pereya to --
19              MR. COOLEY:  I'm going to object.  This is going
20   beyond the scope of redirect.
21              THE COURT:  Well, I haven't heard the question.
22   What's your question?
23              MR. FOSTER:  Well, I am getting down to the point,
24   Judge.  When he was in direct examination, he said --
25              THE COURT:  I need your question.  What's your
```

David A. Perez, RMR, RPR

```
 1   question?
 2           MR. FOSTER:  The question is why you didn't do
 3   anything about it.  The preface is --
 4           THE COURT:  I'll sustain the objection.  It's beyond
 5   the scope.
 6           MR. FOSTER:  Argument, Judge?
 7           THE COURT:  No.  It's beyond the scope.  If you want
 8   to come up here, I will talk to you about it.  Attorneys want
 9   to approach?
10           MR. FOSTER:  Yes, please.
11           (Bench conference.  Out of hearing of jury.)
12           THE COURT:  We're on recross.  He only asked about a
13   specific question.
14           MR. FOSTER:  I'm sorry.
15           THE COURT:  It's beyond the scope.
16           MR. FOSTER:  You're right.  I apologize.  I'm mixing
17   my rules again.
18           THE COURT:  I'm trying to stick with beyond the scope.
19           (Back on the record in open court.)
20           THE COURT:  Whenever you're ready.
21   Q.  (By Mr. Foster)  You are in that picture, aren't you,
22   you're number 17?
23   A.  I'm number 14.
24   Q.  I'm sorry?
25   A.  I'm number 14.
```

David A. Perez, RMR, RPR

1    Q.   14.   Very good.   Thank you.   Appreciate that.

2            MR. FOSTER:  I will pass the witness.

3            MR. COOLEY:  No, Your Honor.

4            THE COURT:  May he step down and is he released?

5            MR. COOLEY:  We ask he be excused.

6            THE COURT:  Any objection?

7            MR. FOSTER:  No.  I don't have a problem with him

8    being excused.  I don't want him waiting outside for days and

9    days.  But should I need him back, could I have permission to

10   --

11           THE COURT:  You can talk to the government.  All

12   right.  Then we will release you at this time.  Remember -- um,

13   if you are recalled, we will let you know that.

14           Ladies and Gentlemen of the Jury, we're going to

15   adjourn for the evening.  It's 4:55.  Remember, you remain

16   under the all instructions the Court has previously given you.

17   And we will see you tomorrow morning at 8:30.  Thank you.

18           (Jury leaves courtroom.)

19

20

21

22

23

24

25

David A. Perez, RMR, RPR

```
 1                              INDEX

 2

 3                    Direct    Cross    Redirect    Recross

 4    WITNESSES FOR THE
      GOVERNMENT:

 5

 6    DANIEL REYES         3       127       182       183

 7    EXHIBITS:                                      Admitted

 8    Government

 9    6SS-1 Photograph                                  126
      6QQ-1 Photograph                                  126
10    11J-1 Photograph                                  126
      13B-1 Photograph                                  126
11    13E-1 Photograph                                  126
      16J   Photograph                                   89
12    16J-1 Photograph                                   89
      16J-2 Photograph                                   89
13    16J-3 Photograph                                   89
      16J-4 Photograph                                   89
14    16J-5 Photograph                                   89
      16J-6 Photograph                                   89
15    16J-7 Photograph                                   89
      16J-8 Photograph                                   89
16    25B   List                                         38
      25A   List                                        109
17    25C   Peace treaty                                112

18                         *  *  *  *  *  *

19         I certify that the foregoing is a correct transcript

20    from the record of proceedings in the above-entitled matter.  I

21    further certify that the transcript fees and format comply with

22    those prescribed by the Court and the Judicial Conference of

23    the United States.

24

25    Signature:/s/_____Date:  July 16, 2013
                  David A. Perez, RMR, RPR
```

David A. Perez, RMR, RPR