1                  IN THE UNITED STATES DISTRICT COURT

2                       WESTERN DISTRICT OF TEXAS

3                            EL PASO DIVISION

4

5   UNITED STATES OF AMERICA              No. EP:10-CR-2213-KC

6   v.                                    El Paso, Texas

7   RAMON RENTERIA                        May 23, 2012

8

9                              JURY TRIAL

10                             VOLUME IV

11            BEFORE THE HONORABLE KATHLEEN CARDONE

12                  UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   For the Government:   Brian Skaret
                          United States Department of Justice
16                        Criminal Division, Human Rights and
                          Special Prosecutions Section
17                        1301 New York Avenue, NW, Suite 200
                          Washington, D.C. 20530
18
                          Joseph Cooley
19                        United States Department of Justice
                          Criminal Division, Gang Unit
20                        10th and Constitution Avenue, NW
                          Washington, D.C. 20530
21
                          George Leal
22                        Assistant United States Attorney
                          700 East San Antonio, Suite 200
23                        El Paso, Texas 79901

24

25

 1  For the Defendant:    Scott P. Foster
                          718 Myrtle Avenue
 2                        El Paso, Texas 79901

 3

 4      Proceedings recorded by stenotype.  Transcript produced by

 5  computer-aided transcription.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    EDITED 7-2 AND 3-2013.  MANNY LOPEZ AND G. MARQUEZ ALREADY
2    EDITED IN 2012.
3              COURTROOM DEPUTY:  EP:10-CR-2213, USA versus Ramon
4    Renteria.
5              MR. COOLEY:  Your Honor, United States represented by
6    Brian Skaret, Joseph Cooley and George Leal.
7              MR. FOSTER:  Scott Foster for the defendant.  We're
8    ready to proceed, Judge.  Your Honor, may I approach?
9              MR. COOLEY:  We can approach or do it in open court.
10   Um, actually --
11             (Bench conference.)
12             MR. COOLEY:  Daniel Reyes, he's basically in Wit. Sec.
13   we have him being watched 24/7.  Seven FBI agents are assigned
14   to him.  I wasn't real clear if Mr. Foster was going to need
15   him again.  Our issue is that he is actually relocated.  And
16   it's like half a day -- actually, a full day travel to get back
17   and forth where he's at.  Our position was and we suggested if
18   we could recall him, ask him a couple questions, I won't object
19   to any recross and let him ask any questions he wants.  I just
20   turned over to Mr. Foster his records when he was in Pollock,
21   if he wants to get into that, if there was issue an with that.
22   But what we'd like to do is after this morning have him excused
23   for the rest of the proceedings.
24             THE COURT:  I don't have any problem with that.
25             MR. FOSTER:  We're in total agreement, Judge.
```

```
 1              THE COURT:  Are we going to recall him?
 2              MR. FOSTER:  I think that's the best way to handle it.
 3              THE COURT:  Okay.
 4              MR. FOSTER:  I didn't realize what kind of problem I
 5      was putting the Government into when I said that.
 6              THE COURT:  That's fine.
 7              (Back in open court.)
 8              THE COURT:  Who's calling him?
 9              MR. COOLEY:  We will recall him.
10              THE COURT:  Are we ready for the jury?
11              MR. COOLEY:  Yes, Your Honor.
12              (Jury enters courtroom.)
13              THE COURT:  You may be seated, Ladies and Gentlemen.
14      My understanding, the Government wishes to recall its witness,
15      Mr. Reyes.
16              MR. COOLEY:  Yes, Your Honor.
17              THE COURT:  All right.
18                          DANIEL REYES, SWORN
19                          DIRECT EXAMINATION
20      BY MR. COOLEY:
21      Q.  Mr. Reyes, remind you you're still under oath.
22      A.  Yes, sir.
23      Q.  There have been different questions about when you're
24      specifically in Pollock.
25      A.  Yes, sir.
```

 1   Q.   Um, in terms of the time, would it be -- would it be fair
 2   to say that you would have arrived in Pollock April 2, 2007?
 3   Does that sound about right?
 4   A.   Yes, sir.
 5   Q.   And that you would have left Pollock, basically,
 6   January 27, 2009?
 7   A.   Yes, sir.
 8   Q.   That sounds about right?
 9   A.   Um, I was at the halfway house at the same time that the
10   Super Bowl was going on.  What's that, like January, February?
11   Q.   The Super Bowl?
12   A.   Yes, sir.
13   Q.   So January 27, 2009, if you're talking about the Super Bowl
14   2009, it was the first week of February?
15   A.   Yes, sir.
16   Q.   That's when you were in the halfway house?
17   A.   That would be about the same time that I came straight from
18   Pollock to the halfway house.
19   Q.   And the halfway house is located where?
20   A.   Dismas Charities on Alameda.
21   Q.   Okay.  Just a few more questions regarding your -- focus on
22   the 2008 after, um, Shotgun left Pollock.
23   A.   Yes, sir.
24   Q.   You were still in Pollock for almost a year.  Is that
25   right?

1    A.  Yes, sir.

2    Q.  And during that time, you said Mr. Renteria was in charge.

3    A.  Yes, sir.

4    Q.  Um, I'm not sure we touched on this.  But there was an

5    individual by the name of Silent.  Do you know who Silent is?

6    A.  Silent?

7    Q.  Yes.

8    A.  In Coffield?

9    Q.  Yes.

10   A.  Okay.  You're talking about not a person at Pollock, right,

11   somewhere else?

12   Q.  Yes.

13   A.  Okay.  Yes, Silent, Mr. Galindo, I believe.

14   Q.  Do you know what his first name was?

15   A.  I can't recall his first name.

16   Q.  At some point while you were in Pollock, did you learn he

17   had access to a cell phone?

18   A.  Yes, sir.

19   Q.  Do you know whether he was communicating with other BA

20   members with that cell phone?

21   A.  Yes, sir.

22   Q.  How was he doing that?

23   A.  Um, through the cell phone, leaving messages at places and

24   picking up the messages through other means by phone.  But not

25   directly because there wasn't a phone in Pollock at the time.

David A. Perez, RMR, RPR

DIRECT - GALINDO

1    Q.  So there wasn't a phone in Pollock at that time.  So if

2    he's communicating with Pollock, how would with he communicate

3    at Pollock by use of that cell phone?

4    A.  By leaving messages, either at family members' houses or

5    through, like I said, attorneys.

6    Q.  Attorneys.  Do you know of anybody in particular that he

7    was calling?

8    A.  Um, I can't recall the name exactly.  But it was a lady at

9    some public defender's where -- I can't recall her full name.

10   Where Guera used to work.

11   Q.  Guera is what you knew her as?

12   A.  Yes.

13   Q.  And how was Pollock getting that information from that

14   individual?

15   A.  Through the calls on the phone.

16   Q.  Who was making those calls?

17   A.  Either Shotgun or Mr. Renteria.

18   Q.  Okay.  So what you're saying is Galindo had that phone

19   before Shotgun even left.  Is that right?

20   A.  Yes.

21   Q.  Okay.  When -- and so while Shotgun was there, he was

22   collecting that information?

23   A.  Yes, sir.

24   Q.  And when Shotgun left, who was collecting that information

25   from Guera that Galindo was leaving?

1    A.  The person who stayed in charge, being Mr. Renteria.

2    Q.  Renteria.  The defendant here?

3    A.  Yes, sir.

4    Q.  Um, one final question.  You know an individual who goes by

5    the name of Nano or Enano?

6    A.  Yes, sir.

7    Q.  Who is he?

8    A.  He's -- right now he's a lieutenant in Juarez.

9    Q.  Okay.  And do you know his full name and last name?

10   A.  I can't recall the whole name.

11   Q.  Do you know of any other nicknames he goes by?

12   A.  Just Enano.  Nano.

13   Q.  You've heard of an individual called Boots?

14   A.  Boots, no, sir.

15   Q.  That doesn't ring a bell?

16   A.  No, sir.

17            MR. COOLEY:  One minute, Your Honor.

18            THE COURT:  All right.

19            MR. COOLEY:  No further questions.

20            THE COURT:  Go ahead, Mr. Foster.

21                      CROSS-EXAMINATION

22   BY MR. FOSTER:

23   Q.  Mr. Reyes?

24   A.  Yes, sir.

25   Q.  Yesterday you testified that Shotgun didn't have a

1    telephone until after the RICO case.

2    A.   Yes, sir.

3    Q.   When did he come back to the unit?

4    A.   After the RICO case.

5    Q.   Which was when?

6    A.   I believe, 2010.

7    Q.   You were already gone from the unit by that time, weren't

8    you?

9    A.   Yes, sir.

10   Q.   So you wouldn't have any personal knowledge of who made

11   phone calls on any phone there, would you?

12   A.   Not the particular phone.

13   Q.   So when you tell the Court that either Shotgun or Ramon

14   Renteria would make the calls, you really don't know, do you?

15   A.   Oh, I do.

16   Q.   No, you don't know because you weren't there.  Isn't that

17   correct?

18   A.   Well, I wasn't there.  But I was told by another Aztec

19   member.

20   Q.   Were you making those phone calls from the other side?

21   A.   No, I was in Beaumont when I learned of it.

22   Q.   So you were not privy to those telephone calls.

23   A.   Like I said, I received calls myself from Silent from

24   Coffield.

25   Q.   But you didn't receive phone calls from Shotgun or

1    Renteria.

2    A.  Oh, no.

3    Q.  So you have no personal knowledge.  Isn't that correct?

4    A.  Um, when I was there in the unit, um, we had a conversation

5    about what was said through the phone.

6           MR. FOSTER:  Judge, I would like to admonish the

7    defendant to answer the question with a yes or a no.

8    A.  Okay.

9           THE COURT:  All right.  Well, he doesn't have to

10   answer yes or no.  But, you do need to answer the question.

11   Okay.  So listen to the question and answer the question.

12          THE WITNESS:  Yes, ma'am.

13   Q.  (By Mr. Foster)  I will move on.  It's getting -- remember

14   the group photos we showed yesterday?

15   A.  Yes, sir.

16   Q.  The first one you weren't there for?

17   A.  Yes, sir.

18   Q.  Carzoli was, right?

19   A.  Yes, sir.

20   Q.  The second one you were there for.  You were in that photo,

21   the second one.

22   A.  Yes, sir.

23   Q.  There were other photos besides those particular

24   photographs, right, other group photos?

25   A.  Oh, many.

```
 1   Q.  And, in fact, you know, you kinda made a deal about Shotgun
 2   having his arm around this other guy.  What was his name?
 3   A.  Grandpa.
 4   Q.  Grandpa?  Okay.
 5   A.  That's what we called him.
 6   Q.  Wasn't that a common occurrence with Shotgun with many of
 7   the other members?
 8   A.  Like I said, if you were an Aztec member and there was no
 9   questions about, you know, that's your brother.  Hey, what's
10   up.  Good morning.  But you don't go hugging people that --
11   Q.  Didn't --
12   A.  -- well, I don't know.  Okay.
13   Q.  Wasn't there a photograph taken where he actually had his
14   arm around you?
15   A.  Not that I recall.
16   Q.  Don't ever recall that?
17   A.  No.  I remember one where we're shaking like that.
18   Q.  You don't recall where he had his arm around you.
19   A.  No, sir.
20   Q.  Thank you.  Let me ask you about collecting quotas.  When
21   you're on the streets, you collected quotas from who?
22   A.  Well, it depends on what year are you talking about.
23   Q.  Well, when did you collect quotas?
24   A.  Every single time I got out of prison.
25   Q.  Okay.  Generally speaking, let's say each time.  I mean,
```

1  was it different -- did you collect quotas from different types

2  of people at different times?

3  A.  Yes.  Different drug houses, different bars that were

4  selling drugs at the time.

5  Q.  And a quota is like a tax in a way.  Is that right?

6  A.  Yes.

7  Q.  What do the drug dealers or bars get in return?

8  A.  Protection and sale of drugs for cheaper price when they

9  can't get it from their own people they're receiving at the

10  time.

11  Q.  You say your house was shot up in February of 2012?

12  A.  No, sir.

13  Q.  When was it?

14  A.  Um, when I got out of the Annex last year.  It's because I

15  can't recall the date.  It's about four months ago.

16  Q.  I'm sorry?  Four months what?

17  A.  About -- yeah, about four months ago.

18  Q.  Four months ago?

19  A.  Because my girl is five months pregnant.  And she was only

20  two months pregnant -- about three, four months ago.

21  Q.  Three months ago would have been February 2012.

22  A.  I'm not too good on my dates because I know when -- it was

23  recently.

24  Q.  What did you do to make someone mad enough to shoot up your

25  house?

1    A.  I guess being part of all this messed up my brother pretty

2    much in his head.  He didn't know if I was going to get him or

3    they were going to get him so. . .

4    Q.  So this is not like a Barrio Azteca hit.  This is your

5    brother's messed up and doing this?

6    A.  It pertains to Barrio Azteca.  He wouldn't have felt like

7    that if we were never Barrio Azteca members.

8    Q.  Isn't your brother exed?

9    A.  Exactly.

10   Q.  All right.

11           MR. FOSTER:  Pass the witness.

12           THE COURT:  All right.  Anything else?

13           MR. COOLEY:  One more question, Your Honor.

14           THE COURT:  Go ahead.

15                      REDIRECT EXAMINATION

16   BY MR. COOLEY:

17   Q.  When you're talking about Shotgun collecting messages from

18   Guera, who was in this lawyer's office, how was he collecting

19   those messages?  What kind of phone was he using?

20   A.  The phone from the unit.

21   Q.  The unit phone?

22   A.  The unit phone.

23   Q.  And when Renteria was checking those messages, what phone

24   was he using?

25   A.  The unit phone.

```
 1   Q.   Okay.  Not a cell phone.  But the unit phone.

 2   A.   No, the unit phone.

 3            MR. COOLEY:  No further questions.

 4            THE COURT:  Anything further?

 5            MR. FOSTER:  Nothing further.

 6            THE COURT:  Is he free to go, excused?

 7            MR. FOSTER:  Yes, Your Honor.  We agree to excuse,

 8   Judge.

 9            THE COURT:  You're free to go.

10            THE WITNESS:  Thank you, ma'am.

11            THE COURT:  Government call their next witness.

12   Roberto Marquez, also known as Bird.

13                    GUALBERTO MARQUEZ, SWORN

14                       DIRECT EXAMINATION

15   BY MR. COOLEY:

16   Q.   State your name.

17   A.   Gualberto Marquez.

18   Q.   Do you go by a nickname?

19   A.   Bird.

20   Q.   Mr. Marquez, you're currently in custody; is that right?

21   A.   Correct.

22   Q.   In federal custody?

23   A.   Federal custody.

24   Q.   You pled guilty to a case?

25   A.   Pled guilty to life sentence for conspiracy of controlled
```

1    substance.

2    Q.   How many defendants were in that case?

3    A.   17 of us.

4    Q.   Approximately, when did that occur?

5    A.   Um, I was arrested on May 30, 2009.

6    Q.   And who was the judge?

7    A.   Frank Montalvo.

8    Q.   Now, when you say pled to a life sentence, you pled guilty

9    and you weren't expecting a life sentence; is that correct?

10   A.   Correct.

11   Q.   But you were sentenced to life?

12   A.   I was sentenced to life.

13   Q.   Now, you agreed to cooperate after you were sentenced; is

14   that right?

15   A.   Correct.

16   Q.   And you were under the impression you were cooperating

17   before you were sentenced; is that right?

18   A.   That's right.

19   Q.   You met with federal agents while you were in prison

20   located where?

21   A.   Coleman, Florida.

22   Q.   At that point, you indicated you wanted to cooperate and

23   certain assurances was made to you; is that correct?

24   A.   That's correct.

25   Q.   One of them would be that if you continued to cooperate, we

1  would -- the Government would, um, file what's called a Rule 35

2  seeking for reduction of your life sentence; is that correct?

3  A.  That's correct.

4  Q.  We also agreed to sponsor you for Wit. Sec., security

5  program; is that right?

6  A.  That's correct.

7  Q.  But you are aware that all we can do is make the

8  recommendations.  And it isn't up to, um -- to us to make that

9  final decision; is that right?

10  A.  That's correct.

11  Q.  Whether it's a Rule 35, that's up to the judge; is that

12  right?

13  A.  That is correct.

14  Q.  And as far as the Wit. Sec. is concerned, it's up to people

15  that run that program; is that correct?

16  A.  That is correct.

17  Q.  How long have you been -- when did you first become a BA

18  member?

19  A.  I became a member at the Coffield Unit in 1996.

20  Q.  And -- in Coffield, you said?

21  A.  Yes, sir.

22  Q.  Who was your padrino?

23  A.  Manual Fernandez, El Grande.

24  Q.  Did he stay as your padrino?

25  A.  Yes, he did.

1   Q.  At some point did you lose him?

2   A.  He was crossed out, meaning he was put to the side for

3   numerous reasons.  And I was never given another padrino.

4   Q.  They never gave you another one?

5   A.  No.

6   Q.  That was '96, you said?

7   A.  1996.

8   Q.  And you stayed a BA member in your mind until when?

9   A.  2010.  Can I correct that?  It was 2009.

10  Q.  2009?

11  A.  Yes, sir.

12  Q.  When in 2009?

13  A.  I was arrested in May.

14  Q.  Arrested in May?

15  A.  30th -- April 30, 2009.  And about May, June, I had nothing

16  to do with it no more.

17  Q.  In your mind you basically said you wanted out?

18  A.  Yes.

19  Q.  Now, when you were arrested in April 30th and gave a

20  statement on May 1st, basically following your arrest, you

21  didn't have an attorney present; is that right?

22  A.  That's right.

23  Q.  You gave a statement, but you weren't truthful during that

24  time; is that right?

25  A.  That is correct.

1    Q.  But in your mind you were still BA?

2    A.  Yes, sir, I was.

3    Q.  And then at some point, when you decided not to be a BA,

4    you, um, believed you were put on the ex list; is that correct?

5    A.  That is correct.

6              MR. COOLEY:  This is in evidence, Your Honor?

7              THE COURT:  Yes, it is.

8    Q.  (By Mr. Cooley)  Can you see that list in front of you?

9    A.  Yes.

10   Q.  Now, on this list, which is Government's Exhibit 11G, do

11   you see your name on that list?

12   A.  No, I don't.

13   Q.  Do you know what this list is?

14   A.  This is when they make you an ex.

15   Q.  They make you an ex.  And this is the list you would be on?

16   A.  It's one of them, maybe.

17   Q.  You don't see your name on that list; is that right?

18   A.  No.

19             MR. COOLEY:  I believe this is in evidence.  I would

20   like to publish it.

21   Q.  (By Mr. Cooley)  This is the same kind of list; is that

22   right?

23   A.  That is correct.

24   Q.  Do you see your name on this list under Marquez?

25   A.  No, I don't.

```
 1   Q.  Can you pull up 13F, please?
 2   A.  My name's not on there.
 3   Q.  Do you see your name on that one?
 4   A.  No.
 5   Q.  Can you pull up 25A, please?  Do you see your name on that
 6   list?
 7   A.  No.  No, I don't.
 8   Q.  At this time can you pull up 20A-1.  Transcript.
 9           MR. COOLEY:  I believe this is already in evidence.  I
10   would like to publish that.
11           THE COURT:  Hold on.  Let me make sure.
12   Q.  (By Mr. Cooley)  You see where it says participants?
13   A.  Yes.  Yes, I do.
14   Q.  Do you see the name Hector Galindo?
15   A.  Yes, I do.
16   Q.  Do you know who he is?  Does that name sound familiar or
17   not?
18   A.  It sounds familiar, I just --
19   Q.  You can't place it?  Do -- you know an individual by the
20   name Silent, do you not?
21   A.  Yes, I do.
22   Q.  Where's Silent from?
23   A.  From El Paso, Texas.
24   Q.  Where was -- did you ever talk to Silent on the phone?
25   A.  I did talk to him on the phone.
```

1   Q.   Where was he when you talked to him on the phone?

2   A.   He was at the Coffield Unit.

3   Q.   Where were you?

4   A.   In the streets in El Paso, Texas.

5   Q.   When you talked to him in Coffield -- Silent in Coffield,

6   were you talking to him on the prison phone or talking to him

7   on the cell phone?

8   A.   I spoke to him on the cellular phone.

9   Q.   Being in the Coffield -- you've been in Coffield.

10  A.   Correct.

11  Q.   You're not supposed to have a cell phone in Coffield, are

12  you?

13  A.   No, sir.

14  Q.   What about Richard Zuniga.  Do you know who he is?

15  A.   No, I don't.

16  Q.   Do you know a person by the name Enano?

17  A.   Yes, I do.

18  Q.   Do you know what his real name is?

19  A.   No, I can't place it right now.

20          MR. COOLEY:  At this time, um, can you bring up 20A-2,

21  please.  I believe this is in evidence.  I would like to

22  publish to the jury.  It's a transcript along with audio.

23          THE COURT:  It is in evidence.

24          MR. COOLEY:  Just -- there's going to be a transcript

25  that appears, Your Honor, and it's going to be scrolling as the

