```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  WESTERN DISTRICT OF TEXAS

 3                      EL PASO DIVISION

 4

 5   UNITED STATES OF AMERICA           No. EP:10-CR-2213-KC

 6   v.                                 El Paso, Texas

 7   RAMON RENTERIA                     May 24, 2012

 8

 9                          JURY TRIAL

10                          VOLUME V

11           BEFORE THE HONORABLE KATHLEEN CARDONE

12                UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15   For the Government:  Brian Skaret
                          United States Department of Justice
16                        Criminal Division, Human Rights and
                          Special Prosecutions Section
17                        1301 New York Avenue, NW, Suite 200
                          Washington, D.C. 20530
18
                          Joseph Cooley
19                        United States Department of Justice
                          Criminal Division, Gang Unit
20                        10th and Constitution Avenue, NW
                          Washington, D.C. 20530
21
                          George Leal
22                        Assistant United States Attorney
                          700 East San Antonio, Suite 200
23                        El Paso, Texas 79901

24

25
```

1    For the Defendant:    Scott P. Foster
                          718 Myrtle Avenue
2                          El Paso, Texas 79901

3

4        Proceedings recorded by stenotype.   Transcript produced by

5    computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              COURTROOM DEPUTY:  EP:10-CR-2213, USA versus Ramon
2    Renteria.
3              MR. SKARET:  Good morning, Your Honor, Brian Skaret,
4    Joseph A. Cooley and George Leal for the United States.
5              THE COURT:  Mr. Foster?
6              MR. FOSTER:  Scott Foster for the defendant, ready to
7    proceed.
8              THE COURT:  Ready to bring in the jury?
9              MR. SKARET:  Yes, Your Honor.
10             MR. FOSTER:  Yes.
11             THE COURT:  All right.
12             (Jury enters courtroom.)
13             THE COURT:  You may be seated.
14             Mr. Skaret, whenever you're ready.
15                  CONTINUED DIRECT EXAMINATION
16   Q.  (By Mr. Skaret)  Good morning, Mr. Lopez.
17   A.  Morning.
18   Q.  I remind you you are still under oath.
19   A.  Yes, sir.
20   Q.  And if you can, also, speak right in that microphone.  And
21   I will try to do the same.  Yesterday we talked about how you
22   had joined the Barrio Azteca.  We went through some of the
23   rules, the violence that you had engaged in and/or ordered,
24   extortion, and we ended right about the time when you took over
25   El Paso; is that right?
```

1    A.  Yes, sir.

2    Q.  And you mentioned that one of your duties as the leader of

3    El Paso was to communicate with Shotgun and Hector Galindo?

4    A.  Yes, sir.

5    Q.  What I'd like to do is to go through recordings.  Have you

6    listened to a number of recordings in this case?

7    A.  Yes, sir.

8         MR. SKARET:  Your Honor, I would like to publish to

9    the jury, Exhibit 21A-2.  It's a recording from June 28, 2010.

10   It should be in evidence.

11        THE COURT:  Let me make sure.  Yes, it is.

12        (Audio being played.)

13   Q.  (By Mr. Skaret)  Mr. Lopez, can you tell us a little bit

14   about what we heard in that call?

15   A.  Um, Galindo was calling Carlos, Shotgun.  But, Ramon

16   answered the phone.

17   Q.  Okay.  Hector Galindo also known as Silent?

18   A.  Yes, sir.

19   Q.  And how do you know that he was calling over toward

20   Shotgun?

21   A.  Because on the -- like on the call said -- um, he said this

22   is Spook.  So that -- Spooky was Shotgun's cell mate.  And

23   Galindo thought he was talking to Shotgun.  He was calling

24   Shotgun's phone.  So he thought he was talking to Shotgun.  So

25   that's why Spooky said, No, this is Spooky.  This guy will come

1   right back.  He stepped out.  He will come right back.

2   Q.  From the context of the phone call, can you tell who, um,

3   Spook or Ramon, as you referred to him, was referring to as far

4   as coming right back to the phone?

5   A.  Yes, sir.

6   Q.  Who was that?

7   A.  Shotgun.

8   Q.  All right.  I would like to play you a call from the same

9   date, June 28, 2010.

10          MR. SKARET:  This is labeled Exhibit 21B-2 into

11   evidence.  And would like to publish to the jury.

12          THE COURT:  All right.  That's fine.

13          (Audio being played.)

14   Q.  (By Mr. Skaret)  Mr. Lopez, who was this call between?

15   A.  Me and Spooky.

16   Q.  Who called who?

17   A.  Spooky called me.

18          MR. FOSTER:  Judge, I'm sorry.  I am going to object

19   to him calling Mr. Renteria -- calling him Spooky.

20          THE COURT:  I'll overrule.

21   Q.  (By Mr. Skaret)  Who was the name you knew Ramon Renteria

22   by?

23   A.  Spooky.

24   Q.  Did you ever call him Mr. Renteria?

25   A.  No, sir.

1    Q.   Did you call him Ramon Renteria?

2    A.   No, sir.

3    Q.   Did you call him Ramon?

4    A.   No.

5    Q.   What did you call him?

6    A.   Spooky.

7    Q.   And do you recognize the individual that you mentioned

8    known as Spooky in the courtroom today?

9    A.   Yes, sir.

10   Q.   Would you please point him out and tell the jury what he's

11   wearing and where he's sitting, please?

12   A.   Right there, wearing a suit, tie.

13   Q.   What color is his tie?

14   A.   Gray, blue.

15         MR. SKARET:   Would the record reflect positive

16   identification of the defendant, Ramon Renteria?

17         THE COURT:   It will so reflect.

18   Q.   (By Mr. Skaret)   Now, in the call we just listened to, um,

19   Mr. Renteria referred to a job, and to go pick it up, and that

20   he needed to play it safe.   Explain to us, what was he talking

21   about with respect to that?

22   A.   That was a shipment of heroin we had sent to, I believe,

23   Mount Rainier, Maryland.   Um --

24   Q.   Who told you to send the drugs to that particular place?

25   A.   Shotgun.

```
 1    Q.  And how did he tell you to send it there?  Did he give you
 2    the address?
 3    A.  He gave me name and address to send it to.  Um, I believe
 4    they intercepted it or something.  I really don't know.  That's
 5    why he was calling me to reroute it -- reroute it somewhere
 6    else so someone else can pick it up.  Reroute it back to El
 7    Paso where I thought it was safe.
 8    Q.  And Mr. Renteria also mentioned that he was getting close
 9    now.  Um, what was he referring to about getting close to?
10    A.  No, he was close to getting out of prison.
11    Q.  What did he ask you to do for him?
12    A.  To send him some clothes so -- for when they get out.
13    Q.  Now, you mentioned about that time -- this would be in --
14    in June of 2010, that Shotgun requested you send a package of
15    drugs to Mount Rainier, Maryland.  What was in that package?
16    A.  Um, heroin.
17    Q.  And if -- well, do you know where Shotgun was located at
18    the time?
19    A.  Yes, sir.
20    Q.  Why was he having you send a package to Maryland?
21    A.  Um, I believe that those people -- those persons were --
22    had someone, an inmate that they went to go visit or something
23    and they would take the drugs into the -- to them that way.
24    Q.  During about that same time, did Shotgun request that you
25    send two ounces of heroin to the Washington, D.C. area?
```

1    A.   Excuse me.

2    Q.   Did Shotgun also tell you that about that same time in June

3    of 2010 that you should send a package of heroin to Washington,

4    D.C.?

5    A.   Yes, sir.

6    Q.   Tell us about that shipment.

7    A.   Um, the same way.  We send it -- we send it -- I don't know

8    if it got there or not.

9    Q.   Did he give you the address?

10   A.   Yes, sir.

11   Q.   Did he tell you how much he wanted?

12   A.   Yes, sir.

13   Q.   I'm showing you what's been marked as 2B-1J.

14          MR. SKARET:  I believe this is in evidence.  If I may

15   publish to the witness and the jury, Your Honor.

16          THE COURT:  2B-1J.  You may publish it.

17          MR. SKARET:  Thank you, Your Honor.

18   Q.   (By Mr. Skaret)  After you got the instructions from

19   Shotgun with respect to the shipment that went to Washington,

20   D.C., did you participate in packing up the shipment of heroin?

21   A.   I watched, yes.

22   Q.   And who actually packaged it up?

23   A.   Um, Albert Mendoza, Igor.

24   Q.   Did you tell him to do that?

25   A.   Yes, sir.

1    Q.   I'm showing you what's been marked as Government's Exhibit

2    2B-1J.  Does this look familiar to you?

3    A.   Yes, sir.

4    Q.   Tell us, what are we looking at there?

5    A.   Um, packages, balloons of heroin -- filled with heroin.

6    Q.   Do those look like the packages of heroin that you sent to

7    Washington, D.C.?

8    A.   Yes, sir.

9    Q.   How did Igor package those balloons of heroin?

10   A.   We get them in Ponds Creams.

11           MR. SKARET:  Your Honor, if I may approach?

12           THE COURT:  You may.

13   Q.   (By Mr. Skaret)  Government's Exhibit 2C.  If you could,

14   Mr. Lopez, take a look inside of the box labeled Government's

15   Exhibit 2C.  What is inside of that box?

16   A.   Two containers Pond's Cream.

17   Q.   Can you go ahead and pull one of those out.  One of those

18   containers.  Does that look like one of the containers that

19   Igor packaged up and sent to Washington, D.C.?

20   A.   Yes, sir.

21   Q.   Why is it that you would put balloons of heroin in the

22   Pond's Cream?

23   A.   It's a really thick substance.  It's really smelly, just to

24   throw off the law enforcement, the dogs, drug sniffing dogs.

25   Q.   And why would -- why would the lotion being a thick

1    substance help accomplish that goal?

2    A.  Because if they put a light through it, it won't go

3    through.  So you can't see anything.  Can't see anything.

4    Q.  Now, as part of Government's Exhibit 2, that box inside of

5    the big box, can you pull that out for me, please?  What kind

6    of a box, that smaller box, that you have in your hands?

7    A.  It's a FedEx box.

8    Q.  Can you look at the label on the FedEx box, please.  I

9    believe it's on the top of the box.  You will have to close up

10   the. . .

11   A.  The one that says Evidence?

12   Q.  The FedEx label with the bar code?

13            THE COURT:  It's on the other side.

14   Q.  Keep going.  Do you see a date on that FedEx label?

15   A.  Yes, sir.

16   Q.  And what is the date on this?

17   A.  Wednesday, 23, June.

18   Q.  Down below, underneath the bar code, does it give a more

19   specific date on the year?

20   A.  Yes.

21   Q.  And what year was that sent in?

22   A.  Actually, it was sent out the 21st of June, 2010.

23   Q.  And if that was sent on June 21, 2010, and the call with

24   Mr. Renteria was on June 28th, about how many days after you

25   sent that package did Mr. Renteria call you to ask about it?

1  A.  Seven.

2  Q.  Now, did you send more drugs to Shotgun and his contacts

3  than just these two shipments?

4  A.  Yes, sir.

5        MR. SKARET:  Your Honor, if I may retrieve the

6  exhibit?

7        THE COURT:  You may.

8  Q.  (By Mr. Skaret)  What kind of drugs did you send Shotgun?

9  A.  Heroin and marijuana.

10  Q.  And in all, how much heroin did you send to -- as a result

11  of Shotgun's orders?

12  A.  Over six ounces.

13  Q.  And, approximately, how much marijuana?

14  A.  About 12 pounds.

15  Q.  Did you ever send it straight to Pollock, Louisiana?

16  A.  No, sir.

17  Q.  Where did you send it?

18  A.  To whatever address they gave me.

19  Q.  Now, did you send it to Shotgun for free?

20  A.  No, sir.

21  Q.  All right.  Who paid for it?

22  A.  We took it out of the quota money.  And he would later pay.

23  Q.  And he would later pay?

24  A.  Yes.

25  Q.  How would he pay?

1  A.  He would send money orders through -- through Desiree or

2  other people, contacts he had.

3  Q.  And then you would pick up that money from them?

4  A.  Yes, sir.

5  Q.  Would you front him the drugs?

6  A.  You could say that.

7  Q.  So he's paying you after you send it?

8  A.  Yes, sir.

9  Q.  Did you do that for all of your drug sellers and buyers?

10  A.  No, sir.

11  Q.  Did you only do it for Shotgun?

12  A.  Yes, sir.

13  Q.  How was it that you're familiar with how much heroin and

14  how much marijuana that you actually sent to Shotgun?

15  A.  Because I was in contact with him.  And he was the one --

16  he would be the one to tell me what to send him.

17  Q.  And you say it was more than six ounces of heroin?

18  A.  Yes.

19  Q.  Now, when Shotgun was explaining to you which address to

20  send the drugs to him, how was he communicating with you?

21  A.  Cell phone.

22  Q.  And did you ever hear that he got that cell phone taken

23  away?

24  A.  After -- after Mr. Renteria came out of prison, yes.

25  Q.  And were you able to call Shotgun -- let me ask you this.

1          Up until the day of your arrest the next year, were

2    you able to call Shotgun through that entire period?

3    A.  No, sir.

4    Q.  So there came a time when you could no longer call Shotgun?

5    A.  Yes, sir.

6    Q.  Do you know what happened to Shotgun?

7    A.  I believe he was sent to super max prison in Florence,

8    Colorado.

9    Q.  Do you know why he was sent there?

10   A.  For -- for -- I believe for this case.

11         MR. SKARET:  I'd like to play another recording, Your

12   Honor, that is in evidence, Government's Exhibit 20E-2, a call

13   from September 15th, 2010.

14         THE COURT:  That's fine.

15         (Audio being played.)

16   Q.  (By Mr. Skaret)  Who are the participants in that

17   particular phone call?

18   A.  Nano and Silent.

19   Q.  All right.  You see on the left-hand side there's HJ and

20   RZ.  Who's HG and RZ?  Who's HG?

21   A.  Hector Galindo.

22   Q.  How did you know Hector Galindo?

23   A.  By his nickname or. . .

24   Q.  Pardon me?

25   A.  What do you mean?

1   Q.  How did you know who Hector Galindo was?

2   A.  I used to talk to him on the phone so. . .

3   Q.  What about RZ?

4   A.  Um, Zuniga, Nano.

5   Q.  Is this the same Zuniga you were talking about the drugs in

6   Juarez?

7   A.  Yes, sir.

8   Q.  Now, they mentioned the individual -- two individuals --

9   the dude got sent to Florence and put in the hold.  Who are

10  they talking about?

11  A.  Shotgun.

12  Q.  How did they feel about the fact he got sent there?

13  A.  Bad.

14  Q.  Why did they feel that way?

15  A.  Because they didn't have no more contact with him.  And

16  it's vital for the organization to have contact with high

17  ranking members.

18  Q.  What did they say about Spooky getting out of jail?

19  A.  Um, he was getting out in a few days.  And -- but he was

20  going to lay low for a while so he wouldn't get busted right

21  away.

22  Q.  I would like to show you what's been marked and admitted

23  into evidence as Government's Exhibit 20E-3.  It's a call from

24  September 15, 2010.  By looking at this transcript, who are the

25  participants?

1    A.   Silent and Nano.

2    Q.   Silent being Hector Galindo?

3    A.   Yes, sir.

4    Q.   And Nano being in charge of the drugs in Juarez?

5    A.   Yes, sir.

6    Q.   Go ahead.

7         (Audio being played.)

8    Q.   At the beginning of the call they talk about, um, some

9    cooperators with law enforcement; is that right?

10   A.   Yes, sir.

11   Q.   And they talk about the woman of Angelillo.  Who are they

12   referring to?

13   A.   Desiree.

14   Q.   What's her full name?

15   A.   Desiree Cardona.

16   Q.   And was that Little Angelillo's wife?

17   A.   Yes, sir.

18   Q.   And is she the same one you've talked about earlier in your

19   testimony?

20   A.   Yes, sir.

21   Q.   And she was indicted in this case.

22   A.   Yes, sir.

23   Q.   They also talk about Camello.  What do they say?

24   A.   That he's cooperating with law enforcement.

25   Q.   And at the time of this call, did you have anyone that

1  worked for you that went by the name Camello?

2  A.  No, sir.

3  Q.  Do you know a Camello?

4  A.  No, sir.

5  Q.  Now, Carlos Zuniga was the one talking about Camello,

6  correct?

7  A.  Yes, sir.

8  Q.  Did he seem to understand who Camello was?

9  A.  Yes, sir.

10  Q.  Does it appear Hector Galindo knew?

11  A.  Yes, sir.

12  Q.  What did they say about Camello?

13  A.  That he's cooperating with law enforcement.  He's giving

14  everything up.

15  Q.  That he's giving everything up?

16  A.  Yes, sir.

17  Q.  Did they -- they said that Camello was, I believe the

18  language was, on this side?

19  A.  Yes.

20  Q.  What does that mean?

21  A.  That he was in the United States already.

22  Q.  I would like to move on to Government's Exhibit 20F-2, a

23  call from October 2, 2010.  You see in this particular

24  transcript the initials on the left?

25  A.  Yes, sir.

```
1   Q.  And what do those initials refer to?

2   A.  Hector Galindo and Carlos Zuniga.

3   Q.  RZ being Zuniga and HG being Galindo?

4   A.  Yes, sir.

5   Q.  Before we go on, prior to your testimony in this case, had

6   you gone through all these calls and identified the speakers?

7   A.  Yes, sir.

8           (Audio being played.)

9   Q.  If you would please tell us what we just heard.

10  A.  Um, he was just saying that Galindo was saying that Spooky

11  had called him that he wanted to put some things out on the

12  table.  I don't know what kind of things he wanted to put on

13  the table.  Um, Zuniga told him that we had got him -- he had

14  gotten a radio; it was a push-to-talk radio.  And that

15  everything, when it came out, everything was still going to be

16  running the same way.

17  Q.  When Hector Galindo mentions that he wants to put something

18  on the table -- on the mesa, right?

19  A.  Yes, sir.

20  Q.  In the Barrio Azteca world, what does it mean to put

21  something on la mesa?

22  A.  You putting something on the mesa, on the table, it just

23  means that you want everything to be set, everyone to know --

24  how can I explain?  Yeah, you put it -- so if you have a

25  problem, you have -- let's say you have a problem where you
```

1   have an issue, you put it there so you can make a decision on

2   that issue, on that problem, see what's going on.

3   Q.  And in this October call, um, why would it be important to

4   call Hector Galindo with issues that he wanted to put on the

5   Mesa?

6   A.  Because where Hector Galindo was at the Coffield unit in

7   the Texas prison system.  That's where the main table is.  The

8   "mesa mayor".

9   Q.  And when the issues are sent to Hector Galindo at Coffield,

10  are those issues decided upon there?

11  A.  Yes, sir.

12  Q.  And in resolving the issues, do they send the information

13  out to the rest of the Barrio Azteca?

14  A.  Yes, sir.

15  Q.  Now, Ricardo Zuniga mentioned that he got him a radio.  Who

16  are they referring to?

17  A.  Spooky.

18  Q.  Why was it important, based on what you heard in this call,

19  for Spooky to have a radio?

20  A.  To be in contact -- well, with me and Zuniga and Galindo,

21  leadership.

22  Q.  And when Zuniga says in the call that it's -- that he gave

23  him the radio so he can get in good with us.  Who's us?  Who's

24  he talking about?

25  A.  Myself, Zuniga, leadership in El Paso.

```
 1   Q.  Okay.  I'd like to direct your attention to Exhibit 20G-2,
 2   a call October 2, 2010 -- before I go on, these calls between
 3   Ricardo Zuniga and Hector Galindo, if we haven't covered this,
 4   where is Hector Galindo at the time of these calls?
 5   A.  In prison.
 6   Q.  All right.  Where?
 7   A.  Coffield.
 8   Q.  And where do you believe Ricardo Zuniga was at the time of
 9   these calls?
10   A.  Juarez, Mexico.
11   Q.  Government's Exhibit 20G-2.
12           MR. SKARET:  May we publish this?
13           THE COURT:  Yes, you may.
14   Q.  (By Mr. Skaret)  On the left-hand side of the column HG,
15   DC.
16   A.  Yes, sir.
17   Q.  Who is this call between?
18   A.  That's David Conde, Chucky, and Hector Galindo, Silent.
19   Q.  And does this call occur when Hector is at Coffield?
20   A.  Yes, sir.
21   Q.  How about David Conde?
22   A.  He's out in the streets in El Paso.
23   Q.  What's his nickname?
24   A.  Chucky.
25   Q.  Who did he report to here in El Paso?
```

