1                IN THE UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF TEXAS

3                        EL PASO DIVISION

4

5   UNITED STATES OF AMERICA          No. EP:10-CR-2213-KC

6   v.                                El Paso, Texas

7   RAMON RENTERIA                    May 25, 2012

8

9                           JURY TRIAL

10                          VOLUME VI

11           BEFORE THE HONORABLE KATHLEEN CARDONE

12               UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15  For the Government:  Brian Skaret
                         United States Department of Justice
16                       Criminal Division, Human Rights and
                         Special Prosecutions Section
17                       1301 New York Avenue, NW, Suite 200
                         Washington, D.C. 20530
18
                         Joseph Cooley
19                       United States Department of Justice
                         Criminal Division, Gang Unit
20                       10th and Constitution Avenue, NW
                         Washington, D.C. 20530
21
                         George Leal
22                       Assistant United States Attorney
                         700 East San Antonio, Suite 200
23                       El Paso, Texas 79901

24

25

David A. Perez, RMR, RPR

1    For the Defendant:    Scott P. Foster
                           718 Myrtle Avenue
2                          El Paso, Texas 79901

3

4        Proceedings recorded by stenotype.  Transcript produced by

5    computer-aided transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          COURTROOM DEPUTY:  EP:10-CR-2213, USA versus Ramon

2    Renteria.

3          MR. SKARET:  Good morning, Brian Skaret, Joseph Cooley

4    and George Leal for the United States.

5          MR. FOSTER:  Scott Foster for the defendant.  We're

6    ready to proceed.

7          THE COURT:  I know we had a discussion about

8    voluntariness.  I have a -- I like to have the charge way

9    early.  And as we're winding down and getting to the point

10   where I'm going to give it to you, my understanding is that

11   it's an agreed to charge.  That both the Government and

12   defendant have gone over it.  And that I know we may have a

13   Rule 29 motion.  But as far as the charge itself, is that

14   correct?  Is it an agreed to charge or is it not?

15         MR. SKARET:  Your Honor, I believe it is agreed.

16         MR. FOSTER:  It is agreed, Judge.

17         THE COURT:  Okay.  Great.  All right.  That being

18   said, let's take up your issue.

19         MR. SKARET:  Your Honor, we'd like to call Lieutenant

20   Fabian Galindo to the stand.

21         THE COURT:  All right.  Whenever you're ready.

22                     FABIAN GALINDO, SWORN

23                     DIRECT EXAMINATION

24   BY MR. SKARET:

25   Q.  Good morning, sir.

1    A.   Good morning.

2    Q.   Would you please introduce yourself to the Court?

3    A.   My name is Fabian Galindo.  Lieutenant with the Federal

4    Bureau of Prisons.

5    Q.   How long have you worked at the Bureau of Prisons?

6    A.   14 years, sir.

7    Q.   And what are your duties as an employee of the Bureau of

8    Prisons?

9    A.   Um, Lieutenant, Special Investigative Office.

10   Q.   What do you do as an officer in the special investigative

11   office?

12   A.   Conduct investigations on threats to inmates, threat

13   assessments, track STG.  And within the institution, staff

14   cases.

15   Q.   What is STG?

16   A.   Security Threat Groups.

17   Q.   Another word for prison gangs?

18   A.   Yes.

19   Q.   In July of 2010, were you sent by the Bureau of Prisons to

20   work on a detail at the El Paso Field Division of the FBI to

21   assist with a wire intercept of a contraband prison phone

22   belonging to Carlos Pereya at the U.S. penitentiary in Pollock,

23   Louisiana?

24   A.   Yes, I was.

25   Q.   And why were you sent there?

1    A.  Pretty much looking out for the Bureau of Prisons' best

2    interests.

3    Q.  And what were the Bureau of Prisons' interests at that

4    time?

5    A.  With the fact that there was a identified cell phone inside

6    a federal institution, making sure that it wasn't going to

7    compromise the security and orderly running of that

8    institution.  Should there have been, maybe, a threat to

9    somebody's life, threat to the security of the institution, we

10   would have let them know.

11   Q.  In the usual course of business if a cell phone is found

12   within a prison system, what is done with that cell phone?

13   A.  If we get information where it is, we'll go in and

14   confiscate it, take it.

15   Q.  Was this an exception to the regular rule?

16   A.  Most definitely.

17   Q.  Did you also help in the -- in the kitchen at the FBI?

18   A.  Yes, I did.

19   Q.  And what is the kitchen?

20   A.  The kitchen was a room where the wiretap was being

21   monitored.

22   Q.  And who was monitoring the wiretap?

23   A.  As far as agencies?

24   Q.  Exactly.

25   A.  I believe there was different agencies.  FBI.  There was

1    DEAs, I believe.

2    Q.  Were there linguists in the kitchen?

3    A.  There was.

4    Q.  Were you assisting the linguists?

5    A.  I was assisting the linguists with translations and

6    interpretations.

7    Q.  And why were you in that -- why were you working in that

8    capacity?

9    A.  A lot of what they were interpreting was, I guess, in

10   common, improper Spanish.  My purpose there was to interpret

11   the slang into pretty much what they were intending to say.

12   Q.  And in your work with the special investigative service at

13   the Bureau of Prisons, do you come in contact with a lot of

14   prison or street slang?

15   A.  Yes, sir.  With experience that I have and the time that I

16   have in the special investigative office, I've been exposed to

17   a lot of different gangs terminologies they use.  So. . .

18   Q.  In August of 2010, the wire went down.  Did you continue

19   working at the FBI after that time?

20   A.  No, sir.

21   Q.  And did you go back to your -- back to your place of

22   business?

23   A.  I went back to my assignment, yes, sir.

24   Q.  And you are assigned to which location?

25   A.  United States Penitentiary in Beaumont, Texas.

Q.  Did there come a time when the Bureau of Prisons seized the
contraband cell phone belonging to Carlos Pereya?
A.  How was that again, sir?
Q.  Did there come a time when the Bureau of Prisons seized the
contraband phone that belonged to Carlos Pereya?
A.  Yes, sir.
Q.  And after that phone was seized, did you have any contact
with the defendant, Ramon Renteria, at Beaumont?
A.  Yes, sir.
Q.  How did you come into contact with him?
A.  Um, that was gonna be on -- on weekly routine rounds that
were conducted in the special housing unit.  I would make
rounds over there.  We talked to every inmate in the special
housing unit, just to see if they're okay, see if they need
anything.
Q.  I'd like to show you what's been marked as Government's
Exhibit 31.  Are you seeing on exhibit on your screen?
A.  Yes, I am.
Q.  Now, based on what you're saying, Lieutenant Galindo, in --
during the time of early August of 2010, where is the -- where
is the -- an individual named Ramon Renteria located?
A.  During the time frame of August?
Q.  Early August of 2010.
A.  He was located in USP Beaumont in the special housing unit.
Q.  Let's start this over.  I'm showing what's been marked as

1    Government's Exhibit 31.  Do you see that on your screen?

2    A.  Yes, sir.

3    Q.  Okay.  Do you recognize what this is here?

4    A.  Yes, I do, sir.

5    Q.  And what is it?

6    A.  It's a Sentry record for -- it's a PP37 for Inmate

7    Renteria.

8    Q.  And is this a Bureau of Prisons document?

9    A.  Yes, this is a database that the Bureau of Prisons uses.

10   Q.  All right.  And what does this particular document show us?

11   A.  The category is quarters.  His housing assignments.

12   Q.  His --

13   A.  Housing assignments.

14   Q.  -- housing assignments?

15   A.  Uh-huh.

16   Q.  Now, direct your attention to the top line here that's in

17   dark green.

18   A.  Yes, sir.

19   Q.  Tell us what that line tells us about the defendant's

20   whereabouts.

21   A.  Starting at the far left is the facility where he was

22   housed.  That was over in Pollock.  USP Pollock.

23   Q.  Okay.  And what about the next column?

24   A.  The assignment is going to be -- is Bravo 02.  I'm gonna

25   say that's gonna be Bravo, Alpha Bunk 256, lower.

1  Q.  Okay.  Um, and it tells us -- does it say which bed he's

2  located on?

3  A.  Yes.  Cell 256, in the lower bunk.

4  Q.  All right.  And he's there from?

5  A.  He got put into that cell assignment 5-10-09 at,

6  approximately, 9:24.

7  Q.  And when did he leave?

8  A.  He left that cell assignment, um, 8-19-10 at 1:15.

9  Q.  All right.  Now, based on this particular record, does the

10  defendant go anywhere from Pollock?

11  A.  Yes, sir.  On the the next line up, you'll see that the

12  facility -- as BMP.  That's gonna be USP Beaumont.

13  Q.  Okay.

14  A.  Z05 is gonna be our special housing unit.  Okay.

15  Q.  What time does -- what day does he get to Beaumont?

16  A.  He gets to Beaumont 8-19-10 at 4:57 in the morning.

17  Q.  All right.  And then what time does he leave that

18  particular place?

19  A.  He leaves there -- he leaves that cell -- what time does he

20  leave Beaumont or what time did he leave that cell?

21  Q.  That cell.

22  A.  He leaves that cell, 8-19-10 at 5:18.

23  Q.  Now, once he arrived at your facility, did you have any

24  contact with Ramon Renteria?

25  A.  Yes, sir.  We would do -- after our meetings we would make

DIRECT - BRADY ORTIZ

1    rounds with wardens and other department heads over in the

2    special housing unit and visit every inmate that is in the

3    special housing unit.

4    Q.  And did you have conversations with a man named Ramon

5    Renteria?

6    A.  Any conversation I would have had with him would have been

7    that of the same nature with any other inmate, just to see if

8    they're okay.  See if they need anything, any complaints.

9    Q.  The individual at your facility at that time, Ramon

10   Renteria, did he have a nickname?

11   A.  Yes.

12   Q.  And what was it?

13   A.  Spook.

14   Q.  If you saw Ramon Renteria, also known as Spook, again,

15   would you recognize him?

16   A.  Yes, sir.

17   Q.  And do you see him in the courtroom today?

18   A.  Yes, I do.

19   Q.  Would you please point him out and tell us where he's

20   sitting and identify him by an article of clothing he's

21   wearing?

22   A.  He's sitting over here, sir, wearing a blue shirt and brown

23   coat.

24   Q.  And who's he's sitting with?

25   A.  Another gentleman there in a gray suit with a maroon shirt.

1          MR. SKARET:  Would the record reflect the positive

2     identification of the defendant?

3          THE COURT:  It will so reflect.

4     Q.  (By Mr. Skaret)  When the -- do you know when the

5     defendant's release date from Beaumont was set for?

6     A.  Could I see that document?

7     Q.  I'm showing you what's been marked as Government's Exhibit

8     31.

9     A.  Yes, he left -- he left our institution, USP Beaumont,

10    9-21-10 at 1:15.

11    Q.  Do you remember that day?

12    A.  Yes, I do.

13    Q.  All right.  Did you see the defendant that day?

14    A.  Yes, I did.

15    Q.  And why did you see him?

16    A.  Being that he was releasing to the streets, we often do

17    exit interviews on individuals as the are leaving the bureau.

18    Q.  Tell me what is meant by the term receiving and discharge

19    by the Bureau of Prisons.

20    A.  Receiving and discharge.  When an individual is being

21    received into the institution, this is the first place that

22    they go where they get searched.  They get the change of

23    clothes.  They get fingerprinted.  They get identified.  They

24    get screened by the unit team, medical, the special

25    investigative office.

```
 1              When an individual is departing, this is the last
 2   place that he will go.  Again, he will be properly identified.
 3   He will be fingerprinted, photographed.  If he's leaving the
 4   bureau, SIS, our office, Special Investigative Office, will
 5   conduct exit interviews on him.
 6   Q.  And did you conduct one of those exit interviews that day?
 7   A.  Yes, I did.
 8   Q.  And when was the exit interview taking place?
 9   A.  It took place in the middle of R and D near a desk.
10   Q.  Was there anyone else in that room that day?
11   A.  Yes, an intelligence research specialist is right there --
12   was there with me.
13   Q.  And about how long did you talk to the defendant?
14   A.  Approximately, 15 minutes.
15   Q.  What was the purpose of your interview with the defendant
16   that day?
17   A.  Maybe -- to gather any pertinent information that would be
18   relevant to the security of the institution.
19   Q.  Did you read him his Miranda rights that day?
20   A.  No, I did not.
21   Q.  Why not?
22   A.  Because that interview was only for informational purposes.
23   Q.  As a practice, do you conduct these exit interviews on all
24   inmates leaving the Beaumont facility?
25   A.  I conduct those interviews on inmates that are leaving the
```

1    bureau.

2    Q.  Leaving the bureau?

3    A.  Yes.  If they're just transferring from one institution en

4    route to another, not likely.  If they're leaving the bureau

5    and going to the streets, yes.

6    Q.  And is it your practice to read Miranda to those

7    individuals?

8    A.  No, sir.

9    Q.  Why not?

10   A.  Again, these interviews are only for informational

11   purposes.

12   Q.  Now, at the time you mentioned that you were talking to him

13   in the discharge area of the prison, had the defendant changed

14   clothes by the time you were speaking with him?

15   A.  I believe he had.

16   Q.  What was his demeanor like at the time?

17   A.  Maybe -- maybe antsy, maybe a little nervous.

18   Q.  And why would -- why would you be nervous or if -- did he

19   say why he was nervous?

20   A.  Probably about going to the streets after being locked up

21   so many years.

22   Q.  How was his mental condition?

23   A.  His mental condition seemed fine, sir.

24   Q.  Did he seem willing to talk to you?

25   A.  Yes, sir.

1    Q.   Did you discuss tattoos that day?

2    A.   Yes, we did.

3    Q.   And what did you talk about?

4    A.   Specifically, I spoke about the tattoo he has on his

5    forearm, which consisted of three Indian heads.

6    Q.   Did you ask him about who those Indian heads were?

7    A.   Yes, sir.

8    Q.   What did he say?

9    A.   He addressed one as T-top.  He addressed the other one as

10   Shotgun.  And then he addressed one as himself.

11   Q.   And did he say where he was going?

12   A.   He said he was going to the streets in El Paso.

13   Q.   Did you ask him what he was gonna do when he got there?

14   A.   I believe I asked him when he hit the streets who he was

15   gonna report to.

16   Q.   Now, was that in context of which probation officer is he

17   reporting to or which gang member is he gonna be reporting to?

18   A.   Which gang member.  Usually, an individual that's -- has

19   some gang affiliations, if they are leaving, I'll ask them --

20   or if they're arriving to our institution, I will ask them who

21   are they going to report to.  Pretty much to establish their

22   rank structure.

23   Q.   And did he answer who he was going to report to?

24   A.   He said he wouldn't report to anybody.  That they would

25   report to him.

```
1    Q.  Did you talk to him about, um, getting out of the gang?

2    A.  Yeah, I did state -- I mean, I said -- he was kind of a

3    younger fellow and he's already spent this much time locked up,

4    if he considered stepping away from it.

5    Q.  What did he say in response?

6    A.  He replied it's -- it's too late.  It's already done.

7    Q.  Did you prepare a self-admission form for the defendant to

8    sign that day?

9    A.  Yes, I did.

10   Q.  Did you have that form prepared in advance?

11   A.  Partially.

12   Q.  I'm showing you what's been marked as Government's Exhibit

13   34.  Do you recognize Government's Exhibit 34?

14   A.  Yes, I do, sir.

15   Q.  And is this the self-admission form you prepared?

16   A.  Yes, it is.  Well, it was -- yes, it was prepared by our

17   office.

18   Q.  Okay.  What parts of the form were prepared in advance of

19   your interview?

20   A.  The inmate's name.  The individual's name.  The

21   individual's register number.  And the gang which he is

22   affiliated with.

23   Q.  Okay.  Um, why is it that you prepare these self-admission

24   forms?

25   A.  These are -- this is part of the criteria for the BOP
```

```
 1    validation process for security threat groups.  This is one of
 2    the elements, the self-admission --
 3    Q.  So this helps you identify -- pardon me.  So this helps you
 4    identify gangs and gang members?
 5    A.  Yes, sir.
 6    Q.  Did the defendant -- did the defendant sign this particular
 7    self-admission form?
 8    A.  Yes, he did, sir.
 9    Q.  And is this his signature right here?
10    A.  Yes, sir.
11    Q.  And did he write in that he had been a member of this group
12    since 1990?
13    A.  No, sir.
14    Q.  Who wrote that in?
15    A.  My staff wrote that in.
16    Q.  Okay.  And why did they write that in?
17    A.  This is information that he relayed to us.
18    Q.  And how about this, did he write that he currently held the
19    rank of lieutenant?
20    A.  No, he did not write that.
21    Q.  Is that also what your staff wrote in?
22    A.  Yes, that's what he stated.  That's what my staff wrote in.
23    Q.  And whose signature is this right here?
24    A.  That's my signature, sir.
25    Q.  All right.  And were you a witness of him signing this?
```

```
1    A.  Yes, I was.

2    Q.  Now, the admittance of membership on the form states that

3    the defendant hereby signs the statement of his own free will

4    without promises or assurances.  And does hereby admit that he

5    is a current and active member of the BA.  Did you tell him

6    that he had to fill out this form?

7    A.  No, sir.

8    Q.  Did you ask him if he would fill it out?

9    A.  Yes, sir.

10   Q.  All right.  And what would have happened if he did not fill

11   out this form?

12   A.  There would have been no negative action taken.

13   Q.  What would have happened if he didn't want to talk to you?

14   A.  Same thing.  No negative action, sir.

15   Q.  Has it happened in your past experience that inmates take

16   that course of action?

17   A.  Yes, sir.

18   Q.  And -- and if they're in this discharge unit of your

19   facility and they decide not to talk to you, what happens to

20   these individuals?

21   A.  They go on with their regular business, sir.

22   Q.  Now, I note that your -- pardon me.  That -- I note that

23   the Government's Exhibit 34 states that this was signed on

24   September 21, 2008, at approximately 12:30 p.m.  Is that

25   correct?  Can you see that?
```

1    A.  Yes, sir.

2    Q.  So that's right after lunch, correct?

3    A.  Yes, sir.

4          THE COURT:  Can -- can I see that again?  I have a

5    question.  It says 2008?

6          THE WITNESS:  Yes.  I'm gonna say that's gonna be a --

7    that has to be a typographical error, sir.  That should have

8    been 2010.

9    Q.  (By Mr. Skaret)  You're talking about right here?

10   A.  Yes, sir.

11   Q.  Is that also a typographical error under the inmate's

12   signature where it says September 21, 2008?

13   A.  Yes, sir, that should be '10.

14   Q.  Now, at the date on the top of the memo or the

15   self-admission form, do you see here September 21, 2010?

16   A.  That's the appropriate date, sir.

17   Q.  Is it safe to say that this is a form that's refilled as

18   you use it or as your staff uses it?

19   A.  Yes, sir.

20   Q.  So he signs and, basically, dates this form September 21,

21   12:30.  I'd like to bring your attention to Exhibit 31, which

22   we've already looked at.  By looking at this record, can you

23   tell what time of day on September 21st that the defendant was

24   keyed out of the facility?

25   A.  Yes, it shows that he was keyed out of the facility on

1    September 21, 2010 at 1:15.

2    Q.   Is that here 13:15?

3    A.   That 13:15, sir.

4    Q.   So that's 1:15 in the afternoon?

5    A.   Yes, sir.

6    Q.   Based on your exit interviews that you've conducted in the

7    past, have you ever kept an inmate in past their release date

8    based on what they say in an exit interview?

9    A.   No, sir.

10   Q.   Was the defendant in restraints at the time?

11   A.   No, he was not.

12   Q.   Not in handcuffs?

13   A.   Not in handcuffs.  Not in leg irons.  Nothing.

14   Q.   Were you wearing a gun?

15   A.   No, sir.

16   Q.   How about any other weapon?

17   A.   No, sir.

18   Q.   Did you make the defendant any promises?

19   A.   No, sir.

20   Q.   Did you make any false statements to the defendant?

21   A.   No, sir.

22   Q.   After the interview, you wrote up a report.  Is that

23   correct?

24   A.   Yes, I did.

25   Q.   And why did you write that report?

1    A.  Well, after the information that was attained through that

2    exit interview, I felt it was pertinent that -- I felt it was

3    pertinent to this case.

4    Q.  Who did you send that memo to?

5    A.  I sent it to an FBI agent.  I believe I sent it to Special

6    Agent Samuels.

7    Q.  And is Special Agent Samuels located in El Paso?

8    A.  Yes.

9    Q.  And why did you -- let me ask you.  Before the exit

10   interview, were you planning on sending this information to the

11   FBI?

12   A.  No, sir.

13   Q.  Why did you change your mind afterward?

14   A.  Because the information that we did gather during that exit

15   interview -- felt it was substantial information.  It was

16   pertinent to the group -- to this incident that took place.

17   Q.  Did the FBI request that you do this interview?

18   A.  No, they did not.

19   Q.  Did anyone from the U.S. Attorney's Office or Department of

20   Justice request that you do this interview?

21   A.  No, sir.

22          MR. SKARET:  That's all, Your Honor.  Thank you.

23          THE COURT:  You may proceed, Mr. Foster.

24

25

```
 1                          CROSS-EXAMINATION
 2   BY MR. FOSTER:
 3   Q.  Mr. Galindo, you were aware of the FBI investigation for
 4   quite sometime, weren't you, before that, before your
 5   interview?
 6   A.  Yes, I was.
 7   Q.  In fact you were listening to the phone calls that were
 8   being made on the cell phone in Carlos Pereya's cell.
 9   A.  Yes, sir.
10   Q.  And you were aware that there was at least one phone call
11   there where Mr. Renteria was on that phone?
12   A.  Yes, sir.
13   Q.  And you were aware that Mr. Renteria was being investigated
14   as part of this case that's been filed on this indictment in
15   this case, weren't you?
16   A.  Yes, sir.
17   Q.  And when you asked him questions, you were aware that the
18   FBI was investigating his role in the Aztecs, weren't you?
19   A.  Yes, sir.
20   Q.  So when you conducted the interview and started asking him
21   questions about who he was reporting to and his rank and
22   leadership, you were fully aware of the FBI's investigation
23   into that matter as well.
24   A.  As far as to his rank within the organization, no, sir.
25   Q.  Wouldn't that be part of their investigation as to his
```

1   role?

2   A.  Maybe what his role was, not necessarily what his rank is

3   within the organization.

4   Q.  That same day you prepared a memo and sent it right off to

5   the FBI, didn't you?

6   A.  I called and I advised them, seeing if they were interested

7   in it.  Because I -- I thought it was pertinent to their case.

8   Q.  While the exit interview is normal in your business,

9   wasn't -- isn't it true the purpose of your questioning was to

10  elicit information that could be used in the criminal

11  investigation?

12  A.  No, sir.

13  Q.  So you-all normally ask about a person's rank?

14  A.  Yes, I do.

15  Q.  You normally ask where they're going to -- who they were

16  going to be reporting to?

17  A.  Yes, I do.

18  Q.  And you're not talking about the probation officer or --

19  A.  No, I'm not talking about the probation officer.

20          THE COURT:  Can I just ask -- wait until he finishes

21  his question before you answer because this gentleman --

22          THE WITNESS:  How's that again?

23          THE COURT:  Wait till he finishes his question before

24  you start your answer.

25          THE WITNESS:  Okay.

1    Q.  (By Mr. Foster)  I noticed in your memo that you said that

2    Mr. Renteria -- said that he spent three years in the Texas

3    Department of Criminal Justice.  Is that right?

4    A.  Yes, sir.

5    Q.  You know, I've been looking over Mr. Renteria's criminal

6    history for quite sometime, and I can't see where he's ever

7    spent any time in the Texas Department of Criminal Justice.

8    Were you able the find that on his criminal history?

9    A.  That was off of his statement, sir.

10   Q.  So you're saying that he would misstate where he's spent

11   prison time in this exit interview?

12   A.  Again, these are statements that he made, sir.

13   Q.  So if that information is not true, then the statement is

14   unreliable, isn't it?

15   A.  I can only take that man at his word.

16   Q.  I noticed when you were asked questions about when

17   Mr. Renteria got to the facility and left, that you first said

18   he got to the facility in early August.  Isn't that correct?

19   A.  In August, yes, sir.

20   Q.  Well, I wrote down the "words early" August on my notes.

21   Are you disagreeing that you said early August?

22   A.  Well, I can't say -- I don't remember exactly which date.

23   But it would have been early August.

24   Q.  And, actually, you were only able to the testify to the

25   dates when you were led through it by the prosecuting attorney.

1    A.  How's that again?

2    Q.  You were only actually able to testify to the dates when

3    you were led through that with an exhibit with the prosecuting

4    attorney.

5    A.  I was looking at the exhibit.  And I was reading Sentry

6    documentation, the dates that it reflected, the exact dates

7    that he arrived, the exact dates that he left.

8    Q.  As I said, you were only able to go through those dates

9    when you were given that information through an exhibit through

10   the prosecuting attorney.  Is that correct?

11   A.  Yes, sir.

12   Q.  What staff members wrote the information on that form?  Who

13   were the staff members that wrote the information, Lieutenant,

14   that he had been in Barrio Azteca since 1990?

15   A.  It's gonna be an intelligence research specialist, Special

16   Investigative Office.

17   Q.  Do you know their name?

18   A.  Robert Niland.

19   Q.  Was he actually in the room?

20   A.  Yes, he was.

21   Q.  Did he write that information on the form before or after

22   it was signed by Mr. Renteria?

23   A.  It was in Renteria's presence.

24   Q.  Did he write the information on the form before or after

25   Mr. Renteria signed it?

David A. Perez, RMR, RPR

```
 1   A.  The written -- the "1990s" and the "lieutenant" was written

 2   in Renteria's presence.

 3            MR. FOSTER:  Judge -- well --

 4   Q.  Let me ask you.  You don't remember whether it was written

 5   on the form before or after, do you?

 6   A.  It was written while he was there, sir.

 7   Q.  Before or after he signed it, sir?

 8   A.  Before he signed it.

 9   Q.  And you remember that clearly?

10   A.  Yes, sir.  I mean. . .

11   Q.  Why does it take you so long to answer that question?

12   A.  I was listening to it the way you were reading it -- the

13   way you were saying it, sir.

14   Q.  Your interviews are recorded.

15   A.  No, they're not.

16   Q.  They're not recorded.  You do not have cameras in the room,

17   recording or audio equipment, recording these interviews?

18   A.  No, I do not.

19   Q.  So we are left with your particular recollection of this

20   event.  Is that correct?

21   A.  And the documentation, sir.

22   Q.  The documentation that may or may not have been written at

23   the time about being a lieutenant and being there since 1990.

24   That may or may not have been written before he signed it or

25   not.  We're left with your recollection of that event.  Is that
```

1    correct?

2    A.  Let me -- can I explain?

3    Q.  Why not?

4    A.  Okay.  That self-admission form, just like explained

5    before, the inmate's name, the inmate's register number and his

6    gang affiliation, that is put on there prior.  The inmate is

7    interviewed.  He's asked these questions.  As he answers the

8    questions, if he's done any other time or how long he's been

9    affiliated with the group, that's written in at that time.

10   What his rank is with the group, that's written in at that

11   time.

12          After those -- after those lines are filled in, after

13   that information is put on the sheet, the sheet is turned to

14   him and he is given the option to sign.

15          THE COURT:  Can I ask a question?  Could the

16   Government put that form back up on the Elmo so I can be

17   looking at it as he's describing?

18          MR. SKARET:  Yes, Your Honor.

19          THE COURT:  Thank you.  Okay.  You may proceed.

20   Q.  (By Mr. Foster)  Are you finished explaining or. . .

21   A.  Yes, sir.

22   Q.  Okay.  When was the last time you reviewed your memos in

23   this form?

24   A.  My memor- -- earlier today, sir.

25   Q.  Mr. Galindo, if you had not reviewed those memos and forms,

```
 1    would you actually have an independent recollection of what
 2    went on in this interview?
 3    A.   To an extent, sir.
 4    Q.   Some.
 5    A.   Some.
 6    Q.   Did you have any other contact with Mr. Renteria when he
 7    was in Beaumont?
 8    A.   As I had expressed, during weekly rounds in the special
 9    housing unit.
10    Q.   Did you ever speak to him?
11    A.   Casual conversation as to -- if there was anything he
12    needed.  If he was okay.  If he had any complaints.
13    Q.   In speaking to him, did you ever talk to him about what you
14    thought was going to happen to him once he got outside?
15    A.   No, sir.
16    Q.   Never teased him?
17    A.   No, sir.
18    Q.   Never ridiculed him?
19    A.   No, sir.
20    Q.   When you make those rounds, are there cameras recording
21    those events as well?
22    A.   Yes, sir.
23    Q.   Is there audio as well?
24    A.   No, sir.
25    Q.   So if anything was said, nobody would know it but you or
```

1    him.  Is that correct?

2    A.  Well, there was a group of individuals.  The administration

3    of the institution, other department heads, are making these

4    rounds at the same time I was.

5    Q.  With you or. . .

6    A.  Yes, with me.

7    Q.  Like in a group?

8    A.  Yes, sir.

9    Q.  You and the administration go out and make rounds as a

10   group?

11   A.  Yes, sir.

12          MR. FOSTER:  I will pass the witness.

13          MR. SKARET:  No questions, Your Honor.

14          THE COURT:  You may step down.  You may proceed.

15          MR. SKARET:  Your Honor, ordinarily a defendant's

16   statements to any sort of law enforcement officer can be

17   admissible in a case in chief of the Government only if it's --

18   the statements were made voluntarily and in accordance with

19   Miranda v. Arizona.  With regard to Miranda, the Supreme Court

20   recently held in Howes v. Fields, that's 132 Supreme Court

21   1811, 2012, that the warnings are not automatically required

22   when an inmate is questioned while in prison regarding other

23   criminal conduct.  As discussed below, the trial court must

24   assess all the features of the interrogation to determine if it

25   carried the same inherently coercive pressures as the type of

1    station house questioning that was envisioned in Miranda.

2         Because it appears that was there was nothing

3    inherently coercive about the exit interview, Government's

4    position that the defendant was not in custody for the purposes

5    of Miranda and, therefore, the warnings were not required.  Now

6    with respect to custody, when interrogating.

7         THE COURT:  Let me ask you a question.  On the Howes

8    versus Fields case, does it make a difference that that's

9    actually a habeas case?

10        MR. SKARET:  I don't believe so, Your Honor.  The

11   same -- you know, in that case the court was taking a look at

12   the same type of coercive environment.  And here, like in

13   Fields, the defendant was taken from the general population

14   unit.  In Fields, as I recall from the facts, when the -- when

15   the case was finished, the defendant in that case was sent back

16   to general population.

17        Here, we have even less coercive environment because

18   the defendant was taken to general population, given additional

19   freedoms that other inmates did not have, such as changes of

20   clothes and getting bus money, and, basically, getting his

21   ticket out of there.  And unlike in Fields, the defendant here

22   was not returned to the general population.  He was sent right

23   out the door, approximately, 45 minutes after the interview.

24        THE COURT:  All right.  Go ahead.

25        MR. SKARET:  So based on that, Your Honor, from the

1    point of view from the defendant and from the point of view of

2    Lieutenant Galindo, the defendant was on his way out,

3    regardless of what was going to happen that particular day.

4            Additionally, the fact that the defendant was not

5    restrained and that the interview lasted roughly ten to 15

6    minutes, both weighed heavily against defining of custody for

7    the purposes of Miranda.

8            Taking all of the objective circumstances of the exit

9    interview, the level of coercion, which appears to be about

10   none, if any, clearly did not rise to the level of station

11   house type of interrogation upon arrest that the Miranda court

12   envisioned.  Therefore, it's the Government's position that the

13   defendant was not in custody during the exit interview.  And,

14   as such, the warnings were not required.

15           Now, because he was not in custody, Miranda does not

16   bar the admission of the statement to Lieutenant Galindo for

17   this purpose.  We wanted to request the Court make a finding of

18   voluntariness on the issue.  Now, of course, under the due

19   process clause, any statement that's offered in this court must

20   be made voluntarily.  And under Colorado v. Connelly, a

21   statement is only involuntary if the product -- pardon me, if

22   the statement is a product of government misconduct.

23           Now, through the years, as the Court is likely aware,

24   there have been many different factors that have gone into this

25   Colorado v. Connelly.  Um, this -- this, um. . .

1          THE COURT:  Test.

2          MR. SKARET:  Yes.  This test -- thank you, Your Honor.

3     Things like the subject's capacity to resist that pressure, the

4     location of the questioning, any promises of leniency that

5     might have led to a statement, appeals to the defendant's

6     emotions, trickery, false or misleading statements, the age or

7     the youth of the person, the physical and mental condition of

8     the person at the time.