```
 1   audio is playing.  Spanish on the left side, English on the
 2   right.
 3           THE COURT:  The screen is going crazy.  I've called
 4   the IT person.  They're coming to fix it.
 5           MR. COOLEY:  Your Honor, because it's the Spanish
 6   language; the actual transcript is what the evidence is; is
 7   that correct?
 8           THE COURT:  The audio is the -- it's in Spanish?
 9           MR. COOLEY:  Yeah.
10           THE COURT:  Then it's the transcript, correct.
11           (Audio being played.)
12   Q.  (By Mr. Cooley)  They just referenced a name, Bird Marquez.
13   Do you see that?
14   A.  That's me.
15   Q.  That's you?
16   A.  That's me.
17   Q.  These two individuals are talking about you; is that
18   correct?
19   A.  Yes, it is.
20   Q.  What's being discussed on that?
21   A.  Talking about me and Chuco Montes, Jose Montes.
22   Q.  Who's that?
23   A.  He was a lieutenant for the Barrio Azteca.
24   Q.  Was he involved in your case?
25   A.  Yes, he was.
```

1    Q.  And they're talking about you got what type of sentence?

2    A.  That I got a life sentence.

3    Q.  And Chuco got what?

4    A.  They're saying that he got about five years.

5    Q.  Now, they said -- they're asking about whether you opened

6    up.  What does that mean, open up?

7    A.  That I cooperated.  I snitched.

8    Q.  So they got the impression from what you understand, they

9    believe you're not cooperating; is that correct?

10   A.  Correct.  Because of the time I received.  They're not

11   sure.  But they're saying because of the time that I received,

12   it's iffy.

13   Q.  Didn't make sense?

14   A.  No.

15   Q.  Would that explain why you're not on the list?

16   A.  Yes.

17   Q.  You spent quite a bit of time in jail; is that right?

18   A.  That's right.

19   Q.  Um, let's start with -- your first conviction goes back as

20   early as May 26 '92; is that right?

21   A.  That's right.

22   Q.  Um, you were put on probation.  That was for aggravated

23   assault; is that right?

24   A.  That's correct.

25   Q.  Then in '99, possession of marijuana.  Again, in '99,

1   possession of cocaine.  Again, in '99, possession of cocaine.

2   These all right?

3   A.  Correct.

4   Q.  Then in '99, a failure to identify yourself; is that right?

5   A.  That's correct.

6   Q.  Then you had another assault in 2002, two years probation,

7   180 days in custody; is that right?

8   A.  That's right.

9   Q.  Then in December of 2002 you had fraud, ID, 14 months.

10  What was that?

11  A.  Um, I had -- I was using fake documents to get around with

12  the police and to purchase a vehicle.

13  Q.  Um, then you were -- December 29, possession of cocaine.

14  You served six months.  And then you had a parole violation

15  when you were ultimately released in July of 2006.  Does that

16  sound right?

17  A.  I was released, discharged from the Texas Department of

18  Criminal Justice.

19  Q.  Then you had some other arrests you didn't get convicted on

20  related to forgery back in August of 2006.  Two checks involved

21  with that.  What was that all about?

22  A.  Um, the checks were given to me five years prior.  They

23  just served the warrant when I was released.  And they

24  apprehended me in the streets.  But that right there was with

25  a, we call a crackhead.  He gave me -- he was paying me with

David A. Perez, RMR, RPR

1    checks.  And I believe --

2    Q.  Stop for a second.  Crackhead?

3    A.  Addicted to cocaine.

4    Q.  And you're taking a check from him?

5    A.  Correct.

6    Q.  Okay.

7    A.  For payments for the cocaine I was providing for him -- to

8    him.  He told me to wait two weeks so that I can cash the

9    checks.  We had been doing it for a while like that.  And his

10   addiction was so severe that he was also buying the cocaine

11   from somebody else.  And he was doing the same thing with that

12   person.  And when he couldn't pay me, he said go ahead and

13   deposit the checks.  And I did, and he went to the bank and

14   reported them stolen.  And the -- I had to hire an attorney and

15   a signature expert.  And they determined that the signature was

16   him, that it was his handwriting on the check.  So they

17   dismissed the charges.

18   Q.  Um, during the time in which you were in the various

19   prisons, you had some problems with discipline; is that

20   correct?

21   A.  Yes, I did.

22   Q.  One incident was allowing somebody to use a pin -- use your

23   pin?

24   A.  No, it was me.  I bought a pin from an individual because

25   they sell you 300 minutes a month in prison.  And I bought his.

1    And we got caught.  I was using his pin number illegally.

2    Q.  Using his pin number?

3    A.  Yes.

4    Q.  And you got caught?

5    A.  Yes.

6    Q.  All right.  Let's talk about, um, when you got involved in

7    selling drugs, when was it -- when did you first get involved

8    in selling drugs?

9    A.  When I first started selling drugs you mean?

10   Q.  Yes.

11   A.  I started selling drugs, actually, in high school.  A

12   little bit here and there.  But, really, after I got out of

13   prison, that's when I really -- in 1997.  From the Coffield

14   Unit.  That's when I started selling.

15   Q.  At this point you were a BA member; is that correct?

16   A.  Correct.

17   Q.  And who was one of your suppliers during that time?

18   A.  Um, Fragoso brothers.

19   Q.  Who was Fragoso?

20   A.  Um, Ivan Fragoso and Rigoberto Fragoso -- Rigoberto's a

21   member of the BA.

22   Q.  And the other Fragoso is his brother?

23   A.  Correct.

24   Q.  Not a BA, but an associate?

25   A.  Associate.

DIRECT 1268 LEE JO MORQUEP

1          MR. COOLEY:  At this time I would like to show the
2    witness 16E-1.  It's not in evidence, I don't believe.  I would
3    like to have the witness see it.
4          THE COURT:  That's correct.  You may show it to the
5    witness.
6    Q.  (By Mr. Cooley)  Do you recognize the photo in front of
7    you?
8    A.  That's Rigoberto Fragoso.
9    Q.  That's the person that you -- when you first come out of
10   jail, um, in '99, you start selling drugs.  He is the BA member
11   that was supplying you; is that right?
12   A.  1997.
13   Q.  What type of drugs?
14   A.  Cocaine.
15         MR. COOLEY:  At this time we would offer into evidence
16   16E-1.
17         THE COURT:  Any objection.
18         MR. FOSTER:  No objections.
19         THE COURT:  16E-1 will be admitted.
20   Q.  (By Mr. Cooley)  So when you first come out, I think you
21   said in '97, um, you were selling small quantities.  And
22   Fragoso was the one supplying it?
23   A.  Yes, the Fragoso brothers.
24   Q.  Now, when you come out, you're now a BA member; do you have
25   to report?

DIRECT - LISA MARIE LOPEZ

1   A.  Yes, I did.

2   Q.  What does that mean?

3   A.  When you have to go present yourself notifying them that

4   you're released.  And, you know, you're involved with the

5   Barrio Azteca.  Whatever is needed to be done.

6   Q.  And where did you report?  What section did you report to?

7   A.  Depends.  We had sectional meetings.  What would be -- for

8   example, I'm from Northeast, so I would be Northeast.  But

9   there's times we had mandatory meetings.  So we would all

10  congregate at like at -- it could be everybody would be called

11  in and we would be in Central.

12  Q.  You're talking about reporting to different meetings,

13  right?

14  A.  No, we had one big one from everybody.

15  Q.  What I'm asking is when you first got out of jail, you had

16  to report?

17  A.  Yes.

18  Q.  You had to report to what section of El Paso?

19  A.  Northeast.

20  Q.  Northeast?

21  A.  Northeast.

22  Q.  Who was running Northeast at the time, if you know, if you

23  remember?

24  A.  Um, Flaco Gordo.

25  Q.  Who was running El Paso at that time; do you remember?

```
 1    A.  David Meraz, Chicho.

 2    Q.  At that time, was he a lieutenant or captain?

 3    A.  Captain.

 4          MR. COOLEY:  We would like to publish 19E.  I believe

 5    it's in evidence.

 6          THE COURT:  Let me check.

 7          MR. FOSTER:  No objection.

 8          THE COURT:  It is.  That's fine.

 9    Q.  (By Mr. Cooley)  Do you recognize this individual?

10    A.  That's Chicho.

11    Q.  So from what you recall, he was running El Paso at that

12    point?

13    A.  Yes.

14    Q.  Now, in '99, you go back to jail for a little bit?

15    A.  Yes.

16    Q.  And you get out, approximately, 2001?

17    A.  Correct.

18    Q.  So from 2001 to 2004, you begin selling drugs again; is

19    that right?

20    A.  Correct.

21    Q.  What type of drugs are you selling at this point?

22    A.  Cocaine, some marijuana.

23    Q.  Um, initially, you're selling how much marijuana a month?

24    A.  Um, like, 50 to a 100 pounds or more.

25    Q.  And, initially, you're selling about how many kilos -- or
```

```
 1    cocaine -- how much cocaine were you selling a month?
 2    A.  About -- when we start off like -- it depends, like,
 3    sometimes five kilos, sometimes more.
 4    Q.  Now, you ultimately hooked up with an individual by the
 5    name of Byron; is that correct?
 6    A.  Correct.
 7    Q.  What's Byron's full name?
 8    A.  Byron Segura.
 9    Q.  Was he a BA member?
10    A.  No, he wasn't.
11    Q.  He was associated with you?
12    A.  Associate.
13    Q.  And then there was another individual that was also hooked
14    up with you; is that right?
15    A.  Yes.
16    Q.  What was his name?
17    A.  That was Gustavo Gallardo.
18    Q.  Know another individual prior to him?  The individual you
19    mentioned.
20    A.  Byron Segura.
21    Q.  And the other individual you said, Guerrero; is that right?
22           THE COURT:  Gallardo.
23    A.  Gallardo.
24    Q.  That's Tavo?
25    A.  Yes.
```

1   Q.  We're not talking about Tavo.  But there was a third

2   individual?

3   A.  Um --

4   Q.  You can't recall?

5   A.  I can't recall.

6   Q.  When you hooked up with Byron, what were you doing for

7   Byron?

8   A.  Selling, um, drugs -- sir, I recall now the name of the

9   other individual.

10  Q.  Who was that?

11  A.  Jeff Andes.

12  Q.  So the three of you were working together; is that right?

13  A.  Yes.

14  Q.  And what were you doing in terms of that?

15  A.  I was taking care of the drugs at a stash house.  And I

16  would do that.  And also provide the muscle and also package

17  the drugs and ship them off to other parts of the country.

18  Q.  For a six-month period when you hooked up with Byron and

19  Andes -- you said his name was?

20  A.  Andes.

21  Q.  For that period, how many kilos -- what kind of drugs were

22  you moving?

23  A.  Cocaine and marijuana.

24  Q.  How many kilos of cocaine were you moving during that

25  period of time?

1    A.  Like 350 to 500 kilograms a month.

2    Q.  Did that for approximately how long?

3    A.  About six months.

4    Q.  Now, at some point, Andes was not seen again; is that

5    correct?

6    A.  That is correct.

7    Q.  Just prior to that, the last time you saw him, how much

8    money did he drop off as part of this drug trafficking group?

9    A.  About $11.8 million.

10   Q.  Now, who was supplying you those drugs?

11   A.  Andes had connections in Mexico.

12   Q.  Do you know who they were?

13   A.  No.  No, I don't.

14   Q.  And then Andes was supposed to pick up some more money; is

15   that right?

16   A.  That is correct.

17   Q.  How much money was he supposed to pick up?

18   A.  The difference of $1.2 million.

19   Q.  But he never returned?

20   A.  Never returned.

21   Q.  Now, you go back to jail, um, in December of 2004 or so; is

22   that right?

23   A.  That is correct.

24   Q.  And you're in there for approximately two years?

25   A.  That is correct.

DIRECT 1268 LERETO MARQUEZ

```
 1   Q.  And then you get out again?
 2   A.  That is correct.
 3   Q.  And who do you hook up with when you get out that time?
 4   A.  Byron Segura.
 5   Q.  And you're beginning to move drugs again; is that right?
 6   A.  That is correct.
 7   Q.  And you continue to move drugs again with Byron for how
 8   long?
 9   A.  Until he got arrested in 2007.
10   Q.  Now, who was your source of drugs during that period of
11   time?
12   A.  One of them was Gustavo Gallardo.
13   Q.  And he goes by what?
14   A.  Tavo.
15   Q.  He's a BA member?
16   A.  He is a member.
17   Q.  Did he have a rank?
18   A.  Yes.
19   Q.  What was his rank?
20   A.  Lieutenant.
21   Q.  Let's talk about, um, while you're a BA member.  Um, during
22   this period of time, who was running El Paso when Tavo was out?
23   Who was running El Paso?
24   A.  He was in charge of El Paso.  But Chicho was in charge from
25   the Juarez side.
```

David A. Perez, RMR, RPR

```
1   Q.  The same Chicho you identified?
2   A.  Yes.
3   Q.  Whose picture's still up?
4   A.  That is correct.
5   Q.  So he's operating mostly in Juarez; is that correct?
6   A.  He's operating from Juarez.
7   Q.  Why did he leave and go to Juarez?
8   A.  He was wanted from the federal government.
9   Q.  Now -- so who were you receiving orders from?
10  A.  Gustavo Gallardo.
11  Q.  What kind of orders were you taking and what would you do?
12  A.  Well, we would pick up drug proceeds -- extortion from
13  other drug local drug dealers.
14  Q.  Now, at one point in your drug career, you were moving --
15  or was at least involved in hundreds of kilos; is that correct?
16  A.  That is correct.
17  Q.  Other parts you were moving smaller amounts?
18  A.  That is correct.
19  Q.  How small?
20  A.  Small, ten dollar bags of cocaine.
21          MR. COOLEY:  One moment, Your Honor.
22          THE COURT:  Sure.
23  Q.  (By Mr. Cooley)  You mentioned as little as ten dollars.
24  What would that be called?
25  A.  Um, dime.
```

1    Q.  Dime bags?

2    A.  Dime bag.

3            MR. COOLEY:  May I approach the witness?

4            THE COURT:  You may.

5    Q.  (By Mr. Cooley)  Mr. Marquez, I'm going to show you what's

6    been previously admitted as Government's Exhibit 5A.  Do you

7    recognize what those are?

8    A.  Yes.  Those are baggies to package and sell individual

9    cocaine.

10   Q.  And what size bags -- are they all one size?

11   A.  No.  There's two different sizes.

12   Q.  What are the two different sizes?

13   A.  The black ones are for half a grams, most commonly used for

14   that.

15   Q.  That would sell for how much?

16   A.  Twenty dollars.

17   Q.  The other size is what?

18   A.  It's ten-dollar baggie.

19   Q.  I'm going to show you a series of documents that are in

20   evidence.

21           MR. COOLEY:  Permission to publish it?

22           THE COURT:  Yes, what number?

23           MR. COOLEY:  6Y.

24   Q.  (By Mr. Cooley)  You see 6Y?

25   A.  Yes.

1  Q.  6W?

2  A.  Yes, I do.

3  Q.  6X, do you see that?

4  A.  Yes, I do.

5  Q.  And 6Z, do you see that?

6  A.  Yes, I do.

7  Q.  What do those appear to be to you?

8  A.  These are ledgers, like record of drug sales.

9  Q.  There's a reference here.  You see what that says?

10  A.  It says -- (Speaking Spanish).

11  Q.  What's dimes?

12  A.  That's the ten-dollar baggies.

13  Q.  What's the term "quota" mean to you?

14  A.  Quota means they have to pay weekly or monthly like tax.

15  We tax drug dealers.

16  Q.  And explain that a little bit further.  How does that work?

17  A.  We approach -- first, we're, you know, told about people

18  selling drugs, either in the neighborhood or in other parts.

19  We approach them with, you know, they have to pay basis --

20  because this is Azteca territory.  There's consequences if they

21  don't want to pay and/or they -- we also tell them if -- if

22  they don't -- if they can help us by giving other people to

23  sell drugs, we will lower their quota.

24  Q.  What does that mean?

25  A.  Quota means --

1    Q.  No.  Giving other people selling drugs.

2    A.  For example, other drug dealers that they know that they

3    sell drugs, if they give up their -- where they're at, what

4    they sell, if they feed us that information, we go and -- we

5    um -- the person that was approached, we lower their quota by

6    maybe fifty percent.

7    Q.  So it's an incentive to give you information?

8    A.  Correct.

9    Q.  Now, how do you first find out if somebody's selling drugs?

10   A.  For example, we have people that tell us, hey -- for

11   example, another Azteca might have been wanting some cocaine.

12   And he was turned on to this subject at this house, this

13   residence.  And he's selling out of his house.  So the Azteca

14   bought from that house.  And it's known, proved and -- that

15   he's selling narcotics or whatever.

16   Q.  How?

17   A.  By the Azteca's word that he purchased the drugs from that

18   individual.  They will send another sale with a witness.  And

19   once that happens, um, then he's approached with -- first, they

20   talk to him.  And if it doesn't go right, then they muscle that

21   person.

22   Q.  Now -- so you're basically saying you do your own

23   investigation whether a drug dealer is actually selling drugs?

24   A.  Correct.  Correct.

25   Q.  And you make buys to establish they are?

```
1   A.  Correct.

2   Q.  Once it's established, you approach them and demand quota?

3   A.  Correct.

4   Q.  If they don't, you said you use muscle.  What does that

5   mean?

6   A.  We have to do different steps where we're starting to

7   threaten or -- or they get severely injured.

8   Q.  Does a particular incident come to mind where a drug dealer

9   was approached while he was at house with his family?

10  A.  That is correct.

11  Q.  What happened on that occasion?  And when did it happen?

12          MR. FOSTER:  Objection, hearsay.

13          THE COURT:  All right.  I will -- well, I don't know

14  if it's hearsay.  Lay the foundation.

15          MR. COOLEY:  I will lay the foundation.

16  Q.  (By Mr. Cooley)  What you're saying is -- how do you know

17  this?

18  A.  I was at a -- several times I've been -- I've gone to

19  these --

20  Q.  Talking about this incident.  How do you know about that

21  specific incident?

22  A.  I've been there myself.  Done that.

23  Q.  All right.  You're talking about a specific incident that

24  you participated in?

25  A.  That's what I'm talking about.
```

```
 1              THE COURT:  All right.  Go ahead.
 2   Q.  Tell us about that.
 3   A.  It was me and several other members.  We went to some
 4   apartments, the Northeast area.  It was a family.  When we
 5   knocked, a gentleman opened the door.  And we said we need to
 6   speak to you.  He's like, yeah.  And he said it was in the
 7   daylight.  So we asked to go inside and he backed up.  He was
 8   scared -- well, confused.  And but -- he sees guys with you
 9   know, gang member looking people.  And he backs up from the
10   door.  And he lets us in.  And I guess, they were fixing to
11   have supper or something.  The members I was with, they started
12   telling him we know you're selling drugs.  And he tried to deny
13   it.  One of the individuals pulled out a revolver, 357.  And
14   his family was there.
15   Q.  Who was the guy that pulled out the gun, do you remember?
16   A.  Um, Gaby Ramirez.
17   Q.  And how many families of this person were there?
18   A.  Um, it was the wife and the children.  I believe it was two
19   children, small children.
20   Q.  What happened as a result of that confrontation?
21   A.  Well, he said he would pay.  And shortly after that, they
22   moved.  But, um, there was panic.  People panicked.  They
23   panicked.  And there was fear in that man's face.
24   Q.  Now, prior to confronting him, with the brothers, there was
25   an investigation to establish he was selling drugs?
```

1  A.  Yes, there was.

2  Q.  Any doubt in your mind he was selling drugs?

3  A.  No, they send -- they call them guinea pigs to purchase

4  drugs from that apartment.

5  Q.  Now, at some point, um, you became the bank; is that right?

6  A.  That is correct.

7  Q.  Describe what the bank is.

8  A.  I was the holder of the proceeds from other people that got

9  extorted, pay their weekly or monthly quota.  I would then hold

10  the money till it was -- I was called or they would go to my

11  residence or meet up with me and tell me to turn over the

12  money, go buy money orders or just, basically, turn it over.

13  Q.  And who would you turn it over to when you were the bank?

14  A.  There were several individuals that would pick it up.  One

15  of them was Pollo.  The other one was Saul Delgado, and Tweety.

16  That's Tweety.  And another individual, Nano.

17  Q.  Was this before or after Tavo left?

18  A.  This is after.

19  Q.  When we say Tavo left, he's -- he was arrested as well; is

20  that right?

21  A.  That is correct.

22  Q.  So he wasn't controlling the streets at that point?

23  A.  No, he wasn't.

24  Q.  You're aware that Tavo was involved in two major drug

25  transactions; is that right?

1    A.   That is right.   That's correct.

2    Q.   What's the first one that you're aware of?

3    A.   He was working with Byron Segura and they were shipping

4    marijuana to other cities across the United States and there

5    was also ecstasy pills, MDMA.

6    Q.   This is in 2006?

7    A.   This is in 2006, 2007.

8    Q.   And what was the second major transaction you're aware of?

9    A.   He got arrested and charged for hundred kilograms of

10   cocaine.

11   Q.   Again, Tavo was a lieutenant BA member at the time?

12   A.   Correct.

13        MR. COOLEY:   5C is in evidence.   I would like to

14   publish that.

15        THE COURT:   It is.   And that's fine.

16   Q.   (By Mr. Cooley)   Can you see 5C?

17   A.   Yes, I do.

18   Q.   What is that?

19   A.   Looks like a spare tire, vehicle cut up.

20   Q.   Um, are you familiar with how they use spare tires like

21   that?

22   A.   That's how we get narcotics across or money into Mexico.

23   Q.   So money would go into Mexico the same way?

24   A.   Correct.

25   Q.   So when you had -- let's go all the way back in 2004 or so.

1  How do you know how much money that was?  You mentioned

2  19 million?

3  A.  There was 11.8 million.

4  Q.  11.8?

5  A.  Yes.

6  Q.  And how do you know it was 11.8?

7  A.  Because it took us two days to count it.  And we counted it

8  by hand in a machine.

9  Q.  And how do you -- what did you do with that money?

10  A.  Um, it goes to Mexico.

11  Q.  How did you get it to Mexico?

12  A.  We transported in tires like that.  And, um, on our- --

13  personal -- -selves and the vehicle -- throughout the vehicle,

14  several vehicles, compartments.

15  Q.  And when you, um, were getting drugs up, do you -- that was

16  one of the methods they brought up drugs as well?

17  A.  Correct.

18  Q.  Getting back to, um, when you were the bank.  The money

19  would be collected from where and given to you where?

20  A.  From all areas of El Paso, from Northeast to Westside,

21  Chaparral, New Mexico, Anthony, Lower Valley, Eastside.

22  Q.  And it would be dropped off to you?

23  A.  Correct.

24  Q.  And what, if any kind, of notations would you make after

25  it's being dropped off?

  1  A.  Well, I'd have to make sure that I wrote down or knew who

  2  was bringing what, how much.  And I would just have everything

  3  properly -- properly, like, to make sure all the money that was

  4  given to me was put, you know, to the sides without being able

  5  to confuse it with my money or. . .

  6  Q.  Would you keep records?

  7  A.  I would keep records.

  8  Q.  Why would you keep records?

  9  A.  Well, if you don't keep records and somebody drops off,

 10  say, 3,000, you know, 5,000, and they don't and I don't keep a

 11  record, or witness and record, um, when I turn it in, it's easy

 12  for somebody to say, no, I gave him 4,000.  Since they were

 13  expecting 4,000, then I would have to pay out of my pocket the

 14  money that's missing.  If not -- or get into a wreck with these

 15  people.

 16  Q.  Get into a what?

 17  A.  In problems with them.

 18  Q.  13H.

 19          MR. COOLEY:  I would like to publish that.

 20          THE COURT:   H?

 21          MR. COOLEY:  Yes.

 22          THE COURT:  That's fine.

 23  Q.  (By Mr. Cooley)  Can you see 13H?

 24  A.  Yes, I can.

 25  Q.  You notice it's an envelope or not?

DIRECT 1368 LEBT 07/16/13 P

```
 1    A.   Yeah, that's an envelope.

 2    Q.   You see notation on 13H?

 3    A.   Yes, I do.

 4    Q.   Um, do you recognize any of those notations?

 5    A.   Yes, I do.

 6    Q.   What are those notations?

 7    A.   Those are weekly, um, from extortions, from money that

 8    they've wrote down, how much was turned in, from what section

 9    of El Paso.

10    Q.   Just so we're clear, these aren't your notations?

11    A.   No.

12    Q.   How do you know they're quotas?

13    A.   Because it's similar to what I used to do.  And because of

14    the -- where it says Valle, that's the Lower Valley.