```
 1   A.  Myself.
 2           (Audio being played.)
 3   Q.  So what are Hector Galindo and David Conde talking about in
 4   this call?
 5   A.  Shipping heroin that was sent to Galindo in prison.
 6   Q.  And prior to this call, did you know about the shipment?
 7   A.  Yes, sir.
 8   Q.  Tell us about that shipment.
 9   A.  Um, Hector Galindo actually wanted six grams of heroin sent
10   to him.  Um, Chucky, he asked for -- if it was all right to
11   send it to him.  I said yeah.  He borrowed the heroin from
12   another BA member.  And I just repaid him back.
13   Q.  You repaid him on that?
14   A.  Yes, sir.
15   Q.  Explain to us why is it you were repaying him for that
16   heroin.
17   A.  Because it was -- he loaned it -- he loaned it to --
18   basically, he loaned it to me because I was supposed to send it
19   to Galindo.  And from the BA -- from BA.  And that was another
20   BA member that was selling heroin.  He -- he took it out of his
21   own personal, I guess, drugs.
22   Q.  Did Hector Galindo ever pay you for these drugs?
23   A.  No, sir.
24   Q.  So tell us, from the call, does it sound like the package
25   got sent to Hector Galindo?
```

1   A.   Yes, sir.

2   Q.   And what happened to the package?

3   A.   It got intercepted.

4   Q.   On the call, they said that the deal got screwed.   What

5   does that mean?

6   A.   That it got intercepted.

7   Q.   All right.   Hector Galindo is asking David Conde if it was

8   in just one or two.

9   A.   Yes, sir.

10   Q.   What does that mean?

11   A.   One or two books.

12   Q.   All right.   You mentioned books.   Did you know how the

13   heroin was going to be sent in?

14   A.   No, sir.

15   Q.   All right.   And when they mention hard cover.

16   A.   Yes, sir.

17   Q.   What does that mean?

18   A.   Hard cover book.

19   Q.   Now, Hector Galindo was also asking David Conde how much

20   was in the package.   And what did David Conde say?   Did he say

21   it was six or four grams?

22   A.   Four grams.

23   Q.   So you believed it was going to be six grams?

24   A.   Yes, sir.

25   Q.   And yet, only four grams were seized?

1   A.  Yes, sir.

2   Q.  What do you think happened to the extra two grams?

3   A.  I believe they only gave Chucky the four grams.  And he

4   thought he was sending six grams.

5   Q.  All right.  I'd like to play for you what's been marked as

6   Government's Exhibit 20B-2, a call from October 8th, 2010.

7          Now, on the left-hand column, Mr. Lopez, initials --

8   based on the initials on the left side, who's this call

9   between?

10  A.  Hector Galindo, Spooky and myself.

11  Q.  So are you -- I'm sorry?

12  A.  Hector, Silent and myself.

13  Q.  And where were you -- pardon me -- where was Hector Galindo

14  at the time of this call?

15  A.  Prison.

16  Q.  Where were you?

17  A.  El Paso.

18  Q.  On the streets?

19  A.  Yes, sir.

20  Q.  Okay.

21          (Audio being played.)

22  Q.  Hector Galindo and you are talking about a man named Pelon?

23  A.  Yes, sir.

24  Q.  Who was Pelon?

25  A.  Estrella, he was a BA member.

David A. Perez, RMR, RPR

1    Q.   And why were you calling Hector Galindo about Pelon?

2    A.   Just putting it on the table, on the mesa.

3    Q.   And what was it that you had to put on the table?

4    A.   That he was skimming off the quota money.

5    Q.   Did Pelon report to you in El Paso?

6    A.   Not directly.  He reported to whoever was in charge of

7    Segundo Barrio at that time.

8    Q.   And you mention in the call that you had spoken to Spooky.

9    A.   Yes, sir.

10   Q.   Did you tell him about what was going on with Pelon?

11   A.   Yes, sir.

12   Q.   And tell me about that conversation.

13   A.   Well, we had told him what he was doing.  That they had

14   told us he was taking quota money instead of turning it in.  He

15   was also -- it doesn't say in this conversation on this call,

16   but he was also going over to Juarez and buying drugs without

17   permission from BA.

18   Q.   When he told Spooky about that, what was Spooky's response?

19   A.   That it was okay to put him on the, what we call, the ex

20   list.

21   Q.   I would like to play 20D-2.

22        MR. SKARET:  May I publish this?

23        THE COURT:  20D-2.  You may.

24        (Audio being played.)

25   Q.   (By Mr. Skaret)  Who does it appear this call is between?

1    A.   Hector Galindo and myself.

2    Q.   He was in Coffield at the time?

3    A.   Yes, sir.

4    Q.   So if you would, please, give us a summary of -- in your

5    own words, of what we just heard.

6    A.   Um, this was a call between me and Silent.  It was agreed

7    that Zuniga -- well, we were going to send money to other BA

8    members to the commissary accounts, people that never got money

9    or that never make commissary so they could have a better

10   Christmas.

11   Q.   And would these -- these BA members have been officers in

12   the BA or soldiers?

13   A.   Just soldiers.

14   Q.   Now, you also mentioned, um, pardon me -- we also heard

15   about Hector Galindo talking to Spooky.  What was that all

16   about?

17   A.   Yes, sir.  Um, something about the P.O. -- about his P.O.,

18   that Spooky had told him about his P.O.

19   Q.   What is a P.O.?

20   A.   Probation officer.

21   Q.   And had Spooky told you he had spoken to his probation

22   officer?

23   A.   Yes, sir.

24   Q.   And what was that in the context of?

25   A.   Something regarding that the probation officer was asking

1    him about another BA member.

2            MR. FOSTER:  I'm going to object.  This is hearsay.

3    It's coming in from the probation officer saying, not from what

4    Spooky said.

5            MR. SKARET:  Your Honor, I believe this is exactly

6    what Spooky told the witness.

7            THE COURT:  I'll overrule.

8    Q.  (By Mr. Skaret)  What did he say about going to his

9    probation officer?

10   A.  Um, about his, Spooky's, probation officer?

11   Q.  That's right.

12   A.  He was asking him about then that he had asked him about,

13   this other BA member, Night Owl, where was he at.  And, um,

14   actually, the probation officer had told him that, you know,

15   he's on probation, he's hooked on drugs, but he will finish his

16   probation.  We will make sure he finishes his probation.

17   Q.  And did this cause any concern to Spooky or to you?

18   A.  Yes, sir.

19   Q.  Why would that cause concern?

20   A.  Because, just by the conversation, we assumed -- we assumed

21   right away that, um, this BA member was cooperating with law

22   enforcement.

23   Q.  Now, these calls that we've heard from October of 2010, did

24   these occur when Spooky had gotten out of jail?

25   A.  Yes, sir.

1    Q.  So he is out on the street with you at the time of these

2    calls?

3    A.  Yes, sir.

4    Q.  Now, with respect to -- let's go on to the next call.  This

5    is 20C-2.  I believe this is in evidence?

6              MR. SKARET:  If we may publish?

7              THE COURT:  You may.

8    Q.  (By Mr. Skaret)  Now, on the left side of 20C-2, you will

9    see the initials on that column.

10   A.  Yes, sir.

11   Q.  Who is this call between?

12   A.  Hector Galindo and myself.

13   Q.  And this is while Hector Galindo is still at Coffield?

14   A.  Yes, sir.

15           (Audio being played.)

16   Q.  Can you give us a summary of this call, Mr. Lopez?

17   A.  Um, Galindo was asking me if I knew anyone -- any other BA

18   members that were in the Houston area.

19   Q.  And he mentioned with respect to that, he said had

20   anyone -- or did you know anyone in Houston that had made the

21   jump.  What does that mean?

22   A.  That had gotten out already.

23   Q.  Made the jump out of prison?

24   A.  Yes, sir.

25   Q.  Into the streets?

1    A.  Yes, sir.

2    Q.  Is he talking about if you know people, or, more

3    specifically, BA?

4    A.  Um, BA.

5    Q.  Why is he asking you about this?

6    A.  Just to be in contact with people in Houston.  There was a

7    BA member, Bampy or Bumpy or something, that was in Houston and

8    he was looking for other BA members to be in contact with him.

9    That's all.

10   Q.  Does the BA have a large presence in Houston?

11   A.  No, sir.

12   Q.  Were you guys trying to expand?

13   A.  Yes, sir.

14   Q.  Where else were you guys trying to expand into?

15   A.  Austin, Dallas, San Antonio.  All over, wherever we can.

16   Q.  Now, on the call, Hector Galindo mentioned that Spooky has

17   a few in Dallas.  What does that mean to you?

18   A.  That he knew a few BA members in Dallas.

19   Q.  Had he talked to you about knowing people in Dallas?

20   A.  Yes, sir.

21   Q.  What did he say about it?

22   A.  He was actually telling me that he was going to -- trying

23   to go to Dallas, leave over there to Dallas.  And so he can --

24   the thing is we were going to open the doors to put mini stores

25   or hubs in Houston and Dallas.

1    Q.   And you also mention Austin and San Antonio?

2    A.   Yes, sir.

3    Q.   Now, you mention you were going to open up the doors to

4    open stores.   What do you mean by that?

5    A.   Sending drugs to cities getting -- expand the BA territory.

6    Q.   And opening stores specifically?

7    A.   Um, drug dealers.

8    Q.   And I believe earlier in your testimony you said that

9    opening stores actually meant extortion of drug dealers.

10   A.   Yes, sir.

11   Q.   Okay.   I'd like to play what's been admitted into evidence

12   marked Government's Exhibit 20C-3, a call on October 23, 2010.

13           MR. SKARET:   Before we get into this call, may we

14   publish, Your Honor?

15           THE COURT:   You may.

16   Q.   (By Mr. Skaret)   Mr. Lopez, on the left-hand column you

17   will see initials.   Who's this call between?

18   A.   Hector Galindo and myself.

19   Q.   While Hector Galindo was in Coffield?

20   A.   Yes, sir.

21   Q.   I don't think I've asked you this.   Before we go on, was

22   Hector Galindo indicted as part of this case?

23   A.   Yes, sir.

24   Q.   So this was between you and Hector Galindo?

25   A.   Yes.

```
1    Q.  So this is a call October 23, 2010; is it not?
2    A.  Yes, sir.
3    Q.  And explain to us what's going on in this call.
4    A.  Um, he was telling me that Spooky -- oh, I had asked him if
5    he wanted an iPod.  And he said that Spooky had offered it to
6    him because it was a window of opportunity there to take in
7    whatever.  They were charging $500 to take in whatever they
8    wanted into prison.
9    Q.  So you had offered Hector Galindo an iPod?
10   A.  Spooky had.
11   Q.  Spooky had?
12   A.  Yes, sir.
13   Q.  Were you following up on that?
14   A.  Yes, sir.
15   Q.  When he said a door opened, what does that mean?
16   A.  A window of opportunity -- they were charging $500 to take
17   whatever they wanted in there.
18   Q.  So for $500 you could get an iPod into the Coffield unit?
19   A.  Yes, sir.
20   Q.  What happened to that door?
21   A.  It closed.
22   Q.  Did he talk about another door opening?
23   A.  Yes, sir.
24   Q.  And what was that?
25   A.  Um, it was another door where he was saying that they were
```

1  going to charge us half of whatever we wanted to take into

2  Coffield.

3  Q.  And this would be half of the drugs that you send in?

4  A.  Yes, sir.

5  Q.  Let's move on to Government's Exhibit 20A-3, a call

6  October 27, 2010.

7          MR. SKARET:  Again, if we may publish this, Your

8  Honor?

9          THE COURT:  Did you say 20A-3?

10          MR. SKARET:  20A-3.

11          THE COURT:  That's fine.

12  Q.  (By Mr. Skaret)  Before we start the call, if you could

13  look at the left-hand column.  Tell us who this call is

14  between.

15  A.  Carlos Zuniga and Hector Galindo.

16  Q.  Where was Zuniga at the time of this call, do you believe?

17  A.  In Juarez, Mexico.

18  Q.  And Galindo in Coffield?

19  A.  Yes, sir.

20          (Audio being played.)

21  Q.  Mr. Lopez, what did we hear in this particular call?

22  A.  Zuniga was asking if he had sent a letter to his

23  father-in-law, Tolon.

24  Q.  How is Ricardo Zuniga related -- who is he talking about,

25  the father-in-law?

1    A.   Tolon.

2    Q.   How do you know that that is Ricardo Zuniga's

3    father-in-law?

4    A.   He's what?

5    Q.   How do you know that Tolon is the father-in-law of Ricardo

6    Zuniga?

7    A.   Because he's married to his daughter.

8    Q.   What's the name of his daughter?

9    A.   April Cardoza.

10   Q.   Um, they also talk about sending letters to a ghost; is

11   that right?

12   A.   Yes.

13   Q.   What does that mean?

14   A.   He said sending letters in ghost, ghost writing.

15   Q.   What is ghost writing?

16   A.   Um, where you write with a pen with no ink -- no ink, or

17   typewriter, no ink, just real hard.  And when the other person

18   gets it, he -- like carbon paper or paper, just scribbles it,

19   and the letters pop out.

20   Q.   They mention a photo; can you ghost write on a photo?

21   A.   Yes, if you know how to do it, yes.

22   Q.   So explain to us, again, if we get -- if Hector Galindo's

23   in jail, he gets a photo, it's ghost written on, how is he

24   going to figure out what the writing is?

25   A.   He's smudges pencil or lead on it, on the letters side on

1    the indentions, and the letters pop out.

2    Q.  Go back to the last call about the door being opened at

3    Coffield.  When the door is opened at a prison, tell us again

4    what that refers to.

5    A.  That's a window of opportunity.

6    Q.  Is this an official window of opportunity or an illegal?

7    A.  Illegal.

8    Q.  And what is that window of opportunity usually?

9    A.  I don't --

10   Q.  Is it a chance for a guard to smuggle in drugs?

11   A.  Yes, sir.

12   Q.  I would like to go to Government's Exhibit 20A-5, a call on

13   October 27, 2010.  On the left side you see those initials.

14   Who is this call between?

15   A.  Zuniga and Hector Galindo.

16   Q.  And Hector Galindo is in Coffield at this time?

17   A.  Yes, sir.

18   Q.  Where is Zuniga?

19   A.  Juarez, Mexico.

20          (Audio being played.)

21   Q.  Mr. Lopez, can you tell us about this call?

22   A.  Yeah, Zuniga was telling Galindo about Night Owl, De

23   Colote, Night Owl.

24   Q.  Is Night Owl -- what's his name?

25   A.  Um, last name is Reyes.

1    Q.  And what did they say about Night Owl?

2    A.  That, according to the call, um, Spooky's probation officer

3    had asked him about him and told him that he was hooked on

4    drugs, but he was going -- he was going to finish his parole.

5    He was going to make sure he finishes his parole.

6    Q.  You said he said that Spooky said that.  They referred to

7    someone as the scared one.  What is that?

8    A.  Espantado, that's Spooky.  Spooky.

9    Q.  Um, so based on what they had learned from the probation

10   officer, what were these two individuals talking about doing to

11   that guy?

12   A.  Kill him.

13   Q.  And why, again?

14   A.  Um, because we believe he was cooperating with law

15   enforcement.

16   Q.  Did you ever talk to the defendant about Night Owl?

17   A.  Yes, sir.

18   Q.  And what was the context of that conversation?

19   A.  Um, where he was -- he was skimming off the quota money.

20   And where we thought he was working for law enforcement as

21   well.

22   Q.  And the call mentioned that this particular person used to

23   run with a guy named Duke.  Do you know what he's talking about

24   there?

25   A.  Yes, sir, Reyes' brother.

1    Q.  They mentioned something to do with they're going to give

2    him the chocolate.  What does that mean?

3    A.  It's just a Spanish saying.  But -- just to pay him back

4    with his own -- the way he paid us.

5    Q.  Okay.  I'd like to take you now to Government's Exhibit

6    23A-2.

7         MR. SKARET:  I believe this is in evidence, if we may

8    publish to the jury.

9         THE COURT:  You may.

10   Q.  (By Mr. Skaret)  Now, in this particular call, if you look

11   down the left-hand column, are you able to tell just by what's

12   written on there who this call is between?  There's RR and UM.

13   A.  Yes, sir.

14   Q.  All right.  Does the UM stand for unidentified male?

15   A.  Yes, sir.

16   Q.  What about the RR?

17   A.  Ramon Renteria.

18   Q.  Now, did you listen to this call with Special Agent

19   Samantha Mikeska?

20   A.  Yes, sir.

21   Q.  And were you able to identify who's been marked on here as

22   the UM?

23   A.  I believe it was 80, 90 percent sure, yes.

24   Q.  Who did you identify that person as?

25   A.  Um, Chino Valles.

1    Q.   And who is Chino Valles?

2    A.   BA member.

3    Q.   Does he have rank?

4    A.   Yes, sir.

5    Q.   And where's he -- at the time of this -- of this call,

6    where was Chino Valles located?

7    A.   In prison in Juarez.

8    Q.   Okay.  Let's roll 23A-2.

9              (Audio being played.)

10   Q.   Mr. Lopez, most of the calls that we've been listening to

11   this morning were from the latter part of September and

12   October 2010; is that correct?

13   A.   Yes.

14   Q.   And that's when you said that the defendant was out on the

15   street?

16   A.   Yes.

17   Q.   Does it sound like the defendant here is on the street?

18   A.   Um, no.

19   Q.   And when he's -- when the defendant is talking in this

20   particular call, about it being really noisy in here, do you

21   know what he's referring to?

22   A.   Prison.

23   Q.   At the beginning of the call, we heard an automated voice

24   saying that this was a call from a certain place.  Can you

25   explain why we're hearing that?

David A. Perez, RMR, RPR

1    A.  It's the operator.  When you make a call from the prison

2    cell phone or -- I'm sorry, from the penitentiary or from any

3    prison, um, they ask you if it's a collect call or prepaid

4    call.

5    Q.  Have you gotten those calls in the past?

6    A.  Not me, personally.

7    Q.  Were you able to identify the defendant's voice?

8    A.  Yes, sir.

9    Q.  And did you hear him say that it was Ramon calling?

10   A.  Yes, sir.

11   Q.  All right.  Now, you mentioned that you believe that he was

12   talking to an individual named Chino?

13   A.  Yes, sir.

14   Q.  Do you know -- during the call Chino mentions he's got a

15   big radio.  What does he mean by that?

16   A.  Just a handheld radio to communicate with other BA members.

17   Q.  And where do you believe Chino Valles was at the time of

18   this call?

19   A.  Cereso prison.

20   Q.  Where is the Cereso prison?

21   A.  Juarez.

22   Q.  Now, in the middle of the call, did you hear the person you

23   identified as Chino, conducting any business as an aside to the

24   call?

25   A.  Yes, sir.

1   Q.   What was he doing?

2   A.   He was ordering someone to -- two groups of people, one to

3   go in front of the other.

4   Q.   Could you understand that from the radio transmissions?

5   A.   Yes.

6   Q.   What were those groups wanting to go do?

7   A.   I don't know.  He was talking in code.

8   Q.   Was it BA code?

9   A.   It was BA in Juarez code.

10   Q.   Are you familiar with those?

11   A.   No, sir.

12   Q.   What rank is Chino Valles?

13   A.   Lieutenant.

14   Q.   Okay.  So we've talked about some of these calls in

15   September and October.  And you mentioned that, um, if I recall

16   your testimony, that the defendant came out of jail in,

17   approximately, October of 2010; is that correct?

18   A.   Yes, sir.

19   Q.   Had you met him before that?

20   A.   No, sir.

21   Q.   And did you meet him in early October?

22   A.   Yes, sir.

23   Q.   When was the first time that you met him?

24   A.   About a week, couple weeks after he got out.

25   Q.   And based on the calls and everything that you were

1    participating in, did you know he was going to come out?

2    A.  Yes, sir.

3    Q.  And, tell us about your first meeting with him.

4    A.  Um, took him out to eat, just my brother and myself went

5    out, um, just to talk to him, how everything was running out on

6    the streets.  And put him up-to-date -- bring him up-to-date on

7    everything.

8    Q.  Where did you guys go out to eat?

9    A.  Arby's.

10   Q.  And why did you take your brother?

11   A.  As a witness.

12   Q.  Why was it important to have a witness with you?

13   A.  Just so they can know either myself of the defendant can't

14   say oh, well he told me this, no, he told me that.  No

15   confusion.

16   Q.  So was this business or personal?

17   A.  Business.

18   Q.  What did you guys talk about at Arby's?

19   A.  Just how everything was going on on the streets, how

20   everything was running and how we wanted him to just lay low

21   for a while to get accustomed to the streets.  Because he had

22   been in prison for such a long time.

23   Q.  Is it common to let BAs coming out of prison to have a lay

24   low period?

25   A.  Yes, sir.

Q.  All right.  Now, you mentioned that you were telling the
defendant about how things were going on the street.

A.  Yes.

Q.  What, specifically, were you telling him about?

A.  Who was running what side of town, who was in charge of
each area, how much money we're bringing in, quota money.  Um,
who we had problems with, who wasn't following orders.  Stuff
like that.

Q.  Why were you meeting with him to tell him these things?

A.  Because he was going to take over the streets.

Q.  At the time of your meeting at Arby's, what rank was the
defendant?

A.  At this time he was still a lieutenant.

Q.  Did you anticipate his rank increasing?

A.  Yes, sir.

Q.  During that meeting with him, did you talk about leadership
in Juarez?

A.  Yes, sir.

Q.  Did you talk to him about drugs coming in from Juarez?

A.  Yes, sir.

Q.  Where were you getting your drugs at that time?

A.  I was already getting them from Juarez.

Q.  And did you -- who from Juarez were you getting those from?

A.  At that time I was already getting it from Zuniga.

Q.  Did you talk to him about passing a number to Zuniga or

1 passing him Zuniga's cell phone number?

2 A.  Yes.

3 Q.  Why would you pass that number to the defendant?

4 A.  Like I said, he was -- he had to be in contact with him

5 since he was going to take over the streets of El Paso.  He had

6 to be in contact with Juarez as well.

7 Q.  So did you give him his time to lay low?

8 A.  Um, yes.

9 Q.  All right.  And after that time, did you meet with him

10 again?

11 A.  Yes.

12 Q.  Were these regular meetings or infrequent?

13 A.  Infrequent, but we were in contact.

14 Q.  How often were you in contact with the defendant?

15 A.  For a while we were in contact every day.

16 Q.  And were you having any face-to-face meetings?

17 A.  Once -- infrequent.  Once in a while.

18 Q.  Mostly on the phone?

19 A.  Yes, sir.

20 Q.  When you're talking to him on this daily basis, on the

21 phone, what are you talking about?

22 A.  Um, business.

23 Q.  Again, what type of business?

24 A.  Um, again, quota money, how much money was coming in, who

25 was -- who wasn't following orders, who was following orders,

```
 1   who was doing what they're supposed to.  Just, basically,

 2   day-to-day business, BA members business.

 3   Q.  Did you do anything to help -- help the defendant get

 4   started with his drug business?

 5   A.  Yes, sir.

 6   Q.  What did you do?

 7   A.  We gave him an ounce of cocaine and half an ounce of

 8   heroin.

 9   Q.  And why did you give that to him?

10   A.  So he can get some -- get money, get started.

11   Q.  And do you make it a practice to give away ounces and half

12   ounces of cocaine and heroin?

13   A.  No, sir.

14   Q.  How many times have you done that?

15   A.  Just once.

16   Q.  Did this come out of your personal stash or out of the BA

17   stash?

18   A.  My personal.

19   Q.  Did the defendant take off with his drug business right

20   away?

21   A.  He struggled for a little while.  And then after a while he

22   took off.

23   Q.  Why would a defendant like Ramon Renteria struggle as he

24   comes out of jail?