9          Well, here, we heard that the defendant may have been

10    nervous at the time of his -- of his exit interview.  And, as

11    the witness stated, this is a common occurrence.  The defendant

12    had been locked up since the late '80s and was heading out onto

13    the street for the first time in decades.

14         With respect to the defendant's capacity to resist,

15    um, you know, he was in a position where he understood Bureau

16    of Prisons rules.  He understood, um, you know, his -- whether

17    he needed to -- to give this information.  The self-admission

18    form itself said that the admission was voluntary, was not a

19    product of coercion.

20         With respect to the location, he was not in leg irons

21    or shackles or handcuffs.  He was away from his cell, away from

22    the general population.  And, in fact, he had already started

23    the discharge process, changing his clothes, um, and almost

24    literally on his way out the door.

25         The witness stated he made no promises to the

1    defendant.  He did not appeal to emotion.  He made no false

2    statements.  The witness stated that the defendant's mental

3    condition appeared to be fine.  It was a ten- to 15-minute

4    chat.  He was not in physical restraints.  And probably the

5    most important point is that he was released right after the

6    interview.

7            For all these reasons, the Government believes that

8    Miranda does not apply because the defendant was not in

9    custody.  And that the statements to Lieutenant Galindo were

10   voluntarily made under the due process clause.

11           THE COURT:  Mr. Foster.

12           MR. FOSTER:  I will be quick, Judge.  I would like to

13   start off with one of the very first things that Lieutenant

14   Galindo said.  Is that he's interested in the security of the

15   institution.  Mr. Galindo was fully aware of this

16   investigation, was in on listening to the telephone calls.

17   That's part of their standard operating procedures when you

18   have telephone situations inside the Bureau of Prisons, inside

19   the prisons.  He was fully aware of the investigation going on.

20   And knew exactly what was gonna happen.

21           Asking about the defendant's rank and who he's going

22   to report to has nothing to do with the security of the

23   institution since -- especially, since the defendant is almost

24   out the door.  I would submit to you that, um, Mr. Galindo was

25   probably trying to do a good deed.  And this is nothing more

1    than a subterfuge for what he could not do directly.  He did it

2    indirectly by using something that was at hand and available

3    that he should have because he was asking questions that led to

4    the investigation that was already underway, that he was fully

5    aware of.  And he is a law enforcement official.  And yet, he

6    still does not do this.  He used a different method than what

7    would normally be required by the code of criminal procedure.

8         He -- my client -- talked about capacity to resist.

9    My client was taken at midnight -- just after midnight from

10   Pollock, packed on a bus, got to Beaumont at 4:15 in the

11   morning.  Why was he sent to Beaumont?  Mr. Galindo was at

12   Beaumont.  They could have sent him to any number of

13   penitentiaries that were a lot closer to the release at El

14   Paso.

15        THE COURT:  Okay.  But here's the issue.  Um, I -- I

16   hear what you are saying about the person involved in asking

17   him the questions.  But, if you look at Howell(sic) versus

18   Fields, how is he -- how -- how is this not a situation where,

19   um, as Mr. Skaret mentions, that he's even in less of a

20   custodial situation than the gentlemen was in Howe -- Howes

21   versus Fields?

22        MR. FOSTER:  It may have been in less of a custodial

23   interrogation situation than the gentleman in Howes v. Fields.

24   However, he was still in custody.  It is --

25        THE COURT:  And so was the gentleman in Howell versus

```
 1   Field.  That he was being questioned by sheriffs and he was
 2   returned to his cell.  And yet that was proper.
 3          MR. FOSTER:  That was about other criminal conduct.
 4   Judge, this is not about other criminal conduct.  That -- there
 5   has been a distinction in the courts in the cases about -- even
 6   where a person is in custody has an attorney on one case, and
 7   law enforcement has information about another case, totally
 8   separate, where they can go and question that person without
 9   even going to their attorney and asking permission.  That's
10   been a distinction.  That's called -- that's the other criminal
11   conduct concept.
12          In this case, Mr. Galindo is not asking him about
13   other criminal conduct.  He's asking about the investigation
14   that he's already aware of and has been a part of.
15          THE COURT:  Well, isn't that what the sheriffs were
16   doing?  The sheriff's deputies were involved in the sexual --
17   the allegations of sexual abuse of a minor.  It wasn't prison
18   officials that were asking him questions.  They brought in the
19   sheriff's officials.
20          MR. FOSTER:  Yes, Judge.  They brought in somebody
21   else.  Someone else in another investigation that was about
22   as -- I recall that was not the case of which he was confined
23   on.
24          THE COURT:  Well, this wasn't the case Mr. Renteria
25   was confined on either.
```

         1          MR. FOSTER:  But, Mr. Galindo had already been a part

         2  of this investigation.  He was, essentially, an investigator in

         3  this case.  And he used his position, the situation with

         4  Mr. Renteria being at his facility, which may have been by

         5  design or not, I don't know.  I don't think anyone's going to

         6  testify to that.

         7          And he used that exit interview situation to obtain

         8  information that he would not have done, that he could have

         9  done as a law enforcement official reading his Miranda rights

        10  and getting a -- a waiver.  And instead, he used another

        11  situation to inquire the same information that he would

        12  otherwise.

        13          In other words, he did incorrectly what he could not

        14  or maybe should have tried to do directly.  Mr. Renteria was

        15  already the focus of the investigation that Mr. Galindo was

        16  part of.

        17          THE COURT:  All right.

        18          MR. FOSTER:  That's all, Judge.

        19          THE COURT:  Any response before I rule?

        20          MR. SKARET:  Your Honor, the Government's position

        21  would be the same even if Special Agent Samantha Mikeska was

        22  flown to Beaumont to take this interview herself.  Because the

        23  questioning was not about and did not relate to the crime for

        24  which he was incarcerated, starting from, I believe, the 2002

        25  or 2003.  So whether it was Lieutenant Galindo doing the

     1    questioning or anybody else, we don't believe that changes the

     2    analysis under Howes v. Fields.

     3         THE COURT:  All right.  Based on the information and

     4    the testimony of Lieutenant Galindo, the Court will find that

     5    the statement was voluntary.  I think that the case law, as

     6    outlined in Howes v. Fields, as well as the cases that it

     7    cites, including Schatzer and Perkins, um, I -- I think the

     8    quote exactly is that the issue -- the questions revolves upon

     9    and depends upon whether the incarceration excerpts a coercive

    10    pressure that Miranda was designed to guard against.  The

    11    danger of coercion that results from the interaction of custody

    12    and official interrogation.  The mere fact that he was being

    13    questioned by a government official is not sufficient.  And the

    14    Court does not believe that it rises to the level of a

    15    custodial interrogation.  Or that Miranda was at play here.  So

    16    the Court will find it to be voluntary.

    17         Anything further before we bring in the jury?

    18         MR. SKARET:  One moment, Your Honor.

    19         THE COURT:  Okay.

    20         MR. SKARET:  Nothing, Your Honor.

    21         MR. FOSTER:  Judge, just would note the defense's

    22    exception to the rulings for the record, please.

    23         THE COURT:  So noted.  So noted for the record.  All

    24    right.  Um, then let's get ready to bring in the jury and

    25    proceed.  You may bring in your witness again.  Let's take just

David A. Perez, RMR, RPR

```
1    a real short recess.  Five minutes.  Let's get ready.
2              (Recess.)
3              COURTROOM DEPUTY:  Court is back in session.
4              THE COURT:  You may be seated.  Ready for the jury?
5              MR. SKARET:  Yes, Your Honor.
6              MR. FOSTER:  Ready to proceed, Judge.
7              (Jury enters courtroom.)
8              THE COURT:  You may be seated.
9                         CROSS-EXAMINATION
10   BY MR. FOSTER:
11   Q.  Good morning, Mr. Mendoza.  My name is Scott Foster.  I'm
12   going to ask you some questions.  I'm going to ask you
13   questions from testimony yesterday.  Let's start off with your
14   criminal history.  It goes back quite a ways before you were an
15   adult.
16   A.  Yes, sir.
17   Q.  I have -- I see a burglary of a building.
18   A.  Yes, sir.
19   Q.  Burglary of vehicle?
20   A.  Yes, sir.
21   Q.  Unauthorized use of motorcycle?
22   A.  Yes, sir.
23   Q.  What year was that?
24   A.  I don't remember, sir.
25   Q.  Was that the one that was rolled into the other cases you
```

1   got ten years on in '99?

2   A.  Yes, sir.

3   Q.  A marijuana case.  Was that possession of marijuana?  Was

4   that a misdemeanor or felony?

5   A.  Misdemeanor.

6   Q.  Evading arrest?

7   A.  Yes, sir.

8   Q.  Unlawful carrying of weapon?

9   A.  Yes, sir.

10  Q.  What type of weapon?

11  A.  380.

12  Q.  Semi-automatic pistol?

13  A.  Yes, sir.

14  Q.  Engaging in organized criminal activity.  Usually that's a

15  state charge.

16  A.  Yes, sir.

17  Q.  And usually with those, there's an underlying charge that

18  says you engaged with more than one person by doing something.

19  What was the underlying charge?

20  A.  Um, I think that was for the for the Ag assaults; wasn't

21  it?

22  Q.  Aggravated assault deadly weapon and aggravated assault on

23  public servants?

24  A.  Yes, sir.

25  Q.  And then I show in December of 2010 you were arrested on a

```
 1   charge of unlawful possession of firearm by a felon?
 2   A.  Yes, sir.
 3   Q.  What happened with that case?
 4   A.  I still got it pending.
 5   Q.  So state or federal?
 6   A.  State, sir.
 7   Q.  Basically, you signed a deal where you're going to be
 8   looking at 240 months or 20 years; is that correct?
 9   A.  Yes, sir.
10   Q.  And if you do really good here, you're hoping you will get
11   reduction for that time, right?
12   A.  Yes, sir.
13   Q.  They also -- in part of that deal is they wouldn't use your
14   prior convictions to seek any type of enhancements, didn't
15   they?
16   A.  Yes, sir.
17   Q.  It looks like you've got about three separate priors where
18   guns were used, or they're a part of that, doesn't it?
19   A.  Yes, sir.
20   Q.  You always carry a gun?
21   A.  No, sir.
22   Q.  Were you known for being able to traffic in guns or get
23   guns?
24   A.  No, sir.
25   Q.  In your plea of guilty in this case, there were certain
```

1    things in the factual basis that you pled guilty to.  I believe

2    one of them was the use of violence or threats to advance

3    Barrio Azteca activities; is that correct?

4    A.  Yes, sir.

5    Q.  Collected quota by extorting drug dealers in El Paso?

6    A.  Yes, sir.

7    Q.  Importing heroin and cocaine?

8    A.  Yes, sir.

9    Q.  And you actually had not just a conspiracy, but a direct on

10   each of those activities; isn't that true?

11   A.  Yes, sir.

12   Q.  I noticed you had a number of situations when you were in

13   Texas prisons with disciplinary reports.  You got disciplined

14   for fighting?

15   A.  Yes, sir.

16   Q.  You've -- possession of contraband?

17   A.  Yes, sir.

18   Q.  In prison, what is contraband?

19   A.  It could be anything from writing pens to anything that

20   you're not supposed to have in prison.

21   Q.  It could be drugs?

22   A.  Yes, sir.

23   Q.  Weapons?

24   A.  Yes, sir.

25   Q.  Telephones?

David A. Perez, RMR, RPR

```
 1    A.  Yes, sir.

 2    Q.  Magazines that are not --

 3    A.  Yes, sir.

 4    Q.  -- on the approved list?

 5    A.  Yes, sir.

 6    Q.  Anything that you might have in your cell that you didn't

 7    get from the prison officials or commissary?

 8    A.  Yes, sir.

 9    Q.  Let's see, you had a specific discipline for possession of

10    weapons?

11    A.  Yes, sir.

12    Q.  What type of weapons did you possess inside the prison?

13    A.  Um, shanks.

14    Q.  When you talk about shanks, what do you mean by shanks?

15    A.  Anything sharpened into a point to stab somebody with.

16    Q.  So you were sent to Coffield prison at one time, I

17    understand; is that right?

18    A.  Yes, sir.

19    Q.  That's where you were made the keeper of the cell phones?

20    A.  Yes, sir.

21    Q.  Who made the decision to make you keeper of cell phones?

22    Is that something someone says this is what you do?  Or do you

23    say I volunteer?

24    A.  It was just -- I would take care of them for certain

25    people.
```

1   Q.   Okay.   These people know that you had all these discipline
2   problems?
3   A.   Yes, sir.
4   Q.   Coffield, that's where the decisions are made to put
5   someone on a green light list, isn't it?
6   A.   Yes, sir.
7   Q.   That decision can only be affirmed there, correct?
8   A.   No, sir.
9   Q.   You're saying anybody else can put someone on a green light
10  list?
11  A.   Yes, sir.
12  Q.   When someone's put on a green light list, what does that
13  mean for them?
14  A.   That you have to get them.   You could either stab them or
15  kill them, anything.   Beat them up.
16  Q.   You ever killed anyone on a green light list?
17  A.   No, sir.
18  Q.   Ever with anybody that killed anybody on a green light
19  list?
20  A.   No, sir.
21  Q.   You've got a big green light list, right?
22  A.   Yes, sir.
23  Q.   Sounds like the BA are just killing people right and left.
24  Do you know anybody that was killed on a green light list?
25  A.   Yes, sir.

1   Q.  How many?

2   A.  Maybe one.

3   Q.  Now, you testified a lot about some phone calls between

4   Galindo and Zuniga.  What's Zuniga's rank?

5   A.  Um, lieutenant.

6   Q.  What's Galindo's rank?

7   A.  Top lieutenant.

8   Q.  It's like first lieutenant?

9   A.  Yes, sir.

10  Q.  Okay.  The lieutenant of lieutenants.  Are you sure he

11  wasn't a sergeant?

12  A.  No, sir.

13  Q.  And did you say that Little Angel was always lieutenant?

14  A.  Yes, sir.

15  Q.  Are you sure about his rank?

16  A.  Yes, sir.

17  Q.  Eventually, Little Angelillo was arrested, right?

18  A.  Yes, sir.

19  Q.  Do you remember when?

20  A.  No, sir, I don't remember on what time.  But I think it was

21  in 2010.

22  Q.  Okay.  That's -- there's 12 months there.  Can you narrow

23  it down, spring, summer, winter, fall?

24  A.  Maybe around June.

25  Q.  And you were told to report to Manny and Peewee; is that

```
1    correct?
2    A.  Yes, sir.
3    Q.  When you got out, what was their rank?
4    A.  Sir?
5    Q.  What was their rank, Manny and Peewee?
6    A.  They didn't have rank at that time.
7    Q.  Did they get rank?
8    A.  Yes, sir.
9    Q.  What rank did they get?
10   A.  Sergeants.
11   Q.  Both of them?
12   A.  Yes, sir.
13   Q.  Who gave them rank?
14   A.  Shotgun.
15   Q.  Did you verify that?
16   A.  Sir?
17   Q.  Did you verify that?
18   A.  No, sir.
19   Q.  I thought you were supposed to verify that stuff.
20   A.  Yes, sir.
21   Q.  Now, there was a discussion about charging members quota.
22   Was that all members paid quota or if they were selling or if
23   they were selling drugs that were outside of the BA drug
24   pipeline?
25   A.  No, sir, anybody who was selling drugs.
```

David A. Perez, RMR, RPR

CROSS - BERT - OMEGA

```
 1    Q.  Everybody who sold drugs?

 2    A.  Yes, sir.

 3    Q.  How much was quota?

 4    A.  Depending on how much they sold.

 5    Q.  Was there a percentage?

 6    A.  Yes, sir.

 7    Q.  What was the percentage?

 8    A.  Ten percent.

 9    Q.  And you found that out from Chucky?

10    A.  Yes, sir.

11    Q.  What was Chucky's rank?

12    A.  He didn't -- had no rank, sir.

13    Q.  And you said Chucky found out from Manny?

14    A.  Yes, sir.

15    Q.  How do you know Chucky found out from Manny?

16    A.  He told me, sir.

17    Q.  Did you verify it?

18    A.  No, sir.

19    Q.  And who did Manny get his orders from?

20    A.  I don't know, sir.

21    Q.  Yesterday there was a small group photo that is Exhibit

22    1-B.

23            THE COURT:  Displayed to the jury?

24            MR. FOSTER:  Yes, Judge, it's been admitted.  Jury's

25    seen it.
```

1    Q.   (By Mr. Foster)   You identified people in that photo?

2    A.   Yes, sir.

3    Q.   You identified two people in that photo?

4    A.   Yes, sir.

5    Q.   Can you identify the three gentlemen on the left side of

6    that photo?

7    A.   No, sir.

8    Q.   How about the guy in the black T-shirt, TX on it, can you

9    identify him?

10   A.   No, sir.

11   Q.   The woman in the background just between her and who you

12   identified as Cano?

13   A.   No, sir.

14   Q.   Do you know where that photo was taken?

15   A.   No, sir.

16   Q.   Were you there when that was taken?

17   A.   No, sir.

18   Q.   Thank you.   You testified that you went to a McDonald's

19   with Chucky?

20   A.   Yes, sir.

21   Q.   Before that you went out with him picking up quota?

22   A.   Yes, sir.

23   Q.   Did you count the money that Chucky had?

24   A.   No, sir.

25   Q.   So, basically, you're relying on what Chucky told you as to

```
 1   how much there was or guessing?
 2   A.  Just guessing what I saw him counting.
 3   Q.  You're guessing from what you saw him count?
 4   A.  Yes, sir.
 5   Q.  And Chucky went to another vehicle?
 6   A.  Yes, sir.
 7   Q.  And sat in another vehicle with somebody else?
 8   A.  Yes, sir.
 9   Q.  You testified that was my client, Ramon Renteria?
10   A.  Yes, sir.
11   Q.  Did you see him?
12   A.  Yes, sir.
13   Q.  Are did you know who he was at that time?
14   A.  Yes, sir.
15   Q.  So you had met him before?
16   A.  No, sir.
17   Q.  Seen pictures of him before?
18   A.  Yes, sir.
19   Q.  Did you verify that Chucky actually gave him the money?
20   A.  No, sir.
21   Q.  So when you say that Chucky gave him money, you only know
22   that from what someone else told you?
23   A.  Yes, sir.
24   Q.  Now, you said you got orders to shoot up a Sureños house;
25   is that correct?
```

```
 1    A.  Yes, sir.

 2    Q.  You said the orders came from Manny?

 3    A.  Yes, sir.

 4    Q.  And do you know where Manny -- do you know where Manny got

 5    his orders?

 6    A.  No, sir.

 7    Q.  And if you testified to where Manny got his orders, you're

 8    only assuming, aren't you?

 9    A.  Yes, sir.

10    Q.  Isn't it possible that Manny might be issuing orders in

11    someone else's name to make himself look legitimate?

12    A.  No, sir.

13    Q.  Did you verify that?

14    A.  No, sir.

15    Q.  Did you verify the orders?

16    A.  No, sir.

17    Q.  So you went out with guns blazing or hoping to blaze, but

18    they didn't, without verifying those orders?

19    A.  Yes, sir.

20    Q.  You testified that Silent told you to be a bridge in the El

21    Paso County Jail or to the El Paso County Jail?

22    A.  To the El Paso County Jail.

23    Q.  Who is Silent again?

24    A.  Lieutenant.

25    Q.  I'm sorry?  I didn't hear you.
```

```
 1    A.  He's a lieutenant.
 2    Q.  What's his name?
 3    A.  Hector Galindo.
 4    Q.  He told you directly?
 5    A.  Yes, sir.
 6    Q.  And when you were shipping drugs to the -- in the Pond's
 7    cold cream -- remember you talked about that?
 8    A.  Yes, sir.
 9    Q.  Who were the addresses given to you by?
10    A.  Cano.
11    Q.  Cano and who else?
12    A.  Manny.
13    Q.  Anyone else?
14    A.  No, sir.
15    Q.  And you said that there were none of those shipments after
16    Manny -- in other words after Manny -- when Manny was no longer
17    in charge, there were no other shipments like that?
18    A.  No, sir.
19    Q.  When you came into the BA originally, you said you had to
20    assault three people in jail.
21    A.  I didn't have to, but I did.
22    Q.  That was when you were an esquina?
23    A.  Yes, sir.
24    Q.  And that was your word?
25    A.  Yes, sir.
```

1    Q.  That's the way you proved yourself?

2    A.  Yes, sir.

3    Q.  Did you do it with your hands or shank?

4    A.  My hands, sir.

5    Q.  All three of them?

6    A.  Yes, sir.

7    Q.  Did you break any bones?

8    A.  No, sir.

9    Q.  At the beginning of your testimony yesterday, did you say

10   that there were eight captains in the BA?

11   A.  I don't know how many there are, sir.

12   Q.  You also said the money from selling drugs was sent to

13   Juarez?

14   A.  Yes, sir.

15   Q.  Who's in charge of Juarez?

16   A.  Tablas.

17          MR. FOSTER:  Pass the witness.

18          THE COURT:  All right.  Mr. Leal.

19                    REDIRECT EXAMINATION

20   BY MR. LEAL:

21   Q.  Mr. Mendoza, Mr. Foster asked you if it was possible Manny

22   would have given some order just to make himself look better

23   when it came to the shootout and you said no.  Why is your

24   answer that, no?

25   A.  Because there was somebody in charge.

David A. Perez, RMR, RPR

1    Q.  And who was in charge at the time?

2    A.  Spooky.

3    Q.  Mr. Foster asked you about verification and how you didn't

4    verify some things.

5            MR. LEAL:  May we look at Government's Exhibit 20H-2.

6    It's been previously admitted in front of the jury.  I would

7    like to go to page four.

8            THE COURT:  All right.

9    Q.  (By Mr. Leal)  In this column we listened to yesterday that

10   I've put that blue square around, did you verify who was being

11   in charge of El Paso was Silent?

12   A.  Yes, sir.

13   Q.  Who was going to be in charge of El Paso with Silent?

14   A.  Spooky.

15   Q.  Is that what wound up happening?

16   A.  Yes, sir.

17           MR. LEAL:  Pass the witness.

18           THE COURT:  Anything else?

19           MR. FOSTER:  No, Judge, not at this time.

20           THE COURT:  You may step down.  Is he free to leave,

21   excused?

22           MR. LEAL:  Yes, Your Honor.

23           MR. FOSTER:  He's going to be in Central, in downtown.

24           THE COURT:  Do you need him?

25           MR. FOSTER:  It's a possibility I might want to recall

DIRECT - ALBERTO MENDOZA

```
 1    him.  But I don't want to create a situation like the other
 2    day.
 3              THE COURT:  Could the attorneys approach?
 4              (Attorneys approach bench.  Off record discussion.)
 5              (Back on the record in open court.)
 6              Government may call their next witness.
 7              MR. SKARET:  Your Honor, the Government calls
 8    Lieutenant Fabian Galindo.  If the Court would swear in the
 9    witness, please?
10              THE COURT:  I believe he was sworn previously.
11              Remember, you're still under oath.
12              THE WITNESS:  Yes, Your Honor.
13              THE COURT:  All right.  Whenever you're ready.
14                        FABIAN GALINDO, SWORN
15                        DIRECT EXAMINATION
16    Q.  Good morning.  Please introduce yourself to the Court and
17    jury.
18    A.  My name is Fabian Galindo.  I'm a lieutenant with the
19    Federal Bureau of Prisons.
20    Q.  And where is your duty station as a lieutenant with the
21    Bureau of Prisons?
22    A.  United States Penitentiary in Beaumont, Texas.
23    Q.  What do you do for the Bureau of Prisons at that facility?
24    A.  I'm a lieutenant in the Special Investigative Office.
25    Q.  And as a lieutenant in that office, what are your
```

1    day-to-day duties?

2    A.  Day-to-day duties is threat assessments amongst the inmate

3    population, tracking security threat groups, which is gangs,

4    and conducting investigations on staff misconduct.

5    Q.  In July of 2010, were you sent to work on detail at the El

6    Paso Field Division of the FBI to assist in a wire intercept of

7    a contraband cell phone belonging to Carlos Pereya at the U.S.

8    Penitentiary in Pollock, Louisiana?

9    A.  Yes, sir, I was.

10   Q.  What did you do at the FBI office to assist with that wire

11   intercept?

12   A.  My assistance consisted of interpreting and translating any

13   Spanish calls that were made over that phone -- over that

14   contraband phone.

15   Q.  Throughout your time in working in the Bureau of Prisons,

16   have you developed special language expertise with respect to

17   gangs?

18   A.  I have been become familiar with slang used by several

19   different gangs, yes, sir.

20   Q.  Did you work at the FBI Field Office until that particular

21   wire intercept went down?

22   A.  Yes, I did, sir.

23   Q.  Was that in August of 2010?

24   A.  Yes, it was.

25   Q.  When the wire went down, where did you go?

1   A.  Once completion of that wire, I went back to my assignment

2   of USP Beaumont.

3   Q.  Did there come a time in 2010 when a man named Ramon

4   Renteria arrived at your facility in Beaumont, Texas?

5   A.  Yes, sir.

6   Q.  I would like to show you Government's Exhibit 31.

7          MR. SKARET:  It's admitted, Your Honor, if we may

8   publish this to the jury.

9          THE COURT:  You may.

10  Q.  (By Mr. Skaret)  Do you recognize Government's Exhibit 31?

11  A.  Yes, I do, sir.

12  Q.  And what is it?

13  A.  It's a Sentry document from our database that BOP uses --

14  the Bureau of Prisons uses.

15  Q.  What type of information does a document like this record?

16  A.  On -- this particular document is a PP37.  It reflects

17  quarters assignment for the individual throughout his

18  incarceration.

19  Q.  Now, you mentioned that an individual named Ramon Renteria

20  arrived at your facility in 2010.  By looking at the document,

21  are you able to tell the jury when he arrived at that facility?

22  A.  He arrived at the United States Penitentiary in Beaumont on

23  8-19-10 at, approximately, 4:57 in the morning.

24  Q.  Now, in going through the columns on this particular

25  document, what does the BMP stand for?

1    A.  The BMP is the facility.  BMP would be United States

2    Penitentiary in Beaumont.

3    Q.  How about this -- this next -- this next -- well, let's go

4    over to the next column, the assignment column.  What does that

5    stand for?

6    A.  That would be his quarters assignment, the unit assignment,

7    cell assignment, and then the bunk assignment.

8    Q.  And then is there a description of that assignment?

9    A.  Yes.

10   Q.  To follow?

11   A.  Yes, sir.

12   Q.  And then there's a start date?

13   A.  That's the date when he was assigned to those quarters.

14   Q.  Which is --

15   A.  And the time.

16   Q.  Uh-huh.  And then there's --

17   A.  And then the -- the -- the date that he came out of those

18   quarters and the time that he came out of those quarters.

19   Q.  Now, we see that there are two additional Beaumont entries

20   on this particular form.  What's the purpose of those

21   additional entries?

22   A.  In the special housing unit, we have 18-day cell rotations.

23   Every 18 days, at the maximum, every inmate gets moved from the

24   cell in which they are to prevent any compromise of the cell.

25   Q.  Based on the information on Government Exhibit 31, are you

1    able to tell us when Ramon Renteria left the Beaumont facility?

2    A.  Yes, sir.

3    Q.  What date was that?

4    A.  This reflects that he left USP Beaumont on September 21,

5    2010 at 13:15 hours.

6    Q.  And is that the 13:15 you're referring to?

7    A.  Yes, sir.

8    Q.  And is that 1:15 in the afternoon?

9    A.  1:15 in afternoon, sir.

10   Q.  By looking at Government Exhibit 31, are you able to tell

11   us where he came from when he got to Beaumont?

12   A.  Before he got to Beaumont, we received him from United

13   States Penitentiary in Pollock, Louisiana.

14   Q.  And would that be illustrated in the exhibit?

15   A.  POL.

16   Q.  POL.  Right before the BMP?

17   A.  Yes, sir.

18   Q.  Okay.  Now, based on Government Exhibit 31, it appears that

19   the man named Ramon Renteria spent, approximately, a month at

20   the facility in Beaumont.  Is that correct?

21   A.  Yes, sir, approximately.

22   Q.  And during that month, did you have an opportunity to meet

23   an individual named Ramon Renteria?

24   A.  Casually, sir.

25   Q.  If you saw Ramon Renteria again, would you recognize him?

1   A.  Yes, sir.

2   Q.  Would you please point him out in the courtroom and

3   identify him as to where he's sitting and an article of

4   clothing that he is wearing?

5   A.  He is sitting to my right.  He's wearing, over here, brown

6   coat with a blue shirt.

7        MR. SKARET:  Your Honor, would the report reflect

8   positive identification of the defendant Ramon Renteria?

9        THE COURT:  It will so reflect.

10  Q.  (By Mr. Skaret)  Did you learn whether Ramon Renteria had a

11  nickname in your dealings with him?

12  A.  Yes, sir.

13  Q.  And what was that nickname?

14  A.  Nickname was Spook.

15  Q.  I'd like to take you to the last day of Mr. Renteria's

16  incarceration at Beaumont.  According to Government's Exhibit

17  31 and your earlier testimony, that would be September 21,

18  2010.  Do you remember seeing him that day?

19  A.  Yes, sir.

20  Q.  Where did you see him?

21  A.  I saw him in the receiving and discharge area of the

22  institution.

23  Q.  And why would he be in the discharge area of that

24  institution on that day?

25  A.  He had completed his sentence.  And he was being released

1    to the streets.

2    Q.  Did you talk to him while he was in discharge?

3    A.  Yes, I did.

4    Q.  Approximately, how long did you talk to him?

5    A.  Approximately, about 15 minutes.

6    Q.  And did you talk to him about his tattoos that day?

7    A.  Yes, I did.

8    Q.  All right.  Why?

9    A.  Seeing what the significance of them were, sir.

10   Q.  And did you notice any new tattoos?

11   A.  Um, there was one significant that I remember that -- on a

12   forearm he had three Indian faces, three Indian heads on his

13   forearm.

14   Q.  Did you ask him about those Indian heads?

15   A.  Yes, I did.

16   Q.  And what did he say about it?

17   A.  He identified them as one of them was Shotgun.  One of them

18   was T-top.  And one of them was himself.

19   Q.  Did you know or did you ask him where he was headed to

20   after he was being discharged?

21   A.  Yes, sir.  He said he was going to be coming back to the

22   streets in El Paso.

23   Q.  Did you ask him about what he was going to do when he got

24   to El Paso?

25   A.  I asked who he was going to report to when he got to the

1   streets.

2   Q.  And in the context of that, were you referring to a law

3   enforcement officer or probation officer or someone on the

4   street?

5   A.  I was referring to his structure in -- in his, gang in his

6   organization.

7   Q.  When you asked him about who he was going to report to,

8   what did he say?

9   A.  He said he wouldn't report to anybody.  They were going to

10  report to him.

11  Q.  I'd like to show you what's been marked as Government's

12  Exhibit 34.

13         MR. SKARET:  This is not in evidence, Your Honor.

14  Q.  (By Mr. Skaret)  Lieutenant Galindo, do you recognize

15  what's been marked as Government Exhibit 34?

16  A.  Yes, sir.

17  Q.  And what is Government Exhibit 34?

18  A.  That is a self-admission form.

19  Q.  And as part of your exit interview at the discharge

20  location, did the defendant sign this defendant self-admission

21  form?

22  A.  Yes, he did, sir.

23  Q.  And what were the admissions that he made on this form?

24  A.  The admissions that he made on here -- that his name is

25  Ramon Renteria and his number -- his registration number was

1    correct.  That he was a member of the Barrio Azteca gang.  And

2    he has been affiliating with that group since the 1990s.  And

3    he claimed he held the rank of lieutenant.

4           MR. SKARET:  Your Honor, I offer Government's Exhibit

5    34 and ask that it be published.

6           THE COURT:  Any objections?

7           MR. FOSTER:  Subject to my earlier objection.

8           THE COURT:  So noted.  The Court will overrule the

9    objection.  And 34 will be admitted.

10   Q.  (By Mr. Skaret)  All right.  What day did you prepare this

11   particular form?

12   A.  September 21, 2010, sir.

13   Q.  All right.  And why is it that you prepared the form?

14   A.  It's part of validation criteria for the BOP to support

15   giving assignments -- Security Threat Group assignments, gang

16   assignments, to individuals.

17   Q.  All right.  And this particular form states here, Ramon

18   Renteria registered number 66797080, signs this statement of

19   his own free will without promises or assurances.  And hereby

20   admits that I am a current and active member of the Barrio

21   Azteca.

22          Is that correct?

23   A.  Yes, sir.

24   Q.  Now, did you ask him how long he had been a member of that

25   group?

1    A.   Yes, sir.

2    Q.   And what did he say?

3    A.   He stated since the 1990s.

4    Q.   And did he write 1990s on that form right here?

5    A.   No, sir, our staff did.

6    Q.   All right.  Was that after he said that?

7    A.   After he said that.

8    Q.   Did you ask him about what rank he held in that

9    organization?