15    Q.   What's the next one?

16    A.   That's West -- West -- Westside.

17    Q.   What's the next one?

18    A.   That's Central.  Northeast.

19    Q.   Central, Northeast is where you said you reported to when

20    you got out of jail; is that right?

21    A.   That's right.

22    Q.   What's the next one?

23    A.   Chaparral.

24    Q.   The next one?

25    A.   Eastside.  Fabens, Texas, and Socorro.
```

1  Q.  Now, when you were the bank, um, you were still operating
2  out of Northeast; is that right?
3  A.  That is correct.
4  Q.  Who was running Northeast?
5  A.  Um, well, I was in charge of the Northeast.
6  Q.  Who was in charge before you?
7  A.  Rigoberto Fragoso.
8  Q.  Who's one of the pictures we saw earlier?
9  A.  Correct.
10 Q.  And how is it that you took over for him?
11 A.  Rigoberto felt heat.  So he left to Houston, Texas.
12 Q.  Heat.  What does that mean, he felt heat?
13 A.  He felt the police coming -- he felt like they were
14 watching him or they were coming to get him or something.
15 Q.  So who put you in charge of the Northeast?
16 A.  He recommended me.  And the final decision was made by --
17 down the line from other members that were with rank and they
18 said you're going to take the Northeast.
19 Q.  From what you recall, who was in charge of El Paso at the
20 time?
21 A.  This was -- he passed away; his name's Scrappy.
22 Q.  Where was Scrappy located?
23 A.  He was in the Eastside.
24 Q.  When he passed away -- strike that.
25         THE COURT:  Could the attorneys approach?

```
 1                  (Attorneys approach bench.  Off record discussion.)
 2                  THE COURT:  Go ahead, Mr. Cooley.
 3   Q.  (By Mr. Cooley)  Now, would people drop off envelopes to
 4   you when you're the bank?
 5   A.  I couldn't hear that.
 6   Q.  I'm sorry.  When you were -- had the bank, would people
 7   drop off envelopes to you with notations similar to this?
 8   A.  They would drop off the money.  And sometimes like with
 9   envelopes or sometimes we would -- count it in front of me --
10   we always got to count it.  But I would have to mark it myself.
11                  MR. COOLEY:  Your Honor, can we publish this first?
12   It's already in evidence.
13                  THE COURT:  That's fine.
14                  MR. COOLEY:  May I approach?
15                  THE COURT:  You may.
16   Q.  (By Mr. Cooley)  Mr. Marquez, I'm going to show you 13N.
17   Take a look at that.  Can you scroll through that a little bit?
18                  (Witness reviewing exhibit.)
19   Q.  Do you know what this is?
20   A.  That is a ledger with notations of the quotas that they
21   picked up.
22   Q.  Over a period of time?
23   A.  Over a period of time.
24   Q.  So 13N.  Before we get into this, there appears to be some
25   names.  You see this name?
```

1   A.   Yes.

2   Q.   Do you recognize that name?

3   A.   Yeah.  Yes, sir.

4   Q.   Who's that?

5   A.   Taz.  He was in charge of Chaparral, New Mexico.

6   Q.   Do you know his full name?

7   A.   No, I don't.

8   Q.   Can you describe what he looks like, how old he is?

9   A.   He's black, about six foot, gray hair.

10  Q.   How old?

11  A.   He's in his fifties.

12  Q.   Now, you say he's black.  Do you believe he's black,

13  African-American, full or part Hispanic?

14  A.   He's African-American.  He was adopted by a Hispanic

15  family, something.  He told us.

16  Q.   To be a BA member you to have some affiliations with

17  Hispanics?

18  A.   Correct.

19  Q.   This is part of 13N; is that correct?

20  A.   13.

21  Q.   You see a notation; there's a date here?

22  A.   Yes.

23  Q.   From the 1st through the 7th?

24  A.   Yes.

25  Q.   Then different locations; is that right?

1    A.   Yes.

2    Q.   445, 1,010?

3    A.   Yes?

4    Q.   Those seem to be the same notations, same amounts,

5    locations?

6    A.   Yes.

7    Q.   That's the envelope.  This is the record?

8    A.   Yes.

9    Q.   Is that right?

10   A.   Yes.

11   Q.   13N.  Going back to 25th.  Top page, um, what is this word?

12   A.   That's muleta.  That means ex-members of the BA.

13   Q.   Now, you remember when we first started with your

14   testimony, you talked about -- well, you listened to that

15   recording; is that right?

16   A.   That's right.

17   Q.   And they were talking about another individual?

18   A.   Correct.

19   Q.   Who was that other individual?

20   A.   Um, I --

21   Q.   Who was the co-defendant in your case that was a BA

22   brother?

23   A.   Oh, they're talking about Jose Montes, Chuco.

24   Q.   And they believe you only got five years?

25   A.   That he got five years.

 1   Q.  And they believe that -- they're talking -- you believe --

 2   they think he was cooperating from the context of that

 3   conversation?

 4           THE COURT REPORTER:  Could you repeat your question?

 5           MR. COOLEY:  I'm sorry.

 6   Q.  (By Mr. Cooley)  From the context of that conversation, do

 7   you believe they think he was cooperating?

 8   A.  They believe he was cooperating.

 9   Q.  Can you see that in there?

10   A.  Yes.

11   Q.  Who's that?

12   A.  Jose Montes.

13   Q.  The same individual they were talking about on the

14   telephone?

15   A.  Yes.

16   Q.  So he's on the list?

17   A.  Yes.

18   Q.  You're not on the list?

19   A.  No.

20           MR. COOLEY:  Pass the witness, Your Honor.

21           THE COURT:  All right.  Ladies and Gentlemen of the

22   Jury, it's 10:23.  We're going to break.  It's going to take a

23   half hour.  Remember, you remain under the instructions the

24   Court has given you.  See you in a half hour.

25           (Jury leaves courtroom.)

```
 1              (Recess.)

 2              (Back on the record.)

 3              (Jury enters courtroom.)

 4              THE COURT:  Be seated.

 5              MR. COOLEY:  Your Honor, with the Court's permission,

 6      we'd like to reopen direct a little bit for a few more

 7      questions.

 8              THE COURT:  That's fine.

 9      Q.  (By Mr. Cooley)  Mr. Marquez, you mentioned, um, one of the

10      documents we showed you, you mentioned an individual by the

11      name of Taz?

12      A.  Yes.

13      Q.  Do you know his real name?

14      A.  No.  I can't recall it at the moment.

15      Q.  At this time I would like to show 16D.  It's not in

16      evidence.

17              THE COURT:  16D, as in David.

18      Q.  Can you see that individual in that photograph?

19      A.  Yes.

20      Q.  Do you recognize that individual?

21      A.  That's Taz.

22              MR. COOLEY:  At this time we'd offer into evidence

23      Government's Exhibit 16D-1.

24              THE COURT:  I actually show it as 16B-1.  Any

25      objections?
```

```
 1              MR. FOSTER:  No objection.

 2              THE COURT:  16D-1 will be admitted.

 3   Q.  (By Mr. Cooley)  This individual you described was

 4   controlling Chaparral during a period of time?

 5   A.  He was in charge.

 6   Q.  Now, was Northeast and Chaparral closer related?

 7   A.  Yes.  They are border of -- from each other.

 8   Q.  Do you know of any point in time when somebody would

 9   control both?

10   A.  Before Taz came out it was Rigo for a minute.

11   Q.  Rigo?

12   A.  Rigoberto Fragoso.

13   Q.  Okay.  And that's the individual you talked about earlier

14   today.  We saw his photo as well?

15   A.  Correct.

16   Q.  That's who you took over from the Northeast?

17   A.  Correct.

18              MR. COOLEY:  One moment, Your Honor.

19              THE COURT:  Sure.

20   Q.  (By Mr. Cooley)  We would like to show 25B, as in boy.  I

21   believe it's already in evidence.

22              THE COURT:  It is in evidence.

23              MR. COOLEY:  We don't want to publish it.  Just for

24   the witness.

25              THE COURT:  All right.
```

1    Q.  (By Mr. Cooley)   In preparation of your testimony, were you

2    shown this list?

3    A.  Yes.

4    Q.  Do you recognize it?

5    A.  Yes, it's a list of all the penitentiaries throughout

6    Texas.

7              MR. COOLEY:  I would like to publish it.

8              THE COURT:  You may show it.

9    Q.  (By Mr. Cooley)   You see this Smith Unit that's underlined

10   there?

11   A.  Correct.

12   Q.  There's some numbers that appear on either side of that.

13   Do you know what those numbers represent?

14   A.  Those are numbers indicating the number on the right-hand

15   side, 84, would be total amount of members and, possibly

16   prospects, to the Barrio Azteca.

17   Q.  That are in those particular units?

18   A.  Yes, individual.  Yes.

19   Q.  Which units in -- this is the State system; is that

20   correct?

21   A.  Correct.

22   Q.  Which units did you serve time in?

23   A.  I was at Coffield, Smith Unit, Lindsey.

24   Q.  Lindsey?

25   A.  Correct.  Um --

David A. Perez, RMR, RPR

1    Q.  Is there another name for Lindsey?  Actually, you see
2    Lindsey there?
3    A.  Yes.
4    Q.  We already saw Smith.  You mentioned Coffield.  What other
5    units?
6    A.  I was also at Limestone County; it's a transfer facility.
7    I was also at -- at -- in Plainview, Texas at the -- I can't
8    recall the name of the prison.
9    Q.  Can't recall the --
10   A.  It was Formby Unit.
11   Q.  Do you see Coffield on there?
12   A.  No, it's not in there.
13   Q.  What is Coffield?  What's the significance regarding the
14   BA?
15   A.  That's our mesa mayor, which is the main headquarters for
16   decision or where orders come out from there or
17   recommendations.
18   Q.  What about the records of the BA members?
19   A.  They keep record there of -- of members when they get in,
20   exed out, et cetera.
21   Q.  So Coffield is not on there here.  Do you have an
22   understanding why Coffield wouldn't be on there?
23   A.  Because this document comes from there.
24   Q.  Now, we talked a little about Tavo.  You mentioned a
25   hundred kilograms of cocaine that was -- do you know who

David A. Perez, RMR, RPR

1   supplied Tavo that hundred grams of cocaine?

2   A.  It was coming from Chicho's connect in Juarez, the cartel

3   of Juarez.

4   Q.  Do you know, um, at some point somebody from Juarez -- a

5   member from Juarez approached you regarding moving a large

6   amount of cocaine; is that right?

7   A.  That's right.

8   Q.  Who was that?

9   A.  That's, um, Angel.  Big Angel.

10  Q.  He was located where?

11  A.  He was in El Paso, Texas.

12  Q.  Who from Juarez was going to supply that?

13  A.  Tablas.

14  Q.  Have you ever met Tablas?

15  A.  Um, I've spoke to him on the telephone, before.  And at one

16  time when he was in El Paso.  I've been told, yeah, you've met

17  him.  But I can't recall, like, personal, I can't.  But I know

18  who he is.

19  Q.  You ever see him in Juarez?

20  A.  I never saw him in Juarez.

21  Q.  Now, you mentioned collecting quota.  And one thing I want

22  to clear up for the record -- strike that other question.

23        One thing I want to clear up, that incident you are

24  talking about where you were assisting in collecting quota and

25  you went into the -- what you believe was a drug dealer's house

1   where the family was at.

2   A.  Correct.

3   Q.  When did that occur?

4   A.  Like in 2004 -- -3 or -4.  2003, 2004.  Maybe sooner, maybe

5   2002.

6   Q.  Were you involved in collecting quota or directed other

7   people to direct quota after that?

8   A.  Yes.

9   Q.  Um, one second.

10          THE COURT:  All right.

11  Q.  Now, from your testimony, you went to jail, um, in a case

12  you're actually serving time now.  You said you were arrested

13  in April -- April 30, basically, 2009; is that right?

14  A.  Correct.

15  Q.  Just prior to that, do you remember attending BA meetings?

16  A.  Yes, we had BA meetings.

17  Q.  Do you remember during one of those meetings discussing

18  that someone was going to get out of prison to take over the

19  streets of El Paso?

20  A.  Yes, it was a meeting in Horizon.  It was the Socorro area.

21  We went to a mobile home and had that meeting regarding several

22  issues.  And one of them -- one of the issues that came out was

23  Spooky was going to come out and help Cano, which was, at the

24  time, in charge of El Paso, Texas.

25  Q.  Cano was?

1    A.  Cano was.  He was going to help him control and run El

2    Paso.

3              MR. COOLEY:  I would like to show the witness 13B.

4    It's already in evidence.

5    Q.  Do you recognize any individuals in this photo?

6    A.  I recognize Cano.

7    Q.  Anyone else other than Cano?

8    A.  I recognize two more.  But I can't recall their names.

9    Q.  Which one is Cano?

10   A.  The one with the glasses and his arms crossed.

11   Q.  Can you touch that on the screen, please?

12             MR. COOLEY:  Can we capture that, please?

13             THE COURT:  13B-2.  I guess there's already 13B-1.

14   Q.  (By Mr. Cooley)  Now, during that time, he was the one that

15   was running the streets; is that correct?

16   A.  That's correct.

17   Q.  Who said Spook was going to come out and take over the

18   streets and help clean up El Paso?

19   A.  There was a meeting there with Nano, Pollo, Tweety and the

20   one having the -- speaking about was -- mostly was Nano.

21   Q.  And you mentioned Nano earlier and you said -- who's Nano?

22   Who did you say Nano was?

23   A.  Oh, he was in charge.

24   Q.  Who is he?

25   A.  He's -- he was our spokesperson for El Paso, the whole El

1    Paso with, of course, Cano, he was like the main, main one.  He

2    was the one that can go to Juarez and bring back orders.

3    Q.   Where is he now?

4    A.   He's in Mexico.  He's on the run from the United States.

5    Q.   Now, one of the last -- when you were at the bank -- when

6    you were the bank for BA, what would you -- you mentioned

7    different people that you would turn over the quota to,

8    correct?

9    A.   Yes.

10   Q.   And Nano is one of the persons you turned it over to?

11   A.   Yes.

12   Q.   Do you remember the last time you turned over money to him?

13   A.   It was days before I got arrested, maybe, like, a week.

14   Q.   How much money was it that you turned over to Nano?

15   A.   It was in the thousands.

16   Q.   Do you recall how much, approximately?

17   A.   No.  Right now I can't.  It was in the thousands.

18   Q.   Do you remember during one of the interviews you told us it

19   was up to $56,000?

20   A.   That was one of the times.  Yes, it was 56,000.  But it was

21   more than one time that I gave him money.

22   Q.   It was more than one time?

23   A.   Of course.

24   Q.   And this is -- what type of money is this?

25   A.   U.S. currency and money orders.

```
1    Q.  And the source came from where?
2    A.  From the quotas that we would pick up from throughout El
3    Paso and New Mexico.
4              MR. COOLEY:  No further questions.
5              THE COURT:  13B-2 has been captured.  Do you want to
6    admit it?
7              MR. COOLEY:  Yes, please.  Thank you.
8              THE COURT:  Any objections?
9              MR. FOSTER:  No objections, Judge.
10             THE COURT:  13B-2 will be admitted.  You may proceed.
11             THE COURT:  Before you get started, Mr. Foster, could
12   the attorneys approach?
13             (Attorneys approach bench.  Off record discussion.)
14             THE COURT:  Whenever you're ready.
15                          CROSS-EXAMINATION
16   BY MR. FOSTER:
17   Q.  Mr. Marquez, my name is Scott Foster.  If there's anything
18   that you don't understand that I say, would you please ask me
19   to repeat it, okay?  All right?
20   A.  All right.
21   Q.  Now, let's make sure we're straight here.  What's the
22   reason you're here today?
23   A.  I'm here to give testimony on what I participated in about
24   Barrio Azteca.
25   Q.  Why are you doing that?
```

 1   A.  Well, so that maybe they can consider taking my life
 2   sentence down some.
 3   Q.  You want to see daylight sometime?
 4   A.  Correct.
 5   Q.  Okay.  You talked about one time that you were under Cano.
 6   And tell me, did Cano have rank?
 7   A.  He had -- he was going by rank of lieutenant.  Did he have
 8   it?  They let people borrow rank.
 9   Q.  Borrow.  Who did he borrow rank from?
10   A.  They -- it's not confirmed, like, from Juarez or anything
11   like that, from headquarters.  But, if they give you a
12   position, you can't be just regular soldier to be on top.
13   People would be, like, who's this guy?  So they appoint you
14   that rank for the meantime.
15   Q.  Would it surprise you that another witness testified that
16   Cano had no rank?
17   A.  No.
18   Q.  Would that person who testified and said Cano had no rank,
19   is that going to be truth or not?
20        MR. COOLEY:  Your Honor, I'm going to object to that.
21   He's questioning whether another --
22        THE COURT:  I'll sustain.  It's up to the jury to
23   decide.
24   Q.  (By Mr. Foster)  You have quite a length of criminal
25   history I see.  And I'm not going to rehash that because the

CROSS - 1989 ALBERTO MARQUEZ

```
 1    prosecutor's gone through that.  But suffice it to say that
 2    you've been involved in some type of drug case since 1999?
 3    A.  Yes.
 4    Q.  How much did you -- how much did you make dealing drugs?
 5    A.  Millions of dollars.
 6    Q.  What did you do with that money?
 7    A.  I bought homes, vehicles, um, partied.  And spent it on
 8    traveling.
 9    Q.  Did you drive nice vehicles?
10    A.  Yes, I did.
11    Q.  You talked about one time that there was $11.8 million from
12    Andes, I believe it is.
13    A.  Yes.
14    Q.  How much did you make off of that?
15    A.  Um, well they sent us about -- from Juarez they sent about
16    600-something-thousand.  And we had to pay other people that
17    would help us.  Then they sent about another -- about another
18    250,000.  And we paid the truck drivers.  So it was around, I'd
19    say, about 150-, 160,000.
20    Q.  And what time frame was this in?  About what year?
21    A.  This was in about 2005.  In, approximately -- that was
22    money that would come in from every load that would leave
23    monthly.
24    Q.  You also testified that Chicho was in charge in Juarez
25    after a while.
```

1  A.  Correct.

2  Q.  You said he went there because he was wanted by the FBI.

3  A.  Um, that's -- I didn't say the FBI.  He was wanted by

4  authorities.  I'm not sure who.  I never investigated it.

5  Q.  You didn't have personal knowledge of that?

6  A.  No.

7  Q.  It was just what you had heard?

8  A.  Rumors from the other members.

9  Q.  Rumors are sometimes wrong, aren't they?

10  A.  Yeah, they are.

11  Q.  Would it surprise you that a government official has

12  already testified that they weren't able to get a warrant on

13  him because he could not get probable cause or reason to arrest

14  him?

15        MR. COOLEY:  Objections, Your Honor, there's been no

16  testimony to that.

17        MR. FOSTER:  Ms. Mikeska testified --

18        THE COURT:  I'll sustain.  I'll sustain.

19  Q.  (By Mr. Foster)  All right.  You were shown about four

20  ledgers, alleged ledgers -- that's hard to say.  You were shown

21  about four documents that purported to be ledgers of drug

22  sales.  Do you recall that on your testimony?

23  A.  Correct.

24  Q.  Um, do you know when those were made?

25  A.  November 7th, one of them was the date on it.

1  Q.  What year?  Do you know what year?

2  A.  No.

3  Q.  You didn't make those?

4  A.  No, I didn't.

5  Q.  You can't verify the accuracy of those documents?

6  A.  Um, I could speak from what I did is similar.

7  Q.  Okay.  But you can't verify the accuracy of those

8  documents?  You didn't make those.

9  A.  I didn't make them.  But I know what -- I can interpret

10  what they mean.

11  Q.  You interpret what they purport to show?

12  A.  Exactly.

13  Q.  But you don't know that's how much money was counted out or

14  turned in?

15  A.  You can't have a paper like that and with numbers like that

16  and just assume that oh, well -- you can't.  They're not going

17  to -- they wouldn't keep that record.

18  Q.  You don't know what years they come from either?

19  A.  Didn't have a year.

20  Q.  And you don't know whether that's something that's happened

21  during the time alleged in the indictment, from January 1, 2003

22  forward, or before that, do you?

23  A.  No.  But this is -- this has been going on for a long time.

24  So it could be --

25  Q.  Basically, what it is, it's an example?

```
 1   A.  Example.
 2   Q.  When you talk about this incident that you were personally
 3   involved in, where you were using muscle, where the person went
 4   to the house and the family; do you recall what I'm talking
 5   about?
 6   A.  Correct.
 7   Q.  And you testified it was in the year 2002 or -3 or -4.  Can
 8   you narrow that down just a little bit?
 9   A.  Um, I can say about 2002, um, maybe the end of 2002.
10   Q.  Do you remember the -- the end of 2002.  So in the fall,
11   maybe, or -- is that what you said, the end?
12   A.  Maybe about September, October.
13   Q.  Okay.  This guy, Gaby Rodriguez, that had the gun.
14   A.  Ramirez.
15   Q.  Ramirez.  Okay.  Thank you.  Um, was he given any
16   permission to use that gun as a result in this deal?
17   A.  When you have somebody denying it and bucking that they're
18   not going to pay, or they just -- it's up to the discretion of
19   the people going up there and doing that.  Now, they can get in
20   trouble, but, normally, no.
21   Q.  Okay.  Were you the team leader here on this case?
22   A.  No, I wasn't.
23   Q.  Who was the team leader?
24   A.  It was -- there was no team leader.  It was -- we were all
25   the same position.  It came from higher up.
```

CROSS — GILBERTO MARQUEZ

```
 1   Q.   Did it surprise you when the gun was pulled out?
 2   A.   Um, yes, it did.
 3   Q.   Was the gun fired?
 4   A.   No, it wasn't.
 5   Q.   Anyone hurt?
 6   A.   No.
 7   Q.   Now, when you talk about you were pulled back around and
 8   talked about the bank and the bank records, um, you made
 9   mention about something of keeping these records to protect
10   yourself.
11   A.   Correct.
12   Q.   Explain to me why you would do that.
13   A.   Well, first of all, if somebody brings you, say, $4,000,
14   and I don't keep record of it, and a witness, and count out the
15   money in front of the person that brought me that money, and if
16   I just grab it and put it in a safe or pocket or whatever, if
17   he told me it's 4,000 and it was short, say, $500, I'm
18   responsible for that money.
19   Q.   So, basically, you kept the records because you couldn't
20   trust your brothers?
21   A.   Something like that.  It's not only about trust.  It's
22   just -- he probably didn't put it all there.  Anything can
23   happen.
24   Q.   Well, you didn't count it later.  You always counted it
25   when it came in.
```

1    A.  Correct.

2    Q.  In particular, you're worried about they might have taken

3    some off the top or told that they turned in more?

4    A.  Correct.

5    Q.  Did the money always come in envelopes?

6    A.  No.

7    Q.  Tell me how it would show up.

8    A.  Sometimes they just have it in their pockets.  Count it

9    out.  They had a piece of paper, say, seven, eight people that

10   paid from, say, Chaparral.  They would have so-and-so pay a

11   hundred, so-and-so paid 70, to what equals the amount and count

12   it out and --

13   Q.  Okay.  Did you go get money orders?

14   A.  Yes, I did.

15   Q.  What amounts were you getting money orders in?

16   A.  950.

17   Q.  Why 950?

18   A.  Um, I was under the impression -- I was told that if you

19   buy $1,000 money orders or more, it could raise a red flag.

20   Q.  Did you send money to the capos?

21   A.  I sent the money -- I gave the money to one individual.

22   And I don't know what he did, if he sent it to who.

23   Supposedly, it was going to Juarez.  That's all.

24   Q.  So you weren't in charge of, maybe, sending money out to --

25   A.  No.

1    Q.   -- to any prison systems?

2    A.   No.

3    Q.   You testified that Tavo's cocaine on his deal came from

4    Chicho.  How sure are you of that?

5    A.   Positive.

6    Q.   There's been other information that it actually came from

7    Tablas.

8    A.   That's later on when he replaced Chicho.

9    Q.   A different deal then?

10   A.   Yes.

11   Q.   So Tavo had more than one case that he got popped on?

12   A.   Yes.

13   Q.   Let me talk to you about this meeting in Socorro, when Nano

14   was talking about who was going to take control.

15   A.   Yes.

16   Q.   When was this in 2009, what month?

17   A.   I'd say between -- it was in early winter.  So it might

18   have been 2008 maybe or -9.  It's cold.  It could have been

19   February or March of 2009.

20   Q.   Did you know who Cano was?

21   A.   Yes.

22   Q.   Do you know who Spook was?

23   A.   No.

24   Q.   Have you met Spook?

25   A.   I can't recall right now.