25   A.  Because he's not used to the way things was running.  It's
```

```
 1   faster on the streets than in jail.  So he was still getting
 2   used to the streets at that time.
 3   Q.  Had he opened any stores at that time?
 4   A.  Did he get his own stores or open?
 5   Q.  Yeah, did he have any of his own stores?
 6   A.  What we gave him, I believe he opened one or two, yes.
 7   Q.  And you said that he struggled at first.  Did he stop
 8   struggling after a while?
 9   A.  Yes, sir.
10   Q.  How long did it take him to catch his rhythm?
11   A.  About a month.
12   Q.  I'd like to talk to you about something that happened in
13   November of 2010.
14           THE COURT:  Could the attorneys approach?
15           MR. SKARET:  Yes, Your Honor.
16           (Attorneys approach bench.  Off record discussion.)
17           THE COURT:  We are going to take a morning break.
18   Remember, you remain under all the instructions the Court has
19   previously given you.  And see you at 10:45.  Thank you.
20           (Jury leaves courtroom.)
21           THE COURT:  You may be seated.  We stand in recess.
22           (Recess.)
23           (Jury enters courtroom.)
24           THE COURT:  Be seated.  You may proceed.
25   Q.  (By Mr. Skaret)  Mr. Lopez, I remind you that you remain
```

1    under oath.

2    A.  Yes, sir.

3    Q.  Now, we are up to the point in your testimony when you

4    mentioned that the defendant had been released to the streets.

5    You were giving him updates, but, generally, you said you were

6    allowing him to lay low.

7    A.  Yes, sir.

8    Q.  And that was sort of his right as a BA member coming out of

9    jail.

10    A.  Yes, sir.

11    Q.  And after about a month, this pushes us up into

12    November 2010; is that correct?

13    A.  Yes, sir.

14    Q.  At that time, who was holding the bank for the BA in El

15    Paso?

16    A.  Um, Payaso.

17    Q.  What was his real name?

18    A.  I don't remember.

19    Q.  Is this the same Payaso you pointed out earlier in your

20    testimony?

21    A.  Yes, sir.

22    Q.  This was the guy standing next to Mr. Cano in that picture?

23    A.  Yes, sir.

24    Q.  Do you remember a day in November when Payaso's house was

25    searched by federal authorities?

1    A.  Yes, sir.

2    Q.  How did you find out about that?

3    A.  His wife called me.

4    Q.  What did she say?

5    A.  She said that her house, their house, got raided but she --

6    she has what I wanted.

7    Q.  Did she sound upset?

8    A.  Yes.

9    Q.  What was her name?

10   A.  I don't remember her name.

11   Q.  I would like to play the call.  Admitted into evidence

12   22A-2 from November 12, 2010.  Looking down the left-hand

13   column of the excerpt, you see UF or M or ML -- pardon me.  You

14   see ML and you see M.  Who's the ML?

15   A.  Myself.

16   Q.  And the M?

17   A.  Payaso's wife.

18   Q.  And reading through just the very beginning of that

19   transcript, do you -- is your memory refreshed as to what

20   Payaso's wife's name was?

21   A.  Monica.

22          (Audio being played.)

23   Q.  This is the call from Payaso's wife that you were talking

24   about?

25   A.  Yes, sir.

1  Q.  When she mentioned that he's not here, who was she

2  referring to?

3  A.  His husband -- her husband, Payaso.

4  Q.  Now, Monica also mentioned to you on that phone call that,

5  I believe it was don't worry, they didn't find what you want.

6  A.  Yes, sir.

7  Q.  What was it that was so important to you?

8  A.  Um, well, both the money and the ledger, mostly the ledger.

9  Q.  And, approximately, how much money did you think was

10 sitting over at Payaso's house?

11 A.  Over 20 grand.

12 Q.  And which was more important to you, the 20 grand or the

13 ledger?

14 A.  The ledger.

15 Q.  Why was the ledger more important?

16 A.  Because it had everything, how much money we were making,

17 how much money we were putting in commissary accounts and what

18 were we using it for.  So. . .

19 Q.  And did you just want to keep that ledger for your own

20 personal use in the future?

21 A.  No, sir.

22 Q.  So why was it so important?

23 A.  It was to show all BA members, high ranking members, that

24 was -- what we were doing with the quota money, where it was

25 going, what we were doing with it.

David A. Perez, RMR, RPR

1    Q.  Was it -- is it fair to say that that notebook would cover
2    your rear end?
3    A.  Yes, sir.
4    Q.  In particular, in case someone came around wondering what
5    happened to the money.
6    A.  Yes, sir.
7    Q.  To your knowledge, did federal authorities conducting the
8    search ever find that notebook and the $20,000?
9    A.  Yes, sir.
10   Q.  I'm showing you what's been marked as Government's Exhibit
11   13N.  I believe this is in evidence.
12          MR. SKARET:  And would like to publish it to the jury.
13          THE COURT:  All right.
14   Q.  (By Mr. Skaret)  Mr. Lopez, do you recognize Government's
15   Exhibit 13N?
16   A.  Yes, sir.
17   Q.  What is it?
18   A.  That's the ledger.
19   Q.  Is this the thing that was so important to you at Payaso's
20   house?
21   A.  Yes, sir.
22   Q.  Open up Government's Exhibit 13N.  Can you read that top
23   word on the inside cover?
24   A.  Money.
25   Q.  Tell us what we're looking at on the first page on the

David A. Perez, RMR, RPR

1    right side.

2    A.   Money that we had, how much money we were using.

3    Northeast, how much money northeast was bringing.   How much

4    money the east side was bringing in.

5    Q.   All right.   Direct your attention to the second page, the

6    notebook, on the right, says July 19th to the 25th.   What is it

7    that we're looking at?

8    A.   Each area of El Paso.

9    Q.   And how much did it look like had come in from the Valley

10   of El Paso?

11   A.   $375.

12   Q.   Does that seem consistent with what was coming in under

13   your watch?

14   A.   Yes.

15   Q.   Take a look at the third page here.   It's labeled July 19

16   to the 25th.   Explain to us this particular entry at the top of

17   page.

18   A.   It's Valley, Valle, Valley, 375.   Westside, 680.   Fabens,

19   455.   Socorro, 195.   Chaparral, 200.   Northeast, 240.

20   Eastside, 170.   Central, 200.

21   Q.   And right underneath Central, it says "uso 80 Chucky".

22   What does that mean?

23   A.   Chucky used, out of the -- what he brought in from the

24   quota money, he used $80.

25   Q.   Why was that permitted?

```
1   A.  He probably used it for a cell phone or we allowed him to
2   use it for BA business.
3   Q.  Now, do you know when -- or which year these dates pertain
4   to?
5   A.  Um, should be 2010.
6   Q.  When you were running the streets?
7   A.  Yes, sir.
8   Q.  On July 26, we have, basically, the same type of data; is
9   that correct?
10  A.  Yes.
11  Q.  Can you take us through that?
12  A.  Lower Valley, 75 plus 365 plus 480.  Westside, 730.
13  Fabens, 23 plus 285, 305.  Socorro, 215.  Chaparral, 100.
14  Northeast, 100 plus 100.  Eastside, 170.  Central, 340.
15  Q.  Then down below looks like maybe some more loans.  Pino?
16  A.  Espino.
17  Q.  Espino?
18  A.  Yes.
19  Q.  And Primo?
20  A.  Primo, Night Owl.
21  Q.  Which Night Owl was this?
22  A.  He owned the shop on the Lower Valley.
23  Q.  Is that -- do you know another Night Owls?
24  A.  Yes, sir.
25  Q.  The particular Night Owl that's referenced here, do you
```

David A. Perez, RMR, RPR

```
 1   know his brother?
 2   A.  No.  That's not the one we're talking about earlier.
 3   Q.  Okay.  Now, with respect to this individual, Primo, 25,
 4   does that indicate a loan to Primo for $25?
 5   A.  No, sir.  What we call -- we're starting to charge BA
 6   members that were doing illegal activity, selling drugs or any
 7   illegal, ten percent of whatever their profits were.
 8   Q.  Earlier you mentioned this is like the ten percent tax?
 9   A.  Yes, sir.
10   Q.  And do you know what Primo's real name is?
11   A.  Angel Renteria.
12   Q.  Did he serve in your organization?
13   A.  Yes, sir.
14   Q.  Is he one of the co-defendants in this case?
15   A.  Yes, sir.
16   Q.  Turning the page, we have similar notations in August 2nd
17   to the 8th?
18   A.  Yes, sir.
19   Q.  August 9 through the 15th?
20   A.  Yes.
21   Q.  August 16 to the 22nd?
22   A.  Yes, sir.
23   Q.  August 23rd to the 29th?
24   A.  Yes, sir.
25   Q.  Turning the page, additional notations for beginning of
```

1   September.  September 13th through the 19th.  September 20th

2   through the 26th and September 27th to the 3rd; is that

3   correct?

4   A.  Yes, sir.

5   Q.  Now we're into October.  October 4th to the 10th?

6   A.  Yes.

7   Q.  October 11th to the 17th?

8   A.  Yes, sir.

9   Q.  October 18th to the 24th?

10  A.  Yes, sir.

11  Q.  October 25th to the 31st?

12  A.  Yes, sir.

13  Q.  Can you go through that -- the ledger for October 25th to

14  the 31st for us?

15  A.  Lower Valley 425, Westside 1,110.  Fabens, 310.  Socorro,

16  250, Northeast 141.  Chaparral, 200.  Eastside doesn't have

17  anything.  Central, 50 plus 170, 220.

18  Q.  In adding up those amounts, got about $400, $1100, 1500,

19  18-, 2000 and $200 there -- so little over $2,000?

20  A.  Yes, sir.

21  Q.  You said earlier in your testimony that you thought on

22  average that your organization was picking up about 1900 per

23  week?

24  A.  Yes, sir.

25  Q.  Now, with respect to the notations, September 27th to the

1    3rd, can you go through these notations for us, please?

2    A.  Yes, sir.  Lower Valley, 425.  Fabens, 179.  Socorro, 309.

3    Westside, 960.  Northeast, 240.  Chaparral, 260.  Eastside,

4    230.  Central has nothing yet.

5    Q.  What about the 236 amount below that?

6    A.  It says 236 for cuerno, Spook and tarjetas.  That's phone

7    for Spooky, and phone cards.

8    Q.  Would this -- does this mean Spooky would be out on the

9    streets at this time?

10   A.  Yes.

11   Q.  Do you remember who bought the phone cards for Spooky?

12   A.  Well, it was phone for Spooky and phone cards for Galindo.

13   Q.  I see.  So the phone for Spooky, do you know who bought the

14   phone?

15   A.  I did.

16   Q.  You did?

17   A.  Yes, sir.

18   Q.  And did you do that at his request?

19   A.  At Zuniga's.

20   Q.  Ricardo Zuniga told you to get the phone?

21   A.  Yes.

22   Q.  Just so we're clear, um, which Spook or Spooky are we

23   talking about here?

24   A.  Ramon Renteria.

25   Q.  The defendant?

1   A.   Yes, sir.

2   Q.   Turning two pages, you see a notation, cortinas up to 1026.

3   What's a cortina?

4   A.   Quota money.

5   Q.   And can you take us through this particular ledger down to

6   the half page?

7   A.   Um, quota money, 11,132 plus 230, 11,362.  $500 for money

8   order.  Ten percent up to 10-26, 3,190.

9   Q.   What is this word here?

10  A.   Machine, maquina.

11  Q.   What is that?

12  A.   $2,500.

13  Q.   For a maquina?

14  A.   I can't remember that.

15  Q.   The total up to 10-26 is how much?

16  A.   17,322.

17  Q.   This would be at the end of October, correct?

18  A.   Yes.

19  Q.   Also, has a notation up here, $90 going to an individual

20  named who?

21  A.   Aracles.

22  Q.   Now, did you ever know that -- what -- was the ten percent

23  tax ever going to be changed to a higher amount?

24  A.   Not that I know.

25  Q.   Okay.  All right.  If you can take us through what this

1    page signifies.

2    A.  Neto, 200.  Polo, two weeks.  Igor, two weeks.  Dejor, one

3    week, plus 20.  Cuate, five weeks.  Should be the ten percent.

4    Q.  So this is notating how much they've paid in their time?

5    A.  Yes.

6    Q.  This person, Cuate, at the bottom of that list, do you know

7    his real name?

8    A.  No, sir.

9    Q.  Do you know whether Cuate was charged in this indictment?

10   A.  Yes, sir.

11   Q.  This individual, Igor, do you know his full name?

12   A.  Albert Mendoza.

13   Q.  Do you know whether he was charged in the indictment?

14   A.  Yes.

15   Q.  This brings us to some notations for November 1st through

16   the 7th.  That's it, correct?

17   A.  Yes, sir.

18   Q.  How important is it that good records be kept in the book

19   like that?

20   A.  Well, it's to -- like you said, it's to cover -- cover our

21   behind.

22   Q.  Did you make those notations in the book?

23   A.  No, sir.

24   Q.  Who did?

25   A.  It was Payaso.

1   Q.  So when Payaso would receive the money, would he make the

2   notations?

3   A.  Yes, sir.

4   Q.  Did you ever see him make notations in that book?

5   A.  Yes, sir.

6   Q.  Now, after you got the phone call from Payaso's wife,

7   Monica, what did you do?

8   A.  Well, I called, I talked to Zuniga.  And then we directed

9   Taz to go and pick up the money and the ledger from her.

10  Q.  And is Taz one of the defendants indicted in this case?

11  A.  Yes, sir.

12  Q.  And why did you ask Taz to go over and talk to Monica?

13  A.  Because he was closer to Payaso and Monica's wife than

14  anyone else.

15  Q.  And was this solely to pick up the money?

16  A.  And the ledger, yes, just to see what was going on.  What's

17  going on with Payaso as well.

18  Q.  Did Taz ever get back to you about what happened over there

19  at Monica's house?

20  A.  Yes, sir.

21  Q.  What did he say?

22  A.  Um, well, at first we couldn't find her.  She was hiding,

23  going -- she wasn't at her house, mom's house.  She went to her

24  mother-in-laws house.  After a while, found her -- we found

25  her.  She gave us a letter stating that the FBI, the

1    Government, had taken the ledger and the money.

2    Q.  So not only had they taken everything she initially worried

3    about, the FBI also seized the ledger and the money?

4    A.  Yes, sir.

5    Q.  Um, did you ever see the information that you mentioned

6    indicating what was seized?

7    A.  Yes, sir.

8    Q.  Did Taz bring that back to you?

9    A.  Yes.

10   Q.  I would like to show you what's been admitted into evidence

11   as Government's Exhibit 6NN.

12            MR. SKARET:  If I may publish to the jury?

13            THE COURT:  You may.

14   Q.  (By Mr. Skaret)  Mr. Lopez, do you recognize what's been

15   marked as 6NN?

16   A.  Yes, sir.

17   Q.  What is it?

18   A.  It's a letter from Special Agent Samantha Mikeska.  It's a

19   search warrant.

20   Q.  In the first letter that's attached to that search warrant,

21   can you tell us what this is at the top here?

22   A.  Receipt for property.  Receipt.  Return.

23   Q.  What is your understanding that this letter purports to

24   show?

25   A.  What they seized.

1   Q.   Do you see the U.S. currency down here that was seized?

2   A.   Yes.

3   Q.   Paperwork, receipts, envelopes, small blue composition

4   notebook?

5   A.   Yes.

6   Q.   Some inmate trust fund deposit slips?

7   A.   Yes, sir.

8   Q.   Documents from a vehicle?

9   A.   Yes.

10   Q.   Date of the receipt is November 12, 2010?

11   A.   Yes.

12   Q.   I would like to show you the second page that's attached to

13   6NN.  This is the same type of document; is it not?

14   A.   Yes, sir.

15   Q.   Receipt for property?

16   A.   Yes.

17   Q.   On November 12th?

18   A.   Yes, sir.

19   Q.   This goes through in a little more detail of what else was

20   found; is that right?

21   A.   Yes, sir.

22   Q.   Why was it important that the BA obtain the receipt of the

23   search from Ms. Diaz?

24   A.   Just to verify that it was taken and she didn't kept it

25   herself.

1    Q.  Were you worried she might have kept it herself?

2    A.  Yes, sir.

3    Q.  Did this receipt of information seized, did that clear her

4    in your mind?

5    A.  Not at first.

6    Q.  What were your doubts about at first?

7    A.  At first we thought it was fake.

8    Q.  Did you ever show the seizure receipt to the defendant?

9    A.  I don't -- I don't recall.

10   Q.  Did you guys talk about it?

11   A.  Yes.

12   Q.  What did you say about the search of Payaso's house with

13   the defendant?

14   A.  That they -- they had -- the Government had seized the book

15   and the money.

16   Q.  How did this affect Barrio Azteca operations at the time?

17   A.  Well, we weren't able to send commissary money to anyone in

18   prison -- in the prison system.  So it affected.

19   Q.  Did you end up dropping the phone that you were using?

20   A.  Yes.

21   Q.  Why did you do that?

22   A.  Because at that time we knew federal law enforcement were

23   listening to our calls.

24   Q.  We've heard some testimony where, um, BA members referenced

25   the phrase feeling the heat.  Was the BA feeling the heat after

1    Payaso's search?

2    A.  Yes.

3    Q.  How did that search affect the defendant and his

4    leadership?

5    A.  I don't -- I don't understand.

6    Q.  Did he start to take over about this time?

7    A.  Yes, sir.

8    Q.  And who took over the bank?

9    A.  My brother took it over for a couple weeks.  And then

10   Spooky took it over after that.

11   Q.  How did you decide to give the -- how was it decided that

12   your brother, Omar, would take the bank?

13   A.  We told him to.

14   Q.  Who's we?

15   A.  Myself and Spooky.

16   Q.  And did Omar want the bank?

17   A.  No.

18   Q.  Why not?

19   A.  It's a lot of responsibility.  And, um, if anything's

20   missing from -- one dollar, whatever is missing from that bank,

21   it's your behind on the line.

22   Q.  He didn't want that responsibility?

23   A.  No, sir.

24   Q.  But he took it nonetheless?

25   A.  Yes, sir.

1    Q.   Why did he take it?

2    A.   Because he was ordered to.

3    Q.   Now, at that time, did your brother have any rank in your

4    organization?

5    A.   Yes, sir.

6    Q.   And what rank was he?

7    A.   Sergeant.

8    Q.   Sergeant you say?

9    A.   Yes.

10   Q.   And how did he get the rank of sergeant?

11   A.   Spooky gave it to him.

12   Q.   And when did he give it to him?

13   A.   Um, I don't know exactly what date.

14   Q.   Was it around the time of the Payaso search?

15   A.   More or less.

16   Q.   Now, in order to hand out the rank of sergeant, do you need

17   to have rank yourself?

18   A.   Yes, sir.

19   Q.   And what -- what rank in the BA is able to give out

20   sergeant ranks?

21   A.   Capos.

22   Q.   And at this time when he gave your brother the sergeant

23   ranking, was he a capo himself?

24   A.   Yes, sir.

25   Q.   And when did Spooky become capo?

1    A.   About a month or so after he got out of prison, more or

2    less.

3    Q.   So about the time of the Payaso search?

4    A.   Yes.

5    Q.   How do you know he became a captain?

6    A.   He showed us a letter from Shotgun.

7    Q.   What did that letter say?

8    A.   Stating he was taking over the -- what we call family,

9    taking over the BA, and, now that he was -- he was the

10   quarterback.  Basically, he was the quarterback.  And he had

11   his capo rank, stripes.

12   Q.   At, approximately, the end of November, the beginning of

13   December, did the defendant, Ramon Renteria, call a meeting at

14   a hotel on the east side of El Paso?

15   A.   Yes, sir.

16   Q.   Where was -- where did that meeting take place?

17   A.   It's -- I can't remember the hotel.  But it was behind a

18   Village Inn.

19   Q.   Behind the what?

20   A.   Village Inn.

21   Q.   Village Inn?

22   A.   Yes, on the east side.

23   Q.   On Mesa?

24   A.   On the east side.

25   Q.   It was at a hotel near the Village Inn.  Where at the hotel

David A. Perez, RMR, RPR

1    was it?

2    A.   Excuse me?

3    Q.   Where at the hotel was it, in a room?

4    A.   In a room.

5    Q.   Single room or double?

6    A.   Single.

7    Q.   Who was supposed to attend that meeting?

8    A.   Um, BA leadership people that were in charge of their

9    particular areas.

10   Q.   At that time, who would that have included?

11   A.   Um, Espino on the Westside, Taz, Northeast, Chucky,

12   Central, Vago, Lower Valley, Moi, Pollo, Eastside, myself,

13   Spooky, and Segundo, Junior Munoz.  But he wasn't there; he

14   sent his right-hand man.

15   Q.   Did more people than leaders show up?

16   A.   Yes, sir.

17   Q.   You mentioned that Jesus Espino arrived.  Who drove Jesus

18   Espino to the meeting?

19   A.   Primo.

20   Q.   This is Angel Renteria?

21   A.   Yes.  Yes.

22   Q.   What was the purpose of the meeting?

23   A.   It was, basically, let them know that -- it was a

24   chastising, basically.  Um, just to let them know that they

25   need to get on the ball because they were getting sloppy.  That

1    we were not going to babysit them.  And just, basically, get on

2    the ball and do your job.

3    Q.  Who did most of the talking at the meeting?

4    A.  Spooky.

5    Q.  Who rented the room for the meeting?

6    A.  I believe his girlfriend did.

7    Q.  At that meeting, did he mention being made captain?

8    A.  No, I don't remember.

9    Q.  Did he or -- pardon me.  When you got the letter from

10   Shotgun, did you spread the word that Spooky was actually a

11   captain?

12   A.  Not at first.  We tried to play low key.  The less people

13   that knew, the better.  But after a while, yeah, people knew.

14   Q.  Why was it in the BAs, interest to be low key about that?

15   A.  Um, again, not to bring heat on yourself.

16   Q.  So, basically, not bring heat on Spooky?

17   A.  Yes, sir.

18   Q.  Now, at that particular meeting, um, tell us about the

19   security at that meeting?

20   A.  Um, well, we search.  We search everyone.  They have to get

21   undressed.  Search shirts, shoes, everything, phone.  Take off

22   the battery on the phone.  Um, put it next to the radio, TV, in

23   case it's in the wiring.  Boxers.  Everything.  And we pass

24   metal detector through their body.

25   Q.  How undressed did every guy get?

1   A.   Up to their boxers.

2   Q.   Okay.  What's the purpose of that security?

3   A.   In case law enforcement is listening or they have an

4   informant among us.

5   Q.   Had you had prior BA meetings in the past?

6   A.   Yes, sir.

7   Q.   Is that how usually business was conducted?

8   A.   Yes, sir.

9   Q.   The beginning of the meeting?

10   A.   Yes, sir.

11   Q.   Tell us some of the problems that the defendant was

12   addressing at that meeting.  What were the issues?

13   A.   Well, people were -- a lot of people were -- leaders for

14   BA, members, weren't going out on the street and finding out

15   what was going on.

16   Q.   Did that include your co-defendant, Taz?

17   A.   Yes, sir.

18   Q.   What was the issue with Taz?

19   A.   That he wasn't out on the street.  And other

20   organization -- other gangs were trying to take over the

21   Northeast.

22   Q.   Were there any complaints that the BAs weren't going after

23   ex-members?

24   A.   Yes.

25   Q.   Tell us about that.

A.  There was a complaint, people would see ex-members and they
wouldn't do anything to them.  They would just walk away.  Or,
actually, even hanging around with them.

Q.  As a BA member in El Paso who's serving the organization
with 121 percent, what is that individual supposed to do if
they see an ex-member on the street?

A.  Ultimately, it's a beat down.  But, ultimately, you have to
kill them.

Q.  Now --

        MR. SKARET:  One moment, please.

Q.  All right.  So now that we're into November and December of
2010, spooky now has his rank.  Does he start making more
decisions for the BA?

A.  Yes, sir.

Q.  Tell us about that shift in leadership.  How does that
occur?

A.  Well, he started taking more -- over the leadership of El
Paso.  I started handing over the -- well, I handed over the
reins to him, the day-to-day business.

Q.  All right.  And at this time were you still selling drugs?

A.  Yes, sir.

Q.  Were you still getting your drugs from Zuniga?

A.  Yes, sir.

Q.  At that time, was the defendant getting his drugs from
Zuniga?

1    A.   Yes.

2    Q.   Do you know, approximately, how much -- how much drugs he

3    was getting from Zuniga?

4    A.   About two ounces every day of heroin.

5    Q.   How was it that you knew about that?

6    A.   Because they used the same women, the same couriers.

7    Q.   Let me ask you, did you ever feel like you were getting cut

8    out of what was going on in the Barrio Azteca in late 2010 and

9    early 2011?

10   A.   Yes.

11   Q.   Why is that?

12   A.   Just, the decisions that were made.  Sometimes I wouldn't

13   find out until after they would happen.

14   Q.   Who would make the decisions?

15   A.   It could -- ultimately, it had to be Mr.-- Spooky.

16   Q.   And he wasn't including you on everything?

17   A.   No.

18   Q.   Was he including your brother on anything?

19   A.   No.

20   Q.   Did there come a time when your brother lost control of the

21   bank?

22   A.   Yes.

23   Q.   All right.  And who took it over?

24   A.   Spooky.

25   Q.   Why did he take it over?

1    A.   He wanted it.

2    Q.   He wanted the bank?

3    A.   Yes.

4    Q.   Do you know why he wanted the bank?

5    A.   Money.

6    Q.   Let me talk to you about, um, some of the violence that

7    occurred in late 2010 and early 2011.  Do you remember an

8    incident that happened at the Player's Bar in El Paso?

9    A.   Yes, sir.

10   Q.   What happened there?

11   A.   There was a fight amongst between a guy and Aracles, Spooky

12   and another BA member.

13   Q.   Aracles, being the guy whose name we see in Exhibit M, the

14   notebook?

15   A.   Yes, sir.

16   Q.   Another BA member and who else?

17   A.   Some other guy I don't know.

18   Q.   What happened?

19   A.   They were -- they -- they got into an altercation.  The guy

20   punched Aracles.  And Aracles fell to the ground.  Spooky

21   stabbed him -- the guy on the side.  And the guy punched Spooky

22   and knocked him out.

23   Q.   How did you hear about this?

24   A.   We saw it on a video.

25   Q.   How did you get a video of that incident?

1    A.  We went to the bar to see it.  I saw it.

2    Q.  How did you get the video from the bar?

3    A.  From, I believe, he was either the manager or the owner --

4    the one that let us see it.

5    Q.  You walked in and said can we check that out?

6    A.  Well, Chucky knew the guy.  And we pretty much -- yeah, we

7    did that.

8    Q.  What did you do with the video after you watched it?

9    A.  We -- we broke it, we burned it.

10   Q.  After watching the video, who did you think was to blame

11   for that whole incident?

12   A.  Aracles.

13   Q.  Aracles?

14   A.  Yes.

15   Q.  And why?

16   A.  Because you can see on the video that he was -- he was the

17   one that was instigating the fight.  He was the one that was

18   just trying to be -- trying to be a bad ass.  Excuse my

19   language.

20   Q.  Now, did Zuniga ever call you up from Juarez and talk to

21   you about how to discipline the people involved in that fight?

22   A.  Yes.

23   Q.  What did Zuniga want to do.

24   A.  He wanted to break their ribs and stab them.

25   Q.  Who, specifically, did he want to stab or break their ribs?

1    A.  The other BA member, Hawaiiano.

2    Q.  Did you agree with what Zuniga suggested?

3    A.  No, sir.

4    Q.  Why not?

5    A.  Because he was going on what Aracles told him.  There was

6    no investigation with it.  We had to do an investigation before

7    we do something like that.

8    Q.  So did you tell Zuniga what you found out in your

9    investigation?

10   A.  Yes, sir.

11   Q.  And how did Zuniga take the news?

12   A.  He was kind of surprised that Aracles lied to him.

13   Q.  So who ended up getting the beating, Hawaiiano or Aracles?

14   A.  Aracles.

15   Q.  Who ordered that beating?

16   A.  I did.

17   Q.  Who beat up Aracles?

18   A.  It was -- I had instructed Narizon to take it and take two

19   other BA members.  And he took two BA members from the east

20   side.  But I don't know who they were.

21   Q.  Did you give him specific guidance on how hard they should

22   beat the guy up?

23   A.  Yes.

24   Q.  What did you tell them?

25   A.  He needed to break his ribs.