10   A.   Yes, sir.

11   Q.   And what did he say?

12   A.   He stated lieutenant.

13   Q.   And is that where it's written on the form?

14   A.   That's where my staff wrote that, yes, sir.

15   Q.   That was after he said it?

16   A.   After he said it.

17   Q.   Now, there's a signature here, inmate signature.  Whose

18   signature is that?

19   A.   That is Renteria's signature.

20   Q.   Did you see him sign that?

21   A.   Yes, sir.

22   Q.   Now, there's a date and time that the inmate signed.  It

23   says September 21, 2008.  Was this a typographical error?

24   A.   That is a typographical error, sir.

25   Q.   There's another 2008 right down here.

```
 1   A.  That, as well, is a typographical error.
 2   Q.  You're sure that this was September 21, 2010?
 3   A.  Yes, sir.
 4   Q.  Is this a picture of the defendant?
 5   A.  Yes, sir.  There's a picture we have on file.
 6   Q.  All right.  And is this some sort of a card?
 7   A.  That's going to be the same information that is put on his
 8   identification card.
 9   Q.  Okay.  After your exit interview with the defendant was
10   complete, what happened to the defendant?
11   A.  Um, he went on with his release procedures.
12   Q.  Was he ultimately released that day?
13   A.  Yes, he was.
14   Q.  Okay.
15           MR. SKARET:  Pass the witness.
16           THE COURT:  All right.  Whenever you're ready.
17                        CROSS-EXAMINATION
18   BY MR. FOSTER:
19   Q.  You were aware of the FBI investigation into the telephone
20   usage in Pollock.
21   A.  Yes, sir.
22   Q.  In fact, you were there with the FBI listening to the
23   telephone conversations.  Is that correct?
24   A.  Yes, sir.
25   Q.  And part of that is Bureau of Prisons protocol when there
```

```
 1   involves investigations inside the prison regarding something
 2   of that nature.  Isn't that true?
 3   A.  Yes, sir.
 4   Q.  So you knew what was being said on there and who was on
 5   those conversations.
 6   A.  Yes, sir.
 7   Q.  And you were aware that Ramon Renteria was in the same cell
 8   as Carlos Pereya.
 9   A.  Yes, sir.
10   Q.  You were aware that there was at least one phone call on
11   there where Ramon Renteria was heard talking.
12   A.  Yes, sir.
13   Q.  And, when was -- let's see.  Mr. Renteria and Mr. Carlos
14   Pereya were removed from that cell in the early morning hours
15   of August 19, 2010.
16   A.  I believe that was the date, yes, sir.
17   Q.  And he arrived in Beaumont that same morning.
18   A.  That same morning.
19   Q.  What time did he get to Beaumont?
20   A.  I believe the records reflected, approximately, 4:00 --
21   shortly after 4:00 in the morning.
22   Q.  How long does it take to drive between Pollock penitentiary
23   and Beaumont penitentiary?
24   A.  Roughly, sir, possibly about three hours or so.
25   Q.  Did they -- did you have anything to do with his transfer
```

1    to Beaumont or that assignment?

2    A.  No, sir.

3    Q.  Just purely by happenstance?

4    A.  It wasn't by my influence.

5    Q.  When he was in Beaumont, I believe he was there for, what,

6    about two weeks?

7         MR. SKARET:  Objection, misstates the evidence on

8    direct.

9    Q.  I'm just asking was it two or three?

10        MR. SKARET:  I believe the testimony on direct was he

11   was there for, approximately, a month.

12        THE COURT:  All right.  Well, ask him -- you can ask

13   him how many weeks he was there.

14   Q.  (By Mr. Foster)  How many weeks was he there?

15   A.  Approximately, four weeks, sir.

16   Q.  Did you have time to talk to him during that four weeks?

17   A.  When we would do weekly rounds in the special housing unit,

18   I engaged in casual conversation with him.

19   Q.  Did you ever pull him aside and ask him things privately?

20   A.  Other than the exit interview.  And that wasn't private.

21   So, no.

22   Q.  Okay.  And, actually, when it comes to the exit interview,

23   didn't you pull him out of a line where he was headed out the

24   doors?

25   A.  Excuse me, sir?

1   Q.  Didn't you pull him out of a line that he was already in

2   where he was headed out the door?

3   A.  No, sir.

4   Q.  No?  When did you actually get him in for the interview?

5   A.  As they were processing him out.

6   Q.  Okay.  Explain to me what processing is.

7   A.  They probably moved him over from the special housing unit

8   over to the receiving and discharge, removed any restraints he

9   may have been wearing, searched him, gave him some release

10   clothing, identified him, proper identification through

11   documentation, fingerprints, photographs, whatever.

12   Q.  Did you get him after those fingerprints, photographs and

13   --

14   A.  I'm not sure if the fingerprints had already been taken or

15   not.

16   Q.  Was he by himself?

17   A.  Yes, he was.

18   Q.  In other words, in the processing --

19   A.  Yes.

20   Q.  He was by himself.  He's not with other people?

21   A.  No, he was not with other people.

22   Q.  After you did the interview, you sent your memo to the FBI

23   that very same day.  Is that right?

24   A.  Yes, sir, I did.

25   Q.  Who did you send it to?

1    A.  An FBI agent.

2    Q.  A name?

3    A.  I believe it was Special Agent Samuels.

4    Q.  Would that be Special Agent Samantha Mikeska?

5    A.  No, sir.

6    Q.  In your memo, I noticed you said that he had served,

7    approximately, three years in the Texas Department of

8    Corrections.

9    A.  Yes, sir.

10   Q.  What is the Texas Department of Corrections?

11   A.  Texas Department of Criminal Justice is the state prison

12   system.

13   Q.  Have you had an opportunity to review his criminal history?

14   A.  No, sir, outside the bureau, no, sir.

15   Q.  Okay.  Do you recall what it was when you reviewed it

16   inside the bureau, then?  Do you recall reviewing in it the

17   bureau?

18   A.  I do go over several individuals'. . .

19   Q.  Do you recall ever seeing a portion of the criminal history

20   that he actually served in the Texas Department of Criminal

21   Justice?

22   A.  No, sir.  That's not going to be in our bureau records.

23   Q.  You said that he already changed clothes.

24   A.  I believe he had, yes.

25   Q.  When you say, I believe he had, that sounds a little --

```
 1   maybe he hadn't kind of thing.  What I'm asking you is what do
 2   you recall independently?  Had he changed clothes or not?  If
 3   you don't remember, that's an appropriate answer as well.
 4   A.  I understand that, sir.  I believe he had -- I believe he
 5   had changed his clothes.
 6   Q.  I'm trying to get beyond -- is that an emphatic yes, he
 7   has.  Or is that, no, he hasn't?  Or is that I'm not quite
 8   sure?
 9   A.  That's to the best of my knowledge that he did change his
10   clothes.
11   Q.  Okay.  Thank you.  What other staff members were there when
12   you did this interview?
13   A.  That was Robert Niland.  He's an intelligence research
14   specialist in my office.
15   Q.  And from the Elmo, Exhibit Number 34, which has been
16   admitted.  Can you see that exhibit, sir?
17   A.  Excuse me?
18   Q.  Can you see that exhibit?
19   A.  Yes, I can.
20   Q.  Okay.  Whose handwriting is that, 1990?
21   A.  That's going to be Mr. Niland's.
22   Q.  And whose handwriting is that?
23   A.  That's going to be Mr. Niland's.
24   Q.  Why is there a difference in these two in the level of
25   intensity?
```

1    A.  I'm not a handwriting specialist, sir.  I couldn't address

2    that.

3    Q.  Could it be, sir, that these entries were made after the

4    fact by different people?

5    A.  After which fact, sir?

6    Q.  After Mr. Renteria had signed this document and --

7    A.  No, sir.

8    Q.  Actually, you already knew or had information from

9    listening to these phone calls from Mr. Carlos Pereya of what

10   Mr. Ramon Renteria's rank was supposed to be, didn't you?

11   A.  Had some indication, yes, sir.

12   Q.  And you asked that information in this interview,

13   specifically for this case, to make a confirmation, didn't you?

14   A.  For confirmation, yes, sir.  This is -- go ahead.

15   Q.  And your question had nothing to do with the security of

16   the prison system.

17         MR. SKARET:  Objection to the relevance.

18         THE COURT:  All right.  I'll overrule.  He can answer.

19   A.  How's that again, sir?

20   Q.  (By Mr. Foster)  Your question as to his rank had nothing

21   to do with the security of the prison system.

22   A.  Yes, it did, sir.

23   Q.  Mr. Renteria was on his way out, sir.  Is that not correct?

24   A.  Yes, sir, he was on his way out.

25         MR. FOSTER:  Pass the witness.

1              THE COURT:  Anything else?

2                     REDIRECT EXAMINATION

3    BY MR. SKARET:

4    Q.  On cross-examination, you said that, um -- the defense

5    lawyer asked you whether your interview had to do with the

6    security of the prison facility at Beaumont.  How did that

7    interview deal with the security at the prison at Beaumont?

8    A.  Okay.  Not necessarily just Beaumont, but with security of

9    any BOP facility.  Okay.  Even though he is on his way out,

10   this is a self-admission form, this is what he is attesting,

11   what he is admitting to.  Okay.  This information would be

12   beneficial to the bureau in the event that additional

13   communication is established with the outside world.

14              I mean, if -- it would be substantial information if

15   he was giving direction from the outside to conduct business

16   matters inside the secure institution that would influence the

17   orderly running, could influence the safety of inmate or staff.

18   Q.  On the self-admission form itself, Government's Exhibit 34,

19   were you there when Mr. Niland wrote in "1990s"?

20   A.  Yes, sir.

21   Q.  Were you there when Mr. Niland wrote in "lieutenant"?

22   A.  Yes, sir.

23   Q.  And did the defendant, Ramon Renteria, sign that form after

24   those things had been written on the form?

25   A.  After those items had been written on there, yes, sir.

```
 1    Q.  And those facts came directly from an interview with him
 2    that day?
 3    A.  His admissions, yes, sir.
 4    Q.  Thank you.
 5              MR. SKARET:  Nothing more, Your Honor.
 6              THE COURT:  All right.  Anything else of this witness?
 7              MR. FOSTER:  No further questions, Judge.
 8              THE COURT:  All right.  Is he released as a witness?
 9              MR. SKARET:  Yes, Your Honor.
10              MR. FOSTER:  We have no objection, Judge.
11              THE COURT:  All right.  Thank you.  You may step down.
12    You're free to go.
13              Government may call their next witness.
14              MR. COOLEY:  Your Honor, at this time Government's
15    gonna call Special Agent Gregory Waterson.
16              THE COURT:  All right.
17                        GREG WATERSON, SWORN
18                        DIRECT EXAMINATION
19    BY MR. COOLEY:
20    Q.  Sir, please state your name.
21    A.  Gregory Waterson.
22    Q.  Are you employed?
23    A.  Yes, I am.
24    Q.  Where are you employed?
25    A.  As a special agent with the Federal Bureau of Prisons of
```

1    Investigation.

2    Q.  Um, prior -- how long have you been an FBI agent?

3    A.  I joined the FBI in May of 2004.

4    Q.  Prior to that, was -- your background?

5    A.  Civil engineer.

6    Q.  And how long were you a civil engineer for?

7    A.  Approximately, seven years.

8    Q.  Now, when you, um, first became an FBI agent, where were

9    you assigned?

10   A.  Brownsville, Texas.

11   Q.  How long were you assigned there?

12   A.  Three years.

13   Q.  What type of work did you do while assigned -- assigned

14   there?

15   A.  Violent crimes and gang matters.

16   Q.  And after -- after that period of time, you were

17   transferred to another location.

18   A.  Las Cruces, New Mexico.

19   Q.  When was that?

20   A.  I arrived in Las Cruces in October 2007.

21   Q.  And what type of assignments did you have when you arrived

22   there?

23   A.  Similar, violent crimes and gang -- criminal enterprises.

24   Q.  Um, which particular gangs did you begin investigating when

25   you arrived in Las Cruces?

David A. Perez, RMR, RPR

1   A.   Barrio Azteca.

2   Q.   How long after you arrived did you begin investigating the

3   Barrio Azteca?

4   A.   Pretty much when I arrived there, there was an ongoing

5   investigation on the Westside BA.   So I was assigned to assist

6   with that investigation.

7   Q.   Who was the principal target in that investigation?

8   A.   Roberto Meza.

9   Q.   Ultimately, were there people charged in that

10   investigation?

11   A.   Yes.

12   Q.   Approximately, how many?

13   A.   11.

14   Q.   Who were some of the principal people or main defendants

15   that were charged in that investigation?

16   A.   Roberto Meza, Pablo Romero, Baltazar Gallegos.

17   Q.   Was there an individual by the name Richard Sanchez, as

18   well?

19   A.   Yes, sir.

20   Q.   Um, upon completion of that investigation, did you, um,

21   begin to, um -- did you get involved in a second BA

22   investigation?

23   A.   I did.

24   Q.   When did that occur, approximately?

25   A.   The summer of 2010.

DIRECT - GREG CHAPPELL

```
 1    Q.   And how did that come about?
 2    A.   I was asked to attend a meeting at the El Paso Field Office
 3    regarding an investigation they were conducting here in El Paso
 4    targeting the BA.
 5    Q.   And based on that meeting, what, if anything, did you begin
 6    to participate in?
 7    A.   We were asked to assist with that investigation, this case,
 8    by, again, targeting the Westside Barrio Aztecas.
 9    Q.   Now, when you say the Westside, um, that was the same area
10    in which you were targeting your first investigation?
11    A.   Correct.
12    Q.   And how does that relate to El Paso, the Westside?
13    A.   The Westside is one of the territories of the Barrio
14    Aztecas.
15    Q.   And that -- what's the general location of the Westside?
16    A.   The Westside of El Paso and some communities in Southern
17    New Mexico, basically, the Rio Grande corridor between El Paso
18    and Las Cruces.
19    Q.   So it encompasses part of El Paso, part of the Western
20    District of Texas, and it stems into New Mexico itself.
21    A.   Correct.
22    Q.   That would explain your participation or venue in terms of
23    that.
24    A.   Correct.
25    Q.   Now, your earlier investigation, again, as you stated, um,
```

```
 1   also focused on the Westside.  And you mentioned that Bobby

 2   Meza and Pablo Romero were two of the principal people you

 3   targeted.  Did they have a rank in the BA at the time?

 4   A.  They were sergeants.

 5   Q.  And in terms of their responsibilities for the Westside,

 6   what was that, if any?

 7   A.  They oversaw the Barrio Azteca criminal enterprise as it

 8   functioned on the Westside.

 9   Q.  Did they do that together or did it turn out one did one,

10   initially, and then was followed by the other?

11   A.  Initially Pablo Romero.  Then, eventually, Roberto Meza

12   took over.

13   Q.  Now, when you began this second investigation, again, on

14   the Westside, um, who was your main target in that

15   investigation?

16   A.  Jesus Espino.

17          MR. COOLEY:  At this time I would like to show the

18   witness -- it's not in evidence at this point, 16B-11.

19   Q.  Do you see that individual?

20   A.  Yes.

21   Q.  Do you recognize that individual?

22   A.  It's a photograph of Jesus Espino.

23   Q.  That was the main target of your investigation in the

24   second Barrio Azteca investigation.

25   A.  Correct.
```

David A. Perez, RMR, RPR

1          MR. COOLEY:  At this time we offer into evidence, Your

2     Honor, 16B-1.

3          THE COURT:  Any objections?

4          MR. FOSTER:  No objections, Judge.

5          THE COURT:  It'll be admitted.

6          MR. COOLEY:  Request that it be published to the jury,

7     Your Honor.

8          THE COURT:  It may.

9     Q.  (By Mr. Cooley)  Now, from the beginning of your

10    investigation, the second investigation now, um, what's your

11    understanding of what maybe -- Jesus Espino's role was in

12    the -- in the Westside?

13    A.  He was in charge of the Westside.

14    Q.  And as a result of you participating and focusing on Jesus

15    Espino, um, did that involve a wiretap?

16    A.  It did.

17    Q.  What is a wiretap?

18    A.  It's a intercept of communications over a cellular

19    telephone.

20    Q.  So we said -- you said it did involve wiretap.  Did you

21    obtain wiretap on his phone?

22    A.  Yes, we did.

23    Q.  When did that occur?

24    A.  It was initiated on October 29, 2010.

25    Q.  How long was it up?

1   A.  I believe it went down on November 24, 2010, approximately,

2   midnight.

3   Q.  Approximately, how many pertinent calls were involved in

4   that wiretap?

5   A.  Approximately, 700.

6   Q.  Now, again, you're from Las Cruces.  Is that correct?

7   A.  Yes.

8   Q.  So that wiretap was obtained in New Mexico or El Paso?

9   A.  New Mexico.

10  Q.  During the time in which the wiretap was up, what type of

11  calls were being intercepted?

12  A.  Calls pertaining to drug trafficking, quota collection, and

13  other Barrio Azteca business.

14          MR. COOLEY:  This is not in evidence, Your Honor.  I

15  would like to show the witness 33A-2.

16          THE COURT:  All right.

17          MR. COOLEY:  Um, actually, what we would like to show

18  this witness, Your Honor is 33A-1, not A-2 at this point.

19          THE COURT:  All right.  And that has not been admitted

20  either.

21          MR. COOLEY:  That's not in evidence at this point

22  either.

23          THE COURT:  Whenever you're ready.

24  Q.  (By Mr. Cooley)  Do you recognize 33A-1?

25  A.  I do.

David A. Perez, RMR, RPR

1   Q.   What is 33A-1?

2   A.   It's a transcript of a translation of an intercepted phone

3   call that occurred on October 29, 2010, approximately, 9:00

4   p.m.

5   Q.   That was off the wiretap you just testified to?

6   A.   Yes.

7            MR. COOLEY:  At this time I would like to show the

8   witness, Your Honor.  It's not in evidence.  33A-2.

9            THE COURT:  All right.

10   Q.   (By Mr. Cooley)  And does this appear to be the audio and

11   transcript of what is Government's Exhibit 30 -- what you just

12   saw as Government's Exhibit 33A-1?

13   A.   It does.

14            MR. COOLEY:  I would like to offer into evidence 33A-1

15   and -2.

16            THE COURT:  Any objections?

17            MR. FOSTER:  No objections, Judge.

18            THE COURT:  33A-1 and 33A-2 will be admitted.

19            MR. COOLEY:  I would like to show the witness, Your

20   Honor, 33 -- it's not in evidence, Your Honor, 33B-1.

21   Q.   (By Mr. Cooley)  Do you recognize 33B-1?

22   A.   I do.

23   Q.   What is 33B-1?

24   A.   It's a transcript of another intercepted phone call from

25   Jesus Espino's telephone that occurred on October 29, 2010, at,

```
 1   approximately, 9:23 p.m.
 2           MR. COOLEY:  If we now could show the witness, Your
 3   Honor, 33B-2.  It's not in evidence.
 4           THE COURT:  All right.
 5   Q.  (By Mr. Cooley)  Agent Waterson, do you recognize 33B-2?
 6   A.  I do.
 7   Q.  And does that appear to be the audio and transcript of what
 8   you already testified to as 33B-1?
 9   A.  It is.
10           MR. COOLEY:  At this time we offer into evidence 33B-1
11   and 33B-2.
12           THE COURT:  Any objections?
13           MR. FOSTER:  No objections, Judge.
14           THE COURT:  Be admitted.
15   Q.  (By Mr. Cooley)  Now, Agent Waterson, while you were on on
16   this telephone you talked about, um, certain types of calls
17   were intercepted.  How -- how would you characterize these type
18   of calls in terms of the BA organization?  Would you say it was
19   a high level type of communication or low level type of
20   communication?
21   A.  Low level.
22   Q.  What do you mean by that?
23   A.  More the activities that they were doing on the street.
24   Um, the drug trafficking on the streets, the quota collection
25   from the stores on the streets.
```

1   Q.  Basically, the soldiers?

2   A.  Soldiers.

3   Q.  And in the course of this, um, investigation did -- while

4   you were up on the telephone, did it lead to a drug seizure?

5   A.  It did.

6   Q.  And when did that occur?

7   A.  November 9, 2010.

8   Q.  Um, who was involved in that drug transaction?

9   A.  Ultimately, Jesus Espino directed couple of individuals,

10  Porky, who's going to be Juan Amaro, and Santiago Lucero, to

11  pick up some unknown quantity of heroin from Omar Lopez.

12  Q.  And who is Omar Lopez?

13  A.  Peewee.

14          MR. COOLEY:  At this time I would like to show the

15  witness -- it is in evidence.  I would like to produce

16  Government's Exhibit 6RR.

17          THE COURT:  All right.  You want it shown to the jury?

18          MR. COOLEY:  Yes, Your Honor.

19  Q.  (By Mr. Cooley)  You mentioned, um, Omar Lopez.  Do you see

20  him in the photo there?

21  A.  I do.

22  Q.  Which individual is he?

23  A.  He's wearing the white shirt with the blue stripes.

24  Q.  If you're looking at the photo, the one on the left or

25  right?

1    A.  The one on my right.

2    Q.  And so two other subjects, actually, um, picked up what

3    ultimately turned out to be drugs from that individual.  Is

4    that correct?

5    A.  Correct.

6    Q.  What was the quantity of the drugs that was ultimately

7    seized?

8    A.  26.5 grams of heroin.

9    Q.  During the course of the wire intercept, was there a code

10   being used for the drugs?

11   A.  A lot of times Jesus Espino would ask for uña de gato from

12   Peewee.

13   Q.  And in this transaction was there a discussion with that

14   code used?

15   A.  Yes.  He had asked Peewee for uña de gato.

16   Q.  And, ultimately, it turned out to be an ounce of what?

17   A.  Heroin.

18        MR. COOLEY:  I would like to show the witness, Your

19   Honor, Government's Exhibit 26.  It's not in evidence.

20   Q.  Now, in the course of this wiretap, in addition to the

21   soldiers identified, um, and some of the leadership, was there

22   a drug customer that was also identified?

23   A.  Yes.

24   Q.  Who was that?

25   A.  Delia Cervantes.

1   Q.   And what's her relationship with the BA?

2   A.   She sold heroin for Jesus Espino.

3   Q.   When you say sold for, what does that mean?

4   A.   Jesus Espino would supply her with heroin.  She would sell

5   it.  And she also would pay quota back to the BA.

6   Q.   What type of quantities was she receiving from him?

7   A.   Um, lesser amounts.  Um, quarter ounces, half ounces.

8   Something to that effect.

9   Q.   Directing your attention to Government's Exhibit 26, do you

10  see Delia on this exhibit?

11  A.   I do.

12  Q.   Where is she?

13  A.   Bottom row.

14  Q.   Do you also see Porky in this exhibit?

15  A.   I do.

16  Q.   And that's the same Porky which was involved in this drug

17  seizure.  Is that correct?

18  A.   Correct.

19  Q.   Do you also see Sonny in this picture?

20  A.   I do.

21  Q.   And he was the second individual that participated in the

22  purchase or the receipt of the ounce of heroin from Peewee.  Is

23  that correct?

24  A.   Yes.

25  Q.   Now, during the course of your investigation -- the BA

```
1    investigation, that is, the second one, did there come a time
2    when, um, there was a search that occurred at -- on an
3    individual known as Payaso?
4    A.   Yes.
5    Q.   Who's Payaso?
6    A.   Jorge Diaz.
7    Q.   And what was the significance of that particular search?
8    A.   He was the bank for the Barrio Aztecas.
9    Q.   When you say bank, what does that mean?
10   A.   He's the individual that held the money generated by the
11   BA.
12   Q.   Now, when you, um -- when that -- were you working that day
13   when that search took place?
14   A.   I was.
15   Q.   Where were you?
16   A.   I was in the the wire room.
17   Q.   Do you recall the precise date?
18   A.   November 12, 2010.
19   Q.   When you say you were in the wire room, what does that
20   mean?
21   A.   The room where the calls are being intercepted.
22   Q.   And during that time, Manny Lopez -- there was a wiretap on
23   Manny Lopez's line.  Is that correct?
24   A.   Correct.
25              MR. COOLEY:  Your Honor, for this witness at this
```

DIRECT - CARL MATTHEWS

 1  point, 22-A2.

 2          THE COURT:  All right.  That is in evidence.

 3  Q.  (By Mr. Cooley)  Do you recognize this exhibit?

 4  A.  I do.

 5  Q.  What do you recognize this exhibit as?

 6  A.  It's a transcript of a phone call that occurred between

 7  Manny Lopez and Monica Diaz the day of the search.

 8          MR. COOLEY:  I'd ask this to be published.  It's

 9  already been offered into evidence.

10          THE COURT:  It may.

11  Q.  (By Mr. Cooley)  Where were you when this call came in?

12  A.  I was in the wire room.

13  Q.  Did anybody bring this call to your attention?

14  A.  The individual actually monitoring the line advised me that

15  this call just occurred.

16  Q.  And once you heard that call occurred, what, if any, action

17  did you take?

18  A.  We -- I made sure I listened to the call.  Spoke with the

19  individual that had intercepted the call -- listened to the

20  initial intercept, and then I contacted agents that were out

21  conducting the search.

22  Q.  As a result of that, what did the agents do?

23  A.  They went back to the residence.

24  Q.  And what did they recover?

25  A.  It's my understanding they recovered currency and drug

```
 1    ledgers and other documentation.
 2    Q.  Now, not too long after this search you participated,
 3    personally participated, in the search of Espino's house.  Is
 4    that correct?
 5    A.  Correct.
 6    Q.  Um, when did that take place?
 7    A.  November 23, 2010.
 8            MR. COOLEY:  Your Honor, I don't believe this is
 9    evidence.
10            THE COURT:  Again, the number, I'm sorry?
11            MR. COOLEY:  10 zero -- 10O.
12            THE COURT:  I don't show it.
13            MR. COOLEY:  I don't have it in evidence, Your Honor.
14            THE COURT:  Okay.  You show it in evidence?
15            MR. COOLEY:  I do not.
16            THE COURT:  No -- I do, too.  I show it already in
17    evidence.
18            MR. COOLEY:  You show it in evidence?
19            THE COURT:  Yes.
20            MR. COOLEY:  Well, you know, just to be safe, Your
21    Honor, I'm gonna go ahead and have him scroll through it.  And
22    then I'll offer it again.
23            THE COURT:  All right.  Thank you.
24    Q.  (By Mr. Cooley)  Do you recognize those photos?
25    A.  I do.
```

```
 1   Q.  What are those photos?
 2   A.  Those are photographs taken during the search warrant of
 3   Jesus Espino's residence.
 4   Q.  Again, when did that occur?
 5   A.  November 23, 2010.
 6   Q.  And this is towards the end of the wire in which you're on
 7   his phone.  Is that right?
 8   A.  Correct.
 9           MR. COOLEY:  At this time, Your Honor, just to be
10   safe, we will offer it again into evidence.
11           THE COURT:  Any objections?
12           MR. FOSTER:  No objections, Judge.
13           THE COURT:  10O will be admitted.
14           MR. COOLEY:  Can you please go to the first page.
15           THE COURT:  Do you wish it shown to the jury?
16           MR. COOLEY:  Yes, I do.
17   Q.  (By Mr. Cooley)  Starting with the first photo that's part
18   of this exhibit, what does this depict?
19   A.  It's a magazine for a handgun.
20   Q.  And this, um -- this is, actually, a notation on the bottom
21   of the screen that gives the address in which the search
22   occurred.  Is that correct?
23   A.  Yes.
24   Q.  Is that accurate?
25   A.  Yes, sir, I believe it's accurate.
```

1  Q.  Again, this is Jose -- Jesus Espino's residence.  Is that
2  right?
3  A.  Yes, sir.
4  Q.  Going to the next picture, please.  What does this depict?
5  A.  I believe it's the same magazine.
6  Q.  Going to the next one.
7  A.  The drawer in which the magazine was found.
8  Q.  Going to the next one.
9  A.  Serial number on a handgun.
10  Q.  Was that handgun recovered?
11  A.  Yes.
12  Q.  It's already been offered into evidence.  Is that correct?
13  A.  Yes.
14  Q.  Or admitted, I should say, in evidence.  Next photo,
15  please.  What does that depict?
16  A.  Photo of a magazine.
17  Q.  Again, that's also been admitted into evidence in the case.
18  Is that correct?
19  A.  Yes.
20  Q.  Next one.
21  A.  Another photograph.
22  Q.  That's it.  I'm showing you what's been admitted into
23  evidence as Government's Exhibit 10A.
24          MR. COOLEY:  I'd like to publish it to the jury, Your
25  Honor.

1          THE COURT:  You may.

2    Q.  (By Mr. Cooley)  Do you recognize this document?

3    A.  I do.

4    Q.  What is this document?

5    A.  It's the second page of a FD302 report of interview.

6    Q.  Who took that interview?

7    A.  Myself, as well -- and couple of Metro narcotics officers

8    present.

9    Q.  Now, on the top here there's a name.

10   A.  Baltazar Gallegos.

11   Q.  And a nickname?

12   A.  Balta.

13   Q.  And the date?

14   A.  February 21, 2009.

15   Q.  When did you -- um, and you actually participated in this

16   document.  Is that right?

17   A.  Yes.

18   Q.  Created this document?

19   A.  Yes.

20   Q.  What does this date reflect?

21   A.  The date of the interview.

22   Q.  Now, was this part of the first BA investigation or the

23   second?

24   A.  The first.

25   Q.  And you mentioned this individual, was he a co-defendant in

1   that case?

2   A.   He was.

3   Q.   There's a reference to a Bobby.  Which Bobby is this?

4   A.   Roberto Meza.

5   Q.   And he was the main target of your investigation.  Is that

6   right?

7   A.   Yes.

8   Q.   His name is mentioned up here?

9   A.   Yes.

10  Q.   There's some notation on the bottom right-hand corner.

11  A.   Yes.

12  Q.   What does that signify?

13  A.   I believe that's a Bates stamp for discovery purposes from

14  the case.

15  Q.   So what does that mean?

16  A.   It's an identifier, Meza et al. is the case.  And I believe

17  1224 is the page number from the discovery that was provided.

18  Q.   So this is the actual case, Meza, et al.?

19  A.   Yes, sir.

20  Q.   U.S. versus Meza, et al.?

21  A.   Yes, sir.

22  Q.   He being the lead defendant.  Is that right?

23  A.   Yes.

24  Q.   And this was turned -- this document or copy of this

25  document with that Bates stamp would have been turned over to

```
 1   the defendant's attorneys in the case.  Is that right?
 2   A.  Yes.
 3   Q.  I'm going to show you what's been in evidence as
 4   Government's Exhibit 10-J, as in John.  This was also recovered
 5   out of Espino's house.  Is that right?
 6   A.  Yes, sir.
 7   Q.  There's the last name Espino here on the last page?
 8   A.  Yes.
 9   Q.  And, again, on the first page there's an Espino.  Is that
10   right?
11   A.  Yes, there is.
12   Q.  Going to the, basically, second page, there's a name on
13   here.  Do you recognize that name?
14   A.  I do.
15   Q.  What is that name?
16   A.  Hector Galindo.
17   Q.  Do you recognize the number that follows that?  What type
18   of number that is?
19   A.  I believe it's a assigned TDC number for Galindo.
20   Q.  Now, through your investigation, are you aware of Hector
21   Galindo?  Do you know what his nickname is?
22   A.  Silent.
23   Q.  During the course of this investigation, he was located
24   where?
25   A.  Within the Texas prison system.
```

```
 1    Q.  Would you characterize him, um, as a low-level BA member or

 2    high-level BA member?

 3    A.  High-level BA member.

 4          MR. COOLEY:  25-A, Your Honor, this is in evidence.  I

 5    would like it published to the jury.

 6          THE COURT:  Fine.

 7          MR. COOLEY:  Thank you.

 8    Q.  Previously, you testified about the 302 that you generated

 9    from the interview of this individual.  Is that correct?

10    A.  Yes.

11    Q.  He was cooperating --

12          THE COURT REPORTER:  What was the name again?

13    Q.  The name then --

14    A.  Baltazar Gallegos.

15    Q.  He was cooperating at the time.  Is that right?

16    A.  Not necessarily.

17    Q.  Does this document indicate who's providing information?

18    A.  He provided information that day.

19    Q.  So at that particular day this document's his cooperation?

20    A.  Yes.

21    Q.  Can we go back to 25A?  Do you see his name on this

22    document?

23    A.  I do.

24    Q.  Can you point to it with an arrow?  Point to it so an arrow

25    appears.  Actually, from the screen there's one name and
```

1   there's a name right below that.  Do you see that?