```
 1    Q.  How many Spooks or Spookies do you know through BA?
 2    A.  Several.
 3    Q.  Spook?
 4    A.  Spookies.
 5    Q.  Seven?
 6    A.  No, several.  Two of them.
 7    Q.  At least two?
 8    A.  Yes.
 9    Q.  Jaime Rodriguez?
10    A.  I don't know him by -- I know them by alias.
11    Q.  I see.  Okay.
12            MR. FOSTER:  I will pass the witness.
13                    REDIRECT EXAMINATION
14    BY MR. COOLEY:
15    Q.  Have you ever been to Pollock Federal Penitentiary?
16    A.  No.
17    Q.  You said that in your estimation that you made about a
18    million dollars in your drug trafficking at the high point; is
19    that right?
20    A.  Yes.
21    Q.  Something to that effect?
22    A.  Yes.
23    Q.  Then you were asked what you were spending it on.  When you
24    had this case, did you have an attorney appointed or do you
25    have your own?
```

```
 1    A.  I had -- on the case for the life sentence, I had

 2    appointed -- I mean, I paid them.

 3    Q.  How much did you pay him?

 4    A.  51,500.

 5    Q.  When Byron was arrested -- you mentioned he was arrested?

 6    A.  Uh-huh.

 7    Q.  He was your partner?

 8    A.  Yes.

 9    Q.  Did he have an attorney?

10    A.  Yes.

11    Q.  Did you pay him?

12    A.  Yes.

13    Q.  How much money did you pay him?

14    A.  Paid him over 100,000.

15    Q.  The Spooks that you know -- you say you know a couple

16    Spookies or Spooks?

17    A.  Spooky.

18    Q.  Did they have rank?

19    A.  No.

20              MR. COOLEY:  No further questions.

21              THE COURT:  All right.  Anything further?

22              MR. FOSTER:  The defense has no further questions.

23              THE COURT:  Is he free to go?

24              MR. FOSTER:  Yes.

25              THE COURT:  You may step down.  And you're released as
```

1     a witness.  Thank you.

2              Ladies and Gentlemen of the Jury, we're going to break

3     for lunch.  Remember, you remain under the instructions the

4     Court has previously given you.

5              (Recess for lunch.)

6              COURTROOM DEPUTY:  Court is back in session.

7              THE COURT:  You may be seated.  Ready?

8              MR. LEAL:  Yes, Your Honor.

9              THE COURT:  Bring in jury.

10             (Jury enters courtroom.)

11             MR. LEAL:  Government calls Michael Criddle.

12             THE COURT:  Whenever you're ready.

13                         MICHAEL CRIDDLE, SWORN

14                         DIRECT EXAMINATION

15    BY MR. LEAL:

16    Q.  Mr. Criddle, would you please introduce yourself to the

17    jury, please?

18    A.  Michael Criddle.

19    Q.  And where do you work?

20    A.  I work at the Federal Correction Complex in Pollock,

21    Louisiana, United States Penitentiary.

22    Q.  And what do you do at the Pollock facility?

23    A.  Currently, I'm a special housing lieutenant supervisor.

24    Q.  How long have you worked there as a corrections officer for

25    the Bureau of Prisons in Pollock?

1   A.   At Pollock, currently, 11 years.

2   Q.   How long, total, have you worked for Bureau of Prisons?

3   A.   Approximately, July of 13(sic).

4   Q.   What does one have to do in order to become a correctional

5   officer at the Bureau of Prisons?

6   A.   Application process, selection, selection to be considered,

7   interview.  Once you go through the interview process, if they

8   select you as a correctional officer, you go through two weeks

9   of training at the institution, three weeks of training at the

10  Federal Law Enforcement Training Center in Glencoe, Georgia.

11  Q.   What kind of things do they teach?

12  A.   Training process.  They teach you search and restraint, how

13  to deal with inmates, communication skills, incident report

14  writing, contraband, areas to look for contraband, housing

15  units or different areas of the institution.  There's a number

16  of things they teach.

17  Q.   Okay.  And when you get done with that initial training and

18  you're assigned to your facilities, either the first and the

19  second facility, which was Pollock, um, do you receive

20  continuing training?

21  A.   Yes, sir, what they call annual refresher training.  We go

22  through it yearly.

23  Q.   And why is that important?

24  A.   It's important to refresh your skills on everything that

25  they teach you.  Myself, I've been going on three years.  You

1    want to keep a refresher on everything they teach you if

2    anything changes as far as policy, procedures.  Or you want to

3    be aware of everything going around and any changes that are

4    instituted throughout the government.

5    Q.  All right.  Are you on any special units or teams there at

6    the Pollock facility?

7    A.  Yes, I'm also currently the disturbance control team leader

8    at Pollock.

9    Q.  And how long have you been on the disturbance control team?

10   A.  Since, approximately, 2003.

11   Q.  Now, what does one have to do in order to become part of

12   the disturbance control team?

13   A.  It's a memorandum for selection.

14   Q.  All right.  And once you're part of that team, do you

15   receive any additional type of training?

16   A.  Yes, sir.

17   Q.  And what type of training do you receive?

18   A.  Use of less lethal ammunitions, search and research, use of

19   force techniques, room entry, room clearing, um, deal with

20   combative inmates, individuals, riot control techniques, baton

21   techniques, shield techniques, a number of things used in the

22   prison system.

23   Q.  Would you tell the jury just briefly what a disturbance

24   control team is and what it does?

25   A.  The disturbance control team is a riot control team that

1   actually trains to quell incidents inside the institution.  We

2   train for cell extractions, if the need is for it.  Riot

3   control, should there be an issue that arises in the

4   institution.  Should the public even attempt to gain access to

5   our grounds, we train for maintaining a perimeter to keep our

6   security to make sure nothing goes on inside the institution.

7   Q.  And you mentioned the term cell extraction.  What does that

8   mean?

9   A.  In the event you have to go into a cell of a combative

10  inmate or two inmates fighting.  Depending on the situation, we

11  train to actually go in.  There's techniques that we use and

12  train on to extract those inmates with the least amount of

13  injury to the inmate and staff.

14  Q.  Is that something you have to do whenever you have to

15  search a cell?

16  A.  Depends on the nature of the cell search.

17  Q.  All right.  I want to turn your attention -- let me ask you

18  this, in 2006, did you become team leader?

19  A.  Yes.

20  Q.  Of the extraction unit?

21  A.  Okay.

22  Q.  Um, as a team leader, what do you do?

23  A.  As a team leader, I train team members in cell extraction,

24  search restraint, room clearing, building entries, the use of

25  less lethal munitions, applying restraints.  There's different

David A. Perez, RMR, RPR

1  things that come out in policy, different areas that we cover.

2  Q.  Now, you said you've been in Pollock, approximately, 11

3  years?

4  A.  Yes, sir.

5  Q.  What types of things are the things you've had to deal with

6  there in Pollock?

7  A.  Fights, stabbings, homicides, um, food strikes, inmate work

8  stoppages.  We've dealt with a number of things.

9  Q.  Drug usage?

10  A.  Yes.

11  Q.  Smuggling of narcotics?

12  A.  Yes, sir.

13  Q.  Maybe smuggling in of cell phones?

14  A.  Yes, sir.

15  Q.  And so, basically, whatever is out in -- outside of

16  Pollock, let's just call it the normal society, that's also

17  what goes on inside a prison.  Is that fair to say?

18  A.  Yes, sir.

19  Q.  All right.  I want to turn your attention, specifically,

20  around the time frame of around 2006 -- and before I do that,

21  let me ask you this, are you familiar with a person by the name

22  of Ramon Renteria?

23  A.  Yes, sir.

24  Q.  Do you see that person seated in the courtroom here today?

25  A.  Yes, sir.

1    Q.  Can you point that person out and identify that person by

2    an article of clothing that person is wearing as well as where

3    that person is either sitting down or standing up?

4    A.  He's sitting down at the defendant's table with a red neck

5    tie.

6         MR. LEAL:  Your Honor, may the record reflect that the

7    witness identified the defendant?

8         THE COURT:  It will so reflect.

9    Q.  (By Mr. Leal)  In regards to this particular defendant, how

10   are you familiar with him?

11   A.  Inmate Renteria was a Pollock prison inmate for sometime.

12   Q.  Okay.

13        MR. LEAL:  If I could, Your Honor, I would like to

14   just publish this exhibit to the witness.

15        THE COURT:  All right.

16        MR. LEAL:  And -- using the door system if I could.

17   Q.  (By Mr. Leal)  Lieutenant Criddle, I'm showing you what's

18   been marked as Government's Exhibit 30.  Do you recognize that?

19   A.  Yes, sir.  That's a layout of the United States

20   penitentiary in Pollock.

21   Q.  All right.  Does that accurately portray what it purports

22   to depict?

23   A.  Yes, sir.

24   Q.  Let me show you what's been marked as Government's Exhibit

25   30A.  Do you recognize that?

David A. Perez, RMR, RPR

1   A.  Yes, sir.

2   Q.  And is that, essentially, a copy of Government's Exhibit

3   30?

4   A.  Yes, sir.

5   Q.  Is this -- 30A, is that something that you marked on?

6   A.  Yes, sir.

7          MR. LEAL:  Your Honor, I ask to publish Government's

8   Exhibit 30 and 30A to the jury.

9          THE COURT:  Any objections to 30 and 30A being

10  admitted?

11         MR. FOSTER:  No objections, Judge.

12         THE COURT:  30 and 30A will be admitted.

13  Q.  Lieutenant colonel, when you're talking about Pollock, is

14  this the area you're talking about?

15  A.  Yes, sir, that's the institution.

16  Q.  Okay.  Now, there's some sections that you've previously

17  marked on, A, B and C.  Um, can you point those out to the

18  jury?

19  A.  A, B, C.

20  Q.  What are those particular areas?

21  A.  Those are the housing units.

22  Q.  Okay.  And tell me what you mean by housing units.

23  A.  Inmates in the general population live in housing units

24  marked Alpha, Bravo and Charlie.  On the left side would be the

25  odd number, the right side, even number.

1    Q.   Okay.  Go ahead.

2    A.   The inmates are assigned to a unit, which holds -- houses

3    64 cells, which are double occupancy cells, at the time.  They

4    can be single if there's not enough inmates in the unit.

5    Q.   Now, in regards to these particular facilities, are there

6    ways for inmates to go back and forth between A, B and C, for

7    example?

8    A.   Yes, sir.

9    Q.   And would you tell the jury how that's possible?

10   A.   During what we call open movement times, inmates have free

11   movement periods which is, approximately, ten minutes.  If

12   inmates assigned to A unit or the yard with the softball field,

13   when that move is open for those to move to that area, they can

14   move from A unit to the softball field or to the indoor

15   recreation, to education, law library, whatever area is open at

16   the time for that group of individuals.

17   Q.   All right.  Now, in regards to that particular type of

18   movement, are there ever occasions when people there -- say

19   they're housed in C Unit, get to move back and forth between C

20   Unit and B Unit?

21   A.   During open movement times you may have inmates straggling,

22   those guys who don't make the move, or those guys who are slow

23   walking to get to their areas.  And if an officer is not aware

24   of what he's got going on, or maybe distracted, he may open

25   another move and an inmate can slip through the gate at the

```
1    time to another housing unit.
2    Q.  So it's possible that somebody housed in C Unit could go to
3    the B Unit?
4    A.  Yes, sir.
5    Q.  For the purpose of visiting another inmate or whatever?
6    A.  Yes, sir.
7    Q.  All right.  Um, let me ask you this, are you familiar --
8    actually, let me --
9              MR. LEAL:  Your Honor, could I ask the screen be
10   blacked out so I could show the exhibit to the witness?
11             THE COURT:  Sure.
12   Q.  (By Mr. Leal)  Lieutenant Criddle, I'm showing you what's
13   been marked as Government's Exhibit 15B and previously admitted
14   into evidence.  And don't tell me what it is.  Just tell me if
15   you recognize what's in it.
16   A.  Yes, sir.
17   Q.  Um, and how do you recognize what's in it?
18   A.  It's an individual, sir.
19             MR. LEAL:  Okay.  Your Honor, I ask that it be
20   published to the jury.
21             THE COURT:  All right.
22   Q.  (By Mr. Leal)  Government's Exhibit 15B, you said you
23   recognize this individual.
24   A.  Yes, sir.
25   Q.  Who is this particular person?
```

1   A.  Inmate Carlos Delgado Pereya.

2   Q.  Does this particular individual have a nickname?

3   A.  Shotgun.

4   Q.  Okay.  And how are you familiar with Carlos Delgado Pereya,

5   also known as Shotgun?

6   A.  Inmate Delgado was also an inmate at Pollock.

7   Q.  All right.  I want to turn your attention --

8         MR. LEAL:  If I could, Your Honor, ask the screen be

9   blacked out again.

10         THE COURT:  All right.

11         MR. LEAL:  And just the witness be able to view.

12   Q.  (By Mr. Leal)  -- to, first off, Government's Exhibit 31.

13   Have you seen this particular exhibit before and do you

14   recognize it?

15   A.  Yes, sir.

16   Q.  And this particular exhibit, um, how do you recognize it?

17   A.  This is an inmate -- history of inmate quarters

18   assignments.  What we use in the bureau is called a PP37.  It

19   lists inmates quarters assignments from the time they're placed

20   in custody of the Bureau of Prisons until such time as they

21   leave the Bureau of Prisons.

22   Q.  Okay.  And did you specifically request this particular

23   item be sent to you yesterday?

24   A.  Yes, sir.

25   Q.  Let me also show you what's been previously marked as

1    Government's Exhibit 31A and ask if you recognize this

2    particular exhibit.

3    A.  Yes, sir.

4    Q.  Is it, basically, the same type of document but for a

5    different individual?

6    A.  Yes, sir.

7    Q.  And did you also request it yesterday?

8    A.  Yes, sir.

9    Q.  Then let me show you what's been previously marked as

10   Government's Exhibit 31-B, as in boy.  Do you recognize this

11   document?

12   A.  Yes, sir.

13   Q.  Did you also request this document yesterday?

14   A.  Yes, sir.

15   Q.  Is it, basically the same kind of document as the previous

16   two exhibits?

17   A.  Yes, sir, it is.

18   Q.  And there's been some highlighting added to assist in your

19   testimony in front of the jury.  But other than that, are they

20   pretty much the way they were received?

21   A.  Yes, sir.

22          MR. LEAL:  Your Honor, at this time I offer into

23   evidence Government's Exhibit numbers 31, 31A, and 31B.

24          THE COURT:  Any objections?

25          MR. FOSTER:  No objections, Judge.

1          THE COURT:  31A -- I'm sorry 31, 31A and B will be

2    admitted.

3    Q.  (By Mr. Leal)  Now, Lieutenant Criddle, in regards to --

4    let's start with 31B, as in boy.  In regards to 31B, as in boy

5    --

6          MR. LEAL:  And, Your Honor, I ask that it be published

7    to the jury, please.

8          THE COURT:  All right.

9    Q.  (By Mr. Leal)  -- who does this particular exhibit refer

10   to?

11   A.  Daniel Reyes.

12   Q.  All right.  And this particular individual, does it -- what

13   does this exhibit show?

14   A.  This exhibit --

15   Q.  Start at the top.

16   A.  -- shows his register number, his name, the category which

17   is quarter and the function which is PRT for print when using

18   the sentry system.

19   Q.  Okay.  And does it also show where he's been housed and the

20   dates?

21   A.  Yes, sir.  It shows the housing assignments, institution,

22   the date and time in which he was placed in those assignments.

23   Q.  All right.  I want to focus in on the highlighted area down

24   here.  The area that's highlighted in green.  Can you tell the

25   jury what the area that's highlighted in green tells them?

1   A.  The green highlight is the inmate's placement in the

2   federal prison at Pollock.  He was placed at Pollock on

3   April 2, 2007, at 1407.

4   Q.  And when did he leave?

5   A.  He left Pollock on January 27, 2009 at 1420.

6   Q.  All right.  Now, let me ask you this.  There's four

7   different entries in there that reference Pollock.  Why are

8   there four different entries?

9   A.  Every time an inmate's housing assignment is changed or

10  he's keyed into Sentry for a different unit or even a different

11  bedding assignment in the same cell, that will show up in the

12  Sentry.

13  Q.  All right.  And Sentry, basically, means the -- where the

14  housing record is kept?

15  A.  Yes, sir.

16  Q.  All right.  I want to turn your attention now to

17  Government's Exhibit 31A, as in apple.  Government's Exhibit

18  31A, who is that referring to?

19  A.  Inmate Carlos Delgado Pereya.

20  Q.  All right.  And Carlos Pereya, that's the person you

21  previously identified as Shotgun, right?

22  A.  Yes, sir.

23  Q.  All right.  In regards to Shotgun, would you tell the jury

24  what Government's Exhibit 31A shows them?

25  A.  This is also his quarters assignment from the moment -- or

1   the time that he arrived at Pollock.  Which was July 27, 2004.

2   Q.  All right.  And there's a break there.  When did he leave

3   Pollock?

4   A.  He officially left the institution on May 20, 2009 --

5   actually 8-19-2010, at 8:15 in the morning.

6   Q.  All right.  I want to take you back before we get there.

7   Okay?

8   A.  Okay.

9   Q.  Is there a break, specifically, around the time frame of

10  January 31, 2008, the time from when he's confined in Pollock

11  and goes somewhere else?

12  A.  Yes, sir.  I believe on January 31st was when he left to go

13  on a writ.

14  Q.  All right.  And where does he go from there?  There's a

15  line up above there that says OKL.

16  A.  Oklahoma Federal Transfer Center.

17  Q.  Then does he wind up coming back to Pollock at some point?

18  A.  Yes, sir.

19  Q.  And when does he come back to Pollock the next time?

20  A.  He's keyed into the system into receiving and discharge

21  May 30, 2009, at 12:40.

22  Q.  Okay.  Let me point you to this line right here.  Does he

23  come back to Pollock around February 8, 2008?

24  A.  Yes, sir.

25  Q.  And does he leave again?

1    A.  Yes, sir.

2    Q.  What would that be for, if you know?

3    A.  I don't know exactly, sir.

4    Q.  All right.  Um, but, regardless, there's a break between

5    2008 and 2009 --

6    A.  Yes, sir.

7    Q.  -- that he leaves on a writ?

8    A.  Yes, sir.

9    Q.  Okay.  Do you know what a writ is?

10   A.  Federal writ -- he returns back to court for some type of

11   court proceedings.

12   Q.  Okay.  So whatever the writ was for, he came back to court

13   for something?

14   A.  Yes, sir.

15   Q.  All right.  And he stays out.  And then at some point in

16   time, does he return to the Bureau of Prisons?

17   A.  He returns to Pollock on May 20th.

18   Q.  2009?

19   A.  Yes, sir.

20   Q.  All right.  And how long does he stay there?

21   A.  Stays at Pollock until 8-19-2010.

22   Q.  All right.  Approximately, 1:15 a.m., is that when he's

23   taken out?

24   A.  Yes, sir.

25   Q.  All right.  Now, I want to turn your attention to

1   Government's Exhibit 31.  Government's Exhibit 31, who does

2   this refer to?

3   A.  Inmate Ramon Renteria.

4   Q.  In regard to Government's Exhibit 31, does it show that

5   when Ramon Renteria was confined in the Bureau of Prisons as

6   far as Pollock goes?

7   A.  Yes, sir, it does.

8   Q.  And what are the dates that Ramon Renteria was confined in

9   the Bureau of Prisons?

10  A.  February 17, 2006, is when he arrived at Pollock.

11  Q.  Okay.  And in regards to his departure, when did he depart

12  Pollock?

13  A.  August 19, 2010, at 1:15 a.m.

14  Q.  Was he also, at some point in time, confined in a

15  facility -- I think that's on the next page.  I don't have that

16  highlighted.  But there's a facility titled OTV?

17  A.  Can you zoom that out for me please, sir?

18  Q.  Sure.

19  A.  Yes, sir.

20  Q.  And this particular facility, OTV, what does that stand

21  for?

22  A.  Otisville.

23  Q.  He was confined in Otisville starting when?

24  A.  June 19, 2002.

25  Q.  Okay.  And he left Otisville when?

1    A.   10-14-2004.

2    Q.   Okay.  And, Ramon Renteria, that we're talking about, in

3    this particular Exhibit 31, is that the person you previously

4    identified as the defendant?

5    A.   Yes, sir.

6    Q.   Now, I wanna point you to this time frame up here that's

7    highlighted in green.  May 10, 2009 to August 19, 2010.  And I

8    wanna get you to look at that date.  And I wanna get you to

9    look -- that's Ramon Renteria.  Government's Exhibit 31, the

10   defendant.  I want to get you to look at Carlos Pereya

11   Delgado's time frame, which is Government's Exhibit 31A.  Is

12   that showing up on the screen for you?

13   A.   Yes, sir.

14   Q.   Um, were Shotgun, Carlos Delgado Pereya, and the defendant,

15   ever confined in the same unit or the same facility?

16   A.   Yes, sir.

17   Q.   And would you point that out to the jury, please?

18   A.   Here and here.  They were both assigned to Bravo 2, cell

19   256.

20   Q.   All right.  Now, I noticed that one has 256U and the other

21   one has 256L.  What does that mean?

22   A.   Represents upper and lower.

23   Q.   And upper and lower what?

24   A.   Bunks.

25   Q.   Okay.  So, basically, they're bunk beds?

1    A.  Yes, sir.

2    Q.  And one's got the top and one's got the bottom?

3    A.  Yes, sir.

4    Q.  But it's the same cell?

5    A.  Yes, sir.

6    Q.  And how much time did they spend together in this same

7    cell?

8    A.  Approximately, a year or so.

9    Q.  All right.  So from May 29, 2009 to August 19, 2010?

10   A.  Yes, sir.

11   Q.  All right.  Little bit like, maybe, about a year and three

12   months, four months, somewhere around there?

13   A.  Yes, sir.

14   Q.  All right.  Now, in regards to Daniel Reyes -- let me get

15   you to look at that.  Can you tell -- well, we previously

16   talked about how Shotgun, Carlos Pereya, was in prison from

17   July 27, 2004, there in Pollock, to January 31, 2008.  Is that

18   right?

19   A.  Yes, sir.

20   Q.  And Daniel Reyes was in Pollock from April 2, 2007 to

21   January 7, 2009.  Is that right?

22   A.  Yes, sir.

23   Q.  So some of his time there at Pollock overlapped with

24   Shotgun's time.  Is that right?

25   A.  Yes, sir.

 1   Q.  And, additionally, Mr. Renteria, the defendant, was
 2   confined in Pollock from March 28, 2006, until August 19, 2010.
 3   Um, so there was also some overlap between Daniel Reyes,
 4   Shotgun, and the defendant.  Is that right?
 5   A.  Yes, sir.
 6   Q.  Was there also some overlap in time when -- at least from
 7   looking at the records, when Daniel Reyes and Ramon Renteria
 8   overlapped while Shotgun was gone?
 9   A.  Yes, sir.
10   Q.  All right.  Now, let me ask you this.  Is there any
11   significance in regards to Carlos Pereya Delgado as far as
12   status or stature there at Pollock?
13   A.  Yes, sir.
14   Q.  And what was Shotgun's status there at Pollock?
15   A.  Inmate Delgado was the leader of the Barrio Aztecas at
16   Pollock.
17   Q.  As the leader of the Barrio Aztecas there at Pollock, let
18   me ask you this.  Um, would you ever go and visit with him
19   about things that needed to be corrected?
20   A.  Not necessarily go and visit.  But he was called to the
21   lieutenant's office to be talked to about things that may have
22   happened with the group, yes, sir.
23   Q.  All right.  And what types of things would these be?
24   A.  Information we would get about something may be happening
25   on the yard or an issue between Aztecas and someone on the

1 compound.  There were numerous reasons you would call him up.

2 If you were having an issue with one of the individuals or

3 associates of that group, you could call him up and talk to him

4 about the problems you were having with that individual to kind

5 of correct the situation without it becoming something bigger

6 than it needs to be.

7 Q.  All right.  And why would that be necessary in the Bureau

8 of Prisons in Pollock?

9 A.  It keeps down confusion.  It keeps down a lot of incidents,

10 stops a lot of incidents in the prison system, being able to

11 deal with the leaders of the groups and quell incidents before

12 they become something major.

13 Q.  All right.  Um, so let me just give you this example.

14 Let's say that, I don't know, somebody's making wine in their

15 cell and they're not supposed to be making it.  And you guys

16 hear about it.  Um, would that be something you might talk to

17 Carlos Pereya about and say, Hey, we catch this guy with some

18 kind of contraband, you guys are gonna get in trouble?

19 A.  Yes, sir.

20 Q.  All right.  And would you talk to him about more serious

21 issues as well?

22 A.  Yes, sir.

23 Q.  Like, maybe, somebody was planning to assault another

24 inmate, and you heard about it.

25 A.  Yes, sir.