```
1    Q.  What, ultimately, happened to the victim that the defendant
2    stabbed at the Player's Bar?
3    A.  He went to the hospital.  But after he got out of the
4    hospital, he got a beating.
5    Q.  Who's idea was that?
6    A.  Mine.
7    Q.  Why was it important to beat up that guy after he got out
8    of the hospital?
9    A.  Um, so he knew he wouldn't make that mistake again.  He
10   beat the highest ranking member we had in the streets.
11   Q.  Now, we've heard a fair amount of evidence so far in this
12   case about a guy named Chicho and what happened to him.  Did
13   you know Chicho?
14   A.  Yes, sir.
15   Q.  Who was Chicho?
16   A.  Um, Chicho Meraz.  He was a capo as well.
17   Q.  And when you did you first meet him?
18   A.  When I was hooked on heroin in the 90s.
19   Q.  And why was it that you were -- was he hooked on heroin
20   back then, too?
21   A.  Yes, sir.
22   Q.  Did you guys hang out?
23   A.  Yes, sir.
24   Q.  What were you doing when you would hang out?
25   A.  Doing drugs, heroin.
```

```
 1   Q.  Now, there came a time when Chicho left El Paso; is that
 2   correct?
 3   A.  Yes.
 4   Q.  Where did he go?
 5   A.  Juarez.
 6   Q.  Do you know why he went to Juarez?
 7   A.  I believe he was running from law enforcement.
 8   Q.  How was -- how was -- well, at the time he went to Juarez,
 9   was he in good standing with the BA?
10   A.  Not that much, no.
11   Q.  Did you hear from other Barrio Azteca members whether
12   Chicho was ever killed?
13   A.  Yes.
14   Q.  Did you hear who killed him?
15   A.  Yes.
16   Q.  Who was it that you heard killed him?
17   A.  Um, Tablas.
18   Q.  And do you know why Tablas killed him?
19   A.  Yeah, he wanted the capo rank.
20   Q.  Who ordered the killing of Chicho?
21   A.  Um, Shotgun, T-top, Tolon.
22   Q.  How did you find out about that?
23   A.  They were the only ones that were able to issue an order
24   like that.
25   Q.  And did you -- were you aware that a letter had been passed
```

1    down from Shotgun to issue that order?

2    A.   Yes.

3    Q.   Did you ever talk to the defendant, Ramon Renteria, about

4    Shotgun's letter?

5    A.   Yes.

6    Q.   What did the defendant tell you?

7    A.   He had told me that, um, they had intercepted that letter,

8    that Shotgun had given that letter to another, supposedly, BA

9    member to send it on under his name.  And that BA member or

10   supposed BA member gave it to the guards, the officials.

11   Q.   Did Spooky tell you where he was at the time that letter

12   was sent out?

13   A.   Pollock, Louisiana.

14   Q.   Is that where you understand Shotgun was also located?

15   A.   Yes.

16   Q.   Do you know if that particular letter ever hit the streets?

17   A.   I don't know.

18   Q.   What day did you get arrested on this case?

19   A.   March 9, 2011.

20   Q.   I would like to show you what's been marked as Government's

21   Exhibit 17B-1.

22          MR. SKARET:  I believe this is not in evidence, Your

23   Honor.

24          THE COURT:  All right.

25   Q.   (By Mr. Skaret)  You see Government's Exhibit 17B-1,

1   Mr. Lopez?

2   A.  Yes, sir.

3   Q.  And what is Government's Exhibit 17B-1?

4   A.  A picture of Spooky.

5   Q.  Is that a fair and accurate depiction of how Spooky looked

6   on the day of your arrest?

7   A.  Yes.

8           MR. SKARET:  Your Honor, I offer and ask to publish.

9           THE COURT:  Any objections?

10          MR. FOSTER:  Yes, Judge.  Could we approach for a

11  moment?

12          (Bench conference.  Out of hearing of Jury.)

13          MR. FOSTER:  Is that some form of a booking photo?

14          MR. SKARET:  I believe it may be a booking photo.

15          MR. FOSTER:  I would object to a booking photo, Judge.

16  Because that's kind of extra prejudicial.  I mean, they've got

17  plenty of pictures of Juan Renteria.  They know who he is.

18          MR. SKARET:  It doesn't have anything on there.  It

19  doesn't say.

20          THE COURT:  He's in regular clothes.  My concern is,

21  didn't -- there are other photos that are in evidence that show

22  all of his tattoos.

23          MR. FOSTER:  Yeah, that's true.  That's true.

24          THE COURT:  I don't see the prejudice.

25          MR. FOSTER:  I don't think it's that big of a deal.  I

```
1    agree with you.

2              THE COURT:  All right.

3              MR. FOSTER:  I don't want it referred to as a booking

4    photo or jail photo, just to kind of -- just throw a little

5    gasoline on the fire.

6              THE COURT:  That's fine.

7              (Back on the record open court.)

8    Q.  (By The Court)  Any objection?

9              MR. FOSTER:  No objection.

10             THE COURT:  You may proceed.  It will be admitted,

11   17B-1.

12   Q.  (By Mr. Skaret)  Now, as I understand your testimony, you

13   joined the Barrio Azteca in December of 2008 and were arrested

14   on the case in March of 2010; is that correct?

15   A.  11.

16   Q.  Pardon me.  March 2011?

17   A.  Yes, sir.

18   Q.  During that time you were selling drugs; is that correct?

19   A.  Yes, sir.

20   Q.  I would like to talk to you about an estimate of the amount

21   of drugs that you were selling from when you joined until when

22   you were arrested on these charges.  So how many months was

23   it -- approximately, the amount of months from December 2008 up

24   to March 2011?

25   A.  About 15.
```

David A. Perez, RMR, RPR

1  Q.  About 15?

2  A.  Yeah.

3  Q.  So you got 2009, 2010 and a couple of extra months?

4  A.  Sorry, I'm not a very good math.

5  Q.  12 plus 12?

6  A.  24.

7  Q.  Plus couple extra months?

8  A.  Yes.

9  Q.  So let's be conservative and go 24 months.

10  A.  Yes.

11  Q.  During those 24 months, approximately, how many ounces of

12  heroin were you importing into the United States by daily

13  basis?

14  A.  Five to ten ounces every other day.

15  Q.  Let's go with five ounces every other day.  So it's every

16  other day, five ounces in a month, would be -- let's see here.

17  . .

18  A.  30.

19  Q.  So five ounces times 15 days in a month that you're

20  receiving those five ounces times 12 months in a year; is that

21  correct?

22  A.  Yes, sir.

23  Q.  All right.  With the assistance of Mr. Foster's calculator

24  that he's provided me, it would appear that five ounces over a

25  15 day interval during the month, times 12 months equals 900

1    ounces in a year.  Does that sound about right?

2    A.  Yes, sir.

3    Q.  That would be on the low side, correct?

4    A.  Yes, sir.

5    Q.  Now, you mentioned at the beginning when you were selling

6    with the BA that you were selling or buying -- pardon me, you

7    were selling the heroin at $800 an ounce.

8    A.  Yes, sir.

9    Q.  And 900 ounces times $800 per ounce, roughly, $720,000 per

10   year that you were selling those drugs for.  Does that sound

11   correct?

12   A.  Yes, sir.

13   Q.  We double that, because it's two years that you're on the

14   street, 720, doubled, would be $1.44 million; is that correct?

15   A.  Yes, sir.

16   Q.  I would like to show you my math, see if we can all figure

17   it out.  So 24 months worth is what we're looking for.  Five

18   ounces every other day, correct?

19   A.  Yes, sir.

20   Q.  That would be the low side.  The high side would be ten

21   ounces every other day.

22   A.  Yes.

23   Q.  Five ounces a day every other day would be 15 days in the

24   month, times 12 months, would be 900 ounces throughout the

25   year.  Two-year totals 900 ounces -- the revenue coming in 900

1   ounces at $800 an ounce, $720,000 a year?

2   A.  Yes, sir.

3   Q.  Over the two-year period, double the 720 and end up with

4   $1.44 million?

5   A.  Yes, sir.

6   Q.  That would be the low side.  The high side would be double

7   that, correct?

8   A.  Yes, sir.

9   Q.  2.88 million, correct?

10  A.  Yes, sir.

11  Q.  Now, that's your revenue; is that right?

12  A.  Yes.

13  Q.  That's how much you're bringing in?

14  A.  Yes.

15  Q.  What was your profit on that?

16  A.  It was, approximately, $100 per ounce.

17  Q.  $100 per ounce?

18  A.  Yes, at first.

19  Q.  Now, you made more profit once you started buying from

20  Scrappy?

21  A.  Yes, sir.

22  Q.  What did that price go?

23  A.  I was buying it for 700 and it dropped to 640 an ounce.

24  Q.  Let's be conservative again.  Keep it at a hundred, total

25  profits on 900 ounces, approximately $90,000; is that right?

1    A.   Yes, sir.

2    Q.   And a two-year period?  We double that to 180,000.

3    A.   Yes, sir.

4    Q.   Mr. Lopez, on the low side we're looking at, approximately,

5    um, 1800 ounces of heroin in a two year period; is that right?

6    A.   Yes, sir.

7    Q.   How many ounces are in a kilo?

8    A.   I don't know.  Honestly, I don't know.  We were buying it

9    by ounces.

10   Q.   Okay.  I offer this particular exhibit.

11          MR. SKARET:  May I approach the clerk?  I offer

12   Government's Exhibit 32.

13          THE COURT:  Any objections?

14          MR. FOSTER:  No objections, Judge.

15          THE COURT:  Government's Exhibit 32 will be admitted.

16   Q.   (By Mr. Skaret)  Have you ever heard of a guy named Sinner?

17   A.   Yes, sir.

18   Q.   How many Sinners do you know?

19   A.   One.

20   Q.   And tell us about Sinner.

21   A.   He's an ex-BA-member.

22   Q.   Did he sell drugs?

23   A.   Yes, sir.

24   Q.   Who did he sell drugs mostly with?

25   A.   Well, when he was a BA member, with Zuniga and Pollo.

```
1    Q.  And was he in El Paso BA or Juarez BA?

2    A.  El Paso.

3    Q.  All right.  Um, why is it that he was made an ex-member?

4    A.  I can't remember.

5    Q.  Haven't you told us earlier he was trying to make up his

6    own gang?

7              MR. FOSTER:  Objection, leading.

8              THE COURT:  Don't lead your witness.  I'll sustain.

9    Q.  (By Mr. Skaret)  Did Zuniga ever talk to you about his

10   desire to take out Sinner?

11   A.  Yes, sir.

12   Q.  What did you say about that?

13   A.  It was okay.

14   Q.  When you were the leader of El Paso, did the BA operate a

15   little differently in Juarez than it did in El Paso?

16   A.  Yes, sir.

17   Q.  What was different about the BA in Juarez than El Paso?

18   A.  More violent.  They were at war with -- like I said, with

19   the Sinaloa Cartel.

20   Q.  When Zuniga said he wanted to take out Sinner, what did

21   that mean?

22   A.  He wanted to kill him.

23   Q.  Did Spooky ever approve of Zuniga and the Juarez side of

24   the BA coming to El Paso to conduct hits?

25   A.  Um, I -- I never -- no.
```

1    Q.  Did he ever tell you that was okay with respect to Sinner?

2    A.  Yes.

3              MR. SKARET:  Pass the witness.

4              THE COURT:  All right.  Ladies and Gentlemen of the

5    Jury, it's 12:15.  We're going to go ahead and break for lunch.

6    Remember, you remain under the instructions the Court has

7    previously given you.  And we will see you back at 1:15.

8              (Jury leaves courtroom.)

9              (Recess for lunch.)

10             (Jury enters courtroom.)

11             THE COURT:  You may be seated.  You may proceed.

12                        CROSS-EXAMINATION

13   BY MR. FOSTER:

14   Q.  Mr. Lopez, why did you join the Barrio Azteca?

15   A.  What did I do?

16   Q.  Why did you join?

17   A.  Power.

18   Q.  I was noticing on your criminal history report you said you

19   had one theft that you were found guilty of.

20   A.  Yes, sir.

21   Q.  That would be -- you're talking about the 1997 theft?

22   A.  I believe so.

23   Q.  And wasn't that conviction for theft with two or more

24   previous convictions?

25   A.  No, sir.

1    Q.  It wasn't?

2    A.  It was a felony.  They brought me down to misdemeanor

3    because I have a problem with identity theft.  Someone else was

4    using my name.

5    Q.  So there is a theft case in January 27, 1999.  It says you

6    did 12 days.  Was that your conviction or somebody else's?

7    A.  I can't remember.

8    Q.  You, basically, testified that you were hooked on heroin

9    and methadone.  How long did you use heroin and methadone?

10   A.  Heroin, early 90s till 2000.  And methadone from 2002 to

11   the day of my arrest.

12   Q.  In fact, when you were arrested, you were -- you were high

13   on something, weren't you?

14   A.  When I got arrested, no.  I was sick because I hadn't taken

15   my dose of methadone.

16   Q.  So you were going through DTs?

17   A.  I took my dose that day.  And I withdrew.  I went into

18   withdrawals in the county jail.

19   Q.  So did the Government take you for more methadone

20   treatments?

21   A.  No, sir.  No, sir.

22   Q.  They just let you sweat out the DTs in jail?

23   A.  Yes, sir.

24   Q.  You said you proved yourself by being an earner?

25   A.  Yes, sir.

1   Q.  You never proved yourself by drawing blood?

2   A.  No, sir.

3   Q.  You held rank?

4   A.  Yes, sir.

5   Q.  On the photograph it showed you with your tattoos; is that

6   still how you are today?

7   A.  I only have one tattoo.

8   Q.  You don't have any feathers?

9   A.  No, sir.  That was my brother.

10  Q.  You don't have any feathers?

11  A.  No, I don't.

12  Q.  I believe it was in Exhibit 6RR.  You said that's the

13  secret handshake?

14  A.  Yes, sir.

15  Q.  Just looping the thumbs over?

16  A.  No, the two and the one with the fingers.

17  Q.  Oh, you've got to have the other hands involved, right?

18  A.  Yes, sir.

19  Q.  Okay.  No full arm kind of deal?

20  A.  No, sir.

21  Q.  And is it correct that Carlos Pereya was the one who gave

22  you rank?

23  A.  Yes, sir.

24  Q.  Now, you talked about supervising or administering some

25  beat downs to a guy named Chapo.

1   A.   Chato.

2   Q.   And another one named Pelon?

3   A.   Yes, sir.

4   Q.   Where was it that you took them for these disciplinary beat

5   downs?

6   A.   Payaso's house.

7   Q.   The same Payaso that keeps the bank?

8   A.   Yes, sir.

9   Q.   Was he keeping the bank at that time?

10  A.   Yes, sir.

11  Q.   You didn't think of that as being a little reckless?

12  A.   Well, we had ordered Payaso to move the bank, move the

13  money, move the ledger somewhere else, not to keep it at his

14  house.  It was up to him if he didn't do it.

15  Q.   When you collect quota, what do you base your quota on?

16  A.   The amount of drugs that particular person or store, as we

17  call it, is selling.

18  Q.   And what percentage?

19  A.   It's usually $50, 50 and above.

20  Q.   $50.  You don't place it on a percentage?

21  A.   No.

22  Q.   Let's say you found out they were making $600 a week off of

23  selling drugs.  How much would you want quota?

24  A.   $50, $70.

25  Q.   Not half of it?

1    A.  No, sir.

2    Q.  When the money -- well, let me ask you.  Well -- that's all

3    right.  When the money was sent to the penitentiary for

4    commissary, how much is supposed to be sent?

5    A.  For ranking members it was $150 a month.  For the capos,

6    was $100 a week.

7    Q.  So the capos then would, on average, would get about four

8    hundred a month?

9    A.  On average, more or less.

10   Q.  Except for those months where you had a fifty week?

11   A.  Exactly.

12   Q.  Okay.  Let's talk about the phone call that you had with

13   Mr. Renteria on a cell phone.  You know which one I'm talking

14   about?

15   A.  No.

16   Q.  Let's see.  Can you see the phone call on your monitor?

17   A.  Yes, sir.

18   Q.  You start to recall that phone call now?

19   A.  Yes, sir.

20   Q.  All right.  If you could scroll to the lower part of the

21   page, please.  What you're talking about, you are talking about

22   there -- that's where you're talking about Mr. Renteria may be

23   getting out shortly; is that right?

24   A.  Yes, sir.

25   Q.  And what were you going to do for him?

1    A.  I was going to send him some clothes for when he got out.

2    Q.  And, actually, you offered to send him some clothes; didn't

3    you?

4    A.  Actually, he sent me a copy, a receipt of the clothes he

5    wanted.

6    Q.  And you're talking about getting some him clothes for when

7    he gets out?

8    A.  Yes, sir.

9    Q.  Did you ever get those clothes to him?

10   A.  No.

11   Q.  In fact, you-all make a joke, if I don't get it, just walk

12   out in the boxers, right?

13   A.  Yes.

14   Q.  Before that, when you're talking about this thing didn't

15   work, didn't he ask you to send him some prescription glasses?

16   A.  Can you repeat that again?

17   Q.  Didn't he ask you to send him some prescription glasses?

18   A.  Before this, yes.

19   Q.  Isn't that what you're talking about there, is don't send

20   them to the front part because he won't get them.  You've got

21   to send them through the medical.  He's telling you the other

22   address?

23   A.  On this call?

24   Q.  Yes, sir.

25   A.  I don't see nothing like that.

1    Q.  Now, you talked about a FedEx shipment with some Pond's

2    Cream and heroin secreted inside.

3    A.  Yes, sir.

4    Q.  You were supposed to be sending that, right?

5    A.  Yes, sir.

6    Q.  You got someone else to send it?

7    A.  Yes, sir.

8    Q.  You talked about using Pond's Cream because it was thick

9    and you could see -- couldn't see things if you put a light

10   through it.

11   A.  Yes, sir.

12   Q.  What about x-rays?

13   A.  I don't know about x-rays.

14   Q.  You don't think you could see things if you had x-rays?

15   A.  Maybe.

16   Q.  FedEx is delivered how soon?

17   A.  Depends how soon you want it there.  It can be overnighted.

18   Q.  Doesn't take a week?

19   A.  We didn't overnight it.  It wasn't priority mail.

20   Q.  So how long would that take?

21   A.  Just regular mail, it could take about three days.

22   Q.  Regular mail is not FedEx, okay.  So did you send this by

23   FedEx or regular?

24   A.  To my -- FedEx.

25   Q.  Okay.  You said Shotgun would tell what you to send; is

1    that correct?

2    A.  Yes, sir.

3    Q.  I understand there was a mix-up on the address.  The wrong

4    address was put on there somewhere.

5    A.  No, they -- on the call it said it was the right address.

6    We're just rerouteing it because I guess they never got it.

7    Q.  Did you get disciplined for not getting that shipment

8    through?

9    A.  No, sir.

10   Q.  Now, you also were responsible for sending what was

11   supposed to be six grams of heroin that got sent in a book.  Do

12   you recall that one?

13   A.  Yes, sir.

14   Q.  And that one didn't get through either; did it?

15   A.  No, sir.

16   Q.  And you said they discovered it wasn't six grams, it was

17   how much?

18   A.  Four grams.

19   Q.  Did you get disciplined for that?

20   A.  No, sir.

21   Q.  Did you know David Rios?

22   A.  David who?

23   Q.  Reyes?

24   A.  Night Owl.

25   Q.  I don't know his moniker.

1    A.  Yes, sir.

2    Q.  He has a brother that got exed; is that correct?

3    A.  Yes, sir.

4    Q.  What's his brother's name?

5    A.  Petey.

6    Q.  And you know about Petey shooting up David Reyes' house?

7          MR. SKARET:  Object with respect to the David Reyes.

8    I believe the evidence was Daniel Reyes.

9          MR. FOSTER:  You know what, I'm --

10         THE COURT:  So noted for the record.

11         MR. FOSTER:  It's my glasses, not my writing.

12         THE COURT:  So noted.

13   Q.  (By Mr. Foster)  Are you aware of Daniel Reyes' house being

14   shot up by his brother?

15   A.  No, sir.

16   Q.  Now, let's see, there was a phone call.  I believe I've got

17   20A-5.  Can you see that on your monitor?

18   A.  Yes, sir.

19   Q.  Do you remember this phone call that we're talking about?

20   A.  Yes, sir.

21   Q.  Talks about -- someone said we will give him a taste of his

22   own chocolate?

23   A.  Yes, sir.

24   Q.  Who are they talking about there?

25   A.  Reyes, Night Owl.

1    Q.   This is Daniel Reyes?

2    A.   I don't know if it's Daniel, David.  But it's Night Owl.

3    Q.   Okay.  Um, so they're basically going to give him a taste

4    of his own medicine; is that right?

5    A.   Basically.

6    Q.   Did he kill somebody?

7    A.   No, sir.

8    Q.   So they're not necessarily talking about killing him either

9    then, are they?

10   A.   Yes, they are.

11   Q.   They're going to give him a taste of his own medicine?

12   A.   Well, if you scroll down, it says they're going to take him

13   shopping.

14   Q.   Take him shopping?

15   A.   Yes.  And that's a code word for killing.

16   Q.   Okay.  When was this phone call; do you recall?

17   A.   I don't know the date.

18   Q.   You're, basically, testifying to it because you recognize

19   the voices on it; is that right?

20   A.   Yes, sir.

21   Q.   Translating the slang?

22   A.   Yes, sir.

23   Q.   Not because you were a party to this phone call?

24   A.   No, sir.

25   Q.   When did Chino get arrested in Juarez?