2   A.  I do.

3   Q.  What individual are you talking about?

4   A.  Gallegos, Baltazar.

5   Q.  Now, the next column there's a name, what name is that?

6   A.  Balta.

7   Q.  The next column there's a location.

8   A.  I believe it's EPT Sunland.

9   Q.  Are you familiar with that notation?

10  A.  I believe it's an indication of Sunland Park, New Mexico.

11  Q.  What part of the BA organization is that?

12  A.  The Westside.

13  Q.  Any doubt in your mind it's the same individual in which

14  that 302 statement was taken from?

15  A.  Same individual.

16  Q.  33A-1.

17          MR. COOLEY:  I would like to publish this, Your Honor.

18  It's previously submitted in evidence.

19          THE COURT:  You may.

20  Q.  (By Mr. Cooley)  Now, this, um -- when you began your

21  testimony we talked about one call.  Is that right?

22  A.  Yes.

23  Q.  When did this call occur in relationship to the telephone

24  intercept that you were on that is Espino's telephone?

25  A.  The first day.

1   Q.   The very first day?

2   A.   Yes.

3   Q.   Um, when did the second call -- can we go to 33B-1 -- I'm

4   sorry, yeah 33B-1.  When did this call occur?

5   A.   Also on the first day.

6   Q.   How much apart?

7   A.   Within half an hour.

8   Q.   What was being discussed during these two calls?

9   A.   These calls were in response to an incident that had

10  occurred in Berino, New Mexico.  Just prior to these calls

11  where Ricardo Gonzalez and Angel Renteria had gone to open a

12  7-11.  And there was an incident that occurred during that.

13  Q.   7-11?

14  A.   Yes, sir.

15  Q.   Were they referring to from 7-11, from your understanding

16  investigating the Barrio Azteca for the last several years,

17  what are they referring to when they say 7-11?

18  A.   A store.

19  Q.   Not an actual 7-11.

20  A.   Correct.

21  Q.   And who participated in this first call?

22  A.   The first call was between Jesus Espino and Omar Lopez.

23  Q.   We've seen those photos already.  Is that correct?

24  A.   Yes.

25  Q.   Today.  Who was the second call between?

1    A.   Jesus Espino, Carlos Perez, and Ricardo Gonzalez.

2    Q.   Did Carlos Perez go by a nickname?

3    A.   Bandit.

4          MR. COOLEY:  At this time, Your Honor, I'd like to

5    show the witness Government's Exhibit 16G-1.  It's not in

6    evidence.

7          THE COURT:  All right.

8    Q.  (By Mr. Cooley)  Do you recognize Government's Exhibit

9    16G-1?

10   A.   I do.

11   Q.   Who is that?

12   A.   Carlos Perez.

13   Q.   What does he go by?

14   A.   Bandit.

15         MR. COOLEY:  At this time we offer into evidence and

16   ask to be published 16G-1.

17         THE COURT:  Any objections?

18         MR. FOSTER:  No objections, Judge.

19         THE COURT:  16G-1 will be admitted.  And it may be

20   published.

21   Q.  (By Mr. Cooley)  Who else participated in that second

22   conversation?

23   A.   Ricardo Gonzalez.

24   Q.   And what nickname does he go by?

25   A.   Cuate.

David A. Perez, RMR, RPR

DIRECT - GREG MARTINSON

1    MR. COOLEY:  At this time, Your Honor, I would like to

2   show the witness Government's Exhibit -- what's been marked as

3   Government's Exhibit 16H-1.  It is not in evidence.

4         THE COURT:  You may show him.

5         MR. COOLEY:  Yes, Your Honor.

6   Q.  (By Mr. Cooley)  Do you recognize this individual?

7   A.  I do.

8   Q.  Who is that individual?

9   A.  Ricardo Gonzalez.

10        MR. COOLEY:  At this time we offer into evidence, Your

11  Honor, Government's Exhibit 16H-1 and ask that that be

12  published.

13        THE COURT:  Any objections?

14        MR. FOSTER:  No objections, Judge.

15        THE COURT:  It will be admitted.  It may be shown.

16  Q.  (By Mr. Cooley)  So the first call, basically, indicated --

17  it was between who?

18  A.  Jesus Espino and Omar Lopez.

19  Q.  And what did it discuss?

20  A.  Jesus Espino advised Omar Lopez that Primo was just

21  arrested.

22  Q.  Who's Primo?

23  A.  Angel Renteria.

24  Q.  And you mentioned a 7-11?

25  A.  Yes.

```
 1   Q.   How did that relate to the 7-11?
 2   A.   I believe he said that they had just -- they were out doing
 3   a 7-11.  And he was arrested as a result of that.
 4   Q.   Now, the second call, who was that between again?
 5   A.   Initially, between Jesus Espino and Carlos Perez.  And then
 6   shortly after the phone call begins Jesus Espino puts Ricardo
 7   Gonzalez on the phone with Carlos Perez.
 8   Q.   Okay.  Carlos Perez being Bandit?
 9   A.   Yes.
10   Q.   Ricardo Gonzalez being who?
11   A.   Cuate.
12   Q.   What does Cuate tell Bandit?
13   A.   He goes into detail with Bandit regarding what had happened
14   when they were attempting to go on a 7-11 in Berino.
15   Q.   Was there any reference during that call to Primo?
16   A.   There was.  He says that Primo was arrested.
17   Q.   Now, you indicated earlier that, um, when you intercepted
18   these calls on Espino's line, this is day one.
19   A.   Yes.
20   Q.   As a result of that, what was your concern?
21   A.   My concern?
22   Q.   Concern in terms of responding to -- personally
23   participating in the investigation relating to this.
24   A.   Myself and one of my task force officers who's assigned to
25   the Dona Ana County Sheriff's Office -- we went out to the
```

1    scene and -- just to get an idea of what had happened out

2    there.

3    Q.  Did you conduct any interviews?

4    A.  No.

5    Q.  Did you aggressively participate in that investigation?

6    A.  No.

7    Q.  Why not?

8    A.  We just -- it was the first day of our wire.  We felt it

9    best not to have the FBI known -- that we were out in the area.

10              MR. COOLEY:  One moment, Your Honor.  Pass the

11   witness.

12              THE COURT:  All right.

13                        CROSS-EXAMINATION

14   BY MR. FOSTER:

15   Q.  If you would, Mr. Waterson, look up -- if you would, look

16   up in the top right-hand corner of that Exhibit Number 25A.

17   A.  Yes.

18   Q.  Can you see it okay?

19   A.  Yes.

20   Q.  Can you interpret that?

21   A.  The top right corner?

22   Q.  Yes.  Above the sticker.

23   A.  "No facho no exes(sic)."

24   Q.  No exes.  So the people on this list are no exes, right?

25   A.  Um, I'm not sure, sir.  It's a muleta list.  It's a list of

```
 1    ex-BA members.
 2    Q.  If it's a list of ex-BA members, why does it say no exes?
 3    A.  I'm not sure why that's typed at the top of the list.
 4    Q.  You think maybe you-all got it wrong?
 5    A.  In my -- during the course of the investigation and my
 6    discussion with other agents, you know, there's numerous names
 7    that are on the list of individuals that are known to be exed
 8    out of the BA.
 9              MR. FOSTER:  I'll pass the witness.
10              THE COURT:  All right.
11              MR. COOLEY:  Couple of follow-up questions, Your
12    Honor.
13              THE COURT:  Go ahead.
14                         REDIRECT EXAMINATION
15    BY MR. COOLEY:
16    Q.  Counsel was asking you about the notation that occurs right
17    up in the top right-hand corner.  Is that correct?
18    A.  Yes.
19    Q.  There's -- right before that notation there's an asterisk.
20    You see that?
21    A.  Yes.
22    Q.  If you scroll down, do you see first asterisk right there?
23    A.  Yes.
24    Q.  Are there any other asterisks between that point and the
25    top of the page?
```

1    A.  I don't see any.

2    Q.  You don't see any?

3    A.  Between there and the top of the page.

4    Q.  Yes.

5    A.  The only other -- I see one below there in blue.  And I see

6    an asterisk at the top of the page next to No Facho.

7    Q.  Your understanding, though, this is an ex-member list.  Is

8    that correct?

9    A.  My understanding, yes.

10          MR. COOLEY:  No further questions.

11          THE COURT:  Anything further?

12          MR. FOSTER:  No questions, Judge.

13          THE COURT:  You may step down.

14          Government may call next witness.

15          MR. LEAL:  Angel Renteria, Your Honor.

16          MR. FOSTER:  May we approach?

17          (Bench conference.  Out of hearing of jury.)

18          MR. FOSTER:  It's going to take a couple minutes to

19   get him out here and everything.  And my client's been asking

20   for an hour that he can take a bathroom break.

21          THE COURT:  Do you want to go to lunch and start up

22   after lunch?

23          MR. LEAL:  That's fine.

24          MR. FOSTER:  That sounds good to me.

25          (Back in open court.)

```
 1              THE COURT:  We're gonna go a little early to lunch
 2    today.  It's 11:30.  We're gonna go ahead and break for lunch.
 3    Remember, you remain under the instructions the Court has
 4    previously given you.  And we'll see you back here at 12:30.
 5    Thank you.
 6              (Jury leaves courtroom.)
 7              (Recess for lunch.)
 8              (Back on the record.)
 9              COURTROOM DEPUTY:  Court is back in session.
10              THE COURT:  You may be seated.  Ready?
11              (Jury enters courtroom.)
12              THE COURT:  You make be seated.
13                        ANGEL RENTERIA, SWORN
14                          DIRECT EXAMINATION
15    BY MR. LEAL:
16    Q.  Mr. Renteria, would you introduce yourself to the jury,
17    please?
18    A.  My name is Angel Renteria.
19    Q.  How old are you?
20    A.  I'm 38.
21    Q.  Where are you living at right now?
22    A.  In the jail.
23    Q.  And have you been in jail for a while now on charges
24    involving RICO and conspiracy?
25    A.  Yes, sir.
```

DIRECT - ANGEL RENTERIA

1    Q.  All right.  I want to turn your attention, first, to your

2    criminal history.  Regarding your criminal history, does that

3    basically start back around 1991 with some DWIs?

4    A.  Yes, sir.

5    Q.  And those DWIs, were they here in Texas?

6    A.  Yes, sir.

7    Q.  I think there's one in '91, one in '94, one in '95, one in

8    '98.  You got driving while license invalid in 1998.  And then

9    you got an aggravated assault with deadly weapon charge back in

10   1998; does that sound about right?

11   A.  Yes, sir.

12   Q.  Um, and then, additionally, um, in 2007, you picked up a

13   third degree felony which was later reduced to state jail

14   felony.  Does that sound about right?

15   A.  Yes, sir.

16   Q.  And, you've also got a conviction on that state jail

17   felony?

18   A.  Yes, sir.

19   Q.  Did you have to do time on that?

20   A.  Yes, sir.

21   Q.  And how much time did you have to do on that?

22   A.  I believe it was six months.

23   Q.  Okay.  Um, at some point in time, along that criminal

24   history, you also picked up some criminal history in New

25   Mexico; is that right?

David A. Perez, RMR, RPR

DIRECT - ANGEL RENTERIA

1   A.  Yes, sir.

2   Q.  Um, and some of that criminal history includes a battery

3   against a household member; is that right?

4   A.  Yes, sir.

5   Q.  Was that back around -- there was a judgment and sentence

6   in that case, back around May 2003; is that right?

7   A.  Yes, sir.

8   Q.  Um, and you had to do a year probation on that?

9   A.  Yes, sir.

10  Q.  Did you live out that probation?

11  A.  Yes, sir.

12  Q.  Additionally, in New Mexico, out of New Mexico -- out of

13  the United States District Court in the District of New Mexico,

14  you also picked up a possession with intent to distribute less

15  than 50 kilograms of marijuana; is that right?

16  A.  Yes, sir.

17  Q.  And that was somewhere around 2001; is that right?

18  A.  Yes, sir.

19  Q.  Um, initially, were you placed on some type of probation on

20  that?

21  A.  Yes.

22  Q.  How long was that?

23  A.  I believe it was two years.

24  Q.  Okay.  And there were some special conditions on that.  You

25  had to be under home confinement for six months?

DIRECT - ANGEL RENTERIA

1   A.   Yes.

2   Q.   And did that probation get revoked?

3   A.   I got revoked, yes, sir.

4   Q.   And did you have to do some time in the federal

5   penitentiary for that?

6   A.   Yes, sir.

7   Q.   Was that about five months?

8   A.   About five months, yes, sir.

9   Q.   And in addition to those things, um, you've also pled

10  guilty in this case; is that right?

11  A.   Yes, sir.

12  Q.   Did you plead guilty to Count I, which is conspiracy to

13  conduct the affairs of enterprise through a pattern of

14  racketeering activity, basically known as RICO?

15  A.   Yes, sir.

16  Q.   And did you also plead guilty to conspiracy to possess --

17  I'm sorry, to distribute -- with intent to distribute

18  controlled substance, um, and conspiracy to import heroin,

19  cocaine and marijuana?

20  A.   Yes, sir.

21  Q.   Okay.  And did you also plead guilty to conspiracy to

22  launder monetary instruments?

23  A.   Yes, sir.

24  Q.   And that's in this case, right?

25  A.   Yes, sir.

DIRECT - ANGEL RENTERIA

1   Q.  Um, and with regards to your plea agreement, was part of

2   your agreement in the plea agreement that for all four of those

3   counts that you -- that the Government recommend that you

4   receive 240 months on each count to run concurrently?

5   A.  Yes, sir.

6   Q.  And something that was not included in the plea agreement,

7   but I believe was included on the record, was there also some

8   information relayed to you about the Government applying for

9   the witness security program on your behalf?

10  A.  Yes, sir.

11  Q.  Um, and you understand that you may not get into that

12  program, but that the Government will make an application for

13  you?

14  A.  Yes, sir.

15  Q.  Um, additionally, um, you also understand -- and you're

16  here testifying today basically out of the hopes that the judge

17  will reduce your sentence; is that right?

18  A.  Yes, sir.

19  Q.  And you understand that even if the Government makes that

20  application for reduction of your sentence, that ultimately

21  that decision rests with the Court?

22  A.  Yes, sir.

23  Q.  Um, all right.  So, you've got a lengthy criminal history.

24  Um, and what I want to turn your attention to is would you tell

25  the jury when it was that you first started hanging around with

DIRECT - ANGEL RENTERIA

1    the people associated with the Barrio Azteca criminal

2    enterprise?

3    A.   Well, that was back in -- when I first met them?

4    Q.   Yeah.

5    A.   That was back in 2001, I believe.

6    Q.   Okay.  And that's just an approximate date.  Um, where were

7    you at whenever you first met folks associated with the Barrio

8    Azteca?

9    A.   I was in La Tuna.

10   Q.   What's La Tuna?

11   A.   That's the federal penitentiary.

12   Q.   Where is that located?

13   A.   In -- I believe in Anthony, Texas.

14   Q.   In regards to your meeting Barrio Azteca members in La

15   Tuna, who did you meet?

16   A.   That I remember was -- I don't recall his name right now.

17   I met a couple of Barrio Azteca members there -- Monchis and

18   some other. . .

19   Q.   All right.  Did you become a member?

20   A.   No.

21   Q.   Um, what did you do -- how was it that you met them?

22   A.   Well, they asked me where I was from, where I lived.  And I

23   told them I was from Sunland.

24   Q.   At some point in time, did you get discharged from La Tuna?

25   A.   I got discharged two months when I was there, afterwards.

DIRECT - ANGEL RENTERIA

```
 1    Q.  And when you got discharged, did any of those Barrio Azteca
 2    members ask you to do them any favors?
 3    A.  When I got out, just ask one of the Barrio Azteca members
 4    to write to let them know what was going on outside.
 5    Q.  Okay.  Did you do that?
 6    A.  Yes, sir.
 7    Q.  And why did you do that?
 8    A.  Just relating a message, favor to them.
 9    Q.  Okay.  Is that about the time that your association
10    started?
11    A.  I just did that one thing.  And then I did my one year.
12    Q.  Supervised release?
13    A.  Supervisor release.  And afterwards -- well, I went to work
14    about four or five years ago back now.
15    Q.  Okay.  So you left federal prison, you did that favor, you
16    did your one year of supervised release and went to work.  Did
17    you stay in this area or go somewhere else?
18    A.  No, I was traveling working.
19    Q.  When we're talking about working, are we talking about --
20    A.  Working in -- I was doing one year supervised release.  I
21    was working at a carpet company.  And afterwards, I got started
22    selling cars, buying them, selling.
23    Q.  And during this time frame, are you involved in any illegal
24    activity?
25    A.  No.
```

DIRECT - ANGEL RENTERIA

1  Q.  At some point in time, do you wind up coming back to this

2  area?

3  A.  Yes, I ended up picking up that state charge for

4  possession.  And I ended up staying three years on supervised

5  release here.

6  Q.  On probation?

7  A.  Yeah, and I ended up talking to one of the gang members

8  that was there on my neighborhood.

9  Q.  And who was that gang member?

10  A.  Baltazar Gallegos.

11  Q.  Now, during that time frame you said that you got picked up

12  for possession?

13  A.  Yeah.

14  Q.  What were you possessing?

15  A.  For one gram of cocaine.

16  Q.  Did you have a cocaine problem?

17  A.  Yes.

18  Q.  How much cocaine were you using?

19  A.  Approximately -- I don't know, like $60, $70 a week, maybe

20  more.

21  Q.  Where were you getting that cocaine from?

22  A.  From neighborhood stores that were there around.

23  Q.  When you say a neighborhood store --

24  A.  Like people that are selling drugs around that I know.

25  Q.  You're not talking about 7-Eleven, Wal-Mart or --

DIRECT - ANGEL RENTERIA

 1    A.  No, sir.  I'm talking about people that are selling drugs.

 2    Q.  All right.  So, um, you said that you got picked up and

 3    then you talked to this Baltazar?

 4    A.  Yeah.

 5    Q.  Do you remember Baltazar's last name?

 6    A.  Gallegos.

 7    Q.  Gallegos?

 8    A.  Yes.

 9    Q.  Um, and Baltazar Gallegos, who was he?  Who was he

10    associated with?

11    A.  With the Barrio Azteca.

12    Q.  And how do you know that?

13    A.  When I got out from La Tuna, that was the guy I was

14    supposed to relay the message to.

15    Q.  So you meet up with this Baltazar Gallegos, and what

16    happens when you met up with Baltazar Gallegos?

17    A.  He starts asking me if -- what I was going to do, if I

18    wanted to sell or what.  So I told him, yes, make some money.

19    And he started asking me, well, do you know of any other stores

20    around, people that are selling?

21    Q.  Okay.  And what did you tell him?

22    A.  Yes, that I knew a couple of stores that were there.

23    Q.  All right.  And so, basically, he's asking you for

24    information on people that are selling dope?

25    A.  Yeah.

DIRECT - ANGEL RENTERIA

1    Q.   Do you relay that information?

2    A.   Yes, sir.

3    Q.   Does he pay you for that information?

4    A.   He kind of dropped the quota on me so I wouldn't pay that

5    much.

6    Q.   All right.  What do you mean by he dropped the quota?

7    A.   Well, when you start up a store or start pushing, um,

8    you're supposed to pay quota to the Barrio Aztecas, a fee for

9    protection or whatever they need.

10   Q.   Okay.  And so back then, were you a member of Barrio

11   Azteca?

12   A.   No, sir.

13   Q.   Okay.  And so because you weren't a member, did you have to

14   pay quota?

15   A.   Yes, sir.

16   Q.   And you said that this quota is for -- the Barrio Azteca

17   collects for protection as well?

18   A.   Yeah, they tell you it's for protection for you whenever

19   you get busted or, you know, for whenever you go into jail that

20   you -- you know, that's for your protection.

21   Q.   Investment in your future?

22   A.   Supposedly.

23   Q.   All right.  So, you're paying a reduced quota?

24   A.   Yeah, for the information, for telling them where the

25   stores were at.

DIRECT - ANGEL RENTERIA

1   Q.  Is this when you start working for the Barrio Azteca?

2   A.  I start off a little bit like that, giving information,

3   giving them rides, taking them where they're at.

4   Q.  At this point in time, um, are you what's referred to as an

5   esquina?

6   A.  I was referred to as an esquina at that time.

7   Q.  Is that a prospect, basically?

8   A.  That's underneath a prospect, not really wanting your shoes

9   yet, not, you know, being a full member of Barrio Azteca.

10  Q.  So you're at the bottom end of the hierarchy; is that fair

11  to say?

12  A.  Yes, sir.

13  Q.  Beneath you would be the people running the stores that

14  aren't involved at all with the BA, they're just paying the

15  quota fee?

16  A.  Yes, sir.

17  Q.  And in regards to the information that you were providing,

18  who were you giving information to?

19  A.  I was giving it to Baltazar while he was in charge.

20  Q.  He was in charge of what?

21  A.  Sunland Park.

22  Q.  Sunland?

23  A.  Yes, sir.

24  Q.  For who?

25  A.  I don't know who was running at the time, who was in charge

DIRECT - ANGEL RENTERIA

1    above him.

2    Q.  A poorly worded question.  Was he in charge of Sunland Park

3    as the mayor or the chief of police?

4    A.  He was in charge of the area of the Barrio Aztecas.

5    Q.  For the Barrio Azteca?

6    A.  Yes, sir.

7    Q.  All right.  So, you're going out and providing all this

8    information.  Are you conducting investigations as to who's --

9    who the stores are?

10   A.  Well, since I knew and I did -- I did cocaine.  And I knew

11   where those stores were at, where to go pick up, who was

12   selling, you know, I let him know who wasn't paying or who was,

13   you know, starting up a new store.

14   Q.  Okay.  And did you open up stores yourself?

15   A.  Yes, I did, sir.

16   Q.  Would you tell the jury how you went about doing that?

17   A.  I had a friend that we went to school to -- with.  And he

18   was pushing.  And I ended up meeting Peter through Balta and

19   grabbing some soda and some cocaine.  And --

20   Q.  Let me stop you there for a minute.  You met Peter through

21   Balta?

22   A.  Yes, sir.

23   Q.  Who's Peter?

24   A.  Peter is another dope dealer that supplies people all over.

25   He was a supplier that Balta was using.

DIRECT - ANGEL RENTERIA

1   Q.   Is he associated with the Barrio Azteca?

2   A.   No, sir.

3   Q.   He's just a supplier?

4   A.   Just a supplier.

5   Q.   And Balta is the same Baltazar Gallegos you're talking

6   about?

7   A.   Yes, sir.

8   Q.   So you meet Peter.  And does Peter become your source of

9   supply?

10  A.   Yes, sir.  He became my source where I started supplying

11  this other guy that started selling for me.

12  Q.   Okay.  And do you have to clear this source of supply with

13  the Barrio Azteca?

14  A.   Yes, sir.

15  Q.   Why is that?

16  A.   Because it's your store.  They look at it as, you know,

17  you're part of selling something, either way, if you're not

18  selling it directly, you're still selling, so you still got to

19  pay.

20  Q.   And so does that source of supply that you're getting, does

21  that source of supply have to be aligned with the right people

22  that the Barrio Azteca are aligned with?

23  A.   Yes, sir.

24  Q.   In other words, if the Barrio Azteca is aligned with La

25  Linea from Juarez, can a source of supply supplying Barrio

DIRECT - ANGEL RENTERIA

1    Azteca members be the Sinaloa Cartel, who's the rival?

2    A.   No.

3    Q.   Why not?

4    A.   Because that would be going against the Barrio Azteca.

5    Q.   Would that cause problems?

6    A.   Yes.

7    Q.   So the source of apply has to be verified?

8    A.   Yes.

9    Q.   You said that you started getting somebody to sell for you?

10   A.   Yes, sir.

11   Q.   Did you charge that person quota?

12   A.   Yes.

13   Q.   And did you have anymore people selling for you?

14   A.   No.

15   Q.   All right.  Um, what happens after that?

16   A.   Um, they started selling drugs.  After they started paying

17   the quota, they started dropping the quota on me after a while.

18   Q.   Is that because your stores were doing so good?

19   A.   Because I was relating more messages and helping out more

20   in the Barrio Azteca.

21   Q.   What kind of other messages were you relating?

22   A.   Just for -- like, if somebody needed a beat down or

23   whatever.

24   Q.   Okay.

25   A.   They would ask me.

David A. Perez, RMR, RPR

DIRECT - ANGEL RENTERIA

1    Q.  Let me ask you this, which time frame that you're talking

2    about -- um, is that around 2008, 2007, somewhere around that

3    time frame?

4    A.  I don't recall exactly the time frame.

5    Q.  Was it about the time that you got put on deferred for your

6    drug charge here in El Paso?

7    A.  Um, I believe so.

8    Q.  Okay.  If that was around 2008, would that be fair?

9    A.  Yes.

10   Q.  Approximate time frame.

11   A.  Approximate, yes.

12   Q.  All right.  Um, you said you started providing information

13   regarding beat downs to individuals.  When was the first time

14   that you were involved in a beat down?

15   A.  That I was involved?

16   Q.  Let me ask you this.  Let me ask it this way.  When was the

17   first time that you relayed any information to anybody

18   regarding a beat down?

19   A.  I think it was the time when Baltazar told me that one of

20   these guys didn't want to pay or something.  I recall his name

21   was Shamu or something like that.

22   Q.  Okay.  And how were you told to relay that information

23   about the beat down?

24   A.  He had told me that to tell one of the carnales, Diablo, to

25   do the beat down on this Shamu guy.

David A. Perez, RMR, RPR

DIRECT - ANGEL RENTERIA

1   Q.  Did you relay that information?

2   A.  I relayed it, yes, sir.

3   Q.  Were you present at that beat down?

4   A.  No, sir.

5   Q.  In regards to relaying information about beat downs, what's

6   going to happen if you relay false information about a beat

7   down?  In other words, let's say you personally have a beef

8   with Shamu, and you say -- and you go tell Diablo, hey, I've

9   been told that Shamu needs to be beat down and Baltazar told me

10  to.  Are you going to get in trouble for lying?

11  A.  Yes, sir.

12  Q.  What's going to happen?

13  A.  You get the beat down.

14  Q.  So, basically, if an order is given from above, you've got

15  to relay it correctly?

16  A.  Yes, sir.

17  Q.  All right.  Did Shamu get beat down?

18  A.  Yes, sir.

19  Q.  Okay.  When was the next time that you were either involved

20  or that you had to relay information regarding a beat down?

21  A.  I recall another incident later on.  It was -- I was

22  driving Espino and Bandit towards --

23  Q.  Tell you what, before we get to that, let me turn your

24  attention to a person named Teco.  Was there a person named

25  Teco that you remember?

DIRECT - ANGEL RENTERIA

1    A.   Yes, sir.

2    Q.   Who's this person?

3    A.   Teco was in charge of the streets at the time when Baltazar

4    and Bobby Meza and all them got caught up.

5    Q.   Okay.  So there was a point in time when Bobby Meza and

6    Baltazar Gallegos got picked up?

7    A.   Yes, sir.

8    Q.   And a person named Teco took over the streets?

9    A.   That he took over the street.

10   Q.   When you're talking about taking over the streets, are you

11   talking about the Westside/Sunland Park area?

12   A.   It was in -- he was of the Westside, I believe.  So, yes,

13   sir.

14   Q.   This Teco person, um, what did he do?

15   A.   Um, he was in charge of the picking up the quotas and

16   turning them in.

17   Q.   Was there a problem?

18   A.   He got in trouble for taking the money and stealing it from

19   the Barrio Azteca.

20   Q.   He got in trouble for stealing quota money?

21   A.   Yes, sir.

22   Q.   Um, and so did he get a beat down?

23   A.   Um.  No, I believe he got ordered a green light.

24   Q.   What's a green light?

25   A.   They ordered to take him or pick him up or beat down or

DIRECT - ANGEL RENTERIA

1    take him somewhere.

2    Q.  Okay.  Did you ever see or hear from Teco again?

3    A.  No, I believe I saw him lately, past -- this month ago,

4    inside jail.

5    Q.  Okay.  Subsequently, um, did you participate in a couple of

6    other beat downs?

7    A.  Um, it was another time when I was there at Espino's house.

8    And they called him up to -- to beat down Flaco.

9    Q.  Okay.

10   A.  I believe his name was Mark Balderrama.

11   Q.  So he got a beat down as well?

12   A.  Yes.

13   Q.  And there's probably four or five other beat downs you were

14   part of as well; is that right?

15   A.  Yes, sir.

16   Q.  Um, did some of those beat downs involve what's called an

17   "orden de tacos"?

18   A.  Yes, sir.

19   Q.  What's an order of tacos?

20   A.  Order of tacos was to beat you down for something that you

21   did wrong.

22   Q.  Is there also something called a tacos with gravy?

23   A.  Yes, sir.

24   Q.  What's tacos with gravy?

25   A.  That would be something more extreme to break your legs or

DIRECT - ANGEL RENTERIA

1   hands or something worse.

2   Q.  Now, in some of these beat downs that you committed, were

3   they against other BA members?

4   A.  They were against other BA members, yes, sir.

5   Q.  And some of the beat downs, were you there, basically.

6   A.  Either lookout or either driving them.

7   Q.  Is there a rule that if you are not a full-fledged BA

8   member, that you can't touch another BA member?

9   A.  Yes, sir.

10  Q.  All right.  I want to take you forward in time, then, to

11  around September or October, November, July 2010, all right?

12  Around that point in time, are you running with somebody known

13  as Jesus Espino?

14  A.  Yes, sir.

15  Q.  Who's that person?

16  A.  Jesus Espino was in charge of the Westside.

17  Q.  Okay.  And Jesus Espino, did he have people working for

18  him?

19  A.  Yes, sir.

20  Q.  And who did he have working for him?

21  A.  Um, his brother, Bandit.

22  Q.  Okay.  Let me pull up, if we could, what's been previously

23  in evidence as Government's Exhibit 16B-1.  Do you recognize

24  that person?  Who's that?

25  A.  Jesus Espino.

DIRECT - ANGEL RENTERIA

1   Q.  If we could also pull up Government's Exhibit 16G-1.  Do

2   you recognize that person?

3   A.  Yes, sir.

4   Q.  Who's that?

5   A.  Bandit, Carlos Perez.

6   Q.  Okay.  If we could also pull up Government's Exhibit 16H-1,

7   that's also been previously admitted into evidence.  Do you

8   recognize that person?

9   A.  Yes, sir.

10  Q.  Who's that?

11  A.  Cuate.

12  Q.  All right.  Now, these particular individuals, um, if we

13  could, switch over to the Elmo just right quick.  Let me show

14  you what's been marked as Government's Exhibit 6GG and has been

15  previously admitted into evidence.

16          THE COURT:  Do you want the jury to see this?

17          MR. LEAL:  Yes, Your Honor.

18  Q.  (By Mr. Leal)  Can you see that okay up there?

19  A.  Yeah.

20  Q.  All right.  So this -- who's at the top of that list?

21  A.  Jesus Espino.

22  Q.  Okay.  Is that the Jesus Espino in that photograph that we

23  just looked at?

24  A.  Yes, sir.

25  Q.  In regards to Mr. Espino, there is a mark over here of

DIRECT - ANGEL RENTERIA

1    121 percent.  Do you know what that means?

2    A.  That means they're carnales, they're Barrio Azteca.

3    Q.  Does that 21 mean he's doing a good job?

4    A.  No, it's just --

5    Q.  He's 121 BA?

6    A.  Yeah.

7    Q.  All right.  Um, we're looking at a person here by the name

8    of Ricky Gonzalez.  Is that J?

9    A.  Yes.

10   Q.  Is that the person you previously identified in that prior

11   photograph?

12   A.  Yes, sir.

13   Q.  Is he also a 121 percenter?

14   A.  Yes, he's a carnal.  He's an Azteca.

15   Q.  Okay.  Now, we're going to go down, little bit further

16   down, to this guy here.  This -- that guy right there.  Carlos

17   Perez, also known as Bandit.  Is that the person you just

18   previously identified?

19   A.  Yes, sir.

20   Q.  He's a 121 percenter?

21   A.  Yes, sir.

22   Q.  All right.  So he's done a good job for the BA?

23   A.  Yes, sir.

24   Q.  All right.  Now, let me show you this person right here.

25   Who is this person?

David A. Perez, RMR, RPR

DIRECT - ANGEL RENTERIA

1   A.  That's me.

2   Q.  Are you Primo?

3   A.  Yes, sir.

4   Q.  And it says right here, that you're a "prospe".  What does

5   that mean?

6   A.  I was a prospect at the time.

7   Q.  Okay.  And are you a 121 percenter?

8   A.  I believe at that time, no.

9   Q.  Does the list show that you're a 121 percenter, that you're

10  doing a good job?

11  A.  It shows, yes, sir.

12  Q.  You didn't know it got so high lately?

13  A.  No.

14  Q.  So you've got some 121 percenters you're running with, and

15  you're a 121 percenter yourself.  What kind of things are you

16  doing for Jesus Espino around this time frame?