```
 1   Q.  Or maybe you'd heard about there being drugs.  And you
 2   wanted that -- tell him not to be doing that?
 3   A.  Yes, sir.  You would have those conversations, yes, sir.
 4   Q.  And, again, the purpose of that is for what?
 5   A.  The purpose of that is to, once again, try and quell the
 6   incident or something major from happening.  Because even an
 7   inmate that's intoxicated, can constitute a serious problem.
 8   Q.  Now, in there in Pollock, did you ever have any
 9   conversations with anybody else besides Shotgun about trying to
10   take care of those types of matters?
11   A.  I've talked to the defendant.
12   Q.  Okay.  The defendant over here, Ramon Renteria?
13   A.  Yes, sir.
14   Q.  All right.  And why would you talk to the defendant Ramon
15   Renteria, about those kinds of things?
16   A.  Most times if you talk to Delgado, he was never by
17   hisself(sic).
18   Q.  Okay.
19   A.  The defendant was with him.  Or, in Delgado's absence, the
20   defendant could also deal with issues.
21   Q.  All right.  And why would you talk -- let me ask you this.
22   Um, and I'll come back to this question.  Are there occasions
23   in Pollock when inmates are allowed to have group photos taken?
24   A.  Yes, sir.
25   Q.  And would you tell the jury how that comes about?
```

1    A.  Inmates are allowed to purchase, what they call, photo

2    tickets from the commissary.  An inmate can purchase however

3    many he likes.  And he goes over to the recreation department.

4    And there's an inmate orderly who takes a camera and takes

5    photographs of the inmate based on the amount of commissary

6    tickets he's purchased for photos.

7    Q.  All right.  So if an inmate wants to take a photo, are

8    those tickets just, like, for himself or are they -- can he

9    bring somebody into the photo if he wants to?

10   A.  If he pays for the photo tickets, he could have whoever he

11   wants in the photo.

12   Q.  All right.  Does he have to get permission from you-all to

13   do that?

14   A.  No, sir.

15   Q.  Okay.  Does he just go out into the yard and get that

16   picture taken?

17   A.  Most photos are taken inside the recreation department.

18   Q.  Okay.  And who takes those?

19   A.  An inmate orderly.

20   Q.  All right.  Let me show you what's been previously admitted

21   as Government's Exhibit 17A-2.  Can you see that?

22   A.  Yes, sir.

23   Q.  That's taken there in Pollock.  Is that right?

24   A.  Yes, sir.

25   Q.  All right.  Now, in this photograph, um, if we look down at

```
 1    who's in this photograph, there's several individuals.  You can
 2    tell that Carlos Pereya, Shotgun's, in there, right?
 3    A.  Yes, sir.
 4    Q.  And Ramon Renteria, is he in there?
 5    A.  Yes, sir.
 6    Q.  Okay.  And did Ramon Renteria -- does he have a nickname?
 7    A.  Spook.
 8    Q.  Okay.  And in regards to this particular photograph, is
 9    this one of those photographs that you're talking about when
10    somebody could get a photo ticket and ask, I guess, friends,
11    buddies, other Barrios Azteca members, to join them?
12    A.  Yes, sir.
13    Q.  Why do you allow these kinds of photos?
14    A.  From an intelligence standpoint, this type of photo helps
15    us to validate other members of the gang or associates of the
16    gang.
17    Q.  All right.  And then here's another photograph, 17A-3.  Is
18    that another photograph that's also taken at Pollock?
19    A.  Yes, sir.
20              MR. LEAL:  I'm sorry.  Were we publishing those to the
21    jury?  Can we publish those to the jury, Your Honor?  17A-2,
22    Your Honor.
23              THE COURT:  Okay.
24              MR. LEAL:  And I did want to publish that.
25              THE COURT:  Okay.
```

1          MR. LEAL:  17A-3.  And ask that be published as well.

2          THE COURT:  All right.

3  Q.  (By Mr. Leal)  And is that another photograph that was

4  there at Pollock?

5  A.  Yes, sir.

6  Q.  All right.  Now let me ask you this.  A minute ago you were

7  talking about how you'd go to Shotgun to get things taken care

8  of with other people, right?

9  A.  Yes, sir.

10  Q.  And, specifically, who are those other people that you're

11  talking about?

12  A.  Members of the gang, the group, their associates.  Because

13  speaking to what we call in the prison the shot caller or the

14  leader of the group, they tend to be able to control what

15  happens easier than the staff.  And that comes with -- if they

16  have one who's creating problems, then we start to key on that

17  one, which in turn makes us key on the rest of the group to see

18  what else -- and they usually didn't want that headache.

19  Q.  All right.  It's just like the real world, they don't want

20  heat from you if they could avoid it?

21  A.  Yes, sir.

22  Q.  All right.  So let me ask you this.  You said that in

23  Shotgun's absence, when he left -- which I guess, would have

24  been when he got writted back for court, right?

25  A.  Uh-huh.

1    Q.  And, I'm sorry, you gotta answer yes or no.

2    A.  Yes, sir.

3    Q.  He gets mad at me if people say um-hum and nuh-uh.

4    A.  I understand.

5    Q.  Okay.  He left around January 31, 2008, as it's shown in

6    Government's Exhibit 31A.  From that time on, until he came

7    back, around May 20, 2009, the defendant would have been who

8    was left.  Is that fair to say?

9    A.  Yes, sir.

10   Q.  All right.  So Shotgun leaves and the defendant stays.  How

11   come you don't go down here and talk to Oso, Rocky, or Porkchop

12   or Fry or El Duque or Mando or Moreno to get problems taken

13   care of?

14   A.  Most of those guys have no -- they really have no say.

15   Q.  All right.  So when you say they don't have any say, you

16   mean they don't have weight, they don't have any pull?

17   A.  Not much, no.

18   Q.  Okay.  And, so, in order get things accomplished, are you

19   going to talk to, basically, the boss?

20   A.  Yes, sir.

21   Q.  All right.  And the defendant served that kind of function

22   there?

23   A.  Yes, sir.

24   Q.  Okay.  Um, I want to turn your attention now to August 19,

25   2010.  On that particular date, did you do anything out of the

1    ordinary?

2    A.  Yes, sir.

3    Q.  And what did you have to do in that particular time frame,

4    around August 19, 2010?

5    A.  August 19, 2010, my disturbance control team was activated

6    by the warden at the federal prison.

7    Q.  All right.  And why was it activated?

8    A.  There was an activation for an operation that was named

9    Cane River at the institution that was intelligence that inmate

10   Delgado Pereya had that cell phone in his cell.

11   Q.  All right.  And in that time frame of August 19, 2010, who

12   was inmate Delgado -- did he have a cell mate?

13   A.  Yes, sir.

14   Q.  And who was his cell mate?

15   A.  The defendant.

16   Q.  And the defendant and inmate Delgado had been cell mates

17   for how long?

18   A.  Over a year, sir.

19   Q.  All right.  Had they been cell mates prior to that?

20   A.  Yes, sir.

21   Q.  And do you recall where they had been cell mates prior to

22   that?

23   A.  They were in the same cell.

24   Q.  Prior to that year and a half?

25   A.  Yes, sir.

1  Q.  Or -- I'm sorry, that year and three months?

2  A.  Yes, sir.

3  Q.  Okay.  Let me ask you this.  Um, you said that the team was

4  activated.  Um, and that there had been information that there

5  was a cell phone in there?

6  A.  Yes, sir.

7  Q.  Um, what did you guys do in regards to trying to locate

8  them?

9  A.  They activated our team.  The intelligence we got was that

10  there was a cell phone in the cell.  They gave us the

11  information that we needed, who the inmates were in this cell,

12  and that the primary target was inmate Delgado.

13  Q.  Okay.  And so what did you-all do as a result?

14  A.  We get our team together.  We did a couple of walkthroughs

15  of what was going to be done.  Approximately, early that

16  morning, we extracted inmate Delgado and Renteria from their

17  cell, midnight, during their sleep.

18  Q.  All right.  So let me ask you this.  There's what's called

19  a prebrief session, right?

20  A.  Yes, sir.

21  Q.  And in that prebrief session, um, do you guys -- or do

22  you-all discuss stuff like officer safety?

23  A.  Yes, sir.

24  Q.  Um, how you are going to manage the situation?

25  A.  Yes, sir.

1    Q.  Why is it important to talk about things like that?

2    A.  Because you never know what situation you may come across.

3    So we made sure everybody had on proper equipment, proper gear,

4    eyes and ears in place, make sure that everybody, as far as --

5    officer safety was paramount prior to entering the cell.

6    Q.  All right.  And so, um, after that's done, you basically

7    line up and go to the cell?

8    A.  Yes, sir.

9    Q.  And when you got to the cell, what did you do?

10   A.  The key man was -- the man in front of me opened the door.

11   I entered the cell.  I placed my hands on inmate Delgado first,

12   restrained him.  Staff members behind me, team members behind

13   me, restrained and secured inmate Renteria.  As soon as they

14   were restrained they were escorted from the cell.

15   Q.  Inmate Delgado, where was he?

16   A.  He was on the bottom bunk.

17   Q.  Inmate -- the defendant, where was he?

18   A.  He was on the top bunk.

19   Q.  All right.  And do you remember anything about the

20   defendant, specifically, being on the top bunk?  What happened

21   when you guys went in there?

22   A.  Yes, sir.  When they extracted him from his bunk he fell

23   and hit me in the head.

24   Q.  Was that an accident?

25   A.  Yes, sir.

1   Q.  All right.  Not like he hit you on purpose.

2   A.  Yes, sir.

3   Q.  That's one of the reasons you remember he was on the top

4   bunk.

5   A.  Yes, sir.

6   Q.  All right.  And besides cuffing them, anything like that,

7   was there any fuss, basically?  Did they offer any resistance

8   to you?

9   A.  No, sir, not at all.  They were asleep.

10  Q.  All right.  So you get them out of the cell.  What happens

11  when you get them out of the cell?

12  A.  We take them out of the cell.  Other staff members escort

13  them straight to a waiting staff to strip search them and move

14  them to a separate institution in the south central region.

15  And we began conducting a cell search as soon as they were

16  removed from the cell.

17  Q.  All right.  And so you conduct the cell search.  Um, and

18  about how long does the search last?

19  A.  The search lasts total, couple hours, maybe three.

20  Q.  All right.  And let me ask you this.  During this two-hour

21  period -- actually, let me ask it this way.

22        When you guys take the defendant and Shotgun out of

23  that cell, do you guys have a couple of other inmates waiting

24  to come on in and take that cell over before you guys search

25  it?

David A. Perez, RMR, RPR

1    A.  At that time, sir, it was after midnight.  There was no

2    inmate movement.  The only inmate movement was the two in that

3    cell and the one downstairs.

4    Q.  Okay.  Um, so there wasn't another set of inmates that came

5    in and occupied that cell before you-all searched it.

6    A.  No, sir.

7    Q.  All right.  So you conduct your search.

8    A.  Yes, sir.

9    Q.  Do you find anything?

10   A.  Yes, sir.

11   Q.  Would you tell the jury what you found?

12   A.  While conducting the search in the bottom locker, I found a

13   three-pack of Irish Spring soap that kept going off with the

14   handheld metal detector.

15   Q.  Is that normal for Irish Spring soap?

16   A.  No, sir.

17   Q.  It's supposed to be fresh, right, but --

18   A.  Yes, sir.

19   Q.  -- not -- not supposed to have any metal in it, right?

20   A.  No, sir.

21   Q.  All right.  What happened after that?

22   A.  The handheld metal detector kept going off.  I opened the

23   first box of soap.  There was actually a bar of Irish Spring in

24   it.  In the middle pack of soap, the box contained a Silver

25   Tracphone, a Motorola phone.

1          MR. LEAL:  Your Honor, may I approach?

2          THE COURT:  You may.

3   Q.  (By Mr. Leal)  Lieutenant Criddle, I'm showing you -- or

4   I've actually taken up there what's been previously admitted

5   into evidence as Government's Exhibit 9.  Could I get you to

6   look at that Irish Spring soap box and open it up?  All right.

7   And in regards to a phone inside an Irish Spring soap box, have

8   you ever in your 13 career(sic) with the Bureau of Prisons,

9   that you were called upon to search a cell, or at any other

10  point in time of your life, have you ever found a cell phone

11  inside an Irish Spring soap box?

12  A.  No, sir.

13  Q.  And so is that the cell phone that you found in the Irish

14  Spring soap box you found inside of that cell?

15  A.  Yes, sir.

16  Q.  And where was that phone located?

17  A.  It was located in the bottom locker.

18  Q.  Okay.  And who did that bottom locker belong to?

19  A.  Inmate Delgado.

20  Q.  Shotgun, right?

21  A.  Yes, sir.

22  Q.  And did you find anything else?

23  A.  We found stamps concealed in Ramen noodle packages.  That

24  was about the most that we found.

25  Q.  All right.  And where'd you find those?

1    A.   Those were in the bottom locker.

2    Q.   Okay.  And is that Shotgun's locker as well?

3    A.   Yes, sir.

4    Q.   In regards to those stamps, um, what's the big deal with

5    having stamps in Ramen noodle packages?

6    A.   Stamps are considered currency by inmates.  They're also

7    used to pay for numerous things, intoxicants, possession of

8    homemade weapons.  Inmates use stamps to purchase many things

9    inside a prison compound.  There're also companies on the

10   street that actually allow inmates to pay for their items -- as

11   currency -- using stamps.

12   Q.  All right.  And when we talk about stamps, we're talking

13   about U.S. postage stamps?

14   A.   Yes, sir.

15   Q.  Um, in regards to those postage stamps, did you -- did you

16   find a lot or was it like one or two?

17   A.   It was more than any -- an inmate should have, sir.

18   Q.   Extremely out of the ordinary.

19   A.   Yes, sir.

20   Q.   All right.  And when you say that -- they're used to

21   purchase intoxicants by inmates?

22   A.   Yes, sir.

23   Q.   What do you mean by that?

24   A.   Homemade intoxicants, homemade alcohol by inmates.  Inmates

25   make homemade intoxicants out of pretty much anything they can

1    get their hands on.

2    Q.  All right.  And I'm sorry, Lieutenant Colonel.  Looking

3    inside that box of Government's Exhibit 9, previously admitted,

4    were you able to find anything in there?

5    A.  There's the plug to charge the phone.

6    Q.  All right.  And so when -- and is that how you found it?

7    You found a charger as well with the phone.

8    A.  Yes, sir.

9    Q.  Okay.  Um, in regards to that particular item, what'd you

10   do with it after you found it?

11   A.  Knowing that the item in question found, i.e. the phone, I

12   proceeded straight to the SIS office and placed it in evidence.

13   Q.  Okay.  And then that phone got forwarded off to the FBI.

14   Is that right?

15   A.  Yes, sir.

16   Q.  Um, after Shotgun and the defendant were taken out of his

17   cell, you mentioned something about them being transferred or

18   sent somewhere else.

19   A.  Yes, sir.

20   Q.  Um, how come you guys just didn't bring them back to their

21   cells.

22   A.  No, sir.

23   Q.  How come?

24   A.  At that point we were briefed.  During the brief we were

25   told that during Cane River once those inmates were extracted

1   from their cell, they would be transferred to separate

2   institutions.

3   Q.  Why is that?

4   A.  To keep them away from each other, sir, I guess.

5   Q.  Okay.  One last question about that charger.  Is that

6   charger modified in some way?  Can you tell?

7   A.  Yes, sir.

8   Q.  Um, how is it modified?

9   A.  It's been cut.  And there's a -- looks like an audio

10  adapter.

11          MR. LEAL:  Your Honor, may I go up there and get that

12  exhibit so I can display it on the --

13          THE COURT:  You may.

14  Q.  (By Mr. Leal)  So we're looking at Government's Exhibit 9,

15  which is the box, the phone and the charger.  And you said the

16  charger was modified.

17  A.  Yes, sir.

18  Q.  Why would the -- why would a charger be modified inside a

19  prison?

20  A.  They modified them in order to use batteries or anything

21  that can plug that audio jack into it to charge the phone.

22  Q.  All right.  How would you use a pair of batteries on that?

23  Do you know?

24  A.  Not necessarily from this charger, no, sir.

25  Q.  Okay.  Um, but, basically, it's fair to say it's modified

1    so that whatever -- whatever is available to charge that phone,
2    they can make use of?
3    A.  Yes, sir.
4    Q.  All right.  That phone, um, whenever you picked it up and
5    took it out of that package it was in, did it weigh about as
6    much as a bar of soap?
7    A.  No, sir.  You could tell it was lighter.
8    Q.  You could tell it was lighter.
9    A.  The package contained three bars of soap.  But it was
10   completely sealed back.
11   Q.  To make it look like it was brand new?
12   A.  Yes, sir.
13          MR. LEAL:  May I have just a moment, Your Honor?
14          THE COURT:  Yes.
15          MR. LEAL:  Pass the witness.
16          THE COURT:  All right.  Mr. Foster.
17                      CROSS-EXAMINATION
18   BY MR. FOSTER:
19   Q.  Mr. Criddle, my name is Scott Foster.  And I represent
20   Mr. Renteria.  And I'm gonna ask you a few questions to follow
21   up.  Draw your attention to what's been marked and entered as
22   30A.  Can you see that on your screen?  Okay.
23   A.  Can you move it down some, please?
24   Q.  Yes.  Looks like being a weather person green screen.
25   Okay.  Um, that's the -- that's the institution you work at,

```
 1   right?
 2   A.  Yes, sir.
 3   Q.  I'm going to leave that up and ask you a few questions from
 4   there.  You said there was movement for, like, ten minutes.
 5   A.  Yes, sir.
 6   Q.  Freely between A, B and C?
 7   A.  Not freely, no, sir.
 8   Q.  When you say not freely, explain.
 9   A.  If A Unit's assigned to a recreation yard, they call the A
10   Unit move, then they call the B Unit move, and then the C Unit
11   move.
12   Q.  So they don't call A, B and C at the same time.
13   A.  No, sir.  We've put restraints in place after some
14   incidents we've had to control the movement.
15   Q.  How long ago was it that you-all put restraints in place?
16   A.  Not exactly sure, sir.
17   Q.  Are we talking about months, years?
18   A.  Maybe two -- prior to this or. . .
19   Q.  Yeah.  I would say -- what I'm asking is 2007.  Was it just
20   like everybody just kind of hit the yard all at the same time?
21   A.  No, sir.
22   Q.  Okay.  So not that way in 2008 or 2009 either.
23   A.  We actually had a set system in place of movement.
24   Q.  Okay.  Are the gates ever left open between the yards A, B
25   and C just for people to move back and forth?
```

1    A.   It has happened.

2    Q.   When you say it has happened, is that an anomaly?  Or is

3    that something that's, like, a regular basis?

4    A.   Not a regular basis, no, sir.

5    Q.   Okay.  Happened because of things that weren't supposed to

6    happen, accidents or. . .

7    A.   It could be from a number of things.

8    Q.   Okay.  Could you -- could you elaborate on that just a

9    little bit?

10   A.   During the move, there may be an incident that takes place

11   in the institution.  Once that happens, you have confusion.  So

12   the officers on the compound -- there are only two officers.

13   They may respond to whatever incident is taking place and not

14   secure the gate.  And with that being said, if an incident does

15   take place, you have a lot of staff responding to that specific

16   area.  So those gates will be left open.

17   Q.   Does that happen very often?

18   A.   No, sir.

19   Q.   About how often would you surmise that would happen?

20   A.   Can't say, sir.  It differs from year to year.

21   Q.   Well, okay.  Let me ask you this.  Are we talking maybe on

22   average two or three times a year, two or three times a month?

23   A.   It depends on the year, sir.  When we first opened up, it

24   was happening daily.  Then, as we got new administration in

25   place and start setting new restrains in place and new controls

1   in place, it started to subside.

2   Q.   Okay.   When did you-all open up?

3   A.   Pollock opened in 2001.

4   Q.   So by 2007, 2008, things were pretty well settled?

5   A.   We still had issues.   But it was a lot more settled than

6   the beginning.

7   Q.   Do inmates get to choose other inmates in which they want

8   to bunk?

9   A.   Now, no, sir.

10   Q.   When you say now, was there a time when that happened?

11   A.   There was a time with that -- an inmate could request to go

12   in a cell with someone else and it was pretty much granted.

13   Q.   How long ago was that?

14   A.   About two, three years ago.

15   Q.   Do you know who was running the yard in 2009?

16   A.   As far as. . .

17   Q.   Do you know what I'm talking about when I say running the

18   yard?   Do you know if there was a particular Barrio Azteca

19   member who was in charge of keeping order in the yard?

20   A.   In 2009?

21   Q.   Yes, sir.

22   A.   As far as running the whole yard, sir, we don't have one

23   inmate who runs the entire compound.

24   Q.   How about in 2008?

25   A.   No.   Inmate Delgado called the shots for the Barrio Azteca.