```
 1    A.  After the consulate murders.  I don't know exactly what
 2    date.
 3    Q.  Year?
 4    A.  After the consulate murders.  I don't know exactly the
 5    date.
 6    Q.  That took place while you've been in jail; is that not
 7    true?
 8    A.  I wasn't in a jail.
 9    Q.  You weren't in jail when that happened?
10    A.  The consulate murders?
11    Q.  Yes.
12    A.  No, sir.
13    Q.  You ever talk to anyone on a prison phone?
14    A.  Yes, sir.
15    Q.  But you've never actually been in prison to use a phone,
16    have you?
17    A.  No, sir.
18    Q.  You've been in county jail?
19    A.  Yes, sir.
20    Q.  Used that phone system to call?
21    A.  Yes, sir.
22    Q.  Can you call Juarez from there?
23    A.  No, sir -- oh, yeah, I'm sorry.  You can call anywhere you
24    want if you have enough money in your -- in your phone card.
25    Q.  Those phone calls are recorded, aren't they?
```

1  A.  Yes, sir.

2  Q.  Now -- and you know they're recorded before you make those

3  calls, don't you?

4  A.  It tells you, yes.

5  Q.  You -- you ever been over to Juarez before?

6  A.  Yes, sir.

7  Q.  Use a cell phone in Juarez?

8  A.  I haven't been over there in about 12, 15 years, more or

9  less.

10  Q.  You ever talk to anyone who's using a US cell phone in

11  Juarez?

12  A.  Yes, sir.

13  Q.  You know what happens to the signal after you start getting

14  past 16 de Septiembre?

15      MR. FOSTER:  That's 16th of September for the court

16  reporter.

17  A.  No, sir.  I don't know.

18  Q.  In the phone call that you referenced, it started off as RR

19  and UM for unknown male.  Do you know which one I'm talking

20  about?

21  A.  No, sir.

22  Q.  Let's see.  I believe -- I believe it's going to be 20A-3.

23  No, that's not -- I'm sorry.  20A -- 23A-2.

24      Okay.  Do you see that on your screen?

25  A.  Yes, sir.

CROSS MARTINEZ

```
 1    Q.  If you would, you see where the page break is in the middle
 2    of the screen?
 3    A.  Yes, sir.
 4    Q.  What does it say in the parenthetical?
 5    A.  In Spanish?
 6    Q.  No, in English.
 7    A.  Kids in background, also people talking.
 8    Q.  They let children in over at Cereso prison?
 9    A.  Um, I don't know.
10    Q.  You think they have family cells over there?
11    A.  I don't think so.
12    Q.  So when you testified this is a phone call between Ramon
13    Renteria and Chino Valles and Chino's in prison --
14    A.  Yes, sir.
15    Q.  -- you really don't know that, do you?
16    A.  80 to 90 percent sure.
17    Q.  So they would have children in there?  You see the place in
18    that phone call where he says he's got one in his arms?
19    A.  Where at?
20    Q.  I don't know.  I'm asking you.  I've seen it in there.  I
21    remember it.  You've gone through this phone call several
22    times, haven't you?
23    A.  Couple of times.
24    Q.  All right.  We'll move on.  So when Ramon Renteria came
25    back, he's supposed to be laying low, right?
```

1    A.  Yes, sir.

2    Q.  So is getting into the business of selling drugs laying

3    low?

4    A.  No.

5    Q.  Do captains open stores?

6    A.  If they want to, yes.

7    Q.  If they want to?

8    A.  Yes.

9    Q.  But that's not what captains do; they direct, right?

10   A.  Yes, sir.

11   Q.  And when the bank got raided and seized, you -- it was you

12   that decided to send somebody over to check things out, right?

13   A.  Zuniga and myself, yes.

14   Q.  And you assumed it upon yourself to make orders to take the

15   bank and secrete that if they could, right?

16   A.  Take the bank to what?

17   Q.  To go ahead and take control of the bank if they could

18   because Payaso had been arrested, right?

19   A.  Yes, sir.

20   Q.  And you were the one directing people to do things; is that

21   correct?

22   A.  Was I the one directing people to do things?

23   Q.  Yes.

24   A.  Yes, sir.

25   Q.  And you didn't talk to Ramon Renteria about this until much

1   later.  Is that your testimony -- until much later; wasn't that
2   your testimony?
3   A.  Yes, sir.
4   Q.  When it came to -- strike that.
5        There were several complaints among the -- the BA to
6   you that Ramon Renteria wasn't really controlling anything,
7   wasn't there?
8   A.  I -- I really don't remember on that.
9   Q.  Well, I got that off of your statement.  I can show you to
10  refresh your memory if that's necessary.
11  A.  If you could, please.
12       MR. FOSTER:  And it will take me a few minutes, Judge,
13  to get through that.
14  Q.  Tell you what, I will come back to that.
15       When you talked about your money, remember when you
16  were doing all the adding up of the money and everything with
17  Mr. Skaret?
18  A.  Yes, sir.
19  Q.  Basically, didn't you have your brother, Omar, taking care
20  of your drug sales and deals and money?
21  A.  At first, I would do it myself and then after that, after a
22  while, um, I let my brother do it.
23  Q.  Are you sure about your brother's bookkeeping?
24  A.  Pretty sure, yes.
25  Q.  Okay.  Let's see.

1          MR. FOSTER:  If I could have just a minute, Judge.
2     I'm trying to locate something.
3     Q.  You never really proved yourself in the BA way, did you?
4     A.  If you are talking about blood in, blood out, no.
5     Q.  Yeah.  That's what I'm talking about.
6     A.  No.
7     Q.  You joined the BA because you liked the idea of getting
8     power?
9     A.  Yes, sir.
10    Q.  And for a while you had that power, didn't you?
11    A.  Yes, sir.
12    Q.  But, according to your testimony, Ramon Renteria came and
13    took that power away, didn't he?
14    A.  He didn't take it away.  It's just the way the hierarchy
15    works.
16    Q.  Basically, you bought and sold drugs and told people to go
17    beat up other people and take care of business like that,
18    didn't you?
19    A.  Took care of BA business, yes, sir.
20    Q.  Controlled the money?
21    A.  The -- whoever took care of the ledger was the one that
22    controlled the money.
23    Q.  And, according to what I read in the statements, I believe
24    you said that whoever controls El Paso, controls -- downtown El
25    Paso controls all of El Paso and New Mexico; is that right?

1    A.  Whoever is in charge of the streets in El Paso, is in

2    charge of West Texas and New Mexico, yes.

3    Q.  And so long as you were in charge of El Paso, you were

4    fairly safe from anybody else touching you; isn't that correct?

5    A.  Not really.  Because there's higher ranks.  I mean, they

6    can send you the discipline from prison, a capo or higher rank

7    than you.

8    Q.  As long as you were in control and took care of business,

9    you were okay?

10   A.  As long as I took care of business, yes.

11   Q.  And you spent your time there hiding behind the badge of

12   the BA, right?

13   A.  Yes, sir.

14   Q.  Thank you.

15          MR. FOSTER:  Pass the witness.

16          THE COURT:  All right.  Mr. Skaret?

17                    REDIRECT EXAMINATION

18   BY MR. SKARET:

19   Q.  I would like to direct you to Exhibit 23A-1?

20          THE COURT:  All right -- -A-2.

21          MR. SKARET:  A-2, which is on the screen.

22   Q.  (By Mr. Skaret)  Mr. Lopez, I'm showing you what's been

23   marked as if A-2, which is on the screen and admitted into

24   evidence.  You see the date at the top of this transcript?

25   A.  Yes.

1  Q.  And what date is that?

2  A.  March 8, 2010.

3  Q.  Now, you mentioned that Chino Valles was locked up for the

4  consulate murders?

5  A.  Yes, sir.

6  Q.  Are you co-defendants with Chino Valles in this case?

7  A.  Yes.

8  Q.  If the consulate murders occurred on March 13, 2010, he

9  would not have been locked up, right?

10  A.  Right.

11  Q.  So is it possible that Chino Valles was out of jail during

12  this call?

13  A.  Yes.

14  Q.  And whether Chino Valles is in or out of jail, does it

15  change your mind that Ramon Renteria called Chino Valles

16  March 8, 2010, five days before the consulate murders?

17  A.  No, sir.

18          MR. SKARET:  No more questions.

19          THE COURT:  Anything else of this witness?

20          MR. FOSTER:  No further questions of this witness,

21  Judge.

22          THE COURT:  May he step down?  And is he released?

23          MR. FOSTER:  I have no objection to his being excused.

24          MR. SKARET:  Yes, Your Honor.

25          THE COURT:  You may step down.  You're released as a

```
 1   witness.
 2           Government may call their next witness.
 3           MR. LEAL:  Government calls Albert Mendoza.
 4           (Witness sworn.)
 5           THE COURT:  Whenever you're ready.
 6                     ALBERTO MENDOZA, SWORN
 7                     DIRECT EXAMINATION
 8   BY MR. LEAL:
 9   Q.  Mr. Mendoza, would you introduce yourself to the jury,
10   please?
11   A.  My name is Alberto Mendoza.
12   Q.  How old are you?
13   A.  30, sir.
14   Q.  Where you currently living?
15   A.  In El Paso County Jail.
16   Q.  I want to turn your attention to your criminal history.
17   Um, you've got criminal history dating back to when you were a
18   juvenile; is that right?
19   A.  Yes, sir.
20   Q.  You've been convicted of a burglary of a building?
21   A.  Yes, sir.
22   Q.  You've had some evading arrests or detentions; is that
23   right?
24   A.  Yes, sir.
25   Q.  Additionally, you had burglaries of a vehicle?
```

```
 1    A.  Yes, sir.

 2    Q.  Unauthorized use of a vehicle?

 3    A.  Yes, sir.

 4    Q.  Possession of marijuana?

 5    A.  Yes, sir.

 6    Q.  Evading arrest and detention?

 7    A.  Yes, sir.

 8    Q.  Unlawful carrying of a weapon?

 9    A.  Yes, sir.

10    Q.  Also, some charges for engaging in organized criminal

11    activity; is that right?

12    A.  Yes, sir.

13    Q.  Um, in -- have you been to the Texas Department of Criminal

14    Justice?

15    A.  Yes, sir.

16    Q.  And why did you get sent to the Texas Department of

17    Criminal Justice?

18    A.  Ten years, sir.

19    Q.  And what offense did you get sent down there, sir?

20    A.  Sir?

21    Q.  What offense?

22    A.  Aggravated assault with a deadly weapon.

23    Q.  Was that also aggravated assault on a public servant?

24    A.  Yes, sir.

25    Q.  That was a two-count charge?
```

```
 1    A.  Yes, sir.

 2    Q.  And you pled to both counts?

 3    A.  Yes, sir.

 4    Q.  Um, and have you pled guilty, um, in this particular case

 5    in front of Judge Cardone?

 6    A.  Yes, sir.

 7    Q.  And, specifically, do you recall pleading guilty to what's

 8    kindly referred to as a RICO charge?

 9    A.  Yes, sir.

10    Q.  Did you also plead guilty to conspiracy to import?

11    A.  Yes, sir.

12    Q.  And conspiracy to possess with intent to distribute?

13    A.  Yes, sir.

14    Q.  And money laundering?

15    A.  Yes, sir.

16    Q.  And in exchange for that plea agreement, how much time did

17    the Government agree to recommend that you receive?

18    A.  20, sir.

19    Q.  I'm sorry?

20    A.  20.

21    Q.  240 months?

22    A.  Yes, sir.

23    Q.  All right.  And you understand that that's a recommendation

24    the Government did make and the ultimate decision on that is up

25    to the Court?
```

```
1    A.  Yes, sir.
2    Q.  Additionally, um, were you also told that in exchange for
3    your testimony, that the Government would make an application
4    for the witness security program?
5    A.  Yes, sir.
6    Q.  And you understand that that's -- we can make the
7    application, but whether or not you get admitted or not, is up
8    to them?
9    A.  Yes, sir.
10   Q.  And, additionally, um, are you here basically testifying
11   out of the goodness of your heart or hoping to get something
12   out of it?
13   A.  Just for my heart, sir.
14   Q.  Okay.  Are you also hoping to get a sentence reduction?
15   A.  Yes, sir.
16   Q.  And you understand that's also up to the Court?
17   A.  Yes, sir.
18   Q.  And the ultimate decision rests with the Court?
19   A.  Yes, sir.
20   Q.  All right.  Um, let me ask you this.  Are you or have you
21   been at one point in time a member of the BA criminal
22   enterprise?
23   A.  Yes, sir.
24   Q.  When did you start running with the BA?
25   A.  In '98, sir.
```

1    Q.  1998?

2    A.  Yes, sir.

3    Q.  One more thing I forgot to cover with you.  Um, we're going

4    to be getting into your disciplinary history so I don't forget

5    about this one, have you been recently disciplined at the El

6    Paso County Sheriff's Department?

7    A.  Yes, sir.

8    Q.  And what were you disciplined for?

9    A.  Contraband, sir.

10   Q.  What kind of contraband was that?

11   A.  Club and some glue and some rolled up paper.

12   Q.  When you're talking about a club, what kind of club?

13   A.  It was just paper rolled up.

14   Q.  And what were you using that for?

15   A.  For to lift a bag of water.

16   Q.  And what were you using that to lift water for?

17   A.  Workout.

18   Q.  To do curls?

19   A.  Yes, sir.

20   Q.  And did the sheriff's department consider that a weapon,

21   basically?

22   A.  Yes, sir.

23   Q.  How much time did you get for that -- what were your

24   disciplined for?

25   A.  Five days.

David A. Perez, RMR, RPR

DIRECT - GILBERTO MENDOZA

1    Q.  Five days?

2    A.  Yes, sir.

3    Q.  Take away privileges from you?

4    A.  No, sir -- yes, sir.

5    Q.  Getting back to your membership with the Barrio Azteca

6    criminal enterprise, when did you say you joined up with them?

7    A.  '98, sir.

8    Q.  Why did you join up with them?

9    A.  Because -- I don't know.  I guess I wanted to fit in.

10   Q.  Were you out on the streets or in jail?

11   A.  Jail.

12   Q.  What were you in jail for?

13   A.  Ag assault with deadly weapon.

14   Q.  And how did you go about hearing about the BA in jail?

15   A.  They're everywhere in jail.

16   Q.  Who's we?

17   A.  I said they're everywhere in jail.

18   Q.  Did you have a particular contact in jail that brought you

19   in?

20   A.  Yes, sir.

21   Q.  Who was that?

22   A.  Chuco Montes.

23   Q.  And Chuco Montes, how was it that he went about bringing

24   you in?

25   A.  I just talked to him about I wanted to get in.  He told me

1    he would take care of everything.

2    Q.  And did you get in?

3    A.  Yes, sir.

4    Q.  How long did it take you to get in?

5    A.  I got in in June 2000.

6    Q.  Is there something that you had to do in order to get in?

7    A.  Yes, sir.

8    Q.  What did you have to do?

9    A.  Different kinds of things.  Anything they needed you to do.

10   Q.  What kind of different kinds of things did you do?

11   A.  Assaulting people and stuff like that.

12   Q.  Um, how many people would you say you assaulted?

13   A.  Maybe three.

14   Q.  With your hands or with weapons?

15   A.  With my hands.

16   Q.  And the people that you assaulted, um, what did you wind up

17   doing, beating them up breaking bones?

18   A.  Just beating them up.

19   Q.  Where?

20   A.  In the county jail.

21   Q.  And that was at the request of who?

22   A.  Um, different people.  Chuco Montes and other people.  I

23   don't remember their names.

24   Q.  Chuco Montes, did he have any kind of rank at the time?

25   A.  Yes, sir.

```
1    Q.   What kind?

2    A.   He was a sergeant.

3    Q.   Does the Barrio Azteca have a rank system?

4    A.   Yes, sir.

5    Q.   All right.  Who's at the top?

6    A.   Um, T-tops.

7    Q.   Okay.  You don't have to give me everybody.  I'm just

8    talking about the basic structure.  Who's at the top?

9    A.   Captains.

10   Q.   Okay.  Who's the highest captain?

11   A.   T-top.

12   Q.   What's he called?

13   A.   Capo mayor.

14   Q.   And beneath him, um, are there -- is there another set?

15   A.   Yes, sir.

16   Q.   And how many captains are those?

17   A.   I don't remember how many there are.

18   Q.   Do you remember some of their names?

19   A.   Yes, sir.

20   Q.   Who are they?

21   A.   Spooky, um, Tolon, Shotgun, Longo.

22   Q.   All right you've made a reference to Spooky.  Do you see a

23   person that you recognize in the courtroom here today as

24   Spooky?

25   A.   Yes, sir.
```

1   Q.  Could you point that person out and identify this person by

2   something he's wearing as well as where he's sitting down or

3   standing?

4   A.  Yes, sir.  He's wearing a suit.

5   Q.  Where is he sitting?

6   A.  Over there, sir.

7   Q.  Okay.  Um, is he -- is there anybody sitting next to him?

8   A.  Yes, sir, his lawyer with glasses.

9           MR. LEAL:  May the record reflect the witness

10  identified the defendant?

11          THE COURT:  It will so reflect.

12  Q.  (By Mr. Leal)  In regards -- so you've got the captains

13  beneath him and what goes beneath that?

14  A.  Lieutenants, top lieutenant.

15  Q.  Beneath that?

16  A.  Lieutenants.

17  Q.  And then is there anything beneath the lieutenant?

18  A.  Yes, sir.

19  Q.  What's beneath that?

20  A.  Sergeants.

21  Q.  Then?

22  A.  Soldiers.

23  Q.  And what's --

24  A.  Escinas.

25  Q.  Anything beneath escinas?

DIRECT - GILBERTO MENDOZA

1    A.  No, sir.

2    Q.  So when you started out in 1998, did you -- what did you

3    start out as?

4    A.  Escina.

5    Q.  And you had to do assaults.  Anything else?

6    A.  Move letters and stuff they needed moved.

7    Q.  Why do they need letters moved?

8    A.  To get communication with other people.

9    Q.  Where were would you move letters to and from?

10   A.  In the jail.

11   Q.  All right.  And is that, basically, how the Barrio Azteca

12   communicates?

13   A.  Yes, sir.

14   Q.  Did you do anything else?

15   A.  No, sir.

16   Q.  What else did you do?

17   A.  Nothing else.

18   Q.  All right.  So you got admitted in 2000.  And prior to

19   getting admitted in 2000, you said you had been in jail.  Did

20   you go anywhere as a prospect for the BA after you entered

21   jail?

22   A.  No, sir.

23   Q.  Did you wind up going to penitentiary?

24   A.  Yes, sir.

25   Q.  When?

1   A.   In January 4, 2000.

2   Q.   By that time were you already a full-fledged BA member?

3   A.   No.

4   Q.   So you went to the penitentiary as a prospect?

5   A.   Yes, sir.

6   Q.   Um, who did you meet up with at the penitentiary?

7   A.   A lot of other Aztecas.

8   Q.   When you met up with the others, were they able to identify

9   you as a prospect?

10   A.   Not that time, sir.

11   Q.   Okay.  Did you wind up coming back to the county at some

12   point?

13   A.   Yes, sir.

14   Q.   And what did you get back for?

15   A.   They wanted to see if I would testify against my

16   co-defendant.

17   Q.   Against your co-defendant in the case that you had gone to

18   the penitentiary for?

19   A.   Yes, sir.

20   Q.   And when you got brought back to the county, is that when

21   you were admitted?

22   A.   Yes, sir.

23   Q.   Did you have a sponsor?

24   A.   Yes, sir.

25   Q.   What's a sponsor called?

DIRECT - GILBERTO MENDOZA

```
 1    A.  The one that just says that it's okay to pick you up.

 2    Q.  Okay.  Is that called a godfather?

 3    A.  Yes, sir.

 4    Q.  Who is your godfather?

 5    A.  Chuco Montes.

 6    Q.  Were there any witnesses?

 7    A.  Yes, sir.

 8    Q.  Who?

 9    A.  Chato Salas, Guelo and Conde.

10    Q.  And why does there need to be witnesses?

11    A.  So they can tell who you are.

12    Q.  So they can tell who -- who you are?

13    A.  Yes, sir, and who picked you up.

14    Q.  Why do they need to know that?

15    A.  So it would be easier to identify you.

16    Q.  All right.  So once you have your godfather and your

17    witnesses, is there anybody else there?

18    A.  No, sir.

19    Q.  Is that information sent anywhere?

20    A.  Yes, sir.

21    Q.  Do they keep a record of that?

22    A.  Yes, sir.

23    Q.  Where is that information sent?

24    A.  Coffield, sir.

25    Q.  What's Coffield?
```

1    A.  The head, the table.

2    Q.  And it's the head; it's the table.  Is Coffield a place?

3    A.  Yes, sir.

4    Q.  What place is it?

5    A.  The penitentiary.

6    Q.  All right.  And you said it's the head or the table.  What

7    does that mean?

8    A.  It's where all the communication goes to.

9    Q.  Is that where all the Barrio Azteca membership records are

10   kept?

11   A.  Yes, sir.

12   Q.  That's kind of like your national archives, I guess?

13   A.  Yes, sir.

14   Q.  So once you get picked up here in El Paso, um, do you

15   continue to stay in El Paso or do you get shipped back to the

16   penitentiary?

17   A.  I get shipped back.

18   Q.  What penitentiary did you get shipped back to?

19   A.  Formby.

20   Q.  And where is the Formby Unit?

21   A.  In Plainview, Texas.

22   Q.  Okay.  Um, and when you get shipped back to the Formby

23   Unit, do you meet up with anyone there?

24   A.  Yes, sir.

25   Q.  Who do you meet up with there?

```
 1   A.  Um, Lobo, and different other Azteca members.

 2   Q.  Are you having to do anything for them at the Formby Unit?

 3   A.  No, sir.

 4   Q.  Do you get shipped somewhere else after the Formby?

 5   A.  Yes, sir.

 6   Q.  Where?

 7   A.  To Central Unit.

 8   Q.  Where is that?

 9   A.  In Sugarland, Texas.

10   Q.  Do you meet up with any BA at the Central Unit?

11   A.  Yes, sir.

12   Q.  And who do you meet up with there?

13   A.  Um, Smokey, and Little G and Pelon.

14   Q.  Are you required to do anything for the Barrio Azteca

15   there?