17  A.  Could you repeat the question?

18  Q.  Sure.  Let me show you the date on this list just so you

19  know how well you were thought of.  The date on the list is

20  September 6, 2010.  Um, you're working for Jesus Espino at the

21  time?

22  A.  Yes, sir.

23  Q.  Was there a point in time during this summer and during the

24  fall when you were asked to look for weapons or bought a

25  weapon?

DIRECT - ANGEL RENTERIA

1    A.   Yes, sir.

2    Q.   Um, do you recall what kind of weapon it was?

3    A.   I don't recall exactly.  It was a handgun.  Okay.

4    Q.   Um, and in regards to that particular handgun, did you wind

5    up trading something for that handgun?

6    A.   I think it was soda, soda.

7    Q.   How much soda did you trade for the handgun?

8    A.   I don't believe I recall how much.  But they were selling

9    the soda to purchase the handgun.

10   Q.   Who is they?

11   A.   J.  Porky.

12   Q.   Okay.  They were selling soda to purchase the handgun?

13   A.   Yes, sir.

14   Q.   What did they need a handgun for?

15   A.   To protect themselves for the --

16   Q.   To protect themselves from what?

17   A.   From other gangs.

18   Q.   Okay.  Why would you need to protect yourself with a

19   handgun from other gangs?

20   A.   So they won't, you know, catch you off guard or do

21   something to you without, you know -- you having to throw a

22   rock or something else.

23   Q.   So at some point in time, you purchase this gun for them;

24   is that right?

25   A.   At the time, yes.

DIRECT - ANGEL RENTERIA

1   Q.   Did you give it to them?

2   A.   Yes.

3   Q.   Okay.  And do they keep it safe for you at some point in

4   time?  Do you leave it with one of them?

5   A.   Yes.

6   Q.   Who did you leave it with?

7   A.   Espino.

8   Q.   All right.  Um, are you in the process of opening up stores

9   during this time frame?

10  A.   They were opening stores, yes, at that time frame.

11  Q.   Was there a point in time whenever you were running with

12  Cuate that you-all went to try and open up a store?

13  A.   Yes, sir.

14  Q.   One in particular that stands out in your mind?

15  A.   Yes, sir.

16  Q.   Specifically, around October 29, 2010?

17  A.   Yes, sir.

18  Q.   Um, around that time frame, um, were you working for the

19  Barrio Azteca?

20  A.   Yes, sir.

21  Q.   And were you still a prospect at that point?

22  A.   I was still a prospect at the time.

23  Q.   What was J at that point in time?

24  A.   He was a carnal.

25  Q.   Was he a full-fledged --

DIRECT - ANGEL RENTERIA

1   A.  Full-fledged member, yes, sir.

2   Q.  And on this particular date, did you-all go somewhere?

3   A.  Yes, sir.

4   Q.  Where did you go?

5   A.  J had called me up to go open this store up.  What I mean

6   by a store, is to go see if this person was selling drugs at

7   this -- in Vado or somewhere in New Mexico.

8   Q.  Do you know what kind of drugs they were alleged to be

9   selling?

10  A.  Cuate had told me that the person that had told -- her -- I

11  think Doobie was her name, was one of the sellers he had

12  selling, that she was selling -- Cookie was selling pot and

13  cocaine at the store.

14  Q.  All right.  And previously you mentioned the word soda.  Is

15  that another word for cocaine?

16  A.  Yes, sir.

17  Q.  All right.  So do you get into a car with Cuate?

18  A.  Yes, sir.  I was driving.

19  Q.  And does Cuate have anything?

20  A.  Cuate had a gun.

21  Q.  How do you know he had a gun?

22  A.  Because he mentioned it.

23  Q.  He mentioned it to you?

24  A.  Mentioned to me.  And then I told him to call or to check

25  with Espino or -- he had to -- you know, about the gun because

DIRECT - ANGEL RENTERIA

1    he wanted to take a gun to a store.

2    Q.  Let me ask it this way.  Why was it important as far as you

3    were concerned that Cuate call Espino about the fact he had a

4    gun?

5    A.  Um, because usually you never take guns to stores.

6    Q.  In your experience?

7    A.  In my experience, all the times that I went, I never took a

8    gun.

9    Q.  Why is that?

10   A.  Because it was never something that we do.

11   Q.  All right.  So does --

12           MR. LEAL:  Can we switch back to the other machine?

13   Can you pull up 16H-1, please?

14   Q.  So the person in 16H-1, you previously testified as Cuate,

15   right?

16   A.  Yes, sir.

17   Q.  Does Cuate call Espino?

18   A.  Yes, sir.

19   Q.  In front of you?

20   A.  Yes, sir.

21   Q.  And does he follow your suggestion and talk about the gun?

22   A.  I believe so, yes, sir.  He called Espino and told him that

23   he was going to take a 21.

24   Q.  What does that mean?

25   A.  Veinte uno, a gun.

DIRECT - ANGEL RENTERIA

1    Q.  Okay.

2    A.  I believe he called Espino.  I don't know if Espino relayed

3    the message up higher or to whoever was in charge of -- Manny

4    or Peewee or whoever was in charge.

5    Q.  Did anyone call you back and say that's a bad idea?

6    A.  Espino, I guess, told Cuate it was all right to take the

7    gun.

8    Q.  Did you-all go ahead and go over to that store?

9    A.  Yes, sir.

10   Q.  Um, and when you got over there to that store that was

11   supposedly selling pot or cocaine, tell the jury what happened.

12   A.  When we got there to the -- to the place where the store

13   was at, the girl that Cuate was -- was using to push dope, um,

14   told us where the store was at.  The person was selling

15   cocaine, her name was Cookie, I believe.  And we got there, we

16   stopped, we parked, we got off.  A gentleman came out.

17   Q.  Let me ask you, who's we?

18   A.  Me and Cuate.

19   Q.  Okay.  Just the two of you go in there?

20   A.  Yes, sir.

21   Q.  And you say you get out of the car, you walk up?

22   A.  Yes, sir.

23   Q.  Knock on the door?

24   A.  No, sir.  He came out towards the car where we were at.

25   The lights were out.

DIRECT - ANGEL RENTERIA

1   Q.  Had you ever seen this person before?

2   A.  No, sir.

3   Q.  Do you-all talk to him?

4   A.  Cuate starts talking to him.

5   Q.  What does Cuate talk to him about?

6   A.  Starts telling him that he wants to talk to Cookie.  That

7   he knows they're selling drugs there.  And that if they were

8   selling drugs, they need to pay quota, to pay taxes, I guess,

9   on selling their drugs.  And the individual, um, I don't recall

10  his name, mentioned it -- he starts telling him that they don't

11  sell drugs there.  And Cuate starts getting aggravated, telling

12  him that he wants to talk to Cookie.  And the guy starts giving

13  him the runaround.  This and this and that about, you know,

14  that they don't sell drugs there.  So he gets aggravated.  I

15  tell him, you know what, just give him your phone number, you

16  know, call him back later, you know, get in touch with her.

17        So he gives him the number.  The phone, I call it, the

18  phone doesn't register, doesn't get it right, or doesn't click.

19  Um, Cuate gets aggravated, pulls out the gun, and then points

20  it at his head and cocks it and points it.

21  Q.  Who's head?

22  A.  At the guy's head, I don't recall his name.

23  Q.  Okay.

24  A.  The person he was talking with.  Points it at his head and

25  tells him that he was -- if he thinks he was fucking around

DIRECT - ANGEL RENTERIA

1    with him, and he wasn't going to, you know, tolerate his

2    bullshit and all this.  He starts cussing and --

3          MR. FOSTER:  Judge, I'm sorry.  I'm going to object to

4    continuing to do this narrative.  There needs to be some

5    questions and answers.

6          THE COURT:  All right.

7          MR. LEAL:  I will break it up.

8          THE COURT:  Thank you.

9    Q.  (By Mr. Leal)  Um, you said that he points the gun at the

10   head, um, asks him, you know, you think I'm F-ing around, not

11   going to deal with this BS, what happens after that?

12   A.  I get nervous.  I look around.  I see a light in the

13   window.  I tell him, hey, let's get out of here, calling the

14   cops.  I jump in the car.  He jumps in after me.  We take off.

15   Q.  What happens after that?

16   A.  Two cars were coming or three, I don't remember.  But it

17   was two cars first, one passed me, the second one was a cop,

18   turned on his lights.  And we took off.

19   Q.  Is Cuate in the car with you?

20   A.  Yes, sir.  Took off in the car.  While he's driving, he

21   throws the gun away.  I don't know.  I got lost somewhere.  It

22   was out in the woods somewhere.  And I crashed.  We both ran.

23   Both took off our own ways.

24   Q.  Okay.  So you crash.  You both take off your own ways.  Um

25   what, happens then?

DIRECT - ANGEL RENTERIA

```
 1   A.  Um, I get arrested.  Cuate gets away.  I call Espino to let

 2   him know that we had gotten caught.

 3   Q.  All right.  Let me ask you this.  Does -- you say you get

 4   arrested and you call Espino from the County Jail or where?

 5   A.  I had a cell phone in my -- I don't remember if I had

 6   jacket or pocket or somewhere.

 7   Q.  All right.  So are you calling Mr. Espino on the run or

 8   where did you call him from?

 9   A.  From the backseat of the police car.

10   Q.  Police car?

11   A.  Yes, sir.

12   Q.  So you call Espino.  You tell him you've gotten in trouble.

13   Um, and what's, essentially, the message that you convey to

14   him?

15   A.  That these people had called the cops on us.  We had gotten

16   caught.

17   Q.  And why is Espino the first person you call?

18   A.  To let him know because he was in charge of the Westside.

19   Q.  All right.  So you're not going to call a relative or

20   somebody you know.  You're going to call the person in charge

21   of the Westside?

22   A.  No.

23   Q.  So, um, what happens -- what happens when you call Espino?

24   What does he tell you?

25   A.  Not to say anything.  Just to be quiet, not to say anything
```

DIRECT – ANGEL RENTERIA

1    anymore.

2    Q.   What do you do then?

3    A.   Um, I turned off the phone, took out the chip.

4    Q.   And what do you do with the chip?

5    A.   I ate it.

6    Q.   Ate the chip?

7    A.   I ate the chip.

8    Q.   Why did you eat the chip?

9    A.   I thought that they might catch me and find the phone

10   numbers of the Barrio Aztecas.

11   Q.   Basically, you ate it to protect, keep the police from

12   finding out contact information?

13   A.   Yes, sir.

14   Q.   All right.  Did that give you a stomachache?

15   A.   Yes, sir.

16   Q.   All right.  So you eat the chip --

17           MR. LEAL:  May I have just a moment, Your Honor?

18   Q.   All right.  Um, can we pull up 33A-2, previously admitted

19   into evidence?  And ask to play that for the jury, Your Honor.

20           THE COURT:  You may.

21           (Audio being played.)

22   Q.   All right.  This particular audio exhibit, um, and the

23   transcript, um, do you recognize the voices?

24   A.   The first voice, yes.  Jesus Espino.

25   Q.   Okay.  Do you recognize the second voice?

DIRECT - ANGEL RENTERIA

1   A.  Um, I believe it was Peewee.

2   Q.  Okay.  And who's Peewee?

3   A.  Peewee is Omar Lopez.

4   Q.  Is that a person that was higher up than Mr. Espino?

5   A.  Yes, sir.  He was in charge at the time.  I think he was

6   sergeant.

7            (Audio being played.)

8   Q.  For the record, 33A-1.  In regards to this, Mr. Renteria,

9   um, you're talking about a 7-Eleven in that particular area,

10  um.  Is that or -- they are talking about a 7-Eleven.  Is that

11  what's referred to as the store?

12  A.  Yes, that's referring to a person that was selling drugs.

13  Q.  In this area here, there's a mention of you being on

14  probation.  Were you on probation at the time?

15  A.  Yes, sir, I was on probation at the time.

16  Q.  Now, earlier today you talked about how that quota money is

17  supposed to be reinvested in case you get in trouble and it's

18  supposed to go to members and maybe help bond you out and

19  stuff.  Um, is the money they're talking about using here to

20  help you out, is that coming from the money collected?

21  A.  Yes, sir.

22  Q.  So membership has some privileges on that.  Okay.  Let's

23  look at Government's Exhibit 33B-2 that's been previously been

24  admitted into evidence.

25            If you could, um, go ahead and play it.

David A. Perez, RMR, RPR

DIRECT – ANGEL RENTERIA

1             (Audio being played.)

2    Q.  Let me ask you this.  Up to this point in time, who's been

3    having the conversation, talking?

4    A.  It was Carlos Perez and Cuate.

5    Q.  Okay.  So, um, and what are they talking about?

6    A.  Um, about the incident that happened in New Mexico.

7    Q.  The incident where you got put in jail?

8    A.  Yes, sir.

9    Q.  And what are they talking about doing?

10   A.  To bond me out.

11   Q.  Okay.  And, again, are they going to use that quota money

12   to bond you out?

13   A.  Yes, sir.

14   Q.  And is there another person on this phone call as well?

15   A.  It was Jesus Espino.

16   Q.  And Jesus Espino was he still in charge of the Westside?

17   A.  Yes, sir.

18   Q.  And there are some reports being given to him as to what

19   happened?

20   A.  Yes, sir.

21   Q.  Okay.  And is the report also being given to Bandit as to

22   what happened?

23   A.  Yes, sir.  Cuate was relating the report to Jesus and --

24   Q.  Why is that being done?

25   A.  Because he needed to know what had happened.  And who or

DIRECT - ANGEL RENTERIA

```
 1    who -- what happened exactly out there in that store we were
 2    trying to open.
 3    Q.  Why do they need to know that?
 4    A.  For the reason that they need to give that information to
 5    the person that's higher than them.
 6    Q.  Okay.  All right.
 7              (Audio being played.)
 8    Q.  All right.  Mr. Renteria, let me ask you this.  There's a
 9    portion in here where they're talking about this dude has
10    always been there for us.  You know what I mean?
11              What does that mean?
12    A.  That I was always an Esquina whenever they needed anything,
13    a ride or to drive or anything they needed, money.
14    Q.  You've been there for them, basically?
15    A.  Yeah.
16    Q.  You're a 121 percenter?
17    A.  I was working with them, yes.
18    Q.  Okay.  And then, um, down in this area here, they talk
19    about calling your wife.  Um, and to tell her to call them
20    right away.  Why do they want that to happen?
21    A.  Because they wanted to see if they could bond me out.
22    Q.  All these individuals, Jesus Espino, Bandit, Carlos Perez,
23    and Ricky Gonzalez, Cuate, were they all co-defendants in this
24    particular case with you?
25    A.  Yes, sir.
```

DIRECT - ANGEL RENTERIA

1   Q.  And they want your wife called so they can bond you out?

2   A.  Yes, sir.

3   Q.  Are they going to give her the money to do it?

4   A.  Yes, sir.

5           (Audio being played.)

6   Q.  All right.  So were they in fact able to bond you out?

7   A.  Um, no.  Because I had a bond hold on my probation hold.

8   Q.  All right.  And is that the probation case that we talked

9   about earlier where you got put on probation for that deferred,

10  the possession?

11  A.  Yes, sir.

12  Q.  Um, so how much time did you wind up spending in jail?

13  A.  I believe it was about 57 days or almost 60 days in New

14  Mexico.

15  Q.  A month and a half to two months, basically?

16  A.  Yes.

17  Q.  Um, did you have any contact with Barrio Azteca while you

18  were in jail?

19  A.  Um, there was another individual there.

20  Q.  And who was that other person?

21  A.  His name was Boxer.

22  Q.  Okay.  And what kind of contact did you have with him?

23  A.  I guess he got a charge for, I don't know, some --

24  something simple.  And as soon as he came in there, he told me

25  about what had happened.  He wanted me to tell them.  And my

DIRECT - ANGEL RENTERIA

```
 1   probation or my lawyer -- somebody showed me some paperwork
 2   that they give you there of what had happened in New Mexico.
 3   Q.  Somebody gave you a report?
 4   A.  Yeah, a report for -- I guess it was the police report of
 5   what had happened, the incident that happened in New Mexico.
 6   Q.  All right.
 7   A.  So I gave the report -- well, before I mailed it out to my
 8   wife, I showed it to -- to Boxer.
 9   Q.  Let me stop you there for a minute.  You've got this police
10   report from what happens in New Mexico.  Um, and you're showing
11   this police report to Boxer.  What business of it is his?
12   A.  So in case he could go and tell Espino what had happened.
13   Q.  Okay.  So you're wanting -- basically, it's information
14   provided to the organization?
15   A.  Yes, sir.
16   Q.  Um, okay.
17   A.  Letting them know I hadn't talked or anything, just, I
18   guess, what the report was saying.
19   Q.  I'm sorry?  You said what?
20   A.  I guess so they could see I didn't talk or anything.
21   Q.  All right.  You wanted them to know you were not
22   cooperating?
23   A.  Yeah.
24   Q.  Why was it important?  Why was it important to you that
25   Espino know that you were not cooperating?
```

DIRECT – ANGEL RENTERIA

1   A.  So, I guess, they wouldn't, you know, issue a green light

2   on me.

3   Q.  Okay.  And you're worried about a green light?

4   A.  Yeah.

5   Q.  And why were you worried about a green light?

6   A.  Well, usually green lights aren't that good for when you

7   start talking.

8   Q.  Okay.  What does it mean to get a green light?

9   A.  It could mean either you get killed or, you know, even

10  worse, family members or somebody else gets hurt.

11  Q.  Okay.  Um, so it was important for you that Mr. Espino know

12  you were not cooperating?

13  A.  Yes, sir.

14  Q.  At some point in time, do you get out of jail?

15  A.  No, I believe it was after those 57 days or 53 days, I did

16  yes, sir.

17  Q.  All right.  When you get out of jail, um, do you have to

18  report to anybody?

19  A.  Yeah.  I still had to go tell somebody that I was out,

20  explain my point of view what had happened.

21  Q.  All right.  Who do you report to?

22  A.  Jesus Espino.

23  Q.  That's not Jesus Espino, probation officer or police

24  officer, right?  That's the Barrio Azteca member?

25  A.  Yes, sir.

David A. Perez, RMR, RPR

DIRECT - ANGEL RENTERIA

1    Q.   And what do you report to him?

2    A.   Um, what had happened, how it happened out there in New

3    Mexico.

4    Q.   Does anything happen after that?

5    A.   Um, we -- he told me to later on go talk to Peewee.

6    Q.   Okay.  And do you do that?

7    A.   Yes.

8    Q.   And what happens then?

9    A.   Go to -- we go to a hotel where Peewee was staying.  And he

10   had said that if I wanted my huaraches at that time.

11   Q.   What does that mean?

12   A.   If I wanted to become a member of the Barrio Azteca.  They

13   were willing to give it to me after that incident that happened

14   in New Mexico.

15   Q.   So Peewee tells you you can have your huaraches if you want

16   them?

17   A.   Yeah.  Yes, sir.

18   Q.   And that means becoming a full-fledged member of the Barrio

19   Azteca?

20   A.   Yes, sir.

21   Q.   Um, what was -- is there a particular term that's used for

22   Peewee as far as what he was to you, then, at that point in

23   time?

24   A.   He was just -- well, at that point when we went to the

25   hotel, he was going to be my padrino.

David A. Perez, RMR, RPR

DIRECT - ANGEL RENTERIA

1    Q.  Omar was?

2    A.  Omar.

3    Q.  Were there --

4    A.  And Espino.  Espino was going to be my witness.

5    Q.  All right.  And is there anyone else in that particular

6    chain?

7    A.  That they told me that whenever they get caught or whatever

8    you go to present yourself to another carnal and they ask you

9    for your papers or when you got to present them to somebody,

10   they would have to say who was your witness, who's your

11   padrino, and who's your penco.

12   Q.  What's a penco?

13   A.  A penco was a capo.

14   Q.  And who was going to be your penco?

15   A.  They mentioned Spooky.

16   Q.  And had you met Spooky at that point in time?

17   A.  No.

18   Q.  Does there come a point in time when you do meet Spooky?

19   A.  Yes, sir.

20   Q.  And would you tell the jury how that happens?

21   A.  I believe it was -- I don't remember exactly.  It was

22   probably sometime December, late December or January.  I don't

23   remember the time exactly.

24   Q.  So late December 2010 or early January 2011?

25   A.  I believe so.  I'm not too accurate with the date.  But

David A. Perez, RMR, RPR

DIRECT - ANGEL RENTERIA

```
 1   they had a -- Bandit called me.  And Espino came over to the
 2   house and they wanted to know if I could go over there with
 3   them because they had a meeting.
 4   Q.  Go over where?
 5   A.  To this place, to a hotel they had a meeting at.
 6   Q.  Okay.  And were you able to give them a ride?
 7   A.  Bandit had a van.  And they were both drinking so they
 8   asked me to drive.
 9   Q.  Did you drive?
10   A.  I was driving.
11   Q.  Did you get there?
12   A.  Um, yeah, they passed me the phone.  I was talking to -- I
13   believe, to Omar or Peewee, Manny, talking to Manny at the
14   time.
15   Q.  Okay.  What happened then?
16   A.  They gave me instructions to go drive to the hotel.  We get
17   off at the hotel, walk.  They give us a door number.  We knock.
18   As soon as we knocked, somebody looked through a peephole or
19   through the window.  And we went inside.
20   Q.  Okay.  When you go inside, what happens?
21   A.  There's about 20 or more people inside this room.
22   Q.  Do you recognize any of those people?
23   A.  Couple of them that were there.
24   Q.  Who did you recognize when you walked in?
25   A.  Um, the one I recognized was Chucky.
```

DIRECT - ANGEL RENTERIA

1  Q.  Is that somebody that's been indicted with you in this

2  case?

3  A.  Yes, another person in the indictment with me.

4  Q.  Okay.  Who else?

5  A.  Um, there was another guy, Beto, that was there.  I don't

6  really recall too many.  There was, like, a lot of them.

7  Q.  So they open the door, let you go inside.  What happens

8  when you get inside?

9  A.  Um, we start shaking hands.  They start greeting us.  They

10  say that Ramon, Spooky was there.  That it was -- my padrino

11  was there.

12  Q.  Who says that?

13  A.  I believe it was -- it was Bandit.

14  Q.  Okay.  Do they introduce you to this person?

15  A.  They quickly mentioned him real quick, yes.

16  Q.  Do they point him out to you?

17  A.  Yes.

18  Q.  And do you go over there and shake his hand?

19  A.  Yes, sir.

20  Q.  Do you see the person that they pointed out to you as Spook

21  or Spooky in the courtroom here today?

22  A.  Yes, sir.

23  Q.  Can you point that person out and tell the jury where that

24  person is sitting down or standing and something that person is

25  wearing?

DIRECT - ANGEL RENTERIA

1   A.  Right there.  He's wearing a blue shirt, blue tie.

2         MR. LEAL:  Your Honor, may the record reflect that the

3   witness identified the defendant?

4         THE COURT:  It will so reflect.

5   Q.  (By Mr. Leal)  All right.  So they introduce you to this

6   person and to the defendant.  And what's significant about the

7   introduction to the defendant?  Who is the defendant to you?

8   A.  Um, he was the capo that gave me my huaraches.

9   Q.  So he's what you call penco?

10  A.  Yes, sir.

11  Q.  All right.  So does anything else happen inside this room?

12  A.  Once we entered and everything, before the meeting starts

13  and everything, they take us to the back, and make us strip,

14  search us, take our clothes off, put a magnet wire so they

15  could search for bugs or if you're wearing a wire.

16  Q.  Okay.

17  A.  Make you turn off the phones.

18  Q.  Let me ask you this.  Do you strip down?

19  A.  To your boxers.

20  Q.  To your boxers?

21  A.  Yes, sir.

22  Q.  Do they find a wire or bug on anybody?

23  A.  No, sir.

24  Q.  And then you're supposed to turn in your phones?

25  A.  Turn off your phones.

DIRECT - ANGEL RENTERIA

1   Q.   Off?

2   A.   Put them all together and turn them off.

3   Q.   And does everyone do that?

4   A.   Yes, sir.

5   Q.   And do you do that?

6   A.   Yes, sir.

7   Q.   What's the next thing that happens?

8   A.   Um, they introduced me.  He asked me if -- talking about

9   Spooky.

10  Q.   The defendant?

11  A.   Yeah.

12  Q.   What does he --

13  A.   What had happened out there in New Mexico, to let him know

14  exactly what was going on out there.  That's what he wanted

15  know.

16  Q.   What do you tell him?

17  A.   I tell him the same story about when we got there, about

18  the store we went to.  And, um, as soon as I tell him that what

19  happened, this guy was, you know, got mad because Cuate was

20  asking him to give the information where Cookie was, that he

21  pulled out a gun.  And he asked me if that was the right store.

22  If that wasn't, you know, if we had gotten the right address.

23  And as soon as I told him yes, he goes "va a tumbar".

24  Q.   What does that mean?

25  A.   That means they're going to get knocked down.

DIRECT - ANGEL RENTERIA

1    Q.  Okay.  And they're going to get knocked down.  Is that the
2    store?
3    A.  Yeah, that Cookie was going to go and -- you know, knock
4    her down.  Take down whatever she had, or if she's still
5    pushing or whatever they had to do to make her pay.
6    Q.  So you provide this information to the defendant.  He tells
7    you this.  Um, what's the next thing that happens?
8    A.  He starts talking about how people are over there in Juarez
9    taking to the other side; they're going with -- gente
10   contraria.  They're going with the other side of the people
11   that are Barrio Aztecas, going with the other people that are
12   working with, I guess, Chapo.
13   Q.  You mean the rival cartel?
14   A.  The rival cartel.
15   Q.  And what else does the defendant say?
16   A.  Um, that Manny was in charge of all the drugs that were
17   coming in from Juarez.  And anybody that needed to pick up
18   cocaine, heroin, anything from the drugs proceeds, everything
19   was going through Manny.  The chain of command had to be
20   followed up.
21   Q.  Okay.  And from this meeting, who was at the top of the
22   chain of command in El Paso, to your understanding?
23   A.  At this time, it was Ramon.
24   Q.  Okay.  And when you talk about Ramon, are you talking about
25   --

DIRECT - ANGEL RENTERIA

1   A.  Talking about spooky, yes.

2   Q.  The defendant?

3   A.  Yes, sir.

4   Q.  And just incidentally, you and the defendant share the same

5   last name.  Are you-all related in any way?

6   A.  No, sir.

7   Q.  So this happens at this meeting.  What's the next thing

8   that happens after he says Manny is going to be in charge of

9   this?  Was it your understanding that the defendant was above

10  Manny.  Defendant's the one in charge of El Paso?

11  A.  Yes, the defendant was there.  Yes.

12  Q.  Okay.  Um, and so does the meeting continue?  And do

13  you-all leave?  What happens?

14  A.  Yeah, that -- there was another guy there.  I don't recall

15  his name.  Um, he had a tattoo on his side, that he mentions

16  that was going to be his right-hand man.

17  Q.  Who's right hand man?

18  A.  Ramon, Spooky's right-hand man.

19      MR. FOSTER:  Objection, he can't recall the name of

20  the person.  It's pure hearsay.

21      THE COURT:  I'll overrule the objection.

22  Q.  (By Mr. Leal)  Just for clarification's sake, it's the

23  defendant making the statement about the right-hand man?

24  A.  Yes, the defendant was making the statement.

25  Q.  You don't remember what the name of the right-hand man was?

DIRECT - ANGEL RENTERIA

1   A.  No, sir.

2   Q.  But it's the defendant making this statement?

3   A.  Yes, sir.  That he was pointing it out, that guy was going

4   to be his right-hand man.

5   Q.  All right.  So what's the next thing that happens?

6   A.  Um, time got quickly, and we started -- everybody started

7   leaving.

8   Q.  Did you leave?

9   A.  Everybody starting leaving, yes, sir.

10  Q.  Who did you leave with?

11  A.  Um, Bandit and Espino.

12  Q.  All right.  Um, did you say good bye to the defendant at

13  all or head out the door?

14  A.  Everybody started shaking everybody's hand and everybody

15  starting leaving.

16  Q.  Okay.  And did you get back in the van?

17  A.  Yes, we all got back in the van.

18  Q.  And after this meeting, were you, basically, a full-fledged

19  member of the Barrio Azteca, for sure?

20  A.  Yes.

21  Q.  And did you -- do you recall if you were introduced to

22  everybody at that meeting or not?

23  A.  We shook hands.  And I don't recall, like, a lot of their

24  names but, yes.

25  Q.  Um, after you left the meeting, did you wind up doing work

DIRECT - ANGEL RENTERIA

 1   for the Barrio Azteca?  After you left that meeting, did you

 2   wind up doing any work for the Barrio Azteca?

 3   A.  Yes.

 4   Q.  What kind of work did you do for the Barrio Azteca?

 5   A.  I went to go pick up some heroin for Espino and them to

 6   take to his brother.

 7   Q.  So you kept doing the same kind of stuff you did prior to

 8   going in jail?

 9   A.  Yes.

10   Q.  Did you keep doing that until you got subsequently picked

11   up on the indictment?

12   A.  Yes, sir.

13         MR. LEAL:  May I have just a moment, Your Honor?

14         THE COURT:  Sure.

15         MR. LEAL:  Pass the witness, Your Honor.

16         THE COURT:  Mr. Foster.

17                    CROSS-EXAMINATION

18   BY MR. FOSTER:

19   Q.  Okay.  Mr. Renteria, I want to make sure I'm clear on a few

20   points.  You've had a federal charge for possession with intent

21   to distribute marijuana?

22   A.  Excuse me?

23   Q.  You had a federal conviction for possession with intent to

24   distribute marijuana?

25   A.  Yes, sir.

1    Q.   You've had possession of controlled substance in Texas?

2    A.   Yes, sir.

3    Q.   And you had another possession of controlled substance in

4    Texas.  You've had three drug charges; is that right?

5    A.   No, I believe it was two, sir.

6    Q.   Let's see, I have one of February 1st; that's the federal

7    case in New Mexico.

8    A.   Yes, the marijuana, yes, sir.

9    Q.   Okay.  I have one, November 20, 2007, possession of

10   controlled substance, penalty group less than one gram, in El

11   Paso, where you got three years deferred, right?

12   A.   Yes, sir.

13   Q.   Another in October 19, 2008, possession of controlled

14   substance, penalty group one less than one gram?

15   A.   No, I believe that was --

16   Q.   Was that motion to adjudicate, the motion to revoke your

17   probation for the previous charge I just talked about?

18   A.   No, sir.  I believe it was just one -- one incident with

19   that.

20   Q.   And so part of your plea agreement is 240 months, 20 years

21   confinement, that's what you're expecting to get?

22   A.   Um, expecting a little bit leniency, yes, sir.

23   Q.   You're hoping to get a little less because of your

24   testimony here if you just knock them out of the ballpark

25   right?

```
 1    A.  I expect at least something, if not, whatever God judges
 2    me.
 3    Q.  They also promise not to use any of your prior convictions
 4    against you, right?  For enhancements, isn't there a program on
 5    no use of prior convictions?
 6    A.  I believe so.
 7    Q.  Did your attorney discuss with you that you're eligible for
 8    the career offender with the two prior drug charges?
 9    A.  I don't believe we went through a lot of them.  But I
10    believe if it's there, it's there.
11    Q.  So that's what that's talking about when they talk about
12    not using the prior drug convictions, right?
13    A.  Right.
14    Q.  You participated in not just selling drugs.  Did you also
15    use drugs?
16    A.  Yes, sir.
17    Q.  What kind of drugs did you use?
18    A.  Cocaine, sir.
19    Q.  Use heroin?
20    A.  No, sir.
21    Q.  You talked about using $60, $70 a week.
22    A.  Maybe more, yes, sir.
23    Q.  How much would you buy in grams?
24    A.  Like, since the store -- from what I was pushing, the guy
25    that was pushing, I grab some from there and use from there.
```

```
 1    Try to sell whatever we could and double up just to pay back
 2    the person.
 3    Q.  When's the last time you used cocaine?
 4    A.  I've been incarcerated already about a year and a half
 5    here, sir.
 6    Q.  Right up to the time you were put into jail?
 7    A.  Yeah.  Yes, sir.
 8    Q.  You also participated in extortion?
 9    A.  Yes, sir.
10    Q.  You got a tattoo that has number 21 on it?
11    A.  No, sir.
12    Q.  No?  You don't have one of those?
13    A.  No, sir.
14    Q.  You said you saw Teco in jail.  Who else have you seen in
15    jail that's involved in this case?
16    A.  Just all the defendants that are in jail.
17    Q.  So when you talk about going to this, um -- collecting --
18    this big chase where you were collecting this quota at this
19    store and they refused and the gun was pulled, you were an
20    esquina during that time, right?
21    A.  I was a prospe.  Prospeto.  Prospect, yes, sir.
22    Q.  How is that different from an esquina?
23    A.  Esquina was little bit lower than a prospe.  It would be
24    just, you know, doing favors, also, but not too much involved.
25    Q.  When did you begin to pay your quota?
```

```
1    A.  Um, when I started -- when I got there.  When I got to that
2    talk to Balta and them, back in 2008, I believe it was.
3    Q.  Okay.  You remember about when in 2008, maybe, what season
4    it was?
5    A.  I don't remember.
6    Q.  Do you remember if it was, like, early 2008 or late 2008?
7    A.  I don't recall.
8    Q.  Just sometime in a 12-month period.
9    A.  I believe so.
10   Q.  Do you read, write and understand the Spanish language?
11   A.  I read it a little and write a little, yes.  Not too well,
12   but, yeah.
13   Q.  When you talk to the brothers, do you talk to them in
14   English or Spanish?
15   A.  Little bit of both.  Depends if one can speak English or
16   the other one can't speak Spanish or. . .
17   Q.  So during this time that you were a prospeto, you got your
18   orders from Teco, I believe, it was.  T-E-C-O?
19   A.  Teco.
20   Q.  Yeah, is that who you got your orders from?
21   A.  What time are you talking about; what period of time?
22   Q.  Well --
23   A.  Because that was --
24   Q.  I'm going back.
25   A.  A while back with Teco.
```

1    Q.   When -- is that with Teco then?

2    A.   I believe it was early 2008 or -9 maybe.

3    Q.   Okay.  You participated in beat downs with him?

4    A.   Not with him.

5    Q.   For him?

6    A.   It wasn't a beat down.  It was just -- I believe they had

7    told him that they had stolen the drug proceeds, the quotas.