```
 1   But you say running the yard, there's an entire population of
 2   inmates.  They don't just control the whole compound, no, sir.
 3   Q.  Well, you're -- okay.  You're within the gang unit, right?
 4   A.  Gang unit?
 5   Q.  Yeah, isn't that what's that's called?
 6   A.  No, sir.  We house inmates who are part of gangs or what we
 7   call security threat groups or disruptive groups.  But our
 8   institution is not considered a gang unit.
 9   Q.  Okay.  No, I didn't mean the whole institution.  I'm
10   talking about you, personally, in the -- the -- the specialized
11   unit you're in deals with the gang and gang intelligence.  Is
12   that correct?
13   A.  No, sir.  I was part of the Special Investigative Services
14   Department which investigates anything or any incident that
15   happens inside the institution.
16   Q.  Okay.  Is a part of that the gang intelligence is an
17   important --
18   A.  Gang intelligence is a part of that, yes, sir.
19   Q.  Okay.  Were, to your knowledge, Barrio Azteca gang members
20   and associates all carrying shanks?
21   A.  To my knowledge?
22   Q.  Yes, sir.
23   A.  Can't answer that question honestly, sir.
24   Q.  Um --
25   A.  Unless I can stand and pat search each Barrio Azteca as I
```

CROSS - McCURLEY - ORIGINAL

 1    noticed them, I can't tell you who was packing and who wasn't.

 2    Q.  Is that a real possibility for all Barrio Aztecas at

 3    Pollock to be carrying shanks?

 4    A.  It's a prison, sir.  It's a possibility, yes, sir.

 5    Q.  Is it a probability?

 6    A.  It's a possibility and a probability for any inmate in

 7    Pollock to pack a weapon at any given time.

 8    Q.  Do you-all have metal detectors that you have them go

 9    through between --

10    A.  Yes, sir.  But inmates don't just carry weapons made out of

11    metal.

12    Q.  What kind of weapons do they carry?

13    A.  We've found weapons made out of Plexiglas.  We've found

14    weapons made out styrofoam.  We've found weapons made out of

15    the printer cartridges that would not set off the metal

16    detector.  However, it is magnetic and can be found stuck under

17    stairwells.

18    Q.  Let me move on to the -- the search that was on August 19,

19    2010.

20    A.  Yes, sir.

21    Q.  Now, the records show that he was out -- these inmates were

22    removed at 1:15 a.m.

23    A.  No, sir.  They were not removed at 1:15 a.m.  They were

24    keyed out of our institution at 1:15 a.m.

25    Q.  So they were removed before that?

David A. Perez, RMR, RPR

1   A.  Yes, sir.

2   Q.  According to your memo, the search was -- search took place

3   at 3:15 a.m.  Is that correct?

4   A.  Yes, sir.

5   Q.  Did you have somebody plop down and stand by that

6   particular cell while --

7   A.  In my memo search states that 3:15 I found the contraband.

8   Q.  Okay.

9   A.  Doesn't say when I started the search.

10  Q.  So what I'm getting down to then is, there was eyes on that

11  cell until -- from the time that --

12  A.  There were, approximately, 15 staff members on that one

13  team.  There was nobody entering that cell or exiting that cell

14  other than the two inmates that we took out of. . .

15  Q.  All right.  That's my question.  You got down to that.

16  That's what I'm trying to bore -- bear down to.

17        Okay.  Did -- two hours search.  Did you stop at the

18  point where you found the cellphone or did you-all continue to

19  --

20  A.  I stopped to take the contraband which was the target that

21  we were looking for to the office and secure it while other

22  staff members continued the search of the cell.

23  Q.  So how long did the search go on total?

24  A.  I can't give you a specific time, sir.  But I know --

25  Q.  Generally.

```
 1   A.  It lasted until everything in that cell was searched and
 2   packed.
 3   Q.  So the cell was searched quite thoroughly?
 4   A.  Yes, sir, very thoroughly.
 5   Q.  Did you find any shanks in the cell?
 6   A.  Once again, sir, I left when I found the phone.
 7   Q.  You were in charge of the search, were you not?
 8   A.  No, sir, I was in charge of the team.  When I found the
 9   phone, I immediately left because that was exactly what they
10   were specifically looking for.
11   Q.  Mr. Criddle, I don't want to belabor this, but you were the
12   man that was in charge.  Is that correct?
13   A.  I was the team leader, yes, sir.
14   Q.  And this report was made and done under your supervision.
15   Was it not?
16   A.  The -- what report?
17   Q.  The report of this particular search.  You did make a
18   report.
19   A.  I wrote an incident finding the contraband, yes, sir.
20   Q.  And if there had been other contraband found in that cell,
21   would you have not known about it?
22   A.  Yes, sir.
23   Q.  Okay.  Was anything else found in the cell, like shanks?
24   A.  No shanks that I know of.  But I found stamps as well.
25   Q.  Stamps.  Did you find any drugs?
```

```
 1   A.  Not that I know of, no, sir.
 2   Q.  Did you find any money?
 3   A.  Not that I know of, no, sir.
 4   Q.  Any money orders?
 5   A.  Not that I know of, no.
 6   Q.  Was this the only time that the jail cells of Mr. Pereya or
 7   Mr. Renteria, either together or separate, were searched while
 8   they are there?
 9   A.  Sir, you would have to obtain the housing unit officer's
10   logbook to answer that question.  Housing officers work those
11   units.  And I can't specifically sit here and tell you what
12   days they searched that cell and when they did it.
13   Q.  The cell is subject to search at any time.  Is that
14   correct?
15   A.  Yes, sir.
16   Q.  And there's not considered to have a reasonable expectation
17   of privacy in a jail cell.
18   A.  None whatsoever, sir.
19   Q.  And if those jail cells were searched and things found in
20   it, there would be a notation in a disciplinary report or
21   something of that nature.  Would there not be?
22   A.  Yes, sir.
23   Q.  Okay.  Let me talk to you about the time between July 31,
24   2008 and May 20, 2009.  You said you you would go to
25   Mr. Renteria because he had pull.  Was that a good thing for
```

1   you?

2   A.  As far as. . .

3   Q.  Being able to control the inmates.

4   A.  Sir, controlling inmates is my job.  Going to inmate

5   Renteria was trying to quell the situation before it came to

6   having to control them.

7   Q.  So that was a good shortcut for your process.

8   A.  Not necessarily a shortcut for me, no, sir.

9   Q.  Would you'd rather have had that situation or rather not?

10  A.  Rather had what situation?

11  Q.  A situation where you have an -- at least an inmate that

12  you can go to to stop something before it happens?

13  A.  It helps.

14  Q.  Thank you.

15          MR. FOSTER:  Pass the witness.

16          THE COURT:  All right.  Mr. Leal, anything further of

17  this witness?

18                      REDIRECT EXAMINATION

19  BY MR. LEAL:

20  Q.  Just because people have their cells that are subject to

21  search, doesn't keep them from keeping stuff in the there that

22  they're not supposed to have, right?

23  A.  During the day, sir, an inmate can hide contraband in

24  anybody's cell he wishes to.  Just because his cell is searched

25  doesn't necessarily mean there's no contraband in it later.  He

```
 1   may have it stashed somewhere else.
 2   Q.  Are there ways to -- to get around that type of -- of -- of
 3   search, basically?
 4   A.  Yes, sir.
 5   Q.  Okay.  Um, let me ask you this.  Mr. Foster asked you about
 6   shanks and things that shanks are made out of.  Um, is there a
 7   way to make a shank out of styrofoam?
 8   A.  Yes, sir.
 9   Q.  Um, how you would make a shank out of styrofoam?
10   A.  They take styrofoam that they may receive from food service
11   and they melt it.  Once they melt it, as it cools, they mold
12   it.  They take another piece of styrofoam and melt that and
13   mold it around the first piece.  It's not what I would consider
14   deadly, but it can hurt you and can inflict serious injury on
15   you.
16   Q.  And are you aware of any incident where that happened with
17   another inmate?
18   A.  Yes, sir.  Some years ago, around 2001, the beginning of
19   the Pollock prison, the first USP, we actually had an inmate in
20   the special housing unit stabbed in the eye by a piece of
21   styrofoam.
22   Q.  All right.  So let me ask you this.  Mr. Foster also asked
23   you on cross-examination about moving freely.  And you said
24   that in the last couple of years there hasn't -- there's been,
25   I guess, less freedom of movement there at Pollock?
```

1    A.  Yes, sir.

2    Q.  And we're in 2012.  So about what time frame did that stop?

3    2010?

4    A.  2009, 2010 somewhere.  They started putting restraints in

5    place due to the incidents that were happening.

6    Q.  Okay.  Prior to that time frame, like around the time frame

7    that we talked about where Daniel Reyes was in, from around

8    2007 to January 27, 2009, as shown in Government's Exhibit 31B,

9    would there have been more freedom of movement?

10   A.  A little bit more, yes, sir.

11   Q.  And also prior to that time frame, from, say, May 20, 2009

12   until August 19, 2010, would that have been still the time

13   frame when people could -- could ask to bunk together?

14   A.  Yes, sir.  The new administration has kind of put a stop to

15   inmates choosing who they get to cell with.

16   Q.  And that -- and that would have been around 2010.

17   Somewhere around that time frame.

18   A.  Yes, sir.

19            THE COURT:  Do you pass the witness?

20            MR. LEAL:  Pass the witness.

21                      RECROSS EXAMINATION

22   BY MR. FOSTER:

23   Q.  Talking about that freedom of movement, Lieutenant Criddle,

24   would an inmate from, say, A or C have any problem during 2008

25   or 2009 going over to an inmate's cell in, say, B and visiting

```
 1    with him over there?
 2    A.  Well, there's several instances that could happen, sir.
 3    Q.  Could you elaborate on the several instances that it could
 4    happen?
 5    A.  If the officer standing at the door may be pat searching
 6    one inmate, another inmate can walk by.  Because your attention
 7    is on something else.  If the inmate actually gets into the
 8    unit, there's nothing stopping him from freely going into any
 9    inmate's cell in the housing unit.  Because none of the cell
10    doors are secure at the inmate's request.  All the doors are
11    open around 6:00 in the morning and then secured at night for
12    the count time until the inmates from food service are released
13    from their service to go to work.
14    Q.  This is a maximum security unit that you work in.  Is it
15    not?
16    A.  No, sir.
17    Q.  No?
18    A.  No, sir.  Pollock is a high security USP.
19    Q.  A high security.
20    A.  Yes, sir.
21    Q.  How does that relate to, say, out here at La Tuna?
22    A.  La Tuna is an FCI, sir.
23    Q.  And the difference in the security?
24    A.  12th grade and kindergarten.  La Tuna is low security or
25    maybe a medium security institution.  Pollock is high security
```

```
 1   USP, which houses maximum security inmates.
 2   Q.  So you work in a high security unit where people can pass
 3   without being noticed by the guards from one unit to another.
 4   A.  Not without being noticed, sir.  If an inmate is being pat
 5   searched or the officer's attention is directed to something
 6   else, then someone may be able to pass.  If there's an officer
 7   working that housing unit who's not familiar with the inmates
 8   in that unit, an inmate may be able to walk in without being
 9   detected.
10   Q.  Do you have problems with your security staff being bribed?
11   A.  Sir, that's any prison.
12   Q.  I'm sorry?
13   A.  That's any prison.  But, yes, sir.
14   Q.  Is that common?
15   A.  No, sir.
16   Q.  On this movement within your unit, sir, do you allow your
17   inmates trustees to go into the administrative offices of the
18   prison?
19   A.  Sir, we don't have trustees.
20   Q.  There are no trustees in that unit?
21   A.  No, sir.  We have inmate orderlies who perform functions
22   for the staff in the areas they're assigned to.  And we do not
23   have trustees.
24   Q.  Thank you.
25           MR. FOSTER:  Pass the witness.
```

```
 1                 THE COURT:  Mr. Leal, anything further?
 2                 MR. LEAL:  Nothing further, Your Honor.
 3                 THE COURT:  All right.  May he step down and is he
 4      free to leave?
 5                 MR. LEAL:  Yes, Your Honor.  Ask that he be excused.
 6                 MR. FOSTER:  We have no objection to him being
 7      excused.
 8                 THE COURT:  All right.  You're free to go.  Thank you.
 9      Ladies and Gentlemen, it's about 2:30.  Let's go ahead and take
10      a short break.  About -- let's just make it real short, five,
11      ten minutes.  Um, and remember, you remain under all the
12      instructions the Court's given you.
13                 (Jury leaves courtroom.)
14                 THE COURT:  You may be seated.  Who's your next
15      witness?
16                 MR. SKARET:  Manny Lopez.
17                 THE COURT:  Okay.  Um, let's go ahead and get him
18      ready.  And we'll start in about ten minutes.  All right.
19      Thank you.
20                 (Recess.)
21                 COURTROOM DEPUTY:  Court is back in session.
22                 THE COURT:  You may be seated.  Ready for the jury?
23                 MR. SKARET:  Yes, we're ready, Your Honor.
24                 (Jury enters courtroom.)
25                 THE COURT:  You may be seated, Ladies and Gentlemen.
```

```
 1              Government may call their next witness.

 2              MR. SKARET:  Your Honor, the United States calls

 3    Manuel Lopez.

 4              THE COURT:  He needs to be sworn in.

 5              (Witness sworn.)

 6                        MANUEL LOPEZ, SWORN

 7                        DIRECT EXAMINATION

 8    BY MR. SKARET:

 9    Q.  Good afternoon, sir.

10    A.  Good afternoon.

11    Q.  Would you please introduce yourself to the jury and spell

12    your last name for the court reporter?

13    A.  Manuel Lopez.  L-O-P-E-Z.

14    Q.  And are you a United States citizen?

15    A.  Yes, I am.

16    Q.  Have you ever been a member of the Barrio Azteca?

17    A.  Yes, I have.

18    Q.  When did you join, approximately?

19    A.  December 2008.

20    Q.  Are you sill a member?

21    A.  No more.

22    Q.  Why not?

23    A.  I'm a cooperating witness.

24    Q.  When did you decide to cooperate in this case?

25    A.  Um, once we got arrested.
```

```
1   Q.  Were you charged in the same indictment as Defendant Ramon
2   Renteria?
3   A.  Yes, sir.
4   Q.  And you're one of his co-defendants?
5   A.  Yes, sir.
6   Q.  What were you charged with?
7   A.  Counts one through four.
8   Q.  Was Count I a RICO conspiracy charge?
9   A.  Yes, sir.
10  Q.  And Count II was a conspiracy to do -- distribute and
11  possess drugs?
12  A.  Yes, sir.
13  Q.  And Count III was a conspiracy to import drugs?
14  A.  Yes, sir.
15  Q.  And Count IV was a conspiracy to commit money laundering?
16  A.  Yes, sir.
17  Q.  On the day of your arrest, did you decide to cooperate?
18  A.  Yes, sir.
19  Q.  And who did you talk to that day?
20  A.  Yourself.
21  Q.  And who else?
22  A.  Samantha, FBI lady.
23  Q.  She's with the FBI?
24  A.  Yes, sir.
25  Q.  Did you enter into a cooperation agreement with the United
```

1  States?

2  A.  Yes, sir.

3  Q.  As part of that agreement, did you plead guilty?

4  A.  Yes, sir.

5  Q.  What did you plead guilty to?

6  A.  All my charges.

7  Q.  Counts I through IV?

8  A.  Yes, sir.

9  Q.  And as part of your plea, did you have to admit that you

10  had -- you were actually guilty of those offenses?

11  A.  Yes, sir.

12  Q.  You had to admit that you were a BA leader in El Paso?

13  A.  Yes, sir.

14  Q.  You had to admit that you issued orders for the BA to beat

15  people up?

16  A.  Yes, sir.

17  Q.  You had to admit that you helped the BA coordinate bringing

18  in more than 30 kilograms of heroin and more than 150 kilograms

19  of cocaine from Mexico?

20  A.  Yes, sir.

21  Q.  You had to admit that you distributed those drugs in El

22  Paso?

23  A.  Yes, sir.

24  Q.  And you had to admit that you participated in a conspiracy

25  to extort and launder, approximately, $200,000 from drug

```
 1    dealers?
 2    A.  Yes, sir.
 3    Q.  I'd like to go through your plea agreement with you and
 4    discuss some of the promises that were made by the United
 5    States and also by yourself.
 6              You pleaded to Counts I through IV, as you mentioned,
 7    correct?
 8    A.  Yes, sir.
 9    Q.  And the parties agreed in your plea agreement that you
10    would be sentenced to a maximum sentence of 25 years?
11    A.  Yes, sir.
12    Q.  Did the Court accept that plea agreement?
13    A.  Yes, sir.
14    Q.  And, also, as part of your plea agreement, did you -- did
15    you agree to cooperate with the United States?
16    A.  Yes.
17    Q.  What are you hoping to gain from that cooperation?
18    A.  Well, lesser time and protection for my family, myself.
19    Q.  So you want to get out of jail sooner than later?
20    A.  Yes, sir.
21    Q.  Now, there are a couple of promises that the United States
22    made to you that are not actually written down in this plea
23    agreement; is that right?
24    A.  Yes.
25    Q.  All right.  Did prosecutors promise to apply on your behalf
```

```
 1    for the prison witness security program?

 2    A.   Yes, sir.

 3    Q.   Can you explain what you believe is that program?

 4    A.   Protection for myself and my family.

 5    Q.   Pardon me, it's what?

 6    A.   Protection for myself my family.

 7    Q.   And the United States also agreed to do what it can to

 8    ensure the safety of your immediate family?

 9    A.   Yes, sir.

10    Q.   Is there any guarantee that you will be admitted into the

11    prison witness security program?

12    A.   No, sir.

13    Q.   So far, are you sure or do you know if the prosecution has

14    kept any of its promises to you in that regard?

15    A.   Yes, sir.

16    Q.   And what do you know about your application with the prison

17    witness security program?

18    A.   It's still pending.

19    Q.   So what is your end of the deal in all this?

20    A.   Just say the truth, everything I did.

21    Q.   Has any agent in this case ever asked you for anything more

22    than the truth?

23    A.   No, sir.

24    Q.   Any prosecutor asked you for anything more than the truth?

25    A.   No, sir.
```

```
1    Q.   If you don't tell the truth, what could happen?
2    A.   They can take away my plea agreement.
3    Q.   And what would that mean for your possible sentence?
4    A.   I can receive a life term.
5    Q.   As opposed to what?
6    A.   The 25 years.
7    Q.   So right now, as it stands, if you cooperate with the
8    Government, the maximum term you are going to receive is 25
9    years?
10   A.   Yes, sir.
11   Q.   Are you hoping for less?
12   A.   Yes, sir.
13   Q.   And if you testify untruthfully, what happens to the
14   security deal for your family?
15   A.   It would be taken away as well.
16   Q.   All right.  Let me ask you a little bit about your personal
17   history.  Have you ever been convicted of any crimes?
18   A.   Yes.
19   Q.   Like what?
20   A.   Convicted of misdemeanor theft.
21   Q.   Approximately, how many misdemeanor thefts?
22   A.   I've been -- that I know of I've been convicted of one.
23   But I've had ten, 12 arrests.
24   Q.   Since when?
25   A.   The 90s, early 90s.
```

```
 1    Q.  And what were -- why were you stealing things back then?
 2    A.  It was to -- for my drug habit.
 3    Q.  What were you stealing?
 4    A.  Electronics, clothing.
 5    Q.  You mentioned your drug habit.  What illegal drugs were you
 6    using?
 7    A.  Heroin.
 8    Q.  Starting when?
 9    A.  Nineties.
10    Q.  Did you ever stop using heroin in the 90s?
11    A.  Up to like 2000, that's when I -- I went into the methadone
12    program.
13    Q.  You went to methadone after heroin?
14    A.  Yes, sir.
15    Q.  Up until what day?
16    A.  The day of my arrest.
17    Q.  So from the early 1990s until the day of your arrest,
18    you've been on heroin or methadone?
19    A.  Yes, sir.
20    Q.  How about now?
21    A.  Clean.
22    Q.  Since when?
23    A.  Since the day of my arrest.
24    Q.  I'd like to talk to you about when you joined the BA.  You
25    said December of 2008.  Tell me, does the BA run in your
```

```
 1    family?
 2    A.  I've had a couple uncles that were BA members.
 3    Q.  Tell me about them.
 4    A.  They're dead, there's two.  They're dead.  Um, they're
 5    members from the early 90s.
 6    Q.  Why did you join the Barrio Azteca?
 7    A.  Power.  Power amongst, I don't know -- pride -- false
 8    pride.
 9    Q.  Who was your sponsor?
10    A.  Manny Minjarez.
11    Q.  And when was all this going on, when was he sponsoring you?
12    A.  He sponsored me in 2008.
13    Q.  Now, was he your padrino?
14    A.  Yes.
15    Q.  What does it mean to be your padrino?
16    A.  He's the one that brings you, gives the blessing, brings
17    you into the family.
18    Q.  And if you could, would you speak into the microphone a
19    little bit more?  It's hard to hear you.
20    A.  Yes.
21    Q.  Thanks.  So the padrino is a Barrio Azteca member that
22    brings you into the family?
23    A.  Yes, sir.
24    Q.  Is he vouching for you?
25    A.  Yes.
```

1    Q.   What happened after he sponsored you?

2    A.   I came into the family.  I was a full-fledged member.

3    Q.   What happened to your application, basically?  Did it go

4    anywhere?

5    A.   It goes to Coffield unit, TDC unit.

6    Q.   And why is Coffield important to the BA?

7    A.   That's the -- what we call it, the table, the main table

8    where everything goes -- that has to go through there.

9    Q.   Who was in charge of the table at the time your application

10   went up?

11   A.   Galindo, Hector Galindo.

12   Q.   Who approved your application into the BA?

13   A.   Hector Galindo.

14   Q.   How did you find out that you had been approved?

15   A.   Through Minjarez.

16   Q.   That was your padrino?

17   A.   Yes.

18   Q.   We've heard testimony in this case that in order to join

19   the Barrio Azteca, that the member must commit some sort of

20   violent act, like blood in and blood out, on the Barrio Azteca.

21   How did you prove yourself so that Manny Minjarez would sponsor

22   you as a BA member?

23   A.   I really didn't do that blood in, blood out.  I was a good

24   earner for the BA.

25   Q.   You said earner?