16   A.  No, sir.

17   Q.  Do you get shipped off anywhere else after that?

18   A.  Yes, sir.

19   Q.  Where?

20   A.  Hightower.

21   Q.  And this Hightower Unit, where is that at?

22   A.  In Houston, Texas.

23   Q.  How long do you spend at Hightower?

24   A.  Like a year and a half.

25   Q.  Now, the Formby Unit -- and I'm sure the other unit was
```

1    which?

2    A.  Central.

3    Q.  What types are those?

4    A.  Just minimum units.

5    Q.  Okay.  And how much time did you spend in each of those?

6    A.  I spent two years in Formby and like a year and a half at

7    Central Unit.

8    Q.  And in any of those units there's Barrio Azteca members?

9    A.  Yes, sir.

10   Q.  And did you run with them?

11   A.  Yes, sir.

12   Q.  Were they able to identify you at those units?

13   A.  Yes, sir.

14   Q.  Um, did you have to do any communication for them or

15   anything at those units?

16   A.  No, sir.  No, sir.

17   Q.  Who was in charge of those units?

18   A.  Um, at Formby it was Lobo.  And at Central Unit, it was

19   Pelon.

20   Q.  All right.  And at the Central Unit, you said Pelon was in

21   charge?

22   A.  Pelon.

23   Q.  Okay.  And what kinds of things are the Barrio Aztecas

24   doing at the Central Unit?

25   A.  Everything, drugs, shanks.

1    Q.  Drugs and shanks?

2    A.  Yes, sir.

3    Q.  How are you getting drugs at the Central Unit?

4    A.  Through other inmates.

5    Q.  And what's a shank?

6    A.  Anything, from a piece of wire to anything you can make a

7    shank out of.

8    Q.  And in regards to the shanks, what does Barrio Azteca need

9    shanks for?

10   A.  To defend themselves in case they have to do something.

11   Q.  At this particular unit, how long did you stay there?

12   A.  Like a year and a half.

13   Q.  Did you wind up having a dirty UA at this unit?

14   A.  Yes, sir.

15   Q.  And what did you test positive for?

16   A.  Marijuana.

17   Q.  Where did you get the marijuana from?

18   A.  From another inmate.

19   Q.  Was that another inmate another BA?

20   A.  No, sir.

21   Q.  Um, in regards to -- at some point in time, did you leave

22   this unit?

23   A.  Yes, sir.

24   Q.  And where did you go to from there?

25   A.  Hightower.

DIRECT 139 - GILBERTO MENDOZA

1  Q.  When you went to the Hightower unit, did you report to the
2  Barrio Azteca there?
3  A.  Yes, sir.
4  Q.  Why do you have to report when you change units?
5  A.  Because you got to make sure who's who.  That way nothing
6  will happen to you and nothing will happen to them.  They know
7  who you are.
8  Q.  Is that a requirement?
9  A.  Yes, sir.
10  Q.  In regards to getting to the Hightower Unit, um, you said
11  you spent a year and three months there?
12  A.  Yes, sir.
13  Q.  What kind of things was the Barrio Azteca into at the
14  Hightower unit?
15  A.  Shanks, sir.  They didn't have no drugs there.
16  Q.  Did you get in trouble at the Hightower Unit?
17  A.  Yes, sir.
18  Q.  And for what?
19  A.  For a fight.
20  Q.  What kind of fight?
21  A.  I was helping another gang member with a fight.
22  Q.  What was the other gang member's name?
23  A.  Michael Spignardo.
24  Q.  Spignardo?
25  A.  Yes, sir.

```
 1    Q.   Is he of Hispanic decent?
 2    A.   He's half Hispanic and half Italian.
 3    Q.   Why were you helping Mr. Spignardo at this unit?
 4    A.   Because he was a Azteca.
 5    Q.   He was a Barrio Azteca?
 6    A.   Yes, sir.
 7    Q.   And what does that have to do with you wanting to help him
 8    out?
 9    A.   He was supposed to be my brother.
10    Q.   And how was it that you wound up getting into a fight
11    because of him?
12    A.   Because I ended up calling him out.
13    Q.   You ended up calling him out?
14    A.   Yes, sir.
15    Q.   What do you mean?
16    A.   They were arguing.  And I told him he wasn't going to do
17    nothing.  And we were going to fight when we go inside.
18    Q.   Who was arguing?
19    A.   Mike Spignardo and the other guy.
20    Q.   So there was another person arguing with Spignardo?
21    A.   Yes, sir.
22    Q.   And you said you wound up calling him out?
23    A.   Yes, sir.
24    Q.   You called out Spignardo or the other guy?
25    A.   The other guy.
```

DIRECT - GILBERTO MENDOZA

```
 1    Q.  Um, and this other guy that you called out, does that mean
 2    you challenged him to fight?
 3    A.  Yes, sir.
 4    Q.  And what happened after that?
 5    A.  We went inside and we fought.
 6    Q.  Um, you and who?
 7    A.  Me and the other guy.
 8    Q.  Did you fight with your hands or did you have a weapon?
 9    A.  No, sir, just my hands.
10    Q.  And Mr. Spignardo, did he help out?
11    A.  Yes, sir.
12    Q.  Did you wind up getting in trouble for that?
13    A.  Yes, sir.
14    Q.  What happened to you?
15    A.  They locked me up for 15 days and let me out to medium
16    custody.
17    Q.  Then what happened?
18    A.  Three months later they shipped me.
19    Q.  Where?
20    A.  Coffield Unit.
21    Q.  Had you gotten in trouble -- just to take you back for a
22    second.  Had you gotten in trouble at the Central Unit as well
23    for not getting up to do work detail?
24    A.  Yes, sir.
25    Q.  What did that involve?
```

```
 1    A.  Just not going to work.  And they gave me -- took away my
 2    commissary and rec.
 3    Q.  What kind of work detail did you not want to get up?
 4    A.  The fields.
 5    Q.  Why didn't want to get up to do that?
 6    A.  It was too early.
 7    Q.  So you told -- basically, you told the guards I'm not
 8    getting up?
 9    A.  Yes, sir.
10    Q.  Um, and you made the decision that you weren't going to go
11    to work?
12    A.  Yes, sir.
13    Q.  All right.  So you had this fight -- we will move on.  You
14    had the fight at Hightower, get shipped off to where?
15    A.  Coffield, sir.
16    Q.  And when you get to Coffield Unit, how much time do you
17    spend there?
18    A.  Four years.
19    Q.  When you get to the Coffield Unit, you said earlier that's
20    the central place for the Barrio Azteca; is that right?
21    A.  Yes, sir.
22    Q.  Do you have to report to anybody when you get to the
23    Coffield Unit?
24    A.  Yes, sir.
25    Q.  Who?
```

1   A.  I reported to Donnie Bonilla.

2   Q.  And that particular person that you reported to, was that a

3   prison guard; is that Barrio Azteca; who is that?

4   A.  It's a Barrio Azteca member.

5   Q.  And is that the person who was in charge of the unit?

6   A.  Yes, sir.

7   Q.  And when you report to him, were you given any type of

8   assignment?

9   A.  No, sir.  They just sent you a whole bunch of papers you

10  got to read.

11  Q.  What type of papers did they give you?

12  A.  The rules and manifest and everything that you had to read.

13  Everything that the Barrio Azteca is involved in.

14  Q.  And when you talk about the rules, are you talking about

15  sacred rules?

16  A.  Yes, sir.

17  Q.  Um, do you recall any of those?

18  A.  No, sir.

19  Q.  So you read those and you read some manifests?  What do you

20  mean by manifest?

21  A.  The peace treaty with the Mexican Mafia and Texas

22  Syndicate.

23  Q.  Why was it important that you be aware of the peace treaty

24  with the Mexican Mafia and Texas Syndicate?

25  A.  So you know what's involved between both families.

```
 1    Q.  All right.  Um, so that way you don't wind up breaking the
 2    treaty?
 3    A.  Yes, sir.
 4    Q.  Um, what kind of stuff was the Barrio Azteca into at the
 5    Coffield Unit besides those things?
 6    A.  Cell phones, shanks, drugs.
 7    Q.  All right.  Let's talk about the cell phones, um, and the
 8    shanks and the drugs.  Um, what would the Barrio Azteca need
 9    cell phones for at the Coffield Unit?
10    A.  Communication.
11    Q.  With who?
12    A.  With Barrio Azteca and family on the outside.
13    Q.  For people on the outside?
14    A.  Yes, sir.
15    Q.  And this time frame that you were there at the Coffield
16    Unit, um, do you recall the years you were there?
17    A.  Um, from 2005 all the way to 2009.
18    Q.  You said the cell phones were needed for communication
19    between Barrio Azteca on the inside and Barrio Azteca on the
20    outside, as well as family members?
21    A.  Yes, sir.
22    Q.  How do those cell phones wind up inside the Coffield Unit?
23    A.  Through guards or inmates.
24    Q.  Are you allowed to have cell phones?
25    A.  No, sir.
```

1   Q.   Are they contraband?

2   A.   Yes, sir.

3   Q.   Um, did Barrio Azteca have to pay for those cell phones?

4   A.   Yes, sir.

5   Q.   And what was the going rate for a cell phone?

6   A.   About $500.

7   Q.   Let me ask it this way.  What was the least somebody would

8   pay for a cell phone?

9   A.   500, sir.

10  Q.   What's the most?

11  A.   About 1,000.

12  Q.   And in regards to those particular cell phones, are they

13  the ancient technology cell phones or can you get Internet on

14  them?

15  A.   Yes, sir.

16  Q.   You can get Internet?

17  A.   Yes, sir, you can get everything on them.

18  Q.   Um.  And how does the BA use those to communicate?

19  A.   They call people on the outside.

20  Q.   Okay.  Do they also shoot e-mails?

21  A.   Yes, sir.

22  Q.   So phone calls and e-mails?

23  A.   Yes, sir.

24  Q.   Um, and were you ever a keeper of any of those cell phones?

25  A.   Yes, sir.

```
 1    Q.  And in regards to those particular cell phones that you
 2    kept, do you recall who some of those people were that you kept
 3    cell phones for?
 4    A.  Juana Aponde and Psycho.
 5    Q.  And those particular folks, were they Barrio Azteca?
 6    A.  Yes, sir.
 7    Q.  And did you have your own cell phone?
 8    A.  No, sir.
 9    Q.  What would you get out of keeping their phone?
10    A.  Just using it all night.
11    Q.  Did those particular individuals have rank or were they
12    just other soldiers?
13    A.  Just other soldiers.
14    Q.  What other types of things was the Barrio Azteca into there
15    at Coffield Unit?
16    A.  Moving stuff during shakedowns, shanks, drugs.
17    Q.  Stop there for minute.  Moving stuff during shakedown, what
18    do you mean?
19    A.  Like when they were shaking us down, we would move stuff to
20    the other side to the families so they can hold it for us.
21    Q.  How is that done?
22    A.  Um, we would cut the vent in the back of the cell and the
23    person behind us would have the vent cut too and send
24    everything to him in socks.
25    Q.  What types of things would you be sending back and forth?
```

```
 1   A.  Anything from drugs, shanks, cell phones.
 2   Q.  What kind of drugs?
 3   A.  Marijuana.
 4   Q.  Any cocaine?
 5   A.  Sometimes.
 6   Q.  Heroin?
 7   A.  Sometimes.
 8   Q.  Those kind of drugs, where would the Barrio Azteca get
 9   those from?
10   A.  Other families.
11   Q.  When you say other families, are you talking about Texas
12   Syndicate?
13   A.  Yes, sir.
14   Q.  Mexican Mafia?
15   A.  Yes, sir.
16   Q.  In regards to other things going on at the Coffield Unit,
17   did you wind up getting in trouble at all?
18   A.  Yes, sir.
19   Q.  What did you get in trouble for at the Coffield Unit?
20   A.  For a vent that was cut.
21   Q.  Okay.  Um, what kind of things would the Barrio Azteca talk
22   about there at the Coffield Unit?
23   A.  Everything that was happening everywhere in prison, in the
24   streets.
25   Q.  And what do you mean by everything?
```

1    A.  From people messing up, other Barrio Azteca messing up,

2    people having the green light.

3    Q.  What's a green light?

4    A.  When they're -- you got to smash them or if they're ex-gang

5    members.

6    Q.  What do you mean by smash them?

7    A.  You get to beat them up or kill them.

8    Q.  Those types of things are discussed there at the Coffield

9    Unit?

10   A.  Yes, sir.

11   Q.  Um, why are -- let me ask you this.  You said you went to

12   the the Formby Unit, the Hightower Unit, and the Central Unit

13   before Coffield, right?

14   A.  Yes, sir.

15   Q.  Are any of those kinds of things, um, discussed as formally

16   as they are, at those facilities, as they are at the Coffield?

17   A.  Not as frequently, sir.

18   Q.  Um, basically, the major decisions are going to flow

19   through Coffield?

20   A.  Yes, sir.

21   Q.  Information comes from elsewhere.  But that's, like you

22   say, La Mesa Mayor?

23   A.  Yes, sir.

24   Q.  The main table?

25   A.  Yes, sir.

```
 1   Q.  All right.  Um, why would you need to talk about who's an
 2   ex?
 3   A.  So that we you could take them out.  They're hurting the
 4   family.
 5   Q.  When you are having these meetings, um, how is this going
 6   on?  Is everybody sitting at a round table and having a
 7   meeting.  How is this happening?
 8   A.  No, sir.  Just sending kites back and fourth.
 9   Q.  What's a kite?
10   A.  A letter.
11   Q.  All right.  And how are these letters being sent back and
12   forth?
13   A.  With a line.
14   Q.  And when you say a line, what do you mean?
15   A.  String twisted up.
16   Q.  So are you-all using, then, that string to go back and
17   forth between the cells?
18   A.  Yes, sir.
19   Q.  And why is it important to send those letters back and
20   forth?
21   A.  So everybody knows what's going on.
22   Q.  Approximately, how many folks associated with Barrio
23   Azteca, when you were there, would you say were at the Coffield
24   Unit that you knew?
25   A.  About maybe 50.
```

David A. Perez, RMR, RPR

1    Q.  Barrio Azteca members?

2    A.  Yes, sir.

3    Q.  Are you familiar with a person by the name of Hector

4    Galindo?

5    A.  Yes, sir.

6    Q.  Does that person have a nickname?

7    A.  Yes, sir.

8    Q.  Did you ever meet Hector Galindo?

9    A.  Yes, sir.

10   Q.  When you met Galindo, did he have any status with the

11   Barrio Azteca?

12   A.  Yes, sir.

13   Q.  What kind?

14   A.  Sergeant.

15   Q.  Was he -- where did you meet him?

16   A.  Coffield Unit.

17   Q.  To your knowledge, do you know where he is today?

18   A.  Yes, sir.

19   Q.  Where?

20   A.  El Paso County Jail.

21   Q.  Was he charged with you in the same RICO indictment?

22   A.  Yes, sir.

23   Q.  Um, I think I heard you say it -- just in case I didn't

24   ask, does he have a nickname?

25   A.  Yes, sir.

```
1    Q.   What's his nickname?
2    A.   Silent.
3    Q.   All right.  So you're passing these kites back and forth at
4    the Coffield Unit.  Um, you're talking about green lights,
5    talking about exes, and you said that you were talking about
6    all the stuff going on on the streets.
7    A.   Yes, sir.
8    Q.   What other stuff is going on on the streets?
9    A.   Who's in charge.
10   Q.   And why are you talking about who's in charge in the free
11   world?
12   A.   Yes, sir.
13   Q.   Why is it important to talk about who's in charge in the
14   free world?
15   A.   For the people getting out, they know who to report to.
16   Q.   So if you go to the penitentiary and do time, you come out
17   of prison, you have to report to somebody?
18   A.   Yes, sir.
19   Q.   Why is that?
20   A.   Still got to report.  You're still part of the family.
21   Q.   All right.  What other things are you talking about that's
22   going on in the streets?
23   A.   Who they're picking up.
24   Q.   What do you mean?
25   A.   Who they're making an Azteca and who they're dropping.
```

1   Q.   Okay.  Are you-all talking about any business activities?

2   A.   Yes, sir.

3   Q.   What kind of business activities are you-all talking about?

4   A.   Sometimes they talk about drugs, the quota they're picking

5   up.

6   Q.   And why were they talking about the quota that's being

7   picked up?

8   A.   Because they got to see who to send money to.

9   Q.   And why do they need to send money to people?

10  A.   To other ranks.

11  Q.   Why do they do that?

12  A.   To keep -- they have to send them money.

13  Q.   Is that part of the rules of the BA?

14  A.   Yes, sir.

15  Q.   Any other kinds of things that you-all are talking about?

16  A.   I don't remember.

17  Q.   All right.  Did you go anywhere else after Coffield Unit?

18  A.   No, sir.

19  Q.   Um, did you get let out of prison from the Coffield Unit?

20  A.   Yes, sir.

21  Q.   When you come back -- I'm sorry, where did you go after you

22  leave the Coffield Unit?

23  A.   Back to El Paso.

24  Q.   When you come back to El Paso, what do you do?

25  A.   Report.

1    Q.  Um, and who do you report to?

2    A.  Raymond Cano.

3    Q.  Do you recall when you were let out of prison?

4    A.  Yes, sir.

5    Q.  When was that?

6    A.  August 25, 2009.

7    Q.  And when you got back to El Paso, did you report right

8    away?

9    A.  No, sir.

10   Q.  Um, how long did you wait until you reported?

11   A.  Like a day or two.

12   Q.  What if you just had come out and not reported at all?

13   A.  Probably get picked up and beat up.

14   Q.  Get picked up and beat up?

15   A.  Yes, sir.

16   Q.  Why would that happened?

17   A.  Because you were not reporting.

18   Q.  All right.  Well, I mean, you told the prison guards in

19   that unit that you were in in Houston that you didn't want to

20   go to work.  Why don't you tell the BA I'm not going to report?

21   A.  You will probably get beat up again.

22   Q.  Prison guards weren't going to beat you up?

23   A.  No, sir.

24   Q.  All right.  So you reported to who?

25   A.  Raymond Cano.

```
 1   Q.  And when you reported to him, what did he tell you to do?
 2   A.  To report to Omar Lopez.
 3   Q.  Why did you need to report to Omar Lopez?
 4   A.  Because he was in charge of the section I was at.
 5   Q.  What section were you part of?
 6   A.  Central.
 7   Q.  Is El Paso divided up into different sections for the BA?
 8   A.  Yes, sir.
 9   Q.  Do you recall what some of those sections are?
10   A.  Westside, um, Northeast, Central, Lower Valley, Socorro.
11   Q.  Okay.  Um, is El Paso, basically, divided up as far as the
12   Barrio Azteca is concerned into basically the same type of
13   precincts that the El Paso Police Department has?
14   A.  Yes, sir.
15   Q.  Um, so he tells you to report to Omar?
16   A.  Yes, sir.
17   Q.  And do you report to Omar?
18   A.  Yes, sir.
19   Q.  How soon after he tells you to report do you report?
20   A.  That same day sir.
21   Q.  Um, and when you report to Omar, what does he tell you to
22   do?
23   A.  Um, that he'd call me later so we can go have a meeting.
24   Q.  Does he give you any other instruction?
25   A.  No, sir, just to keep on calling him.
```

1   Q.  Okay.  Did you keep on calling him?

2   A.  Yes, sir.

3   Q.  And did you subsequently have a meeting with him?

4   A.  Yes, sir.

5   Q.  Um, did he give you an assignment at this point in time?

6   A.  No, all we did was talk about what we had to do.

7   Q.  And what did you have to do?

8   A.  Picking up quotas and opening stores.

9   Q.  Okay.  Um, why was it important to pick up quotas?

10  A.  Because there wasn't that many stores open, so we had to go

11  open them.

12  Q.  And when you're talking about stores being opened, are you

13  talking about Wal-Mart and 7-Eleven?

14  A.  No, sir.  No, sir.

15  Q.  What kind of stores are you talking about?

16  A.  Drug stores.

17  Q.  Um, and so was that one of your first assignments, to go

18  look for quota and look for stores?

19  A.  Yes, sir.

20  Q.  Would you tell the jury how it is that you go about doing

21  that kind of work for the Barrio Azteca?

22  A.  You just try to look for people that are selling drugs.

23  Q.  How do you do that?

24  A.  By people you hang with.

25  Q.  Okay.

David A. Perez, RMR, RPR

DIRECT - ALBERTO MENDOZA

1    A.  People they go buy drugs from.

2    Q.  All right.  So if you hang around with people that are

3    doing drugs, um -- and you said you looked to see where they

4    buy drugs?

5    A.  Yes, sir.

6    Q.  How do you know where they're going to go to buy drugs?

7    A.  Sometimes they're with them or sometimes they will tell

8    you.

9    Q.  All right.  So let's say you're with them, do you watch

10   where they go into?

11   A.  Yes, sir.

12   Q.  Um, and then do you watch them come out?

13   A.  Yes, sir.

14   Q.  And when they come out, what do you do?

15   A.  Sometimes go and knock and talk to the person that sold

16   them the drugs.

17   Q.  What if the person inside denies it?

18   A.  Well, you beat them up and take everything he got.

19   Q.  All right.  Well, do you have to conduct any kind of

20   investigation first to verify they're actually selling drugs?

21   A.  Well, if you see somebody buying drugs coming out their

22   house, more or less they're selling drugs.

23   Q.  Let me ask you, could you check the person coming out of

24   the house to see if they have drugs on them?

25   A.  Sometimes.

```
 1   Q.   Okay.  Um, and sometimes not?
 2   A.   Yes, sir.
 3   Q.   All right.  So, would you pay the people to give you this
 4   information?
 5   A.   Sometimes.
 6   Q.   What would you pay them with?
 7   A.   Money or drugs.
 8   Q.   So you are basically paying informants?
 9   A.   Yes, sir.
10   Q.   They go in, buy the drugs and then you go in and knock on
11   the door?
12   A.   Yes, sir.
13   Q.   If that person says they're not selling drugs, do you have
14   to tell somebody, or can you go ahead and kick the door in and
15   take what they got?
16   A.   Well, you report it and let them know sometimes.
17   Q.   All right.  Report to who?
18   A.   The person in charge of that section.
19   Q.   Let's say that happened in the central area; who would you
20   have reported that to?
21   A.   Peewee.
22   Q.   And what does he do with the information?
23   A.   He just tells me to go ahead and go do what I have to do.
24   Q.   Okay.  Um, what other types of things would you do?
25   A.   Walk in there with the person that's going to go buy drugs.
```

DIRECT - GILBERTO MENDOZA

```
 1   Q.  Anything else?
 2   A.  That's about it.
 3   Q.  All right.  Um, did Omar ever give you any orders to beat
 4   anybody up?
 5   A.  No, sir, not that I remember.
 6   Q.  As far as stores went?
 7   A.  Yes, sir.
 8   Q.  So that was your first assignment?
 9   A.  Yes, sir.
10   Q.  Did your assignment change after that?
11   A.  No, sir.
12   Q.  Okay.  Still looking around?
13   A.  Yes, sir.
14   Q.  Um, did you ever do any beat downs?
15   A.  Yes, sir.
16   Q.  Why would people get beat down out in the free world?
17   A.  For not going to the meetings.
18   Q.  Okay.  Why is it important -- what kind of meeting are you
19   talking about?
20   A.  Barrio Azteca meeting.
21   Q.  Why is it important to go to Barrio Azteca meetings?
22   A.  So you could keep up with everything that's going on.
23   Q.  All right.  But let's say it's you, and you just don't feel
24   like going to the meeting.  You're like you are with the guards
25   at the unit in Houston.  I'm just not going to go today.  It's
```

```
 1   too cold, too hot, dust is blowing or whatever.  Barrio Azteca
 2   let you do that?
 3   A.  No, sir.
 4   Q.  Is there a consequence to doing something like that?
 5   A.  Yes, sir.
 6   Q.  Okay.  Um, so you would administer beat downs?
 7   A.  Yes, sir.
 8   Q.  What kind of things are discussed at the meetings?
 9   A.  Everything from drugs, who was being exed out, the green
10   lights, where stores are being picked up.
11   Q.  Basically, so that everybody can be in the know?
12   A.  Yes, sir.
13   Q.  Are these -- who do they -- these particular types of
14   meetings, who do they include?
15   A.  All the people from central.
16   Q.  Escinas?
17   A.  No, sir.  Just Barrio Azteca members.
18   Q.  Okay.  So soldiers?
19   A.  Yes, sir.
20   Q.  Then any rank that's around?
21   A.  Anybody that needs to go.
22   Q.  How long did you have to report to Omar?
23   A.  I don't remember, sir.
24   Q.  Um, did you have ever report to anybody else?
25   A.  Yes, sir.
```

David A. Perez, RMR, RPR

```
 1    Q.   Who was the next person you had to report to?