8    Q.   I'm not talking about Teco getting a green light.  I'm

9    talking about participating with beat downs on other brothers?

10   A.   Yes.

11   Q.   I thought you weren't supposed to do that until you were a

12   full BA?

13   A.   I participated in just like being there, but not touching

14   them.

15   Q.   They needed a witness?

16   A.   No.  Well, usually, either they needed a ride, or I was

17   there at the moment, or at the timing, something happened that,

18   you know, they only had two, three carnales or three Aztecs

19   were there.

20   Q.   When you talked about trading soda for a handgun.  What are

21   you talking about when you say soda?

22   A.   Cocaine.

23   Q.   You don't know how much cocaine you traded for it?

24   A.   I believe -- I don't recall exactly.

25   Q.   You don't recall --

CROSS - ANGEL RIVIERA

```
1    A.  Half an ounce.  I don't remember.

2    Q.  You don't know what kind of handgun it is?

3    A.  It was a handgun, I believe.

4    Q.  That's all you can say about it?

5    A.  Yes, sir.

6    Q.  And I recall that you testified you usually never take guns

7    to stores; is that right?

8    A.  Yes.

9    Q.  Why is that?

10   A.  Well, apparently, usually, all the stores would be open.

11   Opening a new store, you wouldn't -- you wouldn't know if they

12   were rivals or not.

13   Q.  So you just don't take guns to a store on a regular basis.

14   You've got to get approval?

15   A.  Yeah, you get approval from up high or somebody else to

16   acknowledge that you were taking a gun.

17   Q.  And the case with Cookie, Manny approved it?

18   A.  Um, I believe so.  Cuate had called Espino, and Espino

19   probably called up higher.

20   Q.  Wait a minute.  If he probably called, then you don't know

21   for sure, right, you're guessing?

22   A.  No.  I was there when Cuate called.

23   Q.  Cuate called?

24   A.  Cuate, Espino.

25   Q.  But you don't know who Espino calls unless you were there
```

David A. Perez, RMR, RPR

1    to know the call, right?

2    A.  Well, apparently, that's the way it's supposed to come back

3    with the chain of command.  They have to call one person that's

4    in charge of your area.

5    Q.  Okay.

6    A.  This other person has to call this other person.

7    Q.  You've answered my question, sir.  Thank you.  So when you

8    were arrested on that night, you said you kept a cell phone

9    with you in the police car.

10   A.  I believe the officer either missed it, or he left it

11   there, I don't know.  But I had it.  I don't remember exactly,

12   but I think I had it in one of my sweater -- he might have

13   missed it.

14   Q.  Did he pat you down?

15   A.  He pat me down.

16   Q.  And you were handcuffed?

17   A.  I was handcuffed.

18   Q.  Behind your back?

19   A.  I believe in my back, yes.

20   Q.  Just how did you get your cell phone out to start making a

21   call if you're --

22   A.  I think I had it in my -- in my sweater.  I believe I just

23   pulled the sweater back pulled out the phone, dialed the

24   number.

25   Q.  And you ate the phone chip?

```
 1    A.  Yes.
 2            MR. FOSTER:  Could we go to 33A-2?  I don't need
 3    audio.
 4    Q.  You were asked about a couple of phone calls.  I'm going to
 5    show you 33A-2.  If you could scroll to the next page right
 6    there, I believe.  Let's see if I can find -- see that line
 7    that I've circled.
 8    A.  Yeah.
 9    Q.  What does that mean?
10    A.  (Speaking Spanish)  That means that that person called the
11    cops.  That person we went to for the store.  They had called
12    the cops.
13    Q.  So it doesn't necessarily translate "he shot his mouth off,
14    bro", does it?
15    A.  That what?
16    Q.  It doesn't necessarily translate which is directly over to
17    the right that the person shot his mouth off.  He called the
18    cops.  He snitched.  Doesn't mean he shot his mouth off.  It's
19    a little different, isn't it?
20    A.  Well --
21    Q.  That's okay.
22    A.  That's a literal translation.  But. . .
23    Q.  I'm going to circle an area.  Do you see what I'm circling
24    there?  JE to the side?  You see what I'm circling there?
25    A.  Could you blow it up?
```

```
 1              MR. FOSTER:  Can we have this published?
 2              THE COURT:  Sure.  He needs it a little bit bigger.
 3    Q.  (By Mr. Foster)  You see where I've circled?
 4    A.  Yes.
 5    Q.  Looks like they're talking about using the money to get the
 6    brother out of bond, doesn't it?
 7    A.  Yes.
 8    Q.  Now, the Spanish, the left-hand column, can you look at
 9    that for a minute?
10    A.  Yes, sir.
11    Q.  Read it to yourself.  Okay.  Doesn't that more closely
12    translate, let's get the money together so we can get the
13    brother out on bond.  Isn't that what that's talking about?
14    A.  It's actually telling you that they got the money and the
15    money can be replaced.
16    Q.  Be borrowed?
17    A.  Borrowed from the Barrio Azteca, yeah.
18    Q.  It's not given.  Can we scroll up just -- hold on.  That's
19    okay.  You can cut, thank you.  So, basically, getting arrested
20    and driving and going through all this problem, that's what
21    earned you your huaraches here; is that right?
22    A.  I believe so, yes, sir.
23    Q.  No blood involved here?
24    A.  No, sir.
25    Q.  Correct.  Oh, on -- this meeting, you go into this meeting
```

David A. Perez, RMR, RPR

1  you -- you became the designated driver for the meeting?

2  A.  Yes, sir.

3  Q.  What hotel did you go to?

4  A.  I don't recall the name of the hotel.

5  Q.  Do you recall the room number?

6  A.  No, I don't, sir.

7  Q.  When you had to turn your cell phones off, did they make

8  you take the chips out?

9  A.  No.

10         MR. FOSTER:  I will pass the witness.

11         THE COURT:  All right.  Mr. Leal?

12         MR. LEAL:  Briefly, Your Honor.

13         THE COURT:  Okay.

14                    REDIRECT EXAMINATION

15  BY MR. LEAL:

16  Q.  Mr. Renteria, just a couple of things I want to clear up

17  with you.  Um, you mentioned that you traded that eight ball of

18  cocaine for a handgun.  Was it a handgun or rifle?

19  A.  Handgun.

20  Q.  Okay.

21  A.  Handgun, rifle, yes.

22  Q.  I'm sorry?  It was a rifle?

23  A.  It was a rifle, yes.  That was another -- yeah.

24  Q.  Was that -- that was another one?

25  A.  Yeah.

1   Q.  So there was two that you wanted to trade in cocaine for?

2   A.  Yes.

3   Q.  All right.  Was there one of those rifles that was found

4   subsequently at Bandit's house?

5   A.  Yes, sir.

6   Q.  During the search?  Let me show you what's been marked and

7   admitted into evidence as Government's Exhibit 11H.

8          MR. LEAL:  May I approach?

9          THE COURT:  You may.

10  Q.  (By Mr. Leal)  Does that look familiar?

11  A.  Yes.

12  Q.  Is 11H what you traded for?

13  A.  Yeah.

14  Q.  In regards to 11H, why would you trade for something like

15  that?

16  A.  I had it there for protection.

17  Q.  From what?

18  A.  From anybody.

19  Q.  Anybody, like who?

20  A.  Anybody against -- that would want to do me harm.

21  Q.  All right.  Mr. Foster asked you about your cooperation

22  agreement and what you were hoping to get out of this.  Um, and

23  it's actually the judge you're sitting in front of that decides

24  whether or not you get a lesser sentence; is that right?

25  A.  Yes, sir.

```
 1              MR. LEAL:  Pass the witness.

 2              THE COURT:  Anything further?

 3              MR. FOSTER:  No questions further, Judge.

 4              THE COURT:  Is he excused as a witness?

 5              MR. LEAL:  Yes, Your Honor.

 6              MR. FOSTER:  I have no objections.

 7              THE COURT:  You may step down.  You're excused.

 8              Government may call their next witness.

 9              MR. SKARET:  Fernando Carrillo Candia.

10              THE COURT:  Is now a good time for a short break?

11    Let's take a short break.

12              You remain under all the instructions the Court has

13    previously given you.  See you at 2:30.

14              (Jury leaves courtroom.)

15              (Recess.)

16              COURTROOM DEPUTY:  Court is back in session.

17              THE COURT:  Ready to bring in the jury?

18              MR. SKARET:  Yes, Your Honor.

19              THE COURT:  Okay.

20              (Jury enters courtroom.)

21              THE COURT:  You may be seated, Ladies and Gentlemen.

22              Mr. Skaret, whenever you're ready.  All right.  The

23    Government has called our next witness.  Um, he has not been

24    sworn in yet.  Whenever you are ready.

25
```

CORRECT — FERNANDO CARRILLO CANDIA — DIRECT

```
 1                 FERNANDO CARRILLO CANDIA, SWORN

 2                       DIRECT EXAMINATION

 3          MR. SKARET:  Mr. Martinez, if we could have the Elmo

 4   turned on, before I forget.

 5   BY MR. SKARET:

 6   Q.  Good morning, sir -- pardon me.  Good afternoon.  Would you

 7   please introduce yourself to the jury and spell your last name

 8   more the court reporter?

 9   A.  My name is Fernando Carrillo Candia.  My last name is

10   C-A-R-R-I-L-L-O.

11   Q.  And what is your country of citizenship?

12   A.  I was born in Juarez, Mexico.

13   Q.  And have you ever been a member of the Barrio Azteca?

14   A.  Yes, I do.

15   Q.  When did you join?

16   A.  2000.

17   Q.  Are you still a member?

18   A.  Yes, I do.

19   Q.  As of -- when you get off the witness stand, will you be a

20   member of the Barrio Azteca?

21   A.  Not anymore.

22   Q.  Are you currently serving a federal prison sentence here in

23   the United States?

24   A.  Yes, I do.

25   Q.  What is that sentence for?
```

1    A.   It's for illegal re-entry, 60 months.

2    Q.   What does is illegal re-entry mean?

3    A.   I don't got no papers to be in the United States.

4    Q.   How long is -- how much longer do you have on that 60-month

5    sentence?

6    A.   Two years and a half.

7    Q.   Do you have any history of drug use?

8    A.   Yes.

9    Q.   What is that history?

10   A.   Marijuana, cocaine, alcohol.

11   Q.   When did you start using those drugs?

12   A.   When I was around 15 years old.

13   Q.   Have you been using them consistently since them?

14   A.   Yes, I do.

15   Q.   When was the last time you used illegal drugs?

16   A.   Back in 2010 before I got arrested.

17   Q.   Now, you said you've been a BA since about the year 2000.

18   Is it against BA rules to cooperate with the United States

19   government?

20   A.   Yes.

21   Q.   Why are you doing it?

22   A.   Because I want to get out from this gang.  I'm tired to be

23   following something it's not worth it.  And, um, the only --

24   they only going to take me to end up life in prison or even

25   death.  And I'm done with that.

1  Q.  You made a lot of bad choices in your life?

2  A.  Yes, I do.

3  Q.  What are you hoping to get from cooperating, aside from

4  doing the right thing?

5  A.  They going to look for my safety and my family's safety.

6  Q.  Has anyone promised you that you would get a reduction in

7  your current sentence?

8  A.  No.

9  Q.  Are you hoping to get out early?

10  A.  Yes, I do.

11  Q.  Who is ultimately in charge of whether you do get a

12  reduction?

13  A.  The judge.

14  Q.  Have prosecutors made promises to you regarding the witness

15  security program?

16  A.  No.

17  Q.  Are you sure?

18  A.  Yes.

19  Q.  Have prosecutors applied for the prisoner witness security

20  program on your behalf?

21  A.  Yes.

22  Q.  What do you know about that program?

23  A.  It's about my safety.

24  Q.  All right.  And how is it that that program helps provide

25  for your safety?

1    A.  They're going to put me apart of all the BA members --

2    apart.

3    Q.  Is there any guarantee you will be admitted into that

4    program?

5    A.  No.

6    Q.  Has the prosecution made any promises to you about sending

7    you back to Mexico after your sentence?

8    A.  No.

9    Q.  Has the United States made any promises to you about

10   ensuring the safety of your immediate family?

11   A.  Yes.

12   Q.  What are those promises?

13   A.  Just look about the safety, see if there's any problem with

14   the BAs or. . .

15   Q.  So that is -- that's the United States' part of the deal.

16   What's your part of the deal?

17   A.  Just be cooperating and give my statement.  The better I

18   can do and help them out the best way I can do it.

19   Q.  Is your deal to help out the United States or to testify

20   truthfully?

21   A.  Yes, I do.

22   Q.  To what?  Pardon me?

23   A.  Yes.

24   Q.  Which is it?  Is it to do your best for the United States

25   or to testify truthfully?

1   A.  Both.

2   Q.  Has any agent in the case ever asked you for anything more

3   than the truth?

4   A.  No.

5   Q.  Has any prosecutor ever asked anything more than the truth?

6   A.  No.

7   Q.  I would like to talk about your personal history.  You said

8   you were from Juarez, Mexico.  When did you first come to the

9   United States?

10  A.  Just to help my visa.  And I was coming back and forth

11  before I get arrested.

12  Q.  And, approximately, when was it that you first came to the

13  United States?  How old were you?

14  A.  Around five, six years old with my parents.

15  Q.  Did you live here in El Paso?

16  A.  No.

17  Q.  When did you first have problems with the law?

18  A.  When I got arrested back in January 2000.

19  Q.  What did you get arrested for?

20  A.  Possession, intent more than 1,000 pounds of marijuana.

21  Q.  Was that here in El Paso or in Mexico?

22  A.  No, it was in here in New Mexico.

23  Q.  And just tell us briefly about that charge.

24  A.  They just got me with possession, intent, try to smuggling

25  drugs from Juarez to the United States.  And I got arrested

1   from the Border Patrol.

2   Q.   And who's drugs did that belong to?

3   A.   To one of my uncles.

4   Q.   And was your uncle related in any way to the people in the

5   Juarez drug cartel?

6   A.   Yes.

7   Q.   Now what is the Juarez drug cartel?

8   A.   It's the main guys who run all the drugs in Ciudad Juarez.

9   Q.   And by doing that job that got you in trouble.  Were you

10  trying to join up with the Juarez cartel?

11  A.   Yes.

12  Q.   Why were you wanting to join?

13  A.   Because I got a hard life.  And I tried to get the easy

14  life.

15  Q.   Were you convicted of bringing over all that marijuana?

16  A.   Yes.

17  Q.   And what was your sentence?

18  A.   37 months.

19  Q.   What prisons did you serve the majority of your time on

20  that 37 months sentence?

21  A.   It was in Pecos, Texas and Big Spring.

22  Q.   When you finished up your sentence there, where were you

23  sent?

24  A.   They deport me back to Mexico.

25  Q.   All right.  You mentioned you became a Barrio Azteca member

David A. Perez, RMR, RPR

```
 1   in 2000.  Where were you when you joined?
 2   A.  I was in Pecos, Texas.
 3   Q.  That's when you were serving that drug sentence?
 4   A.  Yes.
 5   Q.  Why did you want to join at that time?
 6   A.  It was just two options, be a Barrio Azteca or be "Paisa".
 7   Q.  Why were those the only two options?
 8   A.  They're the only guys who they walk on the population, on
 9   the yard.
10   Q.  And what did you have to do to join?
11   A.  I got -- put myself in -- prove the gang members I got love
12   on them.
13   Q.  And what did you do to prove yourself?
14   A.  I beat up five guys during four or five months period.
15   Q.  Who are those five guys?
16   A.  It was rival gang members.
17   Q.  Who was their gang?
18   A.  Border Brothers.
19   Q.  And when you say they were rivals, were the BA at war with
20   that gang?
21   A.  Yes.
22   Q.  So how did you beat these guys up?
23   A.  Um, I used to work on R and D.  And --
24   Q.  Is that receiving and discharge?
25   A.  Yes.
```

1    Q.   Go ahead.

2    A.   And I look at the files.   Every time these people came into

3    the prison before they got them -- and I was the -- my job --

4    it was part -- as soon as they got cleared from arriving, I was

5    the guy who take these people to the -- to their units.

6    Q.   Once you took them to their units -- let me go back a step.

7    You would receive, basically, their application as they're

8    coming into the prison?

9    A.   Yes.

10   Q.   Was their gang affiliation listed on those applications?

11   A.   Yes.

12   Q.   So you knew who was who before they even got there?

13   A.   Yes.

14   Q.   And you mentioned you'd take them to the cell.   What would

15   you do when you got them to the cell?

16   A.   It was like some people -- some guys, they go to -- depends

17   on the unit they went.   And, um, as soon as I put these people

18   in their unit, I hold the rival gang member to stay some space

19   where they can get -- can't get us on camera or security

20   guards.   And after I put the people on their units, I beat them

21   up.

22   Q.   And what kind of beatings are we talking about?   How

23   serious?

24   A.   Punching, kicking till they bleed.   Broken teeth, broken

25   jaws, ribs.

1   Q.  Were those particular victims able to walk away from the

2   beatings?

3   A.  No.

4   Q.  How were they taken out?

5   A.  With a stretcher bed.

6   Q.  With what?

7   A.  Stretch bed.

8   Q.  A stretcher?

9   A.  Yeah.

10  Q.  At that point had you proved yourself?

11  A.  Actually, I did it three times by myself.  And that's not

12  supposed to be like that.  And they told me to quit doing that.

13  The last two they send me with another two guys.  And after

14  that, I beat up those five guys.  And I get some disciplinary

15  action.  And I don't tell nobody I got out from the special

16  housing unit.  And they offered me to became a member from the

17  Barrio Azteca.

18  Q.  You mentioned "they" a couple of times.  Who's -- you said

19  beat up three guys and they told me to stop doing it by myself.

20  Who's they?

21  A.  The Barrio Azteca members.

22  Q.  So then the last two beatings of these five that you

23  mentioned, is that with the Barrio Azteca?

24  A.  Yes.

25  Q.  And who ordered you to do those particular beatings?

1   A.  It was the name in charge.  It was Fresa.  His name is
2   Alberto Nunez.
3   Q.  All right.  So Fresa told you to beat up these -- these two
4   Border Brothers, I presume?
5   A.  Yes?
6   Q.  And were those beatings the same that you had handed out
7   before?
8   A.  Yes.
9   Q.  Just with three people against one?
10  A.  Yes.
11  Q.  After the last two beatings, what happened to you?  Were
12  you -- did you still have your job in R and D?
13  A.  No, they fired me.
14  Q.  Where did they put you?
15  A.  They put -- gave me a disciplinary action.  I spent 30 days
16  in solitary.  And I got out.  And I was just in the unit
17  working in the unit.
18  Q.  Did you still have to prove yourself coming out of
19  solitary?
20  A.  Actually, it's when they came to me and offered me if I
21  want to became a member.
22  Q.  So who, specifically, asked you to become a member?
23  A.  Alberto Nunez, Fresa.  And at that time it was like around
24  eight to ten members.  And most of them they asked me if I want
25  to join them.

```
 1    Q.  So this particular individual, Fresa, did he do anything to
 2    move the ball on your membership?
 3    A.  Yes.
 4    Q.  What did he do?
 5    A.  He put word for me and sent my name to one of the capos
 6    from the gang.
 7    Q.  Which capo?
 8    A.  Manuel Cardoza.
 9    Q.  And what was his nickname?
10    A.  Tolon.
11    Q.  And did you ever hear back from Tolon?
12    A.  No.
13    Q.  Did you get a letter back from Tolon?
14    A.  Yes.
15    Q.  Did you become a Barrio Azteca member?
16    A.  Yes.
17    Q.  And did Tolon become your padrino?
18    A.  Yes.
19    Q.  Was that a good thing for you?
20    A.  At the time it was good because I didn't know what was I
21    was getting into it.  They never told me what was the risk or
22    the danger.  Actually, they didn't do -- allow to tell you
23    nothing till you became a member.
24    Q.  Is it good to have a BA captain actually be your padrino as
25    opposed some other guy on the street?
```

```
 1    A.   Yes.
 2    Q.   Why is that good?
 3    A.   Because it's one of the highest rank in -- in the gang.
 4    Q.   Do you have any special privileges in regards to access to
 5    that captain if he is your padrino?
 6    A.   Sometimes.
 7    Q.   Can you write to that captain?
 8    A.   Yes.  Um, depends on the actions you're doing or the
 9    trouble you're into.  You can write the captain or your padrino
10    and let them know what's going on in the deal.  And sometimes
11    going to put word for you to calm down everybody or the people
12    who's trying to -- to put something on you or whatever.
13    Q.   All right.  Let's move ahead a little bit.  You're a
14    full-fledged BA member.  Was there ever a large prison fight at
15    the Pecos prison after you became a member?
16    A.   Yes, it was a riot.
17    Q.   What happened at that riot?
18    A.   It was -- one of the Border Brothers came into the
19    population.  He don't supposed to be there.  And the Paisas
20    tried to back him up, tried to keep him on the yard because
21    they let us be on population.  And the BAs -- it's -- they
22    can't stay over there with us because we got war.  And the
23    Paisas they say like they're not going to stay here.  You're
24    not going to be either.
25    Q.   So was the Barrio Azteca controlling who could and who
```

```
1    could not walk outside in the yard?
2    A.  Actually, it was against rival gang members.
3    Q.  All right.  And with respect to those rivals was the Barrio
4    Azteca trying to keep them out of the yard?
5    A.  Yes.
6    Q.  And, basically, this Border Brother was coming into your
7    yard?
8    A.  Yes.
9    Q.  So what happened?  How did the riot start?
10   A.  They just told me I have to check in to the special
11   housing, he can't be on the population.  And, actually, the
12   Paisas back him up saying, like, he's going to be -- he's going
13   to stay here.  He's not going to stay here.  You have to go
14   with him.  And that's when they started punching and kicking
15   and --
16   Q.  Okay.  Let me ask you.  So the Border Brother that was not
17   supposed to be in your yard went to the Paisas?
18   A.  Yes.
19   Q.  Who are the Paisas?
20   A.  There's a union.  Most of these guys are from Mexico.
21   Q.  It's a gang?
22   A.  It looks like.
23   Q.  Okay.  Were you at war?  Or were you sort of neutral with
24   the Paisas?
25   A.  At this time it was neutral.  We wasn't at war.  But it
```

```
 1    became a war because the Border Brothers.
 2    Q.  So did the Paisas basically backup this Border Brother who
 3    wanted to walk in the yard?
 4    A.  Yes.
 5    Q.  So what happens between the Paisas and Barrio Azteca?
 6    A.  We went to a big riot.  It was like 15 of us against like
 7    200, 300 of them.
 8    Q.  Who won that fight?
 9    A.  Actually, we -- it was like four or five of us they -- we
10    got beat up real bad.  And I was one of them.
11    Q.  What happened to you?
12    A.  They stabbed me.  They hit me with free weights, dumbbells.
13    And punched me, kick me all the way.
14    Q.  Did you get sent to the hospital?
15    A.  Yes.
16    Q.  After the riot, did you stay at Pecos?
17    A.  Yes.
18    Q.  How long did you stay there?
19    A.  Around seven to ten months.
20    Q.  All right.  Now, in serving out the rest of your sentence
21    there, um, where did you finally end your prison sentence?
22    Which -- which prison facility?
23    A.  They send me to outside of Dallas, a private facility.
24    Q.  And in between Pecos and Dallas, did you serve at a number
25    of facilities as well?
```

1    A.   Yeah.

2    Q.   Did you engage in same type of Barrio Azteca business at

3    those facilities?

4    A.   Yes.

5    Q.   At the end of your prison sentence when you're at Dallas, I

6    assume you're ultimately released, where do you go?

7    A.   They deport me back to Mexico through Laredo, Texas to

8    Laredo, Texas to Laredo, Tamaulipas.  And then I went back to

9    Ciudad Juarez, Mexico.

10   Q.   Okay.  And about this time that you're deported, what year

11   is that?

12   A.   It was in back in 2002.

13   Q.   When you went back and reported in Juarez, Mexico -- first

14   of all, why did you report?

15   A.   Because it's one of the rules.

16   Q.   All right.  Who did you report to?

17   A.   I went to see Cosas.

18   Q.   Was Cosas a Barrio Azteca member?

19   A.   Yes.

20   Q.   How do you know who to go talk to?

21   A.   Um, they let us know as soon as -- before we got out, we

22   got a place to go or information to a phone number.

23   Q.   Pardon me.  Who's they?  Who lets you know?

24   A.   The Barrio Azteca.  The gang.

25   Q.   Would this be the leader of the last prison facility you

1    are at?

2    A.  Yes.

3    Q.  So who was the BA -- or what was the BA like in Juarez when

4    you checked in in 2002?

5    A.  It was like prison gang.  It wasn't like it is right now.

6    Actually, it wasn't that kind of organized.  Everybody was

7    splitting.  At this time is when everybody -- Cosas start to

8    get the people straight up and start to get meetings and put

9    everybody together to work.

10   Q.  So when you went and checked in with Cosas, did you start

11   working with the BA or did you find other work?

12   A.  I found another work.

13   Q.  With what?

14   A.  I was working with the Juarez cartel.

15   Q.  Let me ask you, you mentioned the Juarez cartel.  Is La

16   Linea another name for the Juarez cartel?

17   A.  Yes.

18   Q.  How did you get involved in working with Juarez cartel?

19   A.  Because one of my uncles -- two of my uncles, they're

20   relatives through the main guys from the Juarez cartel.

21   Q.  The same uncle who you got locked up for transporting the

22   marijuana across the border?

23   A.  Yes.

24   Q.  Did you have credibility with those guys?

25   A.  Yes.  Yes.

1   Q.  What kind of work were you doing for the Juarez cartel at
2   the time?
3   A.  I start to transport drugs from Mexico, even in Ciudad
4   Juarez.
5   Q.  All right.  How much drugs were you transporting?
6   A.  Around 50 keys of cocaine each week.
7   Q.  How much were you paid for that?
8   A.  3- to $4,500.
9   Q.  Were you making -- can you tell us, were you also working
10  on the side, a side drug business?
11  A.  Yeah.  After I was -- I work for La Linea around ten months
12  a year.  And then I got split.  And I start to do my own thing.
13  Q.  All right.  Now, you mentioned that Tolon was your padrino.
14  Did you ever send him any money down in Juarez at this time?
15  A.  Yes.  It was back in 2003.
16  Q.  And how much money did you send him?
17  A.  Around 2- $300.
18  Q.  How did you get that money to him?
19  A.  I give it to her daughter.
20  Q.  To his daughter?
21  A.  Yes.
22  Q.  And what was the name of his daughter?
23  A.  April.
24  Q.  I would like to show you what's been marked as Government's
25  Exhibit 26.

```
 1              MR. SKARET:  This is not evidence, Your Honor.
 2              THE COURT:  All right.  Just the witness.
 3    Q.  (By Mr. Skaret)  This particular individual, Government's
 4    Exhibit 26, do you recognize her?
 5    A.  Yes.
 6    Q.  What is her name?
 7    A.  April Cardoza.
 8    Q.  Is that the individual that you gave the money to send to
 9    your padrino, Tolon?
10    A.  Yes.
11    Q.  Are you aware he she's been indicted in this case?
12    A.  Yes.
13    Q.  Now it's, approximately, 2003.  Did you ever come back to
14    the United States?
15    A.  Yes.
16    Q.  And why?
17    A.  I got married with my wife.
18    Q.  Did you get married here in El Paso?
19    A.  Yes, on the courthouse.
20    Q.  When was the next time you got in trouble with the law?
21    A.  2006.
22    Q.  What happened there?
23    A.  They arrested me transporting around 200 pounds of
24    marijuana in Oklahoma -- in the State of Oklahoma.
25    Q.  And what were you doing with this 200 pounds of marijuana?
```

```
1    A.   I was on my way to Memphis, Tennessee.
2    Q.   Memphis, Tennessee?
3    A.   Yes.
4    Q.   Were you convicted for that?
5    A.   Yes.
6    Q.   Did you plead guilty?
7    A.   Yes.
8    Q.   What was your sentence?
9    A.   36 months.
10   Q.   Was that in federal court?
11   A.   Yes.
12   Q.   So now you're in federal system.  What prisons did you
13   serve your time at for the drug charge?
14   A.   I went to Fort Worth, Texas.
15   Q.   Where else?
16   A.   And Bastrop.
17   Q.   Anywhere else?
18   A.   Back to Pecos.  And back deported back to Mexico.
19   Q.   Did the BAs have a presence in the federal prisons that you
20   were transported to?
21   A.   Yes.
22   Q.   All right.  Did you check in to the prisons like you were
23   supposed to?
24   A.   Yes.
25   Q.   Tell me, when you checked in, did the Barrio Azteca
```

```
 1    leadership investigate you when you checked in?
 2    A.  Yes.
 3    Q.  Tell us about that investigation process.
 4    A.  They take your information, name.  And if there's not a
 5    rank over there in that prison, they send it to a rank to check
 6    your background.
 7    Q.  And what part of rank -- or who with rank would they send
 8    that to?
 9    A.  Depends on who you got communication with.
10    Q.  Ultimately, did you pass your investigation?
11    A.  Yes.
12    Q.  Did you join up with the Barrio Azteca in those prisons?
13    A.  Yes.
14    Q.  Did you engage in BA assaults during your prison terms?
15    A.  Yes.
16    Q.  When you finished up your 36-month sentence on the drug
17    charge, what happened?
18    A.  I get deported back to Mexico in 2008.
19    Q.  Was Juarez a different place?
20    A.  Yes.
21    Q.  How was it different?
22    A.  The gang -- it was real, real organized.  And they joined
23    Juarez drug cartel, like they're enforcers.
24    Q.  And why did the Barrio Azteca and Juarez drug cartel join
25    forces at that time?
```

David A. Perez, RMR, RPR

1  A.  At the beginning they started just with drugs.  After that,

2  they -- they became like more connected to the cartel.  And the

3  cartel start using the gang to do their dirty work.

4  Q.  Who was the gang doing their dirty work against?

5  A.  Against another rival gangs and the rival Sinaloa cartel.

6  Q.  So the Juarez cartel was basically at war?

7  A.  Yes.

8  Q.  With whom or against whom?

9  A.  Against the Sinaloa cartel.

10  Q.  Now, you mentioned it was a Barrio Azteca rule to check in.

11  Did you check in in Juarez, Mexico?

12  A.  Yes.

13  Q.  Who did you check in with?

14  A.  Fresa.

15  Q.  The same Fresa that sponsored you in back in Pecos?

16  A.  Yes.

17  Q.  Tell us about how you checked in.

18  A.  I looked for him because I'm -- one of the sisters used to

19  have a business where we used to hang up before I come to live

20  in El Paso and went to prison.  And I meet him.  And he take me

21  to my rehab to check my background again.