```
1    A.   Yes, sir.

2    Q.   What kind of an earner?

3    A.   I was a good drug dealer for them.

4    Q.   So you proved yourself by making money?

5    A.   Yes.

6    Q.   For the Barrio Azteca?

7    A.   Yes.

8    Q.   Tell me, how it is that you make money for the Barrio

9    Azteca as being a really great drug dealer?

10   A.   Selling heroin.

11   Q.   Selling?

12   A.   Heroin.

13   Q.   And you sold heroin to who?

14   A.   To BA members -- BA members, um, drug addicts.

15   Q.   And while you're selling heroin to other BA members, how

16   does that money make them richer?

17   A.   Well, the proceeds goes back to -- to the BA, to the --

18   whatever the profit we make, they make, it's -- it goes back to

19   them and goes back into their books, to their commissary.

20   Q.   Did you also collect quota?

21   A.   Yes, sir.

22   Q.   What does it mean to collect quota?

23   A.   Um, extorting money from drug dealers.

24   Q.   And do you call those drug dealers, stores?

25   A.   Yes, sir.
```

1   Q.  Tell us, how do you open a store?

2   A.  Whenever we found out if someone was selling drugs without

3   paying the BA, we went to talk them.  And, basically, we -- it

4   was a threat, either they pay, or they're going to be beaten up

5   or worse.

6   Q.  How do you find or investigate who's selling drugs on your

7   turf?

8   A.  That's through the BA members, members and drug addicts.

9   Q.  So you made the BA money both in selling drugs and picking

10  up quota?

11  A.  Yes, sir.

12  Q.  That's how you proved yourself?

13  A.  Yes, sir.

14  Q.  Back then, did you have someone who was also helping you

15  with your drug business?

16  A.  Yes.

17  Q.  Who was that?

18  A.  My brother.

19  Q.  Has he always helped you with that?

20  A.  For the most part, yes.

21  Q.  Now, once you joined, what did you learn were some of the

22  most important rules of the gang?

23  A.  Pretty much follow the rules.  And, um, how can I say. . .

24  do pretty -- do as you're told, follow.

25  Q.  What about doing what you're doing today?

1    A.  No.  No.  No cooperating.

2    Q.  No cooperating.  You shouldn't be cooperating with whom?

3    A.  Law enforcement.

4    Q.  Now, during your time with the Barrio Azteca did you ever

5    try and investigate whether or not people in your organization

6    were cooperating?

7    A.  Yes, sir.

8    Q.  How would you investigate that?

9    A.  We, um, through other people, whatever sources we had.

10   People that knew them, um, Internet, court records that we

11   could find court records, stuff like that.

12   Q.  How would you try and find court records?

13   A.  We'd ask the person we're investigating for their

14   transcripts, or whatever paperwork they had.

15   Q.  Would the BA ever approach probation officers?

16   A.  I don't know if they approached them, but, yeah.

17   Q.  How about defense lawyers?

18   A.  Yes.

19   Q.  Did you ever look for someone you believed to be

20   cooperating, Gustavo Gallardo?

21   A.  I didn't.

22   Q.  Do you know whether the BA looked for him?

23   A.  Yes.

24   Q.  Did they investigate him?

25   A.  Yes.

```
 1   Q.  Do you know if the BA ever found him?

 2   A.  No.

 3            MR. FOSTER:  I'm going to object to this line of

 4   questioning.  It's -- so far it's been hearsay upon hearsay.

 5            THE COURT:  He answered I don't know.  But lay a

 6   foundation on the next.

 7   Q.  (By Mr. Skaret)  Well, when you're receiving this

 8   information so far that you've been testifying, are you

 9   receiving this information from other BA members?

10   A.  Yes.

11   Q.  And only Barrio Azteca members?

12   A.  Yes.

13   Q.  With respect to another rule, tell us, what are your

14   priorities in life as a BA member?

15   A.  BA comes before anything else.

16   Q.  Before family?

17   A.  Yes.

18   Q.  Before your country?

19   A.  Yes.

20   Q.  Before everything?

21   A.  Before everything.

22   Q.  Did you -- in joining the gang, did you learn about gang

23   signs?

24   A.  Yes.

25   Q.  What are some of the signs or the symbols that are
```

1   important to the Barrio Azteca?

2   A.  21.

3   Q.  Why is that significant?

4   A.  That's the -- just a reference to -- the two is the B, the

5   one is the A.

6   Q.  What about Aztec culture?

7   A.  Yeah.  Yes, sir.

8   Q.  I'd like to show you what's been admitted, um, I believe

9   into evidence?

10         MR. SKARET:  -- Your Honor.  Government's Exhibit 6RR.

11         THE COURT:  That's correct.

12         MR. SKARET:  If I may publish that, Your Honor?

13   Q.  (By Mr. Skaret)  Do you recognize what's been marked as

14   Government's Exhibit 6RR?

15   A.  Yes, sir.

16   Q.  And who's in Government's Exhibit 6RR?

17   A.  That's two Barrio Azteca members.

18   Q.  Who are they?

19   A.  Moreno and Omar Lopez, my brother.

20   Q.  Does your brother have a nickname?

21   A.  Peewee.

22   Q.  What is it they're flashing there with their hands?

23   A.  The 2-1.

24   Q.  And your brother has -- which one is your brother?

25   A.  The one on the right-hand side.

1    Q.  The right-hand side.  And the other gentleman on the left?

2    A.  They call him Moreno.

3    Q.  Any other nicknames?

4    A.  Not that I know of.

5    Q.  Now, I see that they are shaking hands.

6    A.  Yes, sir.

7    Q.  If you're at a -- buying a used car and at the end of your

8    sale you shake hands with the used car dealer, do you shake

9    hands like that?

10   A.  No, sir.

11   Q.  Why are they shaking hands like that?

12   A.  It's common among BA.  Respect.

13   Q.  Do you know where this photo was taken?

14   A.  No.

15   Q.  What about tattoos?  Are tattoos common in the Barrio

16   Azteca?

17   A.  Yes.

18   Q.  I'd like to show you what's been marked as 16A-2.  This is

19   not in evidence.

20          MR. SKARET:  If I could show this to the witness?

21          THE COURT:  All right.

22   Q.  (By Mr. Skaret)  Do you recognize 16A-2?

23   A.  Yes, sir.

24   Q.  What is that?

25   A.  Feather.

1   Q.  On what?

2   A.  On Omar's -- Peewee's right -- on the neck.

3   Q.  Is that a picture of your brother, Omar Lopez?

4   A.  Yes, sir.

5   Q.  Is that how he actually looks?

6   A.  Yes.

7          MR. SKARET:  Your Honor, I would offer Government's

8   Exhibit 16A-2 and publish to the jury.

9          THE COURT:  Any objection?

10          MR. FOSTER:  No objections, Judge.

11          THE COURT:  It will be admitted.

12          It may be published.

13   Q.  (By Mr. Skaret)  You mentioned -- you said there was a

14   feather with your finger on the screen.  Can you circle where

15   that feather is on your brother?

16          MR. SKARET:  May we capture that, Javier?

17   Q.  Do you know a lot of Barrio Aztecas that have that feather

18   tattooed on their body?

19   A.  No.

20   Q.  How many do you know?

21   A.  From just -- from right now, just my brother.

22   Q.  All right.  Do they have feathers tattooed other places?

23   A.  Yeah.

24   Q.  Like where?

25   A.  Their body, anywhere on their body.

1   Q.  Do all Barrio Azteca members have tattoos?

2   A.  No, sir.

3   Q.  How about you?

4   A.  No.  I only have one, my last name.

5   Q.  Your last name?

6   A.  Yes, sir.

7   Q.  Why don't have you any Barrio Azteca tattoos?

8   A.  Um, for me, personally, it was to throw off law

9   enforcement.

10  Q.  Now, when you joined, I believe you said back in

11  December 2008, tell -- let's talk about the hierarchy of the

12  gang at that point.  Who was in charge of El Paso?

13  A.  At that time it was Tweety.

14  Q.  And Tweety, do you know his real name?

15  A.  No, sir.

16  Q.  And at that point, was El Paso divided up into separate

17  sections?

18  A.  Yes, sir.

19  Q.  What section were you part of?

20  A.  Central.

21  Q.  And as a BA member in central, who did you report to?

22  A.  Cano.

23          MR. SKARET:  Your Honor, I would like to show the

24  witness and publish what's been admitted as Government's

25  Exhibit 13B -- Your Honor, offer 16A-2-1.

```
 1              THE COURT:  Any objections?
 2              MR. FOSTER:  No objections, Judge.
 3              THE COURT:  Give us just a minute.  The next was?
 4              MR. SKARET:  The next exhibit would be 13B, which I
 5   believe is admitted.
 6              THE COURT:  You may show it to the jury.
 7              MR. SKARET:  Thank you, Your Honor.
 8   Q.  (By Mr. Skaret)  You mentioned you were a member of the
 9   central part of El Paso.  Who did you report to?
10   A.  Cano.
11   Q.  All right.  I'm showing you what's been marked as 13B.  Do
12   you see anyone that you recognize in that photo?
13   A.  Yes, sir.
14   Q.  Who do you see in the photo?
15   A.  Cano, and Payaso.
16   Q.  Where is Mr. Cano?
17   A.  Second from the right.
18   Q.  Could you, please, just touch the screen where you see
19   Mr. Cano?  Then you mentioned Jorge Diaz?
20   A.  Yes.
21   Q.  Would you please circle Jorge Diaz?  Did Jorge Diaz have a
22   nickname?
23   A.  Payaso.
24   Q.  All right.  So you joined the gang.  You are a member of
25   central.  You're reporting to Cano.  When did you start selling
```

```
 1    drugs as a member of the Barrio Azteca?
 2    A.   Um, January 2009.
 3    Q.   And how much were you selling?
 4    A.   Anywhere from five to ten ounces every other day.
 5    Q.   Where were you getting your drugs from?
 6    A.   At first, I was getting it from Cano.
 7    Q.   And how much were you selling the drugs for?
 8    A.   800 per ounce.
 9    Q.   What kind of drug was this?
10    A.   Heroin.
11    Q.   How much did the ounce of heroin cost you?
12    A.   At that time, 700.
13    Q.   So that's -- you're moving, approximately, $7,000 every
14    other day?
15    A.   Yes, sir.
16    Q.   And you're making about $1,000 every other day?
17    A.   Yes, sir.
18    Q.   Who were you selling to?
19    A.   BA members.
20    Q.   And were they happy to buy?
21    A.   Yes.
22    Q.   Why?
23    A.   They were making money as well.
24    Q.   And how would they make money on an ounce of heroin that
25    you've already made money on?
```

David A. Perez, RMR, RPR

```
 1   A.  They would break it down into grams or individual doses.

 2   Q.  And why wouldn't you do that?

 3   A.  Um, it was easier for me to sell them in ounces faster.

 4   Q.  Faster.  Is it riskier to sell in individual doses?

 5   A.  Yes, sir.

 6   Q.  Why would it be riskier?

 7   A.  Because you have to be out on the street longer periods of

 8   time selling to all kinds of people.

 9   Q.  Then when you mentioned that the Barrio Azteca members that

10   you would sell to were breaking it down, what does it mean to

11   break down an ounce of heroin?

12   A.  They were, like I said, breaking it down into either grams

13   or individual doses.

14   Q.  So you were reporting to Cano.  Did there come a time when

15   Saul Delgado got arrested?

16   A.  Who?

17   Q.  Pardon me.  When Tweety got arrested?

18   A.  Yes, sir.

19   Q.  When was that?

20   A.  I don't know what date he got arrested, but, yes.

21   Q.  Was it soon after you joined the gang?

22   A.  A little -- yeah, months.

23   Q.  And who took over for him?

24   A.  Enano.

25   Q.  Does he have any other nicknames?
```

1   A.   Not -- Boots.

2   Q.   Does he go by just plain Nano?

3   A.   Yes.

4   Q.   How long did he take over the streets?

5   A.   Around a couple of months.

6   Q.   Who took over after Enano?

7   A.   Cano.

8   Q.   Cano came back and took over?

9   A.   No.  Cano was just in charge of central at that time.  And

10  then he took over the streets after Nano.

11  Q.   And how long did Cano hold the streets?

12  A.   I don't know, about four months or so, I'd say.

13  Q.   Do you know an individual by the nickname of Little

14  Angelillo?

15  A.   Yes, sir.

16  Q.   What's his real name?

17  A.   Angel Cardona.

18  Q.   And did he ever take over the streets of El Paso?

19  A.   Yes, sir.

20  Q.   Was it after Cano?

21  A.   Yes, sir.

22  Q.   Now, when Little Angelillo took over El Paso, did he have

23  rank?

24  A.   Yes, sir.

25  Q.   All right.  And were you continuing to get your drugs from

David A. Perez, RMR, RPR

1    Cano?

2    A.  Well, Cano got arrested at that time.  That's why Angelillo

3    took other.  And I started to buy drugs from Little Angelillo.

4    Q.  And were you getting the drugs in the same amounts as you

5    were with Cano?

6    A.  Yes, sir.

7    Q.  Where was Little Angelillo getting his drugs?

8    A.  From Juarez.

9    Q.  Anyone in particular in Juarez that you knew of?

10   A.  Scrappy.

11   Q.  Now, at about this time, when you are getting your drugs

12   from Little Angelillo getting them from Scrappy, did you ever

13   hear that Scrappy wanted a gun?

14   A.  Yes.

15   Q.  And how did you know that Scrappy wanted a gun?

16   A.  Angelillo had told me; Scrappy had told me.

17   Q.  What did Little Angelillo tell you about it?

18   A.  That they just wanted a gun.  They wanted a gun.  See if we

19   can take it over there to them.

20   Q.  Take it over where?

21   A.  To Juarez.

22   Q.  And did you help Little Angelillo get that gun over to

23   Scrappy?

24   A.  Yes, sir.

25   Q.  What did you do?

1    A.  Had another prospect, what we call a prospect, BA member

2    prospect, cross it over, walk it over to Juarez.

3    Q.  Do you know if it ever got delivered to Juarez?

4    A.  Yes, sir.

5    Q.  How do you know it got delivered?

6    A.  Once he got over to Juarez, when he delivered the gun, I

7    asked to talk to the BA member to confirm that he received the

8    gun.

9    Q.  Did there come a time when Little Angelillo got arrested?

10   A.  Yes, sir.

11   Q.  And when, approximately, was that?

12   A.  May -- May 2010, approximately.

13   Q.  And is Roberto Cardona, you've also mentioned Little

14   Angelillo, is he also a co-defendant in this case?

15   A.  Yes, sir.

16   Q.  Now, when the leadership was changing from when you joined

17   in December of 2008 up until now, May 2010, did you have any

18   say in who took over the leadership?

19   A.  No, sir.

20   Q.  How were those decisions made?

21   A.  Through -- through the hierarchy at -- the captains, the

22   leaders.

23   Q.  And could anyone but a captain approve a new leader taking

24   over in El Paso?

25   A.  Scrappy could have done that, too.

```
1    Q.  What was Scrappy's rank?

2    A.  Lieutenant.

3    Q.  Did Scrappy have special pull in the organization?

4    A.  Well, he was really close to Carlos -- Shotgun.

5    Q.  Now, as we go through your testimony in the 16 months --

6    roughly 16 months between when you joined in December of 2008

7    until May of 2010, I'm counting that BA lost and replaced their

8    El Paso leader, approximately, five times.  Would you agree

9    with that?

10   A.  Yes, sir.

11   Q.  Every time that change occurred, did the new leader of El

12   Paso have access to Juarez and drugs?

13   A.  Yes, sir.

14   Q.  When Little Angelillo was arrested, who took over?

15   A.  I did.

16   Q.  At that time, did you have direct connection to Juarez?

17   A.  Yes, sir.

18   Q.  How did you find out who your contact was?

19   A.  Um, they called me.

20   Q.  Who called you?

21   A.  Scrappy called me, that's how.

22   Q.  This is the Scrappy that's in Juarez?

23   A.  Yes, sir.

24   Q.  What did he call to talk about?

25   A.  Just to let me know that I was going to take over.  For me
```

1    to take over.  I guess Little Angelillo had put a good word for

2    me.  And I was going to take over at that time.

3    Q.  And you're not the leader of El Paso.  Did you have rank at

4    that time?

5    A.  Not yet.

6    Q.  Prior to you getting rank, who else were you contacting in

7    Juarez, if anyone?

8    A.  Just Scrappy, um, and Chino Valles.

9    Q.  Who's Chino?

10   A.  He's a lieutenant in the BA.

11   Q.  All right.  And he's also located in Juarez?

12   A.  Yes, sir.

13   Q.  What about an individual named Ricardo Zuniga?

14   A.  That's after.  I started contacting him after they killed

15   Scrappy.

16   Q.  Tell me, how much heroin were you getting on a daily basis

17   from Scrappy in Juarez?

18   A.  Five to ten ounces every other day.

19   Q.  So, basically, about the same as you always had?

20   A.  Yes, sir.

21   Q.  Did anything change in how much profit you were making?

22   A.  Yes, sir.

23   Q.  How -- how did that change?

24   A.  Instead of paying 700 per ounce, we were paying 640 per

25   ounce.

David A. Perez, RMR, RPR

1   Q.   Was this a special deal for everyone or just for you?

2   A.   For everyone.

3   Q.   Now, how were you getting your heroin in from Juarez from

4   Scrappy?

5   A.   We had women that would cross it over the bridge.

6   Q.   All right.  And how would they cross it over the bridge?

7   A.   In their cavities.

8   Q.   All right.  And explain, how does a woman cross in their

9   body cavity from Mexico into the United States?

10  A.   They wrap it real tight, um, in cellophane, put it in a

11  condom and then they secrete it in their cavity.

12  Q.   How were these woman paid, if at all?

13  A.   We were paying them $16 per ounce or a gram per ounce.

14  Q.   And how would they physically get it over here?

15  A.   In their cavity.

16  Q.   Okay.  Would they walk it over?

17  A.   Yes, walk it.

18  Q.   Now, how long did you continue getting heroin from Scrappy?

19  A.   Um, to the day of his -- when he got murdered.

20  Q.   Do you remember that day?

21  A.   Yes, sir.

22  Q.   Did you talk to him that day?

23  A.   Yes, sir.

24  Q.   And tell us about that conversation.

25  A.   Um, well, I was talking, he was driving.  He was driving --

1    I believe he was with another individual, which I don't know.

2    When I was talking to him, he said he wanted to make a stop

3    because something didn't look right.  After that, a couple

4    hours later, Zuniga called me telling me that -- that Scrappy

5    got killed as soon as we hung up.

6    Q.   Did he -- Zuniga is another Barrio Azteca member?

7    A.   Yes, sir.

8    Q.   Did he tell you who had killed him?

9    A.   Rivals.

10   Q.   Who are the Barrio Azteca's rivals in Juarez?

11   A.   Um, Mexicles, Double A, the Sinaloa Cartel.

12   Q.   And so the Mexicles and Double As are aligned with --

13   A.   Sinaloa.

14   Q.   -- the Sinaloans.

15   A.   Yes, sir.

16   Q.   Has the BA formed any alliances with cartels in Juarez?

17   A.   With La Linea.

18   Q.   And are La Linea and the Sinaloans fighting?

19   A.   Yes, sir.

20   Q.   Why are they fighting?

21   A.   Over the drug corridors for El Paso for Juarez.

22   Q.   Why is that drug corridor so important?

23   A.   Profits, a lot of profits.

24   Q.   Now, you mentioned a person named Ricardo Zuniga, um,

25   first, I believe, as a head of El Paso and then later as their

David A. Perez, RMR, RPR

1   contact in Juarez; is that right?

2   A.  Yes, sir.

3   Q.  Who was Ricardo Zuniga?

4   A.  I don't understand your question.

5   Q.  Well, was he Barrio Azteca?

6   A.  Yes, sir.

7   Q.  And you mentioned that his nickname was Enano?

8   A.  Yes, sir.

9   Q.  Why did he leave El Paso when he was the leader of the

10  Barrio Azteca?

11  A.  Because he was wanted for two murders.

12  Q.  Where were those murders committed, if you know?

13  A.  A&M Bar in Socorro.

14  Q.  That's here in El Paso?

15  A.  Yes, sir.

16  Q.  How did you know that he was wanted for those murders?

17  A.  Well, when he fled, and other BA members had told us.

18  Q.  When he left El Paso, did he continue his activities with

19  the gang?

20  A.  In Juarez, yes.

21  Q.  What was his role with the gang down in El Paso -- pardon

22  me, in Juarez?

23  A.  Um, just soldier.

24  Q.  Did he move up?

25  A.  He moved up to -- once Scrappy got killed, he moved up to

David A. Perez, RMR, RPR

```
 1    sergeant.  From sergeant to lieutenant.
 2    Q.  When he was a lieutenant, is that when you were
 3    coordinating with him getting your drugs?
 4    A.  Yes, sir.
 5    Q.  Tell us, who's Tolon?
 6    A.  He's a BA leader in charge of TDC.
 7    Q.  What's his current rank?
 8    A.  Captain, capo.
 9    Q.  Do you know his real name?
10    A.  Manuel Cardoza.
11    Q.  And does Mr. Zuniga, who you've been telling us about in
12    Juarez -- does he have a family relationship with Manny
13    Cardoza?
14    A.  He's married to his daughter.
15    Q.  What's the name of his daughter?
16    A.  April Cardoza.
17    Q.  When you started getting your drugs from Ricardo Zuniga
18    when Scrappy died, were you getting the same amounts of heroin?
19    A.  Yes, sir.
20    Q.  Were you using the same importation scheme?
21    A.  Yes, sir.
22    Q.  Did Zuniga ever change up that scheme?
23    A.  He got different women to do it.
24    Q.  And what women did he get to do it?
25    A.  His wife, April's, friends.
```

```
 1    Q.  And why did he make this change?