 2    A.   Raymond Cano.

 3    Q.   Where was that person in charge of?

 4    A.   He was in charge of all El Paso.

 5    Q.   And do you recall about the time frame you had -- that you

 6    had to report to Mr. Cano?

 7    A.   January 2010.

 8    Q.   In regards to him being in charge of all of El Paso, had

 9    you gotten promoted?

10    A.   No, sir.

11    Q.   But you were now having to report to the person in charge

12    of all El Paso?

13    A.   Yes, sir.

14    Q.   Why was that?

15    A.   Because I was working for him.

16    Q.   Okay.  And when you say that you were working for him, what

17    kind of work were you doing?

18    A.   Selling drugs.

19    Q.   What kind of drugs?

20    A.   Cocaine, heroin, marijuana.

21    Q.   Had you already been selling cocaine, heroin and marijuana?

22    A.   No, sir.

23    Q.   Is this when you started doing that?

24    A.   Yes, sir.

25    Q.   So prior to this you're basic work is just going around
```

```
 1   looking for quota and opening up stores?
 2   A.  Yes, sir.
 3   Q.  How much heroin are you selling?
 4   A.  About nine ounces a week.
 5   Q.  And how much are you selling that heroin for?
 6   A.  Depending who we were selling it to, anywhere from 800 to
 7   1,000.
 8   Q.  How much profit are you making?
 9   A.  I would get paid like once a week.
10   Q.  Okay.  Pull up Exhibit 13B.
11           MR. LEAL:  This has been previously admitted in
12   evidence.
13           THE COURT:  That's fine.
14   Q.  (By Mr. Leal)  Mr. Mendoza, looking at what's on the screen
15   there, Government's Exhibit 13B, do you recognize anybody in
16   that particular exhibit?
17   A.  Yes, sir.
18   Q.  Who do you recognize in that exhibit?
19   A.  Raymond Cano and Paya.
20   Q.  Okay.  As far as that first person that you've indicated,
21   um, would you tap the screen and point to where that person is?
22   All right.  For record purposes, you tapped the screen on the
23   person wearing the striped shirt?
24   A.  Yes, sir.
25   Q.  Um.  Also Government's Exhibit 13B.  You said you recognize
```

```
 1   another person?
 2   A.  Yes, sir.
 3   Q.  Who was the other person you recognize?
 4   A.  Paya.
 5   Q.  Can you point that person out?
 6   A.  Yes, sir.
 7   Q.  For record purposes, you tapped the screen on the person
 8   that's wearing a jersey and the 2 is visible?
 9   A.  Yes, sir.
10   Q.  Um, you said you were selling about nine ounces a week?
11   A.  Yes, sir.
12   Q.  Of heroin?
13   A.  Yes, sir.
14   Q.  Where was that heroin coming from?
15   A.  Mexico.
16   Q.  How do you know it was coming from Mexico?
17   A.  Because I was taking the person to go pick it up.
18   Q.  You were going to Mexico?
19   A.  No, sir.  I was dropping her off at the bridge.
20   Q.  All right.  And you said her.  It was a lady.  And where
21   was she going into?
22   A.  Through the bridge, crossing.
23   Q.  Was she going to Juarez?
24   A.  Yes, sir.
25   Q.  Approximately, how long would you have to wait for her at
```

```
 1   the bridge?
 2   A.  I wouldn't wait.  I would drop her off and leave.  And wait
 3   for her to call me.
 4   Q.  How long would it usually take for her to call you?
 5   A.  Anywhere from an hour to two hours.
 6   Q.  When she called, what did you do?
 7   A.  Go pick her up.
 8   Q.  And when you picked her up, what would happen after that?
 9   A.  Take her to the apartment and she'd take the stuff out and
10   give it to me.
11   Q.  Where you picked her up, would that have been here in El
12   Paso?
13   A.  Yes, sir.
14   Q.  And in the apartment you took her to, was that in El Paso
15   as well?
16   A.  Yes, sir.
17   Q.  And where would she take the stuff out from?
18   A.  From her private.
19   Q.  And was there any verification as to how much she was
20   supposed to have?
21   A.  Yes, sir.
22   Q.  How would that be verified?
23   A.  Raymond Cano would call to Juarez and check how much they
24   had given her.
25   Q.  And why is it important to check to see how much?
```

```
 1  A.  To make sure we were getting what we were sent to go pick
 2  up.
 3  Q.  What happens if, let's say, that Mr. Cano says I want ten
 4  and Juarez only sends nine, um, is that somehow -- does that
 5  somehow have to be accounted for if there's one missing?
 6  A.  When they send it, the next time they would go over.
 7  Q.  They will send the one extra?
 8  A.  Yes, sir.
 9  Q.  If the people in Juarez say they sent ten and you only get
10  eight, does that create some kind of problem?
11  A.  Yes, sir.
12  Q.  What kind of problems?
13  A.  They'd be checking who took the other two.
14  Q.  Would they be asking you questions?
15  A.  Yes, sir.
16  Q.  Would they be asking the lady questions?
17  A.  Yes, sir.
18  Q.  So nobody's watching her when she takes it out.  But the
19  count is verified?
20  A.  Yes, sir.
21  Q.  So after the count is verified, what happens after that?
22  A.  We take it apart and start calling people to pick up.
23  Q.  How would you take it apart?
24  A.  Just take it out of the roll it was rolled in.
25  Q.  What were the basic amounts it would be rolled?
```

David A. Perez, RMR, RPR

1   A.   Ounces.

2   Q.   Um, do you pass them out by ounce then, or half?

3   A.   Depending what they wanted.

4   Q.   They, who's they?

5   A.   Anybody who was picking up.

6   Q.   Who would be picking up?

7   A.   Other gang members or other people that wanted to pick up.

8   Q.   Okay.  Did you have authority to distribute to Barrio

9   Azteca members?

10  A.   Yes, sir.

11  Q.   Did you also have authority to distribute to non-Barrio

12  Azteca members?

13  A.   Yes, sir.

14  Q.   Let's say you distribute to non-Barrio Azteca members.  Um,

15  are those your stores?

16  A.   Yes, sir.

17  Q.   What if your stores decide that they want to pick up drugs

18  from somebody else, from another source of supply?

19  A.   Well, you would have to check where they're picking up

20  from.

21  Q.   Why?

22  A.   To check if they were picking up from other Barrio Azteca

23  members or if they were paying.

24  Q.   What if I'm a store and I just say, you know what, Barrio

25  Azteca is charging me too much money.  I'm going to pick up

David A. Perez, RMR, RPR

```
 1   from some other gang.  Is that a problem?
 2   A.  Yes, sir.
 3   Q.  Why is that a problem?
 4   A.  Because they're selling in El Paso.
 5   Q.  And what's the big deal about selling in El Paso?
 6   A.  It's Barrio Azteca turf.
 7   Q.  So you, basically, can't go to another source of supply?
 8   A.  No, sir.
 9   Q.  If they do, what would you do?
10   A.  Go take their stuff and probably beat them up.
11   Q.  Just on your own or by orders of the BA?
12   A.  Orders.
13   Q.  And where do those orders have to come from?
14   A.  The person that's in charge.
15   Q.  The person that's in charge of that particular section of
16   the city or El Paso or higher up?
17   A.  Depends who you are and if you're working for a person
18   that's in charge.
19   Q.  Okay.  Um, how long did this type of activity go on with
20   you as far as the heroin and then distributing it?
21   A.  All the way until Cano got locked up.
22   Q.  Do you know how long that was?
23   A.  No, sir.
24   Q.  At any point in time, did you have to report to anybody
25   else after Cano got locked up?
```

```
 1    A.  Yes, sir.
 2    Q.  Who?
 3    A.  Angelillo.
 4    Q.  And Angelillo, do you remember his name?
 5    A.  No, sir.
 6    Q.  Was that Big Angel or Little?
 7    A.  Little Angel.
 8    Q.  And was that person also indicted with you in this case?
 9    A.  Yes, sir.
10    Q.  Um, when you reported to him, did he have rank?
11    A.  Yes, sir.
12    Q.  What kind of rank did he have?
13    A.  Lieutenant.
14    Q.  Do you recall about what time frame that was?
15    A.  No, sir.
16    Q.  Um, when you reported to him, were you given any other
17    jobs?
18    A.  Mostly the same things, sir.
19    Q.  Were you also moving heroin?
20    A.  No, sir, I was just picking up the lady to show them who it
21    was.
22    Q.  Did you ever do any movement of cocaine?
23    A.  Yes, sir.
24    Q.  Who did you do that for?
25    A.  Angelillo.
```

1  Q.  Approximately, how much cocaine would you move for him?

2  A.  It was probably, like, half a kilo.

3  Q.  Half a kilo total or a day, week?

4  A.  Just half a key total.

5  Q.  Okay.  How would you move that cocaine?

6  A.  Through the same stores Cano had.

7  Q.  Did you sell that in bulk, the half a kilo total, or divide

8  it up?

9  A.  Depending on what they wanted, cut it up.

10 Q.  Okay.  If you cut it up, how do you cut it up?

11 A.  Eights, halves, ounces.

12 Q.  In all of this cutting up of heroin and drugs and also

13 marijuana?

14 A.  Yes, sir.

15 Q.  Did you work marijuana?  Are people paying for it?

16 A.  Yes, sir.

17 Q.  And what's being done with the money?

18 A.  Sent to Mexico.

19 Q.  And all of it's sent to Mexico?

20 A.  Yes, sir.

21 Q.  Um, what goes on with it in Mexico?

22 A.  They use it to buy other drugs, guns, anything they need.

23 Q.  When you say "they", who's they?

24 A.  Barrio Azteca.

25 Q.  Does the Barrio Azteca here in El Paso get to keep any of

```
 1   that money?
 2   A.  No, sir.
 3   Q.  Do you make a profit of some of what you sell?
 4   A.  Yes, sir.
 5   Q.  Do you get to keep the profit?
 6   A.  Yes, sir.
 7   Q.  And do you also get to keep the quota?
 8   A.  The first one that you open.
 9   Q.  All right.  What do you mean by that?
10   A.  When you open a store, the first money you get, that's
11   yours.
12   Q.  Did you open any stores?
13   A.  Yes, sir.
14   Q.  How many stores did you open?
15   A.  I don't remember, sir.
16   Q.  More than two?
17   A.  Probably seven, eight, I don't remember.
18   Q.  So all those people were selling for you?
19   A.  Yes, sir.
20   Q.  Um, and, in turn, they're working for the Barrio Azteca,
21   basically, right?
22   A.  Yes, sir.
23   Q.  How much stuff would you say the stores moved on your
24   behalf and on behalf of the Barrio Azteca?
25   A.  I don't remember how much it was.
```

1   Q.  Is that part of those -- heroin and the cocaine that the

2   lady was bringing over?

3           THE COURT:  Mr. Leal and attorneys, approach for just

4   a second.

5           (Attorneys approach bench.  Off record discussion.)

6           THE COURT:  It's 3:00.  We are going to break.

7   Remember, you remain under the instructions the Court has given

8   you and we will see you in ten minutes.

9           (Jury leaves courtroom.)

10          THE COURT:  Recess for ten minutes.

11          (Recess.)

12          COURTROOM DEPUTY:  Court is back in session.

13          THE COURT:  You may be seated.  Ready?

14          MR. SKARET:  Yes.

15          (Jury enters courtroom.)

16          THE COURT:  You may be seated, Ladies and Gentlemen.

17  You may proceed.

18          MR. LEAL:  Thank you, Your Honor.

19  Q.  (By Mr. Leal)  Mr. Mendoza --

20          MR. LEAL:  Javier, could we switch over to the Elmo,

21  please, just for a minute?

22  Q.  Mr. Mendoza, I want to show you what's been previously

23  admitted into evidence as Government's Exhibit 10J that was

24  seized from the Jesus Espino search back on November 23, 2010.

25  Um, if you look at it, New Testament Psalms Proverbs Bible.

David A. Perez, RMR, RPR

1    There's a name down here at the bottom.  Can you see that?

2    A.  Yes, sir.

3    Q.  The name at the bottom, what's the name?

4    A.  Hector Galindo.

5    Q.  Okay.  Does it have a number on there?

6    A.  Yes, sir.

7    Q.  Does that look like a number that you'd be familiar with?

8    A.  I think it's his TDC number.

9    Q.  Off to the side, it says C Shop?

10   A.  Yes, sir.

11   Q.  Do you know what C Shop means?

12   A.  No, sir.

13   Q.  The Hector Galindo that you're talking about you referred

14   to as Silent.

15   A.  Yes, sir.

16   Q.  Is that the Hector Galindo that's referenced in the Psalms

17   Proverbs?

18   A.  Yes, sir.

19   Q.  When we left off, we were talking about you reporting to

20   Little Angelillo.

21   A.  Yes, sir.

22   Q.  And you said that you were basically doing the same types

23   of things for him that you were doing for the previous person

24   in charge; is that right?

25   A.  Yes, sir.

1  Q.  Did he have any kind of rank?

2  A.  Yes, sir.

3  Q.  What kind of rank did he have?

4  A.  Lieutenant.

5  Q.  Um, did you do any other types of things for him?

6  A.  Just that, sir.

7  Q.  Just the heroin?

8  A.  The heroin and the weed and picking up money.

9  Q.  And picking up money?

10  A.  Yes, sir, money that was out there when Cano got locked up.

11  Q.  Let me ask you this.  When you were just picking up quota,

12  before you worked with Cano selling out the heroin, on average,

13  how much quota would you pick up?

14  A.  Maybe just two or three stores.

15  Q.  What would you get from those two or three stores?

16  A.  Depending on how much they were selling, about maybe $100.

17  Q.  Is that a day or week?

18  A.  A week.

19  Q.  All right.  And that tax -- is that basically tax to the

20  store?

21  A.  Yes, sir.

22  Q.  Did they have to pay that tax every week regardless?

23  A.  Yes, sir.  If they ain't selling, they don't got to pay.

24  Q.  All right.  How do you know they're not selling?

25  A.  If they tell you they're not selling, you take their word.

```
1    But if you find out they were, you go talk to them.
2    Q.  Did you ever have any of that happen?
3    A.  No, sir.
4    Q.  Why is that?
5    A.  Because I talk to people right.
6    Q.  Is there consequences if they lie to you?
7    A.  Yes, sir.
8    Q.  Consequences ordered by the BA?
9    A.  Yes, sir.
10   Q.  All right.  Now, getting back to Little Angelillo, how long
11   do you have to report to him?
12   A.  Probably, like a month.
13   Q.  At some point in time, does he get picked up?
14   A.  Yes, sir.
15   Q.  After he gets picked up, who do you have to report to?
16   A.  Manny and Peewee.
17   Q.  All right.  Um, so you've kind of gone the full circle,
18   right?  You had to report to Peewee when you got out?
19   A.  Yes, sir.
20   Q.  Then you wind up reporting to other people.  Now you're
21   back to reporting back to Manny and Peewee?
22   A.  Yes, sir.
23   Q.  Out of those two, who had the rank?
24   A.  Both of them.
25   Q.  All right.  Were they both equal?
```

DIRECT - GILBERTO MENDOZA

1    A.  Yes, sir.

2    Q.  Why did you have to report to both of them?

3    A.  Because I was picking up from them, too, drugs.

4    Q.  Picking up drugs from them?

5    A.  Yes, sir.

6    Q.  What kind?

7    A.  Heroin.

8    Q.  How much heroin?

9    A.  Maybe about eight, nine ounces.

10   Q.  And that eight or nine ounces, was that a week or day?

11   A.  Sometimes a week.

12   Q.  Would you do pretty much the same thing with that heroin as

13   you've talked about previously?

14   A.  Yes, sir.

15   Q.  How long would you say you had to report to them?

16   A.  Maybe reported to them like two, three months.

17   Q.  And, subsequently, after having to report to them, who was

18   the next person you had to report to?

19   A.  The person in charge of Central, Chucky.

20   Q.  Okay.  And, um -- and then after Chucky?

21   A.  Just him.

22   Q.  Okay.  Um, and what kind of things would you do for Chucky?

23   A.  Just sometimes they would call me, tell me he needed help

24   doing something.  And I would go with him.

25   Q.  All right.  Um, did there ever come a point in time when

DIRECT - GILBERTO MENDOZA

```
 1    you-all started to charge members?

 2    A.  Yes, sir.

 3    Q.  And why did you-all start charging members?

 4    A.  Because they said that that's what they wanted.

 5    Q.  And who -- said, first off, who suggested that you-all

 6    start charging members?

 7    A.  I don't know who it came directly from.  But Chucky is the

 8    one who said we had to start paying.

 9    Q.  How much did member BA members have to pay?

10    A.  Depending how much they were selling.

11    Q.  Um --

12    A.  Anywhere from $20 and up.

13    Q.  How much would you have to pay?

14    A.  20.

15    Q.  Did you get a discount?

16    A.  No, sir.

17    Q.  Was that a week?

18    A.  Yes, sir.

19    Q.  And who did you have to pay that money to?

20    A.  Chucky.

21    Q.  During this time frame that you're out and you've left

22    prison, um, are you having any contact with Silent?

23    A.  Yes, sir.

24    Q.  And how are you having contact with Silent?

25    A.  I would call him or he would call me.
```

1   Q.  And why are you calling Silent?

2   A.  Just started calling.

3   Q.  I mean, just -- was that a way of you getting around the

4   rank or were you guys just calling, basically, to socialize?

5   A.  Sometimes to socialize or he'd have something to tell me to

6   tell somebody else.

7   Q.  All right.  Um, what kind of things would he tell you to

8   tell other people?

9   A.  He needed numbers or he needed to get in contact with

10  somebody or -- who was being exed out, who was coming out.

11  Q.  And why is he relaying that kind of information to you as

12  opposed to whoever is in charge of El Paso?

13  A.  Because it's everybody's business to know.

14  Q.  You got to be in the know?

15  A.  Yes, sir.

16  Q.  What happens if you take somebody's word on the street that

17  something's happening and you don't check it out?

18  A.  If it comes out it's not right, you probably get in

19  trouble.

20  Q.  In other words, let's say that I don't know -- let's say

21  Cano gets out of jail and some point in time -- and this is an

22  example.  He comes out and says I'm in charge of El Paso and

23  you just say, okay, you're in charge of El Paso.  And you start

24  doing what Cano tells to you do.  Um -- and then you don't

25  check it out.  Then later it turns out that Cano's not in

```
 1   charge of El Paso.  What happens?
 2   A.  He will probably get in trouble.
 3   Q.  He will get in trouble?
 4   A.  Yes, sir.
 5   Q.  How about you?  Will you get in trouble?
 6   A.  Probably, too.
 7   Q.  Why?
 8   A.  For not checking it out.
 9   Q.  Is that one of your responsibilities as a member?
10   A.  Yes, sir.
11   Q.  To verify?
12   A.  Yes, sir.
13   Q.  All right.  So in these conversations that you're having
14   with Silent, Silent is still in the Coffield Unit?
15   A.  Yes, sir.
16   Q.  And he's got one of those cell phones that you talked
17   about; is that right?
18   A.  Yes, sir.
19   Q.  Those that you're not supposed to have, but he's got one?
20   A.  Yes, sir.
21   Q.  Okay.  I want to turn your attention to what's previously
22   been admitted into evidence as Government's Exhibit 20H-2.
23   This contains audio as well as a transcript of a conversation.
24          MR. LEAL:  Your Honor, I ask that the exhibit be
25   published to the jury.
```

DIRECT - GILBERTO MENDOZA