22  Q.  Who was at rehab to check your background?

23  A.  It was Freddie and Cuate.

24  Q.  Cuate.  Did you ever meet an individual named Chino Valles?

25  A.  I spoke on the phone with him.

David A. Perez, RMR, RPR

```
 1   Q.  All right.  And that was at that time at the rehab?
 2   A.  Yes.
 3   Q.  Why did you speak on the phone with Chino Valles?
 4   A.  At that time it was a real, real heat on Juarez because the
 5   war.  And because the Government, they're looking for members
 6   of the gang.  And there was like more hiding.
 7   Q.  And Chino Valles, was he a Barrio Azteca member?
 8   A.  Yes.
 9   Q.  Was he a leader?
10   A.  He used to be.
11   Q.  Um, what did you talk about with him on the telephone?
12   A.  He asked me my name and where I coming from and -- how if I
13   was good and clear.  And I told him yes.
14   Q.  As part of your cooperation in the United States, have you
15   previously identified Fresa and Chino Valles?
16   A.  Yes.
17   Q.  I would like to show you what's been marked as Government's
18   Exhibit 26.
19           MR. SKARET:  This is not in evidence, Your Honor.
20           THE COURT:  All right.
21   Q.  (By Mr. Skaret)  Do you recognize at that individual there?
22   A.  Yes.
23   Q.  Who is that?
24   A.  Fresa.
25   Q.  Do you recognize -- he's not on here.  So, basically, Chino
```

```
 1    Valles conducted your investigation?

 2    A.  Yes.

 3    Q.  Did he get back to you on the results of the investigation?

 4    A.  It was quick on the same phone call I got with him.

 5    Q.  Okay.  How was he able to basically complete your

 6    background investigation so quickly?

 7    A.  Because Fresa, he know me back in the day.  He was the one

 8    who sponsored me to become a member.

 9    Q.  And Fresa vouched for you?

10    A.  Yes.

11    Q.  All right.  Did Fresa give you an update of what was going

12    on in Juarez?

13    A.  Yes.

14    Q.  What did he say?

15    A.  He say we was in a war and we had to take care about what

16    we do, where we go.  If you got any tattoos, you have to cover

17    up because the federal government -- it was behind us and the

18    rival gangs.

19    Q.  And what did he say about the murders that were occurring

20    in Juarez?

21    A.  Um, he told me like right now there were working for La

22    Linea direct -- work for La Linea.  And they told me, like the

23    enforcers.  And at this time it was JL in charge from La Linea.

24    He was the main guy who orders the hits and tell the Barrio

25    Azteca to do it.
```

David A. Perez, RMR, RPR

1  Q.  And why is Juarez so important to these cartels that are

2  fighting?

3  A.  Because it's one of the biggest places to transport drugs

4  into the United States.

5  Q.  Now, you just mentioned an individual named JL?

6  A.  Yes.

7  Q.  And you mentioned he was involved with the Juarez drug

8  cartel?

9  A.  Yes.

10  Q.  What was his position?

11  A.  He was the leader.

12  Q.  Did there ever come a time when you went and talked to JL?

13  A.  Yes.

14  Q.  Tell us about that.

15  A.  I meet him before I went to prison the last -- second time.

16  And I was doing some work for him, moving around keys of

17  cocaine.  And when I got out the second time, um, one of my

18  have cousins used to have a bar over there.  It was a place

19  where they used to hang up.  My cousin told me, like, JL came

20  by before I got out and asked for me.  My cousin -- at the time

21  I went with my cousins to get a couple of drinks.  He told me

22  if I can go and see JL.

23  Q.  Did you ultimately meet up with him?

24  A.  Yes.

25  Q.  And why did you go see him?

David A. Perez, RMR, RPR

A.  Just to give my respects.  And just to find out what he want from me.

Q.  Were you looking for a job?

A.  Not really.

Q.  Why not?

A.  Because I'm done.  And I was doing too many time in prison.  And, actually, I was married.  My wife wait for me.  And she told me if I came back again to the same thing, she's going to left me.

Q.  Where was your wife at this time?

A.  In El Paso.

Q.  Did you ultimately go see JL?

A.  Yes.

Q.  Where was he?

A.  It was kind of outside Juarez city limits.

Q.  All right.  Um, what happened when you -- did you go to the place?

A.  Yes.

Q.  What happened when you got there?

A.  I got there.  And as soon as I came in, I see three of the gang members from the Barrio Azteca.  One of them, it was in the car.  And two of them was inside of the house talking with JL.

Q.  Who was in the car?

A.  Camello.

David A. Perez, RMR, RPR

1    Q.   Camello.  Do you know his full name?

2    A.   Jesus Chavez.

3    Q.   And with respect to this individual, Jesus Chavez, he's

4    also known as Camello, you say?

5    A.   Yes.

6    Q.   All right.  Do you know what his position was at that time?

7    A.   Fresa told me he became leader.  He was in charge of one of

8    the hit squads.

9    Q.   Now Camello is in the car.  Who's outside of the car?

10   A.   Nobody was outside the car.  The other two members -- it

11   was inside of the house.

12   Q.   Inside the house?

13   A.   Yes.

14   Q.   Did you go inside his house?

15   A.   Yes.

16   Q.   And did you see who were those two other guys?

17   A.   Yes.

18   Q.   Who were they?

19   A.   One of them was Tablas.  And the other one was Rafa Duarte.

20   Q.   Who's Tablas?

21   A.   Eduardo Ravelo.

22   Q.   What's his position in Juarez?

23   A.   It's one of the captains for the gang.

24   Q.   For them who?  The Barrio Azteca?

25   A.   Yes.

1  Q.  All right.  I'm showing what's been marked as Government's

2  Exhibit 26.  Do you recognize that individual?

3  A.  Yes.

4  Q.  Who is it?

5  A.  Tablas.

6  Q.  You mentioned the second individual that was inside was

7  Rafa?

8  A.  Rafa Duarte.  Rafael Duarte.

9  Q.  And what was his role in the Barrio Azteca organization?

10  A.  He is a lieutenant from the gang.

11  Q.  Why was Tablas and Rafa Duarte at the home of JL that day?

12  A.  He was talking about some business.

13  Q.  All right.  What kind business?

14  A.  Actually, when I get in, Rafa -- I saw JL.  And he told me,

15  like, he want to introduce me to these guys.  And he didn't

16  know I was a Barrio Azteca member.  So he told me, like, I want

17  you to meet these guys.  And they're working with me.  And it

18  was a laugh over there, because the two gang members, they

19  already know me because I was a member.  And JL became like

20  strange because he didn't know about me.  So --

21  Q.  He's trying to introduce you to people that already know

22  you?

23  A.  Yes.

24  Q.  All right.  What, if anything, did JL tell Tablas about

25  you?

1  A.  Um, actually, they start to talk about business.  And JL

2  told me to get to another room.  As soon as they finish, I came

3  back.  And JL told to Tablas, like, I want you to take care

4  about this guy, about me.  And I don't want you to put him on a

5  hit -- he just barely got out.  I don't want you to put him on

6  the hit squads and all that.

7  Q.  All right.  Now, you mentioned the hit squads.  What is a

8  hit squad?

9  A.  Hit squad, it's about -- it's about six -- six, seven

10  members.  It's these people, they're always in quarantine.

11  These people -- it's people who got deported or they're from

12  Juarez.  They are Barrio Azteca members.  And they put them to

13  work.

14  Q.  Okay.  So what kind of work does a hit squad do?

15  A.  Killing.

16  Q.  And is this -- is that the sole goal in life, basically?

17  A.  Yes.

18  Q.  All right.  So JL tells Tablas don't put you on a hit team.

19  A.  Yes.

20  Q.  All right.  Does Tablas end up putting you on a hit team?

21  A.  No.

22  Q.  All right.  What does he do?

23  A.  He talked to me.  And he was worried.  He asked me where I

24  know JL.  I told him it was back in the day and I was working

25  with him.  And he was kind of worried, kind of jealous

David A. Perez, RMR, RPR

1    because -- I don't know.

2    Q.  Because you were friends with JL?

3    A.  Yes.

4    Q.  Okay.  Now, if JL hadn't put in that word for you, do you

5    know what Tablas had in mind for you?

6    A.  Yes.

7    Q.  And what had he had in mind?

8    A.  Put me on a hit squad right away.

9    Q.  In Juarez did you ever come across another individual by

10   the name of Arturo Castrellon Gallegos, otherwise known as

11   Benny or Farmero?

12   A.  Yes.

13   Q.  As part of your cooperation in this case you've identified

14   that individual, correct?

15   A.  Yes.

16   Q.  I would like to show you what's been marked as Government's

17   Exhibit 26.  Do you recognize that individual?

18   A.  Yes.

19   Q.  Who is it?

20   A.  Farmero.

21   Q.  Is he also known as Benny, real name Arturo Castrellon

22   Gallegos?

23   A.  Yes.

24   Q.  What are some of the other leaders of the Barrio Azteca

25   that you met down there after meeting with JL at his house?

1   A.  Actually, I got out.  And two days later Fresa called me

2   and they want -- they want to talk to me.  And they take me to

3   another house.  And I meet Tablas over there and Rafa.  And he

4   want to talk to me.  And he pulled me to the side and asked me

5   about JL and all that.  And, actually, he tried to get JL out

6   of the game and tried to get his spot.

7   Q.  Tried to get his spot?

8   A.  Yes.

9   Q.  So, basically, Tablas is trying to take over?

10  A.  Yes.

11  Q.  Did he want your help?

12  A.  Yes.

13  Q.  Did you give it to him?

14  A.  No.

15  Q.  Why not?

16  A.  I told him, like, he has to be real connected with the main

17  leader from the Juarez drug cartel.  Because if he don't, the

18  leader is going to come and get him.

19  Q.  Um, now when you were down there, meeting up with some of

20  these Barrio Azteca leaders in Juarez, in addition to nicknames

21  did they go by numbers?

22  A.  Yes.

23  Q.  Why do they have numbers assigned to them?

24  A.  Because all the communication they have on the frequency

25  radios, they don't want to pick up names or nicknames.

```
 1    Q.  So they use numbers on the radios?
 2    A.  Yes, sir.
 3    Q.  Did you listen to the radios when you were down there?
 4    A.  Yes.
 5    Q.  What kind of business are they conducting on the radio?
 6    A.  All kind of business.  Killings, extorsion, drug business,
 7    money laundering.
 8    Q.  Let me go back for a second.  When you met with Tablas and
 9    he wanted to use you with respect to JL, what did Tablas want
10    your help in doing to JL?
11    A.  Kill him.
12    Q.  Okay.  All right.  That's when you say no you're not going
13    to do that?
14    A.  Yes.
15    Q.  Now with respect to these -- the Barrio Aztecas' use of
16    radios down there, they use the number on the radio.  Why is
17    that?
18    A.  Because they don't wanna get the federal police, get a
19    track or for names or nicknames.
20    Q.  When you were with Fresa, did he have a radio?
21    A.  Yes.
22    Q.  Was he a leader in the Barrio Azteca then?
23    A.  He got -- he was on the -- the leader of one of the hit
24    squads.
25    Q.  All right.  And he had a radio?
```

David A. Perez, RMR, RPR

1  A.  Yes.

2  Q.  And did you hear hits going down on the radio?

3  A.  Yes.

4  Q.  Did the Barrio Azteca leaders in Juarez all have radios?

5  A.  Yes.

6  Q.  What is Chino Valles a leader?

7  A.  Yes.

8  Q.  Did you ever make it back to your wife in El Paso?

9  A.  Yes.

10  Q.  When was that?

11  A.  Just spent like 20 days, 25 days in Juarez.  And I came

12  back to El Paso.

13  Q.  All right.  Did the police ever come to you because you

14  were here illegally at that point?

15  A.  Yes.

16  Q.  When was that?

17  A.  Back in May 26, 2010.

18  Q.  Before you got picked up, did you report to the Barrio

19  Azteca here in El Paso?

20  A.  Yes.

21  Q.  And who did you report to?

22  A.  It was Flaco.

23  Q.  All right.  Was he a leader in the organization?

24  A.  Yes.  He was in charge of one of the areas from El Paso.

25  Q.  All right.  Now, with respect to the police catching you

David A. Perez, RMR, RPR

1   because you were here illegally, were you charged and convicted

2   on a charge relating to that?

3   A.  Yes.

4   Q.  Is that the illegal re-entry charge we talked about

5   earlier?

6   A.  Yes.

7   Q.  Where have you spent your prison time up to date on that

8   charge?

9   A.  I went to Coleman, Florida.  And then they transferred me

10   to Oakdale, Louisiana.

11   Q.  Before you came out here for trial, where were you?

12   A.  Oakdale, Louisiana.

13   Q.  And when you left Oakdale, who was in charge for the BAs

14   there?

15   A.  I was.

16   Q.  Mr. Carrillo, I would like to ask you, have you ever heard

17   of a BA member by the name of Spooky?

18   A.  Yes.

19   Q.  How have you heard of this individual?

20   A.  We got some communication with another lieutenant.  And he

21   let us know about -- he's the new captain on the Barrio Azteca

22   gang.

23   Q.  Did you know anything about his background?

24   A.  Over there in Oakdale, there was a member who used to --

25   did some time with Spooky.

```
 1    Q.  All right.  What did that particular member tell you about
 2    Spooky?
 3    A.  He said he was in charge in some prison.  I don't know the
 4    name of the prison.  And, um, he got shipped out to Otisville,
 5    New York.
 6    Q.  Otisville, New York?
 7    A.  Yes.
 8    Q.  All right.  Go ahead.
 9    A.  And he did some kind of mess.  And he got to clean it up.
10    And another capo from the gang, Shotgun, Carlos Pereya, send
11    him a order to clean up his mess.
12              MR. FOSTER:  Judge, I'm going to object and ask for a
13    hearing on this matter.
14              THE COURT:  Would the attorneys approach?
15              (Bench conference.  Out of hearing of Jury.)
16              THE COURT:  What's your objection?
17              MR. FOSTER:  They're about to introduce prior
18    adjudicated conduct for which there has been a trial, pled
19    guilty.  And he's been -- and my client -- has been sentenced
20    on that case.  This conduct falls within the -- just about a
21    month within the indictment.  If they're going to use
22    adjudicated conduct within the indictment to prove up his
23    involvement in the BA, then that could constitute a lesser
24    included offense or might be a prior jeopardy claim.
25              THE COURT:  Is it a pending case?
```

1          MR. FOSTER:  It's already been adjudicated.  He's pled

2     guilty on it and been sentenced and did his time.  They're

3     about to introduce things from which there's already a judgment

4     pending.  My client has not testified.  And so, um, using a

5     prior adjudicated conduct against him at this point actually

6     constitutes a portion of the offense that -- that's charged.

7     And it could be a former jeopardy.

8          THE COURT:  All right.  What's the Government's

9     response?

10          MR. SKARET:  First of all, Your Honor, the defense has

11     had notice of this.  It's been in this 302 of this particular

12     individual, first.  Second, under RICO, this is typical and

13     customary RICO type of evidence.  What did the guy do in jail?

14     How did he participate in BA activities?  I believe the

15     witness's testimony up to the point of the objection was that

16     this particular person that he knew as Spooky, he heard from

17     his BA -- BA buddies at Oakdale was -- this particular man

18     named Spooky was locked up in Otisville.  And that I believe

19     the testimony is going to be that as part of that -- well, I

20     should back up.  The testimony was that while in Otisville, he

21     got himself in a mess, which I'm going to have him explain what

22     a mess is.

23          In order to clean up that mess an individual named

24     Shotgun told him he had to do a job.  This individual, in

25     talking with others in the conspiracy, all believed that what

 1   he did to clean up that job was stabbed a rival inmate.  We're
 2   not getting into anything about whether he was charged and
 3   convicted of that offense.  Um, only that that was the word.
 4   And the reason why that's important, that particular event gave
 5   the defendant instant credibility in the organization.  And he
 6   was subsequently shipped off to be housed with Shotgun.  And,
 7   you know, of course, the Court knows the evidence after that.
 8           So with respect to our RICO conspiracy, it's within
 9   the timing of the RICO, but it's a co-conspirator statement
10   certainly within the time of the conspiracy.
11           MR. FOSTER:  What's a co-conspirator statement -- I
12   know what a co-conspirator statement is.  What I'm saying is
13   this man is not a co-conspirator.
14           MR. SKARET:  Yes.  He is unnamed.
15           MR. FOSTER:  He's not in the indictment or the other
16   indictment.
17           MR. SKARET:  The indictment alleges the RICO
18   conspiracy was with these individuals and others named and
19   unnamed.  This individual testified he's a member of the Barrio
20   Azteca, has been a member.  He was a member of the Barrio
21   Azteca before the charged conspiracy, all during, and, in fact,
22   all the way up until today.  So he's certainly a
23   co-conspirator.  And the statement that he's referencing, um,
24   is from a Barrio Azteca member, who's at Oakdale and speaking
25   about this charged conspiracy and talking about Spooky and why

1   he's got credibility.

2          THE COURT:  Okay.  What are we trying to prove with

3   all of this?  I'm at a loss to understand what the Government

4   is attempting to prove that this incident happened at Oakdale.

5          MR. SKARET:  Well, the incident didn't happen at

6   Oakdale.  It was at Otisville.

7          THE COURT:  Sorry.

8          MR. SKARET:  We are attempting to prove that members

9   who were in jail, not even at Otisville, members all over the

10  country knew about Spooky.  The reason they knew was that he

11  proved himself just like every other witness that has taken the

12  stand.  They've proven themselves.  And the way he did is he

13  stabbed an individual at Otisville, New York while

14  incarcerated.  It was a member of a rival gang.  And the reason

15  he did it was because he was in bad standing with Shotgun.

16         THE COURT:  This is at Shotgun's direction?

17         MR. SKARET:  Yes.

18         THE COURT:  What year is it?

19         MR. SKARET:  2003, I believe.

20         MR. FOSTER:  February 21, 2003 is the allegation --

21  that's the --

22         MR. SKARET:  Of course, he gets charged for that in

23  the Southern District of New York.  That's why, ultimately, he

24  gets, basically, another sentence stacked onto his sentence

25  that he was serving time for.  We're not getting into the fact

David A. Perez, RMR, RPR

```
 1    he was charged or convicted.  And, basically, it's just the
 2    beginning of that part of the story.
 3              MR. COOLEY:  May I address this?
 4              THE COURT:  Sure.
 5              MR. COOLEY:  RICO would permit to us get into that
 6    conviction if we decided to do that.  RICO encompasses other
 7    offenses of conviction.  We're not even going that far.
 8    Simply, the information is provided by other co-conspirators.
 9    Again, that raised his status to one of the top five people in
10    the whole BA gang.  I mean, that explains why.  That's why it's
11    pertinent.
12              MR. FOSTER:  I can see their point, Judge.  I'm
13    looking at this saying this is an event which is a part of this
14    case, the fact that he has been convicted on it brings up a
15    former jeopardy claim.
16              THE COURT:  I don't know how it's part of this case.
17    The conspiracy that we're talking about here has to do -- I
18    mean, everything the Barrio Azteca does is in furtherance of
19    the BA.  The RICO conspiracy has been about the movement and
20    the collection of quotas here in El Paso area and not anything
21    to do with, you know, some stabbing in Otisville.  I mean,
22    everything that Barrio Azteca do since they formed is in
23    furtherance of the BA.  Doesn't make it part of this case.
24              MR. SKARET:  Your Honor, I believe the witness already
25    is -- for the most part in his life when he joined, he was in
```

1    jail.  And, you know, I think we've heard a lot of evidence in

2    this case that the enterprise conducts its affairs in jail.

3          He's saying that, you know, while he was in jail, he's

4    ordered to beat up members of the rival gangs.  It's no

5    different than what Spooky did back in 2003.  I believe it was

6    two weeks or so where I had a conversation with Mr. Foster

7    about our ability to introduce the certified conviction on this

8    case.  At that point he raised the same concern and said, Well,

9    I don't want the jury thinking they need to punish my guy for a

10   stabbing that he's already been convicted for.  He mentioned he

11   might put this in his side of the case.

12          MR. FOSTER:  That's true, Judge.

13          MR. SKARET:  That might very well be in.  But as far

14   as we're concerned, we don't need to introduce the evidence.

15   This is the evidence that we need to get in.  We don't need a

16   certified conviction, again, what we're trying to get to the

17   jury.  But if he's concerned about the jury wanting to punish

18   his guy a second time for something that he's already done, he

19   believes is part of the conspiracy, we would have no objection

20   to him introducing this in his part of the case.

21          THE COURT:  Again, I don't want to confuse the jury.

22   There's been plenty of testimony of illegal activities.  The

23   Court's going to overrule the objection.  I do think it's

24   admissible.  But if someone -- whether the government or you

25   attempt to introduce his prior conviction, then I'm going to

```
 1    need some good reason to introduce it.  Because it's not being
 2    introduced for any other purpose than to show standing in the
 3    BA, so -- not because he's trying to be punished for it.  So
 4    all right.  I'll -- I'll overrule.
 5              (End of bench conference.  Back in open court.)
 6              THE COURT:  The Court will overrule the objection.
 7    You may proceed.
 8    Q.  (By Mr. Skaret)  So you had just told the Members of the
 9    Jury that you heard from a BA member in Oakdale, Louisiana that
10    the defendant was in Otisville, New York, got himself into a
11    mess.  In order to get himself out of the mess, he obeyed an
12    order from Shotgun and stabbed an inmate.  Is that correct?
13    A.  Yes.
14    Q.  What does it mean to get yourself into a mess?
15    A.  It's different.  Kind of a screwed up.  Probably, he didn't
16    follow an order or didn't do something he supposed to do.
17    Q.  As, um, usual practice in the Barrio Azteca if you get
18    yourself into a mess, are you given a job?
19    A.  Yes.
20    Q.  Is it usually -- um, what types of jobs are you given?
21    A.  It's depending of the rank what he want to give you.  He
22    can give you probation, put to you work or put to you workout.
23    Or even they could give you a job where you need to stab
24    somebody.
25    Q.  Is it safe to say this is how the defendant proved himself
```

1   with Shotgun?

2   A.  Yes.

3   Q.  Is this the last you heard of an individual in the Barrio

4   Azteca named Spooky?

5   A.  After he did his job, he got some time, federal time, for

6   doing that.  He got transported to Pollock, Pollock USP where

7   he meet with Shotgun.

8   Q.  How do you know that?  How do you know he was transferred

9   to Pollock?

10  A.  Because the same member he was with me, he told me about

11  his -- his story.

12  Q.  And did you ever see a picture of this individual named

13  Spooky?

14  A.  Yes.

15  Q.  And what kind of a picture was it?

16  A.  It was a prison group picture.

17  Q.  Group prison picture?

18  A.  Yes.

19  Q.  In that particular picture what was this individual named

20  Spooky wearing?

21  A.  Muscle shirt.

22  Q.  Muscle shirt?

23  A.  Yes.

24  Q.  Can you describe from the picture what Spooky looked like?

25  A.  Short guy, white, with long sleeved tattoos.

```
 1    Q.  And is it common to see pictures of other Barrio Azteca
 2    members while you were in prison?
 3    A.  Yes.
 4    Q.  And is it common to send out pictures of Barrio Azteca
 5    members in your facility?
 6    A.  Yes.
 7    Q.  All right.  Have you ever seen this individual named Spooky
 8    in person?
 9    A.  No.
10    Q.  If you saw him again, would you recognize him?
11    A.  Yes.
12    Q.  Do you recognize him today in court?
13    A.  Yes.
14    Q.  If you would, please point to the individual that you
15    recognize from that photo and identify him by what he's wearing
16    and sitting.
17    A.  It's right there, that table.  Wearing a black suit with a
18    blue shirt.
19         MR. SKARET:  May the record reflect a positive
20    identification of the defendant?
21         THE COURT:  It will so reflect.
22    Q.  (By Mr. Skaret)  Did you receive any letters regarding this
23    particular individual named Spooky while you were at Oakdale?
24    A.  Not for him.
25    Q.  Not from him?
```

1    A.  No.

2    Q.  Did you receive letters about him?

3    A.  Yes.

4    Q.  What were those about?

5    A.  They just let us know who he was, the new captain on the

6    gang.

7    Q.  Was it your job to receive these types of letters?

8    A.  I wasn't in charge.  It was another gang member.

9    Q.  So when was this, approximately?

10    A.  Approximately, in January this year.

11    Q.  And, um, that he's when you received it at Oakdale?

12    A.  Yes.

13    Q.  What did the letter say?

14    A.  Um, it says about Spooky.  And say about Shotgun, he was

15    underground on the supermax.  And it said another gang member

16    Lugas was in charge of the federal system.  And, um, he said

17    also, like, as soon as Shotgun get out from the shoe on -- on

18    Florence, he's going to do a clean-up on the gang.

19    Q.  Does it say thinking about the guys who are on the muleta

20    list?

21    A.  Excuse me?

22    Q.  Does it say anything about the guys who are on the muleta

23    list?

24    A.  Not really.

25            MR. SKARET:  Your Honor, at this time the Government

 1    would offer Government's Exhibit 26 into evidence.  This is the

 2    organizational chart.  I believe everyone has been identified

 3    by name and by picture, by rank.  And the government would like

 4    to produce this for demonstrative purposes.

 5              THE COURT:  Any objections?

 6              MR. FOSTER:  No, Judge.  I've been counting.  They've

 7    got them all identified.

 8              THE COURT:  So Government's Exhibit 26 will be

 9    admitted.

10              MR. SKARET:  May I publish, Your Honor?

11              THE COURT:  You may.

12              MR. SKARET:  Pass the witness.

13              THE COURT:  Mr. Foster?

14                         CROSS-EXAMINATION

15    BY MR. FOSTER:

16    Q.  Mr. Carrillo, you were charged and sentenced to 37 months

17    back in 2000.  Is that correct?

18    A.  Yes.

19    Q.  In federal court.  Possession of marijuana with intent to

20    distribute?

21    A.  Yes.

22    Q.  That was out of New Mexico?

23    A.  Yes.

24    Q.  Um, and shortly thereafter you were also -- or probably

25    wrapped into the same case, you had an importation of marijuana

1    of 100 kilos where you got 36 months?

2    A.   Yes.

3    Q.   That was the case out of El Paso, correct?

4    A.   No, in Oklahoma.

5    Q.   No.  Let's see.  Oklahoma.  That was in 2006?

6    A.   Yes.

7    Q.   I'm talking 2001.  Did you not have a case in El Paso and a

8    case in New Mexico for drug smuggling?

9    A.   Yes.

10   Q.   Okay.  In 2006 you had a possession with intent to

11   distribute marijuana out of Oklahoma, correct?

12   A.   Yes.

13   Q.   And you did a cooperative agreement in that case as well,

14   didn't you?

15   A.   Yes.

16   Q.   Then here in 2010, it looks like May 25th, you were in the

17   county jail for possession of marijuana less than two ounces?

18   A.   Yes.

19   Q.   And that's where you were picked up by immigration

20   officials and consequently prosecuted for illegal re-entry.  Is

21   that correct?

22   A.   Yes.

23   Q.   You received a 66-month sentence or 60?

24   A.   60.

25   Q.   In this case you're looking for a reduction in sentence.

```
1    Is that correct?
2    A.  Yes.
3    Q.  When did you first start talking to the Government about
4    this case?
5    A.  It was August of 2010.
6    Q.  August 2010.  Even though you had been talking to the
7    government you went back to a prison where you were put in
8    charge by the Barrio Azteca?
9    A.  Yes.
10   Q.  They didn't know you had talked to the government?
11   A.  Yes.
12   Q.  They did or did not?
13   A.  Did not.
14   Q.  Okay.  In fact, when you were first started talking to the
15   government, you denied any gang affiliation, didn't you?
16   A.  No.
17   Q.  Were you arrested on this?
18   A.  They already know it's on my record.
19   Q.  You've also been a user of drugs, as well, cocaine,
20   marijuana?
21   A.  Yes.
22   Q.  You used right up until the time you were arrested.  Is
23   that correct?
24   A.  Yes.
25   Q.  In fact, that's why you were over there in jail was because
```

1    of the marijuana.

2    A.   Yes.

3    Q.   And earlier in your life you also used mushrooms and LSD?

4    A.   Yes.

5    Q.   What are mushrooms?

6    A.   It's a -- it's -- grows underwater.  But it's some kind of

7    a synthetic drug.

8    Q.   Okay.  Are you looking for something like an S visa or

9    asylum this your case?

10   A.   Yes.

11   Q.   What happens if the government and immigration officials do

12   deport you or restate your deportation order and you go back to

13   Juarez?

14   A.   I'm going to get killed.

15   Q.   You worked for La Linea at one time.

16   A.   Yes.

17   Q.   What did you do for La Linea?

18   A.   Transported drugs.

19   Q.   It's my understanding La Linea is the enforcement side of

20   the Juarez cartel?

21   A.   It's a name for the Juarez cartel.

22   Q.   So it's used interchangeably?

23   A.   Yes, it's the same thing.

24   Q.   To prove yourself you beat up how many people?

25   A.   Five.

David A. Perez, RMR, RPR

```
 1   Q.  Broken ribs?
 2   A.  Yes.
 3   Q.  Knocked out their teeth?
 4   A.  Yes.
 5   Q.  Serious injuries.
 6   A.  Yes.
 7   Q.  You said after you got out, you went back to Juarez and
 8   reported to Cosas?
 9   A.  Yes.
10   Q.  And you were -- I'm sorry.  How much cocaine you said you
11   transported each week?
12   A.  Around 50 kilograms.
13   Q.  About 50 kilos?  How much were you being paid?
14   A.  3,000 to $4500 a week.
15   Q.  Did you suspect that you were being severely underpaid for
16   that?
17   A.  Yes.
18   Q.  Why did you do it?
19   A.  Because I don't got no job and no money at the time.
20   Q.  Now, let's see.  When you were in Oakdale, Louisiana, you
21   said you were in charge.  Were you in regular population or
22   lock-down?
23   A.  Regular population.
24   Q.  Now, you said Tablas came to you and asked you for help in
25   taking over in Juarez?
```

David A. Perez, RMR, RPR

```
 1   A.  For the leader.

 2   Q.  What did you tell him?

 3   A.  I told him, like, he's not being really connected to the

 4   main guy through the leader from the cartel, he's going to send

 5   people to kill him.

 6   Q.  No.  I said what did you tell him?  Did you tell him -- you

 7   told him no?

 8   A.  Yes.

 9   Q.  Is that correct?

10   A.  Yes.

11   Q.  And is no a word you use to the leadership?

12   A.  No, not really.  I just -- I just explained to him what was

13   going to be the risk if he do that.

14   Q.  You claimed to recognize Mr. Renteria from a photograph.

15   When was the first time you saw a photograph of Mr. Renteria?

16   A.  At the beginning of this year.

17   Q.  Who showed you that photograph?

18   A.  Another member.

19   Q.  I'm sorry?

20   A.  Another member.

21   Q.  Another member?

22   A.  Yes, sir.

23   Q.  So it was done in prison?

24   A.  Yes.

25   Q.  Was it done by the FBI?
```

```
 1   A.   It was a prison photograph.
 2   Q.   You have no problem with your recollection at this point of
 3   this one person?
 4   A.   Yes.
 5   Q.   Was that a group photograph you looked at?
 6   A.   Yes.
 7   Q.   Do you remember everybody on that photograph?
 8   A.   Most of them.
 9   Q.   How many were on that photograph?
10   A.   Around eight, ten people.
11   Q.   Do you know when the photograph was taken?
12   A.   Probably Otisville, New York.
13   Q.   No.  When?
14   A.   I don't know.
15   Q.   You don't know when it is?
16   A.   No.
17   Q.   You weren't there for the photograph to be taken, right?
18   A.   Yes.
19   Q.   Have you seen that photograph again?
20   A.   I just saw him, like, a couple times.  That's it.
21   Q.   Have you seen it a couple of times since you first saw it?
22   A.   Yes.
23   Q.   From the same people, same location?
24   A.   Yes.
25   Q.   Not since you've been talking with the FBI or the
```

```
 1   government?
 2   A.  No.
 3   Q.  But you've never before met Mr. Renteria?
 4   A.  No.
 5   Q.  When you testified about things that you heard about what
 6   happened in Otisville -- I'm sorry, yeah, Otisville, those were
 7   things you heard from somebody?
 8   A.  Yes.
 9   Q.  You have no person knowledge of that?
10   A.  Not really.  But we not allowed say --
11   Q.  Sir -- I'm sorry.  Do you have any personal knowledge of
12   that?  Yes or no, please.
13   A.  They just told me about it.
14   Q.  How many people did it go through before it got to you?  Do
15   you have any clue?
16   A.  No.
17   Q.  How far are you on the BA gossip vine?
18   A.  I don't understand the question.
19   Q.  Are you one of the top people who gets information right
20   away about stuff like that -- well, back in 2003, were you one
21   of the top people who gets information about that right away or
22   kind of on the tail end of that line?
23   A.  Can you say that again?
24   Q.  Back when this was supposed to have happened in 2003, were
25   you one of the first people to receive this type of
```

```
 1    information?  Or were you at the end of the line of receiving
 2    information?
 3    A.  What information you talking about?
 4    Q.  The information you're testified to, sir.
 5    A.  I don't understand 2003 and this information.
 6            MR. SKARET:  I believe the question misstates the
 7    evidence.  The information came in around the beginning of this
 8    year was the testimony on direct.
 9            THE COURT:  All right.
10            MR. SKARET:  Not 2003.
11            THE COURT:  The jury will recall the testimony.
12            MR. FOSTER:  I will go ahead and pass the witness.
13            THE COURT:  All right.  Mr. Skaret?
14                       REDIRECT EXAMINATION
15    BY MR. SKARET:
16    Q.  Mr. Carrillo, how important is effective communication
17    within the Barrio Azteca?
18    A.  It's -- when you're in prison, it's the only way to get
19    communication between the other prisoners.
20    Q.  What happens if you receive unreliable information?
21    A.  You're up to get disciplinary action.
22    Q.  And the people who provide unreliable information, what
23    happens to them?
24    A.  Depends.  They got beat up.  They can be stabbed or they
25    can become ex-members.
```

1  Q.  And if you spread unreliable information, what happens to

2  you?