 2    A.  Because he didn't -- he said that they would go straight to

 3    his house.  He didn't have to worry to be out on the streets,

 4    nothing like that.

 5    Q.  Can you explain a little more detail?  How was it first and

 6    then how did it change?

 7    A.  Well, at first we had -- we had a couple of women since

 8    Cano and Cano used them, Angelillo used them.  I used them.  We

 9    used them a couple of times with -- with Enano.  And then after

10    that, he told me that he was going to change for -- to the

11    other women, to his wife's friends because they would either

12    drive all the way to his house or go all the way to his house

13    and it was more private.  He didn't have to worry about being

14    out on the streets and being caught with drugs or being

15    targeted.

16    Q.  So there was less risk for Mr. Zuniga?

17    A.  Yes, sir.

18    Q.  Do you know whether April Cardoza, his wife, was indicted

19    in the case?

20    A.  Yes, sir.

21    Q.  She's one of your co-defendants?

22    A.  Yes, sir.

23    Q.  At this time when April's friends were helping Ricardo

24    Zuniga with his drugs, were you also getting marijuana from

25    Juarez?
```

David A. Perez, RMR, RPR

```
 1   A.  Yes, sir.

 2   Q.  How much marijuana were you getting?

 3   A.  15 to 30 pounds a day.

 4   Q.  How often?

 5   A.  A day.

 6   Q.  A day.  And how would you get that?

 7   A.  Um, inside tires or bumpers.  In the car bumpers.

 8   Q.  Explain in a little more detail.  How would you put

 9   marijuana into a car bumper?

10   A.  I don't know how they would do it.  They would do it in

11   Juarez.  But they -- they -- they disassemble the bumper, put

12   the marijuana in the bumper, and put the bumper back in the

13   car.

14   Q.  Did you ever unpack those bumpers?

15   A.  No.

16   Q.  Did you have people do that for you?

17   A.  Yes, sir.

18   Q.  Who would do that for you?

19   A.  Um, we had Chucky Conde do that.

20   Q.  And Chucky, you mentioned also known as Conde?

21   A.  Yes, sir.

22   Q.  Is he also indicted in this case?

23   A.  Yes, sir.

24   Q.  So you mentioned that you took over the streets of El Paso

25   for the Barrio Azteca in May of 2010, right?
```

1    A.   Yes, sir.

2    Q.   You'd only been in for 15 months?

3    A.   Yes.

4    Q.   And you said you didn't have any rank?

5    A.   Until about a month -- about a month after I took over.

6    Q.   How did you get the rank?

7    A.   Um, Perea, Carlos Perea gave it to me.

8    Q.   Did anyone ask him to do that?

9    A.   Not that I know of.

10   Q.   Now, did you prove yourself with Carlos Perea?

11   A.   Yes.

12   Q.   How did you do that?

13   A.   Following orders, um, sending him whatever he needed,

14   drugs.

15   Q.   Anything else or just drugs?

16   A.   Just drugs, being reliable, basically.

17   Q.   How do you know that Shotgun was the one that gave you the

18   rank?

19   A.   Okay.  He told me; we had a conversation on the phone.

20   Q.   Where was he when you had that conversation?

21   A.   Federal prison.

22   Q.   Did you ever hear from Juarez that you had gotten rank?

23   A.   Yes, from Zuniga.

24   Q.   And how did he tell you?

25   A.   Over the phone.

1    Q.  Now, at the time when you took over El Paso, did you have

2    any -- any street leaders that reported to you?

3    A.  Yes, sir.

4    Q.  Who were some of those street leaders?

5    A.  Um, it was Espino, Jesus from the west side, um, Conde from

6    central, um, Roberts from northeast/Chaparral.

7    Q.  Does he is a nickname?

8    A.  Taz.  Vago Espino from the Lower Valley, Pollo from the

9    east side.  Basically, all the same people that were in charge

10   of their areas.

11   Q.  I'd like to show you what has been marked as Government's

12   Exhibit 26.

13        MR. SKARET:  This is not in evidence, Your Honor.  If

14   we could just publish it to the witness.

15        THE COURT:  All right.

16   Q.  (By Mr. Skaret)  Are you familiar with Government's Exhibit

17   26?

18   A.  Yes, sir.

19   Q.  You've seen it before?

20   A.  Yes, sir.

21   Q.  What is it?

22   A.  It's a -- just the rank, how -- the structure, BA

23   structure.

24   Q.  Is this the structure, more or less, of the BA gang as of

25   the day of your arrest?

```
 1    A.  Yes, sir.

 2    Q.  Do you recognize most of the people in Government's Exhibit

 3    26?

 4    A.  Yes, sir.

 5    Q.  There are a few that you do not recognize though; is that

 6    right?

 7    A.  Yes, sir.

 8    Q.  Who do you not recognize?  And let's start up at the top.

 9    A.  Benjamin Alvarez, Carlos Perea, Manuel Cardoza.

10    Q.  What about Eduardo Ravelo; do you recognize him?

11    A.  Yes, sir.

12    Q.  Have you ever seen him?

13    A.  I've seen him on billboards.

14    Q.  The next line, do you recognize any of those individuals?

15    A.  Yes, sir.

16    Q.  Is there anyone in that second line that you do not

17    recognize?

18    A.  No, sir.

19    Q.  The third line, do you recognize who that is?

20    A.  Yes, sir.

21    Q.  Who's that?

22    A.  Myself.

23    Q.  All right.  Anyone in the fourth line that you do not

24    recognize?

25    A.  Just the ones on the right-hand side.
```

1  Q.  Okay.

2  A.  Alberto Nunez Payan and Arturo Castrellon Gallegos.

3  Q.  The next line where it says soldiers and associates, is

4  there anyone in that line that you do not recognize?

5  A.  No, sir.

6  Q.  In the bottom line, anyone you do not recognize?

7  A.  April Cardoza and Yolanda Chavira.

8  Q.  With respect to her, you mentioned her.  Have you ever met

9  her?

10  A.  No.

11  Q.  Is this a fair and accurate representation of how all the

12  people that you know of actually looked on the day of your

13  arrest?

14  A.  Yes, sir.

15  Q.  You also see there are some rankings that are mentioned on

16  this organizational chart.  Do you agree that the individuals

17  on the top line were the captains on the day of your arrest?

18  A.  Yes, sir.

19  Q.  Do you agree that the individuals on the second line were

20  lieutenants in the Barrio Azteca on the date of your arrest?

21  A.  Yes, sir.

22  Q.  Do you agree that the individual, yourself, on the third

23  line was a sergeant on the day of your arrest?

24  A.  Yes, sir.

25  Q.  Do you agree that the street leaders on the fourth line

1    were leaders of El Paso as well?

2    A.  Yes, sir.

3    Q.  Under you of course.

4    A.  Yes, sir.

5    Q.  Manny -- pardon me.  Your brother, Omar Lopez, is

6    identified here.  On the day of your arrest, what rank did he

7    hold?

8    A.  On the day of arrest he didn't have no rank.

9    Q.  Did anyone ever give him the rank of sergeant?

10   A.  Yes, sir.

11   Q.  That was not by the day of your arrest?

12   A.  That was before.

13   Q.  So on the day of your arrest he was a sergeant?

14   A.  No.  He was stripped of his rank months before.

15   Q.  I see.  But at one point he was a sergeant?

16   A.  Yes, sir.

17   Q.  Okay.  The individuals in the bottom two rows, were those

18   all soldiers and associates, to the best of your knowledge, of

19   the Barrio Azteca?

20   A.  Yes, sir.

21   Q.  Now, you mentioned an individual named Jesus Espino.  And

22   you said that he worked on the west side.

23   A.  Yes, sir.

24   Q.  Was he the leader of the west side?

25   A.  Yes, sir.

1    Q.   Did you ever sell drugs to Jesus Espino?

2    A.   Yes, sir.

3    Q.   How much were you selling to him?

4    A.   Um, about, um, an ounce a day.

5    Q.   And that was an ounce of what?

6    A.   Heroin.

7    Q.   Did you know an individual named Carlos Perez, also known

8    as Bandit?

9    A.   Yes, sir.

10   Q.   Did he work with Jesus Espino?

11   A.   Yes, sir.

12   Q.   Was he a BA?

13   A.   Yes.

14   Q.   Do you know if those individuals from the west side ever

15   possessed guns?

16   A.   Yes, sir.

17   Q.   How do you know that?

18   A.   They told me.

19   Q.   Did they tell you what kind of guns they had?

20   A.   No.

21   Q.   Why did they have the guns?

22   A.   Just protection.

23   Q.   Did they tell you what they were going to do with the guns?

24   A.   Just use them in case they needed them.

25   Q.   Did they keep them, um -- were they going to move them

```
1    anywhere to a safer location?
2    A.   Yes.
3    Q.   Where were they going to move them?
4    A.   To Las Cruces.
5    Q.   Why would they move them there?
6    A.   Because the west side was getting really -- as they say,
7    getting hot.  Law enforcement was on them a lot.  And so they
8    moved them to Las Cruces for safekeeping.
9    Q.   So now it's -- it's, approximately, May of 2010.  You've
10   taken over the streets of El Paso.  And you're a sergeant.  As
11   the leader of El Paso, are you also in charge of west Texas?
12   A.   Yes, sir.
13   Q.   Are you in charge of New Mexico?
14   A.   Yes, sir.
15   Q.   We've only talked about your drug trafficking.  Does the
16   Barrio Azteca also engage in violence?
17   A.   Yes, sir.
18   Q.   For what purpose?
19   A.   For -- to secure their turf, their home base.
20   Q.   What about the violence used to collect quota?
21   A.   Yes, sir.
22   Q.   How is it used to collect quota?
23   A.   If someone doesn't want to pay, they -- like I said, they
24   either get beat up or worse.
25   Q.   Does the violence used -- does the Barrio Azteca use
```

1  violence to enforce their own rules on their own members?

2  A.  Yes, sir.

3  Q.  What are those beatings called?

4  A.  Calentadas.

5  Q.  Did you ever participate in calentadas?

6  A.  Yes, sir.

7  Q.  Tell us about Smiley.

8  A.  Um, I participated in that one because he was looking into

9  another BA's apartment, looking at his wife.

10  Q.  Approximately, when was that?

11  A.  2009.  2009.

12  Q.  Back then, who were you reporting to?

13  A.  Cano.

14  Q.  And who order that calentada?

15  A.  Cano did.

16  Q.  Who ordered you to participate?

17  A.  Cano did.

18  Q.  And what kind of calentada did you give him?

19  A.  One they call "with gravy".  Um, more severe beating than

20  just a regular.

21  Q.  And did this individual, Smiley, did he fight back?

22  A.  No, sir.

23  Q.  Why not?

24  A.  He's not allowed to.

25  Q.  Explain that.

```
 1    A.  He's not allowed to do that.  He has to take it.  He did a
 2    misdoing.  So he had to just take what the discipline, take the
 3    discipline.  If not, um, if he fought back, we can break his
 4    bones, send him to the hospital.
 5    Q.  Then what if he fights?
 6    A.  They could break his bones.
 7    Q.  Did he fight back that day?
 8    A.  No, sir.
 9    Q.  Tell me about an individual name Chato or Ramirez.
10    A.  Yes, sir.
11    Q.  What happened to Chato?
12    A.  Um, they also gave him a calentada.
13    Q.  When was this?
14    A.  Of 2009.
15    Q.  Who were you reporting to when that happened?
16    A.  Cano.
17    Q.  And who ordered the beating of Chato?
18    A.  Scrappy.
19    Q.  Why did he order that?
20    A.  Because he was going over to Juarez and buying heroin.
21    Q.  Who was going over to Juarez?
22    A.  Chato was going to Juarez and buying heroin in Juarez.
23    Q.  Why did Scrappy think that was an issue?
24    A.  Because there was -- we had told all members they weren't
25    allowed to go to Juarez because of everything that was going
```

1    on.  They could go buy drugs from rivals that we didn't know

2    who they were buying from.  And they could either get killed,

3    or they left the BA in bad standing, just not having control

4    over their members.

5    Q.  And you said you didn't allow them to go over there to

6    Juarez because of everything that was going on.  What was going

7    on?

8    A.  There's a war going on between BA members, La Linea and

9    Sinaloa Cartel.

10   Q.  So if a BA member from El Paso goes and buys drugs from the

11   wrong people in Juarez, how did that make the BA look?

12   A.  Bad.

13   Q.  Is that what Scrappy was upset about?

14   A.  Yes.

15   Q.  How did Scrappy relay the order to assault Chato?

16   A.  Through Cano.

17   Q.  How did Cano relay the order?

18   A.  To me.

19   Q.  Did you participate in that assault?

20   A.  No, sir.

21   Q.  Who did?

22   A.  Um, that was two other BA members, Gabriel and Grande.

23   Q.  Do you remember where that assault happened?

24   A.  Yes, sir, at Payaso's house.

25   Q.  The same Payaso that we saw in the exhibit earlier?

```
 1   A.  Yes, sir.

 2   Q.  And did you see it?

 3   A.  Yes, sir.

 4   Q.  Did other BA members see it?

 5   A.  Yes, sir.

 6   Q.  Why were you guys watching?

 7   A.  Just to make sure everything went -- that he got

 8   disciplined and it didn't go overboard or he got what he

 9   deserved, basically.

10   Q.  Tell me about an individual named Pelon.

11   A.  Pelon Estrella.

12   Q.  Yes.

13   A.  Also, the same thing.  We had told him he had to stop

14   selling drugs.  He kept selling drugs and he kept going to

15   Juarez to buy drugs.  And he didn't follow orders.  So he also

16   got disciplined for that.

17   Q.  Did Scrappy order that one or was it someone else?

18   A.  Zuniga, it was --

19   Q.  Where did that take place?

20   A.  At Payaso's house as well.

21   Q.  Do you remember who did it?

22   A.  No, I wasn't there.

23   Q.  Now, you mentioned about the war that's going on in Juarez,

24   Mexico.  Is the Barrio Azteca also at war with different gangs

25   here in the United States?
```

David A. Perez, RMR, RPR

```
1    A.  Yes, sir.

2    Q.  Who are some of those gangs?

3    A.  Mexican Mafia from California, Sureños.

4    Q.  Did you ever -- were you ever involved in violent

5    encounters with Sureños here in El Paso?

6    A.  BA -- not personally, but yes.

7    Q.  Tell us about one of those violent encounters.

8    A.  They shot at Bad Boy, Adam Garcia, at a bar.  And then BA

9    members went and shot up their apartments.

10   Q.  Is Adam Garcia one of the defendants charged in this case?

11   A.  Yes, sir.

12   Q.  So all this that we've been talking about was occurring in

13   El Paso; is that correct?

14   A.  Yes, sir.

15   Q.  Payaso's house was in El Paso?

16   A.  Yes, sir.

17   Q.  These beatings on Chato and Pelon and Smiley are all in El

18   Paso?

19   A.  Yes, sir.

20   Q.  Your drug sales and the other drug sales we've been talking

21   about are in El Paso?

22   A.  Yes, sir.

23   Q.  The quota pickups are also in El Paso?

24   A.  Yes, sir.

25   Q.  So let's talk a little bit more about quota.  Was one of
```

David A. Perez, RMR, RPR

1    your duties as the leader of the BA in El Paso to make sure the

2    quotas were being picked up?

3    A.  Yes, sir.

4    Q.  All right.  Explain to us what a quota is.

5    A.  It's a fee that you have to pay for selling drugs in BA

6    territory.

7    Q.  What happens if you don't pay it?

8    A.  You either close your store shop, um, take a beating, or

9    worse.

10   Q.  When you were in charge of El Paso, approximately, how much

11   quota money were you taking in on behalf of the BA from each of

12   your sections that you were supervising?

13   A.  I can't remember from each of the sections.  But it was,

14   approximately, 1900 a week.

15   Q.  $1900 a week?

16   A.  Yes, altogether.

17   Q.  When you were in charge, was the BA also charging it's own

18   members a quota of some sort?

19   A.  Yes, sir.

20   Q.  What kind of quota was that?

21   A.  We called it a ten percent.

22   Q.  It was ten percent on what?

23   A.  On all their drug sales or illegal activities.

24   Q.  Where did all that money go from both the drug -- the ten

25   percent and the extortion money?

DIRECT - MANUEL ORTEGA

```
 1    A.  Most of it went to commissary accounts of BA members,

 2    incarcerated BA members.

 3    Q.  Before it would go into their accounts, where would you

 4    drop it off?

 5    A.  At Payaso's house.

 6    Q.  And this is Payaso's house here in El Paso?

 7    A.  Yes, sir.

 8    Q.  You mentioned that the money would go to leaders in prison.

 9    Was that the only use for the quota money that the BA would use

10    it for?

11    A.  At the time I was leader, yes.

12    Q.  What about buying cell phones?

13    A.  Cell phones, yeah, buying cell phones, putting gas,

14    whatever BA leaders in the streets needed as well.

15    Q.  So as a BA leader, could you, basically, do an expense

16    report for what you were doing on the streets as -- you know,

17    as BA business?

18    A.  Yes, sir.

19    Q.  And you could be reimbursed from the quota money for that?

20    A.  Yes, sir.

21    Q.  Now, at the time you were in charge, more or less how much

22    was the BA sending to its leaders in jail?

23    A.  Well, we were sending to the federal prison and to the

24    Texas prison system as well.  So --

25    Q.  How much could capos get?
```

1    A.   $100 a week.

2    Q.   How about Hector Galindo; how much was he getting?

3    A.   150 a month.

4    Q.   Who is he again?

5    A.   Um, Silent.

6    Q.   That's his nickname, Silent?

7    A.   Yes, sir.

8    Q.   Or in Spanish, Silencio?

9    A.   Yes.

10   Q.   What about other officers, like lieutenants?

11   A.   Every ranking member would get $150 a month.

12   Q.   How would you actually take the money from the bank in El

13   Paso and send the Western Union transfer to the people in

14   prison?

15   A.   We'd use people.  We'd use women or other BA members to

16   send the money to the commissary.

17   Q.   Who were some of the women that you would use?

18   A.   Um, we'd use Yolanda Chavira.

19   Q.   Is she also known as Yoli?

20   A.   Yes.

21   Q.   Who else would you use?

22   A.   I think they used -- I'm not sure, but I think they used

23   April Cardoza.

24   Q.   Okay.  Did they use Little Angelillo's wife?

25   A.   Yes, sir.

```
1    Q.  What was her name?

2    A.  Desiree.

3    Q.  And was Desiree Cardona indicted in the case?

4    A.  Yes, sir.

5    Q.  And was Yolanda Barba Chavira indicted in this case?

6    A.  Yes, sir.

7    Q.  How important is the bank to the Barrio Azteca?

8    A.  It's very.

9    Q.  Why?

10   A.  Well, it's all the proceeds, all the money that we support

11   BA members, incarcerated BA members.

12   Q.  And in addition to sending out money from the bank, did you

13   ever send out anything else?

14   A.  To incarcerated BA members?

15   Q.  Exactly.

16   A.  Yes.

17   Q.  Like what?

18   A.  Drugs.

19   Q.  Are you aware that incarcerated BA members had cell phones?

20   A.  Yes, sir.

21   Q.  In prison?

22   A.  Yes, sir.

23   Q.  And how would they -- how would they use those cell phones?

24   A.  I don't understand.

25   Q.  Let me ask that again.
```

1   A.   Okay.

2   Q.   How would they pay for their cell phone usage?

3   A.   We would buy phone cards for them.

4   Q.   Have you sent phone cards to incarcerated BA leaders?

5   A.   We would give them the phone card number.  They could punch

6   it into their cell phone.

7   Q.   Who did you have that arrangement with?

8   A.   Hector Galindo and Shotgun Perea.

9   Q.   You mentioned, um, Shotgun and Hector.  As the leader of El

10  Paso, was your job to communicate with them?

11  A.   Yes, sir.

12  Q.   How did you communicate with the two of them?

13  A.   Cell phone.

14  Q.   Since you've been cooperating with the United States in

15  this case, have you come to learn that the FBI was up on Carlos

16  Pereya's prison cell phone?

17  A.   Yes, sir.

18  Q.   How about Hector Galindo's cell phone?

19  A.   Yes, sir.

20  Q.   Did you come to learn that the FBI was up on your cell

21  phone?

22  A.   Yes, sir.

23  Q.   Twice?

24  A.   Yes, sir.

25  Q.   Have you spent time with Special Agent Samantha Mikeska

1  going over a number of these calls?

2  A.  Yes, sir.

3  Q.  In going over the calls, did you listen to them?

4  A.  Yes, sir.

5  Q.  Did you make any changes to the Spanish transcripts?

6  A.  Yes, sir.

7  Q.  Did you make changes to the translations of transcriptions?

8  A.  Yes, sir.

9  Q.  Did you identify some of the slang?

10  A.  Yes, sir.

11  Q.  Did you identify the speakers?

12  A.  Yes, sir.

13  Q.  And in every case how did you know who the speakers were?

14  A.  Because I had contact with those speakers I knew.

15  Q.  I would like to play you a number of recordings and have

16  you explain some of them to us.

17       MR. SKARET:  Your Honor, I would like to play a

18  recording from June 28, 2010, marked as Government's Exhibit

19  21A-2.  I believe this is in evidence.

20       THE COURT:  All right.  Could the attorneys approach

21  for just a second?

22       (Attorneys approach bench.  Off record discussion.)

23       THE COURT:  Ladies and Gentlemen of the Jury, it's

24  4:00.  I have other matters I have to take up.  We're going to

25  break for the evening.  Remember, you remain under the

1  instructions the Court has previously given you.  If you could

2  be back at 8:30 we will start then.  Thank you.

3          (Jury leaves courtroom.)

4          THE COURT:  You may be seated.  We are in recess for

5  the trial.  We will resume tomorrow morning.

6          (Recess.)

7

8                              **INDEX**

9

10                  Direct    Cross    Redirect    Recross

11  WITNESSES FOR THE
    GOVERNMENT:

12

13  DANIEL REYES          4        8         13

14  GUALBERTO MARQUEZ    14       57         66

15  MICHAEL CRIDDLE      68      102        111      113

16  MANUEL LOPEZ        117

17  EXHIBITS:                                    Admitted

18  Government

19  13B-2 Photograph                                57
    16E-1 Photograph                                26
20  16D-1 Photograph                                50
    16A-2 Photograph                               132
21  30    Photograph                                74
    30A   Photograph                                74
22  31    Photograph                                79
    31A   Photograph                                79
23  31B   Photograph                                79

24

25

David A. Perez, RMR, RPR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                              * * * * * *

19          I certify that the foregoing is a correct transcript

20   from the record of proceedings in the above-entitled matter.  I

21   further certify that the transcript fees and format comply with

22   those prescribed by the Court and the Judicial Conference of

23   the United States.

24

25   Signature:/s/_____Date:  July 16, 2013
                    David A. Perez, RMR, RPR

                          David A. Perez, RMR, RPR