```
 1              THE COURT:  It's been admitted.  You may publish it.
 2   Q.  (By Mr. Leal)  This particular call, have you listened to
 3   this call before?
 4   A.  Yes, sir.
 5   Q.  All right.  There's some initials on the screen, AM.  Do
 6   you know who that is?
 7   A.  Yes, sir.
 8   Q.  Who's that?
 9   A.  Me.
10   Q.  Okay.  And HG, who is that?
11   A.  Hector Galindo.
12   Q.  Is he also known as Silent?
13   A.  Yes, sir.
14   Q.  Do you have a nickname?
15   A.  Yes, sir.
16   Q.  What's your nickname?
17   A.  Igor.
18   Q.  All right.  In this particular call, um, if I recall
19   correctly, the date of the call is September 25, 2010.  Would
20   you play it.
21              (Audio being played.)
22   Q.  There's a mention of a person named Blacky.  Who is asking
23   about Blacky?
24   A.  Um, I am.
25   Q.  Okay.  And who's Blacky?
```

1    A.  Another Barrio Azteca member.

2    Q.  Okay.  And why are you asking about Blacky?

3    A.  Because they were talking about him being in charge of El

4    Paso.

5    Q.  Who was talking about being in charge of El Paso?

6    A.  Chuco Fierro.

7    Q.  Who is that?

8    A.  Another Barrio Azteca member.

9    Q.  And Chuco Fierro is mentioned a little bit later in the

10   transcript.  Um, is Chuco Fierro a Barrio Azteca member here in

11   El Paso?

12   A.  Yes, sir.

13   Q.  Does Chuco Fierro have any kind of rank?

14   A.  That I know of, yes.

15   Q.  What kind of rank did he have?

16   A.  Sergeant.

17   Q.  And what about Blacky?  Did Blacky have any kind of rank?

18   A.  Yes, sir.

19   Q.  What kind?

20   A.  Sergeant.

21   Q.  Were any of those people in charge of areas?

22   A.  No, sir.

23           (Audio being played.)

24   Q.  A little bit earlier on the call that is from September 25,

25   2010, um, there's a mention of Shotgun.  Do you know who

David A. Perez, RMR, RPR

1   Shotgun is?

2   A.  Yes, sir.

3   Q.  Who's Shotgun?

4   A.  Um, Pereya.

5   Q.  Okay.  And does Shotgun have any kind of rank?

6   A.  Yes, sir.

7   Q.  What kind of rank does he have?

8   A.  Captain.

9   Q.  Okay.  Um, why is Shotgun mentioned?

10  A.  Because they're talking about he parked Blacky's -- parked

11  him.

12  Q.  Did Shotgun park Blacky?

13  A.  Yes, sir.

14  Q.  What does that mean?

15  A.  He stopped -- he ain't got no rank right now.

16  Q.  And so is this one of those things where you're basically

17  investigating whether or not you're supposed to be following

18  Blacky?

19  A.  Yes, sir.

20  Q.  All right.

21          (Audio being played.)

22  Q.  All right.  Now, there's mention of a person by the name of

23  Tolon in this area here.  And then there's also mention of

24  Blacky again.  And then there's mention of Shotgun in that area

25  there.  Who is Tolon?

1   A.  Another captain.

2   Q.  Okay.  And do you happen to know where he is?

3   A.  In TDC.

4   Q.  All right.  And, um, what's the discussion going on here

5   about Tolon and Shotgun?

6   A.  They're talking about Blacky.  Blacky is talking about

7   Tolon sent him.  And Tolon is saying he didn't send him.

8   Q.  All right.  So Blacky's basically saying Tolon told me to

9   be in charge.  And somewhere along the way, has Tolon gotten

10  word this is going on?

11  A.  Yes, sir.

12  Q.  And he's saying what?

13  A.  That he didn't send him.

14  Q.  All right.  And is Tolon saying follow Shotgun?

15  A.  Yes, sir.

16  Q.  All right.  And is this what Silent, Hector Galindo, is

17  relating to you?

18  A.  Yes, sir.

19  Q.  All right.

20          (Audio being played.)

21  Q.  All right.  What's going on there in that part of the

22  conversation?

23  A.  They're still talking about Blacky, about that they parked

24  him because they didn't want to work with the way they were

25  working.

1  Q.  What does that mean?

2  A.  They didn't want to work the way they were doing everything

3  out here.

4  Q.  He kind of wanted to go do things his own way?

5  A.  Yes, sir.

6  Q.  So, as a result, is there a consequence for wanting to do

7  things your own way?

8  A.  Yes, sir.

9  Q.  And what's the consequence?

10  A.  That's why they parked him.

11  Q.  That's why they suspended him?

12  A.  Yes, sir.

13         (Audio being played.)

14  Q.  All right.  So there's a phrase in there, um, that's in

15  Spanish.  It was -- in English -- they didn't take away his

16  feathers.  What does that mean?

17  A.  That he's still a sergeant, but they just parked him.

18  Q.  Okay.  So they didn't take away his rank?

19  A.  No, sir.

20  Q.  But they parked him?

21  A.  Yes, sir.

22  Q.  Did that conversation came after Shotgun gave the order and

23  Tolon said I didn't tell Blacky he was in charge?

24  A.  Yes, sir.

25  Q.  And all this type of communication -- to your knowledge was

1   Tolon and Shotgun in this same prison?

2   A.  No, sir.

3   Q.  So all this communication is going on through what you

4   previously described, maybe through kites?

5   A.  Yes, sir.

6   Q.  Cell phones?

7   A.  Yes, sir.

8   Q.  And other forms of communication?

9   A.  Yes, sir.

10          (Audio being played.)

11  Q.  All right.  Now, in this area here, what do we have Hector

12  Galindo telling you?

13  A.  That Spooky should already be out and he's the one that's

14  going to be in charge.

15  Q.  Okay.  Does he identify Spooky?

16  A.  Yes, sir.

17  Q.  And how does he identify the Spooky that he's referencing?

18  A.  Because he was there with Shotgun.

19  Q.  So the Spooky that was with Shotgun is the one that's going

20  to be in charge?

21  A.  Yes, sir.

22  Q.  And the Spooky who was with Shotgun, do you know who that

23  is?

24  A.  Yes, sir.

25  Q.  Who is that?

1  A.  Ramon Renteria.

2  Q.  Okay.  Is that the person you previously identified as the

3  defendant?

4  A.  Yes, sir.

5  Q.  All right.  So, at some point in time, does the defendant

6  come out of jail?

7  A.  Yes, sir.

8  Q.  The defendant, Ramon Renteria?

9  A.  Yes, sir.

10  Q.  Do you ever meet him?

11  A.  Yes, sir.

12  Q.  Do you recall about what time frame that was?

13  A.  No, sir, I don't remember.

14  Q.  Okay.  Would it have been before Christmas 2010 or after?

15  A.  I think it was after, sir.

16  Q.  All right.  Where did you meet him?

17  A.  At a McDonald's.

18  Q.  Was that the first time you met him?

19  A.  Yes, sir.

20  Q.  And what was the purpose of you guys meeting at McDonald's?

21  A.  Chucky was turning in money to him.

22  Q.  What kind of money was he turning in?

23  A.  From the quotas, the stores.

24  Q.  From the stores?

25  A.  Yes, sir.

```
1    Q.  Um, were you aware of how much money it was?
2    A.  Around $1,000.
3    Q.  And why -- why were you -- let me ask you this.  Why were
4    you with Chucky?
5    A.  Because we -- he just picked me up earlier.  We were
6    cruising around drinking, picking up the stores.
7    Q.  All right.  And, why did you go to this particular
8    McDonald's?
9    A.  That's where we were supposed to meet Spooky.
10   Q.  Who had told you that's where you were supposed to meet?
11   A.  Chucky.
12   Q.  Um, who's driving?
13   A.  Chucky.
14   Q.  Do you get to the McDonald's?
15   A.  Yes, sir.
16   Q.  Is the defendant already there?
17   A.  No, sir.
18   Q.  Do you have to wait for a while?
19   A.  Not that long.
20   Q.  Does the defendant eventually show up?
21   A.  Yes, sir.
22   Q.  What happens then?
23   A.  Chucky gets off the car and gets into the other car and
24   gives him the money.
25   Q.  Okay.  Did Chucky leave the car with anything?
```

1   A.  Yes, sir.

2   Q.  What did he leave the car with?

3   A.  The money.

4   Q.  In a bag, in an envelope?

5   A.  No, sir.  It was in his pocket.

6   Q.  All right.  Um, so he leaves, um, and he gives the money to

7   the defendant?

8   A.  Yes, sir.

9   Q.  And how do you know he gave the money to the defendant?

10  A.  Because he didn't have it with him no more when he got back

11  into the car.

12  Q.  All right.  Did you go and talk to the defendant?

13  A.  No, sir.

14  Q.  When -- Chucky got out of the car and got into the car with

15  the defendant.  Did the defendant look at Chucky and say, Hey,

16  I don't know what you're doing.  Get out of my car?

17  A.  No, sir.

18  Q.  Did they talk for a little bit?

19  A.  Yes, sir.

20  Q.  After Chucky left and came back, um, what did you-all do?

21  A.  Um, him and Renteria got into the truck.

22  Q.  What happened then?

23  A.  We were talking.

24  Q.  What were you-all talking about?

25  A.  Guns.

1   Q.  Um, is this the same day?

2   A.  Yes, sir.

3   Q.  At the McDonald's?

4   A.  Yes, sir.

5   Q.  All right.  So does Chucky and the defendant -- do they get

6   in the same car that you're in?

7   A.  Yes, sir.

8   Q.  Were you in a truck or car?

9   A.  Truck.

10  Q.  Um, when they get into the truck, um, does Chucky introduce

11  the defendant to you?

12  A.  Yes, sir.

13  Q.  Had you ever met him before that day?

14  A.  No, sir.

15  Q.  How does Chucky introduce the defendant to you?

16  A.  He said it was Spooky.

17  Q.  Okay.  And, at that point in time, do you know that that's

18  the Spooky that's in charge?

19  A.  Yes, sir.

20  Q.  Is that the same Spooky that Silent Galindo referenced in

21  that call?

22  A.  Yes, sir.

23  Q.  Um, and you said there's a conversation that takes place?

24  A.  Yes, sir.

25  Q.  What's the conversation that takes place?

DIRECT - GILBERTO MENDOZA

```
 1    A.  About guns.
 2    Q.  All right.  And what's the conversation about guns?
 3    A.  He wanted to buy some guns.
 4    Q.  And why is he coming -- is he coming to you to buy guns?
 5    A.  Yes, sir.
 6    Q.  Why is he coming to you?
 7    A.  I guess somebody told him I could get guns.
 8    Q.  All right.  What kind of gun does the defendant ask for?
 9    A.  I don't remember, sir.
10    Q.  Um, does he tell what you he wants the gun for?
11    A.  No, sir.
12    Q.  What do you tell him in regards to the guns?
13    A.  That I could get them.
14    Q.  Were you going to charge him for it?
15    A.  Yes, sir.
16    Q.  How much were you going charge him for it?
17    A.  Drugs.
18    Q.  Is that discussed?
19    A.  Yes, sir.
20    Q.  Um, how much drugs did you say you are going to charge him
21   for 'em?
22    A.  I don't remember how much it was.
23    Q.  Were you going to make him pay you with heroin or cocaine?
24    A.  Cocaine.
25    Q.  Um, and when you tell him, Hey, I want however much
```

David A. Perez, RMR, RPR

DIRECT - GILBERTO MENDOZA

1    cocaine.  Did he say, Hey, I'm not involved with any cocaine?

2    Or does he agree to pay?

3    A.  He agrees, sir.

4    Q.  What happens after that?

5    A.  Um, he said he is going to get in contact with me and then

6    he leaves.

7    Q.  All right.  Um, what happens next?

8    A.  Me and Chucky leave.

9    Q.  After you left, did you ever see Mr. Renteria, the

10   defendant, again?

11   A.  Yes, sir.

12   Q.  Why did you see him the next time?

13   A.  At a bar.

14   Q.  What bar?

15   A.  I don't remember the name of it.

16   Q.  And what were you doing at the bar?

17   A.  Um, I bumped into somebody else and he told me let's go in

18   and drink.  And I went inside and drank with him.

19   Q.  And who all was at that bar?

20   A.  Um, Aracles and Narizon.

21   Q.  Who else?

22   A.  Spooky.

23   Q.  By Spooky, you mean the defendant?

24   A.  Yes, sir.

25   Q.  Um, did anything happen at the bar?

1    A.   No, sir.

2    Q.   Was that the night you just drank?

3    A.   I drank, but they went outside to talk.

4    Q.   Who went outside?

5    A.   Spooky and Aracles and Narizon.

6    Q.   Do you know what they talked about?

7    A.   No, sir.

8    Q.   Did anything out of the ordinary happen at the bar that

9    night?

10   A.   No, sir.

11   Q.   Did you ever see the defendant again after this?

12   A.   No, sir.

13   Q.   Um, let me ask you this.   You talked about earlier about

14   how there's a structure in the Barrio Azteca and how orders are

15   relayed, basically, from the top down.

16   A.   Yes, sir.

17   Q.   By ranking members to lower members.

18   A.   Yes, sir.

19   Q.   Were you still a soldier at this point in time?

20   A.   Yes, sir.

21   Q.   Um, were you ever given the orders to do anything with

22   firearms?

23   A.   Yes, sir.

24   Q.   Um, and what orders were you given to do with firearms?

25   A.   To go shoot at somebody's house.

David A. Perez, RMR, RPR

```
 1   Q.  And this particular order that you received to go shoot at
 2   somebody's house, um, who did that order come from?
 3   A.  Chucky.
 4   Q.  Okay.  Did it come directly from Chucky or was he relaying
 5   an order?
 6   A.  He was relaying an order.
 7   Q.  And who was he relaying an order from?
 8   A.  From Manny.
 9   Q.  And did Manny give that order or was he relaying an order?
10   A.  I guess he was relaying it.
11   Q.  And relaying the order from who?
12   A.  Spooky.
13         MR. FOSTER:  Objection, Judge.  He said he guessed.
14   He doesn't have knowledge.
15         THE COURT:  Let's lay foundation.  Don't speculate.
16   Only answer if you know.
17   Q.  (By Mr. Leal)  An order like that to go shoot at somebody's
18   house, um, is that something that somebody, a soldier, can make
19   a decision about?
20   A.  No, sir.
21   Q.  Is that something somebody like Chucky can make a decision
22   about?
23   A.  No, sir.
24   Q.  Um, is that an order that has to come from whoever is in
25   charge of El Paso at the time?
```

David A. Perez, RMR, RPR

1   A.  Yes, sir.

2   Q.  Um, and who was in charge of El Paso at that time?

3   A.  Spooky.

4   Q.  So is that the type of order that would have had to have

5   come from Spooky?

6   A.  Yes, sir.

7   Q.  And the order to go shoot at this person's house, why was

8   that?

9   A.  Something to do with somebody else's family member.

10  Q.  And what was that about?

11  A.  Um, somebody -- something about them telling him that they

12  were Sureños.

13  Q.  What's a Sureño?

14  A.  Another gang.

15  Q.  And what would be so bad about the Sureños being at this

16  house?

17  A.  They're at war right now with the Aztecas.

18  Q.  All right.  And this particular location, this particular

19  house that you were ordered to go and shoot up, where is it

20  located?

21  A.  The Lower Valley.

22  Q.  Is that considered Barrio Azteca territory?

23  A.  Yes, sir.

24  Q.  And so, the Sureños are a rival gang?

25  A.  Yes, sir.

DIRECT 1269 - ALBERTO MENDOZA

```
 1   Q.  So if they were moving into Barrio Azteca territory, what's
 2   the rule among the Barrio Azteca?
 3   A.  Take them out.
 4   Q.  By take them out, what does that mean?
 5   A.  Shoot them, take them out of the picture.
 6   Q.  That's the rule of the Barrio Azteca?
 7   A.  Yes, sir.
 8   Q.  You're going to protect your turf?
 9   A.  Yes, sir.
10   Q.  Um.  Once you got the order, um, what did you do?
11   A.  Went over there to the house.
12   Q.  Okay.  Let's back up a minute.  Did you just go over to the
13   house unarmed or --
14   A.  No, sir, with guns.
15   Q.  Okay.  Where did you get the guns from?
16   A.  Got a gun from Assassin.
17   Q.  From Assassin?
18   A.  Yes, sir.
19   Q.  Does he have a name?
20   A.  Philip Sandoval.
21   Q.  And the gun that you got from Assassin, what kind of gun
22   was that?
23   A.  Tech 9.
24   Q.  And what's a Tech 9?
25   A.  It's a gun.
```

DIRECT - GILBERTO MENDOZA

1   Q.  Is it like a -- do you know if it's semi-automatic or

2   automatic?

3   A.  It's a semi-automatic.

4   Q.  Now, is it like a handgun or rifle?

5   A.  Like a rifle.

6   Q.  And is that the only gun you-all got?

7   A.  No, sir.

8   Q.  Did you-all get another gun?

9   A.  Yes, sir.

10  Q.  What other gun did you get?

11  A.  25.

12  Q.  What kind of gun is that?

13  A.  It's a handgun.

14  Q.  Um, and who was in charge of holding that gun?

15  A.  The same person we went to drop off the other guns to.

16  Q.  Who was that?

17  A.  Saenz and Cisco.

18  Q.  Um, so are those the only guns you-all picked up?

19  A.  Yes, sir.

20  Q.  So when you-all picked up those guns, where do you go?

21  A.  To the house.

22  Q.  Who all is going?

23  A.  Me, Cisco and Saenz.

24  Q.  Do you get to the house?

25  A.  Yes, sir.

```
 1    Q.  When you get to the house, what do you do?
 2    A.  Try to shoot at it.
 3    Q.  And why do you try to shoot at it?
 4    A.  Because that was the order.
 5    Q.  Was there any kind of investigation done beforehand to
 6    verify that Sureños were at this house?
 7    A.  We drove by there.
 8    Q.  Did you verify it?
 9    A.  Yes, sir.
10    Q.  And were there Sureños at the house?
11    A.  Yes, sir.
12    Q.  Um.  When you verify it, and you're out in the field, I
13    guess, so to speak, do you have to call that in and say it's
14    verified or basically say, is the order, once verified, go for
15    it?
16    A.  Once it's verified, just go for it.
17    Q.  Are you-all successful?
18    A.  No, sir.
19    Q.  Why aren't you successful?
20    A.  Because the gun wouldn't shoot.
21    Q.  What gun?
22    A.  The Tech 9.
23    Q.  What about the 25?
24    A.  There was something wrong with it too.
25    Q.  So these two guns that you got from Assassin don't work?
```

1    A.  No, sir.

2    Q.  What do you do since they won't work?

3    A.  We just called him and told him that they didn't do it

4    because they didn't work.

5    Q.  Called who?

6    A.  Chucky.

7    Q.  And what does Chucky say?

8    A.  He said all right.

9    Q.  What happens then?

10   A.  Then I call somebody else to drop off the guns with him.

11   Q.  And who was that other person that you called?

12   A.  Bubba.

13   Q.  And when you call Bubba, did you give him the guns?

14   A.  Yes, sir.

15   Q.  And when you gave him the guns, did you give him any

16   message to relay?

17   A.  No, sir.

18   Q.  All right.  Did you ever go back and talk to Assassin at

19   any point in time?

20   A.  No, sir.

21   Q.  As far as the guns not working, um, did you have to go and

22   explain that to anybody?

23   A.  No, sir.

24   Q.  Did you have to go and explain why the job wasn't done at

25   all?

DIRECT - GILBERTO MENDOZA

```
 1   A.  Yes, sir.

 2   Q.  Who did you go and explain that to?

 3   A.  Chucky.

 4   Q.  And then what did Chucky do?

 5   A.  He went and picked up the guns and had them cleaned.

 6   Q.  Okay.  So they worked the next time?

 7   A.  I don't know.

 8   Q.  To make sure they would work, I guess?

 9   A.  Yes.

10        MR. LEAL:  May I have a just a moment, Your Honor?

11        THE COURT:  Sure.

12   Q.  (By Mr. Leal)  Let me ask you this.  Did you ever serve in

13   any other capacity for the defendant as far as working as a

14   bridge?

15   A.  No, sir.

16   Q.  Okay.  Was there anybody that ever served as a bridge for

17   the defendant in the Annex?

18   A.  Yes, sir.

19   Q.  Who was that?

20   A.  Me.

21   Q.  You?

22   A.  Yes, sir.

23   Q.  Okay.  Um, what's a bridge?

24   A.  Somebody that relays kites.

25   Q.  And was this after the defendant got out of prison that you
```

1  worked in this capacity for him as a bridge for the Annex?

2  A.  Yes, sir.

3  Q.  And let me ask you this, what's the Annex?

4  A.  The El Paso County Jail.

5  Q.  The El Paso County Jail.

6  A.  Yes, sir.

7  Q.  Um, and why do you need to serve as a bridge to the El Paso

8  County Jail?

9  A.  To have communication in there.

10  Q.  And the communication, why is it important to have

11  communication in there?

12  A.  So they know what's going on out here and in there.

13  Q.  Again, to keep the Barrio Azteca informed?

14  A.  Yes, sir.

15  Q.  And that was something that the defendant wanted you to do?

16  A.  I never talked to him about it, but I talked to somebody

17  else about it.

18  Q.  Who did you talk to about it?

19  A.  Silent.

20  Q.  All right.  Silent relayed that message to you?

21  A.  Yes, sir.

22  Q.  All right.  In your work with the Barrio Azteca and in

23  picking up drugs and moving drugs and all those kinds of

24  things, were you ever asked to package up drugs and send them

25  through the mail?

DIRECT - GILBERTO MENDOZA

 1    A.  Yes, sir.

 2    Q.  Or via FedEx?

 3    A.  Yes, sir.

 4    Q.  I want to show you --

 5            MR. LEAL:  May I approach, Your Honor?

 6    Q.  I want to show you what's been marked and admitted into

 7    evidence as 2C.  Um, in that particular box, would you reach in

 8    there?  Please pull out what's inside.  All right.  Is that the

 9    only thing in there or is there something else?

10    A.  I don't know, sir.

11    Q.  What have you just pulled out there?

12    A.  Cream.

13    Q.  What kind of cream?

14    A.  Pond's.

15    Q.  All right.  Is it two Pond's Cream jars?

16    A.  Yes, sir.

17    Q.  Is there bubble wrap in there?

18    A.  Yes, sir.

19    Q.  Did you ever do any work on behalf of the Barrio Azteca

20    involving those kinds of Pond's Cream jars?

21    A.  Yes, sir.

22    Q.  And would you tell the jury what kind of work you did for

23    the Barrio Azteca involving those kinds of Pond's Cream jars?

24    A.  Putting heroin in them.

25    Q.  Putting heroin in them?

DIRECT - GILBERTO MENDOZA

1  A.  Yes, sir.

2  Q.  Would you tell the jury how you'd go about doing that?

3  A.  Take out the cream, package up the heroin in balloons, put

4  it in there and put the cream back in, weigh it, make sure it's

5  the same weight it was when the cream was in there.  Close it

6  back up.

7  Q.  You take out the cream and then weigh it and make sure the

8  cream weighed the same amount that it weighed as it displays on

9  the label?

10  A.  Yes, sir.

11  Q.  The way that the heroin -- with the heroin in it?

12  A.  Yes, sir.

13  Q.  All right.  If it was over or under, um, what would you do?

14  A.  Add more cream or take more out.

15  Q.  Why do you want to make sure it's the same weight?

16  A.  So that way when they weigh it, it comes out the same

17  weight.  It's not more or less.

18  Q.  And in regards to the sending out of that particular Pond's

19  Cream, um, or in that manner, where would you send that to?

20  A.  The address they would give us.

21  Q.  Who's they?

22  A.  Either Cano or the person that took over after he got

23  locked up.  Manny.

24  Q.  Cano or Manny?

25  A.  Yes, sir.

```
 1   Q.  Um, after Manny took charge, did you continue to move that
 2   kind of heroin?
 3   A.  Just once or twice.
 4   Q.  All right.  What about after Manny finished?
 5   A.  No, sir.
 6   Q.  Um, in regards to that heroin that you were sending out,
 7   was it to other Barrio Azteca members?
 8   A.  Yes, sir.
 9   Q.  And what do they do with it?
10   A.  Use it in prison, I guess.
11   Q.  All right.  And the use in prison, is that for personal
12   use?
13   A.  Personal use or sell.
14   Q.  Or sell it to somebody else?
15   A.  Yes, sir.
16           MR. LEAL:  May I have just a moment, Your Honor?
17           THE COURT:  Sure.
18           MR. LEAL:  Pass the witness, Your Honor.
19           THE COURT:  All right.  Ladies and Gentlemen of the
20   Jury -- well, could the attorneys approach a second?
21           (Attorneys approach bench.  Off record discussion.)
22           THE COURT:  It's 4:00.  We are going to break for the
23   day.  Remember, you remain under all the instructions the Court
24   has given you.  And see you at 8:30 in the morning.  Thank you.
25           (Jury leaves courtroom.)
```

```
 1           THE COURT:  You may be seated.  Recess for the

 2    evening.

 3           (Recess for evening.)

 4                            INDEX

 5

 6                    Direct    Cross    Redirect    Recross

 7    WITNESSES FOR THE
      GOVERNMENT:
 8

 9    MANUEL LOPEZ           3        79        95

10    ALBERTO MENDOZA       97

11

12    EXHIBITS:                                      Admitted

13    Government

14    17B-1 Photograph                                 73
      32    Drug calculations                          77
15

16

17                       *  *  *  *  *  *

18           I certify that the foregoing is a correct transcript

19    from the record of proceedings in the above-entitled matter.  I

20    further certify that the transcript fees and format comply with

21    those prescribed by the Court and the Judicial Conference of

22    the United States.

23

24    Signature:/s/ _____Date:  July 16, 2013
                   David A. Perez, RMR, RPR
25
```

David A. Perez, RMR, RPR