3  A.  Reliable.  It's always we talk.

4  Q.  And if you spread unreliable information, what happens to

5  you?

6  A.  They run a card on you.  And they put you up to

7  disciplinary action.

8          MR. SKARET:  That's all, Your Honor.

9          THE COURT:  All right.  Mr. Foster, anything further?

10          MR. FOSTER:  Give me just a second, Judge.

11          THE COURT:  All right.

12          MR. FOSTER:  We're not going to have any further

13  questions of this witness.

14          THE COURT:  Is this witness excused?

15          MR. SKARET:  Yes, Your Honor.

16          MR. FOSTER:  We have no objection, Judge.

17          THE COURT:  You may step down.  You're excused as a

18  witness.

19          Government may call their next witness.

20          MR. COOLEY:  Thomas Roberts.

21          THE COURT:  We are going to bring in this witness.

22  However, my understanding, it's gonna take a couple of minutes.

23  So let's go ahead and take a short break in case any of you

24  need to use the restroom or whatever.

25          Remember, you remain under the instructions the Court

```
 1    has previously given you.  And we'll see you in about five

 2    minutes.

 3              (Jury leaves courtroom.)

 4              THE COURT:  You may be seated.  We're in recess.

 5              (Court is back in session.)

 6              THE COURT:  You may be seated.  You can go get the

 7    jury.  While he's getting the jury, could the attorneys

 8    approach just real quick.

 9              (Off the record discussion at bench.)

10              (Jury enters courtroom.)

11              THE COURT:  You may be seated, Ladies and Gentlemen.

12              Government may call their next witness.  I believe

13    this witness needs to be sworn in.

14              MR. COOLEY:  I don't believe he's been sworn in yet,

15    Your Honor.

16                        THOMAS ROBERTS, SWORN

17                          DIRECT EXAMINATION

18    BY MR. COOLEY:

19    Q.  Sir, please state your name.

20    A.  Thomas Martin Roberts.

21    Q.  Mr. Roberts, you've pled guilty in this case.  Have you

22    not?

23    A.  Yes, I have.

24    Q.  And you pled guilty to three counts, four counts?

25    A.  It was actually four counts.
```

DIRECT - THOMAS ROBERTS

```
 1   Q.  What were those counts?
 2   A.  Racketeering, money laundering, um, drug sales.  And I
 3   don't remember the fourth one, sir.
 4   Q.  Importation --
 5   A.  Yes, sir.
 6   Q.  -- of drugs?
 7   A.  Yes, sir.
 8   Q.  Now, in your plea agreement it had that 20-year cap.  Is
 9   that right?
10   A.  Yes, sir.
11   Q.  Meaning if the Court, um, accepts your plea agreement, the
12   most that you can be sentenced off of that plea agreement is 20
13   careers.  Is that right?
14   A.  Yes, sir.
15   Q.  And your guideline's actually had 30 years to life.
16   A.  Yes, sir.
17   Q.  As part of your plea agreement you agreed to cooperate with
18   the Government.  Is that right?
19   A.  Yes, I did.
20   Q.  In exchange for that the Government has agreed to recommend
21   you as a candidate for the witness SEC program.  Is that right?
22   A.  Yes, sir.
23   Q.  In addition, the Government agreed that if you continued to
24   cooperate, that we would file a departure of the 20-year
25   sentence with the Court.  Is that right?
```

```
 1    A.   Yes, sir.
 2    Q.   And what judge would make a determination of your sentence
 3    ultimately?
 4    A.   Your Honor, sir.
 5    Q.   Judge Cardone?
 6    A.   Yes, sir.
 7    Q.   Now in the past you've been addicted to drugs.  Is that
 8    right?
 9    A.   Yes, sir.
10    Q.   What type of drugs?
11    A.   Cocaine, mainly.
12    Q.   I'm sorry?
13    A.   Cocaine.
14    Q.   How long have you been addicted to the cocaine?
15    A.   Many, many years.
16    Q.   Did you ever become clean?
17    A.   In 2002 when I was incarcerated.
18    Q.   2002?
19    A.   Yes, sir.
20    Q.   You became incarcerated in 2002.  Um, did you get clean
21    right away or did it take a period of time from that point?
22    A.   In 2002 is when I was incarcerated.  I was not let out.  So
23    from that point on.
24    Q.   So when were you released from that incarceration?
25    A.   2007.
```

1   Q.   So when you came out, you basically stopped using cocaine?

2   A.   Yes, sir.

3   Q.   Now, your criminal history includes theft.

4   A.   Yes, sir.

5   Q.   Drugs.

6   A.   Yes, sir.

7   Q.   Multiple burglaries.

8   A.   Yes, sir.

9   Q.   During the course of your incarceration you've been

10  disciplined.  Is that right?

11  A.   Yes, sir.

12  Q.   For what type of violations?

13  A.   Um, when I was in a prerelease unit, I had for what they

14  call the meal ticket.  I also had one fight.  And also for

15  paraphernalia of -- they were little stickers from a Cracker

16  Jack package that I brought from visitation.

17  Q.   What about holding on to prescription drugs?

18  A.   Yes, sir, also.

19  Q.   Can you explain what happened on that?

20  A.   On that incident, um, they were giving me medication for

21  pain.  And that medication was also used for psych medication.

22  And the medication was -- I was having a bad reaction to that

23  medication.  And I kept the medication inside of a bowl.  And

24  when they did a search and seizure on my home, they found the

25  medication.  And I had a disciplinary for that.

```
 1    Q.  You said search and seizure of your home.  Actually, your
 2    cell?
 3    A.  Well, yes, sir.  Yes, sir.
 4    Q.  Let's talk about the day you were arrested in this case.
 5    Can you explain the day you were arrested in this case?
 6    A.  Yes, sir.  It was 3-9 of '11, which was actually my
 7    birthday.  And what happened in this case I was getting ready
 8    to go to work that morning.  And, um, where my house is located
 9    there's a quite a few bars on the other side of the house.  And
10    I have a habit of going over there when I see cars parked there
11    because there's times when the people have been drunk or stuff
12    like waken them up and got them up.  And I went over there.
13    And that's when Samantha was in the car when I approached her.
14    Q.  Who's Samantha?
15    A.  The FBI agent.  Because I thought she needed help.  I was
16    going to see if she was okay.
17    Q.  What happened?
18    A.  Samantha came out the vehicle.  And when I seen it was her,
19    I just said whatever you need I'm here.
20    Q.  Did you see her before that day?
21    A.  Never.
22    Q.  So what happened?
23    A.  She just arrested me.  And we -- I agreed to help her with
24    whatever she needed to be done at that time.
25    Q.  Now, did you give a statement that day?
```

1   A.  Yes, I did.

2   Q.  And you give a statement regarding what?

3   A.  Regarding my activities in Chaparral and northeast.  And

4   regarding other activities that were present at that time.

5   Q.  When did you become a BA member?

6   A.  1999 in the Sanchez Unit.

7   Q.  How did it happen?

8   A.  In 1999 in the Sanchez Unit, I was a prospecto.  And there

9   was Lugas -- Anque was there.  And at that time my paperwork

10  was getting ready to go in.  And he's the one who passed me

11  through and got my -- what they call your huaraches.  He is the

12  one who became my padrino.

13  Q.  Who was?

14  A.  Lugas Anque.

15  Q.  Did he maintain -- or was he your padrino throughout the

16  course of your career with the BA?

17  A.  Yes, he was.

18  Q.  Who witnessed it?

19  A.  That was Mota.  And he was also from Odessa.  And Danny

20  Boy.  He was also from Odessa.

21  Q.  And where were they from?

22  A.  Odessa.  Midland.

23  Q.  That's part of Texas?

24  A.  Yes, in the west part.

25  Q.  You're familiar -- once you became a BA member you became

```
 1    familiar with sacred rules.

 2    A.  Yes, sir.

 3    Q.  What are some of the more important sacred rules that come

 4    to mind?

 5    A.  One that mostly comes to mind is exactly what we're doing

 6    is participating with law enforcement.  If you participated

 7    with any type of law enforcement, automatically you became an

 8    ex.  And a green light would be put on you.

 9    Q.  After you became BA member you were released approximately

10    18 months and sometime in December of 2001.  Is that correct?

11    A.  Yes, sir.

12    Q.  Then you were arrested again in February of 2002?

13    A.  Yes, sir.

14    Q.  And you met other BA members during that period of

15    incarceration?

16    A.  Yes, I did.

17    Q.  Where were you incarcerated during that period of time?

18    A.  Um, first I was incarcerated at the Sanchez Unit.  From the

19    Sanchez, I was incarcerated at a prerelease unit.  And then

20    that's when I was sent to Telford.

21    Q.  I'm going to show what I believe is in evidence.  But if it

22    isn't, I will show it to the witness that the point, 16D-1.

23              THE COURT:  D or B?

24              MR. COOLEY:  D as in David.

25              THE COURT:  I show it's in.
```

DIRECT - THOMAS ROBERTS

```
 1          MR. COOLEY:  Can we show it just to the witness at
 2   this point?
 3          THE COURT:  Sure.
 4   Q.  (By Mr. Cooley)  Do you recognize the individual in this
 5   photo?
 6   A.  That is me.
 7   Q.  Who's that?
 8   A.  It is me.
 9          MR. COOLEY:  Again, Your Honor, for the record we
10   offer if it hasn't been 16D-1.
11          THE COURT:  It was admitted when Marquez was on the
12   witness stand.
13          MR. COOLEY:  I would ask that it be published, Your
14   Honor.
15          THE COURT:  It may be published.
16   Q.  (By Mr. Cooley)  You have a series of tattoos on your body.
17   Is that right?
18   A.  Yes, I do.
19          MR. COOLEY:  At this time I would ask to show the
20   witness 16D-3.  It's not evidence at this point.
21          THE COURT:  All right.
22   Q.  (By Mr. Cooley)  Do you recognize 16D-3?
23   A.  Yes, sir, that is my back.
24   Q.  And it has a series of tattoos.  Is that correct?
25   A.  Yes, sir.
```

```
 1             MR. COOLEY:  We offer evidence 16D-3.
 2             THE COURT:  Any objections?
 3             MR. FOSTER:  No objections.
 4    Q.  (By Mr. Cooley)  We're not going to go through all these
 5    tattoos.  But if you can describe as far as the BA's concerned,
 6    Barrio Azteca.  Which of those tattoos closely represents your
 7    participation and membership of the BAs?
 8    A.  It would have to the calendario and also -- plus, the
 9    feather serpent, sir.  Feathers.  Exactly.
10    Q.  Basically that area?
11    A.  Yes, sir.
12             MR. COOLEY:  We didn't publish that.
13             THE COURT:  Oh, I thought --
14             MR. COOLEY:  My apologies.
15    Q.  (By Mr. Cooley)  There's a circle right now.  That's the
16    area you're talking about?
17    A.  Yes, sir.
18    Q.  Would you please focus in on that circled area.  So you're
19    talking about the calendar and the serpent?
20    A.  Yes, sir.
21    Q.  Feather serpent?
22    A.  Yes, sir.
23    Q.  Now, you were -- when you -- towards the end of your time
24    before your arrested, you were holding a position of authority
25    within the BA.  Is that correct?
```

1   A.  Yes, sir.

2   Q.  What area?

3   A.  I had Northeast and Chaparral.

4   Q.  And at some point do they distinguish between one or the

5   other -- in other words, sometimes it's just Northeast and

6   encompasses Chaparral, other times, um, it's split up.  Is that

7   correct?

8   A.  Yes, sir.

9   Q.  When did you -- you've had that position on two separate

10  occasions.  Is that correct?

11  A.  Yes, I had.

12  Q.  The first time you had it for how long?

13  A.  Oh, approximately, five to six months.

14  Q.  And who appointed that position to you?

15  A.  It was Nano.

16  Q.  Did he take it away?

17  A.  Yes, he did.

18  Q.  Why?

19  A.  I wasn't doing -- I wasn't bringing no quotas in.  I wasn't

20  doing the job that was supposed to be done.

21  Q.  Who replaced you?

22  A.  Bird.

23  Q.  How long did Bird have that position?

24  A.  I really do not know.  I know he did it until he got

25  arrested.

```
 1   Q.  After he got arrested, who took over?
 2   A.  I took it back.
 3   Q.  And you kept that position for how long?
 4   A.  Until I was arrested.
 5   Q.  Before you were arrested.  To the day you were arrested or
 6   shortly before?
 7   A.  Shortly before I was arrested.
 8   Q.  Now you mentioned quota.  When you were collecting quota,
 9   um, you weren't collecting quota during your first period of --
10   A.  No, sir.
11   Q.  When you had the leadership in northeast?
12   A.  No, sir.  That was one of the problems.
13   Q.  What about the second time?
14   A.  Yes, I was.
15   Q.  Do you know, um, a person by the name of Spook?
16   A.  Yes, I do.
17   Q.  How do you know a person by the name of Spook?
18   A.  I met him when we had a junta.  That was the first time I
19   met him.  That's when we were called to a gathering together to
20   meet Spooky.
21   Q.  You mentioned a word.  What word did you mention?
22   A.  Junta.
23   Q.  What is that?
24   A.  It's like a gathering where we -- the ones who are in
25   charge of the areas are the ones that are called in who have
```

1   some type of say so in an area.  We get together and we have a
2   meeting.
3   Q.  Where did that take place?
4   A.  In some hotel.  I wasn't sure right there.  I'm pretty sure
5   about Yarbrough.  In that area.
6   Q.  When did this take place, approximately?
7   A.  Whoa.  Golly.  The exact date, I'm not sure of when it was.
8   Q.  Do you know an individual by the name of Payaso?
9   A.  Yes, I do.
10  Q.  How do you know?
11  A.  I met Payaso when I was in the Telford Unit.  And, um, he
12  was released before I was released.  And that's where me and
13  him became friends.
14  Q.  During the period of time when you were collecting quota
15  during your last period of leadership in the northeast?
16  A.  Yes, sir.
17  Q.  What were you doing with the quota once you collected it?
18  A.  First of all, when I was receiving quota from the two
19  different areas, I would take the quota to -- that's when
20  Payaso had the bank.  So I was taking it to him first.
21  Q.  13B is up.  Published.
22          Do you see a group of individuals that are depicted in
23  Government's Exhibit 13B?
24  A.  Yes, I do.
25  Q.  Do you recognize any of the individuals in that photo?

1    A.   Paya and Cano.

2    Q.   If you can, which one is Cano?

3    A.   Cano is the heavyset one over here to your -- my right.

4    Q.   The second one to the right?

5    A.   Yes, sir.  Yes, sir.

6    Q.   Payaso.  Which -- describe what he's wearing.

7    A.   He's wearing the Redskins jersey with the 21.  Right

8    next -- that's him.  Yes, sir.

9    Q.   That individual?

10   A.   Yes, sir.

11   Q.   That's the individual that you would dropoff quota?

12   A.   Yes, sir.

13   Q.   At some point did you stop?

14   A.   Yes, I did when he was arrested.

15   Q.   After he was arrested, who was collecting quota?

16   A.   After he was arrested, it went to the Lopez brothers, to

17   Omar.

18   Q.   And does he go by a nickname?

19   A.   Yes, he does.

20   Q.   What is it?

21   A.   Peewee.

22   Q.   How long was he collecting quota?

23   A.   Oh, I would say, probably -- I'm not really sure.  But I

24   would have to give it like for four or five months.

25   Q.   Months?

```
1    A.  Yes, sir.

2    Q.  Now -- during the period of time with, um, you mentioned

3    this meeting -- did this meeting occur before or after Payaso

4    was arrested?

5    A.  It was after.

6    Q.  How long after that?

7    A.  Boy, I'm not really sure on that time.  I'm not really

8    sure.

9    Q.  Are we talking a month, two months?

10   A.  No.  We're talking a lot longer than that.  Maybe three or

11   four months.

12   Q.  You said you were arrested when?

13   A.  3-9-11.

14   Q.  Okay.  And if Payaso was arrested in November, are you

15   still certain it was three or four months after that?

16   A.  In November?

17   Q.  November 2010.

18   A.  Yes, sir.

19   Q.  Now, you said that Peewee --

20        MR. COOLEY:  One moment, Your Honor.

21   Q.  Now in terms of, um -- let's talk about this meeting.  Um,

22   how many people were at this meeting when you first met Spook?

23   A.  I'd say probably around 11 or 12 people.

24   Q.  And you said occurred in a hotel you believe on the east

25   side of El Paso?
```

```
 1   A.  Yes, it was the east side.
 2   Q.  What was the purpose of this meeting?
 3   A.  Basically to let us know we had Spook here and that we had
 4   a capo and he was taking care of everything in the calles.  And
 5   everything was his.
 6   Q.  Who called the meeting?
 7   A.  I was told to come to the meeting by Manny.
 8   Q.  Who is Manny?
 9   A.  Lopez.  He was a sergeant.
10   Q.  Up until then you understand that Manny was running El
11   Paso?
12   A.  Yes, sir.  Yes, sir.
13   Q.  So he calls this meeting.  You said there was ten or more
14   people there.  Is that right?
15   A.  Yes, sir.
16   Q.  What takes place during that meeting?
17   A.  It was just discussing the things.  And how things were
18   ran.  And what things were going on.  And how things were going
19   to change.  And, um, then also introducing us to Spooky.
20   Q.  Who was doing most of the talking?
21   A.  Spooky was.
22   Q.  You keep referring to Spooky.  Do you see him in the
23   courtroom today?
24   A.  Yes, I do.
25   Q.  Describe what he's wearing.  Where he is sitting?
```

1    A.  Wearing a blue suit with a blue shirt.  And he's sitting

2    over there on that able.

3            MR. COOLEY:  May the record reflect the identification

4    of the defendant, Your Honor.

5            THE COURT:  It will so reflect.

6    Q.  (By Mr. Cooley)  Um, that's the first time you met him?

7    A.  Yes, sir.

8    Q.  Um, so, in general, you talked about what was being

9    discussed.  Was there any particular focus on you during that

10   meeting?

11   A.  Really, the only thing I was focused on me was

12   straightening up my area also.  And being able to, um, meet the

13   quota needs and the things that needed to be done.  The

14   meetings were held in Spanish.  And I don't speak Spanish.  So

15   a lot of times, um, the guys would have to dictate to me what

16   was being said.

17   Q.  Now, in comparison to the other sections of El Paso, you

18   had northeast.  Is that right?

19   A.  Yes, I did.

20   Q.  How would you compare what you were collecting on a weekly

21   basis to others?

22   A.  Not too good.

23   Q.  That was some of the things that Spook was talking to you

24   about?

25   A.  Those are some of the things, yes, sir, that were brought

```
 1  up.
 2  Q.  Now, again, you mentioned that Payaso was -- when Payaso
 3  was arrested, Peewee took over.  Does somebody replace Peewee?
 4  A.  After -- no, not that I know of.  When I was dropping off
 5  to Peewee, the next one I started dropping off to was Spook.
 6  Q.  So somebody did take over?
 7  A.  It would be Spooky, yes, sir.
 8  Q.  You dropoff quota to him personally?
 9  A.  Yes, I did.
10  Q.  Approximately, how many times?
11  A.  A good four or five times.
12  Q.  Do you recall some of the locations in which you would drop
13  money off?
14  A.  Yes, Gateway East.  There at the Kentucky Fried Chicken.
15  Also, right there across from the University Medical.  Then we
16  also did a drop right there on -- right there by Cielo Vista
17  Mall at the Valero.
18  Q.  When you're dropping off, are you dropping off personally,
19  alone or with somebody?
20  A.  No, I would be by myself.
21  Q.  What was the approximate amounts of money that you're
22  dropping off on those occasions?
23  A.  Basically, I would be dropping 450.  Because I was getting
24  approximately 250 from Chaparral and 200 from the norte.
25  Q.  Now, towards the end, um, we don't need to get into quota.
```

1    A.  Okay.

2    Q.  But prior to you being introduced to Spook, were the

3    brothers, the BA members, did they have to pay quota on drugs

4    they sold?

5    A.  No.  There was a rule that was brought in that I know that

6    I've heard about it before.  But it was ten percent of whatever

7    the brothers had on their sales that they put in what was

8    supposed to be used as a bank to be used for family.

9    Q.  When was the last time that occurred before that you first

10   met Spook?

11   A.  It wasn't never occurred.  When we had -- Spooky took over,

12   he set that up also from my understanding.  And that was to set

13   up a bank for -- specifically for the carnales out there who

14   needed money for bills or whatever might need have been done.

15   Q.  So your understanding he was going to charge BA members ten

16   percent for ten percent of their drug sales?

17   A.  Yes.  Yes, sir.  Their personal.

18        MR. COOLEY:  Now, can you bring up Exhibit 14B?  I'd

19   ask this published.

20        THE COURT:  You may.

21   Q.  (By Mr. Cooley)  Do you recognize what's on the screen?

22   A.  Yes, sir.

23   Q.  What is that?

24   A.  This was that Blood River.  That was that sort of like that

25   CD made about the Barrio Aztecas.  I think I seen this on You

```
 1    Tube.
 2    Q.  Do you know whether or not other brothers have seen it as
 3    well?
 4    A.  I'm pretty sure they have.
 5    Q.  Okay.  Was this something discussed when you first saw it?
 6    A.  Yes, I think so.  I know that we had talked about this.
 7    Q.  Let's talk about a few days before you were arrested.  Did
 8    you meet the defendant a couple days before you were arrested?
 9    A.  Yes, sir, I did.
10    Q.  Who were you with?
11    A.  I was with Fragoso.
12         MR. COOLEY:  Can you bring up 16E-1, please?  I would
13    ask that this be published.
14         THE COURT:  You may.
15    Q.  (By Mr. Cooley)  Do you recognize this individual depicted
16    in 16E-1?
17    A.  Yes, sir.
18    Q.  Who is that?
19    A.  Fragoso.
20    Q.  So a couple days before you were arrested you and Fragoso,
21    meet the defendant.  Is that correct?
22    A.  Yes, we do.
23    Q.  Where did that meeting take place?
24    A.  It took place at Memorial Park.
25    Q.  What was the point of that meeting?
```

```
 1  A.  It was -- I was going to give everything to Fragoso.  I
 2  wanted out.
 3  Q.  What do you mean give everything to him?
 4  A.  Fragoso -- he had the norte with me.  But at this time I
 5  was turning everything over to Fragoso.
 6  Q.  When you say he had the northeast with you, what does that
 7  mean?
 8  A.  We were working northeast jointly.
 9  Q.  So the northeast encompassed Chaparral as well?
10  A.  Exactly.
11  Q.  So you're working it together and you wanted to walk away?
12  A.  Yes, I did.
13  Q.  Why did you want to walk away?
14  A.  I was done.
15  Q.  Now, being a BA member, you know you just can't walk away.
16  A.  That's right.
17  Q.  What story did you give them to help you walk away?
18  A.  I told them that my cancer had reoccurred.
19  Q.  Did you have cancer?
20  A.  I had it before.  But I don't have it.  It was a lie.
21  Q.  Now before you did that, um, did you talk to Rigo about
22  this?
23  A.  Yes, I did.
24  Q.  What did he agree to do?
25  A.  He agreed to take the norte.
```

1   Q.  As a result of that, um, you approached the defendant.  Is
2   that right?
3   A.  Yes, we did.
4   Q.  And you told him you had cancer.
5   A.  Yes, I did.
6   Q.  And you wanted out.
7   A.  Yes, sir.
8   Q.  What decision did he make?
9   A.  He said it was fine.
10  Q.  Now, during that conversation was there a name brought up,
11  the name of Sinner?
12  A.  Excuse me?
13  Q.  Was the name Sinner brought up during that meeting?
14  A.  Yes, it was.  Yes, it was.
15  Q.  In what context did he bring up the name Sinner?
16  A.  Through the conversation that we were having Sinner's name
17  came up and another ex-member came up.  I don't know who this
18  ex-member is.  But, um, the deal is that, um, Spook -- he
19  wanted Sinner out of the way, basically.
20  Q.  What does that mean?
21  A.  That means you take him out of the way.  Get him out of
22  there.
23  Q.  What does that mean?
24  A.  Put him to sleep.
25  Q.  Put him to sleep.  Can you be more specific?

```
 1   A.  Oh, kill him.
 2   Q.  Now, as a result of that, um, was somebody contacted to do
 3   that?
 4   A.  Yes, sir.  When we left -- when we left Spooky from
 5   Memorial, um, me and Fragoso -- Fragoso dropped me off.  And I
 6   picked up my vehicle.  And we met Whispers over there on -- by
 7   54 -- by 54 and Howdy's.  And at this time, Fragoso, since he
 8   had -- he had the area, talked to Whispers about the hit that
 9   needed to be done.
10   Q.  Who's Whispers?
11   A.  Was another carnal from -- he was from northeast and also
12   from Chaparral.
13   Q.  Another BA member?
14   A.  Yes, he was.
15   Q.  Did he agree to take on that assignment?
16   A.  He's been waiting to take that.  Oh, yes.  Most definitely.
17   Q.  He agreed to take on the mission of killing Sinner?
18   A.  Yes, sir.
19   Q.  Why was Sinner so important as a target for the BA?
20   A.  Um, from my understanding, this is all I really know about
21   this issue, is I know he was moving a lot of drugs also.  And,
22   um, that he was, you know, that he was in areas and he wasn't
23   supposed to be moving.  And there's other things that I
24   probably don't know that was going on also.
25           MR. COOLEY:  One moment, Your Honor.
```

```
 1    Q.  Mr. Roberts, let's go back a little bit about the

 2    collection of the quota and you who dropping it off to.

 3    A.  Okay.

 4    Q.  You indicated that, um, Payaso -- up until Payaso was

 5    arrested for an extended period of time you were dropping off

 6    to him.

 7    A.  Yes, sir.

 8    Q.  After him, you were dropping off to Peewee.

 9    A.  Yes, sir.

10    Q.  And after Peewee you dropped off to the defendant.

11    A.  Yes, sir.

12    Q.  Is that right?

13    A.  Yes, sir.

14    Q.  And you estimated if Payaso was arrested in mid-November of

15    2010, you were arrested in March of 2011, you still believe

16    that you were dropping off to Peewee for four months.  Or would

17    it much less time?

18    A.  It had to have been more time.

19    Q.  More time or less?

20    A.  More time.  It's because I'm not really sure on the dates

21    on the time.

22    Q.  From the time of November, mid-November to March of 2011,

23    is basically four months, maybe five.

24    A.  Right.

25    Q.  Is that correct?
```

1    A.  Right.  Right.

2    Q.  Tops.  How long of a period of time were you dropping off

3    quota to the defendant?  You say you dropped off five times.

4    Over what period?

5    A.  Like, about five times.  But after that, Whispers was going

6    to drop it off to the defendant.

7    Q.  Five times.  And when you're typically dropping off, you're

8    dropping off on a weekly basis?

9    A.  Yes, sir.  Yes, sir.

10   Q.  So five times.  That's a five-week period.  Is that right?

11   A.  Yes, sir.  Yes, sir.

12   Q.  And the last time you dropped off to the defendant before

13   you were arrested was how long?

14   A.  I would have to say probably in February.

15   Q.  So approximately a month prior to that?

16   A.  Yes, sir.

17           MR. COOLEY:  No further questions, Your Honor.

18           THE COURT:  All right.  Mr. Foster.

19                    CROSS-EXAMINATION

20           MR. FOSTER:  Just a couple questions, Judge.

21   BY MR. FOSTER:

22   Q.  This meeting you went to on this hotel where 11 or 12

23   people were there, was Fernando Carrillo Candia at that

24   meeting?

25   A.  Who is this?

1   Q.  Fernando Carrillo.  Do you remember a Fernando Carrillo?

2   A.  No, sir.

3   Q.  The people that were at that meeting that were like

4   leadership people, were they not?

5   A.  Yes, they were.  I know that the ones that I knew.  You

6   know, I don't know all of them.  Like I knew Espino and Manny.

7   Q.  It wasn't for someone who'd just been initiated into the

8   BA, right?

9   A.  No, not that I think of.

10  Q.  Now, you said you met Mr. Renteria at a KFC on Gateway

11  East.

12  A.  Yes, sir.

13  Q.  Whereabouts on Gateway East?

14  A.  You know, I really don't know the street.  I know when you

15  come off -- when you come off the interstate, there's a

16  Kentucky Fried Chicken if you're going west.  There's a

17  Kentucky Fried Chicken.  There's a 7-Eleven right there across

18  the street, too.

19  Q.  So that would be on Gateway West?

20  A.  Right.

21  Q.  Not Gateway East.

22  A.  That's what I thought I said was west.

23  Q.  At Cielo Vista Mall?

24  A.  Yes, sir.

25  Q.  Where is Cielo Vista Mall?

1    A.  It's right there by Hawkins, Viscount off I-10.

2    Q.  East side.

3    A.  Yes, sir.

4           MR. FOSTER:  I will pass the witness, Judge.

5           THE COURT:  Anything further?

6           MR. COOLEY:  Nothing further, Your Honor.  Thank you.

7           THE COURT:  May he step down?  And is he released as a

8    witness?

9           MR. COOLEY:  Yes, from the Government, Your Honor.

10          THE COURT:  Mr. Foster?

11          MR. FOSTER:  Yes, Judge.

12          THE COURT:  Thank you.  You may step down.

13          THE WITNESS:  Thank you.

14          THE COURT:  Ladies and Gentlemen of the Jury, it is

15   5:10.  We're gonna go ahead and break for the day.  Remember,

16   you remain under all the instructions the Court has previously

17   given you.  I do want to give you some specific instructions.

18   And that is, we are off on Monday because of the holiday.  So

19   it is important that you remember all of the things this Court

20   told previously told you about not discussing the case with

21   anybody, not doing any independent research, not reading any

22   articles or anything about the case.

23          We're getting close to getting this resolved.  And, as

24   you can imagine, if I had to try this all over again, it would

25   take a lot of time.  So, please, follow all the instructions.

1    And we will see you Tuesday morning at 8:30.  All right?  Thank

2    you.  Have a great weekend.

3              (Jury leaves courtroom.)

4              THE COURT:  You may be seated.  Anything we need to

5    take up before we recess?

6              MR. SKARET:  Nothing, Your Honor.

7              MR. FOSTER:  Nothing, Judge.  I think we're gonna get

8    together on Saturday and see if we can work out some other

9    problems.

10             THE COURT:  Okay.  This doesn't need to be on the

11   record.

12             (Recess for the evening.)

13

14

15

16

17

18

19

20

21

22

23

24

25

CROSS - THOMAS ROBERTS

**INDEX**

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES FOR THE GOVERNMENT: | | | | |
| FABIAN GALINDO | 3 | 21 | | |
| ALBERT MENDOZA | | 37 | 50 | |
| FABIAN GALINDO | 52 | 62 | 69 | |
| GREG WATERSON | 70 | 96 | 97 | |
| ANGEL RENTERIA | 99 | 145 | 155 | |
| FERNANDO CANDIA | 158 | 201 | 209 | |
| THOMAS ROBERTS | 211 | 234 | | |

<u>EXHIBITS</u>:                                                          <u>Admitted</u>

Government

| 10O | Photograph | 85 |
|---|---|---|
| 16B-1 | Photograph | 75 |
| 16G-1 | Photograph | 93 |
| 16H-1 | Photograph | 94 |
| 16D-3 | Photograph | 219 |
| 26 | Chart | 201 |
| 33A-1 | Transcript | 77 |
| 33A-2 | Transcript | 77 |
| 33B-1 | Transcript | 78 |
| 33B-2 | Transcript | 78 |
| 34 | Form | 60 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17                              *  *  *  *  *  *

18          I certify that the foregoing is a correct transcript

19    from the record of proceedings in the above-entitled matter.  I

20    further certify that the transcript fees and format comply with

21    those prescribed by the Court and the Judicial Conference of

22    the United States.

23

24    Signature:/s/_____Date:  July 16, 2013
                   David A. Perez, RMR, RPR

25

David A. Perez, RMR, RPR